**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ALARM.COM, INC. and<br>ICN ACQUISITION, LLC, | ) <br> ) CASE NO.:  1:15-cv-00807 (RGA) <br> ) |
| Plaintiffs, | ) **JURY TRIAL DEMANDED** <br> ) |
| v. | ) ▇▇▇▇▇▇▇▇▇ <br> ) |
| SECURENET TECHNOLOGIES LLC, | )  Redacted Version <br> ) |
| Defendant. | ) <br> ) <br> ) <br> ) |

**JOINT [PROPOSED] PRETRIAL ORDER- Volume II**

DATED: January 9, 2019

Kenneth L. Dorsney (#3726)
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
kdorsney@morrisjames.com

*Attorneys for Plaintiffs*
*Alarm.com, Inc., and*
*ICN Acquisition, LLC*

Jack B. Blumenfeld (#1014)
Stephen J. Kraftschik (#5623)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
skraftschik@mnat.com

*Attorneys for Defendant*
*SecureNet Technologies LLC*

10688847/1

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on January 9, 2019, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed.

I further certify that on the same date the attached document was electronically mailed to counsel of record.

Dated: January 9, 2018

*/s/ Kenneth L. Dorsney*

Mary B. Matterer (#2696)
Kenneth L. Dorsney (#3726)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com
kdorsney@morrisjames.com

*Attorneys for Plaintiff*

# Exhibit 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ALARM.COM, INC. and
ICN ACQUISITION, LLC,

        Plaintiffs,

v.

SECURENET TECHNOLOGIES LLC,

        Defendant.

CASE NO.:  1:15-cv-00807 (RGA)

**JURY TRIAL DEMANDED**

**EXHIBIT 10**

**ALARM.COM'S MOTION *IN LIMINE* NO. 1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ALARM.COM, INC. and
ICN ACQUISITION, LLC,

      Plaintiffs,

v.

SECURENET TECHNOLOGIES LLC,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.:  1:15-cv-00807 (RGA)

**JURY TRIAL DEMANDED**

**EXHIBIT 10A**

**ALARM.COM'S MOTION *IN LIMINE* NO. 1**

**ADC'S Motion in Limine No. 1.**

ADC respectfully moves to exclude evidence, opinions, and arguments related to (1) ADC's non-infringement and invalidity defenses and positions in *Icontrol Networks, Inc. v. Alarm.com Incorporated, et al.*, E.D. Va. Case No. 1:13-cv-834-LMB/IDD, and (2) other unrelated legal proceedings in which ADC was involved. Such information is irrelevant, likely to confuse/mislead the jury, and carries a substantial risk of unfairly prejudicing ADC. *See* FED. R. EVID. 401-403. Evidence of prior and unrelated lawsuits is "generally inadmissible." *Johns Hopkins Univ. v. Alcon Labs. Inc.*, No. CV 15-525, 2018 WL 4178159, at *21 (D. Del. Aug. 30, 2018); *see also Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007) ("[c]ourts are reluctant to cloud the issues in the case at trial by admitting evidence relating to previous litigation involving one or both of the same parties"); *Sonos, Inc. v. D&M Holdings Inc.*, No. CV 14-1330-WCB, 2017 WL 5633204, at *1 (D. Del. Nov. 21, 2017) (precluding arguments, testimony, or evidence relating to a prior lawsuit in which plaintiff was a party); *ICU Med., Inc. v. RyMed Techs., Inc.*, 752 F. Supp. 2d 486, 490 (D. Del. 2010).

Any evidence, opinions, or discussion regarding unrelated legal proceedings in which ADC was involved should be excluded. Such evidence has no bearing on any disputed issue in this case, but may bias the jury against ADC by suggesting that ADC is a bad actor. For example, SecureNet intends to use documents and statements made pursuant to an FTC investigation regarding ADC's acquisition of Icontrol Networks, Inc. ("Icontrol") and documents used in an antitrust suit brought by an ADC competitor to block that same acquisition.  Such evidence and testimony would be totally irrelevant, as they relate to issue of antitrust law and not patent law, but would be highly prejudicial to ADC if the jury were to hear, for example, that the Federal Government once investigated ADC or that it had been sued for an antitrust violation.

1

The Court should also exclude any evidence or testimony relating to previous positions ADC took in a 2013 lawsuit brought by Icontrol. At the time, Icontrol owned three of the patents-in-suit in this case (the '619, '844, and '931 patents), and Icontrol alleged that ADC infringed these three patents. ADC countered by pleading standard defenses including noninfringement and invalidity.  Ex. 1 at 9.  ADC also disputed Icontrol's reasonable royalty damages theory.  Icontrol and ADC settled their dispute in 2014. In September 2015, Icontrol filed the current lawsuit against SecureNet. However, in March 2017, ADC acquired the patents-in-suit from Icontrol and substituted in for Icontrol as plaintiff at that time. Now, SecureNet seeks to use against ADC the positions it took when defending against Icontrol's 2013 allegations. Such evidence and testimony should be excluded under FRE 403.

First, evidence and testimony regarding ADC's 2013 litigation positions has no probative value. For example, the fact that ADC once contended it did not infringe the '619, '844, and '931 patents is irrelevant to whether SecureNet infringes those patents. Moreover, the positions ADC took in the 2013 litigation were based on different proposed claim constructions than apply in this case. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

The Court in this case, however, construed "connection management component" to be a means-plus-function term for which the claimed functions are

> "automatically establishing a wireless coupling with a separate security system,"
> and "forming a security network by automatically discovering the security system
> components of a security system and integrating communications and functions of
> the security system components into the security network."

2

D.I. 94 at 2-3. The Court construed the corresponding structure as "software executing on a processor using the algorithms shown in Figures 12 and 14," which includes a number of steps that must be performed (none of which were addressed by the parties in the 2013 litigation). *See id.*; '844 Patent at Figure 12; Ex. 2 at 295-304, 318-323.

████████████████████████████████████

████████████████████████████████████

████████████████████  The Court in this case, however, did not construe "gateway" to be a standalone device. D.I. 94 at 2 n.3. Finally, in this case the Court also construed "automatically," whereas the parties in the 2013 litigation required no construction. *Compare* Ex. 2 at 295-304, 318-323, 339-342, *and* Ex. 3 (ICONTROL 0000369-564) at 436-444, 461-472, 492-499, *with* D.I. 94. The different claim constructions render ADC's 2013 litigation positions irrelevant.

Second, using ADC's prior litigation defenses against it unduly prejudices ADC in its ability to enforce its rights in patents acquired from Icontrol. The mere fact that ADC was once sued for infringement involving these patents and defended itself should not be used against it now. This will bias the jury against ADC's infringement allegations and its defenses to SecureNet's invalidity claims by implanting the suggestion that ADC does not truly believe its own allegations. Moreover, introduction of such evidence or testimony may create a confusing and distracting "trial within a trial" where ADC would be forced to devote a substantial portion of its time explaining the impact of different claim constructions.

Evidence or testimony about ADC's 2013 litigation positions invites the jury to improperly decide infringement and validity on issues other than the legally correct analysis for deciding infringement and invalidity. The Court should exclude this highly prejudicial evidence.

3

# EXHIBIT 1

Case 1:13-cv-00834-LMB-IDD Document 30 Filed 08/30/13 Page 10 of 19 PageID# 275

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| ICONTROL NETWORKS, INC.,<br><br>                    Plaintiff,<br><br>      v.<br><br>ALARM.COM INCORPORATED AND<br>FRONTPOINT SECURITY SOLUTIONS, LLC,<br><br>                  Defendants. | Case No. 1:13CV834 (LMB-IDD)<br><br>**JURY TRIAL DEMANDED** |

**ANSWER AND COUNTERCLAIMS
OF DEFENDANT ALARM.COM INCORPORATED**

Defendant Alarm.com Incorporated ("Alarm.com") hereby answers the

Complaint for Patent Infringement ("Complaint") filed by Plaintiff iControl Networks, Inc.

("iControl"). Alarm.com hereby responds to the numbered paragraphs of the Complaint and in

doing so denies the allegations of the Complaint except as specifically stated:

## THE PARTIES

1.     Alarm.com lacks knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in paragraph 1.

2.     Alarm.com admits that it is a Delaware corporation with its principal place of

business at 8150 Leesburg Pike, Suite 1400, Vienna, Virginia 22182, which is located within the

Alexandria Division of the Eastern District of Virginia.

3.     Paragraph 3 of the Complaint contains no allegations as to Alarm.com and

therefore does not require a response by Alarm.com. To the extent a response is required,

Case 1:13-cv-00834-LMB-IDD   Document 30   Filed 08/30/13   Page 2 of 19 PageID# 276

Alarm.com states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 3.

## JURISDICTION AND VENUE

4.       Alarm.com admits that this is a civil action in which iControl alleges claims of patent infringement under Title 35 of the United States Code, but denies it has infringed the iControl patents asserted in the Complaint.  Alarm.com admits that this Court has jurisdiction over the subject matter of this action pursuant to at least 28 U.S.C. § 1338(a).

5.       For purposes of this action only, Alarm.com admits that venue is proper in this judicial district pursuant to at least 28 U.S.C. § 1400(b).  Alarm.com admits that it resides in this judicial district, but denies that it commits or has committed any acts of patent infringement. Alarm.com admits that it transacts business in this judicial district and has a regular, established place of business in this judicial district.  With respect to the allegations of paragraph 5 as to Defendant FrontPoint Security Solutions, LLC ("FrontPoint"), Alarm.com lacks knowledge or information sufficient to form a belief as to the truth of those allegations.  Alarm.com denies the remaining allegations of paragraph 5.

6.       Alarm.com admits that it is subject to personal jurisdiction in this judicial district. Alarm.com admits that its principal place of business is located in the Commonwealth of Virginia and within this judicial district.  Alarm.com admits that it conducts business in this Commonwealth and this judicial district, and that it derives revenue from goods sold and services provided to Virginia residents, but denies that it engages or has engaged in infringing activities.  With respect to the allegations of paragraph 6 as to FrontPoint, Alarm.com lacks knowledge or information sufficient to form a belief as to the truth of those allegations. Alarm.com denies the remaining allegations of paragraph 6.

- 2 -

Case 1:13-cv-00834-LMB-IDD    Document 30  Filed 08/30/13   Page 3 of 12 PageID # 271

## iCONTROL

7.      Alarm.com lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 7

8.      Alarm.com lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 8.

9.      Alarm.com lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 9.

10.     Alarm.com admits that in the Complaint, iControl alleges infringement by Alarm.com and FrontPoint of the six patents listed in paragraph 10 (collectively the "iControl Patents-in-Suit"), but Alarm.com denies it has infringed those patents.  Alarm.com lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 10.

## ALARM.COM AND FRONTPOINT

11.     Alarm.com admits that it provides some of its products and services to FrontPoint, and that those products and services have features relating to cellular connectivity, alarm reporting, Internet-based functionality, video and Z-Wave.  With respect to the allegations of paragraph 11 as to FrontPoint, Alarm.com lacks knowledge or information sufficient to form a belief as to the truth of those allegations.  Alarm.com denies the remaining allegations of paragraph 11.

12.     Paragraph 12 of the Complaint contains no allegations as to Alarm.com and therefore does not require a response by Alarm.com.  To the extent a response is required, Alarm.com states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12.

13.      Paragraph 13 of the Complaint contains no allegations as to Alarm.com and therefore does not require a response by Alarm.com.  To the extent a response is required, Alarm.com states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13.

14.      Paragraph 14 of the Complaint contains no allegations as to Alarm.com and therefore does not require a response by Alarm.com.  To the extent a response is required, Alarm.com states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14.

15.      Paragraph 15 of the Complaint contains no allegations as to Alarm.com and therefore does not require a response by Alarm.com.  To the extent a response is required, Alarm.com states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15.

16.      Paragraph 16 of the Complaint contains no allegations as to Alarm.com and therefore does not require a response by Alarm.com.  To the extent a response is required, Alarm.com states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 16.

17.      Alarm.com admits that, as of August 30, 2013, the website accessible at the URL http://www.frontpointsecurity.com/about-us/partners contains the text quoted in paragraph 17.

18.      Alarm.com admits that its business has included pager-based and cellular-based home-security-related services that allow for remote communication with alarm systems. Alarm.com further admits that its business has included wireless and web-enabled security-related technology for residential and commercial customers.  Alarm.com denies the remaining allegations in paragraph 18.

- 4 -

Case 1:23-cv-00834-LMB-IDD   Document 30   Filed 08/30/19   Page 39 of 19 PageID# 279

19.     Alarm.com admits that on April 1, 2009, it issued a press release in which it "announced an affordable, user-friendly video monitoring solution that enables consumers to remotely monitor their homes and small businesses via mobile device".  Alarm.com further admits the press release stated that this solution enabled consumers to "remotely adjust pan-tilt cameras".  Alarm.com denies the remaining allegations in paragraph 19.

20.     Alarm.com admits that on June 15, 2010, issued a press release in which it "announced the launch of emPower, its new automation and energy management solution for homes and businesses".  Alarm.com admits that emPower was the first solution or product it launched that utilized Z-Wave technology.  Alarm.com further admits that the press release stated that consumers could "remotely monitor and change their thermostat settings" and "lock and unlock doors, even when far away".  Alarm.com denies the remaining allegations in paragraph 20.

## COUNT I

### (INFRINGEMENT OF U.S. PATENT NO. 7,262,690)

21.     Alarm.com incorporates by reference its response to paragraphs 1 through 20 above.

22.     Alarm.com admits that the public record reflects that U.S. Patent No. 7,262,690 (the "'690 Patent") is entitled "Method and System for Monitoring Events" and has an issue date of August 28, 2007.  Alarm.com admits that a document purported to be a copy of the '690 Patent was attached as Exhibit A.  Alarm.com denies the remaining allegations of paragraph 22.

23.     Alarm.com denies each and every allegation of paragraph 23.

24.     Alarm.com denies each and every allegation of paragraph 24.

25.     Alarm.com denies each and every allegation of paragraph 25.

26.     Alarm.com denies each and every allegation of paragraph 26.

Case 1:13-cv-00834-LMB-IDD Document 30 Filed 08/30/13 Page 6 of 15 PageID #: 9714

**COUNT II**

**(INFRINGEMENT OF U.S. PATENT NO. 7,911,341)**

27.     Alarm.com incorporates by reference its response to paragraphs 1 through 20 above.

28.     Alarm.com admits that the public record reflects that U.S. Patent No. 7,911,341 ("the '341 Patent") is assigned to iControl, is entitled "Method for Defining and Implementing Alarm/Notification by Exception", and has an issue date of March 22, 2011.  Alarm.com admits that a document purported to be a copy of the '341 Patent was attached as Exhibit B.  Alarm.com states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning iControl's relationship to the '341 Patent.  Alarm.com denies the remaining allegations of paragraph 28.

29.     Alarm.com denies each and every allegation of paragraph 29.

30.     Alarm.com denies each and every allegation of paragraph 30.

31.     Alarm.com denies each and every allegation of paragraph 31.

32.     Alarm.com denies each and every allegation of paragraph 32.

**COUNT III**

**(INFRINGEMENT OF U.S. PATENT NO. 8,073,931)**

33.     Alarm.com incorporates by reference its response to paragraphs 1 through 20 above.

34.     Alarm.com admits that the public record reflects that U.S. Patent No. 8,073,931 (the "'931 Patent") is assigned to iControl, is entitled "Networked Touchscreen with Integrated Interfaces", and has an issue date of December 6, 2011.  Alarm.com admits that a document purported to be a copy of the '931 Patent was attached as Exhibit C.  Alarm.com denies the remaining allegations of paragraph 34.

- 6 -

Case 1:15-cv-00807-RGA-CJB   Document 234   Filed 01/16/19   Page 16 of 112 PageID
Case 1:13-cv-00834-LMB-IDD   Document 30   Filed 08/30/13   Page 7 of 19 PageID# 261
#: 9715

35.     Alarm.com denies each and every allegation of paragraph 35.

36.     Alarm.com denies each and every allegation of paragraph 36.

37.     Alarm.com denies each and every allegation of paragraph 37.

38.     Alarm.com denies each and every allegation of paragraph 38.

## COUNT IV

### (INFRINGEMENT OF U.S. PATENT NO. 8,335,842)

39.     Alarm.com incorporates by reference its response to paragraphs 1 through 20 above.

40.     Alarm.com admits that the public record reflects that U.S. Patent No. 8,335,842 (the "'842 Patent") is assigned to iControl, is entitled "Premises Management Networking", and has an issue date of December 18, 2012.  Alarm.com admits that a document purported to be a copy of the '842 Patent was attached as Exhibit D.  Alarm.com denies the remaining allegations of paragraph 40.

41.     Alarm.com denies each and every allegation of paragraph 41.

42.     Alarm.com denies each and every allegation of paragraph 42.

43.     Alarm.com denies each and every allegation of paragraph 43.

44.     Alarm.com denies each and every allegation of paragraph 44.

## COUNT V

### (INFRINGEMENT OF U.S. PATENT NO. 8,073,931)

45.     Alarm.com incorporates by reference its response to paragraphs 1 through 20 above.

46.     Alarm.com admits that the public record reflects that U.S. Patent No. 8,073,931 (the "'619 Patent") is assigned to iControl, is entitled "Security Network Integrated with Premise Security System", and has an issue date of June 25, 2013.  Alarm.com admits that a document

Case 1:13-cv-00834-LMB-IDD   Document 30   Filed 08/30/13   Page 8 of 19 PageID# 262

purported to be a copy of the '619 Patent was attached as Exhibit E.  Alarm.com denies the remaining allegations of paragraph 46.

47.     Alarm.com denies each and every allegation of paragraph 47.

48.     Alarm.com denies each and every allegation of paragraph 48.

49.     Alarm.com denies each and every allegation of paragraph 49.

50.     Alarm.com denies each and every allegation of paragraph 50.

## COUNT VI

### (INFRINGEMENT OF U.S. PATENT NO. 8,478,844)

51.     Alarm.com incorporates by reference its response to paragraphs 1 through 20 above.

52.     Alarm.com admits that the public record reflects that U.S. Patent No. 8,478,844 (the "'844 Patent") is assigned to iControl, is entitled "Forming a Security Network Including Integrated Security System Components and Network Devices", and has an issue date of July 2, 2013.  Alarm.com admits that a document purported to be a copy of the '844 Patent was attached as Exhibit F.  Alarm.com denies the remaining allegations of paragraph 52.

53.     Alarm.com denies each and every allegation of paragraph 53.

54.     Alarm.com denies each and every allegation of paragraph 54.

55.     Alarm.com denies each and every allegation of paragraph 55.

56.     Alarm.com denies each and every allegation of paragraph 56.

### PRAYER FOR RELIEF

Alarm.com denies that iControl is entitled to either the requested relief or any other relief.

Case 1:15-cv-00807-RGA-CJB   Document 234  Filed 01/16/19   Page 18 of 112 PageID
#: 9717
Case 1:13-cv-00834-LMB-IDD   Document 30   Filed 08/30/13   Page 9 of 19 PageID# 263

## AFFIRMATIVE DEFENSES

Alarm.com hereby asserts the following defenses with knowledge as to its own actions and on information and belief with respect to the actions of others, and without undertaking or otherwise shifting any applicable burdens of proof.  Alarm.com reserves the right to assert additional defenses, as warranted by facts learned through investigation and discovery.

### FIRST DEFENSE – NON-INFRINGEMENT

57.     Alarm.com does not infringe, has not infringed, and does not and has not induced infringement or contributed to infringement of the iControl Patents-in-Suit under any theory, including literal infringement or infringement under the doctrine of equivalents.

### SECOND DEFENSE – INVALIDITY

58.     The claims of each of the iControl Patents-in-Suit are invalid for failure to comply with one or more provisions of Title 35, United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103 and 112.

### THIRD DEFENSE – LACHES, WAIVER AND EQUITABLE ESTOPPEL

59.     iControl's claims for relief for infringement of the iControl Patents-in-Suit are barred in whole or in part under the doctrines of laches, waiver and/or equitable estoppel.

### FOURTH DEFENSE – LICENSE

60.     To the extent the alleged infringement of the iControl Patents-in-Suit is based in whole or in part on the conduct of anyone licensed or otherwise authorized to practice any of the iContol Patents-in-Suit, iControl's claims for relief are barred.

### FIFTH DEFENSE – LIMITATION ON DAMAGES

61.     The relief sought by iControl is barred in whole or in part by 35 U.S.C. §§ 286 and 287.

- 9 -

## SIXTH DEFENSE – NO INJUNCTIVE RELIEF

62.     iControl is not entitled to injunctive relief because any alleged injury to iControl is not immediate or irreparable, and iControl has an adequate remedy at law.

## COUNTERCLAIMS

Counterclaim-Plaintiff Alarm.com hereby alleges with knowledge as to its own actions and on information and belief with respect to the actions of others the following counterclaims against Counterclaim-Defendant iControl.  Alarm.com reserves the right to assert additional counterclaims as warranted by facts learned through investigation and discovery.

## THE PARTIES

63.     Alarm.com is a Delaware corporation with its principal place of business at 8150 Leesburg Pike, Suite 1400, Vienna, Virginia 22182.  iControl has alleged in its Complaint that it is a Delaware corporation with its principal place of business at 555 Twin Dolphin Drive, Suite 280, Redwood City, California 94065.  iControl purports to be the assignee and lawful owner of all right, title and interest in to the iControl Patents-in-Suit.

## JURISDICTION AND VENUE

64.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 1367(a), 2201, and 2202, and 35 U.S.C. §§ 1, *et seq.*

65.     iControl has submitted to the personal jurisdiction of this Court.

66.     Venue is proper because iControl brought this action and thereby consented to venue.

## INFRINGEMENT OF ALARM.COM'S INNOVATIVE PATENTED TECHNOLOGY

67.     Alarm.com is a pioneer and innovator in the home security industry, launching and introducing the industry's first wireless interactive security solution in 2003-2004.

Case 1:13-cv-00834-LMB-IDB   Document 30   Filed 08/30/13   Page 11 of 19 PageID# 285

Alarm.com was founded in 2000, with the goal of developing industry-changing interactive security solutions.   The company's co-founders worked for more than three years to define the solution category and develop the Alarm.com offering before bringing it to market in 2003.  Its first-to-market innovations include the use of dedicated wireless signaling that is fully integrated into the security control panel and eliminates the line-cutting vulnerability of landline-based security systems, cellular-based fully integrated two-way voice emergency response capability, alerting via text messages and email of non-alarm activity, the ability to raise an alarm condition even when an intruder destroys the physical alarm panel that generates the alarm signal, and home security apps for major smartphone platforms that allow remote control of security systems from anywhere.

68.     In 2009, Alarm.com released native mobile apps for iPhone and Blackberry devices to enable users to monitor and control their home security systems remotely.  These apps built upon Alarm.com's existing suite of services for Internet-based notifications and control of home security systems.  Alarm.com later released native mobile apps for Android and Windows Phone devices.

69.     Alarm.com has sought and received patent protection for many of its innovations, including the patents identified in paragraphs 72 through 74.

70.     On March 11, 2011, iControl announced the nationwide availability of a new monitoring solution, OpenHome, comprising software components and one or more applications for use on, *e.g.*, smartphones.  According to iControl's published statements and materials, OpenHome offers the ability to remotely "view live video and event-driven video clips and pictures", remotely arm and disarm the security system, remotely control lighting and temperature, and receive event notifications via the web and mobile phones including, *e.g.*, via

- 11 -

an iPhone app.  OpenHome also includes functionality to detect the destruction of certain alarm system components and contact authorities in response.

71.     iControl's OpenHome software platform is incorporated into at least some of the home security systems sold to consumers by several home security companies.

## ALARM.COM'S PATENTS

72.     On September 26, 2006, the United States Patent and Trademark Office issued U.S. Patent No. 7,113,090 (the "'090 Patent") entitled "System and Method for Connecting Security Systems to a Wireless Device".  A copy of the '090 Patent is attached to this answer as Exhibit A.  The '090 Patent is owned by Alarm.com and has been since its date of issue.

73.     On January 8, 2013, the United States Patent and Trademark Office issued U.S. Patent No. 8,350,694 (the "'694 Patent") entitled "Monitoring System to Monitor a Property with a Mobile Device with a Monitoring Application".  A copy of the '694 Patent is attached to this answer as Exhibit B.  The '694 Patent is owned by Alarm.com and has been since its date of issue.

74.     On July 23, 2013, the United States Patent and Trademark Office issued U.S. Patent No. 8,493,202 (the "'202 Patent") entitled "Alarm Signaling Technology".  A copy of the '202 Patent is attached to this answer as Exhibit C.  The '202 Patent is owned by Alarm.com and has been since its date of issue.

## COUNTERCLAIM ONE
## INFRINGEMENT OF U.S. PATENT NO. 7,113,090

75.     Alarm.com repeats and realleges paragraphs 63-74 above as if fully set forth herein.

76.     iControl has infringed the '090 Patent by making, using, selling and/or offering to sell within the United States products and services for remotely monitoring a property, without

- 12 -

Case 1:13-cv-00834-LMB-IDB   Document 30   Filed 08/30/13   Page 13 of 19 PageID #: 287

authorization from Alarm.com. These infringing products and services include at least OpenHome.

77. This Answer gives iControl notice of the '090 Patent and that its products and services infringe the '090 Patent, to the extent iControl was not previously on notice. To the extent that, after being on notice of the '090 Patent and iControl's infringement of that patent, iControl has continued to induce its customers and end users to make, use, sell, and offer to sell within the United States and/or to import into the United States one or more products or systems that embody the patented invention, or to perform alone or in combination with others, patented processes, iControl has induced infringement of the '090 Patent.

78. iControl has sold, offered to sell, and/or imported into the United States components that constitute a material part of the inventions claimed in the '090 Patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use. To the extent that, after being on notice of the '090 Patent and iControl's infringement of that patent, iControl has or will have sold, offered to sell, and/or imported into the United States such components, iControl has or will have contributed to the infringement of the '090 Patent.

79. To the extent that, after being on notice of the '090 Patent and iControl's infringement of that patent, iControl has or will have directly or indirectly infringed the '090 Patent, that infringement has or will have been willful.

80. As a result of iControl's infringement of the '090 Patent, Alarm.com has and will continue to suffer irreparable harm, injury and damages for which it is entitled to both monetary and injunctive relief.

- 13 -

Case 1:13-cv-00834-LMB-IDB   Document 30   Filed 08/30/13   Page 14 of 19 PageID# 288

## COUNTERCLAIM TWO

### INFRINGEMENT OF U.S. PATENT NO. 8,350,694

81.     Alarm.com repeats and realleges paragraphs 63-74 above as if fully set forth herein.

82.     iControl has infringed the '694 Patent by making, using, selling and/or offering to sell within the United States products and services for remotely monitoring a property using a mobile device, without authorization from Alarm.com.  These infringing products and services include at least OpenHome.

83.     This Answer gives iControl notice of the '694 Patent and that its products and services infringe the '694 Patent, to the extent iControl was not previously on notice.  To the extent that, after being on notice of the '694 Patent and iControl's infringement of that patent, iControl has continued to induce its customers and end users to make, use, sell, and offer to sell within the United States and/or to import into the United States one or more products or systems that embody the patented invention, or to perform alone or in combination with others, patented processes, iControl has induced infringement of the '694 Patent.

84.     iControl has sold, offered to sell, and/or imported into the United States components that constitute a material part of the inventions claimed in the '694 Patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use.  To the extent that, after being on notice of the '694 Patent and iControl's infringement of that patent, iControl has or will have sold, offered to sell, and/or imported into the United States such components, iControl has or will have contributed to the infringement of the '694 Patent.

85.     To the extent that, after being on notice of the '694 Patent and iControl's infringement of that patent, iControl has or will have directly or indirectly infringed the '694 Patent, that infringement has or will have been willful.

- 14 -

86.    As a result of iControl's infringement of the '694 Patent, Alarm.com has and will continue to suffer irreparable harm, injury and damages for which it is entitled to both monetary and injunctive relief.

## COUNTERCLAIM THREE

## INFRINGEMENT OF U.S. PATENT NO. 8,493,202

87.    Alarm.com repeats and realleges paragraphs 63-74 above as if fully set forth herein.

88.    iControl has infringed the '202 Patent by making, using, selling and/or offering to sell within the United States products and services for alarm signaling during alarm system destruction, without authorization from Alarm.com.  These infringing products and services include at least OpenHome.

89.    This Answer gives iControl notice of the '202 Patent and that its products and services infringe the '202 Patent, to the extent iControl was not previously on notice.  To the extent that, after being on notice of the '202 Patent and iControl's infringement of that patent, iControl has continued to induce its customers and end users to make, use, sell, and offer to sell within the United States and/or to import into the United States one or more products or systems that embody the patented invention, or to perform alone or in combination with others, patented processes, iControl has induced infringement of the '202 Patent.

90.    iControl has sold, offered to sell, and/or imported into the United States components that constitute a material part of the inventions claimed in the '202 Patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use.  To the extent that, after being on notice of the '202 Patent and iControl's infringement of that patent, iControl has or will have sold, offered to sell, and/or imported into the United States such components, iControl has or will have contributed to the infringement of the '202 Patent.

- 15 -

Case 1:15-cv-00807-RGA-CJB   Document 234   Filed 01/16/19   Page 25 of 112 PageID
Case 1:13-cv-00834-LMB-IDB   Document 30   Filed 08/30/13   Page 16 of 19 PageID #: 290
#: 9724

91.     To the extent that, after being on notice of the '202 Patent and iControl's infringement of that patent, iControl has or will have directly or indirectly infringed the '202 Patent, that infringement has or will have been willful.

92.     As a result of iControl's infringement of the '202 Patent, Alarm.com has and will continue to suffer irreparable harm, injury and damages for which it is entitled to both monetary and injunctive relief.

## COUNTERCLAIM FOUR

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT

93.     Alarm.com repeats and realleges paragraphs 63-74 above as if fully set forth herein.

94.     iControl has sued Alarm.com in the present action, alleging infringement of the iControl Patents-in-Suit.  Thus, an immediate, real and justiciable controversy exists between Alarm.com and iControl with respect to the alleged infringement of the iControl Patents-in-Suit.

95.     Alarm.com does not infringe, has not infringed, and does not and has not induced infringement or contributed to infringement of the iControl Patents-in-Suit.

96.     Alarm.com requests a declaratory judgment that Alarm.com does not infringe, directly or indirectly, any claim of the iControl Patents-in-Suit.

## COUNTERCLAIM FIVE

### DECLARATORY JUDGMENT OF INVALIDITY

97.     Alarm.com repeats and realleges paragraphs 63-74 above as if fully set forth herein.

98.     iControl has sued Alarm.com in the present action, alleging infringement of the iControl Patents-in-Suit.  An immediate, real and justiciable controversy exists between Alarm.com and iControl with respect to the invalidity of the iControl Patents-in-Suit.

- 16 -

99.     The iControl Patents-in-Suit are invalid for failure to comply with one or more provisions of Title 35, United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103 and 112.

100.     Alarm.com requests a declaratory judgment that the iControl Patents-in-Suit are invalid.

## PRAYER FOR RELIEF

WHEREFORE, Alarm.com prays for judgment:

1.     Declaring the iControl Patents-in-Suit not infringed by Alarm.com and/or invalid.

2.     A judgment declaring that iControl has infringed one or more claims of the '090, '694, and '202 Patents and finding such infringement willful.

3.     Awarding Alarm.com damages for iControl's infringement of the '090, '694, and '202 Patents, including treble damages for all willful infringement.

4.     Permanently enjoining iControl, its officers, agents, servants, employees, attorneys, successors, assigns , and anyone acting in concert therewith or on its behalf, from infringing the '090, '694, and '202 Patents.

5.     Awarding Alarm.com interest, the cost of this action and its reasonable attorneys' fees.

6.     Granting such other and further relief to Alarm.com as this Court may deem just and equitable.

## JURY DEMAND

Alarm.com demands a trial by jury on all issues triable of right by a jury.

- 17 -

ALARM.COM INCORPORATED


By                 /s/              
                    Of Counsel

Dabney J. Carr, IV, VSB #28679
Robert A. Angle, VSB #37691
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com


Roger G. Brooks (admitted pro hac vice)
Teena-Ann V. Sankoorikal (admitted pro hac vice)
Andrei Harasymiak (admitted pro hac vice)
**CRAVATH, SWAINE & MOORE LLP**
Worldwide Plaza
825 8th Avenue
New York, New York 10019-7475
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
rgbrooks@cravath.com
tsankoorikal@cravath.com
aharasymiak@cravath.com

*Counsel for Defendant Alarm.com Incorporated.*

- 18 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of August, 2013, a true copy of the foregoing will be

filed electronically with the Clerk of Court using the CM/ECF system, which will send a

notification of such filing (NEF) to the following:

Stephen E. Noona
senoona@kaufcan.com
Mark E. Warmbier
mewarmbier@kaufcan.com
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510

James C. Yoon
Ryan R. Smith
Alyssa N. Knutson
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
jyoon@wsgr.com
rsmith@wsgr.com
aknutson@wsgr.com

*Counsel for Plaintiff*

Michael A. Oakes, VSB #42745
Alysa N. Youngson, VSB #82838
**HUNTON & WILLIAMS LLP**
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
moakes@hunton.com
ayoungson@hunton.com

*Counsel for Defendant FrontPoint Security
Solutions, LLC*

/s/
Dabney J. Carr, IV, VSB #28679
Robert A. Angle, VSB #37691
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
*Counsel for Defendant Alarm.com Incorporated*

# EXHIBIT 2

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT 3

# EXHIBIT REDACTED IN ITS ENTIRETY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ALARM.COM, INC. and
ICN ACQUISITION, LLC,

        Plaintiffs,

v.

SECURENET TECHNOLOGIES LLC,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.:  1:15-cv-00807 (RGA)

**JURY TRIAL DEMANDED**

███████████████

**EXHIBIT 10B**

**SECURENET'S OPPOSITION TO ALARM.COM'S MOTION *IN LIMINE* NO. 1**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ALARM.COM, INC. and
ICN ACQUISITION, LLC,

    Plaintiffs,

    v.

SECURENET TECHNOLOGIES LLC,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.:  1:15-cv-00807 (RGA)

**JURY TRIAL DEMANDED**

███████████████████

**SECURENET TECHNOLOGIES LLC's OPPOSITION TO
PLAINTIFFS' MOTION *IN LIMINE* NO. 1:**

1

This Court should deny Plaintiffs' Motion in *Limine* No. 1 because the evidence related to ADC's prior antitrust proceedings is highly relevant to damages and the evidence related to the *iControl v. ADC* litigation is highly relevant to damages, willfulness and witness credibility.

**Evidence from the antitrust proceedings is highly relevant to the damages analysis.** ADC's arguments based on relevance are flawed. They ignore that there are factual issues relevant to both antitrust and the lost profits analysis, namely market definition, market share and competition and that the market for the same products is addressed in both proceedings.

Moreover, it is highly relevant to the lost profits analysis that ADC previously framed the relevant market and competition contrary to the definition currently proffered by Plaintiffs' damages expert, Mr. Reed. In his analysis of lost profits, ████████████████████████ ████████████████████████████████████████ *See* Ex. 1, Reed Rpt. at 36-37, 77-78, M1, M3. In the Honeywell litigation, however, ██████████ ████████████████████████████████████████ ████████████████████████ Ex. 2, DTX-76 at 3. ██████████████ ████████████████████████████████████████ ████████████████ *See* Ex. 3, DTX-243 at 4, 15, and 21-34; Ex. 4, DTX-75 at 34; *see also* Ex. 5, Kidder Rpt. at 32-33. Accordingly, ADC's statements in the antitrust proceedings are party admissions that directly rebut Mr. Reed's market definition. SecureNet can rely on these statements without explaining that they occurred in the context of prior antitrust proceedings.

In addition to rebutting Mr. Reed's proposed market definition, ADC's statements related to the Honeywell litigation are relevant to the determination of the value of a reasonable royalty for the Asserted Patents. ████████████████████████ ████████████████████████████████████████

1

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ *See*

Ex. 5, Kidder Rpt. at 106-107; Ex. 6, DTX-238 at -613.  Plaintiffs should not be permitted to

conceal evidence of ████████████████████████████████████████████████████████

█████████████ from the jury merely because it refers to a prior legal proceeding.  At the very

least, SecureNet should be permitted to discuss evidence from or related to the antitrust

proceedings without discussing the details of the antitrust proceedings.

   ***Evidence related to the positions ADC took in its prior litigation against iControl is***

***highly relevant and not unfairly prejudicial.***  The unusual posture of this case makes ADC's prior

litigation positions uniquely relevant and mitigates any concerns of unfair prejudice.  The prior

owner, iControl, sued ADC for infringement of three of the four patents-in-suit.  ADC asserted

non-infringement and invalidity.  Unlike other cases cited by Plaintiffs, in this case ADC has taken

positions directly contrary to its prior litigation positions.  Any prejudice would not be unfair

because Plaintiffs knew ADC had asserted that these patents were invalid and not infringed when

it acquired them and assumed the role of Plaintiff in this case.  Moreover, the relevance of ADC's

prior litigation admissions outweighs any risk of prejudice.  Specifically, ADC's prior litigation

positions are relevant to the credibility of ADC's witnesses and to rebut damages and willfulness.

   ***First***, ADC in this case has taken positions on the value of the asserted patents ███████

████████████████████████████████████.  *See, e.g.*, Ex. 1, Reed Rpt. at 7-8 (citing

Trundle deposition).  ADC's prior litigation positions cast doubt on the credibility and the accuracy

of any such testimony.  SecureNet would be prejudiced if it were not able to cross examine

Mr. Trundle, or other ADC witnesses, regarding ADC's prior contrary positions.

2

*Second*, to determine willfulness the jury may consider "whether or not" SecureNet "acted consistently with standards of behavior for its industry" and "whether or not" SecureNet "reasonably believed it did not infringe or that the patent[s] [were] invalid." Ex. 7, 2016 Federal Circuit Bar Association Model Patent Jury Instructions. The fact that ADC was previously sued for infringement of these patents and ADC's prior position that patents were invalid and not infringed are relevant to both of these factors.[1, 2]

*Finally*, Dr. Clark and Dr. Rhyne both submitted expert opinions on behalf of iControl in the prior *iControl v. ADC* litigation. To the extent Dr. Clark or Dr. Rhyne present opinions to the jury in this case that are inconsistent with the opinions they submitted in the prior *iControl v. ADC* litigation, SecureNet should be permitted to use their opinions from the prior litigation for impeachment purposes. *See Johns Hopkins Univ. v. Alcon Labs. Inc.*, No. CV 15-525, 2018 WL 4178159, at *21 (D. Del. Aug. 30, 2018); *Sonos, Inc. v. D&M Holdings Inc.*, No. CV 14-1330-WCB, 2017 WL 5633204, at *1 (D. Del. Nov. 21, 2017).

---

[1] Given ADC's position regarding the similarity of the ADC and SecureNet products, it would have been reasonable for SecureNet to believe that it did not infringe for the same reasons ADC previously contended it did not infringe. ADC's motion suggests that "the fact that ADC once contended it did not infringe the '619, '844, and '931 patents is irrelevant to whether SecureNet infringes those patents" (Pl. MIL No. 1 at 2) but this is at odds with the opinion of ADC's technical expert, Dr. Clark, that ADC allegedly practices the asserted patents for the same reasons that SecureNet allegedly infringes. *See, e.g.* Ex. 8, Clark Opening Rpt. at ¶¶ 138, 250, 305.

[2] ADC erroneously suggests that its prior litigation positions should be excluded because it relied on claim construction that is different from the Court's claim construction in this case. Prior to issuance of the claim construction order in this case, however, it was reasonable to base non-infringement and invalidity positions on ADC's claim construction in the prior case. *See ICU Medical Inc. v. RyMed Techs, Inc.*, 752 F. Supp. 2d 486, 490 (D. Del. 2010). Moreover, Plaintiffs overstate the extent to which any differences in claim construction would have to be explained to the jury. None of the claim terms that ADC identifies appear in the independent claims of the '931 or '635 patent. To the extent the claim construction in this case differs from ADC's prior proposed constructions, they either provide SecureNet with additional non-infringement positions beyond those advanced by ADC in the prior litigation, or are similar to ADC's prior proposals and do not meaningfully change the analysis of the claims. *See* D.I. 94 at n. 2 and n. 3.

3

# EXHIBIT 1

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC.,) )<br><br>Plaintiff, )<br><br>v.  )<br><br>ICONTROL NETWORKS, INC., and )<br>ALARM.COM HOLDINGS, INC., )<br><br>Defendants. ) | FILED UNDER SEAL<br><br>Case No. 2:17-cv-01227<br><br><br>CONFIDENTIAL |

## Declaration of Mark A. Israel, Ph. D.

Mark A. Israel declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

### I.   INTRODUCTION AND SUMMARY OF OPINIONS

1.   My name is Mark A. Israel. I am a Senior Managing Director at Compass Lexecon, an economic consulting firm. From August 2000 to June 2006, I served as a full-time member of the faculty at Kellogg School of Management, Northwestern University. I received my Ph.D. in economics from Stanford University in 2001. More details on my qualifications are disclosed in my curriculum vitae, attached as Appendix A.

2.   In preparing this Declaration, I have relied on my substantial experience in antitrust economics, including the analysis of mergers, as well as my expertise as an industrial organization economist more generally. I, and my staff at my direction, have undertaken data analysis and reviewed documents and other evidence collected as part of the Federal Trade Commission's review of this acquisition. I also have discussed the competitive dynamics of the industry with representatives of Alarm.com Holdings, Inc. ("Alarm.com"). On August 22, 2016 and December 22, 2016, I presented my analysis and findings to the FTC, and I or my staff





DEFENDANT'S
TRIAL EXHIBIT

DTX-0076

Case 1:15-cv-00807-RGA

participated in numerous other conversations with FTC staff concerning their analysis of the acquisition.

3.      I have been asked by Counsel for Alarm.com and Icontrol Networks Inc. ("Icontrol") to analyze how the proposed Alarm.com acquisition of certain assets of Icontrol will affect competition and consumers. I have also been asked to review and respond to certain aspects of the Complaint filed by Honeywell International Inc. ("Plaintiff" or "Honeywell"),[1] including the Plaintiff's definition of the relevant antitrust market and the Plaintiff's assessment of the acquisition's competitive effects.

4.      My findings are summarized as follows:

- *Plaintiff's market definition is incorrect as a matter of economics. A proper market definition shows that Alarm.com and Icontrol ("Defendants") face potent competition from current competitors and new entrants. Hence, in a properly defined relevant market, the acquisition would neither harm competition nor harm consumers.*

- *Although Plaintiff's proposed market, which is restricted to sales through the dealer channel, is not a relevant antitrust market, competition in the dealer channel is vigorous and substantial recent entry demonstrates the lack of entry barriers.*

- *The intense competition faced by Defendants is reflected in Alarm.com's* ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮

- *Plaintiff has failed to state a valid economic theory of foreclosure.*

- *In fact, Alarm.com has no ability to foreclose Honeywell post-acquisition; instead, as an improved competitor post-acquisition, Alarm.com can be expected to put additional pressure on Honeywell, which is procompetitive and will benefit consumers. To give weight to Honeywell's complaints would be to confuse harm to a competitor with harm to competition, which is not consistent with my understanding of the purpose of antitrust enforcement.[2]*

---

[1]      Verified Complaint, *Honeywell International Inc. v Alarm.com Holdings Inc. and Icontrol Networks Inc.*, (N.J. 2017) (No. 2:17-cv-01227) (hereinafter, *Complaint*).

[2]      The Horizontal Merger Guidelines, for example, discuss harm to consumers (not competitors) and stress the need to prevent the acquisition of market power, through merger, that would allow firms to "raise price, reduce output, diminish innovation, or otherwise harm customers <u>as a result of diminished competitive constraints</u> or incentives." (U.S. Department of Justice and the Federal

2

## II.   IN A PROPERLY DEFINED RELEVANT ANTITRUST MARKET, ALARM.COM WILL CONTINUE TO FACE AMPLE COMPETITION POST-ACQUISITION

5.     Plaintiff proposes a relevant antitrust market for "Remote Services sold through a security system dealer." This market definition is fundamentally flawed because it focuses only on one channel through which home security systems are sold—the dealer channel—and thus grossly understates the current and future competition for sales of home security systems that constrains Alarm.com.

6.     Because Alarm.com earns revenue based on subscribership, any source of competition for home security subscribers is an economically relevant source of competition that constrains Alarm.com's pricing and other competitive decisions. From Alarm.com's point of view, any household that buys a home security system that does not use the Alarm.com platform is a lost sale; to presume that only sales lost to competitors who operate through the dealer channel are relevant to Alarm.com's behavior would be to ignore huge and growing sources of competition. Plaintiff's claim that only competition through the dealer channel is relevant would be analogous to, and equally ignorant of market realities as, a claim that a seller of office supplies, books, or music should focus only on competitor sales through bricks and mortar stores, ignoring online competitor sales (including direct to consumer sales) as being "in another market" because they use a different sales channel.

### A.     PLAINTIFF'S MARKET DEFINITION IGNORES EXTREMELY POTENT COMPETITION

7.     A home security system includes both hardware and software elements. Hardware installed at the customer's home may include sensors and a control panel, and other home control devices such as thermostats may also be included. The software is the interactive security platform used to facilitate central monitoring services, whereby the monitoring company responds to security system events according to protocols chosen by the consumer, as well as consumer monitoring, which enable a consumer to monitor and control a home security system

---

Trade Commission, *Horizontal Merger Guidelines*, issued August 19, 2010, (hereinafter, *HMG*), available at: https://www.justice.gov/atr/file/810276/download (emphasis added).

or smart home devices locally or via a mobile phone, computer, or other Internet-connected device.[3]

8.      Consumers may purchase a home security system from many channels. These include (among others): large dealers such as ADT; small, independent dealers of which there are numerous choices; a cable or telco firm such as Comcast or AT&T—which may have an existing relationship with potential home security subscribers for other services and may offer home security services as additions to a larger bundle of services; or a vertically integrated provider of home security systems such as Vivint that sells directly to consumers. When purchasing through these channels, consumers rely on dealers or the vertically integrated company to install the security system for them. The consumer may pay an upfront hardware and installation fee or that fee may be rolled into the monthly service charge that is applied for the duration of the contract.

9.      The set of choices available to consumers actually extends well beyond the list above. Consumers may choose to install a security system themselves while relying on a professional security firm to monitor the system in exchange for a monthly service charge. Such "professionally monitored DIY solutions" are typically less expensive than dealer-installed options and are not subject to a long-term contract.[4] Consumers also have the option of purchasing home security products from high-tech giants such as Apple, Google, and Samsung which are increasingly using their presence in the connected home marketplace to enter the home security business.

10.     Plaintiff defines a relevant antitrust market for "Remote Services sold through a security system dealer." This market definition ignores most of the sources of competition listed above, on the basis that they do not work through the dealer channel. This is a distinction without an economically meaningful difference. Although Alarm.com does not sell directly to downstream consumers, it collects revenue based on consumer subscribership to its software platform and its strategic focus in the ordinary course of business is on its subscribership level.[5] A lost

---

[3]      This software is what Plaintiff refers to as "Remote Services."

[4]      For the purposes of this declaration, I ignore non-professionally monitored security systems.

[5]      For example, Alarm.com's 2015 10-K reports (p. 45), "We generate the majority of our SaaS and license revenue primarily from monthly fees charged to our service providers sold on a per

Alarm.com home security sale in the downstream market is a lost sale whether it is lost to a provider working through the dealer channel or a provider working through another channel. Any alternative option for new or switching subscribers is a source of competition to Alarm.com because any loss of subscribers to another option represents substitution away from Alarm.com.

11. Hence, any alternative option for downstream subscribers represents competition to which Alarm.com must react, and thus this downstream competition acts as a constraint on Alarm.com regardless of the sales channel utilized. Plaintiff's market definition focuses only on the dealer channel and ignores these sources of downstream competition and thus is incorrect as a matter of economics.

12. The importance of downstream competition is well established in the Horizontal Merger Guidelines (HMG) and in the economics literature. The HMG describe how a proper relevant market can be defined based on whether a hypothetical monopolist of that market would find it profitable to impose a small but significant and non-transitory increase in price ("SSNIP"):[6]

> The hypothetical monopolist test … requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ('hypothetical monopolist') likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the market, including at least one product sold by one of the merging firms.

In determining whether a SSNIP would be profitable, the HMG consider all reasonable responses by consumers to the SSNIP – that is, the HMG considers all reasonable sources of competition or demand elasticity, including downstream competition. The HMG state: "In considering customers' likely responses to higher prices, the Agencies take into account any reasonably available and reliable evidence, including, but not limited to: … the influence of downstream competition faced by customers in their output markets."[7]

13. In this case, a hypothetical monopolist of sales of software to the dealer channel (as implied by the Plaintiff's market definition) would be constrained by downstream competition

---

subscriber basis for access to our cloud based connected home platform and the related solutions."

[6]    *HMG*, ¶ 4.1.1.

[7]    *HMG*, ¶ 4.1.3.

from other channels. Indeed, a hypothetical monopolist of all sales of home security systems through dealers would surely be laser-focused on the intense competition coming from telco, cable, vertically integrated, DIY, and other high-technology providers. Thus, Plaintiff's market definition, which focuses only on the dealer channel, fails the core logic of the hypothetical monopolist test: The hypothetical monopolist in the Plaintiff's proposed "market" would still face enormous price-constraining competition from outside of the purported market, meaning that Plaintiff is incorrect to exclude that competition from the market.

14.     The Areeda-Hovenkamp antitrust treatise explains why a focus on a particular distribution channel leads to an erroneous market definition when there is vigorous downstream competition:[8]

> A product at a given distribution level is presumptively not a market. Consider, for example, a defendant manufacturer who sells a machine at wholesale to retailers and requires them to buy a tied product from the defendant, while other manufacturers sell equivalent machines directly to users. "Monopolizing" sales to retailers does not bring the defendant market power, for its prices are fully constrained by rivals. If its wholesale price plus the costs of efficient retailing (including the profit necessary to keep the retailers in business) exceed the retail price of the direct-selling rivals, the defendant's customers—and therefore the defendant—will sell nothing. That an intermediary (actual or prospective) now has only one supplier does not confer power on that supplier, whose product faces intense competition downstream.

15.     Because Plaintiff's market definition ignores important sources of competition, Plaintiff's analysis of the potential impact of the proposed acquisition in that "market" is incorrect. The

---

[8]     Phillip E. Areeda and Herbert Hovenkamp (2016), *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1736. See, also, Roman Inderst and Tomasso M. Valletti (2007), "Market Analysis in the Presence of Indirect Constraints and Captive Sales," *Journal of Competition Law and Economics*, 3(2), p. 203-204 ("In contrast, vertically integrated firms that compete directly on the retail market or, likewise, firms with different technologies are said to impose an indirect constraint. Precisely, if the purchasing price was raised substantially above the competitive level, the supplier's customers would become less competitive on the retail market, which would reduce their market share and consequently also their purchases from the suppliers."); Irving Scher, ed. (2013), *Antitrust Advisor*, (Thomson Reuters, 4th ed.) ("The influence of downstream competition . . . may be central to estimating the elasticity of demand of many products. In many situations, products that lack direct substitutes are used as inputs to the manufacture of a downstream product that has significant close substitutes. . . . [C]ompetition at the downstream level will determine the demand and cross-elasticities of the end product, which in turn will influence the demand and cross-elasticities of the product in question. . . . This can result in functionally dissimilar products being included in the same relevant product market.")

impact of the acquisition must be analyzed in the context of all sources of downstream competition. This follows because if Alarm.com loses sales to other channels, it will need to react accordingly, including by cutting its prices or otherwise improving its offerings to dealers so that Alarm.com's products can be more competitive in the overall market.

B. **IN A PROPERLY DEFINED RELEVANT ANTITRUST MARKET, ALARM.COM FACES HUGE AND GROWING COMPETITION FROM NON-DEALER CHANNELS INCLUDING CABLE AND TELCO FIRMS, HIGH-TECH FIRMS, AND "DIY" OPTIONS**

16. A properly defined relevant market contains all sales of home security systems to downstream consumers. Any consumer sale that is lost to any provider of home security systems is a lost sale to Alarm.com and therefore competition from all home security system providers constrains Alarm.com's behavior. Alarm.com faces competition from the following categories of competitors:

- Cable and telco firms

- █████████████████████████

- Professionally monitored dealer-free ("DIY") options

- Other alternative connected home technologies/options, which create demand elasticity (substitution) on both the "upside" and "downside" for Alarm.com – opportunities for growth and competitive threats from high-tech heavyweights

- Other competitors who operate through independent dealers

Cable and Telco Firms

17. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████



Industry reports also confirm that cable and telco's share of new connects is increasing. For example, according to a Parks Associate survey, more than 40% of new connections to a professionally monitored service in 2014 used a cable or telco firm as the service provider; this represents more than a four-fold increase from six years earlier (see Figure 2 below).[9] Given these growth patterns, it makes no economic sense to exclude cable and telco firms from the relevant antitrust market.

---

[9] New connections are based on subscribers who connected to a service less than 11 months from the date of the survey in Q4, 2014.



18.



Professionally Monitored Dealer-Free ("DIY") Options

19.     Although in some industries "do it yourself" (DIY) can suggest a very different, often lower-tech product, that is not the case in home security. DIY home security systems are simply systems that consumers order, often online, without relying on a dealer.[10] So while the consumer installs the system himself, using provided instructions, it is then a fully functional, professionally monitored system, with the only difference being the upfront setup process. In essence an online site takes the place of a dealer, yet Plaintiff ignores scores of examples of the importance of such online competition from other industries and ignores similar competition in home security.

20.     DIY installations account for an increasing share of home security installations. A recent Parks Associates survey reported that DIY accounted for as much as 27% of all home security installations in the fourth quarter of 2015, a more than four-fold increase from six years earlier (see Figure 4 below). Among several players in the DIY channel, I understand that Simplisafe

---

[10]     Not all DIY systems are professionally monitored. My discussion of DIY here focuses on those that are professionally monitored.

(which offers a mix of professionally and customer monitored DIY service) has grown rapidly since its launch and recently stated that it had 400,000 customers.[11]



Connected Home Alternatives

21.    Technology giants entering the connected home space are a growing competitive threat for traditional home security firms.  Apple's HomeKit, Amazon's Echo, Samsung's SmartThings, and Google's Home are all smart home platforms that can be integrated with many devices including monitored security devices that are also used by Alarm.com.  In fact, Google Nest has very recently entered the home security space.[12]

22.

---

[11]    See, https://www2.simplisafe.com/cloud-operations-engineer.

[12]    For a description, see Abode Systems, Inc., available at:
https://workswith.nest.com/company/abode-systems-inc/abode.





23.

24.

C.    EVEN WITHIN THE DEALER CHANNEL, PLAINTIFF FAILS TO ACCOUNT FOR INTENSE COMPETITION, ENTRY, AND EXPANSION

25.    Although sales through the dealer channel is not a relevant antitrust market, competition in the dealer channel is vigorous and substantial recent entry demonstrates the lack of entry barriers. Hence, competition within the dealer channel is an important piece of the intense overall competition for home security offerings.

26.



27.



28.     The variety and success of these software platforms demonstrate the robustness of competition that exists within the dealer space. For example:

- Telular leverages its experience and innovation to compete vigorously with Alarm.com through its innovative home automation subsidiary, Telguard. Telular has "over 25 years of wireless experience" and "has grown to be one of America's largest security communications solutions."[14] Telguard had 617,000 subscribers in 2012 (when it used Icontrol's software platform), demonstrating "credibility to the market,"[15] and spurring acquisition of Telular by Avista Capital Partners. Telguard has since developed its own software platform.

- Zerowire is owned by United Technologies ("UTC"), a well-established, highly regarded home and automation security giant through its collection of subsidiaries/brands, including Interlogix, ZeroWire, Lenel, and Carrier. UTC has been on an aggressive

---

[14]     Telguard, "About Telguard," available at: http://www.telguard.com/home/.

[15]     Telular 10-K, September 30, 2012, available at: https://www.sec.gov/Archives/edgar/data/915324/000143774912012864/telular_10k-093012.htm.

expansion campaign that increasingly puts it in direct competition with traditional partners like Alarm.com. UTC acquired Interlogix from GE's security division in 2002 and reintroduced it shortly thereafter as a formidable competitor in the home security segment. In 2015, Interlogix showcased its ZeroWire system at the Consumer Electronics Expo touting it as a "self-contained, wireless security and lifestyle enhancement system, featur[ing] a built-in Web server and offer[ing] simple installation and complete system control for the home."[16] At the 2017 Consumer Electronics Show, UTC/Interlogix announced additional devices and compatibility for the UltraSync SmartHome system.[17]

- SecureNet, ███████████████████████████████████, describes itself as a "a market leader in security-centric IoT solutions,"[18] ███████████



[19] ███████████

[20] In 2012, SecureNet moved its headquarters to the United States and began aggressively targeting the U.S. home automation market.[21] Alarm.com estimates SecureNet currently has ████ subscribers.

---

[16]   "Interlogix ZeroWire - Security and Home Automation," April 24, 2015, available at: http://www.securityelectronicsandnetworks.com/articles/2015/04/24/interlogix-zerowire-%E2%80%93-security-and-home-automation.

[17]   "Interlogix UlltraSync SmartHome Adds New Devices, Expands Compatibility," January 3, 2017, available at: http://www.interlogix.com/news/Interlogix-UltraSync-SmartHome-adds-new-devices-expands-compatibility.

[18]   SecureNet Technologies, "SecureNet Technologies Announces Support for Best Selling 2GIG GC2 Security & Home Control System," April 6, 2016, available at: http://finance.yahoo.com/news/securenet-technologies-announcessupport-best-210700426.html.

[19]   SecureNet Technologies, "About SecureNet," available at: http://www.securenettech.com/about/companyprofile.php.

[20]   Id.

[21]   Id.

### D.   THE INTENSE COMPETITION FACED BY ALARM.COM IS REFLECTED IN ITS STRATEGIC DIRECTION AND FINANCIAL PERFORMANCE

29.   Plaintiff posits that Alarm.com is a dominant provider in a market with little effective entry.



30.

31.   Alarm.com's R&D investments have paid off in the form of quality improvements to its services, including such recently introduced quality improvements as an improved image sensor with expanded range and improved motion capture (February 2015), new temperature sensors, improved cellular connection, and improved dealer installation tools (October 2015), and new Wi-Fi doorbell camera and indoor wireless camera (April 2016).

32.





33.    Providing bottom-line evidence of intense competition,



## III. PLAINTIFF'S THEORY OF FORECLOSURE IS NOT ECONOMICALLY VALID BUT RATHER REFLECTS THE SELF-INTERESTED COMPLAINTS OF A HORIZONTAL COMPETITOR

34.   Plaintiff asserts that, in its alleged relevant market for the sale of software platforms through the dealer channel, Alarm.com will have a 70 percent share following the acquisition. Plaintiff advances an economic "foreclosure" theory based on this share, asserting that Alarm.com will be able to use this share to harm Honeywell by (a) preventing Honeywell's potential efforts to open its software platform so that it is compatible with other hardware manufacturers; (b) undermining Honeywell's business relationship with ADT by requiring that Honeywell invest to establish interoperability between Honeywell hardware and Alarm.com software – or by sabotaging the effort to establish such interoperability; (c) undermining Honeywell's business relationships with dealers who may want to offer both Honeywell and Alarm.com based systems.

35.   Honeywell's theory of foreclosure is not valid as an economic theory of harm to competition or consumers. Rather than describe a coherent mechanism that would allow

Alarm.com to foreclose Honeywell from access to inputs or customers post-acquisition, potentially leading to harm to competition and consumers, Honeywell complains that it may be more difficult to compete with Alarm.com post-acquisition. It is the nature of pro-competitive mergers that they make it more difficult for rivals to compete, but such mergers – and the reactions of rivals in response – yield benefits to consumers. Rather than harming competition, Alarm.com's acquisition of Icontrol will yield benefits to consumers, even as it may make it more difficult for Honeywell to win business without pro-competitively improving its service or lowering its price.

A.    VALID FORECLOSURE THEORIES INVOLVE THE ABILITY TO PREVENT A FIRM FROM ACCESSING INPUTS OR CUSTOMERS

36.    Foreclosure theories generally take one of two forms: input foreclosure, in which a firm with market power has the incentive and ability to prevent a rival (or potential rival) from accessing inputs needed to compete; or customer foreclosure, in which a firm with market power has the incentive and ability to prevent a rival (or potential rival) from accessing customers. To be valid, such a theory would, at minimum, have to demonstrate a clear mechanism by which Alarm.com could prevent Honeywell from accessing inputs or customers (and even with this established, many additional steps would be required to establish anti-competitive foreclosure, including a demonstration of substantial harm to competition). Standard examples in which foreclosure is alleged include cases in which a firm owns critical inputs or controls the critical channels for distribution to customers and is able to use this control to expand its market power and thus harm competition and consumers. Such situations do not apply in this case.

37.    Alarm.com is not today, nor after the merger will it be, situated between Honeywell and Honeywell's dealers or customers. With the exception of its limited relationship with ADT, Honeywell has pursued a closed architecture in which its dealers sell integrated systems of Honeywell hardware and the Honeywell software system, Total Connect. The acquisition does not change this fact: Honeywell can freely access its own hardware and software inputs and all of its dealers and customers today, and it will retain the ability to do so after the Alarm.com acquisition of Icontrol's assets. Hence, post-acquisition, if Honeywell feels competitive pressure to respond to a strengthened Alarm.com, it has full access to the inputs and customers required to compete.

38. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████  ██████████████████████
█████████████████████████████████████████████████
█████████████████████████

39. █████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████

40. ████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████  ███  ███████████████████████████
██████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████
██████████

41.    Indeed, today, Alarm.com's software is currently compatible with four different panel manufacturers: Nortek/2GiG, UTC, Tyco, and Qolsys.[25] And although Plaintiff asserts that Alarm.com has "an incentive to work with hardware manufacturers who do not also compete



with it in the Remote Services market,"[26] ██████████████████████████

██████████████████████████████████████████████████

█████████ Furthermore, Alarm.com already enables its independent dealers to install Honeywell's leading security product, the Honeywell Vista, with Alarm.com's remote services. The Alarm.com System Enhancement Module (SEM) for Honeywell Vista is available today.

42.      As further evidence that it is in the interest of hardware and software providers generally to work together to provide interoperable solutions that will be attractive to dealers, I note that several hardware manufacturers have partnered with numerous software providers, many of which compete with the hardware provider's own software platform. For example, while Tyco has its own software platform (Connect 24), Tyco's DSC panels integrate with Alarm.com, Control4, HomeSeer, SecureNet, Telguard, and Vera.[28] Similarly, although UTC has its own software platform (Zerowire and UltraSync), its Interlogix panels integrate with multiple competitive third-party software platforms including Control4, SecureNet, Telguard, and Uplink.[29] As another example, Nortek's 2GiG panels integrate with at least SecureNet, Telguard, and Uplink, and Nortek is one of Vivint's proprietary panel providers.[30]

---

[26]      *Complaint,* ¶ 78.

[27]      As discussed above, UTC produces Zerowire and Tyco produces Control 24 software platforms. 2GiG has a minority interest in MioS (see https://www.nortek.com/news/nortek-agrees-acquire-minority-stake-mios-limited/).

[28]      http://www.dsc.com/products/interactive/Control4/4 (Control 4); http://store.homeseer.com/store/HomeSeer-DSC-Alarm-Panel-Software-Plug-in-P60.aspx (Homeseer); http://www.sdmmag.com/articles/91370-sentrynet-partners-with-securenet, http://www.securenettech.com/hardware/igm/ (Securenet); http://www.telguard.com/home/flex, http://www.telguard.com/home/DSC (Telguard); http://getvera.com/apps/ (Vera).

[29]      https://www.control4.com/press_releases/2015/10/15/control4-delivers-enhanced-smart-home-security-and-entertainment-experiences (Control4); http://investor.numerex.com/releasedetail.cfm?releaseid=926342 (Uplink); http://www.securenettech.com/hardware/igm/ (SecureNet); http://www.telguard.com/home/Interlogix (Telguard).

[30]      https://www.uplink.com/2gig/ (Uplink); http://www.securenettech.com/hardware/2gig/ (SecureNet); http://www.telguard.com/home/Products/Telguard-HomeControl (Telguard).

B.  A 70 PERCENT POST-MERGER SHARE, EVEN IF TRUE, WOULD NOT IMPLY FORECLOSURE

43.    Plaintiff asserts that Alarm.com has a 70 percent share of the Plaintiff's alleged relevant market and that this gives Alarm.com leverage to use against Honeywell. In addition to the fact that this share is computed in an invalid market, the 70 percent figure is simply the sum of Alarm.com and Connect's shares of the software sales through the dealer channel. There is no basis to conclude that this share prevents competition or that the parties will necessarily be able to maintain a 70 percent share post-acquisition. It is not locked in stone and does not represent a critical "asset" of the type required for a valid foreclosure theory. Instead, if Honeywell can offer a better product or lower its cost—and therefore its price—it can steal share from Alarm.com. Nothing in the acquisition prevents Honeywell from fully competing for and winning business from the merged entity and thus nothing in the acquisition represents foreclosure of Honeywell. Indeed, Honeywell's vertically integrated business model gives it pricing advantages compared to a non-vertically integrated business model, thus making it a strong competitor.

44.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

C.  AS A MATTER OF ECONOMICS, COMPLAINTS BY A HORIZONTAL COMPETITOR THAT HAS NOT BEEN DENIED THE ABILITY TO COMPETE FOR BUSINESS GENERALLY INDICATE THAT THE COMPETITOR EXPECTS TO FACE STRONGER COMPETITION POST-MERGER

45.    After a merger, the merged entity may become a stronger competitor, either because it is able to lower its costs or improve its quality. Either of these outcomes leads to a reduction in quality-adjusted prices and, absent competitor responses, an increase in the merged entity's

share. Even in the absence of any response by rivals, this is a pro-competitive outcome: Consumers are made better off, even as the share of the merged entity increases. However, rivals who do not wish to lose share will not stand still. A pro-competitive merger prompts them to respond by lowering their costs or improving their products. These responses by rivals further benefit consumers. As part of this pro-competitive process, rivals are made worse off, either because the rivals lose share or because they must expend effort to reduce costs or improve quality in order to avoid losing share. Hence, complaints by a competitor about a merger generally indicate that the merger is pro-competitive, not anti-competitive.

46.     Honeywell's third theory of foreclosure, for example, rather than stating a valid foreclosure theory, amounts to nothing more than a complaint that competing for business will be tougher after the acquisition.[31] Honeywell asserts that Alarm.com may try to steer dealers from promoting the Honeywell system to promoting a system featuring Alarm.com. But Alarm.com has the same incentive today to try to convince dealers to promote its services, and if Alarm.com offers additional financial incentives to dealers post-acquisition (or offers improved products as a result of the acquisition), that is an example of increased competition that will benefit consumers, even if it makes it more difficult for Honeywell to compete. Honeywell characterizes this outcome, where Honeywell's competitors become stronger, as anti-competitive foreclosure; this characterization, however, confuses harm to competition with harm to competitors.

I declare under penalty of perjury that the foregoing statements are true and correct. Executed on February 26, 2017.

_Mark A. Israel_
Mark A. Israel

---

[31] ██████████████████████████████████████████████████████████

25

# APPENDIX A: CURRICULUM VITAE OF MARK A. ISRAEL, PH.D.

**Mark A. Israel**                                                                      **December 2016**
**Senior Managing Director**
**Compass Lexecon**

1101 K Street NW, 8th Floor
Washington, DC 20005
(202) 589-3484 (direct)
misrael@compasslexecon.com

## SUMMARY OF PROFESSIONAL EXPERIENCE

- Served as an expert for both the Federal Government and private parties in cases involving industries including fixed and mobile telecommunications, cable television, broadband internet service, other high technology industries, airlines, railroads, shipping, financial markets, credit cards, beverages, consumer retail, and many others.

- Testified in Federal Court and appeared in front of government agencies including DOJ, FTC, and FCC, and state agencies on behalf of numerous clients.

- Submitted expert reports in Federal Court, as well affidavits, declarations, and white papers to agencies including DOJ, FTC, FCC, DOT, and state agencies.

- Written numerous academic articles on topics including competition economics, merger policy, telecommunications, airlines, insurance markets, and labor markets.  Research published in leading scholarly and applied journals including The American Economic Review, The Rand Journal of Economics, The Review of Industrial Organization, Antitrust Source, and the Global Competition Review, and presented to business, government, and academic audiences around the world.

## AREAS OF EXPERTISE

- Antitrust and competition economics; industrial organization economics

- Applied econometrics

- Economic and econometric analysis of horizontal and vertical mergers

- Economic and econometric analysis of antitrust litigation topics, including: Class certification, damages, and liability issues in cases involving price fixing, exclusive dealing, monopolization, bundling, price discrimination, and exclusionary practices

## EDUCATION

- Ph.D., Economics, STANFORD UNIVERSITY, June 2001.
- M.S., Economics, UNIVERSITY OF WISCONSIN-MADISON, August 1992.
- B.A., Economics, ILLINOIS WESLEYAN UNIVERSITY, Summa Cum Laude, May 1991.

## EMPLOYMENT HISTORY

Compass Lexecon: *Senior Managing Director*, January 2016 – Present.

> (Previously: *Executive Vice President*, April 2013 – January 2016; *Senior Vice President*, January 2009 – March 2013; *Vice President*, January 2008 – December 2008; *Economist*, January 2006 – December 2007.)

Kellogg School of Management, Northwestern University: *Assistant Professor of Management and Strategy*, 2000 – 2006; *Associate Professor of Management and Strategy*, 2007 – 2008.

State Farm Insurance: *Research Administrator*, 1992 – 1995.

## RECENT PROFESSIONAL RECOGNITIONS

American Antitrust Institute 2015 Antitrust Enforcement Awards, *Outstanding Antitrust Litigation Achievement in Economics* Finalist.

Global Competition Review Who's Who Legal: Competition 2016, leading Economist.

Global Arbitration Review's 2016 International Who's Who of Commercial Arbitration, leading Expert Witness.

## LIVE TESTIMONIAL EXPERIENCE

Testimony as Economic Expert on behalf of Anthem Inc., *United States of America, et al. v. Anthem Inc. and Cigna Corp.*, In the District Court of the District of Columbia, No. 16-cv-01493 (ABJ), Deposition: November 9, 2016.

Testimony as Economic Expert on behalf of Defendants, *Darren Ewert v. Nippon Yusen Kabushiki Kaisha et al.*, Supreme Court of British Columbia, No. S-134895. Deposition: September 14, 2016.

Testimony in Commercial Arbitration on Issues Related to Mobile Wireless Competition; New York, NY; April 12, 2016.

Testimony as Economic Expert on behalf of Regal Entertainment Group, In the Matter of iPic – Gold Class Entertainment, LLC, et al., v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., et al., In the District Court of Harris County, Texas, 234th Judicial District, No. 2015-68745. Deposition: January 12, 2016. Live Trial Testimony: January 21, 2016.

Testimony as Economic Expert on behalf of Federal Trade Commission in Re: Federal Trade Commission et al. v. Sysco Corporation and USF Holding Corp., Civil Action No. 15-cv-00256 (APM). Deposition: April 28, 2015. Live Trial Testimony: May 7, May 8, May 14, 2015.

Appearances in Federal Communications Commission, Economists Panels:
- Comcast/Time Warner, January 2015
- AT&T/T-Mobile, July 2011
- Comcast/NBCUniversal, August 2010

Appearance before California Public Utility Commission, Public Hearings on Comcast/Time Warner Merger, Los Angeles, April 2015.

Appearance as Economic Testifying Expert in front of Department of Justice, Federal Trade Commission, Federal Communications Commission, and State Regulatory Agencies in many additional transactions, including: Danaher/NetScout, AT&T/Leap Wireless, T-Mobile/MetroPCS, American Airlines/US Airways, SpectrumCo/Cox/Verizon Wireless, oneworld antitrust immunity application, PepsiCo/bottlers, Houghton Mifflin/Harcourt, Chicago Mercantile Exchange/Chicago Board of Trade.

## EXPERT REPORTS, AFFIDAVITS, AND DECLARATIONS

Expert Report of Mark A. Israel, In the Matter between Darren Ewert and DENSO Corporation et al., In the Supreme Court of British Columbia, Vancouver Registry, No. S-135610, November 15, 2016.

Supplemental and Rebuttal Expert Report of Mark A. Israel, In the Matter of United States of America, et al. v. Anthem Inc. and Cigna Corp., In the United States District Court, District of Columbia, No. 16-cv-01493 (ABJ), October 28, 2016.

Expert Report of Mark A. Israel, In the Matter of United States of America, et al. v. Anthem Inc. and Cigna Corp., In the United States District Court, District of Columbia, No. 16-cv-01493 (ABJ), October 7, 2016.

Reply Verified Statement of Mark Israel and Jonathan Orszag, "Review of Commodity, Boxcar, and TOFC/COFC Exemptions," Surface Transportation Board, Docket No. EP 704 (Sub-No. 1), August 26, 2016.

Third Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, "Analysis of the Regressions and Other Data Relied Upon in the Business Data Services FNPRM And a Proposed Competitive Market Test," Federal Communications Commission, WC Docket Nos. 16-143, 15-247, 05-25, RM-10593, August 9, 2016.

Verified Statement of Mark Israel and Jonathan Orszag, "Review of Commodity, Boxcar, and TOFC/COFC Exemptions," Surface Transportation Board, Docket No. EP 704 (Sub-No. 1), July 26, 2016.

Second Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, "Analysis of the Regressions and Other Data Relied Upon in the Business Data Services FNPRM And a Proposed Competitive Market Test," Federal Communications Commission, WC Docket Nos. 16-143, 05-25, RM-10593, June 28, 2016.

Expert Declaration of Mark A. Israel, In the Matter of Liberman Broadcasting, Inc. and LBI Media, Inc. vs. Comcast Corporation and Comcast Cable Communications, LLC, Federal Communications Commission, MB Docket No. 16-121, June 7, 2016.

Expert Report of Mark Israel, In the Matter of La Crosse County, individually, and on behalf of all others similarly situated, v. Trinity Industries, INC. and Trinity Highway Products, LLC, In the United States District Court, Western District of Wisconsin, No. 3:15-cv-00117-scl, May 27, 2016.

3

Expert Report of Mark A. Israel, In the Matter between Darren Ewert and Nippon Yusen Kabushiki Kaisha, et al., In the Supreme Court of British Columbia, Vancouver Registry, No. S-134895, May 20, 2016.

Second Supplemental Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, In the Matter of Special Access for Price Cap Local Exchange Carriers, Federal Communications Commission, WC Docket No. 05-25, April 20, 2016.

Supplemental Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, In the Matter of Special Access Rates for Price Cap Local Exchange Carriers, Federal Communications Commission, WC Docket No. 05-25, March 24, 2016.

Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, In the Matter of Special Access Rates for Price Cap Local Exchange Carriers, Federal Communications Commission, WC Docket No. 05-25, February 19, 2016.

Declaration of Mark Israel, Daniel Rubinfeld, and Glenn Woroch, "Competitive Analysis of the FCC's Special Access Data Collection," Federal Communications Commission, WC Docket No. 05-25, January 26, 2016.

Declaration of Dr. Mark Israel, In the Matter of iPic – Gold Class Entertainment, LLC, et al., v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., et al., In the District Court of Harris County, Texas, 234th Judicial District, No. 2015-68745, January 18, 2016.

Declaration of Dennis Carlton, Mark Israel, Allan Shampine & Hal Sider, "Investigation of Certain Price Cap Local Exchange Carrier Business Data Services Tariff Pricing Plans," Federal Communications Commission, WC Docket No. 15-247, January 7, 2016.

Declaration of Mark A. Israel, Attached to "Response of AT&T Mobility LLC to Notice of Apparent Liability for Forfeiture," Federal Communications Commission, File No. EB-IHD-14-00017504, July 17, 2015.

Reports in Re: Federal Trade Commission et al. v. Sysco Corporation and USF Holding Corp., Civil Action No. 15-cv-00256 (APM). Declaration: February 18, 2015. Report: April 14, 2015. Rebuttal Report: April 21, 2015.

Declaration of Mark A. Israel, Bryan G. M. Keating, and David Weiskopf, "Economic Analysis of the Effect of the Comcast-TWC Transaction on Voice and Broadband Services in California," December 3, 2014.

Expert Report of Mark A. Israel, "Economic Analysis of the Effect of the Comcast-TWC Transaction on Broadband: Reply to Commenters," Federal Communications Commission, MB Docket No. 14-57, September 22, 2014.

Supplemental Declaration of Mark Israel and Allan Shampine, In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent, Appendix A to "Reply Comments of the National Association of Broadcasters," Federal Communications Commission, MB Docket No. 10-71, July 24, 2014.

4

Declaration of Mark Israel and Allan Shampine, In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent, Appendix B to "Comments of the National Association of Broadcasters," Federal Communications Commission, MB Docket No. 10-71, June 26, 2014.

Expert Report of Mark A. Israel, "Implications of the Comcast/Time Warner Cable Transaction for Broadband Competition," Federal Communications Commission, MB Docket No. 14-57, April 8, 2014.

Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Sprint's Proposed Weighted Spectrum Screen Defies Economic Logic and Is Inconsistent with Established Facts," Federal Communications Commission, WT Docket No. 12-269, March 14, 2014.

Reply Declaration of Mark A, Israel, "Competitive Effects and Consumer Benefits from the Proposed Acquisition of Leap Wireless by AT&T: A Reply Declaration," Federal Communications Commission, WT Docket No. 13-193, October 23, 2013.

Declaration of Mark A. Israel, "An Economic Analysis of Competitive Effects and Consumer Benefits from the Proposed Acquisition of Leap Wireless by AT&T," Federal Communications Commission, WT Docket No. 13-193, August 1, 2013.

Supplemental Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Comments on Appropriate Spectrum Aggregation Policy with Application to the Upcoming 600 MHz Auction," Federal Communications Commission, WT Docket No. 12-269, June 13, 2013.

Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Comment on the Submission of the U.S. Department of Justice Regarding Auction Participation Restrictions," Federal Communications Commission, WT Docket No. 12-269, June 13, 2013.

Reply Declaration of Michael L. Katz, Philip A. Haile, Mark A. Israel, and Andres V. Lerner, "Spectrum Aggregation Policy, Spectrum-Holdings-Based Bidding Credits, and Unlicensed Spectrum," Federal Communications Commission, GN Docket No. 12-268, March 12, 2013.

Declaration of Igal Hendel and Mark A. Israel, "Econometric Principles That Should Guide the Commission's Analysis of Competition for Special Access Service," Federal Communications Commission, WC Docket No. 05-25, February 11, 2013.

Reply Declaration of Mark A. Israel and Michael L. Katz, "Economic Analysis of Public Policy Regarding Mobile Spectrum Holdings," Federal Communications Commission, WT Docket No. 12-269, January 7, 2013.

Declaration of Mark A. Israel and Michael L. Katz, "Economic Analysis of Public Policy Regarding Mobile Spectrum Holdings," Federal Communications Commission, WT Docket No. 12-269, November 28, 2012.

Declaration of Mark Israel, "An Economic Assessment of the Prohibition on Exclusive Contracts for Satellite-Delivered, Cable-Affiliated Networks," Federal Communications Commission, MB Docket Nos. 12-68, 07-18, & 05-192, September 6, 2012.

Expert Report of Mark Israel, "Implications of the Verizon Wireless & SpectrumCo/Cox Commercial Agreements for Backhaul and Wi-Fi Services Competition," Federal Communications Commission, WT Docket No. 12-4, August 1, 2012.

Expert Report of Mark A. Israel, Michael L. Katz, and Allan L. Shampine, "Promoting Interoperability in the 700 MHz Commercial Spectrum," Federal Communications Commission, WT Docket No. 12-69, July 16, 2012.

Affidavits of Dr. Mark A. Israel in Re: Bloomberg L.P. V. Comcast Cable Communications, LLC, Federal Communications Commission, MB Docket No. 11-104, June 21, 2012 (Declaration), June 8, 2012 (Declaration), September 27, 2011 (Supplemental Declaration), July 27, 2011 (Declaration).

Expert Report of Robert Willig, Mark Israel, Bryan Keating, and Jonathan Orszag, "Response to Supplementary Comments of Hubert Horan," Docket DOT-OST-2009-1055, October 22, 2010.

Expert Report of Robert Willig, Mark Israel, Bryan Keating, and Jonathan Orszag, "Measuring Consumer Benefits from Antitrust Immunity for Delta Air Lines and Virgin Blue Carriers," Docket DOT-OST-2009-1055, October 13, 2010.

Expert Report of Mark Israel and Michael L. Katz, "Economic Analysis of the Proposed Comcast-NBCU-GE Transaction," Federal Communications Commission, MB Docket No. 10-56, July 20, 2010.

Expert Report of Mark Israel and Michael L. Katz, "The Comcast/NBCU Transaction and Online Video Distribution," Federal Communications Commission, MB Docket No. 10-56, May 4, 2010.

Expert Report of Mark Israel and Michael L. Katz, "Application of the Commission Staff Model of Vertical Foreclosure to the Proposed Comcast-NBCU Transaction," Federal Communications Commission, MB Docket No. 10-56, February 26, 2010.

Expert Report of Robert Willig, Mark Israel, and Bryan Keating, "Competitive Effects of Airline Antitrust Immunity: Response of Robert Willig, Mark Israel, and Bryan Keating" in Docket DOT-OST-2008-0252, January 11, 2010.

Affidavit of Dr. Mark A. Israel on Class Certification in Re: Puerto Rican Cabotage Antitrust Litigation, in the United States District Court for the District of Puerto Rico, MDL Docket No. 3:08-md-1960 (DRD), December 10, 2009.

Expert Report of Robert Willig, Mark Israel, and Bryan Keating, "Competitive Effects of Airline Antitrust Immunity" in Docket DOT-OST-2008-0252, September 8, 2009.

6

Expert Report and Supplemental Expert Report of Dennis W. Carlton and Mark Israel in Re: Toys "R" Us-Delaware, Inc., and Geoffrey Inc. v. Chase Bank USA N.A. in American Arbitration Association New York, New York, Commercial Arbitrations No. 13-148-02432-08, February 27, 2009 (Expert Report), March 20, 2009 (Supplemental Expert Report).

Expert Reports of James Levinsohn and Mark Israel in Re: 2006 NPM Adjustment Proceeding pursuant to Master Settlement Agreement, October 6, 2008 (Expert Report), January 16, 2009 (Expert Report), March 10, 2009 (Expert Report).

## EXPERT WORK IN REVIEW OF MERGERS/TRANSACTIONS

*Successful Acquisition of Starwood Hotels & Resorts by Marriott International.* 2016. Led team that performed detailed analysis of competitive conditions, extensive econometric analysis of pricing, and full review of Marriott's internal pricing models to demonstrate that Starwood and Marriott were not close competitors, combined ownership of the brands would not lead to upward pricing pressure, and competition would remain robust post-merger.

*Successful Acquisition of PR Newswire by GTCR.* 2016. Lead economic expert for GTCR. Made presentations to DOJ showing lack of competitive harm from the transaction, based on detailed analysis of win/loss data, including calculations showing no possible upward pricing pressure (UPP) concerns regardless of the level of margins.

*Successful Acquisition of Schurz Communications' Broadcast Stations by Gray Television.* 2015. Lead economic expert for Gray. Made presentations to DOJ demonstrating output expanding effects of proposed transaction in light of the scale economies in television production and advertising and the small size of the DMAs affected by the transaction.

*Successful Acquisition of the Communications Business of Danaher Corporation by NetScout Systems.* 2015. Lead economic expert for NetScout. Made presentations to DOJ describing proper economic framework for analysis of competition and potential merger harms, and demonstrated that the presence of multiple viable competitors and numerous other credible threats to be used by powerful buyers in a dynamic industry made theories of anti-competitive harm from the merger implausible.

*Successful Acquisition of Windmill Distribution Co. by Manhattan Beer Distributors.* 2015. Lead economic expert for Manhattan Beer Distributors. Submitted White Paper to DOJ demonstrating, based on margin data, that the merger would be highly unlikely to lead to anti-competitive effects. Transaction was granted early termination from the Hart Scott Rodino process by the DOJ.

*Proposed Acquisition of Time Warner Cable by Comcast Corporation.* 2014-2015. Served as lead economic expert on broadband issues on behalf of Comcast Corporation. Submitted multiple Declarations and made multiple presentations to DOJ and FCC, explaining lack of horizontal, bargaining, or vertical/foreclosure concerns with regard to broadband competition as a result of the transaction.

*Successful acquisition of Leap Wireless by AT&T.* 2014. Lead economic expert for AT&T. Submitted multiple Declarations to FCC and made presentation to DOJ, demonstrating the transaction would generate substantial consumer benefits, while generating at most minimal upward pricing pressure in a properly defined mobile wireless services market and no issues related to spectrum concentration or other competitive concerns.

*Successful merger of American Airline and US Airways.* 2013. Lead consulting expert, managing Compass Lexecon team of over 25 economists supporting multiple experts. Made multiple presentations to DOJ, worked on expert reports in litigation, and assisted counsel with the analysis leading to settlement of litigation, permitting transaction to close.

*Successful merger of T-Mobile USA and MetroPCS.* 2013. Lead economic expert for T-Mobile USA. Conducted economic analyses of competitive effects of the transaction, as well as consumer benefits from reduced costs and increased network quality. Presented analyses to both DOJ and FCC.

*FTC Investigation of Acquisition of Dollar Thrifty Automotive Group by Hertz, 2012.* Served as a lead economic expert for FTC and prepared to serve as FTC's testifying expert against the merger, prior to case settlement. Conducted empirical analyses based on previous rental car mergers demonstrating likely price increases from the transaction.

*Decision by Federal Communications Commission not to extend the ban on exclusive contracts for satellite-delivered, cable-affiliated networks.* 2012. Lead economic expert for National Cable and Telecommunications Association. Submitted economic analysis demonstrating that the ban on exclusive distribution of satellite-delivered, cable affiliated networks is no longer warranted given increased marketplace competition. FCC made decision to allow the ban to sunset.

*Successful sale of wireless spectrum by SpectrumCo and Cox ("Cable Companies") to Verizon Wireless and successful completion of related commercial agreements.* 2012. On behalf of the Cable Companies, performed economic analyses demonstrating lack of competitive harm from the transaction on markets for backhaul and Wi-Fi services. Presented analyses to FCC.

*Successful acquisition by LIN Media of broadcast television stations from NVTV.* 2012. Lead economic expert for LIN Media. Prepared economic analysis demonstrating lack of competitive concern over potential issues related to Shared Service and Joint Sale Arrangements.

*Proposed acquisition of T-Mobile USA by AT&T.* 2011. Served as one of the lead economists, initially for T-Mobile (along with Michael Katz) and ultimately for both parties (along with Michael Katz and Dennis Carlton). Made multiple presentations to DOJ and FCC. Appeared in FCC Workshop, ex parte meeting.

*Successful application for antitrust immunity by Delta and Virgin Blue.* 2010. Together with Robert Willig, Bryan Keating, and Jon Orszag, prepared economic analyses demonstrating substantial net consumer benefits from antitrust immunity. Submitted results in expert reports to Department of Transportation.

8

*Successful joint venture between Comcast and NBC Universal (and ultimate full acquisition of NBC Universal by Comcast)*. 2010. Served as one of the lead economists (along with Michael Katz) on behalf of the merging parties. Wrote multiple reports submitted to FCC (with Michael Katz) demonstrating lack of significant competitive concerns from the transaction. Made multiple presentations to DOJ and FCC. Appeared in FCC Workshop of economists, ex parte meeting.

*Successful application for antitrust immunity for oneworld alliance and associated joint venture of American Airlines, British Airways, and Iberia Airlines*. 2009-2010. Together with Robert Willig and Bryan Keating, prepared economic analyses demonstrating substantial net consumer benefits associated with antitrust immunity for the joint venture. Submitted results in expert reports to Department of Transportation.

*Successful acquisition by PepsiCo of bottlers, PBG and PAS*. 2009. Performed econometric and simulation analyses demonstrating pro-competitive effect of merger on PepsiCo's own brands, other brands distributed by PBG and PAS, and overall marketplace. Presented results to FTC (together with Dennis Carlton).

*Successful merger of Delta Airlines and Northwest Airlines*. 2008. In support of Dennis Carlton, developed empirical and theoretical analyses to demonstrate merger's pro-competitive nature. Work focused on (ultimately settled) private litigation opposing the merger.

*Successful acquisition of Harcourt Education by Houghton Mifflin*. 2007. Along with Daniel Rubinfeld and Frederick Flyer, developed econometric analyses demonstrating lack of competitive harm from proposed merger. Presented results to DOJ.

*Successful acquisition of Chicago Board of Trade by Chicago Mercantile Exchange*. 2007. Along with Robert Willig and Hal Sider, developed and presented multiple empirical analyses demonstrating lack of competitive harm from merger. Submitted multiple white papers and made multiple presentations to DOJ.

## SELECTED OTHER EXPERT/CONSULTING WORK

Led team supporting Dennis Carlton's testimony in Toshiba/Hannstar TFT-LCD Antitrust litigation vs. Plaintiff Best Buy, 2013.

Led team supporting Dennis Carlton's testimony in Toshiba's TFT-LCD Class Action Antitrust litigation. Named Litigation Matter of the Year for 2012 by *Global Competition Review*, 2012.

As economic expert for US Airways, developed econometric analysis of air traffic at major US airports, presented to Philadelphia Airport management team, 2011.

Prepared analysis of the competitive impact of low-cost-carrier competition in Washington, DC and New York airports. Filed with DOT, 2011.

On behalf of major pharmaceutical firm, developed econometric model to forecast pharmaceutical expenditures, 2009.

9

Developed econometric model to measure of the importance of network effects in credit cards in the context of measuring damages incurred by a major credit card issuer, 2007-2008.

## PUBLICATIONS

"Complementarity without Superadditivity," (with Steven Berry, Philip Haile, and Michael Katz), Volume 151, Pages 28-30 in *Economics Letters*, February 2017.

"Antitrust in a Mobile World," (with Yonatan Even, Jonathan M. Jacobson, Scott Martin, and Dr. Helen Weeds), Chapter 17 of *International Antitrust Law & Policy: Fordham Competition Law 2015*, Edited by James Keyte, Juris Publishing, Inc., 2016.

"Buyer Power in Merger Review," (with Dennis W. Carlton and Mary Coleman), Chapter 22 of *The Oxford Handbook of International Antitrust Economics*, Volume 1, Roger D. Blair and D. Daniel Sokol, eds, Oxford University Press, 2015.

"The Evolution of Internet Interconnection from Hierarchy to 'Mesh': Implications for Government Regulation," (with Stanley M. Besen), *Information Economics and Policy*, December 2013.

"Airline Network Effects and Consumer Welfare," (with Bryan Keating, Dan Rubinfeld, and Robert Willig), *Review of Network Economics*, November 2013.

"The Delta-Northwest Merger: Consumer Benefits from Airline Network Effects (2008)," (with Bryan Keating, Daniel L. Rubinfeld, and Robert D. Willig), *The Antitrust Revolution*, Sixth Edition, Edited by John E. Kwoka, Jr. and Lawrence J. White, Oxford University Press, New York, July 2013.

"Proper Treatment of Buyer Power in Merger Review," (with Dennis W. Carlton), *Review of Industrial Organization*, July 2011.

"Response to Gopal Das Varma's Market Definition, Upward Pricing Pressure, and the Role of the Courts: A Response to Carlton and Israel," (with Dennis W. Carlton), *The Antitrust Source*, December 2010.

"Will the New Guidelines Clarify or Obscure Antitrust Policy?" (with Dennis W. Carlton), *The Antitrust Source*, October 2010.

"Should Competition Policy Prohibit Price Discrimination?" (with Dennis W. Carlton), *Global Competition Review*, 2009.

"The Empirical Effects of Collegiate Athletics: An Update Based on 2004-2007 Data," (with Jonathan Orszag), Paper commissioned by National Collegiate Athletic Association, available *at http://www.epi.soe.vt.edu/perspectives/policy_news/pdf/NCAASpending.pdf*, February 2009.

"Services as Experience Goods: An Empirical Examination of Consumer Learning in Automobile Insurance," *The American Economic Review*, December 2005.

"Tenure Dependence in Consumer-Firm Relationships: An Empirical Analysis of Consumer Departures from Automobile Insurance Firms," *The Rand Journal of Economics*, Spring 2005.

"The Impact of Youth Characteristics and Experiences on Transitions Out of Poverty," (with Michael Seeborg), *The Journal of Socio-Economics*, 1998.

"Racial Differences in Adult Labor Force Transition Trends," (with Michael Seeborg), *The Journal of Economics*, 1994.

## SELECTED RECENT PRESENTATIONS

American Bar Association Section of Antitrust Law, "Economic Issues Raised In The Comcast – Time Warner Cable Merger," Panelist, February 2016.

Fordham Competition Law Institute, 42nd Annual Conference on International Antitrust Law and Policy, Panel: Antitrust in a Mobile World, Panelist, October 2015.

American Bar Association Section of Antitrust Law, "Merger Practice Workshop," Faculty Member, October 2015.

Searle Center Conference on Antitrust Economics and Competition Policy, Panel on Recent Transactions in the Telecom Industry, Panelist, September 2015.

National Bureau of Economic Research, Summer Institute 2015, Industrial Organization Meetings, "Panel Discussion of the Comcast-Time Warner Merger," Panelist, July 2015.

Federal Communications Bar Association, "How the Antitrust Agencies and the FCC are Likely to Analyze Vertical Mergers," Panelist, November 2014.

The Coca Cola Company Global Antitrust Forum, "Round Table Discussion on Use of Economics and Economists," Panel Chair, November 2014.

Compass Lexecon Competition Policy Forum, Lake Como Italy, "Consolidation of the Telecoms Industry in the EU and the US," Panelist, October 2014.

The IATA Legal Symposium 2014, Aviation Law: Upfront and Center, "Merger Analysis – A sudden shift in approach by DOJ in the American Airlines and US Airways merger," Panelist, February 2014.

Georgetown Law 7th Annual Global Antitrust Enforcement Symposium, "Merger Enforcement and Policy," Panelist, September 2013.

American Bar Association Section of Antitrust Law, "Airline Mergers: First Class Results or Middle-Seat Misery?" Panelist, May 2013.

American Bar Association Section of Antitrust Law, "Go Low or Go Home! Monopsony a Problem?" Panelist, March 2012.

Federal Communications Bar Association Transactional Committee CLE Seminar, "The FCC's Approach to Analyzing Vertical Mergers," Panelist, October 2011.

The Technology Policy Institute Aspen Forum, "Watching the Future: The Economic Implications of Online Video," Panelist, August 2011.

American Bar Association Forum on Air & Space Law, 2011 Update Conference, "Antitrust Issues: What's on the Horizon for the Industry," Panelist, February 2011.

American Bar Association Section of Antitrust Law, "Antitrust in the Airline Industry," Panelist, September 2010.

## GRANTS AND HONORS

Searle Fund for Policy Research Grant, 2004-2006, for "An Empirical Examination of Asymmetric Information in Insurance Markets."

Kellogg School of Management Chairs' Core Course Teaching Award, 2003 & 2005.

Bradley Dissertation Fellowship, Stanford University, 1999-2000.

Stanford University, Outstanding Second Year Paper Prize, 1997.

## SELECTED ACADEMIC SEMINARS

Yale University
University of Arizona
Washington University, St. Louis
University of Pennsylvania
University of Toronto
UCLA
University of Wisconsin-Madison
Massachusetts Institute of Technology
Harvard University
University of Chicago
Columbia University
University of Texas
Carnegie Mellon University
University of California, Irvine
University of California, San Diego

## REFEREE FOR ACADEMIC JOURNALS

American Economic Review
The Journal of Industrial Economics
The Rand Journal of Economics
Journal of the European Economic Association
The Review of Economic Studies
The Review of Economics and Statistics
Journal of Risk and Insurance

# EXHIBIT 3

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| HONEYWELL INTERNATIONAL INC., <br><br> Plaintiff, <br><br> v. <br><br> ICONTROL NETWORKS, INC., and ALARM.COM HOLDINGS, INC., <br><br> Defendants. | Case No.: 2:17-cv-01227-MCA-LDW <br><br> **CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY** <br><br> **FILED UNDER SEAL PURSUANT L. CIV. R. 5.3(c)(3)** <br><br> **DOCUMENT ELECTRONICALLY FILED** |

### DECLARATION OF STEPHEN TRUNDLE

Stephen Trundle declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

#### I.    Introduction

1. I am President and Chief Executive Officer of Alarm.com Holdings, Inc. ("Alarm.com"). Except where stated below, I have personal knowledge of the information in this declaration.

2. I have been President and Chief Executive Officer of Alarm.com since May 2003, and a member of Alarm.com's Board of Directors since October 2003. Previously, I was Director of Technology and later the Chief Technology Officer at MicroStrategy Incorporated.

3. I make this declaration in opposition to Honeywell International Inc.'s ("Honeywell") motion for a temporary restraining order ("TRO") that would block Alarm.com from acquiring two business units from iControl Networks, Inc. ("iControl"), the Connect and Piper business units (the "Proposed Transaction"). That transaction is scheduled to close

1





DEFENDANT'S
TRIAL EXHIBIT

**DTX-0075**

Case 1:15-cv-00807-RGA

on ▮▮▮▮▮▮ following an eight-month review by the Federal Trade Commission, after the agency concluded that the transaction poses no harm to consumers or competition.

4. There is a ▮▮▮▮▮ date of March 23, 2017 for closing the Proposed Transaction, and a related transaction with Comcast. Thus, if this Court stops the transaction from closing, even temporarily, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ If the transaction is consummated we expect that competition will *increase*, as Comcast becomes an even more important formidable competitor against Alarm.com's dealers in this space.

5. No anticompetitive harm will result from the Proposed Transaction: neither competition nor innovation in the home security market will be harmed. As I discuss below, competition in this industry is already intense, and continues to get more and more intense with many new entrants ranging from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and countless others.

6. Honeywell, a multi-billion dollar manufacturer of security systems hardware and software, asserts that it will be excluded from a relationship with ADT. That is simply not true. Honeywell is a giant in the marketplace, and will have no difficulty surviving after the Proposed Transaction closes. Moreover, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Accordingly, Honeywell has no basis to claim it could be excluded from competing for ADT's business.

7. By contrast, if the TRO is issued, Alarm.com will suffer great harm. Pursuant to the Agreement among iControl, Alarm.com, and Comcast,



Thus, time is of the essence.

8. Alarm.com has devoted significant financial and employee resources to the Proposed Transaction. The TRO sought by Honeywell would prevent the consummation of the Proposed Transaction, ████████████████ Moreover, even if the ████ date were to be postponed, the assets that Alarm.com is to acquire from iControl are deteriorating in value, and continue to do so with each additional day that the closing is delayed.

### II.   Alarm.com

9. Alarm.com is based in Tyson's, Virginia. It was founded in 2000, and went public in June 2015.

10. Alarm.com offers connected home technology through a multi-tenant software-as-a-service ("SaaS") platform that includes cellular service and dealer support services, hosted by Alarm.com servers, for home and business owners. Alarm.com's service enables control of the home's connected devices, including alarm panels, security sensors, cameras, thermostats, door locks, window shades, lighting, garage doors, solar panels, and others from an application.

11. Alarm.com does not have direct relationships with end subscribers; instead, its services are sold to home and business owners through Alarm.com's network of approximately ████ independent, non-exclusive dealers. This is a fraction of the approximately ████

dealers in the independent dealer channel, and many of the Alarm.com non-exclusive dealers sell multiple security or home automation products.

12. The Alarm.com platform consists of four primary solutions: interactive security, intelligent automation, video monitoring, and energy management.

13. Alarm.com's fiscal year 2015 revenues were approximately $208.9 million. Alarm.com has not yet reported full year 2016 results, but revenue through the first three fiscal quarters of 2016 was $191.2 million.

14. Alarm.com derives the majority of its revenue from its software and cellular services, which are provided to service providers, or dealers, who resell the Alarm.com platform to end user customers (*e.g.*, homeowners), and pay Alarm.com monthly fees. As an example, a service provider typically charges the end customer about ▮▮▮▮ for central station monitoring plus Alarm.com software and cellular services. Of the ▮▮▮▮ the service provider collects from the customer, it would be typical for such service provider to pay Alarm.com about ▮▮▮▮ for the services that Alarm.com renders to the customer. This type of revenue to Alarm.com is referred to as Software as a Service ("SaaS"). Alarm.com's SaaS revenues in fiscal year 2015 were $140.9 million.

15. In addition to its SaaS revenues, Alarm.com generates revenue from hardware. For fiscal year 2015, Alarm.com earned $67.95 million in hardware revenue.

16. Alarm.com has approximately 600 employees and a current public company market capitalization of approximately $1.2 billion.

### III. The Rapidly Growing and Dynamic Smart Home Industry

4

17. Alarm.com understands from industry forecasts that the burgeoning smart home market is growing at compound growth rates estimated between 20% - 30% annually and is expected to be worth nearly $30 billion by 2020.

18. Alarm.com currently competes with a broad range of competitors in the independent dealer security sales channel including Honeywell, SecureNet, Telular, DMP Virtual Keypad, Interlogix ZeroWire, IPDatatel, Numerex Uplink, Napco and others. All of these players offer software "apps" that allow users to remotely control their security systems and other automated devices. In fact, ██████████████████████ ████████████████████████████████ ████████████

19. Alarm.com's dealers also face increasing competition to win and retain existing interactive security customers from cable and telco giants like Comcast's Xfinity Home, AT&T's Digital Life, and others like them. Comcast and AT&T offer apps to their subscribers that allow them to control their security, thermostats and other devices remotely. AT&T has built its Digital Life security service, which comes with professional installation and monitoring, to bypass dealers and go direct to consumers. Alarm.com's dealers constantly demand lower pricing, better service and more features from Alarm.com to enable them to meet the competition from these multi-system operators.

20. ████████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████████████████

21. Alarm.com and its dealers must also compete to win customers against rapidly growing, professionally monitored do-it-yourself ("DIY") home security players like SimpliSafe, Blink and Scout.  Indeed, a recent study reports that DIY accounted for as much as 27% of all home security installations in the fourth quarter of 2015.

22. Finally, Alarm.com confronts significant competition from

23.



24. Google is already a direct competitor to Alarm.com with its Nest thermostat and Dropcam video camera offerings that are sold through multiple channels, including through security dealers. Google's website contains announcements by Google of integrations with its Google Home smart speaker and home security competitors, including Honeywell, Belkin WeMo, LiFX, Wink, TP-Link and First Alert.

25. SmartThings is an open smart home hub focused on smart home and home security products. Alarm.com understands that Samsung aims to be a "universal" app that allows user to control all of the connected products in the home. Alarm.com is increasingly facing competition from Samsung's offering.

_____

[1] *See* http://appleinsider.com/articles/17/01/05/honeywell-embraces-apple-homekit-with-lyric-home-security-and-control-system.

26. In sum, the market is extremely competitive, as evidenced by the fact that we hear constantly from dealers demanding lower pricing, better service, and more features from Alarm.com to enable them to meet the competition from the interactive home security competitors described above.

## IV. Honeywell

27. Honeywell, a Fortune 100 company, is Alarm.com's largest competitor in the security system market, and an industry giant, whose resources far outstrip those of Alarm.com. According to Honeywell's most recently filed Form 10-K, Honeywell has approximately 131,000 employees and fiscal year 2016 revenues of $39.3 billion. Its Home and Buildings Technology division (the division that competes against Alarm.com) had over $10.6 *billion* in revenues, approximately *50 times* Alarm.com's total revenues. Honeywell's market capitalization exceeds $90 billion.

28. Honeywell's income before taxes in 2016 was $6.6 billion. Honeywell produces as much profit in a single day as Alarm.com produces in an entire year, and Honeywell's profit exceeds Alarm.com's 2016 R&D budget by approximately *13200%* (132X). Honeywell can certainly afford to make any investments it needs to make to compete with Alarm.com.

29. It is my understanding that Honeywell is the market share leader in providing security equipment to the U.S. residential and commercial markets. According to Honeywell's website, the technology from Honeywell's Home and Buildings Technology division is in more than 150 million homes worldwide. Year after year, a reader survey from one of

8

the primary industry journals (Security Distributing and Marketing Magazine) has ranked

Honeywell as "the industry's preferred channel partner."[2]

30.

31. Honeywell advertises on its website that Lyric is compatible with Samsung SmartThings, Amazon Echo, Google Home, Logitech Harmony, IFTTT, Yonomi, Panasonic Smart Home, Zonoff, Wink, Stringify, Iris by Lowes, MyKnock, Compass Control, WeatherBug Home, EnergyHub, Simple Control, UniKey Kevo, Encycle, Lutron, ClareControls, and Home8Smart Home Systems.[3]

### V. Honeywell Will Not Be Injured by the Proposed Transaction

32. I do not believe that the Proposed Transaction will harm Honeywell. But if Honeywell is harmed, it will be the result of vigorous, ordinary course competition, not a violation of the antitrust laws.

33. Alarm.com is acquiring the Connect business unit from Icontrol. ▓▓▓▓▓▓

---

[2] https://www.security.honeywell.com/aboutus/company-profile/index html.

[3] https://yourhome.honeywell.com/en/partners.

9



Honeywell complains that it will somehow be excluded from its pre-existing relationship with ADT. Nothing could be further from the truth.

34.

    i.

35.

36. Contrary to Honeywell's complaint, Complaint, ¶¶ 51-54,

10

37. Honeywell correctly states, "it takes two to interoperate" in its Brief in Support of its Application for Order to Show Cause at p. 14. ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

38. Alarm.com supports the Honeywell Vista control panel because the market asked it to do so. Many dealers install different versions of the Honeywell Vista control panel together with the Alarm.com SEM module for Honeywell Vista in their new installations. There are also many dealers who use our SEM module for the Honeywell Vista to work with already installed Honeywell Vista control panels.

39. Honeywell argues that Alarm.com might stop supporting Honeywell's products after the closing of the Proposed Transaction. *See, e.g.*, Complaint ¶¶ 51, 85-90. ████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

40. In fact, Alarm.com is acquiring Connect in order to serve those accounts. ████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

11



41. Alarm.com hopes to grow its business relationship with ADT as a result of the Proposed

Transaction.

42. Moreover, Alarm.com and ADT have entered an agreement contingent upon closing the

Proposed Transaction

43.

44.



45. I am also unaware of Honeywell ever showing any signs that it is actively attempting to "open" its remote services software platform, Total Connect, to other third-party control panel manufacturers.

## V. Significant Harm Will Result From the Issuance of a TRO

46. Alarm.com will suffer significant harm if the TRO is issued.

47.

48.

49. Alarm.com has shown itself to be highly competent in managing the scalable and reliable deployment of software to large populations of security system users.

50.



51. Alarm.com works hard to attract and retain the top product development and technical talent that we can identify. In recognition of our efforts, and based upon employee survey results, Alarm.com was named a Top Workplace by the Washington Post in 2015 and 2016. It is nearly impossible to be an attractive employer if your employees do not know their future. The primary iControl employee population is in Silicon Valley, CA where there is rampant competition for technical talent.

52. Until the deal closes, Alarm.com is unable to share with iControl employees what their future will be in the combined company. Honeywell also likely understands this dynamic and is seeking to further damage Alarm.com by delaying the closing as long as possible

53. We have continuously had to tell prospective employees, "we're sorry how long this is taking but please just wait a little bit longer."

Honeywell filed its suit.

54.



████████████████████████████████████

████████████████████

58. Relative to Honeywell, we are a small company with a modest executive team.

Honeywell likely knows they can distract us further with these activities and in so doing,

harm the existing Alarm.com business and employees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2017.

_____

Stephen Trundle

16

# EXHIBIT 5

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 6

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT 7

# THE FEDERAL CIRCUIT BAR ASSOCIATION

# MODEL PATENT JURY INSTRUCTIONS

Last Edited:  July 2016

© Federal Circuit Bar Association 2010

**B.3    Infringement**

### 3.10    WILLFUL INFRINGEMENT

[This instruction should be given only if willfulness is in issue.]

In this case, [patent holder] argues both that [alleged infringer] infringed and, further, that [alleged infringer] infringed willfully.  If you have decided that [alleged infringer] has infringed, you must go on and address the additional issue of whether or not this infringement was willful. Willfulness requires you to determine whether [patent holder] proved that it is more likely than not that the infringement by [alleged infringer] was especially worthy of punishment. You may not determine that the infringement was willful just because [alleged infringer] knew of the [ ] patent and infringed it. Instead, willful infringement is reserved for only the most egregious behavior, such as where the infringement is malicious, deliberate, consciously wrongful, or done in bad faith.

To determine whether [alleged infringer] acted willfully, consider all facts. These may include, but are not limited, to:

(1)    Whether or not [alleged infringer] acted consistently with the standards of behavior for its industry;

(2)    Whether or not [alleged infringer] intentionally copied a product of [patent holder] that is covered by the [ ] patent;

(3)    Whether or not [alleged infringer] reasonably believed it did not infringe or that the patent was invalid;

(4)    Whether or not [alleged infringer] made a good-faith effort to avoid infringing the [ ] patent, for example, whether [alleged infringer] attempted to design around the [ ] patent; and

(5)    Whether or not [alleged infringer] tried to cover up its infringement.

[Give this instruction only if [alleged infringer] relies upon an opinion of counsel as a defense to an allegation of willful infringement:

[Alleged infringer] argues it did not act willfully because it relied on a legal opinion that advised [alleged infringer] either (1) that the [product] [method] did not infringe the [ ] patent or (2) that the [ ] patent was invalid [or unenforceable].  You must evaluate whether the opinion was of a quality that reliance on its conclusions was reasonable.]

37

Authorities

35 U.S.C. § 284; *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, __ U.S. __, __ (2016) (preponderance of the evidence standard for finding willfulness); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1354 (Fed. Cir. 1999) (knowledge of the patent necessary to show willfulness and explaining, in the context of willful infringement, that "the patent law encourages competitors to design or invent around existing patents"); *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992) (identifying factors that indicate the degree of an infringer's culpability).

35 U.S.C. § 298 ("The failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent.").

Committee Comments: Some commentators have questioned whether the Supreme Court's *Halo* decision is consistent with the Federal Circuit's prior decisions holding that willfulness is a jury question (*see, e.g., Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1250 (Fed. Cir. 1989)). The Committee takes no position on whether willfulness should be submitted to the jury or whether it is more properly decided by the court.

The National Patent Jury Instructions include whether the alleged infringer acted in a manner consistent with the standards of commerce for its industry in the subjective part of the test. (www.nationaljuryinstructions.org.)  Some other pattern jury instructions decline to provide a list of nonexhaustive considerations, *see, e.g.*, Seventh Circuit, 2008 Patent Jury Instructions, at 11.2.14, on the theory that the factors are better left to attorney argument or may mislead a jury to believe other factors should not be considered.  (www.ca7.uscourts.gov/Pattern-Jury-Instr.)

It is the Committee's view that to the extent the court decides to provide a list of factors for the jury's consideration (an issue on which the Committee takes no position), only the factors for which there is evidentiary support should be included. *Cf. Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1231 (Fed. Cir. 2014) (stating that "the district court erred by instructing the jury on multiple *Georgia-Pacific* factors that are not relevant, or are misleading, on the record before it").

38

# EXHIBIT 8

# EXHIBIT REDACTED
# IN ITS ENTIRETY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ALARM.COM, INC. and ICN ACQUISITION, LLC, | ) ) ) | CASE NO.:  1:15-cv-00807 (RGA) |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) ) | |
| SECURENET TECHNOLOGIES LLC, | ) ) ) | █████████████ |
| Defendant. | ) ) ) ) ) ) | |

**EXHIBIT 10C**

**ALARM.COM'S REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 1**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALARM.COM, INC. and ICN ACQUISITION, LLC, )<br><br>Plaintiffs, )<br><br>v. )<br><br>SECURENET TECHNOLOGIES LLC, )<br><br>Defendant. ) | CASE NO.: 1:15-cv-00807 (RGA)<br><br>**JURY TRIAL DEMANDED** |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* NO. 1**

As to the antitrust matters (the FTC and Honeywell proceedings), SecureNet seeks to introduce hearsay evidence regarding the purported market definition under *antitrust law* by an expert who is not testifying in this case. SecureNet offers nothing showing that such information is relevant to *patent law* damages. Antitrust is a totally separate regulatory framework from patent law. This evidence would considerably distract and confuse by necessitating an explanation of the differences between antitrust and patent law.

Evidence regarding prior patent litigation between Icontrol and ADC should also be excluded. SecureNet concedes that Alarm.com denied infringement and alleged invalidity based on *different* claim constructions than those adopted in this case. Thus, ADC's positions are *not* contrary to those taken in that case. Explaining that to the jury would result in a confusing and distracting "trial within a trial." This substantial prejudice far outweighs any relevance.

SecureNet's attempt to establish relevance falls flat: *First*, SecureNet wrongly surmises that Mr. Trundle intends to rely upon the prior litigation to support a valuation for the patents in this case. Not so. ADC will not offer any testimony pertaining to the prior litigation. *Second*, ADC's prior litigation positions have no bearing on SecureNet's willfulness, given that ADC's allegations focus on SecureNet's specific conduct following Icontrol's dismissal of a 2014 action against SecureNet and its refusal to engage in licensing discussions. *Third*, ADC's experts haven't offered positions inconsistent with their prior testimony. Even if they had, SecureNet could impeach their testimony without identifying the specifics of the prior litigation.[1]

---

[1] SecureNet should not be permitted to introduce evidence regarding ADC's prior art theories from prior litigation while simultaneously excluding evidence of how the PTO disposed of those theories when *SecureNet* included them in its rejected *IPR* petitions.