# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALARM.COM, INC. and<br>ICN ACQUISITION, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SECURENET TECHNOLOGIES LLC,<br><br>Defendant. | )<br>) CASE NO.:  1:15-cv-00807 (RGA)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>) ▮▮▮▮▮▮▮▮▮▮▮▮<br>)<br>)  Redacted Version<br>)<br>)<br>)<br>)<br>) |

## JOINT [PROPOSED] PRETRIAL ORDER- Volume IV

DATED: January 9, 2019

Kenneth L. Dorsney (#3726)
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
kdorsney@morrisjames.com

*Attorneys for Plaintiffs*
*Alarm.com, Inc., and*
*ICN Acquisition, LLC*

Jack B. Blumenfeld (#1014)
Stephen J. Kraftschik (#5623)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
skraftschik@mnat.com

*Attorneys for Defendant*
*SecureNet Technologies LLC*

10688847/1

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on January 9, 2019, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed.

I further certify that on the same date the attached document was electronically mailed to counsel of record.

Dated: January 9, 2018

    /s/ Kenneth L. Dorsney
Mary B. Matterer (#2696)
Kenneth L. Dorsney (#3726)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com
kdorsney@morrisjames.com

*Attorneys for Plaintiff*

# Exhibit 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ALARM.COM, INC. and
ICN ACQUISITION, LLC,

      Plaintiffs,

v.

SECURENET TECHNOLOGIES LLC,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.:  1:15-cv-00807 (RGA)

**JURY TRIAL DEMANDED**

███████████████

**EXHIBIT 14**

**SECURENET'S MOTION *IN LIMINE* NO. 2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ALARM.COM, INC. and<br>ICN ACQUISITION, LLC, | ) <br> ) <br> ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SECURENET TECHNOLOGIES LLC, | ) <br> ) |
| Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) |

CASE NO.:  1:15-cv-00807 (RGA)

**JURY TRIAL DEMANDED**

████████████████

**EXHIBIT 14A**

**SECURENET'S MOTION *IN LIMINE* NO. 2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ALARM.COM, INC. and
ICN ACQUISITION, LLC,

          Plaintiffs,

      v.

SECURENET TECHNOLOGIES LLC,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.:  1:15-cv-00807 (RGA)

**JURY TRIAL DEMANDED**

**SECURENET TECHNOLOGIES LLC's MOTION *IN LIMINE* NO. 2:
PRECLUDE REFERENCE TO THE PATENT TRIAL AND APPEAL BOARD'S
DENIAL OF INSTITUTION OF *INTER PARTES* REVIEW PROCEEDINGS OF THE
ASSERTED PATENTS**

Pursuant to Federal Rule of Evidence 403, SecureNet moves *in limine* to preclude Plaintiffs from offering into evidence, referencing, or eliciting testimony regarding the Patent Trial and Appeal Board's ("PTAB") decisions declining to institute *inter partes* review ("IPR") of the Asserted Claims of the Asserted Patents. Such evidence is highly prejudicial under Federal Rule of Evidence 403 and its introduction will only serve to confuse the jury.

### A.    IPRs and Evidence at Issue

Prior to Plaintiffs Alarm.com, Inc. and ICN Acquisition Technologies LLC's substitution as plaintiffs in this litigation, SecureNet filed six IPRs on the four Asserted Patents against then-Patent Owner iControl Networks, Inc. (*See* IPR2016-01909 ('931 Patent); IPR2016-00919 and IPR2016-01920 ('619 Patent); IPR2016-01191 and IPR2016-01916 ('844 Patent); IPR2016-00959 ('635 Patent).) With the exception of IPR2016-00959[1] on the '635 Patent, all of SecureNet's IPRs were denied institution by the PTAB.

SecureNet anticipates that Plaintiffs will seek to introduce evidence of the PTAB's denials of the IPRs for the purpose of coloring the jury's views of the patents in Plaintiffs' favor. Such evidence includes, but may not be limited to, PX 221, PX 222, PX 332 to PX 334, PX 338 to PX 340, PX 471, PX 663, and PX 664.

### B.    Argument

SecureNet moves to exclude the PTAB decisions declining to institute IPR under Federal Rule of Evidence 403 because any probative value of the PTAB decisions is outweighed by the risk of unfair prejudice to SecureNet and confusion of the jury, as this Court has ruled many times before. *See Bio-Rad Labs., Inc. v. 10X Genomics*, C.A. No. 15-152-RGA, D.I. 371 (D. Del. Oct.

---

[1] IPR2016-00959 resulted in a final written decision holding the claims of the '635 Patent invalid. (*See* PX 331, PX 471.) The PTAB's final written decision in IPR2016-00959 is currently on appeal before the Federal Circuit.

1

12, 2018) ("Regarding the IPR decisions, failure to institute an IPR has little or no probative value. To the extent there is any probative value, it is substantially outweighed by the risk of confusing the issues, misleading the jury, and undue delay for time spent providing appropriate context. Fed. R. Evid. 403.") (attached as Ex. 1); *Nox Med. EHF v. Natus Neurology Inc.*, C.A. No. 15-709-RGA, D.I. 240 at 2 (D. Del. Apr. 12, 2018) ("Failure to institute an IPR has little or no probative value, and, to the extent there is any probative value, it is greatly outweighed by the risk of jury confusion and the time it would take to put the failure to institute in an appropriate context. Fed. R. Evid. 403.") (attached as Ex. 2); *see also Acceleration Bay, LLC v. Activision Blizzard, Inc.*, C.A. No. 15-453-RGA, D.I. 606, Tr. at 102:6-7 (D. Del. Oct. 19, 2018) ("And of course, in my history, [IPR] never had enough relevance to come in.") (attached as Ex. 3).

As this Court has previously held, denial of an IPR petition has little to no probative value because it is not a "decision on the merits." *Interdigital Commc'ns Inc. v. Nokia Corp.*, C.A. No. 13-10-RGA, 2014 WL 8104167, at *1 (D. Del. Sept. 19, 2014); *see also Andover Healthcare, Inc. v. 3M Co.*, C.A. No. 13-843, 2016 WL 6404111, at *2 (D. Del. Oct. 27, 2016) ("The PTAB's decision [denying institution] is not a final decision on validity, is based on different legal standards, and has no estoppel effect."). Moreover, any marginal relevance of the denial of a petition for IPR is significantly outweighed by the risk of juror confusion and the waste of time providing the jury with the appropriate context for the decision. *See Interdigital*, 2014 WL 8104167, at *1 ("[T]he probative value is greatly outweighed by the expenditure of time that would be required to give the jury the full context necessary to fairly evaluate the evidence. Further, because of the complexity involved in giving the full context, there would also be a significant risk of confusion of the issues."); *ART+COM Innovationpool GmbH v. Google Inc.*, No. 1-14-cv-00217-TBD, D.I. 382, at 4 (D. Del May 16, 2016) (Dyk, J., sitting by designation) (The "PTAB's

2

decision not to institute was reached on a record that was less than complete and without the benefit of a full adversarial proceeding. . . . The danger of prejudice and confusion outweighs the probative value of this evidence.")(attached as Ex. 4.); *accord Bio-Rad*, C.A. No. 15-152-RGA, D.I. 371 at 2 (Ex. 13); *Nox Med.*, C.A. No. 15-709-RGA, D.I. 240 at 2 (Ex. 4).

SecureNet would be unfairly prejudiced if the Court permits Plaintiffs to introduce evidence regarding the PTAB's denials of its petitions on the Asserted Patents. The PTAB's decisions are not final decisions on the merits, involve a different legal standard, and were decided on an incomplete record without the benefit of a full adversarial process. The PTAB's denial of institution also carries no estoppel effect on this litigation. Use of the decisions denying institution may create a false impression in jurors that the PTAB found the Patents-in-Suit valid and has settled questions of patent validity on the merits such that the jurors need not separately reevaluate validity. Jurors may also conclude that PTAB's denial of institution signals that the prior art used in the petitions is "inferior as prior art." *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 14-CV-1296, 2017 WL 4570787, at *6 (E.D. Wis. 2017).

### C.    Conclusion

The PTAB's decisions denying institution are highly prejudicial to SecureNet's presentation of its invalidity case and explanations regarding the IPR process will simply confuse the jury unnecessarily. Therefore, SecureNet respectfully requests that the Court grant its motion *in limine* and preclude Plaintiffs from offering into evidence, referencing, or eliciting testimony regarding the PTAB's decisions declining to institute IPR of the Asserted Patents.

3

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BIO-RAD LABORATORIES, INC. and
THE UNIVERSITY OF CHICAGO,

     Plaintiffs,

     v.                               C.A. No. 15-cv-152-RGA

10X GENOMICS, INC.,

     Defendant.

ORDER ON MOTIONS IN LIMINE

Each side has filed three motions in limine. (D.I. 323-1). They are resolved as follows.

Plaintiffs' MIL #1 is **GRANTED**. The litigations and IPRs involving unrelated patents and issues are not relevant to this case. Fed. R. Evid. 401. Defendant's theory that Bio-Rad acquired the prior plaintiff in this case (RainDance), for $87 million, just to have another shot at litigating against Defendant is of dubious relevancy at best. The technical and market analyses in the prior ITC actions are even less relevant, and regardless, have little value compared to the extensive infringement and damages expert testimony to be presented at trial. Therefore, even if these matters have marginal probative value, that value is substantially outweighed by the danger of confusing the issues, misleading the jury, and wasting time by needlessly presenting evidence of little or no value. Fed. R. Evid. 403.

Plaintiffs' MIL #2 will be addressed separately. Because the parties' arguments rely on speculation as to what theories each side will be advancing at trial, it is difficult to conduct a Rule 403 analysis in the abstract. Fed. R. Evid. 403. Whether particular evidence purportedly

related to Plaintiffs' "pre-suit state-of-mind" is probative of willfulness, or the extent to which asserted patents are "foundational," depends in large part on how Plaintiffs address those issues. It would be premature to exclude Defendant's purportedly responsive evidence without first knowing what it is responding to. Therefore, the parties should be prepared to discuss this motion at the Final Pretrial Conference on October 15, 2018. The parties should be ready to provide more detail on the evidence they plan to offer as it relates to this motion.

Plaintiffs' MIL #3 is **GRANTED**. Defendant disclaimed any reliance on advice of counsel in its response to interrogatories. This includes any reliance on advice given to QuantaLife, where Defendant's principals formerly worked, and which was later acquired by Bio-Rad. That Bio-Rad owns, and did not waive, the attorney-client privilege over any advice given to QuantaLife did not prevent Defendant from identifying such advice in response to interrogatories. Defendant's disclaimer of reliance on advice of counsel cannot be withdrawn piecemeal to Defendant's advantage.

Defendant's MIL #1 is **GRANTED-IN-PART** and **DENIED-IN-PART**. Plaintiffs do not oppose exclusion of the recently initiated ex parte reexaminations. Regarding the IPR decisions, failure to institute an IPR has little or no probative value. To the extent there is any probative value, it is substantially outweighed by the risk of confusing the issues, misleading the jury, and undue delay for time spent providing appropriate context. Fed. R. Evid. 403. Thus, the motion is **GRANTED** with respect to the IPR decisions and the ex parte reexaminations. Defendant also moves to exclude expert testimony given by Drs. Huck and Olmsted during the IPRs. I agree with Defendant that, on the present record, this testimony is inadmissible hearsay and cannot be presented in Plaintiffs' case-in-chief. However, that does not prevent Dr. Huck's IPR testimony from being used for impeachment purposes if Dr. Huck testifies at trial.

Likewise, Dr. Sia is free to rely on the IPR testimony, regardless of its admissibility, as part of his own expert testimony, assuming that the proper foundation is laid. Fed. R. Evid. 703. Whether Dr. Sia can disclose the underlying IPR testimony to the jury depends on whether its probative value substantially outweighs its prejudicial effect. *Id.* It should not be introduced absent my express approval. I will conduct a balancing analysis, should it be necessary, when I have a clearer idea of what each expert intends to testify at trial. The parties may address this at the Final Pretrial Conference. Thus, the motion is **GRANTED** with respect to the IPR testimony, but only to the extent that Plaintiffs seek to introduce it in their case-in-chief. Lastly, Defendant moves to exclude the Patent Office's consideration of Quake during the original prosecution of the asserted patents. Quake is the key prior art in this case and, to properly weigh the evidence, the jury should know that the Patent Office has already considered it. *See Sciele Pharms Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260–61 (Fed. Cir. 2012). Thus, the motion is **DENIED** with respect to the consideration of Quake in the original prosecution.

Defendant's MIL #2 is **GRANTED-IN-PART** and **DENIED-IN-PART**. Plaintiffs assert that the e-mails at issue were only added to their exhibit list by administrative error and have already been removed. Thus, the motion is **GRANTED** with respect to the actual e-mails.[1] Plaintiffs' refusal to produce the e-mails, however, is unrelated to testimony on QuantaLife's efforts to recruit Dr. Ismagilov. Defendant seeks to exclude testimony based on the e-mails and "other evidence that employees of QuantaLife communicated with the University of Chicago or Dr. Ismagilov that Plaintiffs failed to produce in discovery." It is not clear exactly what evidence this refers to, but, to the extent that Defendant moves to exclude testimony or other evidence

---

[1] This refers to the set of e-mails added and removed from Plaintiffs' exhibit list. Defendant states in its reply that there were seven e-mails, but only six were attached as exhibits to the motion. (Exs. A–F).

3

Case 1:15-cv-00152-RGA-CJB Document 371 Filed 10/12/18 Page 4 of 4 PageID #: 34546

related to QuantaLife's efforts to recruit Dr. Ismagilov, on the theory that the e-mails should have been produced in discovery, the motion is **DENIED**.

Defendant's MIL #3 is **GRANTED**. As discussed regarding Plaintiffs' MIL #2, Defendant is barred from relying on any advice of counsel at trial. Plaintiffs have stated that they do not intend to imply lack of advice of counsel so long as Defendant "does not suggest it has or is relying on legal advice." Thus, I would characterize this motion as being unopposed. If either side, including witnesses associated with the side, raise or refer to advice of counsel, or lack of advice of counsel, that side should expect to pay all necessary costs and fees relating to a retrial if one becomes necessary.

IT IS SO ORDERED this 12 day of October 2018.

_____
United States District Judge

4

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

NOX MEDICAL EHF,                     :
                                     :
                Plaintiff,           :
                                     :
        v.                           :        Civil Action No. 15-709-RGA
                                     :
NATUS NEUROLOGY INC.,                :
                                     :
                Defendant.           :

**ORDER ON MOTIONS IN LIMINE**

Nox MIL #1 (D.I. 235, Exh. G). This motion will be addressed separately. On Plaintiff's

third argument, that certain theories are barred by issue preclusion, Plaintiff cites two cases and

Defendant cites none. Plaintiff's only Federal Circuit citation stands for the unremarkable

proposition that a prior IPR decision finding a patent claim obvious precludes there being a

dispute about the obviousness of the same claim in a second proceeding. That is not what

Plaintiff wants to bar here. Plaintiff picks out various passages in the IPR opinion, and says

Defendant cannot relitigate the subject of those passages. I would like both parties to do some

legal research and submit briefs with more pertinent authorities, fleshing out whether there is any

basis for what Plaintiff requests. The parties might consider whether the IPR estoppel statute has

any impact on the analysis. The parties should submit any such briefs by COB April 20, 2018,

and may submit any answering briefs by COB April 23, 2018.

Nox MIL #2 (D.I. 235, Exh. H). The motion is GRANTED, as it is, in principle,

unopposed. The parties discuss "withheld" references. In front of the jury, all any party can say

is that a particular reference was, or was not, before the PTO during prosecution. Any hint

before the jury about wrongdoing (that is, dishonesty with, or concealment of anything from, the PTO) is EXCLUDED.

Nox MIL #3 (D.I. 235, Exh. I). Defendant says it will not introduce evidence of its "redesigned disposable RIP belt," but "reserves the right to present such evidence to rebut efforts by Nox to use this same evidence in defense of [Defendant's] invalidity claims or in support of its damages claims." Plaintiff responds that its evidence about design, or redesign, is in the 2011-13 time period. Thus, if I understand Plaintiff correctly, it will not introduce any "redesign evidence" post-dating 2013, and therefore Defendant's evidence about efforts leading up to the 2018 redesign will be excluded. On that understanding, the MIL is GRANTED. (It should be obvious that there is no expert testimony about whether the redesigned belt infringes or not. It is not an accused product. Thus, I expect both sides' damages experts will take into account the phasing out of the accused product. The parties should advise at the pretrial conference if this is an issue.)

Natus MIL #1 (D.I. 235, Exh. J). I agree with Plaintiff that this motion in limine is really an untimely summary judgment motion. It is therefore DENIED. On the subject of my claim constructions, as both sides agree, the experts have to use the claim constructions. If the parties have not done so already, they need to put all of the relevant claim constructions into one proposed order, which will go to the jury. The jury gets that order, and only that order. It does not get my claim construction opinions.

Natus MIL #2 (D.I. 235, Exh. K). Defendant's motion is GRANTED. Failure to institute an IPR has little or no probative value, and, to the extent there is any probative value, it is greatly outweighed by the risk of jury confusion and the time it would take to put the failure to institute in an appropriate context. Fed. R. Evid. 403. Further, to the extent Defendant states that it can

Case 1:15-cv-00807-RGA-CJB Document 236 Filed 01/16/19 Page 19 of 477 PageID
Case 1:15-cv-00709-RGA Document 240 Filed 04/12/18 Page 3 of 3 PageID #: 17843
#: 9975

use the institution of the IPR, or the pendency of IPR proceeding, for any purpose, including lack

of willfulness, such evidence would be excluded on the same rationale. The parties are

instructed that the jury is not to be told about the IPR in any fashion. Of course, if a witness

made an inconsistent statement in connection with an IPR, the witness may be impeached with it,

but without disclosure that it occurred in an IPR.

Natus MIL #3 (D.I. 235, Exh. L). Both sides agree that Defendant did not infringe the

asserted patent before it was issued. Plaintiff wants to put on evidence that Defendant copied the

product that embodies the patent, and, then, when it learned of the patent, continued to make and

sell its product. This seems like relevant evidence to support a theory of willfulness. I will

instruct the jury that it is perfectly lawful to copy unpatented products. I will also instruct the

jury that before the date of issuance, Plaintiff's product was an unpatented product (or something

similar). Thus, I will make sure that the jury does not find the Defendant acted willfully for non-

infringing and lawful conduct. Defendant's motion is DENIED. The parties should meet and

confer, and submit a proposed instruction that I can give during trial in order to make sure that

the evidence is only used for a proper purpose and that there is no unfair prejudice to Defendant.

IT IS SO ORDERED this 12 day of April 2018.

_Richard G. Andrews_
United States District Judge

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ACCELERATION BAY, LLC          )
                               )
            Plaintiff,         )
                               )
        v.                     ) Civil Action No. 15-453-RGA
                               )
ACTIVISION BLIZZARD, INC.,     )
                               )
            Defendant.         )

J. Caleb Boggs Courthouse
844 King Street
Wilmington, Delaware

Friday, October 19, 2018
8:32 a.m.
Pretrial Hearing

BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge

APPEARANCES:

PHILIP A. ROVNER, ESQUIRE
POTTER ANDERSON & CORROON, LLP
   1313 N. Market Street, 6th Floor
   Hercules Building
   Wilmington, Delaware  19899

               -and-

PAUL ANDRE, ESQUIRE
LISA KOBIALKA, ESQUIRE
AARON M. FRANKEL, ESQUIRE
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
   990 Marsh Road
   Menlo Park, California  94025
   For the Plaintiff

---

APPEARANCES CONTINUED:

JACK B. BLUMENFELD, ESQUIRE
MORRIS NICHOLS ARSHT & TUNNELL, LLP
   1201 North Market Street
   Wilmington, Delaware  19899

               -and-

DAVID P. ENZMINGER, ESQUIRE
MICHAEL TOMASULO, ESQUIRE
KATHLEEN B. BARRY, ESQUIRE
WINSTON & STRAWN, LLP
   333 S. Grand Avenue, 38th Floor
   Los Angeles, California  90071

               -and-

B. TRENT WEBB, ESQUIRE
AARON E. HANKEL, ESQUIRE
SHOOK HARDY & BACON, L.L.P.
   2555 Grand Boulevard
   Kansas City, Missouri 64108-2613
   For the Defendant

Also Present:

Mr. Omar Salik
Ms. Julia Kazaks

---

THE CLERK:  All rise.

THE COURT:  All right.  Good morning.  Please be seated.

This is Acceleration Bay versus Activision Blizzard.  Civil Action Number 16-453.

Good morning, Mr. Rovner.

MR. ROVNER:  Good morning, Your Honor.  Phil Rovner from Potter Anderson for plaintiff, Acceleration Bay.  With me from Kramer Levin, Paul Andre.

MR. ANDRE:  Good morning, Your Honor.

MR. ROVNER:  Lisa Kobialka.

MS. KOBIALKA:  Good morning, Your Honor.

MR. ROVNER:  And Aaron Frankel.

MR. FRANKEL:  Good morning, Your Honor.

THE COURT:  All right.  Good morning to you all.

Mr. Blumenfeld.

MR. BLUMENFELD:  Good morning, Your Honor.  Jack Blumenfeld for Activision Blizzard.  And with me are Trent Webb from Shook Hardy & Bacon, David Enzminger, and Mike Tomasulo from Winston & Strawn.

Behind them Aaron Hankel from Shook Hardy & Bacon, and Kathleen Barry from Winston & Strawn.

And in the first row, Omer Salik and Julia Kazaks, next to him, from Activision.

THE COURT:  All right.  Well, good morning to

---

you all, too.  All right.

So, though I've read portions of the Pretrial Order, including the motions in limine and the body of it, but I guess the first thing to address is damages.

What are we going to do about that, Mr. Andre?

MR. ANDRE:  Your Honor, we're going to be putting forward a damages case that has three factual bases that the jury can decide a reasonable royalty.

First being a cost savings methodology that you have allowed in the case with Dr. Valerdi and others who will be talking about the cost-savings basis.  This is largely based on a few other Federal Circuit cases that have allowed this type of damages model.

We also have a revenue-based model based on the proper apportionment of the revenue and the profits of the infringing technology over the relevant time period that the jury can base a reasonable royalty on.

And we also have a per-unit royalty possibility that the jury can base a reasonable royalty on as well.

THE COURT:  All right.  So for example, the per unit, let's say cost, I don't know, $100 to buy an Activision software package.

How do you get to a per-unit royalty?

MR. ANDRE:  It's actually a per-user royalty because it's -- when I say per unit, it's per unit per user.

101

And so, you know, there's going to be a conversation that was held. If you want to bring it out, maybe they'll bring it out, with a number of other companies. I mean, it seems to me like something that's going to be a blip in the trial, so I'm going to allow them to do that.

MR. WEBB: Thank you, Your Honor.

THE COURT: Okay. Is there anything else here because there's not going to be any discussion about Sony and Mr. Van Datta surreptitiously copying asserted patents; right?

MR. ANDRE: I don't know where that's coming from. We're not going to be presenting that evidence to prove willfulness or for anything.

THE COURT: Okay. So I don't think there's much else there. So I'm going to, you know, deny it to the extent it seeks to keep out the Bourassa conversation in 2001 or so, and that it's not relevant to willfulness.

So the last motion in limine is about the IPRs, I guess. And I don't really understand why, the fact that there's no anticipation and obviousness defenses here, it doesn't mean that this is pretty moot, too, because what possible relevance could the IPRs or PTAB have on anything?

I take it you agree. No, you want to get them in.

102

Sorry, Mr. Frankel. I was putting you on the side rank here.

What's the relevance to this?

MR. FRANKEL: Well, the relevance has certainly been reduced, Your Honor.

THE COURT: And of course, in my history, it never had enough relevance to come in. So when you're reducing it from not being sufficient, it's still insufficient.

MR. FRANKEL: If Activision is not going to talk about the state of the art, then we're not going to reference the IPRs.

THE COURT: Okay. Well, they're, I guess, going to do a little talking about the state of the art, but you're not going to be talking about the IPRs because they're confusing, and they have no relevance, particularly in a case where there's not even an issue in the case that's relevant to IPRs, PTAB, anticipation, obviousness. And I guess the one -- hold on a minute.

So I take it, because the only issue here is this lack of written description, there's going to be no -- I think I'm getting this confused with a case I had on Monday. So, in any event, let's move on.

But I'm going to exclude -- yes, Mr. Frankel.

MR. FRANKEL: If I could just make two brief

103

points, Your Honor. The first is that Activision is calling as witnesses two prior art witnesses that we've objected to, Ed Terrano and Kegel.

And all that they were disclosed for was prior art. The prior art that they were disclosed for was overcome in the IPRs.

THE COURT: So Ed Terrano. And who is the other one?

MR. FRANKEL: Kegel, K-E-G-E-L.

THE COURT: Are you actually calling Kegel and Terrano?

MR. ENZMINGER: We are going to play some testimony from them.

THE COURT: Why?

MR. ENZMINGER: Because with respect to Mr. Terrano, he designed a Microsoft network that they contend is non-infringing. We thought it wasn't an anticipatory reference.

The Patent Office disagreed with that. That's fine. But it still is now then a non-infringing alternative.

THE COURT: All right. So you're going to call this person. I'm sorry. Are we talking about Terrano here --

MR. ENZMINGER: Yeah. We'll be presenting

104

some --

THE COURT: -- or some deposition?

MR. ENZMINGER: Mr. Terrano, unfortunately, has throat cancer, so he will not be able to be here. But, yes, with respect to the non-infringing design that existed in the late 1990s that he designed and that Activision used.

THE COURT: Okay. So basically he's going to say something, and then your expert is going to say something to make it relevant?

MR. ENZMINGER: Exactly.

THE COURT: All right. And how about Kegel?

MR. ENZMINGER: Same.

THE COURT: All right. What's your response to that?

MR. FRANKEL: The issue we have is that if Mr. Kegel and Mr. Terrano designed the topologies that are non-infringing, the experts should just say these topologies are available as a non-infringing alternative.

The fact that these topologies were created in 1990 or the late 1990s before or after these patents is not relevant, and it's confusing. It's getting into the --

THE COURT: No, but I think, you know, it's not as though the jury is going to be looking at this against the background of, Jeez, where are the anticipation and obviousness defenses that we were expecting? Hmm.

# EXHIBIT 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ART+COM INNOVATIONPOOL GMBH,

   *Plaintiff;*

  v.

GOOGLE INC.,

   *Defendant.*

Civil Action No. 1:14-217-TBD

**MEMORANDUM ORDER**

## I.   Motions in Limine

Presently before the court are (A) the motions in limine of Plaintiff ART+COM Innovationpool GmbH ("ART+COM" or "ACI") (D.I. 365-13 at PageID 10290, 10337, 10386), Google's oppositions (D.I. 365-13 at PageID 10308, 10360, 10391), and ACI's replies (D.I. 365-13 at PageID 10334, 10377, 10397) and (B) the motions in limine of Defendant Google Inc. ("Google") (D.I. 365-14 at PageID 10401, 10462, 10609), ACI's oppositions (D.I. 365-14 at PageID 10453, 10594, 10641), and Google's replies (D.I. 365-14 at PageID 10458, 10605, 10662). For the reasons stated below, and the court having heard oral argument, **IT IS HEREBY ORDERED THAT**:

 A.1.   ART+COM's Motion in Limine #1 is **DISMISSED-IN-PART** as moot, **GRANTED-IN-PART**, and **DEFERRED-IN-PART**. ACI's Motion in Limine #1 (D.I. 365-13 at PageID 10290) seeks to bar certain testimony by Google's technical expert, Dr. Michael Goodchild, that ACI argues is inconsistent with the court's claim construction of U.S. Patent No. RE44,550 ("the '550 patent"). Google opposes. D.I. 365-13 at 10309. The issues as to Dr.

1

Goodchild's opinions regarding steps (a) and (c) are resolved by the agreement of the parties, and are now moot. *See* D.I. 365-13 at PageID 10291, 10309, 10335.

The court concludes that ACI's Motion in Limine #1 with respect to steps (e) and (f) of claim 1 of the '550 patent effectively raises issues of claim construction. It is improper for counsel to argue conflicting claim constructions to the jury. *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005). And "[w]hen the parties raise an actual dispute regarding the proper scope of [patent] claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). The court concludes that further claim construction is necessary as to steps (e) and (f) of claim 1 of the '550 patent.

With respect to step (e) of claim 1 of the '550 patent, which requires, "representing the data for the field of view in a pictorial representation having one or more sections," **the parties shall submit supplemental briefing** of no more than 10 pages, double-spaced, by 5:00 pm EDT on Tuesday, May 17, 2016, on the proper interpretation of the claim, as was agreed to at the pre-trial conference. *See* D.I. 377 at 45.

ACI's Motion in Limine #1 is **GRANTED** with respect to step (f) of claim 1, which requires, "dividing each of the one or more sections . . . into a plurality of smaller sections, requesting higher resolution space-related data for each of the smaller sections." '050 patent, col. 10 ll. 33–41. ACI argues that Dr. Goodchild's opinion is inconsistent with the plain meaning of the claim when he states that the claimed invention requires traversing each parent node of a given resolution/layer before traversing any child/subnodes, *i.e.*, that every one of the "one or more sections" must be "divid[ed] . . . into a plurality of smaller sections" before any "requesting higher resolution space-related data" takes place. The court previously construed step (f) to

2

Case 1:14-cv-00021-PBD Document 382 Filed 05/16/16 Page 3 of 8 PageID #: 11583

require, "dividing each of the one or more sections . . . into a plurality of smaller sections, prior to requesting higher resolution space-related data for each of the smaller sections." D.I. 148 at 17, and explained that "the steps must occur in order. The device cannot request higher resolution data for a 'smaller section' before that section exists." D.I. 148 at 18. Google's interpretation of "each" to mean "every" in this instance is not persuasive. While the steps must be performed in order for a given "section," it is not necessary that *all* "sections" must be divided before higher resolution space-related data can be requested for *any* of the "smaller sections."

The motion is **GRANTED** so that Dr. Goodchild is precluded from testifying that the claim requires that all of the sections must be divided into smaller sections before any requesting of higher resolution space-related data can take place.

A.2.    ACI's Motion in Limine #2 seeks to exclude Google's "single data source" non-infringing alternative. The motion is **DENIED**. The substance of this motion was already addressed by the court's prior ruling. *See* D.I. 354 at PageID 9715.

A.3.    ACI's Motion in Limine #3 requests that the court rule in advance of Dr. Goodchild's testimony which of the references asserted by Google have been proven to qualify as prior art. This motion essentially seeks to reargue questions that were resolved by the summary judgment order of April 28, 2016. D.I. 354. The motion is **DENIED** without prejudice to ACI's ability to request, at the conclusion of the evidence, a jury instruction that particular references asserted by Google do not qualify as prior art.

B.1.    Google's Motion in Limine #1 seeks to exclude any testimony, evidence, or argument suggesting that Google or its former employees copied ACI's patented technology. The motion is **DISMISSED** as moot. ACI has agreed that it will not allege that Google copied

Case 1:15-cv-00807-RGA-CJB Document 236 Filed 01/16/19 Page 27 of 477 PageID
Case 1:14-cv-00217-PBD-J Document 382 Filed 05/16/16 Page 4 of 8 PageID #: 1814
#: 9983

ACI's Terravision system. *See* D.I. 365-14 at PageID 10454. This ruling does not preclude objections to individual questions relating to the 1995 interactions between SGI and ACI.

B.2.    Google's Motion in Limine #2 seeks to exclude evidence of Google's petitions for Inter Partes Review of claims of the '055 patent and the PTAB's denial of institution of those petitions. The motion is **GRANTED**. Under Federal Rule of Evidence 403, the court has discretion to exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. In both IPR2015-00788 and IPR2015-00789, the PTAB's decision not to institute was reached on a record that was less than complete and without the benefit of a full adversarial proceeding. *See* D.I. 365-14 at PageID 10489–94, 10499–504. The danger of prejudice and confusion outweighs the probative value of this evidence. There will be no reference at the trial to the PTAB's decision not to institute Inter Partes Review against claims of the '550 patent.

B.3.    Google's Motion in Limine #3 is **DISMISSED** as moot. Google urges the court to exclude any evidence, testimony, or argument suggesting that a prior art publication does not disclose a limitation because the limitation had allegedly not been implemented. D.I. 365-14 at PageID 10610. ART+COM opposes, and states that it will not argue that a publication's disclosure requires actual implementation in a system or product to qualify as prior art. D.I. 365-14 at PageID 10642. Objections to individual questions concerning implementation of prior art are not foreclosed at trial by this ruling.

## II.    Google's motion for reargument

Google has moved for reconsideration of the court's order of April 28, 2016, (D.I. 353) denying its motion to preclude testimony of Mr. Nawrocki regarding his per-session damages theory. D.I. 359. The issue has been fully briefed. D.I. 368. The court heard argument at the

pretrial conference on May 12, 2016. For the reasons set forth below, Google's motion is **DENIED**.

A motion for reconsideration may only be granted if the moving party demonstrates "(1) an intervening change in controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Google contends that Mr. Nawrocki improperly included certain categories of revenue in the royalty base for his per-session theory and that the evidence does not support Mr. Nawrocki's 13% apportionment. But the court previously addressed these very arguments, and Google fails to establish any clear error of fact or law.

As for Mr. Nawrocki's calculation of the royalty base for his per-session theory, Google argues that it was improper for Mr. Nawrocki to begin with revenue figures from the entire Google Geo product group. But, as the court previously explained, to the extent the various revenue sources rely upon an accused product like Google Earth Free in their implementation, they are properly included in a damages analysis so long as a proper apportionment is undertaken. D.I. 354 at PageID 9719. There is evidence that Google Geo, of which Google Earth is a part, improves the quality and targeting of advertising for Google across multiple products and contributes to more local queries on Google.com, which collectively drives advertising revenue. *See* D.I. 369, Ex. B at 126; Ex. H at 101. The evidence further supports the view that the products are to varying degrees interrelated. *See, e.g., id.* at Ex. I, 33:2–9. Mr. Nawrocki's calculation of the royalty base is "methodologically sound." D.I. 354 at PageID 9720.

As for Mr. Nawrocki's 13% apportionment, Google contends that Mr. Nawrocki's representations "lack any support in the record." D.I. 359 at 9. But, as the court previously found and Google itself acknowledges, Mr. Nawrocki's 13% figure is derived from a 2008 Google-prepared business plan with projected advertising revenue for Google Earth, Google Maps, and Google Maps API. D.I. 354 at PageID 9720. The 13% figure is further supported by other evidence in the record. *See id.* "Mr. Nawrocki's 13% figure may or may not be the most accurate apportionment for Google Earth's contributions to the Geo segment, but that goes to the weight and credibility of the evidence." *Id.* at PageID 9721. Mr. Nawrocki's apportionment employs valid methodology and "can properly be applied to the facts at issue." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593 (1993). Though this does not reflect a decision on the weight and credibility of the evidence, Mr. Nawrocki's apportionment does not run afoul of Rule 702 of the Federal Rules of Evidence.

It is **SO ORDERED** this 16th day of May, 2016.

Honorable Timothy B. Dyk

United States Circuit Judge, sitting by designation

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ALARM.COM, INC. and ICN ACQUISITION, LLC, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| SECURENET TECHNOLOGIES LLC, | ) ) ) |
| Defendant. | ) ) ) ) ) ) ) |

CASE NO.:  1:15-cv-00807 (RGA)

**JURY TRIAL DEMANDED**

▮▮▮▮▮▮▮▮▮▮▮

**EXHIBIT 14B**

**ALARM.COM'S OPPOSITION TO SECURENET'S MOTION *IN LIMINE* NO. 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALARM.COM, INC. and ICN ACQUISITION, LLC | ) | CASE NO.:  1:15-cv-00807 (RGA) |
| | ) | |
| Plaintiffs, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| SECURENET TECHNOLOGIES LLC, a Delaware limited liability company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS ALARM.COM, INC. AND ICN ACQUISITION, LLC'S OPPOSITION TO SECURENET TECHNOLOGIES LLC'S MOTION IN LIMINE NO. 2: PRECLUDE REFERENCE TO THE PATENT TRIAL AND APPEAL BOARD'S DENIAL OF INSTITUTION OF *INTER PARTES* REVIEW PROCEEDINGS OF THE ASSERTED PATENTS**

SecureNet's IPR petitions and their outcome are highly relevant for three reasons. First, SecureNet seeks to introduce at trial a pre-IPR report from the same expert that SecureNet used in its IPR petitions that includes opinions applying the same prior art to the same patents as at trial. Second, SecureNet intends to challenge the validity of the patents-in-suit using prior art that the Patent Office has already considered and rejected *eight times*, including five times in SecureNet's IPR petitions. Finally, the IPR petitions are relevant to SecureNet's mental state regarding its invalidity defense and the prior art. Thus, the IPR petitions and the Patent Office's denial thereof are highly relevant to rebutting SecureNet's invalidity counterclaims and its defenses to willful infringement.

## I. SECURENET SEEKS TO INTRODUCE INTO EVIDENCE ITS IPR EXPERT'S SEPARATE OPINIONS ABOUT THE SAME PRIOR ART

SecureNet seeks to exclude any reference to its denied IPR petitions but simultaneously seeks to introduce into evidence an earlier expert report from its IPR expert, James Parker, from a separate litigation (the "pre-IPR report").

Any introduction of Parker's pre-IPR report should open the door to the jury hearing how the Patent Office addressed (and rejected) Parker's opinions about this prior art.[1]

## II. SECURENET'S FAILED IPR PETITIONS RELY ON THE SAME PRIOR ART THAT SECURENET INTENDS TO ADVANCE AT TRIAL.

SecureNet's IPR petitions are also relevant because SecureNet intends to assert at trial the *same* prior art SecureNet used in its IPR petitions and over which the Patent Office has

---

[1] ADC is moving to exclude Parker's pre-IPR Report and references to the separate litigation.

repeatedly upheld the asserted claims' validity. Indeed, SecureNet has now served two expert reports—the latest on December 20, 2018—advancing the Wimsatt reference and other references against the claims of the patents-in-suit.[2] *See* Ex. 9 at ¶¶ 173, 249, 250, 268, 271, 279, 289, 291, 301, 302, 309-311, 313-314, and 330; Ex. 10 at ¶¶ 9, 12-13, 15-16, 19-20, 26, 34-38. The Patent Office considered Wimsatt a total of eight several times during the patents' prosecutions and in SecureNet's IPRs. *See* D.I. 1 at ECF PageID 34, 77, 120 (referencing Wimsatt by its issued patent number); Ex. 11 at 5-8, Ex. 12 at 7-20, Ex. 13 at 12-29. In the IPRs, the Patent Office determined in each instance that Wimsatt combined with other references failed to create a reasonable likelihood of unpatentability. *See id.*

If SecureNet uses Wimsatt at trial this should open to door to the jury hearing how the Patent Office considered Wimsatt during prosecution and in the IPR petitions and still upheld the claims' validity. The Patent Office's repeated rejection of the Wimsatt reference renders SecureNet's burden at trial "particularly heavy" and is highly relevant to rebutting SecureNet's Wimsatt-based obviousness claims. *Impax Laboratories, Inc. v. Aventis Pharmaceuticals, Inc.*, 545 F.3d 1312, 1314, 88 U.S.P.Q.2d 1381 (Fed. Cir. 2008) ("When the examiner considered the asserted prior art and basis for the validity challenge during patent prosecution, that burden becomes particularly heavy.").

## III. THE IPR PETITIONS ARE RELEVANT TO SECURENET'S SUBJECTIVE GOOD FAITH DEFENSE TO WILLFUL INFRINGEMENT

There are also particularized issues regarding SecureNet's alleged subjective belief defense to ADC's willful infringement claim. SecureNet bases its defense to willful infringement in part on its alleged subjective belief that the patents-in-suit are invalid. However SecureNet's

---

[2] U.S. Patent Application Pub. No. 2004/0260427 and U.S. Patent No. 7,047,092. SecureNet's invalidity expert intends to offer opinions on other IPR references as well, such as Johnson. *See, e.g.,* Ex. 10 at ¶ 309.

2

invalidity positions rely on prior art references that SecureNet used in its rejected IPR petitions. The fact that the Patent Office considered these references and denied SecureNet's petitions is probative of SecureNet's mental state regarding its defenses and the prior art at least as of the date of those denials, and is therefore probative of willful infringement. *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp.*, LLC, 879 F.3d 1332, 1353 (Fed. Cir. 2018) ("The district court must reconsider its decision to exclude evidence of the prior art during the jury trial on willfulness to determine whether Briggs had ***developed any views about the prior art*** at the time of accused infringement or whether the evidence only relates to Briggs' litigation-inspired defenses." (emphasis added)).

For the foregoing reasons, the Court should deny or defer SecureNet's motion until trial subject to any door opening events such as those described above. *See* Ex. 14 at 34:3-7 ("So if there is something that supposedly opens the door, I would like to hear about it before you walk through the door.").

3

# EXHIBIT 1
## FILED UNDER SEAL

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT 2
## FILED UNDER SEAL

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 3
## FILED UNDER SEAL

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT 4

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

SecureNet Technologies, LLC,
Petitioner

v.

iControl Networks, Inc.,
Patent Owner

U.S. Patent No. 8,073,931
Filing Date: Aug. 25, 2008
Issue Date: Dec. 6, 2011
Title: Networked Touchscreen with Integrated Interfaces

————————————

*Inter Partes* Review No. _____

**Petition for *Inter Partes* Review of U.S. Patent No. 8,073,931**

i

ALARM.COM-SECURENET-DE 1726608

## Table of Contents

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1) | | 1 |
| | A. | Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1) | 1 |
| | B. | Related Matters Under 37 C.F.R. § 42.8(b)(2) | 1 |
| | C. | Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3) | 2 |
| | D. | Service Information | 2 |
| | E. | Power of Attorney | 2 |
| III. | PAYMENT OF FEES - 37 C.F.R. § 42.103 | | 2 |
| IV. | REQUIREMENTS FOR INTER PARTES REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108 | | 2 |
| | A. | Grounds for Standing Under 37 C.F.R. § 42.104(a) | 2 |
| | B. | Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested | 3 |
| | C. | Threshold Requirement for Inter Partes Review 37 C.F.R. § 42.108(c) | 3 |
| V. | BACKGROUND OF TECHNOLOGY RELATED TO THE '931 PATENT | | 3 |
| VI. | SUMMARY OF THE '931 PATENT | | 4 |
| VII. | CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3) | | 4 |
| | A. | Legal Overview | 4 |
| | B. | Proposed Claim Constructions | 4 |
| VIII. | PERSON HAVING ORDINARY SKILL IN THE ART & STATE OF THE ART | | 4 |
| IX. | CLAIMS 1-6, 14-46, 49-58 AND 60-61 OF THE '931 PATENT ARE UNPATENTABLE | | 5 |
| | A. | Overview Of The Prior Art | 5 |
| | | 1. Overview of Wimsatt | 5 |
| | | 2. Overview of the User Guide | 6 |
| | | 3. Overview of Johnson | 6 |
| | | 4. Overview of Severson | 6 |

ALARM.COM-SECURENET-DE 1726609

## Table of Contents
### (continued)

|  |  |  | Page |
|---|---|---|---|
|  | 5. | Overview of Tsai | 7 |
|  | 6. | Overview of Modeste | 7 |
| B. |  | The Cited References Are Analogous Art | 7 |
| C. |  | Grounds 1-4 – Claims 1-6, 14-46, 49-58 and 60-61 Are Rendered Obvious by the Prior Art Under 35 U.S.C. § 103(a) | 7 |
|  | 1. | Independent claim 1 – Ground 1 | 7 |
|  | 2. | Independent claim 60 – Ground 1 | 29 |
|  | 3. | Independent claim 61 – Ground 1 | 31 |
|  | 4. | Dependent claim 2 – Ground 1 | 36 |
|  | 5. | Dependent claim 3 – Ground 1 | 37 |
|  | 6. | Dependent claim 4 – Ground 1 | 39 |
|  | 7. | Dependent claim 5 – Ground 1 | 39 |
|  | 8. | Dependent claim 6 – Ground 1 | 40 |
|  | 9. | Dependent claim 14 – Ground 2 | 41 |
|  | 10. | Dependent claim 15 – Ground 2 | 43 |
|  | 11. | Dependent claim 16 – Ground 2 | 44 |
|  | 12. | Dependent claim 17 – Ground 2 | 47 |
|  | 13. | Dependent claim 18 – Ground 2 | 47 |
|  | 14. | Dependent claim 19 – Ground 2 | 48 |
|  | 15. | Dependent claim 20 – Ground 3 | 49 |
|  | 16. | Dependent claim 21 – Ground 1 | 49 |
|  | 17. | Dependent claim 22 – Ground 1 | 50 |
|  | 18. | Dependent claim 23 – Ground 1 | 51 |
|  | 19. | Dependent claims 24 and 26 – Ground 1 | 52 |
|  | 20. | Dependent claim 25 – Ground 1 | 53 |
|  | 21. | Dependent claim 27 – Ground 1 | 53 |
|  | 22. | Dependent claim 28 – Ground 1 | 54 |
|  | 23. | Dependent claim 29 – Ground 1 | 54 |

ALARM.COM-SECURENET-DE 1726610

## Table of Contents
### (continued)

|  |  |  | Page |
|---|---|---|---|
| 24. | Dependent claim 30 – Ground 1 | | 54 |
| 25. | Dependent claim 31 – Ground 1 | | 57 |
| 26. | Dependent claim 32 – Ground 1 | | 57 |
| 27. | Dependent claims 33 and 34 – Ground 1 | | 58 |
| 28. | Dependent claim 35 – Ground 1 | | 58 |
| 29. | Dependent claim 36 – Ground 1 | | 59 |
| 30. | Dependent claim 37 – Ground 1 | | 59 |
| 31. | Dependent claim 38 – Ground 1 | | 59 |
| 32. | Dependent claim 39 – Ground 1 | | 60 |
| 33. | Dependent claim 40 – Ground 1 | | 60 |
| 34. | Dependent claim 41 – Ground 1 | | 61 |
| 35. | Dependent claim 42 – Ground 1 | | 62 |
| 36. | Dependent claim 43 – Ground 1 | | 63 |
| 37. | Dependent claim 44 – Ground 1 | | 63 |
| 38. | Dependent claim 45 – Ground 1 | | 63 |
| 39. | Dependent claim 46 – Ground 1 | | 64 |
| 40. | Dependent claim 49 – Ground 1 | | 65 |
| 41. | Dependent claim 50 – Ground 1 | | 65 |
| 42. | Dependent claim 51 – Ground 1 | | 66 |
| 43. | Dependent claims 52 and 53 – Ground 1 | | 66 |
| 44. | Dependent claim 54 – Ground 1 | | 67 |
| 45. | Dependent claim 55 – Ground 1 | | 67 |
| 46. | Dependent claim 56 – Ground 1 | | 68 |
| 47. | Dependent claim 57 – Ground 4 | | 69 |
| 48. | Dependent claim 58 – Ground 1 | | 69 |
| X. | CONCLUSION | | 70 |

ALARM.COM-SECURENET-DE 1726611

## EXHIBITS

| Exhibit No. | Description of Document |
|---|---|
| 1001 | U.S. Patent No. 8,073,931 ("the '931 patent") |
| 1002 | Declaration of James Parker |
| 1003 | File History for U.S. Patent No. 8,073,931 |
| 1004 | U.S. Patent Publication No. 2004/0260427 to Wimsatt ("Wimsatt") |
| 1005 | CorAccess, "Companion 6 User Guide" (June 17, 2002) ("the User Guide") |
| 1006 | U.S. Patent No. 6,580,950 to Johnson et al. ("Johnson") |
| 1007 | U.S. Patent No. 4,951,029 to Severson ("Severson") |
| 1008 | Installation Instructions for PC5401 Data Interface Module (2004) |
| 1009 | U.S. Patent Publication No. 2004/0205824 to Tsai ("Tsai") |
| 1010 | U.S. Patent Publication No. 2003/0056012 to Modeste et al. ("Modeste") |
| 1011 | "Understanding Universal Plug and Play," White Paper, Microsoft (2000) |
| 1012 | Waiver of Service, *iControl Networks, Inc. v. SecureNet Techns., LLC*, No. 15-807-GMS, (D. Del. Sept. 30, 2015), ECF No. 5 |
| 1013 | Information Disclosure Statement filed in U.S. Design Patent No. D506,687 (August 2, 2004) |
| 1014 | *Curriculum Vitae* of James Parker |

iv

ALARM.COM-SECURENET-DE 1726612

Petition for *Inter Partes* Review of
Patent No. 8,073,931

## I.    INTRODUCTION

SecureNet Technologies, LLC ("Petitioner" or "SecureNet") petitions for

*inter partes* review ("IPR") under 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42 of

claims 1-6, 14-46, 49-58 and 60-61 ("the Petitioned Claims") of U.S. Patent No.

8,073,931 ("the '931 patent") (Ex. 1001).

## II.    MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A.    Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1)

SecureNet Technologies, LLC is the real party-in-interest.

### B.    Related Matters Under 37 C.F.R. § 42.8(b)(2)

The '931 patent is asserted in *iControl Networks, Inc. v. SecureNet*

*Technologies, LLC*, No. 15-807-GMS (D. Del.), filed on September 11, 2015.[1]

Petitioner is concurrently filing two IPR petitions covering claims 1-4 and 6-

50 of U.S. Patent No. 8,478,844, and two IPR petitions covering claims 1-9 and

12-62 of U.S. Patent No. 8,473,619, each of which is assigned to the Patent Owner

and claims priority to the same applications as the '931 patent.

Petitioner is not aware of any other judicial or administrative matters that

---

[1] iControl Networks, Inc. ("Patent Owner" or "iControl") filed a Waiver of Service

on September 30, 2015 (Ex. 1012). Based on the PTAB-designated informative

decision docketed as Case No. IPR2013-00010 (Paper 20) (January 30, 2013), this

Petition is being timely filed.

1

ALARM.COM-SECURENET-DE 1726613

Petition for *Inter Partes* Review of
Patent No. 8,073,931

would affect, or be affected by, a decision in this proceeding.

### C.    Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

**Lead Counsel:** Erik B. Milch (Reg. No. 42,887) / emilch@cooley.com
**Back-up Counsel:**
Jennifer Volk (Reg. No. 62,305) / jvolkfortier@cooley.com
Frank Pietrantonio (Reg. No. 32,289) / fpietrantonio@cooley.com
zSecureNetIPR@cooley.com
zpatdcdocketing@cooley.com
Cooley LLP ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700 Washington, DC 20004
Tel: (703) 456-8573 Fax: (703) 456-8100

### D.    Service Information

The Petition is being served by FEDERAL EXPRESS to the '931 Patent

Owner's ("PO") attorneys of record, IPR Law Group, PC and outside counsel to

PO, Wilson Sonsini. Petitioner consents to service by e-mail at the addresses

provided above.

### E.    Power of Attorney

Filed concurrently with this petition per 37 C.F.R. § 42.10(b).

### III.   PAYMENT OF FEES - 37 C.F.R. § 42.103

This Petition requests review of claims 1-6, 14-46, 49-58 and 60-61 (a total

of 51 claims) of the '931 patent and is accompanied by a payment of $43,600. 37

C.F.R. § 42.15. This Petition meets the fee requirements of 35 U.S.C. § 312(a)(1).

### IV.   REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108

### A.    Grounds for Standing Under 37 C.F.R. § 42.104(a)

2

ALARM.COM-SECURENET-DE 1726614

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Petitioner certifies that the '931 patent is eligible for IPR and that Petitioner

is not barred or estopped from requesting IPR.

### B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested

Petitioner requests that the Board institute *inter partes* review of claims 1-6,

14-46, 49-58 and 60-61 of the '931 patent and requests that each claim be found

unpatentable as obvious under 35 U.S.C. § 103(a) on the following grounds:

| Ground | '931 Claim(s) | Basis for Challenge |
|--------|---------------|---------------------|
| 1. | 1-6, 21-46, 49-56, 58, 60, 61 | Obvious over <u>Wimsatt</u> in view of the <u>User Guide</u> and <u>Johnson</u> under 35 U.S.C. § 103(a) |
| 2. | 14-19 | Obvious over <u>Wimsatt</u> in view of the <u>User Guide</u>, <u>Johnson</u> and <u>Severson</u> under 35 U.S.C. § 103(a) |
| 3. | 20 | Obvious over <u>Wimsatt</u> in view of the <u>User Guide</u>, <u>Johnson</u> and <u>Tsai</u> under 35 U.S.C. § 103(a) |
| 4. | 57 | Obvious over <u>Wimsatt</u> in view of the <u>User Guide</u>, <u>Johnson</u> and <u>Modeste</u> under 35 U.S.C. § 103(a) |

This petition is accompanied by the Declaration of James Parker (Ex. 1002,

"Mr. Parker"), an expert in the field.

### C.    Threshold Requirement for *Inter Partes* Review 37 C.F.R. § 42.108(c)

*Inter partes* review of claims 1-6, 14-46, 49-58 and 60-61 should be

instituted because this Petition establishes a reasonable likelihood that Petitioner

will prevail with respect to each of the claims challenged. 35 U.S.C. § 314(a).

### V.    BACKGROUND OF TECHNOLOGY RELATED TO THE '931 PATENT

Mr. Parker provides a technology tutorial in his declaration. (Ex. 1002, ¶¶

3

ALARM.COM-SECURENET-DE 1726615

Petition for *Inter Partes* Review of
Patent No. 8,073,931

30-57.)

## VI.   SUMMARY OF THE '931 PATENT

The '931 patent was filed on August 25, 2008 and claims priority to a long

list of prior applications, the earliest of which has a filing date of March 16, 2005.

(Ex. 1001.) For this proceeding only, we assume the earliest possible priority date

of the '931 patent is March 16, 2005 and otherwise reserve the right to dispute this

priority date.

## VII.   CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(b)(3)

### A.   Legal Overview

A claim subject to IPR is given its "broadest reasonable construction in light

of the specification of the patent in which it appears."[2] 37 C.F.R. § 42.100(b).

### B.   Proposed Claim Constructions

All claim terms and clauses should be given their plain and ordinary

meaning as understood by a POSITA. (*See* Ex. 1002, ¶ 59.)

## VIII.   PERSON HAVING ORDINARY SKILL IN THE ART & STATE OF THE ART

The '931 patent is directed to integrated security systems capable of being

remotely accessed and controlled. (Ex. 1002, ¶¶ 17-24.) A person having ordinary

skill in the art ("POSITA") as of the assumed priority date would hold a bachelor's

---

[2] Petitioners reserve the right to pursue different constructions in litigation. *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989).

4

Petition for *Inter Partes* Review of
Patent No. 8,073,931

degree or the equivalent in electrical engineering (or related academic fields) and at

least three years of additional work experience in the area of digital and/or

telecommunication system design, as applicable to safety and security systems, or

equivalent work experience. (*Id.*, ¶ 19.)

## IX.    CLAIMS 1-6, 14-46, 49-58 AND 60-61 OF THE '931 PATENT ARE UNPATENTABLE

As detailed in the sections below, claims 1-6, 14-46, 49-58 and 60-61 of the

'931 patent are obvious in light of Wimsatt, the User Guide, Johnson and/or one or

more other references cited below.

### A.    Overview Of The Prior Art

#### 1.    Overview of Wimsatt

Wimsatt published on December 23, 2004 and is prior art under 35 U.S.C. §

102(a). The patent issuing from this publication was cited by the Examiner as

relevant prior art but it was never applied against the claims.

Wimsatt describes a home automation system having a control panel 101

("panel 101") connected to a number of co-located devices, called "controlled

devices", which manage already-existing systems, such as lighting systems or

security systems. (Ex. 1004, ¶ 0023.) Panel 101 can be implemented by the

"Companion™ 6 and Companion™ touch-screen interface units produced by

CorAccess Systems." (*Id.*, ¶ 0035.) It displays an interactive graphical user

interface (GUI) that allows the user (e.g., homeowner) to control the controlled

5

ALARM.COM-SECURENET-DE 1726617

Petition for *Inter Partes* Review of
Patent No. 8,073,931

devices. (*Id.*, ¶ 0022; Ex. 1002, ¶¶ 61-64.)

### 2. Overview of the User Guide

The User Guide expressly provides a publication date of June 17, 2002 on page 4. This document was also cited in an IDS dated August 2, 2004 in U.S. Design Patent No. D506,687. (Ex. 1013.) The User Guide is for the Companion 6 panel described in Wimsatt and provides further details about the functionality of the panel. (Ex. 1002, ¶ 65.)

### 3. Overview of Johnson

Johnson issued on June 17, 2003 and is prior art under 35 U.S.C. § 102(b). Johnson discloses an "Internet based home communications system for allowing a homeowner to monitor and control various features of their home from a distant location via a global computer network." (Ex. 1006, Abstract.) Johnson provides a website where homeowners can log in to access, monitor and control, for example, a home's security system. (*Id.*, 6:35-59; Ex. 1002, ¶¶ 66-70.)

### 4. Overview of Severson

Severson issued on August 21, 1990 and is prior art under 35 U.S.C. § 102(b). Severson discloses a home security system controller that automatically discovers sensors newly added to its security network. (Ex. 1007, 23:60-26:7; Ex. 1002, ¶¶ 71-73.)

6

ALARM.COM-SECURENET-DE 1726618

Petition for *Inter Partes* Review of
Patent No. 8,073,931

### 5.    Overview of Tsai

Tsai published on October 14, 2004 and is prior art under 35 U.S.C. § 102(a). Tsai discloses a wireless home security system coupled with a LAN over 802.11. (Ex. 1009, Abstract, ¶¶ 5, 7, 9; Ex. 1002, ¶ 74.)

### 6.    Overview of Modeste

Modeste published on March 20, 2003 and is prior art under 35 U.S.C. § 102(b). Modeste discloses a system providing a connection between embedded controllers in devices, such as utility meters, and server facilities using a gateway with connectivity to the Internet. (Ex. 1010, Abstract, FIG. 3, ¶ 40; Ex. 1002, ¶ 75.)

## B.    The Cited References Are Analogous Art

As indicated above and as explained in Mr. Parker's declaration, each of the prior art references combined in this Petition is analogous art to the '931 patent and to each other, as each reference is in the same field of endeavor as the '931 patent. (Ex. 1002, ¶ 76.)

## C.    Grounds 1-4 – Claims 1-6, 14-46, 49-58 and 60-61 Are Rendered Obvious by the Prior Art Under 35 U.S.C. § 103(a)

### 1.    Independent claim 1 – Ground 1

#### a.    Preamble: "A device comprising"

Claim 1 recites "[a] device" that comprises "a touchscreen at a first location" and "a remote server at a second location." Since a device cannot have components in two separate locations Petitioner understands this claim is a system claim rather

7

ALARM.COM-SECURENET-DE 1726619

Petition for *Inter Partes* Review of
Patent No. 8,073,931

than a claim to a device. Regardless, Wimsatt, and Johnson disclose all of the

elements of the "device" of claim 1.

### b.  Claim element 1[a]: "a touchscreen at a first location"

Wimsatt discloses the claimed "touchscreen" as control panel 101 ("panel

101"). The panels 101 in Wimsatt are "mounted throughout a building at locations

where it is convenient or desired to exercise control over controlled systems." (Ex.

1004, ¶ 0034.) Such a building can be a home. (*Id.*) Wimsatt describes an example

where the panels 101 are "Companion™ 6 and Companion™ **touch-screen**

**interface units**" "implement[ing] a touch-screen graphical user interface." (Ex.

1004, ¶ 0035 (emphasis added).) Thus, Wimsatt discloses this limitation.

### c.  Claim element 1[b]: "wherein the touchscreen includes a processor coupled to a local area network (LAN) and a security system at the first location"

Wimsatt discloses this limitation. In Figure 2 of Wimsatt (reproduced and

annotated below), panel 101 includes a processor 201 (highlighted red). (Ex. 1004,

¶ 0047, FIG. 2.) The processor 201 "may be implemented, for example, by a

Pentium® class processor." (*Id.*)

8

ALARM.COM-SECURENET-DE 1726620

Petition for *Inter Partes* Review of
Patent No. 8,073,931



The processor 201 in Wimsatt is coupled to a LAN. The figure shows the processor 201 is connected to a "network interface" (highlighted orange) that "implements the resources required to support packet communication." (Ex. 1004, ¶¶ 0048-0050.) According to Wimsatt, the network interface's "functions are substantially similar to what might be found in a convention[al] personal computer network interface card (NIC)." (*Id.*, ¶ 0050.) A POSITA would have understood that a NIC is designed to connect a computer and its processor to a LAN so that it can communicate over the LAN. (Ex. 1002, ¶ 80; *see also,* Ex. 1004, ¶ 0024 (explaining the system can be used in LAN environments).) Furthermore, Figure 1 of Wimsatt illustrates panel 101 is connected to hub 103, which is described as implementing an Ethernet connection among the system devices. (Ex. 1004, ¶ 0036.) It is well known that Ethernet connections form LANs. (Ex. 1002, ¶ 80.) A POSITA would understand that panel 101 connects to hub 103 via this Ethernet /

9

ALARM.COM-SECURENET-DE 1726621

Petition for *Inter Partes* Review of
Patent No. 8,073,931

LAN connection via the network interface highlighted orange above. (Ex. 1002, ¶ 81.)

Wimsatt also discloses that the processor 201 is coupled to a "security system at the first location." Wimsatt explains that the "control panel 101 implements a native GUI that interfaces with various special-purpose plug in components" including a "security plug-in". (Ex. 1004, ¶ 0057; *see also, id.* FIG. 3.) The "[s]ecurity plug-in monitors status of a **home security system** and may enable features of the security system to be enabled/disabled." (*Id.*, ¶ 0058 (emphasis added).) A POSITA would have understood that panel 101 and its processor 201 are communicatively "coupled to" the home's security system via the security plug-in that is implemented by panel 101 (via its processor 201). (Ex. 1002, ¶ 82.)

A POSITA would have also understood that the green-highlighted control subsystem interface above physically couples the processor 201 to the security system. (Ex. 1002, ¶ 83.) As Mr. Parker explains in his declaration, security systems at the time of the '931 patent often used RS-232 and RS-485 serial interfaces to communicate with other local devices. (Ex. 1002, ¶ 83 (citing to Ex. 1005, 10; Ex. 1008, 1).) Furthermore, Wimsatt discloses a wireless control panel 107 and its processor 201 would be wirelessly coupled to the home security system. (Ex. 1004, ¶ 0037; Ex. 1002, ¶ 0084.)

10

ALARM.COM-SECURENET-DE 1726622

Petition for *Inter Partes* Review of
Patent No. 8,073,931

> **d.    Claim element 1[c]: "a plurality of interfaces presented by at least one application executing on the processor of the touchscreen and presented to a user via the touchscreen"**

Panel 101 in Wimsatt displays a *"plurality of interfaces"* that are *"presented to a user via the touchscreen."* An annotated version of Figure 4A from Wimsatt illustrating a user "home screen" on panel 101 is below. It shows a temperature interface (highlighted red), a security interface (highlighted yellow), and links to other interfaces for intercom, lighting, and security cameras (highlighted green). (Ex. 1004, ¶¶ 0062-0063.) Each of these interfaces "presents a series of linked images where the links … implement desired functionality." (Ex. 1004, ¶ 0061; *see, e.g., id.,* FIGS. 4B-4F, FIGS. 6-7, ¶¶ 0064-0068, 0013.)

11

ALARM.COM-SECURENET-DE 1726623

Petition for *Inter Partes* Review of
Patent No. 8,073,931



The interfaces displayed on panel 101 in Wimsatt are *"presented by at least one application executing on the processor."* For example, Wimsatt explains that the above interfaces are provided and controlled by its own special "plug-in" applications. (Ex. 1004, ¶¶ 0057-0059, 0061 ("plug-in application components implement human interfaces").) These plug-ins "define controls that are presented at a particular time and in a particular context" on panel 101. (Ex. 1004, ¶ 0061; see also, id., ¶ 0013.)

Wimsatt specifically describes Figure 3 (below) as "a logical view of

12

ALARM.COM-SECURENET-DE 1726624

Petition for *Inter Partes* Review of
Patent No. 8,073,931

processes implemented by [the] control panel 101."



As Mr. Parker explains, Wimsatt makes clear that the processor 201 executes plug-in applications and the other applications shown in Figure 3. (Ex. 1002, ¶ 87; *see also*, Ex. 1004, ¶ 0047 (explaining that "processor 201 implements data processing functionality for accessing and manipulating data from various subsystems and memory").) Also, as a practical matter, Wimsatt does not disclose any other control panel component that would be capable of such processing so it would be obvious to a POSITA that processor 201 executes these applications / processes. (Ex. 1002, ¶ 87.)

13

ALARM.COM-SECURENET-DE 1726625

Petition for *Inter Partes* Review of
Patent No. 8,073,931

> e.  Claim element 1[d]: "wherein the plurality of interfaces include a security interface and a network interface"

Figure 8 (annotated and reproduced below) of the '931 patent illustrates the claimed "security interface" (highlighted orange) and "network interface" (highlighted red). The patent states that the "first UI 802" is referred to as the security interface and describes its relation to the security system. (Ex. 1001, 18:41-47.) The "second UI 804" is referred to as the network interface "by which a user selects or interacts with services and other network content (e.g., … photos...)." (Ex. 1001, 18:47-52.)



(Ex. 1001, FIG. 8 (annotated above).)

14

ALARM.COM-SECURENET-DE 1726626

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Wimsatt discloses the same "security interface" described and claimed in the

'931 patent. As shown in annotated Figure 4A, the orange highlighted interface

relates specifically to the home security system and displays the state of the system

(i.e., "DISARMED") to the user. (Ex. 1004, ¶ 0062.) Thus, this interface is the

claimed "security interface." (*See also,* Ex. 1004, FIG. 4C, ¶ 0065.)



Wimsatt and the User Guide collectively disclose the same "network

interface" described and claimed in the '931 patent. Wimsatt describes an

embodiment where "a browser interface is provided to supplement the native GUI

interface" (Ex. 1004, ¶ 0060; *see also,* FIG. 3 (annotated above) (illustrating a

"BROWSER" interfacing a web plug-in), ¶ 0054.) The User Guide provides details

about this interface.

As shown in the below annotated figure from the User Guide, the

15

ALARM.COM-SECURENET-DE 1726627

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Companion™ 6 panel displays an icon for "Media/Comm". (Ex. 1005, 7.) (Also apparent from this figure is that the displayed home screen is almost identical to the home screen in Wimsatt.) The User Guide states that this icon provides access to the PhotoMate photo gallery. (*Id.*) An enhanced version of that gallery – i.e., the "Enhanced Photo Gallery" – is also an available option on the Companion™ 6 panel. (Ex. 1005, 17-18.) The Enhanced Photo Gallery "allows you to share pictures across the internet" and "also gives instant access to weather and news from around the world." (*Id.*, 18.) It is thus understood that the panel must be connected to the Internet to share photos and to download weather and news – this is the only way this content can be accessed. (Ex. 1002, ¶ 91.) Thus, the User Guide discloses the claimed "network interface."

16

ALARM.COM-SECURENET-DE 1726628

Petition for *Inter Partes* Review of
Patent No. 8,073,931



***Motivation to Combine Wimsatt with the User Guide:*** It would be obvious

to a POSITA to combine Wimsatt with the User Guide disclosures so that panel

101 displays a network interface, including the "Media/Comm" icon. (Ex. 1002, ¶

92.) This icon could be included in the sidebar (highlighted green in Figure 4A) on

the "home screen" discussed above in **Part IX.C.1.d** similar to how it is displayed

on the Companion™ 6 panel in the User Guide.

Wimsatt provides express motivation to combine with the User Guide.

Wimsatt expressly states that its panel 101 can be a Companion™ 6 panel. (Ex.

1004, ¶ 0035.) The User Guide is specifically for that panel. (Ex. 1005, 1.) Thus, a

POSITA would look to this User Guide for details about panel 101 and its

17

ALARM.COM-SECURENET-DE 1726629

Petition for *Inter Partes* Review of
Patent No. 8,073,931

functionality and would be motivated to combine Wimsatt with the Guide. (Ex.

1002, ¶¶ 93-95.)

> **f.** **Claim element 1[e]: "wherein the security interface provides the user with control of functions of the security system and access to data collected by the security system"**

Wimsatt's security interface "*provides the user with control of functions of*

the security system" because it

displays the system state to the

user and allows the user to

change it. (Ex. 1004, ¶ 0062.) As

shown in annotated Figure 4A at

right, the security system is

"DISARMED" but the user can



optionally activate the "AWAY" icon to change it to armed. Thus, the user can

control the function of the security system. (*See, e.g.,* Ex. 1004, FIG. 4C (where

the user can enter a security code to arm the security system), FIG. 4E (where the

status is "ARMED"), ¶¶ 0062, 0065-0066 (describing the process of arming the

security system using the security interface); *see also, id.,* ¶ 0029, ¶ 0058; Ex.

1002, ¶ 96.)

The User Guide "*provides the user with ... **access** to data collected by the*

*security system*". The User Guide discloses that the Companion™ 6 panel includes

18

ALARM.COM-SECURENET-DE 1726630

Petition for *Inter Partes* Review of
Patent No. 8,073,931

a "Zone Status button" that, when activated, displays a list of all "security zones within the area and indicate[s] the current state of that zone." (Ex. 1005, 11 ("Security: Open, Closed, Secure, Bypassed, **Tripped**, Tamper")(emphasis added); Ex. 1002, ¶¶ 97-99.) Thus, the user is provided "access" to data collected by the system.

It would be obvious to combine Wimsatt and the User Guide as previously discussed in **Part IX.C.1.e** so the security interface in Wimsatt displays the same collected data to the user as described in the related User Guide. (Ex. 1002, ¶¶ 100-103.) Wimsatt, in Figure 4B, illustrates a button below the "ARM SYSTEM" icon which is similar to "Zone Status". It would be obvious to implement the features in the User Guide with the button of Wimsatt. (*Id.*) It would have been obvious to a POSITA that all of the security related zone status details could be associated with the security interface and could be implemented as part of the security interface. (*Id.*) Furthermore, a POSITA would have understood that the alarm information is already being collected and it would be easy for a programmer to make that information available to the user at panel 101. (*Id.*)

g.   **Claim element 1[f]: "wherein the network interface allows the user to transfer content to and from a wide area network (WAN) coupled to the LAN"**

This limitation is disclosed by Wimsatt and the User Guide. Wimsatt discloses a "*WAN coupled to the LAN*". As discussed in **Part IX.C.1.c**, hub 103

19

ALARM.COM-SECURENET-DE 1726631

Petition for *Inter Partes* Review of
Patent No. 8,073,931

forms a LAN. (Ex. 1004, ¶ 0036.) The below annotated Figure 1 of Wimsatt shows

that the hub 103 (red) is coupled to Internet gateway 127 (blue) which is coupled to

the Internet. (*See* Ex. 1004, ¶¶ 0041, 0042.) The Internet is a WAN (see claim 28

of the '931 patent). Thus, the WAN in Wimsatt is coupled to the LAN via the hub

103 and the Internet gateway 127. (*Id.*)



FIG. 1

Wimsatt discloses that "*the network interface allows the user to transfer*

*content to and from* [the WAN]". The '931 patent uses "content" generically to

20

ALARM.COM-SECURENET-DE 1726632

Petition for *Inter Partes* Review of
Patent No. 8,073,931

refer to many things and a POSITA understands it to encompass "data" or "information." (*See, e.g.,* Ex. 1001, FIG. 2 (illustrating that the "**content** store" 242 includes "**photos**, videos, widgets")(emphasis added), 7:10-15 ("third party content such as traffic and weather"), 18:49-53 ("network content (e.g., clock, calendar, weather, stocks, news, sports, **photos**, maps, music, etc.)")(emphasis added); Ex. 1002, ¶ 105.)

As discussed in **Part IX.C.1.e**, the interface including the "Media/Comm" icon in the User Guide is the claimed "network interface". (*See, e.g.,* Ex. 1005, 7.) As discussed in **Part IX.C.1.e**, when activated the "Media/Comm" icon enables the user to "share pictures across the internet." (*Id.,* 18.) This means that pictures can be both uploaded *to* and downloaded *from the internet*. (Ex. 1002, ¶¶ 106-108.) The pictures are thus the claimed "content" here just as photos constitute content in the '931 patent.

For the same reasons discussed throughout claim 1, it would have been obvious to a POSITA to combine the disclosures of Wimsatt and the User Guide so panel 101 in Wimsatt includes a "Media/Comm" icon that performs the same functions as the icon in the User Guide. (Ex. 1002, ¶ 109.) Wimsatt already discloses a "photo plug-in" that "handles accessing and displaying photographs, video, or other *content*." (Ex. 1004, ¶ 0058.) It would thus be obvious that Wimsatt's photo plug-in could control the "Media/Comm" icon and perform the

21

ALARM.COM-SECURENET-DE 1726633

Petition for *Inter Partes* Review of
Patent No. 8,073,931

same functions as the icon in the User Guide. (Ex. 1002, ¶ 109.) The end result is

an interface that can communicate content via the Internet.

> h.    **Claim element 1[g]: "a remote server at a second location, wherein the remote server is coupled to the touchscreen"**

This limitation is disclosed by Wimsatt and Johnson. Petitioner relies on

Johnson for disclosing a remotely located server coupled to a control panel. (*See*

*also*, Ex. 1002, ¶¶ 110-111.) Johnson discloses a control unit 30 that is similar to

panel 101 in Wimsatt and that is located within a user's home. (Ex. 1006, 4:15-39.)

Control unit 30 in Johnson is coupled to a remotely located data center 20 via a

global computer network 12. (*Id.*) Johnson explains that its data center 20

comprises "**one** or more server computers." (Ex. 1006, 4:40-53 (emphasis added);

*see also, id.*, 4:16-39.) This server is the claimed "remote server." Data center 20

server in Johnson is located remotely from the user's home "at a second location."

(*See*, Ex. 1006, FIG. 5.)

**_Motivation to Combine Johnson with Wimsatt and the User Guide:_** It

would be obvious to a POSITA to combine Johnson with Wimsatt and the User

Guide so that panel 101 in Wimsatt (as implemented by the panel of the User

Guide) is coupled to data center 20 server in Johnson. (Ex. 1002, ¶ 113.) As a

result of this coupling, panel 101 can be remotely accessed and controlled through

data center 20 server as described in Johnson. (*Id.*) Johnson specifically improves

22

ALARM.COM-SECURENET-DE 1726634

Petition for *Inter Partes* Review of
Patent No. 8,073,931

upon panel 101 in Wimsatt as well as the Companion™ 6 panel in the User Guide.

Johnson explains that "[o]ur society has become extremely mobile with the reduced expense and ease of travel leaving many homes unattended while the homeowner is traveling or at work" (Ex. 1006, 1:14-16) and that "there is a need for a home monitoring system that allows a homeowner to monitor their home from a distant location." (*Id.*, 1:14-25.) Coupling panel 101 in Wimsatt to remotely located data center 20 server would allow for such remote monitoring and control. (Ex. 1002, ¶¶ 113-114.)

A POSITA would be further motivated to combine Johnson with Wimsatt and the User Guide because control unit 30 in Johnson is similar to panel 101 in Wimsatt and the panel in the User Guide. (Ex. 1002, ¶ 115.) Control unit 30 panel 101 and the Companion™ 6 panel are systems that integrate functionality from multiple subsystems (e.g., security systems, lighting systems, entertainment systems, surveillance systems, etc.) into a single controller for user control and convenience. (*See, e.g.,* Ex. 1004, ¶¶ 0022-0023; Ex. 1005, 9; Ex. 1006, 4:16-39.) Furthermore, panel 101 in Wimsatt and the panel in the User Guide are already connected to the Internet so it would be an easy task for the panels to connect with data center 20 server in Johnson. (Ex. 1002, ¶ 116.) The end result would be a system that allows a homeowner to directly control aspects of the panels (and their subsystems) from remote locations similar to Johnson.

23

ALARM.COM-SECURENET-DE 1726635

Petition for *Inter Partes* Review of
Patent No. 8,073,931

> ### i.   Claim element 1[h]: "the remote server managing at least one of the touchscreen and the security system"

This limitation is disclosed by Wimsatt and Johnson. As explained in Johnson, data center 20 server is capable of "receiving, storing and transmitting various types of data related to the homeowner's home," including data related to the security system. (Ex. 1006, 4:40-53.) "The homeowner may connect to data center 20 [server] through a conventional web browser 14" to access this data. (*Id.*, 7:47-50; *see, also, id.*, 4:30-36.) Using web browser 14, the homeowner accesses control page 76 to "monitor and control" features of the security system based on this data. (Ex. 1006, 2:14-25, 4:15-39, 6:61-7:4.)

The homeowner can enter a command into the control page 76 changing a particular setting of the security system. (*Id.*, 6:61-7:4.) This command is then "transmitted to data center 20 [server] which forwards the information directly to control unit 30 which transmits the data accordingly modifying any previous settings." (*Id.*, 6:61-7:4, 7:65-8:5.) Data center 20 server actively receives and transmits command functions for the security system thereby managing it.

Johnson also discloses that data center 20 server manages control unit 30. Johnson states "the user programs the desired settings into control unit 30 either directly at home **or via data center 20** through an external computer 16." (Ex. 1006, 7:30-32 (emphasis added).) Thus, a POSITA would understand that the homeowner also uses data center 20 server to control or "manage" control unit 30.

24

ALARM.COM-SECURENET-DE 1726636

Petition for *Inter Partes* Review of
Patent No. 8,073,931

(Ex. 1002, ¶¶ 117-119.)

It would have been obvious to combine Johnson with Wimsatt so panel 101 in Wimsatt is coupled to data center 20 server Johnson. (Ex. 1002, ¶ 120.) Data center 20 server would function in the same manner except that it would monitor and control panel 101 in Wimsatt instead of control unit 30. The same motivations to combine Johnson with Wimsatt and the User Guide discussed above for claim element 1[g] apply here.

> **j.     Claim element 1[i]: "wherein objects are maintained on the remote server that correspond to at least one of at least one security system component of the security system and at least one network device of the LAN"**

Wimsatt and Johnson disclose this limitation. First, regarding the newly introduced claim term "security system component," the '931 patent discloses that a "security system component" can be a sensor or any other component "belonging to the security system." (Ex. 1001, 4:47-52.) A POSITA would have understood from Wimsatt's disclosures that its security system indeed includes sensors. (Ex. 1002, ¶¶ 121-122.) Wimsatt discloses at paragraph [0031] that "tripping a zone on a burglar alarm ... causes the control units to display a security screen having controls that allow the alarm to be de-activated." (Ex. 1004, ¶ 0031.) A POSITA would have understood that a "burglar alarm" is a security system and that at least one sensor is located within each zone of the house. (Ex. 1002, ¶ 121.) It is this sensor (or sensors) that is "tripped" and sets off an alarm.

25

ALARM.COM-SECURENET-DE 1726637

Petition for *Inter Partes* Review of
Patent No. 8,073,931

If PO argues that explicit disclosure of sensors is required to satisfy this limitation, Johnson discloses a plurality of sensors. For example, as illustrated in the below excerpted and annotated Figure 5 of Johnson, the system includes "security sensors." (*See also,* Ex. 1004, FIG. 3 (illustrating icons for well-known components of home security systems such as a door sensor, a window sensor and a smoke alarm).)



Thus to the extent any modification to Wimsatt is needed it would be obvious to a POSITA from Johnson to include multiple security sensors in the system. (Ex. 1002, ¶¶ 123-124.)

26

ALARM.COM-SECURENET-DE 1726638

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Regarding "network device," the '931 patent discloses that it can be an IP camera. (Ex. 1001, FIG. 5 (items 255-257), 14:26-32.) Wimsatt discloses an IP camera 109 that is connected to the hub 103 forming the LAN. (Ex. 1004, FIG. 1, ¶¶ 0038, 0040, 0072.)

Regarding the remainder of the limitation, which recites that "objects are maintained on the remote server that correspond to" the security system sensor and the IP camera 109, the '931 patent explains that the remote server "provide[s] access to, and management of, the objects associated with an integrated security system." (Ex. Ex. 1001, 8:38-49.) It further explains that "every **object** monitored by the gateway 102 is called a **device**." (*Id.* (emphasis added)) "Devices include the sensors, cameras, home security panels and automation devices." (*Id.*)

Wimsatt and Johnson disclose the claimed limitation consistent with this disclosure in the '931 patent. As shown in Figure 3 of Johnson, the homeowner accesses a web page "displayed by data center 20" and can "monitor and control" aspects of the security system and cameras using that web page. (Ex. 1006, 4:30-36, 5:29-39, 6:35-59.)

27

ALARM.COM-SECURENET-DE 1726639

Petition for *Inter Partes* Review of
Patent No. 8,073,931



Johnson explains a homeowner can "modify any preprogrammed settings within the home" by "simply select[ing] the desired feature on the control page 76 of the desired home as shown in FIGS. 3 and 7." (Ex. 1006, 6:61-65.) "The homeowner may then enter the desired data into the computer 16 which is transmitted to data center 20 which forwards the information directly to control unit 30 which transmits the data accordingly modifying any previous settings. (Ex.

28

ALARM.COM-SECURENET-DE 1726640

Petition for *Inter Partes* Review of
Patent No. 8,073,931

1006, 6:65-7:4.) When Wimsatt is modified by Johnson, the homeowner is able to remotely control panel 101 and its controlled devices in the same manner. (Ex. 1002, ¶ 128.)

A POSITA would have understood that the icons illustrated on the above web page represent particular controlled devices located within the home in Wimsatt. (Ex. 1002, ¶ 129.) These icons are the claimed "objects" maintained at data center 20 server. For example, the icon labeled "camera" is an object maintained at the server corresponding to the IP camera 109. Similarly, icons labeled "door" and "window" are objects maintained at the server corresponding to a door and window sensor, respectively.

It would be obvious to a POSITA to combine Johnson with Wimsatt and the User Guide in this manner for the same reasons previously discussed in **Part IX.C.1.h**.

For at least these reasons, independent claim 1 is rendered obvious by Wimsatt, the User Guide, and Johnson.

### 2. Independent claim 60 – Ground 1

Each of claim elements 1[pre]-1[b], 1[d]-1[e] and 1[g]-1[i] of independent claim 1 has an identical counterpart in claim 60. Elements 1[c] and 1[f] have counterparts that vary slightly as shown below. Thus, the arguments discussed above in **Part IX.C.1.** relating to those claim elements from claim 1 that are

29

ALARM.COM-SECURENET-DE 1726641

Petition for *Inter Partes* Review of
Patent No. 8,073,931

identical in claim 60 apply here. The remainder of this section addresses the elements that differ.

|      | **Claim 1**                                                                                                                                                              |        | **Claim 60**                                                                                                                                              |
|------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------|--------|-----------------------------------------------------------------------------------------------------------------------------------------------------------|
| 1[c] | a plurality of interfaces presented by at least one application executing on the processor of the touchscreen and presented to a user via the touchscreen,                 | 60[c]  | a plurality of applications executing on the processor of the touchscreen and displaying a plurality of interfaces to a user via the touchscreen,          |
| 1[f] | wherein the network interface allows the user to transfer content to and from a wide area network (WAN) coupled to the LAN; and                                            | 60[f]  | wherein the network interface allows the user to transfer content to and from a remote network coupled to the LAN; and                                     |

### a. Claim element 60[c]

Claim element 60[c] differs from claim element 1[c] in that it recites "a plurality of applications" instead of "at least one application". As previously discussed in **Part IX.C.1.d**, Wimsatt discloses a plug-in application for each interface that is displayed on panel 101. Thus, there is one plug-in application for the security interface, one plug-in application for the temperature interface and so on. As also discussed in that section, these plug-in applications are executed on control panel's processor 201.

### b. Claim element 60[f]

This claim element differs from claim element 1[f] in that it replaces "WAN" with "remote network." The '931 patent explains that "the remote network of an embodiment is the internet." (Ex. 1001, 42:1.) As discussed in **Part IX.C.1.g**

30

ALARM.COM-SECURENET-DE 1726642

Petition for *Inter Partes* Review of
Patent No. 8,073,931

with respect to claim element 1[f], the LAN hub 103 in Wimsatt is coupled to an Internet gateway 127, which connects the system to the Internet. (*See, e.g.*, Ex. 1004, ¶ 0041.) Thus, Wimsatt discloses that a LAN is coupled to a remote network.

For at least these reasons, along with the reasons set out for claim 1, Wimsatt, the User Guide and Johnson render obvious independent claim 60.

### 3.  Independent claim 61 – Ground 1

#### a.  Claim element 61[pre]: "A device comprising"

The arguments in **Part IX.C.1.a**, apply equally here.

#### b.  Claim element 61[a]: "an input/output (I/O) device at a first location" and Claim element 61[b]: "the I/O device comprising a processor coupled to a local area network (LAN) and a security system at the first location"

These elements are identical to claim elements 1[a] and 1[b] except that they replace "touchscreen" with "input/output (I/O) device," which is just a more generic term. Thus all of the arguments made in **Part IX.C.1.b** for claim elements 1[a] and 1[b] relating to the "touchscreen" in Wimsatt apply here for the "I/O device".

#### c.  Claim element 61[c]: "wherein the security system includes a plurality of security system components that are proprietary to the security system"

**Part IX.C.1.j**, addressed the aspect of claim 1 that referred to multiple components for the security system. The same reasons why a POSITA would have understood such a limitation could be found in Wimsatt alone or by combining

31

ALARM.COM-SECURENET-DE 1726643

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Wimsatt and Johnson apply here.

Claim 61 adds that security components being proprietary to the system. This does not distinguish over Wimsatt. It would be obvious to a POSITA that the security system sensors in Wimsatt would be "proprietary to the security system" since the reference explains that its system includes "proprietary controlled devices." (Ex. 1004, ¶ 0023; *see also, id.*, ¶ 0045 (briefly describing a process for interrogating proprietary devices so that they can be integrated into the system).) It further explains that such controlled devices can include security systems. (Ex. 1004, ¶ 0012 ("controlled systems (e.g., security systems…)").) A POSITA would understand that a proprietary security system would have sensors that are also proprietary to the security system. (Ex. 1002, ¶¶ 133-134.)

> **d.    Claim element 61[d]: "a security application executing on the processor and providing a security interface for control of functions of the security system"**

The element substantially overlaps with portions of claim elements 1[c] to 1[e], which recite in part: "a plurality of interfaces presented by at least one application executing on the processor of the touchscreen" (element 1[c]), "wherein the plurality of interfaces include a security interface" (element 1[d]), and "wherein the security interface provides the user with control of functions of the security system" (element 1[e]). As described above the specific security plug-in described in Wimsatt that allows the user to, for example, "enable features of the

32

ALARM.COM-SECURENET-DE 1726644

Petition for *Inter Partes* Review of
Patent No. 8,073,931

security system to be enabled/disabled" corresponds to the claimed "security application" (Ex. 1004, ¶¶ 0057-0059, 0061.) Thus, Wimsatt discloses claim element 61[d] for the same reasons discussed in **Parts IX.C.1.d** to **IX.C.1.f** in connection with claim elements 1[c] to 1[e].

> e.    **Claim element 61[e]: "the security interface presented to a user via the I/O device"**

Whereas in claim 1 the security interface is presented via touchscreen, claim element 61[e] replaces "touchscreen" with the more generic term "I/O device." The claimed "I/O device" encompasses a touchscreen. Thus, the arguments presented above in **Parts IX.C.1.d** and **IX.C.1.e** for claim elements 1[c] and 1[d] apply here.

> f.    **Claim element 61[f]: "a content application executing on the processor and providing a network interface for access to networked content of a remote wide area network (WAN)"**

As previously explained in **Part IX.C.1.d**, each interface in Wimsatt is provided by and specifically controlled by its own special plug-in application that is executed on the control panel's processor 201. (*See, e.g.,* Ex. 1004, ¶¶ 0057-0059, 0061.) As discussed in **Part IX.C.1.e**, Wimsatt further describes a browser interface that is controlled by a web plug-in. (Ex. 1004, FIG. 3.) The User Guide provides more details regarding the browser interface and, in one example, shows it as a "Media/Comm" interface. (Ex. 1005, 7, 13.) This "Media/Comm" interface

33

ALARM.COM-SECURENET-DE 1726645

Petition for *Inter Partes* Review of
Patent No. 8,073,931

is the claimed "network interface" and its web plug-in is the claimed "content application."

The rest of this limitation is similar to claim element 1[f], which recites, in part, "wherein the network interface allows the user to transfer content to and from a wide area network (WAN)." Thus, this limitation is disclosed by Wimsatt, the User Guide and Johnson for the same reasons discussed in **Parts IX.C.1.d, IX.C.1.e**, **IX.C.1.f** and **IX.C.1.g.**

> g.    **Claim element 61[g]: "the network interface presented to a user via the I/O device"**

This element is substantially similar to the subject of claim elements 1[c] and 1[d] where there is a network interface presented to the user via touchscreen. 61[g] differs by reciting "I/O device" which is broader than and encompasses a touchscreen. Thus, the arguments presented above in **Parts IX.C.1.d** and **IX.C.1.e** for claim elements 1[c] and 1[d] apply here.

> h.    **Claim element 61[h]: "wherein the I/O device is coupled to the WAN via the LAN"**

As previously discussed, the touchscreen panel 101 in Wimsatt is the claimed "I/O device." As shown below in annotated Figure 1 from Wimsatt, and as discussed in **Part IX.C.1.g**, panel 101 in Wimsatt is coupled to the Internet / WAN via the LAN hub 103. Accordingly, Wimsatt discloses this limitation.

34

ALARM.COM-SECURENET-DE 1726646

Petition for *Inter Partes* Review of
Patent No. 8,073,931



FIG. 1

i.    **Claim element 61[i]: "a remote server at a second location"**

This element is identical to the first portion of claim element 1[g]. Therefore, Wimsatt and Johnson disclose this element for the same reasons discussed in **Part IX.C.1.h** for claim element 1[g].

j.    **Claim elements 61[j] to 61[l]**

Claim elements 61[j] to 61[l] are substantively identical to claim elements 1[g] to 1[i] except that the term "touchscreen" is replaced with "I/O device". As

35

ALARM.COM-SECURENET-DE 1726647

Petition for *Inter Partes* Review of
Patent No. 8,073,931

discussed, however, an I/O device is a broader term that encompasses a touchscreen. Therefore, the same arguments presented above in **Parts IX.C.1.h** to **IX.C.1.j** for claim elements 1[g] to 1[i] apply here.

Thus, for at least these reasons, Wimsatt in view of the User Guide and Johnson render obvious independent claim 61.

### 4.    Dependent claim 2 – Ground 1

| 2 | The device of claim 1, wherein the remote server allows a user to configure content of the touchscreen. |
|---|---|

Claim 2 is obvious under Ground 1. Johnson discloses that data center 20 server can receive, store and transmit "photographs" to/from control unit 30. (Ex. 1006, 4:47-53.) The photographs are "content." Johnson further can "control" aspects of panel 101 of Wimsatt and its content "by accessing a web page [76] displayed by data center 20 [server]." (Ex. 1006, 4:30-36, 5:29-39, 6:35-59.) As shown in Figure 3 of Johnson, the web page 76 displayed to the user via data center 20 server includes an "Image Gallery." A POSITA would understand that this "Image Gallery" corresponds to the photos transmitted from control unit 30. (Ex. 1002, ¶ 135.) Given that Johnson discloses it can "transmit[]" "photographs", a POSITA would understand that the user can add photos to the Image Gallery on the web page 76 and those new photos are transmitted to control unit 30 via data center 20 server. (*Id.*) Thus, the user "configures" the "content" at control unit 30 because it is adding to the content it already has. (*Id.*)

36

ALARM.COM-SECURENET-DE 1726648

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Alternatively, or in addition to the above disclosure, the User Guide describes accessing the "Media/Comm" interface and adjusting how its photographs are displayed on the touchscreen. (Ex. 1005, 13.) For example, the user can choose between a "Framed mode" or "Full Screen mode". (*Id.*) Because Johnson can "control" aspects of panel 101 and its content, it would be obvious to a POSITA that the user, through the "Image Gallery" interface on the web page 76, could be given the option to select between these modes. (Ex. 1002, ¶¶ 136-137.) Thus, when Wimsatt is combined with the User Guide and Johnson, it provides another example of how the user can "configure" the "content" of panel 101.

It would be obvious to combine the references for the reasons set forth in claim 1. Also, a POSITA would understand the benefit of enhancing the functionality of photosharing using the panels, making the process easier and more user-friendly and also allowing those features to be remotely controlled.

### 5.    Dependent claim 3 – Ground 1

| 3 | The device of claim 1, wherein the remote server provides user portals that enable content and information displayed on the touchscreen to be displayed on other devices. |

Wimsatt, the User Guide and Johnson disclose claim 3. As discussed in **Part IX.C.1.j**, the homeowner in Johnson can "monitor and control" aspects of panel 101 and its content "by accessing a web page [76] displayed by data center 20 [server] through a conventional web browser 14 on a computer." (Ex. 1006, 4:30-

37

ALARM.COM-SECURENET-DE 1726649

Petition for *Inter Partes* Review of
Patent No. 8,073,931

36, 5:29-39, 6:35-59.) Johnson also discloses that the web browser 14 / web pages 76 can be displayed on "wireless PDA's, web-connected phones and pagers" (see, for example, Figure 5). These devices are the claimed "other devices" and the web pages 76 are the claimed "user portals".

Figure 3 of Johnson (not shown) provides an example of the web page 76 (also called a "control page 76") that includes an "Image Gallery." A POSITA would understand this "Image Gallery" corresponds to photos provided by and stored within control unit 30. (Ex. 1002, ¶ 139; *see also*, Ex. 1006, 4:47-53 (explaining that data center 20 server receives, stores, and transmits "photographs" from control unit 30).) When Wimsatt is combined with Johnson, the panel 101 includes this capability of Johnson. The User Guide additional details support storing the photos in the "Media/Comm" interface. (*Id.*) When these references are further combined with Johnson, these photos are further made available to the homeowner via the web page 76. (*Id.*) These photos are the claimed "content." Also as discussed in **Part IX.C.1.j**, the web page 76 (through its icons) provides the homeowner with information about the status of certain devices (e.g., camera and sensors) and also allows the homeowner to adjust certain settings associated with those devices. (*See, e.g.*, Ex. 1006, 6:61-65.) The status and settings are the claimed "information".

For at least the reasons previously discussed with respect to claim 1, it

38

ALARM.COM-SECURENET-DE 1726650

Petition for *Inter Partes* Review of
Patent No. 8,073,931

would be obvious to combine Wimsatt with the User Guide and Johnson so that the

photos from panel 101 and the Companion™ 6 panel are available to the

homeowner on its devices via the web page. (Ex. 1002, ¶ 140.)

### 6.    Dependent claim 4 – Ground 1

| 4 | The device of claim 3, wherein the other devices include at least one of HTML browsers, WEB/WAP phones, and desktop widgets. |
|---|---|

As discussed with respect to claim 3, Johnson discloses that the web browser

14 can be displayed on "wireless PDA's, web-connected phones and pagers" as in

Figure 5.  These "web-connected phones" are the claimed "WEB/WAP phones."

### 7.    Dependent claim 5 – Ground 1

| 5 | The device of claim 1, wherein the security system is managed via applications entirely within the touchscreen. |
|---|---|

As previously discussed in **Parts IX.C.1.d** and **IX.C.1.f**, panel 101 in

Wimsatt manages the security system via the security plug-in. (Ex. 1004, ¶¶ 0057-

0059, 0061.) This includes managing the arming / disarming of the security system

via the security interface. (*See, e.g.*, Ex. 1004, FIGS. 4C, 4E, ¶¶ 0062, 0065-0066,

0029, 0058.) A POSITA would understand from the disclosures in Wimsatt that

the security plug-in application is contained entirely within panel 101, as is the

GUI application that supports the plug-in application (collectively, the claimed

"applications"). (Ex. 1002, ¶ 142; Ex. 1004, ¶ 0057, FIG. 3.) Wimsatt does not

disclose any applications external to panel 101 (partial or otherwise), including any

that manage the security system. Thus, claim 5 is obvious under Ground 1.

39

ALARM.COM-SECURENET-DE 1726651

Petition for *Inter Partes* Review of
Patent No. 8,073,931

### 8.   Dependent claim 6 – Ground 1

| 6 | The device of claim 1, wherein the touchscreen includes a wireless transceiver for communicating with security system components of the security system. |
|---|---|

Wimsatt and Johnson disclose claim 6. As shown in Figure 5 of Johnson, control unit 30 includes a receiver for wirelessly communicating with the security sensors (i.e., the claimed "security system components") of the security system 60. (*See also*, Ex. 1006, 5:29-52.) Although labeled a "receiver" in Figure 5, a POSITA would have understood that this component can be a transceiver. (Ex. 1002, ¶ 143.) For example, Johnson explains that the control devices 40, such as the security system 60 and its sensors, "may be capable of receiving, storing and transmitting data to and from control unit 30." (Ex. 1006, 5:40-42.) The specification also makes clear that one of the advantages of the Johnson system is that "a homeowner is capable of monitoring and **controlling** the control device within the home by accessing [the] web page." (Ex. 1006, 2:13-25 (emphasis added).) A POSITA would have understood that the only way to control a security system is to send it commands and that would require that control unit 30 in Johnson is able to transmit data to the security sensors. (Ex. 1002, ¶ 143.) As such, a POSITA would have understood that control unit 30 includes a transceiver. (*Id.*)

Panel 101 in Wimsatt can be modified so that it has the same functionality as control unit 30 in Johnson, thereby predictably resulting in panel 101 being

40

ALARM.COM-SECURENET-DE 1726652

Petition for *Inter Partes* Review of
Patent No. 8,073,931

capable of wirelessly communicating with its security system (and its sensors) via

a transceiver. (Ex. 1002, ¶ 144.) Such a configuration would have been obvious to

a POSITA. (*Id.*) Wimsatt already discloses that its control panels can be wireless

(those panels are labeled 107 as opposed to 101). (Ex. 1004, ¶ 0037.) There is no

specific disclosure though that the security system or its components communicate

wirelessly with the wireless control panels 107 but such communication would be

obvious to a POSITA because the only way to communicate with a wireless system

is through wireless communication. (Ex. 1002, ¶ 144.) Thus, Wimsatt provides the

motivation for wireless communication between panel 101/107 and the security

system – combining Wimsatt with Johnson makes this disclosure explicit.

### 9.    Dependent claim 14 – Ground 2

| 14 | The device of claim 1, where devices are added to the security system through the touchscreen. |
|----|---|

Wimsatt, Johnson and Severson render claim 14 obvious. Wimsatt discloses

that its panel 101 can implement a "system discovery process" to add devices.

According to Wimsatt, "[w]hen a control panel 101 is coupled to a controlled

device or subsystem, it interrogates that device or subsystem to learn details of the

control interface of that particular system." (Ex. 1004, ¶ 0045.) As a result panel

101 is provided "full access" to the new device. (*Id.*) A POSITA would understand

this "full access" to mean that the device is added to the overall home automation

system through panel 101. (Ex. 1002, ¶ 145.) A POSITA would have further

ALARM.COM-SECURENET-DE 1726653

Petition for *Inter Partes* Review of
Patent No. 8,073,931

understood that discovering the security system through this process would also include discovering its sensors. (Ex. 1002, ¶ 146.)

Wimsatt further discloses that its panel 101 implements "Universal Plug-and-Play (UPnP™) processes." (Ex. 1004, ¶ 0054.) It was well known at the time of the '931 patent that UPnP™ was used to auto-discover 2-way devices connected to a shared network. (Ex. 1002, ¶ 147 (citing to Ex. 1011, 7).) A POSITA would have understood that sensors could be added to the overall home automation system, and thus the security system, via these UPnP™ processes. (Ex. 1002, ¶ 147.)

An even more detailed disclosure of discovering and adding sensors is disclosed in Severson wherein a security system includes a controller and a plurality of sensors similar to that in Wimsatt and Johnson. (Ex. 1007, FIG. 1, 4:3-29.) Severson explains that "each system controller may be operated to 'self-learn' each of its sensors." (Ex. 1007, 25:3-13; *see also, id.*, 23:60-26:7.) And, once the controller confirms that accuracy of the sensor's data, that sensor (and its data) is added to the controller's memory for future use. (*Id.*, 25:6-10.) This is similar to the discovery process described in the '931 patent. (*See, e.g.*, Ex. 1001, FIG. 18, 30:58-31:64.)

***Motivation to Combine Severson with Wimsatt, the User Guide and Johnson:*** It would be obvious to a POSITA to combine the discovery disclosure

42

ALARM.COM-SECURENET-DE 1726654

Petition for *Inter Partes* Review of
Patent No. 8,073,931

with Wimsatt and Johnson so that panel 101 in Wimsatt can discover security sensors and add them to the security system (and thus the overall home automation system). (Ex. 1002, ¶¶ 148-149.) This would predictably result in an easier sensor installation process and reduce the likelihood of installer error. (Ex. 1002, ¶ 149; *see also*, Ex. 1007, 26:5-7.)

As previously discussed, Wimsatt discloses an active discovery process for learning and adding the security system. (Ex. 1004, ¶ 0045.) A POSITA would have been motivated to further discover the sensors that form part of the security system and then add them to that system. (Ex. 1002, ¶ 150.) Severson discovers sensors using a passive "listening" system that would be easy to implement in the Wimsatt system because it would merely require adding an extra step in the discovery process. (*Id.*) As also previously discussed, the User Guide provides more details regarding panel 101 in Wimsatt so a POSITA would have been motivated to combine it with Severson for the same reasons as Wimsatt.

### 10.    Dependent claim 15 – Ground 2

| 15 | The device of claim 14, where devices are added to a user account on the remote server through the touchscreen. |
|----|---|

Claim 15 is obvious under Ground 2. Johnson discloses that its data center 20 server maintains a "user account" for each homeowner. For example, Johnson explains that a "homeowner can access their specific 'control page' 76 upon the web site by using a user name and password." (Ex. 1006, 6:35-50.) The  control

43

ALARM.COM-SECURENET-DE 1726655

Petition for *Inter Partes* Review of
Patent No. 8,073,931

page 76 provides the user with access to all of the automated devices within the home so that they can be remotely controlled. (*See, e.g.*, Ex. 1006, FIG. 3.) so a POSITA would understand that this would only be logical next step that the devices discovered by the touch screen, such as by the techniques in Wimsatt and/or Severson, in the system installation process would be reflected in the user's account so they can be remotely controlled. (Ex. 1002, ¶ 151.)

It would thus be obvious to a POSITA to combine Johnson with Wimsatt, the User Guide and Severson so that panel 101 is connected to data center 20 server in Johnson and newly discovered devices at panel 101 are added to the server and thus made available to the user's control page 76. (Ex. 1002, ¶ 152.) The motivations to combine Johnson, Wimsatt, the User Guide and Severson that were discussed in connection with claim 14 apply here.

### 11. Dependent claim 16 – Ground 2

| 16 | The device of claim 15, wherein device information and device data are transmitted to *[sic]* from the devices to the remote server. |
|----|-----------------------------------------------------------------------------------------------|

Claim 16 includes a typo. This claim should recite that "data are transmitted *from* the devices to the remote server."

Claim 16 is obvious under Ground 2. As previously discussed with respect to claims 14, Wimsatt in view of the User Guide, Johnson and Severson disclose discovering devices (e.g., sensors) and adding their "information" (e.g., sensor number) to panel 101 for use in the home automated system. (*See, e.g.*, Ex. 1007,

ALARM.COM-SECURENET-DE 1726656

Petition for *Inter Partes* Review of
Patent No. 8,073,931

23:60-26:7, Tables 4, 5.) As explained with respect to claim 15, this combination also teaches that panel 101 in Wimsatt transmits the newly discovered device's information to data center 20 server so that that information can be made available to the homeowner via their control page 76. Thus device information is transmitted from the devices to the remote server, through the panel. The fact that panel 101 acts as a relay between the devices and data center 20 server is irrelevant. (Ex. 1002, ¶ 154.)

This combination further discloses the device's status, a form of device data, is transmitted from the device to data center 20 server as well. For example, Johnson specifically discloses that a homeowner can log into his account and request information about a particular device within the home. (Ex. 1006, 7:47-60.) Figure 3 of Johnson (below) shows that one of the items available for selection is a "door" or "window" icon, which are understood to represent a door or window sensor, respectively. (Ex. 1002, ¶¶ 155-156.)

45

ALARM.COM-SECURENET-DE 1726657

Petition for *Inter Partes* Review of
Patent No. 8,073,931



According to Johnson, when one of these items is selected, data center 20

server connects with control unit 30 and requests the status of that sensor. (Ex.

1006, 7:56-8:4.) When Wimsatt is modified by the User Guide, Severson and

Johnson such that panel 101 is connected to data center 20 server, this same

communication and data download occurs between panel 101 in Wimsatt and data

center 20 server in Johnson. Thus, the examples above show that both device

46

ALARM.COM-SECURENET-DE 1726658

Petition for *Inter Partes* Review of
Patent No. 8,073,931

information and device data are transmitted from the devices to the remote server

per the claim language.

### 12. Dependent claim 17 – Ground 2

| 17 | The device of claim 16, wherein the device information includes at least one of device name and device type, wherein the device data includes at least one of device state and battery state. |
|----|----|

Claim 17 is obvious under Ground 2. Severson explains that sensors are programmed with their sensor number (i.e., the claimed "device name") and their group information (i.e., the claimed "device type"). (Ex. 1007, 23:60-26:31, Tables 4, 5, 6.) As discussed in connection with claim 16, when Wimsatt is combined with the User Guide, Johnson and Severson, it would be obvious to a POSITA that a sensor transmits this information to panel 101, which then relays the information to data center 20 server. (Ex. 1002, ¶ 157.)

Severson also explains that sensors "periodically report their status and battery condition to the controller." (Ex. 1007, 26:40-43.) When Wimsatt is combined with the User Guide, Johnson and Severson, it would be obvious to a POSITA that the sensor's status and battery condition are transmitted to data center 20 server via panel 101 when, for example, the homeowner requests information about the sensors, as discussed in connection with claim 16. (Ex. 1002, ¶ 158.)

### 13. Dependent claim 18 – Ground 2

| 18 | The device of claim 16, wherein device information and device data are associated with a user account by the remote server. |
|----|----|

47

ALARM.COM-SECURENET-DE 1726659

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Claim 18 is obvious by the discussions provided above in connection with claims 14 to 17. Specifically, it would be obvious to a POSITA that data center 20 server associates the "device information and device data" with the homeowner's account when data center 20 receives that information/data from panel 101. (Ex. 1002, ¶ 159.) If this information / data is not associated with the homeowner's account, then the homeowner will not have access to it and the purpose of Johnson is defeated. (*Id.*) Also, in general, it is illogical to send information / data to a server and not associate it with anything because it renders the information / data useless. (*Id.*)

### 14.    Dependent claim 19 – Ground 2

| 19 | The device of claim 14, wherein the devices are automatically detected by the touchscreen and added to a user account on the remote server through the touchscreen. |
|----|---|

This claim is similar in scope to claim 15 but adds that "the devices are automatically detected by the touchscreen." Thus the only issue is whether the asserted combination also satisfies this limitation and it does. As discussed above in connection with claim 14, Wimsatt discloses a technique for automatically discovering system devices and it would be obvious that this discovery process is extended to the sensors within the network. (Ex. 1004, ¶¶ 0045, 0054.) Severson more explicitly discloses discovering sensors. Severson explains that "**without human intervention**" "each system controller may be operated to 'self-learn' each

48

ALARM.COM-SECURENET-DE 1726660

Petition for *Inter Partes* Review of
Patent No. 8,073,931

of its sensors." (Ex. 1007, 25:3-13 (emphasis added); *see also, id.*, 23:60-26:7.)

Severson therefore discloses that its discovery process is automatic. Wimsatt, the User Guide, Johnson and Severson can be combined in the same manner and for the same reasons discussed with respect to claims 14 and 15 and given the teaching of "automatic discovery" in Wimsatt and/or Severson claim 19 is obvious as well.

### 15.    Dependent claim 20 – Ground 3

| 20 | The device of claim 1, wherein the coupling with the LAN is over 802.11. |
|----|---|

It is well known that IEEE 802.11 is a set of specifications for implementing a wireless LAN (WLAN). (Ex. 1002, ¶ 162.) While Wimsatt does not disclose coupling to a LAN over 802.11, it would have been obvious to a POSITA to use such a coupling as 802.11. (*Id.*) For example, Tsai discloses a wireless home security system coupled with a LAN over 802.11. (Ex. 1009, Abstract, ¶¶ 5, 7, 9; Ex. 1002, ¶ 162.)

It would have been obvious to a POSITA to implement the 802.11 coupling from Tsai in Wimsatt because Wimsatt already describes that its panel 101/107 communicates wirelessly with the hub 103. (Ex. 1002, ¶ 163; *see,* Ex. 1004, FIG. 1 (items 107, 105, 103).)

### 16.    Dependent claim 21 – Ground 1

| 21 | The device of claim 1, wherein the touchscreen integrates the content with the access and control of the security system. |
|----|---|

49

ALARM.COM-SECURENET-DE 1726661

Petition for *Inter Partes* Review of
Patent No. 8,073,931

As discussed with respect to claim 1, when panel 101 in Wimsatt includes

"content" in the form of "photographs". (Ex. 1004, ¶ 0058.) These photographs are

managed by the photo plug-in. (*Id.*) The security system is managed by the security

plug-in, which can "talk" to the photo plug-in. (*Id.*) Because both of these plug-ins

and their functionality reside on panel 101, they are considered "integrate[d]" with

each other. (Ex. 1002, ¶¶ 164-165.) Furthermore, when panel 101 in Wimsatt

receives new photographs (e.g., from the server in Johnson), then those new

photographs are also integrated into panel 101, which access and controls the

security system. (*Id.*)

### 17.    Dependent claim 22 – Ground 1

| 22 | The device of claim 1, wherein the content includes interactive content in the form of internet widgets. |
|----|----|

The '931 patent describes "internet widgets" as "icons such as weather,

sports, etc." (Ex. 1001, 16:46-49.) The User Guide states that new features can be

added to the Companion™ 6 panel through a "System Update" feature on the

panel. (Ex. 1005, 17.) Exemplary new features are provided including

"AudioMate™" and the "Enhanced Photo Gallery." (*Id.*) It would be obvious that

installing these new features would result in either new icons being presented on

the panel or updates to icons that are already on the panel. (Ex. 1002, ¶ 166.)

50

ALARM.COM-SECURENET-DE 1726662

Petition for *Inter Partes* Review of
Patent No. 8,073,931

It is well known that system updates are installed via an Internet connection

– e.g., a service provider can install them onto the panel via a secure connection.

The updates must come from outside the panel and over a network connection

because it would be impractical for a service provider to send an employee to

every home to manual install an update on all of its devices. (Ex. 1002, ¶ 167.)

Thus, a POSITA would understand that these updates, which would include small

programs (i.e., widgets) would be received from and connect to the internet,

making them "internet widgets." (*Id.*) When panel 101 in Wimsatt is modified by

the User Guide, panel 101 will receive system updates, including internet widgets.

(*Id.*) It would be obvious to combine Wimsatt with the User Guide and Johnson for

the reasons previously discussed. And, also it would be obvious to combine them

so that the panel 101 in Wimsatt is capable of receiving system updates so it is up-

to-date with features and enhancements. (*Id.*)

### 18.   Dependent claim 23 – Ground 1

| 23 | The device of claim 1, wherein the network interface allows the user to transfer at least one of content and internet widgets to and from the LAN. |
|----|---|

Claim 23 can be satisfied by transferring content or an internet widget. We

have shown above that the references of ground 1 cover transfer of content. The

only remaining issue for claim 23 is if that involves the LAN. As discussed above,

the LAN in Wimsatt provides the connection to the WAN. Therefore, transferring

51

ALARM.COM-SECURENET-DE 1726663

Petition for *Inter Partes* Review of
Patent No. 8,073,931

any "content" to the WAN necessarily requires transferring it to the LAN. Thus,

claim 23 is obvious under Ground 1.

### 19.    Dependent claims 24 and 26 – Ground 1

| 24 | The device of claim 1, wherein the network interface allows the user to control functions of peripheral devices of the first location coupled to the LAN. |
|----|---|
| 26 | The device of claim 1, wherein the network interface provides the user with communication and control of a plurality of network devices coupled to the LAN. |

Claims 24 and 26 are substantively similar and are thus addressed together.

As an initial matter, a POSITA would have understood a "peripheral device" to be

synonymous with "network devices". (Ex. 1002, ¶ 169.) A POSITA would have

also understood that these devices can be any devices connected to the touchscreen

via the LAN or WAN (and, hence, they are "network" devices). (*Id.*)

Wimsatt discloses "one or more" security cameras 125 and/or IP cameras

109 installed at the user's home. (*See,* Ex. 1004, FIG. 1, ¶ 0072.) As shown in

Figure 1 of Wimsatt, these devices are all connected to the hub 103, which

implements the LAN communication and facilitates connection with Internet.

Thus, these cameras 125, 109 are "peripheral devices of the first location coupled

to the LAN" (claim 24) and "a plurality of network devices coupled to the LAN"

(claim 26).

Wimsatt discloses panel 101 includes "a control to switch cameras, move a

camera, focus a camera, switch between tiled and non-tiled views of multiple input

52

ALARM.COM-SECURENET-DE 1726664

Petition for *Inter Partes* Review of
Patent No. 8,073,931

streams, record the camera view, and the like." (Ex. 1004, ¶ 0072.) This control is

launched when the user activates the camera icon on panel's 101 home screen and

the camera interface is displayed on the panel 101. The camera interface is the

claimed "network interface" because the camera uses the LAN to communicate

surveillance data to panel 101 for display on the camera interface screen, and

because panel 101 controls the functions of the camera using controls on the

camera interface via the LAN / Internet connection. (Ex. 1002, ¶¶ 170-171.)

### 20. Dependent claim 25 – Ground 1

| 25 | The device of claim 1, wherein the plurality of interfaces are configurable. |
|----|------------------------------------------------------------------------------|

Wimsatt discloses claim 25. For example, Wimsatt explains that the

interfaces are "easily programmed" (Ex. 1004, ¶ 0026) and an interface can be

configured for a particular user, such as, for example, a child (Ex. 1004, ¶ 0029).

### 21. Dependent claim 27 – Ground 1

| 27 | The device of claim 1, wherein the network interface provides the user with communication and control of a plurality of security system components, wherein the security system comprises the plurality of security system components. |
|----|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|

The '931 patent discloses that a security system can include IP cameras.

(*See, e.g.*, Ex. 1001, 10:25-35.) Wimsatt also explains that its IP cameras 109 can

be used for security purposes (e.g., for surveillance). (Ex. 1004, ¶ 0072.) Thus, the

"one or more" IP cameras 109 in Wimsatt are the claimed "plurality of security

system components". As previously discussed with respect to claims 24 and 26, the

53

ALARM.COM-SECURENET-DE 1726665

Petition for *Inter Partes* Review of
Patent No. 8,073,931

relevant arguments for which apply here, the network interface in Wimsatt

"provides the user with communication and control" of the IP cameras 109. Thus,

Wimsatt discloses claim 27.

### 22.    Dependent claim 28 – Ground 1

| 28 | The device of claim 1, wherein the WAN is the internet and the network interface is a web browser. |
|----|----|

As previously discussed in **Part IX.C.1.g**, Wimsatt discloses the WAN as

the Internet. As previously discussed in **Part IX.C.1.e**, Wimsatt and the User

Guide disclose a web browser as the network interface. The relevant arguments

from those sections apply here.

### 23.    Dependent claim 29 – Ground 1

| 29 | The device of claim 1, wherein the touchscreen integrates at least one of a security system control panel and an internet browser. |
|----|----|

Figure 4C of Wimsatt shows that touchscreen panel 101 can display a

security system keypad from a security system control panel. (*See also*, Ex. 1004, ¶

0065.) As previously discussed in **Part IX.C.1.e**, Wimsatt also discloses that a

"browser user interface is provided to supplement the native GUI interface" and, in

some embodiments, can replace the native GUI. (*Id.*, ¶ 0060.) Thus, panel 101 in

Wimsatt "integrates at least one of a security system control panel and an internet

browser."

### 24.    Dependent claim 30 – Ground 1

| 30 | The device of claim 1, comprising an application engine coupled to the |
|----|----|

54

ALARM.COM-SECURENET-DE 1726666

Petition for *Inter Partes* Review of
Patent No. 8,073,931

| processor, wherein the application engine controls a plurality of applications executing under the processor. |
|---|

The '931 patent describes an "application engine" as the "application/presentation layer" that "provides the presentation and interactivity capabilities for all applications (widgets) that run on the touchscreen." (Ex. 1001, 18:27-37.) This application engine – i.e., application layer – is highlighted and shown below in Figure 7 of the '931 patent.



ALARM.COM-SECURENET-DE 1726667

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Wimsatt discloses the same application layer in its Figure 3 (annotated and shown below). Wimsatt states that "configurable functionality is implemented by application layer and plug-in components." (Ex. 1004, ¶¶ 0057, 0061.) As previously discussed in **Parts IX.C.2.a** and **IX.C.1.d**, the plug-in components are applications specific to each device in the home automation system.



A POSITA would understand that the functionality of the application layer in Wimsatt is exactly the same as the application layer in the '931 patent. (Ex. 1002, ¶ 175.) Furthermore, as discussed in **Part IX.C.1.d**, the control panel's processor 201 executes the plug-in applications and the application layer processes shown in Figure 3. (*Id.*; Ex. 1004, ¶ 0047.) Thus, claim 30 is obvious under

56

ALARM.COM-SECURENET-DE 1726668

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Ground 1.

### 25.    Dependent claim 31 – Ground 1

| 31 | The device of claim 30, wherein the plurality of applications includes a security application and a content application, wherein the security application provides the security interface and the content application provides the network interface. |
|---|---|

Dependent claim 31 is obvious under Ground 1 for the same reasons discussed in **Parts IX.C.3.e** and **IX.C.3.g** for claim elements and 61[d] and 61[f], which recite in part "a security application … providing a security interface" and "a content application … providing a network interface." *See also,* **Parts IX.C.2.a** (the relevant arguments for which apply here).

### 26.    Dependent claim 32 – Ground 1

| 32 | The device of claim 30, wherein the plurality of applications provides interactivity with a plurality of devices via the plurality of interfaces. |
|---|---|

As discussed above in connection with claim 30, and as also discussed with respect to claim 1, the plug-in applications in Wimsatt form the "plurality of applications" and provide various interfaces for interacting with specific devices in the home automation network. (Ex. 1004, ¶¶ 0057-0059, 0061, 0069-0072.) For example, the security plug-in provides the security interface shown in Figure 4A of Wimsatt (reproduced in **Part IX.C.1.d** above) and "enable[s] features of the security system to be enabled/disabled under user control." (*Id.,* ¶ 0058, 0065-0066, 0071.) The security plug-in therefore provides interactivity with a security system panel via the security interface. Similarly, the audio plug-in provides the

57

ALARM.COM-SECURENET-DE 1726669

Petition for *Inter Partes* Review of
Patent No. 8,073,931

audio interface that "enables controls that … control audio equipment 123." (*Id.*, ¶¶

0058, 0072, 0076) The audio plug-in therefore provides interactivity with audio

equipment 123 via the audio interface. The other plug-ins described in Wimsatt

function similarly. (*See, e.g.*, Ex. 1004, ¶¶ 0069-0076.) Thus, claim 32 is obvious

under Ground 1.

### 27. Dependent claims 33 and 34 – Ground 1

| 33 | The device of claim 32, wherein the plurality of devices are coupled to the processor. |
| 34 | The device of claim 32, wherein the plurality of devices are coupled to the processor via a wireless coupling. |

Claims 33 and 34 are similar and are thus addressed together. Wimsatt

discloses that its panel 101 can be wireless (referred to as wireless control panel

107) such that it is coupled to the networked devices within the home automation

system via this wireless coupling. (Ex. 1004, ¶¶ 0037-0039, FIG. 1.) The processor

201 within panel 101 is thus wirelessly coupled to the same devices and satisfies

the "coupling" requirement of these two claims.

### 28. Dependent claim 35 – Ground 1

| 35 | The device of claim 32, wherein the plurality of devices include a plurality of devices of the security system. |

The '931 patent discloses that a security system can include IP cameras and

security system panels. (*See, e.g.*, Ex. 1001, 10:25-35; *see also*, **Part IX.C.21**

(claim 27).) Wimsatt explains that its IP cameras 109 and security system panels

ALARM.COM-SECURENET-DE 1726670

Petition for *Inter Partes* Review of
Patent No. 8,073,931

interact with and are controlled by their own special plug-in applications running

on panel 101. (*See, e.g.,* Ex. 1004, ¶¶ 0058-0059, 0061, 0072.) As such, claim 35 is

obvious under Ground 1.

### 29. Dependent claim 36 – Ground 1

| 36 | The device of claim 32, wherein the plurality of devices include a plurality of devices of the LAN. |
|---|---|

The devices in Wimsatt discussed above for claim 35 are all part of the

home automation network and are operatively connected to the LAN hub 103. (Ex.

1004, FIG. 1, ¶¶ 0024, 0036.) Thus, claim 36 is obvious under Ground 1.

### 30. Dependent claim 37 – Ground 1

| 37 | The device of claim 32, wherein the plurality of devices include a plurality of devices of the WAN. |
|---|---|

As discussed for claim 36, the networked devices in Wimsatt are described

as being operatively connected to a LAN. However, Wimsatt states that the

network can be "scaled upwardly" to "more complex network environments such

as wide area networks (WANs)" to meet the needs of a particular client. (Ex. 1004,

¶ 0023.) The same devices that are part of the LAN in claim 36 can therefore be

part of the WAN when the network is scaled up. Thus, claim 37 is obvious under

Ground 1.

### 31. Dependent claim 38 – Ground 1

| 38 | The device of claim 32, wherein the plurality of applications are accessed and loaded directly via the WAN. |
|---|---|

59

ALARM.COM-SECURENET-DE 1726671

Petition for *Inter Partes* Review of
Patent No. 8,073,931

As discussed in claim 1, panel 101 in Wimsatt is connected to the hub 103, which is further connected to the Internet (i.e., the claimed "WAN"). (Ex. 1004, ¶ 0036.) As explained with respect to claim 22, it would have been obvious in view of the User Guide that each plug-in (i.e., application) in Wimsatt is updated via a network connection, such as a WAN. (Ex. 1002, ¶ 176.) It would further be obvious that any features that are not pre-programmed onto panel 101 in Wimsatt at the time of installation would be selected and download via the same process. (*Id.*) Panel 101 and its interfaces would be highly configurable and customizable for the user without sacrificing memory space for potentially unnecessary pre-programmed features. (*Id.*)

### 32.   Dependent claim 39 – Ground 1

| 39 | The device of claim 30, wherein the touchscreen includes the plurality of applications. |
|----|---|

As discussed in **Part IX.C.1.d** and for claim 30, the control panel's processor 201 executes the plug-in applications (i.e., the claimed "plurality of applications"). (*See also,* Ex. 1004, ¶ 0047, FIG. 3.) The plug-in applications are therefore clearly included within panel 101. Thus, claim 39 is obvious under Ground 1.

### 33.   Dependent claim 40 – Ground 1

| 40 | The device of claim 30, wherein the plurality of applications includes a resident application that manages interactions between the plurality of applications. |
|----|---|

60

ALARM.COM-SECURENET-DE 1726672

Petition for *Inter Partes* Review of
Patent No. 8,073,931

The '931 patent explains that a "resident application … is the master service that controls the interaction of all widgets in the system." (Ex. 1001, 19:1-3.) "For example, the resident application determines the priority of widgets, thereby enabling a home security widget to override resource requests from a less critical widget (e.g., a weather widget)." (*Id.*, 19:4-7.)

POSITA would understand that such a resident application is running in the background on panel 101 and could even be the Operating System ("OS", FIG. 3) since the OS is responsible for determining application priority within a computing system and it would make sense for the OS in Wimsatt to perform that priority assignment for the plug-ins. (Ex. 1002, ¶¶ 178-179.)

Wimsatt explains that, when the security plug-in detects an alarm event, "the security plug-in may **override and close** certain applications such as a photo player plug-in or audio plug-in to disable activities that might distract from the security plug-in's activities." (Ex. 1004, ¶ 0059.) This is the same functionality described in the '931 patent. The background application (or OS) in Wimsatt that allows the security plug-in to perform these "override and close" functions is therefore the claimed "resident application." Thus, claim 40 is obvious under Ground 1.

### 34.    Dependent claim 41 – Ground 1

| 41 | The device of claim 40, wherein the resident application manages interactions between the plurality of devices. |
|---|---|

61

ALARM.COM-SECURENET-DE 1726673

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Claims 41 is obvious for the same reasons discussed in connection with claim 40. By allowing the security plug-in in Wimsatt to "override and close" functions of other plug-ins, the resident application (e.g., a background application or the OS) is managing interactions between devices. This is because overriding and closing functions necessarily has an effect on the corresponding device. For example, shutting off the audio plug-in would have an effect on the home's audio equipment. (Ex. 1004, ¶ 0058.) It would be obvious based on the disclosures in Wimsatt that, when an alarm event is detected, the current sound emanating from the home's audio equipment (e.g., speaker system) is shut off and replaced with an alarm sound to warn the homeowner of an event needing immediate attention. (Ex. 1002, ¶ 181.)

### 35. Dependent claim 42 – Ground 1

| | |
|---|---|
| 42 | The device of claim 40, wherein the resident application determines a priority of each application of the plurality of applications and manages the plurality of applications according to the priority. |

Claim 42 is obvious for at least the reasons discussed in claim 40. Wimsatt does not explicitly disclose that its background resident application (or OS) performs these claimed tasks but it would be obvious based on "override and close" functionality discussed for claim 40. Clearly, in that passage, there was a level of priority assigned to the plug-in applications and those plug-in applications were managed (e.g., closed) based on their level of priority. (Ex. 1002, ¶ 182.)

62

ALARM.COM-SECURENET-DE 1726674

Petition for *Inter Partes* Review of
Patent No. 8,073,931

### 36.    Dependent claim 43 – Ground 1

| 43 | The device of claim 42, wherein the resident application allows a first application having a first priority to override a second application having a second priority when the first priority is higher than the second priority. |
|---|---|

Claim 43 is obvious for at least the reasons discussed in claim 40. In the example provided from Wimsatt, the security plug-in had a higher priority than the audio plug-in and was thus able to override the audio plug-in. (Ex. 1004, ¶ 0059.)

### 37.    Dependent claim 44 – Ground 1

| 44 | The device of claim 1, comprising a first application engine coupled to the processor, wherein the first application engine executes a security application that provides the security interface. |
|---|---|

Claim 44 is substantively identical to claims 30 and 31, which recite in part "an application engine coupled to the processor" (claim 30), "the application engine controls a plurality of applications" (claim 30), and "the plurality of applications includes a security application … [that] provides the security interface" (claim 31). A POSITA would understand that the application engine disclosed in Wimsatt "executes" the security plug-in because the application engine is simply a "layer" in which programs are executed. (Ex. 1002, ¶¶ 183-184.)

### 38.    Dependent claim 45 – Ground 1

| 45 | The device of claim 44, comprising a second application engine coupled to the processor, wherein the second application engine executes a content application that provides the network interface. |
|---|---|

ALARM.COM-SECURENET-DE 1726675

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Although Wimsatt only discloses a single application layer that executes the plug-ins, it would be obvious to a POSITA to add a second application layer to the control panel's processor 201 so that one layer is dedicated to, for example, security-related plug-ins, and the other is dedicated to network-related plug-ins. (Ex. 1002, ¶¶ 185-186.) This is simply a matter of design choice. But, a POSITA would understand that having multiple application layers could enhance processing efficiency by enabling a layer to focus on limited, related processes instead of managing all processes in the panel 101. (*Id.*)

### 39.    Dependent claim 46 – Ground 1

| 46 | The device of claim 1, comprising a core engine coupled to the processor, the core engine controlling dynamic provisioning of the plurality of applications and the content. |
|---|---|

The '931 patent provides details regarding its "core engine" in column 19, lines 10-36. Based on this disclosure and the claimed language, the core engine is synonymous with the Operating System (OS) in Wimsatt. (Ex. 1004, FIG. 3.) It is well known the function of an OS on any computer is to dynamically provision processes and data. (Ex. 1002, ¶¶ 187-188.) Wimsatt disclose that panel 101 includes "variants of a personal computer (PC) architecture to take advantage of price and performance features." (Ex. 1004, ¶ 0034.) This passage clearly suggests that the panel's OS can function in the same manner as PC, including the provisioning features. (Ex. 1002, ¶¶ 187-188.) Those provisioning features would

64

ALARM.COM-SECURENET-DE 1726676

Petition for *Inter Partes* Review of
Patent No. 8,073,931

obviously be applied to the applications and other content stored at panel 101. (*Id.*)

Thus, claim 46 is obvious.

### 40.   Dependent claim 49 – Ground 1

| 49 | The device of claim 1, wherein the processor is coupled to the WAN via a broadband coupling. |
|---|---|

The '931 patent describes an embodiment where "broadband coupling" is performed via Ethernet connection. (Ex. 1001, 15:46-50, 13:59-64 ("broadband 412"), FIG. 4 ("Ethernet 412").) As previously discussed in **Part IX.C.1.g**, Wimsatt discloses that its hub 103 implements Ethernet protocols. (Ex. 1004, ¶ 0036.) As shown in Figure 1 of Wimsatt, panel 101 (and its processor 201) are connected to the hub 103 and the hub 103 is further connected to the Internet. Thus, the control panel's processor 201 is coupled to the Internet (i.e., WAN) via the Ethernet connection implemented by the hub 103.

### 41.   Dependent claim 50 – Ground 1

| 50 | The device of claim 1, wherein the processor is coupled to the WAN via a cellular data coupling. |
|---|---|

Wimsatt discloses wireless panels 101/107 that can be implemented, for example, as "palm computers." (Ex. 1004, ¶ 0037.) A POSITA would have understood that a palm computer is a PDA (personal digital assistant), which is known to operate over a cellular data network. (Ex. 1002, ¶ 189.) A POSITA would have also understood that the palm computer connects to the Internet (i.e., WAN) via the cellular data connection. (Ex. 1002, ¶ 190.) Thus, it is obvious that

65

ALARM.COM-SECURENET-DE 1726677

Petition for *Inter Partes* Review of
Patent No. 8,073,931

Wimsatt discloses claim 50.

### 42.     Dependent claim 51 – Ground 1

| 51 | The device of claim 1, wherein the plurality of interfaces provides interactivity with a plurality of devices via the plurality of interfaces. |
|----|---|

As previously discussed in **Part IX.C.1.d**, Wimsatt discloses the plurality of interfaces illustrated below in annotated Figure 4C. Each one of these interfaces is configured to interact with a particular device within the



user's home. For example, the labeled "first interface" in the image below interacts with a thermometer or thermostat. (*See, e.g.,* Ex. 1004, ¶¶ 0062, 0067.) The labeled "second interface" interacts with a security system. (Ex. 1004, ¶¶ 0029, 0058, 0065.) The labeled "links to other interfaces" provide access to a camera interface, which interacts with, for example, an IP camera 109 (Ex. 1004, ¶ 0072), and to a lighting interface, which interacts with a home's lighting system (*id.*). Thus, Wimsatt discloses claim 51.

### 43.     Dependent claims 52 and 53 – Ground 1

| 52 | The device of claim 51, wherein a device of the plurality of devices is an |
|----|---|

66

ALARM.COM-SECURENET-DE 1726678

Petition for *Inter Partes* Review of
Patent No. 8,073,931

|    | Internet Protocol device. |
|----|---------------------------|
| 53 | The device of claim 51, wherein a device of the plurality of devices is a camera. |

As discussed immediately above for claim 51, the camera interface in

Wimsatt interacts with an IP camera 109, which is an Internet Protocol device. (Ex.

1004, ¶¶ 0038, 0072.)

### 44.   Dependent claim 54 – Ground 1

| 54 | The device of claim 51, wherein a device of the plurality of devices is another touchscreen. |
|----|----------------------------------------------------------------------------------------------|

Wimsatt discloses that panels 101 are connected to one another via hub 103.

Accordingly, each is a device including the same or similar interfaces configured

to interact with one another. (Ex. 1004, ¶¶ 0035-0037; Ex. 1002, ¶ 191.)

### 45.   Dependent claim 55 – Ground 1

| 55 | The device of claim 51, wherein a device of the plurality of devices is a device controller that controls an attached device. |
|----|------------------------------------------------------------------------------------------------------------------------------|

The claimed "device" is satisfied by any device that is included in the home

automation network of Wimsatt. Figure 1 of Wimsatt illustrates a number of

devices, including a lighting control subsystem 113. Wimsatt explains that this

subsystem 113 interface comprises a "control device", which is the claimed

"device controller." (Ex. 1004, ¶ 0039.) As shown below, this control device is

coupled to the home's lighting devices (e.g., lamps). (*Compare to* Ex. 1001, 15:21-

26, 22:47-52, 22:63-23:3.) Thus, claim 55 is obvious under Ground 1.

67

ALARM.COM-SECURENET-DE 1726679

Petition for *Inter Partes* Review of
Patent No. 8,073,931



**FIG. 1**

### 46.    Dependent claim 56 – Ground 1

| 56 | The device of claim 55, wherein the device controller is a thermostat. |

The same configuration shown in claim 55 with respect to the lighting system in Wimsatt is also disclosed for a thermostat. For example, referring to Figure 4A (not shown), Wimsatt states that the panel's 101 home screen "includes a thermostat display indicating room temperature and/or outside temperature, either of which may be measured by panel 101 itself, or be obtained **from a remote device or other control panel 101**." (Ex. 1004, ¶ 0062 (emphasis added).)

68

ALARM.COM-SECURENET-DE 1726680

Petition for *Inter Partes* Review of
Patent No. 8,073,931

A POSITA would understand that the thermostat is "attached" to the remote device or other panel 101 via direct or indirect coupling. (Ex. 1002, ¶ 192.) Nothing in claims 55 or 56 require a physical coupling between the "device controller" and the "attached device". Thus, claim 56 is obvious under Ground 1.

### 47. Dependent claim 57 – Ground 4

| 57 | The device of claim 55, wherein the device controller is an energy meter. |
|----|---|

Wimsatt does not disclose a device controller being an energy meter. Johnson discloses collecting data regarding gas and utility consumption (Ex. 1006, col. 7, ll. 8-10), but does not disclose the use of an energy meter. Modeste discloses a system that provides a connection between embedded controllers in various devices, such as a home security system 194, digital utility meters including a gas meter 196, a water meter 198, and an electrical meter 200, and server facilities using a gateway with broadband connectivity to the Internet. (Ex. 1010, Abstract, FIG. 3, ¶ 40; Ex. 1002, ¶ 193.) It would have been obvious to a POSITA to connect an energy meter as disclosed in Modeste to the Wimsatt system so that panel 101 in Wimsatt controls the energy meter. (Ex. 1002, ¶ 193.)

### 48. Dependent claim 58 – Ground 1

| 58 | The device of claim 51, wherein a device of the plurality of devices is a sensor. |
|----|---|

As discussed above in **Parts IX.C.1.f** and **IX.C.3.d**, Wimsatt discloses that

69

ALARM.COM-SECURENET-DE 1726681

Petition for *Inter Partes* Review of
Patent No. 8,073,931

its security interface interacts with a home security system. As also discussed in these parts, it would have been obvious to a POSITA that the security system includes sensors that facilitate tripping an alarm. To the extent explicit disclosure of security system sensors is necessary, Johnson discloses these sensors for the same reasons discussed in **Parts IX.C.1.f** and **IX.C.3.d**. Wimsatt further discloses that its system can include "environmental sensors" which would have its own interface associated with a specialized plug-in. (Ex. 1004, ¶¶ 0038, 0057-0058.)

## X.    CONCLUSION

Petitioner respectfully requests that the Board institute *inter partes* review of claims 1-6, 14-46, 49-58 and 60-61.

Dated: <u>September 30, 2016</u>

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
Tel: (703) 456-8000
Fax: (202) 842-7899

Respectfully submitted,
**COOLEY LLP**

By:    <u>/Erik B. Milch/</u>
Erik B. Milch
Reg. No. 42,887

70

ALARM.COM-SECURENET-DE 1726682

Petition for *Inter Partes* Review of
Patent No. 8,073,931

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Petition complies with the

type-volume limits of 37 C.F.R. § 42.24(a)(1)(i) because it contains 13,717 words,

according to the word-processing system used to prepare this petition, excluding the

parts of this Petition that are exempted by 37 C.F.R. § 42.24(a) (including the table

of contents, mandatory notices, a certificate of service or this certificate word count,

appendix of exhibits, and claim listings).

Dated: September 30, 2016

By:       /Erik B. Milch/
          Erik B. Milch
          Reg. No. 42,887

ALARM.COM-SECURENET-DE 1726683

Petition for *Inter Partes* Review of
Patent No. 8,073,931

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.6(e) and 42.105(b), the undersigned certifies

that on September 30, 2016, a complete and entire copy of this **Petition for *Inter**

***Partes* Review of Patent No. 8,073,931**, including Exhibit Nos. 1001-1014 and a

Power of Attorney, was served via FEDERAL EXPRESS, costs prepaid, to the

Patent Owner by serving the correspondence address of record as follows:

> Richard Gregory Jr.
> Barbara Courtney
> IPR Law Group, PC
> 5338 Cornish Street
> Houston, TX 77007

A courtesy copy was also served via FEDERAL EXPRESS on the Patent Owner at

the following address:

> Ryan Smith
> Wilson Sonsini Goodrich & Rosati
> 650 Page Mill Road
> Palo Alto, CA 94304

By:       /Erik B. Milch/
          Erik B. Milch
          Reg. No. 42,887

ALARM.COM-SECURENET-DE 1726684

# EXHIBIT 5

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SecureNet Technologies, LLC,
Petitioner

v.

iControl Networks, Inc.,
Patent Owner

U.S. Patent No. 8,478,844
Filing Date: Aug. 12, 2008
Issue Date: July 2, 2013
Title: Forming a Security Network Including Integrated Security System
Components and Network Devices

———————————

*Inter Partes* Review No. _____

**Petition for *Inter Partes* Review of U.S. Patent No. 8,478,844**

i

## Table of Contents

                                                                         **Page**

I.     INTRODUCTION ................................................................................1

II.    MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1) .......................1

       A.    Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1) ..........................1

       B.    Related Matters Under 37 C.F.R. § 42.8(b)(2) ...................................1

       C.    Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3) ..................2

       D.    Service Information...........................................................................2

       E.    Power of Attorney ............................................................................2

III.   PAYMENT OF FEES - 37 C.F.R. § 42.103 .........................................2

IV.    REQUIREMENTS FOR INTER PARTES REVIEW UNDER 37
       C.F.R. §§ 42.104 AND 42.108 ..........................................................3

       A.    Grounds for Standing Under 37 C.F.R. § 42.104(a) ..........................3

       B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and
             Statement of Precise Relief Requested ...............................................3

       C.    Threshold Requirement for Inter Partes Review 37 C.F.R. §
             42.108(c)..........................................................................................3

V.     BACKGROUND OF TECHNOLOGY RELATED TO THE '844
       PATENT ..........................................................................................4

VI.    SUMMARY OF THE '844 PATENT ....................................................4

VII.   CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3)..................4

       A.    Legal Overview ................................................................................4

       B.    Proposed Claim Constructions ...........................................................4

VIII.  PERSON HAVING ORDINARY SKILL IN THE ART & STATE
       OF THE ART ....................................................................................5

IX.    CLAIMS 1-4, 6-24 AND 41 OF THE '844 PATENT ARE
       UNPATENTABLE...............................................................................5

       A.    Overview Of The Prior Art ...............................................................5

             1.    Overview of Wimsatt...............................................................5

             2.    Overview of Johnson ...............................................................6

             3.    Overview of Severson...............................................................6

             4.    Overview of Naidoo..................................................................7

i

# Table of Contents
(continued)

**Page**

5. Overview of Anthony ...................................................................7

B. The Cited References Are Analogous Art ...........................................7

C. Grounds 1-3 – Claims 1-4, 6-24 and 41 Are Obvious over Wimsatt in view of Johnson and/or Other Prior Art References Under 35 U.S.C. § 103(a)...........................................................8

    1. Independent claim 1 – Ground 1...............................................8

    2. Dependent claim 2 – Ground 1 ...............................................34

    3. Dependent claim 3 – Ground 1 ...............................................35

    4. Dependent claim 4 – Ground 1 ...............................................35

    5. Dependent claim 6 – Ground 1 ...............................................37

    6. Dependent claim 7 – Ground 1 ...............................................38

    7. Dependent claim 8 – Ground 1 ...............................................39

    8. Dependent claim 9 – Ground 1 ...............................................40

    9. Dependent claim 10 – Ground 1 .............................................41

    10. Dependent claim 11 – Ground 1 .............................................43

    11. Dependent claim 12 – Ground 1 .............................................44

    12. Dependent claim 13 – Ground 1 .............................................44

    13. Dependent claim 14 – Ground 1 .............................................44

    14. Dependent claim 15 – Ground 1 .............................................45

    15. Dependent claim 16 – Ground 1 .............................................45

    16. Dependent claim 17 – Ground 1 .............................................47

    17. Dependent claim 18 – Ground 2 .............................................49

    18. Dependent claim 19 – Ground 2 .............................................51

    19. Dependent claim 20 – Ground 2 .............................................52

    20. Dependent claim 21 – Ground 1 .............................................53

    21. Dependent claim 22 – Ground 3 .............................................53

    22. Dependent claim 23 – Ground 2 .............................................54

    23. Dependent dcaim 24 – Ground 2 .............................................56

ii

## Table of Contents
(continued)

**Page**

24.   Dependent claim 41 – Ground 2 .................................................56

X.   NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST .................................................................................................58

XI.   CONCLUSION.................................................................................58

iii

**EXHIBITS**

| Exhibit No. | Description of Document |
|---|---|
| 1001 | U.S. Patent No. 8,478,844 ("the '844 patent") |
| 1002 | Declaration of James Parker |
| 1003 | File History for U.S. Patent No. 8,478,844 |
| 1004 | U.S. Patent Publication No. 2004/0260427 to Wimsatt ("Wimsatt") |
| 1005 | U.S. Patent No. 6,580,950 to Johnson et al. ("Johnson") |
| 1006 | U.S. Patent No. 4,951,029 to Severson ("Severson") |
| 1007 | U.S. Publication No. 2003/0062997 to Naidoo et al. ("Naidoo") |
| 1008 | U.S. Patent No. 6,748,343 to Alexander et al. ("Alexander") |
| 1009 | U.S. Publication No. 2003/0137426 to Anthony et al. ("Anthony") |
| 1010 | Installation Instructions for PC5401 Data Interface Module (2004) |
| 1011 | "Understanding Universal Plug and Play," White Paper, Microsoft (2000) |
| 1012 | Waiver of Service, *iControl Networks, Inc. v. SecureNet Techns., LLC*, No. 15-807-GMS,  (D. Del. Sept. 30, 2015), ECF No. 5 |
| 1013 | *Curriculum Vitae* of James Parker |

iv

Petition for *Inter Partes* Review of
Patent No. 8,478,844

## I.    INTRODUCTION

SecureNet Technologies, LLC ("Petitioner" or "SecureNet") petitions for

*inter partes* review ("IPR") under 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42 of

claims 1-4, 6-24 and 41 ("the Petitioned Claims") of U.S. Patent No. 8,478,844

("the '844 patent") (Ex. 1001).

## II.    MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A.    Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1)

SecureNet Technologies, LLC is the real party-in-interest.

### B.    Related Matters Under 37 C.F.R. § 42.8(b)(2)

The '844 patent is asserted in *iControl Networks, Inc. v. SecureNet*

*Technologies, LLC*, No. 15-807-GMS (D. Del.), which was filed on September 11,

2015.[1]

Petitioner is concurrently filing an IPR petition for claims 25-40 and 42-50

of the '844 patent.  Petitioner is also concurrently filing an IPR petition for claims

1-6, 14-61 of U.S. Patent No. 8,073,931, which is assigned to the Patent Owner

and claims priority to same applications as the '844 patent. Petitioner is also

---

[1] iControl Networks, Inc. ("Patent Owner" or "iControl") filed a Waiver of Service

in that case on September 30, 2015 (Ex. 1012). Based on the PTAB-designated

informative decision docketed as Case No. IPR2013-00010 (Paper 20) (January 30,

2013), this Petition is being timely filed.

1

Petition for *Inter Partes* Review of
Patent No. 8,478,844

concurrently filing two IPR petitions for claims 1-9 and 12-62 of U.S. Patent No.

8,473,619, which is assigned to the Patent Owner and is the parent patent to the

'844 patent.

Petitioner is not aware of any other judicial or administrative matters that

would affect, or be affected by, a decision in this proceeding.

### C.    Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

**Lead Counsel:** Erik B. Milch (Reg. No. 42,887) / emilch@cooley.com
**Back-up Counsel:**
Jennifer Volk (Reg. No. 62,305) / jvolkfortier@cooley.com
Frank Pietrantonio (Reg. No. 32,289) / fpietrantonio@cooley.com
zSecureNetIPR@cooley.com
zpatdcdocketing@cooley.com
Cooley LLP ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700 Washington, DC 20004
Tel: (703) 456-8573 Fax: (703) 456-8100

### D.    Service Information

The Petition is being served by FEDERAL EXPRESS to the '844 Patent

Owner's attorneys of record, IPR Law Group, PC and the known outside counsel

to Patent Owner, Wilson Sonsini Goodrich & Rosati. Petitioner consents to service

by e-mail at the addresses provided above.

### E.    Power of Attorney

Filed concurrently with this petition per 37 C.F.R. § 42.10(b).

## III.    PAYMENT OF FEES - 37 C.F.R. § 42.103

This Petition requests review of claims 1-4, 6-24 and 41 (a total of 24

claims) of the '844 patent and is accompanied by a payment of $27,400. 37 C.F.R.

2

Petition for *Inter Partes* Review of
Patent No. 8,478,844

§ 42.15. This Petition meets the fee requirements of 35 U.S.C. § 312(a)(1).

**IV.    REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108**

**A.    Grounds for Standing Under 37 C.F.R. § 42.104(a)**

Petitioner certifies that the '844 patent is eligible for IPR and further certifies that Petitioner is not barred or estopped from requesting IPR.

**B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested**

Petitioner requests that the Board institute *inter partes* review of claims 1-4, 6-24 and 41 of the '844 patent and requests that each claim be found unpatentable as obvious under 35 U.S.C. § 103(a) on the following grounds:

| Ground | '844 Claim(s) | Basis for Challenge |
|---|---|---|
| 1. | 1-4, 6-17, 21 | Obvious over <u>Wimsatt</u> in view of <u>Johnson</u> and <u>Severson</u> under 35 U.S.C. § 103(a) |
| 2. | 18-20, 23-24, 41 | Obvious over <u>Wimsatt</u> in view of <u>Johnson</u>, <u>Severson</u> and <u>Naidoo</u> under 35 U.S.C. § 103(a) |
| 3. | 22 | Obvious over <u>Wimsatt</u> in view of <u>Johnson</u>, <u>Severson</u>, <u>Naidoo</u> and <u>Anthony</u> under 35 U.S.C. § 103(a) |

This petition is accompanied by the Declaration of James Parker (Ex. 1002, "Mr. Parker"), an expert in the field.

**C.    Threshold Requirement for *Inter Partes* Review 37 C.F.R. § 42.108(c)**

*Inter partes* review of claims 1-4, 6-24 and 41 should be instituted because this Petition establishes a reasonable likelihood that Petitioner will prevail with

3

Petition for *Inter Partes* Review of
Patent No. 8,478,844

respect to each of the claims challenged. 35 U.S.C. § 314(a).

## V.   BACKGROUND OF TECHNOLOGY RELATED TO THE '844 PATENT

Mr. Parker provides a technology tutorial in his declaration. (Ex. 1002, ¶¶ 30-57.)

## VI.   SUMMARY OF THE '844 PATENT

The '844 patent was filed on August 12, 2008 and claims priority to a divisional application and a long list of continuation-in-part applications and provisional applications, the earliest of which has a filing date of March 16, 2005. (Ex. 1001.) For purposes of this proceeding, we assume that the earliest possible priority date of the '844 patent is March 16, 2005. We reserve the right to dispute this priority date at a later time or in another proceeding.

## VII.   CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(b)(3)

### A.   Legal Overview

A claim subject to IPR is given its "broadest reasonable construction in light of the specification of the patent in which it appears."[2] 37 C.F.R. § 42.100(b).

### B.   Proposed Claim Constructions

Petitioner does not propose any claim constructions for this proceeding.  All claim terms and clauses should be given their plain and ordinary meaning as

---

[2] Petitioners reserve the right to pursue different constructions in litigation. *In re Zletz,* 893 F.2d 319, 321 (Fed. Cir. 1989).

4

Petition for *Inter Partes* Review of
Patent No. 8,478,844

understood by a person of ordinary skill in the art ("POSITA"). *See* Ex. 1002, ¶ 59.)

## VIII. PERSON HAVING ORDINARY SKILL IN THE ART & STATE OF THE ART

The '844 patent is directed to integrated security systems that are capable of being remotely accessed and controlled. (Ex. 1002, ¶¶ 17-24.) At the time of the alleged invention, a person having ordinary skill in the art ("POSITA") as of 2005 would hold a bachelor's degree or the equivalent in electrical engineering (or related academic fields) and at least three years of additional work experience in the area of digital and/or telecommunication system design, as applicable to safety and security systems, or equivalent work experience. (*Id.*, ¶ 19.)

## IX. CLAIMS 1-4, 6-24 AND 41 OF THE '844 PATENT ARE UNPATENTABLE

As detailed in the sections below, claims 1-4, 6-24 and 41 of the '844 patent are obvious in light of Wimsatt in view of Johnson and/or one or more other prior art references cited below.

### A. Overview Of The Prior Art

#### 1. Overview of Wimsatt

Wimsatt published on December 23, 2004 and therefore qualifies as prior art under 35 U.S.C. § 102(a). The patent issuing from Wimsatt was cited by Patent Owner in an Information Disclosure Statement (IDS) during prosecution of the '844 patent but it was never applied against the claims.

Wimsatt describes a home automation system having a control panel 101

5

Petition for *Inter Partes* Review of
Patent No. 8,478,844

that is connected to a number of co-located devices, called "controlled devices",

which manage already-existing systems, such as lighting systems or security

systems. (Ex. 1004, ¶ 0023.) The control panel 101 displays an interactive

graphical user interface (GUI) that allows the user (e.g., homeowner) to control the

controlled devices. (*Id.*, ¶ 0022; Ex. 1002, ¶¶ 61-64.)

### 2.    Overview of Johnson

Johnson issued on June 17, 2003 and therefore qualifies as prior art under 35

U.S.C. § 102(b). Johnson was cited by Patent Owner in an IDS during prosecution

of the '844 patent but it was never applied against the claims.

Johnson discloses an "Internet based home communications system for

allowing a homeowner to monitor and control various features of their home from

a distant location via a global computer network." (Ex. 1005, Abstract.) For

example, Johnson provides a website where homeowners can log in to access,

monitor and control a home's security system, lighting system, exterior cameras

and the like. (*Id.*, 2:8-28, 6:35-59.) The web site is provided through one or more

data center 20 servers that are located remotely from the home. (*Id.*, 4:15-53.)

### 3.    Overview of Severson

Severson issued on August 21, 1990 and therefore qualifies as prior art

under 35 U.S.C. § 102(b). Severson discloses a home security system controller

6

Petition for *Inter Partes* Review of
Patent No. 8,478,844

that automatically discovers newly-added sensors its security network. (Ex. 1006, 23:60-26:7; Ex. 1002, ¶¶ 70-72.)

### 4.    Overview of Naidoo

Naidoo published on April 3, 2003 and therefore qualifies as prior art under 35 U.S.C. § 102(b). Naidoo was used as a primary reference against the claims during prosecution. It is used here as a secondary reference for a few of the dependent claims. Naidoo discloses transmitting alarm and video data from a premise security gateway 115 to a security server 131, a central monitoring station 136, and/or a remote client device 155. (Ex. 1007, FIG. 7, ¶¶ 0069-0070.)

### 5.    Overview of Anthony

Anthony published on July 24, 2003 and therefore qualifies as prior art under 35 U.S.C. § 102(b). Anthony discloses security cameras for use in various security operations, including home security. (Ex. 1009, ¶¶ 31-33.)   Anthony discloses a security system that allows continuous remote monitoring and analysis. (Ex. 1009, ¶ 38.)   Audiovisual signals and other signals from the system can be transmitted via general packet radio service ("GPRS").   (Ex. 1009, ¶¶ 8, 29, 39, 40, 44, 57, 92.)

### B.    The Cited References Are Analogous Art

As indicated in the section above and as explained in Mr. Parker's declaration, each of the prior art references combined in this Petition is analogous

7

Petition for *Inter Partes* Review of
Patent No. 8,478,844

art to the '844 patent and to each other, as each reference is in the same field of

endeavor as the '844 patent. (Ex. 1002, ¶ 75.)

### C.    Grounds 1-3 – Claims 1-4, 6-24 and 41 Are Obvious over Wimsatt in view of Johnson and/or Other Prior Art References Under 35 U.S.C. § 103(a)

Claims 1-4, 6-24 and 41 are rendered obvious under 35 U.S.C. § 103(a) for

the reasons that follow.

#### 1.    Independent claim 1 – Ground 1

##### a.    Preamble: "A method comprising"

For the reasons discussed in the following sections, Wimsatt in view of

Johnson and Severson discloses a method.

##### b.    Claim element 1[a]: "coupling a gateway to a local area network located in a first location and a security server in a second location"

Wimsatt and Johnson disclose this limitation in its entirety. For clarity, this

limitation is divided into two parts and discussed separately.

###### i.    "coupling a gateway to a local area network located in a first location"

Wimsatt discloses this portion of claim element 1[a]. For example, Wimsatt

discloses a control panel 101 that is mounted within a user's home at a central

location. (Ex. 1004, ¶ 0034.) The control panel 101 is the claimed "gateway" and

the user's home is the claimed "first location." As shown below in annotated and

excerpted Figure 1 from Wimsatt, the control panel 101 is coupled to a hub 103,

8

Petition for *Inter Partes* Review of
Patent No. 8,478,844

which is described as implementing an Ethernet connection among the system devices. (Ex. 1004, ¶ 0036.) It is well known that Ethernet connections form LANs. (Ex. 1002, ¶ 77.)



The hub 103 in Wimsatt is located within the home and therefore the LAN is also located at the "first location." (*See, e.g.,* Ex. 1004, ¶¶ 0036, 0038, 0040 (each passage describing physical couplings between the hub 103 and system devices located within the home indicating the hub's physical presence within the home).)

Furthermore, Figure 2 of Wimsatt (annotated and shown below) provides a "hardware-oriented view" of the control panel 101 and shows that the panel 101 includes a "network interface" component. (Ex. 1004, ¶ 0016.) According to Wimsatt, the network interface's "functions are substantially similar to what might be found in a convention[al] personal computer network interface card (NIC)." (*Id.,* ¶ 0050.) A POSITA would have understood that a NIC is designed to couple or connect a computer to a LAN so that it can communicate over the LAN. (Ex.

9

Petition for *Inter Partes* Review of
Patent No. 8,478,844

1002, ¶ 79; *see also,* Ex. 1004, ¶ 0024 (explaining that Wimsatt's system can be

used in LAN environments).)



Thus, for at least these reasons, a POSITA would have understood from the

disclosures in Wimsatt that the control panel 101 is coupled to a LAN located in

the user's home. (Ex. 1002, ¶¶ 77-80.)

> ii. **"coupling a gateway to … a security server in a second location"**

Wimsatt and Johnson disclose this portion of claim element 1[a]. Wimsatt

does not explicitly disclose a remotely located security server coupled to its control

panel 101 but Johnson provides this disclosure. For example, Johnson discloses a

control unit 30 that is similar to the control panel 101 in Wimsatt and that is

10

Petition for *Inter Partes* Review of
Patent No. 8,478,844

located within a user's home. (Ex. 1005, 4:15-39.) The control unit 30 in Johnson

is coupled to a remotely located data center 20 via a global computer network 12.

(*Id.*) Johnson explains that its data center 20 comprises "**one** or more server

computers" that are "capable of receiving, storing and transmitting various types of

data related to the homeowner's home," including security data. (Ex. 1005, 4:40-53

(emphasis added); *see also, id.*, 4:16-39.) This data center 20 server is the claimed

"security server." The data center 20 server in Johnson is located remotely from

the user's home and is thus "in a second location." (*See*, Ex. 1005, FIG. 5.)

*Motivation to Combine Johnson with Wimsatt:* It would be obvious to a

POSITA to combine Johnson with Wimsatt so that the control panel 101 in

Wimsatt is coupled to the data center 20 server in Johnson. (Ex. 1002, ¶¶ 81-82.)

As a result of this coupling, the control panel 101 in Wimsatt can be remotely

accessed and controlled through the data center 20 server as described in Johnson.

(*Id.*) Johnson specifically improves upon the control panel 101 in Wimsatt and

explains that "[o]ur society has become extremely mobile with the reduced

expense and ease of travel leaving many homes unattended while the homeowner

is traveling or at work." (Ex. 1005, 1:14-16.) Therefore, according to Johnson,

"there is a need for a home monitoring system that allows a homeowner to monitor

their home from a distant location." (Ex. 1005, 1:14-25.) Coupling the control

11

Petition for *Inter Partes* Review of
Patent No. 8,478,844

panel 101 in Wimsatt to a remotely located data center 20 server would allow for

such remote monitoring and control.

A POSITA would be further motivated to combine Johnson with Wimsatt

because the control unit 30 in Johnson is the same as the control panel 101 in

Wimsatt. (Ex. 1002, ¶ 83.) Namely, both the control unit 30 and control panel 101

are systems that integrate functionality from multiple subsystems (e.g., security

systems, lighting systems, entertainment systems, surveillance systems, etc.) into a

single unit 30/ panel 101 for user control and convenience. (*See, e.g.,* Ex. 1004, ¶¶

0022-0023; Ex. 1005, 4:16-39.) Furthermore, the control panel 101 in Wimsatt is

already connected to the Internet so it would be a relatively easy task for the panel

101 to connect with the data center 20 server in Johnson. (Ex. 1002, ¶ 83.) The end

result would be a system that allows a homeowner to directly control aspects of the

control panel 101 (and its subsystems) from remote locations similar to that in

Johnson.

>        c.    **Claim element 1[b]: "wherein the first location**
>              **includes a security system comprising a plurality of**
>              **security system components"**

Wimsatt discloses this limitation. Wimsatt discloses that the user's home

(i.e., the claimed "first location") includes a security system. (*See, e.g.,* Ex. 1004, ¶

0005 ("Home automation systems may be integrated with a home security

system"), ¶ 0012 (describing a home automation system that controls "security

12

Petition for *Inter Partes* Review of
Patent No. 8,478,844

systems"), ¶ 0023 (explaining that the "invention is particularly useful in home automation environments because it builds on top of the vast array of controlled devices and subsystems that already exist for managing … security systems"), ¶¶ 0029-0031 ("tripping a zone on a burglar alarm … may indicate a household member [is] entering the house"), ¶¶ 0043, 0057-0058, 0062, 0065, 0073-0074.)

The '844 patent discloses that "security system components" can be sensors or any other components "belonging to the security system." (Ex. 1001, 4:40-45.) While Wimsatt does not illustrate a plurality of sensors in its security system, a POSITA would have understood that the security system indeed includes sensors. (Ex. 1002, ¶ 85.) Wimsatt discloses at paragraph [0031] that "tripping a zone on a burglar alarm … causes the control units to display a security screen having controls that allow the alarm to be de-activated." (Ex. 1004, ¶ 0031.) A POSITA would have understood that a "burglar alarm" is a security system and that at least one sensor located within each zone of the house. (Ex. 1002, ¶ 85.) It is this sensor (or sensors) that is "tripped" and sets off an alarm. Thus, sensors are inherent in Wimsatt.

To the extent Patent Owner disagrees, it would be obvious from Wimsatt that its security system includes sensors. It was well known at the time of the '844 patent that home security systems came equipped with multiple sensors (e.g., motion sensors, door sensors, window sensors, etc.) that could be mounted at

13

Petition for *Inter Partes* Review of
Patent No. 8,478,844

various locations throughout a home. (Ex. 1002, ¶ 86.) As Mr. Parker explains in

his declaration, sensors are the "eyes" of a home security system. (*Id.*) Without

sensors, a home security system is blind and cannot function. (*Id.*)

To the extent the Patent Owner further argues that a more specific disclosure

of sensors is required, Johnson has that disclosure. As illustrated in the below

excerpted and annotated Figure 5 of Johnson, the security system 60 includes

"security sensors." (*See also,* Ex. 1004, FIG. 3 (illustrating icons for well-known

components of a home security system, e.g., a door sensor, a window sensor and a

smoke alarm).)



14

Petition for *Inter Partes* Review of
Patent No. 8,478,844

While a POSITA would have understood that Wimsatt already indicates the presence of sensors, it would be obvious to modify Wimsatt to include the plurality of security sensors disclosed in Johnson to make this disclosure more explicit. (Ex. 1002, ¶ 88.)

> **d.  Claim element 1[c]: "automatically discovering the plurality of security system components at the gateway and establishing a first communication channel between the gateway and the plurality of security system components"**

Wimsatt, Johnson and Severson disclose this limitation in its entirety. For clarity, this limitation is divided into two parts and discussed separately.

> **i.  "automatically discovering the plurality of security system components at the gateway"**

Wimsatt discloses that its control panel 101 can implement a "system discovery process." According to Wimsatt, "[w]hen a control panel 101 is coupled to a controlled device or subsystem, it interrogates that device or subsystem to learn details of the control interface of that particular system." (Ex. 1004, ¶ 0045.) "This interrogation may simply be a matter of determining the controller type in which case the control panel 101 can look up a command set and signaling protocol information for that controller type." (*Id.*) Per this disclosure, the control panel 101 can automatically discover the home security system when the home security system is coupled to the control panel 101.

Wimsatt also discloses that its control unit 101 implements "Universal Plug-

15

Petition for *Inter Partes* Review of
Patent No. 8,478,844

and-Play (UPnP™) processes." (Ex. 1004, ¶ 0054.) It was well known at the time of the '844 patent that UPnP™ was used to auto-discover devices connected to a shared network. (Ex. 1002, ¶¶ 89-90 (citing to Ex. 1011, 7).)

Wimsatt does not explicitly disclose that its security system's sensors are automatically discovered using this process – it only explicitly discloses that the "security system" is discovered. A POSITA would have understood that discovering the security system would also include discovering its sensors. (Ex. 1002, ¶ 91.) To the extent Patent Owner disputes this Severson discloses a security system that includes a controller and a plurality of sensors. (Ex. 1006, FIG. 1, 4:3-29.) Severson explains that "without human intervention" "each system controller may be operated to 'self-learn' each of its sensors." (Ex. 1006, 25:3-13.) In describing a system installation process, Severson explains that the sensors and controller are mounted at the home and then "the controller is enabled and self-learns each of its sensors/transducers as they report their status." (Ex. 1006, 25:51-26:7; *see also, id.*, 23:60-25:50.) As a result, "[i]nstallation time is thereby reduced with minimal potential installer error, due to the CPU self-learning its reporting sensors." (*Id.*, 25:51-26:7.) This is similar to the auto-discovery process described in the '844 patent. (*See, e.g.,* Ex. 1001, FIG. 14, 24:66-26:5.)

***Motivation to Combine Severson with Wimsatt and Johnson:*** It would be obvious to a POSITA to combine the auto-discovery disclosure with Wimsatt and

16

Petition for *Inter Partes* Review of
Patent No. 8,478,844

Johnson so that the control panel 101 in Wimsatt can auto-discover the security sensors in addition to the discovering the security system controller. (Ex. 1002, ¶ 92.) This would predictably result in an easier sensor installation process and reduce the likelihood of installer error. (Ex. 1002, ¶ 92; *see also,* Ex. 1006, 26:5-7.)

As previously discussed, Wimsatt already discloses an automatic discovery process for learning the security system so it would be obvious to a POSITA to further discover the sensors that form part of that system. (Ex. 1004, ¶ 0045; Ex. 1002, ¶ 93.) A POSITA would understand that the control panel 101 would want to "discover" all of the devices that it and the data center 20 server in Johnson controls. Severson illustrates the ability and desire for similar controllers to automatically discover devices at the security component level. A POSITA would understand that adding an extra step in the automatic discovery process to include discovery of the sensors would be easy to implement. (Ex. 1002, ¶ 93.)

      ii.    **"establishing a first communication channel between the gateway and the plurality of security system components"**

Wimsatt and Johnson disclose this portion of the limitation. For example, as shown below in excerpted and annotated Figure 5 of Johnson, the control unit 30 includes a "wireless alert receiver" (highlighted red) that wirelessly communicates with the security sensors. (Ex. 1005, 5:54-67.) This wireless communication (highlighted purple) is the claimed "first communication channel". Wireless

Petition for *Inter Partes* Review of
Patent No. 8,478,844

communication between the control unit 30 and the security sensors would be

established during the system setup (installation) stage.  This channel is then used

every time a sensor reports a change of state (alarm/restore) or supervisory signal.

(Ex. 1002, ¶ 94.)



When Wimsatt is modified by Johnson, the control panel 101 in Wimsatt can

communicate with the security system sensors via a wireless communication

channel. (Ex. 1002, ¶ 95.) This communication can be "direct" (i.e., the sensors

18

Petition for *Inter Partes* Review of
Patent No. 8,478,844

communicate directly with the control panel 101) or "indirect" (i.e., the sensors communicate with the security system controller which then communicates with the control panel 101). The wireless communication channel would have been established during the system setup (installation) stage as a result of the automatic discovery processes discussed above. (*See e.g.,* Ex. 1004, ¶ 0045; Ex. 1002, ¶ 95.) And that channel would be used for all future communications between the devices.

Wimsatt already discloses an embodiment where its control panel 101 has wireless capabilities. (Ex. 1004, ¶ 0037 ("wireless control panels 107").) Thus, it would be obvious to a POSITA to extend this wireless capability to communicating with the security system sensors. (Ex. 1002, ¶ 96.)

> ### e. Claim element 1[d]: "automatically discovering network devices at the gateway and establishing a second communication channel between the gateway and the network devices"

Wimsatt, Johnson and Severson disclose this limitation in its entirety. For clarity, this limitation is divided into two parts and discussed separately.

> #### i. "automatically discovering network devices at the gateway"

Wimsatt discloses this portion of the limitation. As previously discussed, Wimsatt discloses that its control panel 101 can implement a "system discovery process." According to Wimsatt, "[w]hen a control panel 101 is coupled to a

19

Petition for *Inter Partes* Review of
Patent No. 8,478,844

controlled device or subsystem, it interrogates that device or subsystem to learn details of the control interface of that particular system." (Ex. 1004, ¶ 0045.) Wimsatt also explains that when the interrogation process does not work correctly, "the control panel can be **manually or semi-automatically** programmed to support that controlled device or subsystem." (*Id.* (emphasis added)) This last passage indicates that the interrogation process is automatic (i.e., the control panel 101 automatically discovers the controlled devices) because manual or semi-automatic programming is only performed when the automatic interrogation fails. (*See also,* Ex. 1004, ¶ 0006 (describing the difficulties of manually adding devices to a network).)

Also, as previously discussed, Wimsatt also discloses that its control unit 101 implements "Universal Plug-and-Play (UPnP™) processes." (Ex. 1004, ¶ 0054.) It was well known at the time of the '844 patent that UPnP™ was used to auto-discover devices connected to a shared network. (Ex. 1002, ¶ 98 (citing to Ex. 1011, 7).)

A controlled device in Wimsatt can include IP cameras 109 and environmental sensors. (*Id.*, FIG. 1, ¶ 0038; *see also, id.,* ¶¶ 0040, 0072.) These controlled devices are the claimed "network devices." (*See, e.g.,* Ex. 1001, claims 43, 44, 47 (reciting "wherein the network device is an [IP] device", "a camera" or "a sensor").) Thus, Wimsatt discloses automatically discovering network devices at

20

Petition for *Inter Partes* Review of
Patent No. 8,478,844

the control panel 101.

> **ii.** **"establishing a second communication channel between the gateway and the network devices"**

A POSITA would have understood that a communication channel is established between the control panel 101 and the controlled devices in Wimsatt; otherwise, the control panel 101 would not be able to interrogate the controlled devices. (Ex. 1002, ¶ 100.) As shown below in excerpted and annotated Figure 1 of Wimsatt, the red-highlighted path between the control panel 101 and the IP camera 109 demonstrates such an established communication channel. This path forms the claimed "second communication channel".



A POSITA would have understood that a similar communication path would have been established between the control panel 101 and the environmental sensors; otherwise, the control panel 101 would not have been able to interrogate those sensors for the auto-discovery process. (Ex. 1002, ¶ 101.)

Thus, for at least these reasons, Wimsatt discloses claim element 1[d].

21

Petition for *Inter Partes* Review of
Patent No. 8,478,844

> **f.    Claim element 1[e]: "wherein the second communication channel is independent of the first communication channel"**

As previously discussed, the hub 103 in Wimsatt implements an Ethernet connection between the system devices. (Ex. 1004, ¶ 0036; *see also,* **Part IX.C.1.b.i** above.)    As such, the claimed "second communication channel" between the control panel 101 and the IP camera 109 (and/or environmental sensors) is provided via an Ethernet connection. *See*, **Part IX.C.1.e.ii** above.

As previously discussed with respect to **Part IX.C.1.d.ii**, the claimed "first communication channel" between the control panel 101 and the security system sensors is provided via a wireless communication channel. This wireless communication channel is independent from the communication channel provided by the Ethernet connection. Thus, Wimsatt and Johnson disclose this limitation.

> **g.    Claim element 1[f]: "forming a security network by electronically integrating into the gateway communications and functions of the network devices and the plurality of security system components"**

For clarity, this limitation is divided into three parts, each of which is discussed separately below. Petitioner discusses "forming a security network" last because it is the end result of "electronically integrating" the devices.

> > **i.    "electronically integrating into the gateway communications and functions of the network devices…"**

Wimsatt discloses this portion of the limitation. Wimsatt disclose a home

22

Petition for *Inter Partes* Review of
Patent No. 8,478,844

automation system. The purpose of a home automation system, in general, is to communicate with and control the functionality of multiple home-based devices such as lighting, heating and air conditioning, media equipment, and security systems. (Ex. 1004, ¶¶ 0005-0006.) In its background section, Wimsatt provides an example of how such systems were known to operate with home security systems: "Home automation systems may be integrated with a home security system so that when a fire alarm is raised, for example, internal and external lights will be turned on." (Ex. 1004, ¶ 0005.) In other words, it was well known at the time of the '844 patent that home automation systems communicated with home-based devices (such as the lights in the above example) and controlled their functionality (i.e., the system commanded the lights to "turn on"). Thus, the general concept of integrating communications and functions of home-based devices into a home automation system was well known long before the earliest priority date of the '844 patent. (Ex. 1002, ¶ 104.)

Looking at Wimsatt's system specifically, the control panel 101 "electronically integrat[es]" communications and functions of its home-based control devices through the system discovery process discussed above. (*See, e.g.,* Ex. 1004, ¶ 0045.) Through this discovery process, the control panel 101 is able to "learn" various details about the controlled device, such as its command set, signaling protocol information, and the functionality available for that device. (Ex.

23

Petition for *Inter Partes* Review of
Patent No. 8,478,844

1004, ¶ 0046.) The control panel 101 is then able to communicate with and control the functions of that device.

In the case of IP cameras 109 (i.e., the claimed "network devices"), Wimsatt explains that the control unit 101 presents a graphical user interface to the user with controls that allow the user to, for example, move or focus the camera 109. (Ex. 1004, ¶¶ 0072, 0076.) A POSITA would have understood that controlling the camera 109 in this manner requires the control unit 101 to send a command to the camera 109 instructing it to move in a certain direction and/or focus its lens to a certain degree. (Ex. 1002, ¶ 106.) It is understood from the disclosures in Wimsatt that the control panel 101 communicates with and controls the functionality of all of the controlled devices listed within Wimsatt to at least some degree. (*See, e.g.,* Ex. 1004, ¶ 0022 (generally explaining that "a control panel … generates commands … to turn on/off a controlled device, adjust settings on a controlled device… and the like"), ¶ 0044.) As previously discussed, the control panel 101 would not have the ability to control or communicate with the devices if it had not discovered the devices and electronically integrated their functionality into itself and the overall system.

Thus, Wimsatt discloses the portion of this limitation reciting "electronically integrating into the gateway communications and functions of the network devices."

24

Petition for *Inter Partes* Review of
Patent No. 8,478,844

> **ii.    "electronically integrating into the gateway communications and functions of the … plurality of security system components"**

This portion of the limitation is disclosed by Wimsatt and Johnson. As previously discussed, Wimsatt discloses a security system and a POSITA would understand that it has sensors. Johnson makes that even more explicit.

As just discussed, Wimsatt discloses "electronically integrating" into the control panel 101 communications and functions of its home-based controlled devices. (Ex. 1004, ¶¶ 0045, 0046.) Wimsatt identifies the home's security system as one type of controlled device. (*See, e.g.,* Ex. 1004, ¶¶ 0012, 0029, 0058.) The specification also states that "control application software executes on the control unit to communicate control information such as commands, *sensor messages*, status messages, and the like with … controlled systems (e.g., *security systems* …)." (*Id.* (emphasis added).) It further explains that this software "may enable features of the security system to be enabled/disabled." (Ex. 1004, ¶ 0058.) A POSITA would have understood that controlling features of a security system would include controlling features (i.e., functions) of the security system's sensors via the home's security system. (Ex. 1002, ¶ 108.) Thus, Wimsatt discloses this portion of the limitation.

25

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### iii.    "forming a security network…"

A POSITA would have understood that the claimed "security network" is formed in Wimsatt (as modified by Johnson) as a result of the control panel 101 integrating the functions of the IP cameras and security system sensors. (Ex. 1002, ¶ 109.) Wimsatt actually refers to this network more generically as a "home automation system" because its control panel 101 integrates the functions of many other types of home-based control devices, in addition to security-related devices. (*See, e.g.,* Ex. 1004, ¶¶ 0005, 0012.) But, a POSITA would have understood that this home automation system includes a security network, which is specific to the security-related devices. (Ex. 1002, ¶¶ 109-110.) Referring to the network as a home automation network versus a security network is semantics.

### h.    Claim element 1[g]: "receiving at the gateway security data from the plurality of security system components, device data of the network devices, and remote data from the security server"

Wimsatt and Johnson disclose this limitation. In general, Wimsatt discloses that its control panel 101 receives "status signals" from the controlled devices. (Ex. 1004, ¶ 0044.) The controlled devices include, for example, IP cameras and the home's security system.

With respect to the security system's sensors specifically, Wimsatt discloses several scenarios where a burglar alarm (i.e., one or more sensors) is triggered, causing the control panel 101 to sound an alarm. (Ex. 1004, ¶¶ 0030-0031, 0059.)

26

Petition for *Inter Partes* Review of
Patent No. 8,478,844

A POSITA would have understood that, in these particular scenarios, the status of the security system's sensors is sent to the control panel 101 in some form. (Ex. 1002, ¶ 112; *see also,* Ex. 1004, ¶¶ 0044, 0056, 0059; *compare to* Ex. 1001, 27:5-10.) Thus, it would be obvious to a POSITA that the control panel 101 in Wimsatt receives "security data" from the security system sensors. (Ex. 1002, ¶ 112.)

With respect to the IP cameras (i.e., the claimed "network devices"), as just discussed, the control panel 101 in Wimsatt receives "status signals" from the IP cameras. (Ex. 1004, ¶ 0044; *see also, id.,* ¶ 0038 (explaining that IP cameras "communicate control messages with a network-coupled control panel 101"), ¶ 0056 (describing "control messages" as "including command and status messages").) Wimsatt also discloses that the control panel 101 receives a streaming input from the IP cameras. (Ex. 1004, ¶¶ 0072, 0075, FIG. 6.) It further discloses that the control panel 101 receives details about the IP cameras (e.g., signaling protocol information) as part of the discovery process. (Ex. 1004, ¶ 0045.) Thus, Wimsatt clearly discloses that its control panel 101 receives "device data of the network devices" as recited in this limitation.

With respect to the security server, as previously discussed, it would have been obvious to a POSITA to modify Wimsatt so that the control panel 101 is coupled to the data center 20 server in Johnson (i.e., the claimed "security server"). *See* **Part IX.C.1.b.ii** above. Johnson discloses that its control unit 30 "may []

27

Petition for *Inter Partes* Review of
Patent No. 8,478,844

download any data from the data center 20 such as commands from the homeowner." (Ex. 1005, 5:13-18; *see also, id.*, 6:65-7:2, 7:67-8:4.) This data is the claimed "remote data." It would have been obvious to modify the control panel 101 in Wimsatt so that it receives data from the remotely-located data center 20 server in the same manner described for the control unit 30 in Johnson. (Ex. 1002, ¶ 114.) As such, a homeowner in Wimsatt would be able to remotely control the control panel 101 and the networked controlled devices through the data center 20 server as described in Johnson. (*Id.*) The motivations to combine Wimsatt and Johnson discussed above in **Part IX.C.1.b.ii** apply here. Thus, Wimsatt (as modified by Johnson) discloses that its control panel 101 receives "remote data from the security server" as recited in this limitation.

> i.  **Claim element 1[h]: "generating processed data by processing at the gateway the security data, the device data, and the remote data"**

Wimsatt and Johnson disclose this limitation. The control panel 101 in Wimsatt includes a processor 201 that "implements data processing functionality for accessing and manipulating data from various subsystems and memory." (Ex. 1004, ¶ 0047.) Thus, it would be obvious for this processor 201 to generate "processed data" by processing the "security data" from the security system sensors, the "device data" from the IP cameras, and the "remote data" from the data center 20 server in Johnson. (Ex. 1002, ¶ 115.)

28

Petition for *Inter Partes* Review of
Patent No. 8,478,844

With respect to the "security data", as previously discussed, when one or more security system sensors are activated (e.g., a burglar alarm is triggered), the sensors transmit a "status signal" that is received at the control unit 101. (*See, e.g.,* Ex. 1004, ¶¶ 0030-0031, 0059.) According to Wimsatt, the control panel's processor 201 includes a message broker process that receives this status signal, interprets it, and then passes it to the security plug-in for further processing. (Ex. 1004, ¶¶ 0044, 0056, 0058-0059.)   If the security plug-in determines that the received "security data" indicates an intrusion, it activates the necessary audio plug-in to sound an alarm on the control panel 101. (Ex. 1004, ¶ 0059.) Thus, the "security data" is "processed" by the control panel's processor 201.

With respect to the "device data", a POSITA would understand that any status signal from the IP camera 109 would be processed by the processor 201 in a manner similar to that described above for the "security data". (Ex. 1002, ¶ 117.) Any streamed input received at the control panel 101 from the IP camera 109 would also necessarily require processing. (*Id.*) Furthermore, when the "device data" is, for example, the signaling protocol information received by the control panel 101 as part of the IP camera discovery process, a POSITA would have understood that this information is processed by the processor 201 because the processor 201 uses this information to generate messages that can be

29

Petition for *Inter Partes* Review of
Patent No. 8,478,844

communicated to the IP camera via that protocol. (*Id.*; *see also,* Ex. 1004, ¶¶ 0038, 0045, 0054.)

Finally, with respect to the "remote data", as previously discussed, when the control panel 101 in Wimsatt is modified by Johnson, the control panel 101 is capable of receiving data from a remotely-located data center 20 server. *See* **Part IX.C.1.h** above. The data can be, for example, commands entered by a homeowner instructing the control panel 101 to change one or more settings on a controlled device (e.g., the home security system). (*See, e.g.,* Ex. 1005, 4:15-53.) A POSITA would understand that data received at the control unit 101 from data center 20 server would be processed by the control unit's processor 201 so that the data can be interpreted and the appropriate actions taken by the control unit 101 to modify the settings of the particular controlled device. (Ex. 1002, ¶ 118.) The same motivations to combine Wimsatt and Johnson discussed in **Part IX.C.1.b.ii** apply here.

Thus, Wimsatt and Johnson disclose this limitation.

> **j.    Claim element 1[i]: "determining a state change of the security system using the processed data; and"**

Wimsatt and Johnson also disclose this limitation. Wimsatt discloses that the control panel 101 can be used to arm and disarm the home's security system. (Ex. 1004, ¶¶ 0065-0066, 0070-0071, 0074.) When Wimsatt is modified by Johnson, a homeowner can control this functionality remotely through the data center 20

30

Petition for *Inter Partes* Review of
Patent No. 8,478,844

server. For example, if the status (or "state") of the security system (and its sensors) is "unarmed", then the homeowner can send a command signal though the data center 20 server to the control panel 101 instructing the control panel 101 to change the status (or "state") of the security system (and its sensors) to "armed". (Ex. 1002, ¶¶ 119-120.) A POSITA would have understood that the control panel 101 in Wimsatt must process this "remote data" from the data center 20 server to determine what command needs to be implemented. (*Id*.) Here, upon processing, the control panel 101 would have determined that the status (or "state") of the home security system needs to be changed from "unarmed" to "armed." (*Id*.)

> **k.** **Claim element 1[j]: "maintaining at the security server with use of the processed data objects corresponding to the plurality of security system components and the network devices"**

The '844 patent explains that the remote security server "provide[s] access to, and management of, the objects associated with an integrated security system." (Ex. 1001, 8:29-41.) It further explains that "every **object** monitored by the gateway 102 is called a **device**." (*Id.* (emphasis added)) "Devices include the sensors, cameras, home security panels and automation devices." (*Id.*)

Wimsatt and Johnson disclose claim element 1[j] consistent with this disclosure in the '844 patent. As shown below in Figure 3 of Johnson, the homeowner accesses a web page "displayed by the data center 20" and can

31

Petition for *Inter Partes* Review of
Patent No. 8,478,844

"monitor[] and control[]" aspects of the security system and cameras using that

web page. (Ex. 1005, 4:30-36, 5:29-39, 6:35-59.)



Johnson explains that a homeowner can "modify any preprogrammed

settings within the home" by "simply select[ing] the desired feature on the control

page 76 of the desired home as shown in FIGS. 3 and 7." (Ex. 1005, 6:61-65.)

"The homeowner may then enter the desired data into the computer 16 which is

32

Petition for *Inter Partes* Review of
Patent No. 8,478,844

transmitted to the data center 20 which forwards the information directly to the control unit 30 which transmits the data accordingly modifying any previous settings." (Ex. 1005, 6:65-7:4.) When Wimsatt is modified by Johnson, the homeowner is able to remotely control the control panel 101 and the controlled devices in the same manner. (Ex. 1002, ¶¶ 121-123.)

A POSITA would have understood that the icons illustrated on the above web page represent particular controlled devices located within the home in Wimsatt. (Ex. 1002, ¶ 124.) These icons are the claimed "objects" maintained at the data center 20 servers. For example, the icon labeled "camera" is an object maintained at the server corresponding to the IP camera 109. Similarly, the icons labeled "door" and "window" are objects maintained at the server corresponding to a door sensor and a window sensor, respectively.

A POSITA would have also understood that the data center 20 server maintains the status of each of these objects (corresponding to the camera, window and door sensors) using the processed data discussed in **Part IX.C.1.i** above. (Ex. 1002, ¶ 125.) As Mr. Parker explains in his declaration, it would be difficult to change a device's settings without knowing the current status of that device. (*Id.*; *see also,* Ex. 1005, 7:6-8.) Thus, it would be obvious to a POSITA to conclude that the control panel 101 in Wimsatt transmits the processed security data and device

33

Petition for *Inter Partes* Review of
Patent No. 8,478,844

data to the data center 20 server so that the web page displayed for the homeowner

has the most up-to-date information about the objects. (Ex. 1002, ¶ 125.)

For at least these reasons, Wimsatt in view of Johnson and Severson disclose

claim 1.

### 2. Dependent claim 2 – Ground 1[3]

| 2 | The method of claim 1, comprising controlling the functions of the security network via an interface coupled to the security network, wherein the interface is accessed using a remote client device. |
|---|---|

Wimsatt and Johnson disclose this limitation. The web page illustrated

above in Figure 3 of Johnson is the claimed "interface." The web page allows a

homeowner to "monitor[] and control[]" aspects of the security system and

cameras using that web page. (Ex. 1005, 4:30-36, 5:29-39, 6:35-59.) Because these

components are part of the "security network", the web page is used to control the

functions of the security network. The web page in Johnson is coupled to the

home's security network via the global network 12, the data center 20 server and

the control unit 101. (*See, e.g.,* Ex. 1005, FIG. 1, 4:15-23.) And, the homeowner in

---

[3] Throughout the petition when referring to applying a Ground against a given

dependent claim it is intended that the entire combination of references is being

applied against that claim in its totality even if only a subset of the references are

discussed with respect to the specific limitations added by that dependent claim.

Petition for *Inter Partes* Review of
Patent No. 8,478,844

Johnson is able to access the web page using a remotely located computer (i.e., the claimed "remote client device"). (*See, e.g.,* Ex. 1005, Abstract ("An Internet based home communications system for allowing a homeowner to monitor and control various features of their home from a distant location via a global computer network"), FIG. 1 (illustrating that the "user's computer" is remote from the home where the control unit 30 and control devices 40 are located), 4:30-36, 5:29-39, 6:35-59.)

When Wimsatt is modified by Johnson, the homeowner in Wimsatt would be able to remotely access the control panel 101 in Wimsatt and control the controlled devices in the "security network" using the web page provided in Johnson. The motivations to combine Wimsatt, Johnson and Severson for claim 2 are the same as for claim 1.

### 3.    Dependent claim 3 – Ground 1

| 3 | The method of claim 2, wherein the remote client devices include one or more of personal computers, personal digital assistants, cellular telephones, and mobile computing devices. |
|---|---|

As just discussed, Johnson discloses that the homeowner can access the web page via a computer, which is the claimed "personal computer". (Ex. 1005, 3:24-27, 3:40-43, 4:30-33, 6:36-38, 7:30-32.)

35

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 4.    Dependent claim 4 – Ground 1

| 4 | The method of claim 1, comprising using protocols of the security system to discover the security system components, wherein the gateway includes the protocols of the security system. |
|---|---|

As previously discussed, Wimsatt discloses a discovery process in which controlled devices in the network (e.g., security systems) are discovered and "signaling protocol information" is acquired from the devices. (Ex. 1004, ¶ 0045.) Wimsatt discloses that this information is "learn[ed]" into the control panel 101 (i.e., the claimed "gateway"), which means that it is stored at the control panel 101. (*Id.*) Thus, Wimsatt discloses "*wherein the gateway includes the protocols of the security system.*"

Wimsatt does not disclose using these signaling protocols to discover the security system's sensors but such use would be obvious to a POSITA in view of Severson. As discussed above in **Part IX.C.1.d.i**, Severson discloses a method of discovering security sensors that involves "listening" for sensors on the network and then "learning" details about the sensors based on their transmitted status information. (Ex. 1006, 23:60-26:7.) As Mr. Parker explains in his declaration, any controller "listening" to network traffic would need to know the protocols for which to listen. (Ex. 1002, ¶¶ 130-131.) The controller in Severson listening for transmitting sensors would need to know the protocol those sensors are using to transmit their data. (*Id.*)

36

Petition for *Inter Partes* Review of
Patent No. 8,478,844

When Wimsatt is modified by Severson, the control panel 101 is capable of listening for and discovering the security sensors associated with the home's security system. (Ex. 1002, ¶ 132.) A POSITA would have understood that the "signaling protocol information" acquired from the security system in Wimsatt would include the signaling protocols for the security system's associated sensors because they are part of the same system. (*Id.*) This protocol information would then be used by the control panel 101 to listen for the security sensors as described in Severson. (*Id.*) Again, per Mr. Parker's declaration, the control panel 101 would need to know the protocol that the sensors are using in order to listen for their transmissions and discover them on the network. (*Id.*) Thus, Wimsatt in view Severson discloses "*using protocols of the security system to discover the security system components.*" The rationale for combining Severson with Wimsatt and Johnson for claim 4 is the same as for claim 1. *See,* **Part IX.C.1.d.i** above.

For at least these reasons, Wimsatt in view of Johnson and Severson render claim 4 obvious.

### 5.    Dependent claim 6 – Ground 1

| 6 | The method of claim 1, wherein the gateway comprises a connection management component, the connection management component automatically establishing a coupling with the security system including the security system components. |
|---|---|

As discussed with respect to claim element 1[c], Wimsatt discloses that its

37

Petition for *Inter Partes* Review of
Patent No. 8,478,844

control panel 101 can automatically discover the home's security system when the security system and the panel 101 are connected to the network. (Ex. 1004, ¶¶ 0045-0046.) As also discussed in that section, Wimsatt in view of Johnson and Severson disclose that the control panel 101 automatically discovers the security system's sensors. (*See,* Ex. 1006, 23:60-26:7.) A POSITA would have understood that "discovering" the security system and its sensors necessarily requires that a connection or "coupling" be made between the control panel 101 and the system / sensors. (Ex. 1002, ¶ 134.) Otherwise, the control panel 101 would not be able to receive signals from the system / sensors. (*Id.*) Thus, it is obvious that Wimsatt in view of Johnson and Severson disclose "automatically establishing a coupling with the security system including the security system components" as recited in claim 6.

Wimsatt does not identify a specific component within the control panel 101 as a "connection management component." But a POSITA would understand that the "connection management component" in claim 6 would be a module implemented by a processor to carry out the claimed operation. (Ex. 1002, ¶¶ 133, 135.) A POSITA would also have understood that the control panel 101 in Wimsatt must also include a module to perform the discovery and connection processes that it describes and, thus, the control panel 101 in Wimsatt must indeed include the "connection management component". (*Id.*)

38

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 6. Dependent claim 7 – Ground 1

| 7 | The method of claim 6, wherein the connection management component automatically discovers the network devices. |
|---|---|

As discussed in **Part IX.C.1.e**, Wimsatt discloses a process for automatically discovering IP devices (i.e., the claimed "network devices"). As discussed with respect to claim 6, a POSITA would have understood that the control panel 101 in Wimsatt included a module (i.e., the claimed "connection management component") that performs this discovery process. (Ex. 1002, ¶ 136.) Thus, Wimsatt in view of Johnson and Severson discloses claim 7.

### 7. Dependent claim 8 – Ground 1

| 8 | The method of claim 6, wherein the connection management component automatically installs the network devices in the security network. |
|---|---|

The discovery process described in Wimsatt includes automatically installing the discovered devices into the control panel 101 and thus into the security network. For example, Wimsatt discloses that, as a result of the discovery process, the control panel 101 is "programmed to support" the discovered devices (e.g., an IP camera 109) and receives "full access" to those devices. (Ex. 1004, ¶ 0045.) The discovered / installed IP camera 109 is thus operational on the security network via the control panel 101.

As discussed with respect to claim 6, a POSITA would have understood that the control panel 101 in Wimsatt included a module (i.e., the claimed "connection

Petition for *Inter Partes* Review of
Patent No. 8,478,844

management component") that performs this discovery process. (Ex. 1002, ¶¶ 137-138.)

Claim 8 is therefore rendered obvious by Wimsatt in view of Johnson and Severson.

### 8. Dependent claim 9 – Ground 1

| 9 | The method of claim 6, wherein the connection management component automatically configures the network devices for operation in the security network. |
|---|---|

The discovery process described in Wimsatt includes automatically installing the discovered devices into the control panel 101 and thus into the security network such that the devices operate within the security network. For example, Wimsatt discloses that, as a result of the discovery process, the control panel 101 is "programmed to support" the discovered devices (e.g., an IP camera 109) and receives "full access" to those devices. (Ex. 1004, ¶ 0045.) The discovered / installed IP camera 109 is thus operational on the security network via the control panel 101.

As discussed with respect to claim 6, a POSITA would have understood that the control panel 101 in Wimsatt included a module (i.e., the claimed "connection management component") that performs this discovery, installation and configuration process. (Ex. 1002, ¶¶ 139-140.) A POSITA would not install devices without having them configured to operate with the system. (*Id.*)

40

Petition for *Inter Partes* Review of
Patent No. 8,478,844

Claim 9 is therefore rendered obvious by Wimsatt in view of Johnson and

Severson.

### 9.    Dependent claim 10 – Ground 1

| 10 | The method of claim 1, wherein the gateway includes a rules component that manages rules of interaction between the gateway, the security system components, and the network devices. |
|---|---|

Claim 10 is disclosed by Wimsatt and Johnson. The claimed "rules

component" is collectively formed by the plug-ins shown below in annotated

Figure 3 of Wimsatt, which are stored at and processed by the control panel 101.



Wimsatt discloses that the security plug-in in particular "may monitor [the]

status of a home security system and when an anomaly is detected, activate the

audio and home control plug-ins to provide information and/or alerts to users."

(Ex. 1004, ¶ 0059; *see also, id.*, ¶¶ 0058, 0061.) The audio and home control plug-

41

Petition for *Inter Partes* Review of
Patent No. 8,478,844

ins are described in Wimsatt as controlling the home's audio equipment 123 and

the home's lighting system 113, respectively. (*Id.*, FIG. 1, ¶¶ 0056, 0058.)  An alert

received at the security plug-in therefore results in that plug-in activating the

home's audio equipment 123 and the home's lighting system 113 (e.g., sounding

an alarm and/or turning on the lights).[4] Thus, the security plug-in includes the rules

for determining how the control panel 101 and the other networked devices

respond when the security system (and its sensors) alerts the control panel 101 to a

particular situation.  It would be obvious to a POSITA that each plug-in includes

its  own set of rules for managing how the control panel 101 interacts and

communicates with corresponding devices, and vice versa. (Ex. 1002, ¶¶ 141-147.)

Also, although Figure 3 does not illustrate a plug-in for IP cameras 109 (i.e.,

the claimed "network devices"), it is understood from the disclosures in Wimsatt

that the control panel 101 would include a camera plug-in with its own rules for

managing interactions. Wimsatt describes using the control panel 101 to control

---

[4] The '844 patent appears to suggest that Automation engine 308 is an example of

a "rules component" as it is described as "manag[ing] the user-defined rules of

interaction between the different devices (e.g., when door opens turn on the light)."

(Ex. 1001, 13:3-8.) Wimsatt describes an identical operation for the security plug-

in.

42

Petition for *Inter Partes* Review of
Patent No. 8,478,844

certain aspects of an IP camera 109. (*See, e.g.,* Ex. 1004, ¶¶ 0072, 0076.) This functionality would only be possible through a plug-in. (Ex. 1004, ¶ 0058 ("Any number of third party plug-ins are possible to implement extended functionality and/or enable access to new types of controlled devices and subsystems.").)

### 10.    Dependent claim 11 – Ground 1

| 11 | The method of claim 1, wherein the gateway includes a device connect component that includes definitions of the security system components and the network devices. |
|---|---|

The plug-ins in Wimsatt also collectively form the claimed "device connect component". The '844 patent states that "DeviceConnect 310 includes definitions of all supported devices (e.g., cameras, security panels, sensors, etc.) using **standardized plug-in architecture**." (Ex. 1001, 13:9-19 (emphasis added).) This is exactly what Wimsatt discloses for its plug-ins. (Ex. 1004, ¶¶ 0057-0059.)

Although Wimsatt does not explicitly disclose that its plug-ins include definitions for the security system's sensors (i.e., the claimed "security system components"), this would be obvious to implement into the security plug-in in view of Severson. (Ex. 1002, ¶¶ 148-149.) Severson discloses that sensor information (including sensor name, alert level) is learned into the controller. (*See, e.g.,* Ex. 1006, 23:60-67, Tables 4 and 5.) When Wimsatt is modified by Severson, the control panel 101 would include this sensor information. This information (or "definition") would be included in and/or used by the security plug-in in Wimsatt

43

Petition for *Inter Partes* Review of
Patent No. 8,478,844

to support interaction between the control panel 101 and the sensors. (Ex. 1002, ¶ 149.) The motivations for combining Severson with Wimsatt and Johnson here are the same as discussed for claim 1. Thus, claim 11 is rendered obvious.

### 11.    Dependent claim 12 – Ground 1

| 12 | The method of claim 1, wherein the premise local area network is coupled to a wide area network via a premise router. |
|---|---|

As discussed with respect to claim element 1[a], the premise LAN is implemented by the hub 103. This hub 103 can be a router. (Ex. 1004, ¶ 0036.) The hub 103 is connected to an Internet gateway 127 that provides access to the Internet, which is a "wide area network." (*Id.*, FIG. 1, ¶ 0041.) Thus, Wimsatt discloses claim 12.

### 12.    Dependent claim 13 – Ground 1

| 13 | The method of claim 1, wherein the gateway is coupled to the local area network using a premise router, and the gateway is coupled to a wide area network. |
|---|---|

Nothing in claim 13 requires that the gateway is *directly* coupled to a WAN. The disclosures from Wimsatt discussed above for claim 12 therefore apply here and render claim 13 obvious. The control panel 101 in Wimsatt is thus coupled to both the LAN and the WAN via the hub 103, which can be a router. (Ex. 1004, ¶¶ 0036, 0041.)

44

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 13. Dependent claim 14 – Ground 1

| 14 | The method of claim 1, wherein the gateway is coupled to the network devices using a wireless coupling. |
|----|---|

Wimsatt discloses that its control panel 101 can be wireless (referred to as "control panel 107") and can wirelessly communicate with any of the controlled devices, including the IP camera 109. (Ex. 1004, ¶¶ 0037, 0043.) Thus, Wimsatt renders claim 14 obvious.

### 14. Dependent claim 15 – Ground 1

| 15 | The method of claim 1, wherein the gateway is coupled to the security server via the internet. |
|----|---|

Claim 15 is rendered obvious by Wimsatt and Johnson. Johnson discloses that its control unit 30 communicates with the data center 20 server (i.e., the claimed "security server") via a global computer network 12. (Ex. 1005, FIG. 1, 4:55-63.) This global computer network 12 can be the Internet. (*Id.*, 4:20-21.)

When Wimsatt is modified by Johnson, the control panel 101 in Wimsatt replaces the control unit 30 such that the control panel 101 communicates with the data center 20 server via the Internet. (Ex. 1002, ¶ 154.) As discussed in connection with claims 12 and 13, the control panel 101 in Wimsatt is already connected to the Internet so it would be an easy task to connect the control panel 101 to the server. The same motivations to combine Johnson with Wimsatt and Severson discussed above for claim 1 apply here.

45

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 15.    Dependent claim 16 – Ground 1

| 16 | The method of claim 1, wherein the gateway is coupled to a central monitoring station corresponding to the security system, wherein the central monitoring station is located at a third location different from the first location and the second location. |
|---|---|

Claim 16 is rendered obvious by Wimsatt and Johnson. Johnson discloses that its control unit 30 can communicate with an auxiliary service 80 to report a security breach. (Ex. 1005, 6:6-11, 6:27-29.)  A POSITA would understand from Johnson that the auxiliary service could be a security agency that can call the homeowner at, for example, their work to notify them of the breach. (*Id.*, 1:27-32.) A POSITA would have understood that (1) this "security agency" is a central monitoring station, (2) the monitoring station corresponds to the security system, and (3) the monitoring station is located remotely from both the control unit 30 and the data center 20 server. (Ex. 1002, ¶ 155.)

As discussed throughout, when Wimsatt is modified by Johnson, the control panel 101 replaces the control unit 30 so that the control panel 101 is capable of communicating with the data center 20 server and the security agency. It would be obvious to a POSITA to combine Johnson with Wimsatt and Severson for the same reasons discussed for claim 1. In addition, a POSITA would have understood the benefits of enabling the control panel 101 to contact a central monitoring station separately from the data center 20 server when an alarm event occurs. (Ex. 1002, ¶ 156.) The data center 20 in Johnson enables a homeowner to remotely control the

46

Petition for *Inter Partes* Review of
Patent No. 8,478,844

control panel 101 and its home devices. But a central monitoring station is specifically associated with a security system and acts quickly to contact local first responders when a breach occurs. These entities serve two different functions. Thus, Wimsatt's control panel 101 would benefit from having direct communication with a central monitoring station. (*Id.*)

### 16. Dependent claim 17 – Ground 1

| 17 | The method of claim 1, wherein the security system is coupled to a central monitoring station via a third communication channel, wherein the gateway is coupled to the central monitoring station via a fourth communication channel that is different than the third communication channel. |
|----|----|

As discussed above in connection with claim 16, Wimsatt in view of Johnson discloses that the control panel 101 communicates with a security agency (or "central monitoring station") via the Internet. (Ex. 1005, 6:6-11, 6:27-29.) The Internet can be implemented by, for example, a "digital subscriber line (DSL)," which is the claimed "fourth communication channel." Thus, Wimsatt in view of Johnson discloses "wherein the gateway is coupled to the central monitoring station via a fourth communication channel."

In its background section, Johnson explains that conventional security system panels communicate directly with security agencies. (Ex. 1005, 1:27-32.) Nothing in Wimsatt suggests that its security system panel losses any functionality when it is connected to the control panel 101 as part of the home automation

47

Petition for *Inter Partes* Review of
Patent No. 8,478,844

system. According to Wimsatt, the control panel 101 is intended to work with

*existing devices* and merely provides a user-friendly interface through which those

devices can be controlled. (Ex. 1004, ¶¶ 0023, 0065.) Wimsatt is silent with respect

to the control panel 101 being capable of communicating with an outside service,

such as a central monitoring station, so a POSITA would have understood that the

security system in Wimsatt maintains the ability to contact the monitoring station

even when it is part of the home automation system. (Ex 1002, ¶¶ 157-158.)

Wimsatt and Johnson do not disclose how the security system communicates

with the monitoring center, but Severson does. Severson discloses that its security

system controller communicates with a central monitoring station 4 via one or

more telephone lines. (Ex. 1006, 3:57-4:2.) When Wimsatt is modified by

Severson and Johnson, the security system in Wimsatt communicates with the

security agency via a telephone line. This telephone line is the claimed "third

communication channel." A telephone line is a different communication channel

than a DSL.

It would have been obvious to combine Wimsatt with Johnson and Severson

so that both the security system and the control panel 101 in Wimsatt are capable

of contacting a security agency (or central monitoring station). (Ex. 1002, ¶¶ 159-

160.) A POSITA would have understood the benefit of having two devices capable

of contacting a security agency on different communication channels. (*Id.*) For

48

Petition for *Inter Partes* Review of
Patent No. 8,478,844

example, once device (e.g., the control panel 101) could act as a back-up in case the first device (e.g., the security system) failed to make contact with the central monitoring station.

Thus, for at least these reasons, claim 17 is rendered obvious by Wimsatt in view of Johnson and Severson.

### 17.    Dependent claim 18 – Ground 2

| 18 | The method of claim 17, comprising transmitting event data of the security system components and the network devices to the central monitoring station via the gateway and the fourth communication channel. |
|---|---|

Claim 18 is disclosed by Wimsatt in view of Johnson, Severson and Naidoo. An overview of Naidoo's security system is illustrated below. (Ex. 1007, FIG. 7.) As shown, the security gateway 115 in Naidoo (which is located on a homeowner's premises) communicates directly with a data center 132 (similar to Johnson) as well as a central monitoring station 136 (also similar to Johnson). Naidoo discloses that, upon detection of an alarm event, the gateway 115 sends the central monitoring station 136 "notification of the alarm condition and information relating to the alarm condition, which may include alarm video." (Ex. 1007, ¶¶ 0070-0071.)

49

Petition for *Inter Partes* Review of
Patent No. 8,478,844



When Wimsatt in view of Johnson is further modified by Naidoo, the control

panel 101 in Wimsatt is capable of sending the security sensor alarm data and

video from the IP camera 109 to the central monitoring station 136, as described in

Naidoo. Transmission between the control panel 101 and the central monitoring

station 136 occurs over the DSL, as discussed in claim 17. (Ex. 1002, ¶¶ 161-162.)

It would have been obvious to a POSITA to combine Naidoo with Wimsatt,

Johnson and Severson so that the control panel 101 in Wimsatt could communicate

certain event data with the central monitoring station. (Ex. 1002, ¶ 163.) As

discussed in Naidoo, by providing both the sensor event data and video data to the

central monitoring station, an operator, in short order, is able to "verif[y] whether

50

Petition for *Inter Partes* Review of
Patent No. 8,478,844

the alarm signal corresponds to an actual alarm condition using the alarm signal

information and the segment of real-time video," and then take appropriate action.

(Ex. 1007, ¶¶ 0075, 0077, 0008, 0011, 0027.) "Timely response may increase the

chance of apprehending an intruder, and in the case of life-threatening

circumstances, reduce the likelihood of injury or death." (*Id.*, ¶ 0100.) A POSITA

would have understood these benefits and been motivated to combine Naidoo with

Wimsatt, Johnson and Severson to enhance their respective security capabilities

and first-responder response times. (Ex. 1002, ¶ 163.)

A POSITA would have also understood that sending sensor data and video

data is a relatively easy task, especially since Johnson already provides for the

connection between the control panel 101 in Wimsatt and a central monitoring

station. (Ex. 1002, ¶ 164.)

### 18.   Dependent claim 19 – Ground 2

| 19 | The method of claim 18, wherein the event data comprises changes in device states of at least one of security system components and network devices, data of at least one of security system components and network devices, and data received by at least one of security system components and network devices. |
|---|---|

As discussed for claim 18, Naidoo discloses that, upon detection of an alarm

event, the gateway 115 sends the central monitoring station 136 "notification of the

alarm condition and **information relating to the alarm condition, which may**

**include alarm video**." (Ex. 1007, ¶¶ 0070-0071 (emphasis added).) In other

Petition for *Inter Partes* Review of
Patent No. 8,478,844

words, the information associated with the event includes device state (i.e., alarm

event), data (i.e., the video data) and data received by the component (i.e., the

video itself).    Thus, for the same reasons discussed for claim 18, claim 19 is

rendered obvious under Ground 2.

### 19.    Dependent claim 20 – Ground 2

| 20 | The method of claim 17, comprising transmitting event data of the security system to the central monitoring station via the gateway and the fourth communication channel when the third communication channel is unavailable. |
|---|---|

Claim 20 is substantively identical to claim 18 except that it adds the

limitation "when the third communication channel is unavailable." For the same

reasons discussed in claim 18, Wimsatt, Johnson, Severson and Naidoo disclose

"*transmitting event data of the security system to the central monitoring station via*

*the gateway and the forth channel*."

Severson discloses that alternate channels for communicating with a central

monitoring station can be utilized when the main channel is unavailable. (Ex. 1006,

6:53-7:15.) This alternate channel "provides for uninterruptable communications

with the central station" when the main channel fails or is otherwise unavailable.

(*Id.*). When Wimsatt is combined with Johnson, Severson, and Naidoo, the control

panel 101 communicates with the central monitoring station via the DSL channel

when the telephone line is unavailable. (Ex. 1002, ¶ 167.) The result is a system

with uninterrupted communications with the central monitoring station. (*Id.*) It

Petition for *Inter Partes* Review of
Patent No. 8,478,844

would be obvious to a POSITA to implement redundancy into Wimsatt's system in

event of a partial system / channel failure. (*Id*.)

### 20.    Dependent claim 21 – Ground 1

| 21 | The method of claim 17, wherein the fourth communication channel includes a broadband coupling. |
|---|---|

As discussed for claim 17, the claimed "fourth communication channel" is

formed by a DSL channel. It is well known that DSL technologies are broadband.

Thus, claim 21 is rendered obvious by Wimsatt in view of Johnson and Severson.

### 21.    Dependent claim 22 – Ground 3

| 22 | The method of claim 17, wherein the fourth communication channel includes a General Packet Radio Service (GPRS) coupling. |
|---|---|

Claim 22 is rendered obvious under Ground 3. It is well known that GPRS

communications are a type of mobile communication. (Ex. 1002, ¶ 169.) Naidoo

discloses that is gateway 115 can transmit to a security server 131 (similar to the

data center 20 server in Johnson) via a "mobile communications network." (Ex.

1007, ¶ 0043.) It would be obvious to a POSITA that the gateway 115 in Naidoo

could also communicate with the central monitoring station 136 via this same

mobile communications network as long as the station 136 is equipped to handle

such communication. (Ex. 1002, ¶ 169.)

Anthony discloses a security system that allows continuous remote

monitoring and analysis. (Ex. 1009, ¶ 38.)  Audiovisual signals and other signals

53

Petition for *Inter Partes* Review of
Patent No. 8,478,844

from the system can be transmitted via general packet radio service ("GPRS"), which is a mobile communication mode. (Ex. 1002, ¶ 170.)

It would be obvious to a POSITA to combine Naidoo with Wimsatt, Johnson and Severson so that the control panel 101 in Wimsatt can communicate with the central monitoring station via the mobile communications network disclosed in Naidoo. (Ex. 1002, ¶ 171.)

It would further be obvious to a POSITA to combine Anthony with Naidoo, Wimsatt, Johnson and Severson to utilize available mobile communication modes, such as GPRS. (Ex. 1002, ¶ 172.)

### 22.  Dependent claim 23 – Ground 2

| 23 | The method of claim 17, comprising transmitting messages comprising event data of the security system components and the network devices to remote client devices via the gateway and the fourth communication channel. |
|----|---|

Claim 23 is rendered obvious under Ground 2. Naidoo discloses that its security server 131 can "create a data connection between remote station 155 and security gateway 115 such that communications between remote station 155 and security gateway 115 bypass security system server 131." (Ex. 1007, ¶ 0041.) Through this connection, the gateway 115 can "transmit the alarm signal and alarm video corresponding to the alarm condition automatically to [the] customer … at an email address [or] by any other electronic means." (*Id.*, ¶ 0069.) As discussed in

54

Petition for *Inter Partes* Review of
Patent No. 8,478,844

**Part IX.C.3**, Johnson discloses various types of "remote client devices" that can be implemented in Wimsatt.

It would have been obvious to a POSITA to combine the above disclosures from Naidoo with Wimsatt, Johnson and Severson so that the control panel 101 in Wimsatt is capable of directly communicating event data with the remote client devices (such as those described in Johnson). (Ex. 1002, ¶ 174.) This communication would be over the DSL channel as described in **Part IX.C. 18** (the relevant arguments for which apply here) because that is the channel the control panel 101 uses when communicating with external devices / entities. (*Id.*)

Naidoo explains that bypassing a security server "avoids network bottlenecks" at the server – this is especially important during an alarm condition when server resources should be spent processing alarm data instead of sending messages to customers. (Ex. 1007, ¶ 0041.) In other words, the direct connection can provide a better allocation of resources. (Ex. 1002, ¶ 175.)

Also, a POSITA would have understood that creating this connection between devices would have been a relatively simple task since the control panel 101 and the remote client devices are already connected to the Internet (via DSL). (Ex. 1002, ¶ 176.) Furthermore, when a homeowner is remotely located from the home, receiving a message with this data would have brought "peace of mind" that the situation is being handled and it would quickly alert the homeowner of the

55

Petition for *Inter Partes* Review of
Patent No. 8,478,844

alarm condition so they can appropriately. A POSITA would understand the

aforementioned benefits and would have been motivated to combine these

references.

### 23.   Dependent claim 24 – Ground 2

| 24 | The method of claim 23, wherein the event data comprises changes in device states of at least one of security system components and network devices, data of at least one of security system components and network devices, and data received by at least one of security system components and network devices. |
|----|---|

As discussed for claim 23, the gateway 115 in Naidoo can "transmit the

alarm signal and alarm video corresponding to the alarm condition automatically to

[the] customer … at an email address [or] by any other electronic means." (1007, ¶

0069.)  Additionally, this claim is identical to claim 19 but for its dependence upon

claim 23. Thus, for the same reasons discussed for claims 19 and 23, claim 24 is

rendered obvious.

### 24.   Dependent claim 41 – Ground 2

| 41 | The method of claim 1, wherein the security server transmits event data of the security system components and the network devices to a central monitoring station of the security system over the fourth communication channel. |
|----|---|

As an initial matter, this claim recites "over **the** fourth communication

channel" but no such communication channel is disclosed in claim 1, to which

claim 41 depends. Dependent claim 17 is the first claim to recite this fourth

communication channel but claim 41 does not depend from claim 17. Thus, the

56

Petition for *Inter Partes* Review of
Patent No. 8,478,844

"fourth communication channel" is interpreted here to mean any communication channel other than the first or second communication channels recited in claim 1.

Claim 41 is rendered obvious under Ground 2. Johnson discloses that the data center 20 server communicates security alarm alerts (or event data) to an auxiliary service 80 via the Internet (i.e., the claimed "fourth communication channel) but is silent regarding sending video event data. (Ex. 1005, 6:6-11, 7:30-42.) This is disclosed in Naidoo. As similarly discussed in connection with claim 18, Naidoo discloses that, upon detection of an alarm event, the gateway 115 sends the security server 131 "a notification of the alarm condition and information relating to the alarm condition, which may include alarm video." (Ex. 1007, ¶ 0070.) The security server 131 then relays the notification to the central monitoring station 133. (*Id.*, 0072.)

It would have been obvious to a POSITA to combine Naidoo with Wimsatt, Johnson and Severson so that the control panel 101 in Wimsatt transmits this "event data" to the data center 20 server in Johnson, which then relays that information to the central monitoring station in Naidoo. (Ex. 1002, ¶ 200.) These devices can be coupled together in this manner without any change in their respective functionalities, as they are all capable of communicating via the Internet. (*Id.*) Also, as discussed in Naidoo, by providing both the sensor event data and video data to the central monitoring station, an operator, in short order, is able

57

Petition for *Inter Partes* Review of
Patent No. 8,478,844

to "verif[y] whether the alarm signal corresponds to an actual alarm condition using the alarm signal information and the segment of real-time video," and then take appropriate action. (Ex. 1007, ¶¶ 0075, 0077, 0008, 0011, 0027.) "Timely response may increase the chance of apprehending an intruder, and in the case of life-threatening circumstances, reduce the likelihood of injury or death." (*Id.*, ¶ 0100.) A POSITA would have understood these benefits and been motivated to combine Naidoo with Wimsatt, Johnson and Severson to enhance their respective security capabilities and first-responder response times.

## X.    NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST

Patent Owner has not identified any evidence of secondary indicia of non-obviousness for the '844 patent. Accordingly, there is no objective evidence of non-obviousness that might warrant a finding that the Petitioned Claims are patentable. (Ex. 1002, ¶ 224.)

## XI.    CONCLUSION

Petitioner respectfully requests that the Board institute *inter partes* review of claims 1-4, 6-24 and 41.

Petition for *Inter Partes* Review of
Patent No. 8,478,844

Dated: <u>September 30, 2016</u>

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
Tel: (703) 456-8000
Fax: (202) 842-7899

Respectfully submitted,
**COOLEY LLP**

By:    <u>/Erik B. Milch/</u>
Erik B. Milch
Reg. No. 42,887

59

Petition for *Inter Partes* Review of
Patent No. 8,478,844

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Petition complies with the

type-volume limits of 37 C.F.R. § 42.24(a)(1)(i) because it contains 12,155 words,

according to the word-processing system used to prepare this petition, excluding the

parts of this Petition that are exempted by 37 C.F.R. § 42.24(a) (including the table

of contents, mandatory notices, a certificate of service or this certificate word count,

appendix of exhibits, and claim listings).

Dated: September 30, 2016

By:    /Erik B. Milch/
       Erik B. Milch
       Reg. No. 42,887

Petition for *Inter Partes* Review of
Patent No. 8,478,844

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.6(e) and 42.105(b), the undersigned certifies

that on September 30, 2016, a complete and entire copy of this **Petition for *Inter***

***Partes* Review of Patent No. 8,478,844**, including Exhibit Nos. 1001-1013 and a

Power of Attorney, was served via FEDERAL EXPRESS, costs prepaid, to the

Patent Owner by serving the correspondence address of record as follows:

> Richard Gregory Jr.
> Barbara Courtney
> IPR Law Group, PC
> 5338 Cornish Street
> Houston, TX 77007

A courtesy copy was also served via FEDERAL EXPRESS on the Patent Owner at

the following address:

> Ryan Smith
> Wilson Sonsini Goodrich & Rosati
> 650 Page Mill Road
> Palo Alto, CA 94304

By:      /Erik B. Milch/
         Erik B. Milch
         Reg. No. 42,887

# EXHIBIT 6

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

SecureNet Technologies, LLC,
Petitioner

v.

iControl Networks, Inc.,
Patent Owner

U.S. Patent No. 8,478,844
Filing Date: Aug. 12, 2008
Issue Date: July 2, 2013
Title: Forming a Security Network Including Integrated Security System
Components and Network Devices

————————————

*Inter Partes* Review No. _____

**Petition for *Inter Partes* Review of U.S. Patent No. 8,478,844**

i

# Table of Contents

**Page**

I.      INTRODUCTION ...................................................................................1

II.     MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1) .......................1

        A.      Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1) ...........................1

        B.      Related Matters Under 37 C.F.R. § 42.8(b)(2) .....................................1

        C.      Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3) ...................2

        D.      Service Information ...............................................................................2

        E.      Power of Attorney .................................................................................2

III.    PAYMENT OF FEES - 37 C.F.R. § 42.103 ..........................................2

IV.     REQUIREMENTS FOR INTER PARTES REVIEW UNDER 37
        C.F.R. §§ 42.104 AND 42.108 ...........................................................3

        A.      Grounds for Standing Under 37 C.F.R. § 42.104(a) ...........................3

        B.      Identification of Challenge Under 37 C.F.R. § 42.104(b) and
                Statement of Precise Relief Requested .................................................3

        C.      Threshold Requirement for Inter Partes Review 37 C.F.R. §
                42.108(c) ...............................................................................................3

V.      BACKGROUND OF TECHNOLOGY RELATED TO THE '844
        PATENT ............................................................................................3

VI.     SUMMARY OF THE '844 PATENT ........................................................4

VII.    CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3)..................4

        A.      Legal Overview ......................................................................................4

        B.      Proposed Claim Constructions ..............................................................4

VIII.   PERSON HAVING ORDINARY SKILL IN THE ART & STATE
        OF THE ART ......................................................................................5

IX.     CLAIMS 25-40 AND 42-50 OF THE '844 PATENT ARE
        UNPATENTABLE................................................................................5

        A.      Overview Of The Prior Art ....................................................................5

                1.      Overview of Wimsatt..................................................................5

                2.      Overview of Johnson ..................................................................6

                3.      Overview of Severson.................................................................6

                4.      Overview of Alexander................................................................7

# Table of Contents
(continued)

**Page**

B.    The Cited References Are Analogous Art ...........................................7

C.    Grounds 1-2 – Claims 25-40 and 42-50 Are Obvious over Wimsatt in view of Johnson and/or Other Prior Art References Under 35 U.S.C. § 103(a)........................................................................7

    1.    Independent claim 1 ..................................................................8

    2.    Dependent claim 25 – Ground 1 .............................................34

    3.    Dependent claims 26-29 – Ground 1 ......................................36

    4.    Dependent claims 30 and 31 – Ground 1................................38

    5.    Dependent claims 32 and 33 – Ground 1................................39

    6.    Dependent claims 34 – Ground 1 ............................................40

    7.    Dependent claims 35 and 36 – Ground 1................................41

    8.    Dependent claim 37 – Ground 1 .............................................42

    9.    Dependent claim 38 – Ground 1 .............................................43

    10.    Dependent claim 39 – Ground 1 .............................................44

    11.    Dependent claim 40 – Ground 1 .............................................45

    12.    Dependent claim 42 – Ground 1 .............................................46

    13.    Dependent claims 43 and 44 – Ground 1................................46

    14.    Dependent claim 45 – Ground 1 .............................................46

    15.    Dependent claim 46 – Ground 1 .............................................47

    16.    Dependent claim 47 – Ground 1 .............................................48

    17.    Independent claim 48 – Ground 2...........................................49

    18.    Independent claim 49 – Ground 2...........................................53

    19.    Independent claim 50 – Ground 2...........................................58

X.    NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST .........................................................................................66

XI.    CONCLUSION........................................................................................66

ii

**EXHIBITS**

| Exhibit No. | Description of Document |
|---|---|
| 1001 | U.S. Patent No. 8,478,844 ("the '844 patent") |
| 1002 | Declaration of James Parker |
| 1003 | File History for U.S. Patent No. 8,478,844 |
| 1004 | U.S. Patent Publication No. 2004/0260427 to Wimsatt ("Wimsatt") |
| 1005 | U.S. Patent No. 6,580,950 to Johnson et al. ("Johnson") |
| 1006 | U.S. Patent No. 4,951,029 to Severson ("Severson") |
| 1007 | U.S. Publication No. 2003/0062997 to Naidoo et al. ("Naidoo") |
| 1008 | U.S. Patent No. 6,748,343 to Alexander et al. ("Alexander") |
| 1009 | U.S. Publication No. 2003/0137426 to Anthony et al. ("Anthony") |
| 1010 | Installation Instructions for PC5401 Data Interface Module (2004) |
| 1011 | "Understanding Universal Plug and Play," White Paper, Microsoft (2000) |
| 1012 | Waiver of Service, *iControl Networks, Inc. v. SecureNet Techns., LLC*, No. 15-807-GMS,  (D. Del. Sept. 30, 2015), ECF No. 5 |
| 1013 | *Curriculum Vitae* of James Parker |

Petition for *Inter Partes* Review of
Patent No. 8,478,844

## I.    INTRODUCTION

SecureNet Technologies, LLC ("Petitioner" or "SecureNet") petitions for *inter partes* review ("IPR") under 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42 of claims 25-40 and 42-50 ("the Petitioned Claims") of U.S. Patent No. 8,478,844 ("the '844 patent") (Ex. 1001).

## II.    MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A.    Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1)

SecureNet Technologies, LLC is the real party-in-interest.

### B.    Related Matters Under 37 C.F.R. § 42.8(b)(2)

The '844 patent is asserted in *iControl Networks, Inc. v. SecureNet Technologies, LLC*, No. 15-807-GMS (D. Del.), which was filed on September 11, 2015.[1]

Petitioner is concurrently filing an IPR petition for claims 1-4, 6-24 and 41 of the '844 patent.  Petitioner is also concurrently filing an IPR petition for claims 1-6, 14-61 of U.S. Patent No. 8,073,931, which is assigned to the Patent Owner and claims priority to same applications as the '844 patent. Petitioner is also

---

[1] iControl Networks, Inc. ("Patent Owner" or "iControl") filed a Waiver of Service in that case on September 30, 2015 (Ex. 1012). Based on the PTAB-designated informative decision docketed as Case No. IPR2013-00010 (Paper 20) (January 30, 2013), this Petition is being timely filed.

1

Petition for *Inter Partes* Review of
Patent No. 8,478,844

concurrently filing an IPR petition for claims 1-9 and 12-62 of U.S. Patent No.

8,473,619, which is assigned to the Patent Owner and is the parent patent to the

'844 patent.

Petitioner is not aware of any other judicial or administrative matters that

would affect, or be affected by, a decision in this proceeding.

### C.   Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

**Lead Counsel:** Erik B. Milch (Reg. No. 42,887) / emilch@cooley.com
**Back-up Counsel:**
Jennifer Volk (Reg. No. 62,305) / jvolkfortier@cooley.com
Frank Pietrantonio (Reg. No. 32,289) / fpietrantonio@cooley.com
zSecureNetIPR@cooley.com
zpatdcdocketing@cooley.com
Cooley LLP ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700 Washington, DC 20004
Tel: (703) 456-8573 Fax: (703) 456-8100

### D.   Service Information

The Petition is being served by FEDERAL EXPRESS to the '844 Patent

Owner's attorneys of record, IPR Law Group, PC and the known outside counsel

to Patent Owner, Wilson Sonsini Goodrich & Rosati. Petitioner consents to service

by e-mail at the addresses provided above.

### E.   Power of Attorney

Filed concurrently with this petition per 37 C.F.R. § 42.10(b).

## III.   PAYMENT OF FEES - 37 C.F.R. § 42.103

This Petition requests review of claims 25-40 and 42-50 (a total of 25

claims) of the '844 patent and is accompanied by a payment of $28,000. 37 C.F.R.

2

Petition for *Inter Partes* Review of
Patent No. 8,478,844

§ 42.15. This Petition meets the fee requirements of 35 U.S.C. § 312(a)(1).

**IV.    REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108**

**A.    Grounds for Standing Under 37 C.F.R. § 42.104(a)**

Petitioner certifies that the '844 patent is eligible for IPR and further certifies that Petitioner is not barred or estopped from requesting IPR.

**B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested**

Petitioner requests that the Board institute *inter partes* review of claims 25-40 and 42-50 of the '844 patent and requests that each claim be found unpatentable as obvious under 35 U.S.C. § 103(a) on the following grounds:

| Ground | '844 Claim(s) | Basis for Challenge |
|:---:|---|---|
| 1. | 25-40, 42-47 | Obvious over <u>Wimsatt</u> in view of <u>Johnson</u> and <u>Severson</u> and <u>Alexander</u> under 35 U.S.C. § 103(a) |
| 2. | 48-50 | Obvious over <u>Wimsatt</u> in view of <u>Johnson</u> under 35 U.S.C. § 103(a) |

This petition is accompanied by the Declaration of James Parker (Ex. 1002, "Mr. Parker"), an expert in the field.

**C.    Threshold Requirement for *Inter Partes* Review 37 C.F.R. § 42.108(c)**

*Inter partes* review of claims 25-40 and 42-50 should be instituted because this Petition establishes a reasonable likelihood that Petitioner will prevail with respect to each of the claims challenged. 35 U.S.C. § 314(a).

**V.    BACKGROUND OF TECHNOLOGY RELATED TO THE '844 PATENT**

3

Petition for *Inter Partes* Review of
Patent No. 8,478,844

Mr. Parker provides a technology tutorial in his declaration. (Ex. 1002, ¶¶ 30-57.)

## VI.   SUMMARY OF THE '844 PATENT

The '844 patent was filed on August 12, 2008 and claims priority to a divisional application and a long list of continuation-in-part applications and provisional applications, the earliest of which has a filing date of March 16, 2005. (Ex. 1001.) For purposes of this proceeding, we assume that the earliest possible priority date of the '844 patent is March 16, 2005. We reserve the right to dispute this priority date at a later time or in another proceeding.

## VII.   CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(b)(3)

### A.   Legal Overview

A claim subject to IPR is given its "broadest reasonable construction in light of the specification of the patent in which it appears."[2] 37 C.F.R. § 42.100(b).

### B.   Proposed Claim Constructions

Petitioner does not propose any claim constructions for this proceeding. All claim terms and clauses should be given their plain and ordinary meaning as

---

[2] Petitioners reserve the right to pursue different constructions in litigation. *In re Zletz,* 893 F.2d 319, 321 (Fed. Cir. 1989).

4

Petition for *Inter Partes* Review of
Patent No. 8,478,844

understood by a person of ordinary skill in the art ("POSITA"). *See* Ex. 1002, ¶ 59.)

## VIII. PERSON HAVING ORDINARY SKILL IN THE ART & STATE OF THE ART

The '844 patent is directed to integrated security systems that are capable of being remotely accessed and controlled. (Ex. 1002, ¶¶ 17-24.) At the time of the alleged invention, a person having ordinary skill in the art ("POSITA") as of 2005 would hold a bachelor's degree or the equivalent in electrical engineering (or related academic fields) and at least three years of additional work experience in the area of digital and/or telecommunication system design, as applicable to safety and security systems, or equivalent work experience. (*Id.*, ¶¶ 19.)

## IX.    CLAIMS 25-40 AND 42-50 OF THE '844 PATENT ARE UNPATENTABLE

As detailed in the sections below, claims 25-40 and 42-50 of the '844 patent are obvious in light of Wimsatt in view of Johnson and/or one or more other prior art references cited below.

### A.    Overview Of The Prior Art

#### 1.    Overview of Wimsatt

Wimsatt published on December 23, 2004 and therefore qualifies as prior art under 35 U.S.C. § 102(a). The patent issuing from Wimsatt was cited by Patent Owner in an Information Disclosure Statement (IDS) during prosecution of the '844 patent but it was never applied against the claims.

Wimsatt describes a home automation system having a control panel 101

5

Petition for *Inter Partes* Review of
Patent No. 8,478,844

that is connected to a number of co-located devices, called "controlled devices", which manage already-existing systems, such as lighting systems or security systems. (Ex. 1004, ¶ 0023.) The control panel 101 displays an interactive graphical user interface (GUI) that allows the user (e.g., homeowner) to control the controlled devices. (*Id.*, ¶ 0022; Ex. 1002, ¶¶ 61-64.)

### 2.    Overview of Johnson

Johnson issued on June 17, 2003 and therefore qualifies as prior art under 35 U.S.C. § 102(b). Johnson was cited by Patent Owner in an IDS during prosecution of the '844 patent but it was never applied against the claims.

Johnson discloses an "Internet based home communications system for allowing a homeowner to monitor and control various features of their home from a distant location via a global computer network." (Ex. 1005, Abstract.) For example, Johnson provides a website where homeowners can log in to access, monitor and control a home's security system, lighting system, exterior cameras and the like. (*Id.*, 2:8-28, 6:35-59.) The web site is provided through one or more data center 20 servers that are located remotely from the home. (*Id.*, 4:15-53.)

### 3.    Overview of Severson

Severson issued on August 21, 1990 and therefore qualifies as prior art under 35 U.S.C. § 102(b). Severson discloses a home security system controller

6

Petition for *Inter Partes* Review of
Patent No. 8,478,844

that automatically discovers newly-added sensors its security network. (Ex. 1006, 23:60-26:7; Ex. 1002, ¶¶ 70-72.)

### 4.    Overview of Alexander

Alexander issued on June 8, 2004 and is prior art under 35 U.S.C. § 102(a). Alexander discloses an integrated security system connected to a remote server capable of creating and modifying user accounts, and creating and modifying system devices. (Ex. 1008, Abstract.)

### B.    The Cited References Are Analogous Art

As indicated in the section above and as explained in Mr. Parker's declaration, each of the prior art references combined in this Petition is analogous art to the '844 patent and to each other, as each reference is in the same field of endeavor as the '844 patent. (Ex. 1002, ¶ 75.)

### C.    Grounds 1-2 – Claims 25-40 and 42-50 Are Obvious over Wimsatt in view of Johnson and/or Other Prior Art References Under 35 U.S.C. § 103(a)

Claims 25-40 and 42-50 are rendered obvious under 35 U.S.C. § 103(a) for the reasons that follow.  The elements of claim 1 are addressed herein despite the fact that claim 1 is not the subject of this petition.  The elements of claim 1 are addressed because claims 25-40 and 42-47 depend from claim 1.  The basis of rejection for claim 1 is incorporated into each of claims 25-40 and 42-47.

7

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 1.    Independent claim 1

#### a.    Preamble: "A method comprising"

For the reasons discussed in the following sections, Wimsatt in view of Johnson and Severson discloses a method.

#### b.    Claim element 1[a]: "coupling a gateway to a local area network located in a first location and a security server in a second location"

Wimsatt and Johnson disclose this limitation in its entirety. For clarity, this limitation is divided into two parts and discussed separately.

##### i.    "coupling a gateway to a local area network located in a first location"

Wimsatt discloses this portion of claim element 1[a]. For example, Wimsatt discloses a control panel 101 that is mounted within a user's home at a central location. (Ex. 1004, ¶ 0034.) The control panel 101 is the claimed "gateway" and the user's home is the claimed "first location." As shown below in annotated and excerpted Figure 1 from Wimsatt, the control panel 101 is coupled to a hub 103, which is described as implementing an Ethernet connection among the system devices. (Ex. 1004, ¶ 0036.) It is well known that Ethernet connections form LANs. (Ex. 1002, ¶ 77.)

8

Petition for *Inter Partes* Review of
Patent No. 8,478,844



The hub 103 in Wimsatt is located within the home and therefore the LAN is also located at the "first location." (*See, e.g.,* Ex. 1004, ¶¶ 0036, 0038, 0040 (each passage describing physical couplings between the hub 103 and system devices located within the home indicating the hub's physical presence within the home).)

Furthermore, Figure 2 of Wimsatt (annotated and shown below) provides a "hardware-oriented view" of the control panel 101 and shows that the panel 101 includes a "network interface" component. (Ex. 1004, ¶ 0016.) According to Wimsatt, the network interface's "functions are substantially similar to what might be found in a convention[al] personal computer network interface card (NIC)." (*Id.*, ¶ 0050.) A POSITA would have understood that a NIC is designed to couple or connect a computer to a LAN so that it can communicate over the LAN. (Ex. 1002, ¶ 79; *see also,* Ex. 1004, ¶ 0024 (explaining that Wimsatt's system can be used in LAN environments).)

Petition for *Inter Partes* Review of
Patent No. 8,478,844



Thus, for at least these reasons, a POSITA would have understood from the disclosures in Wimsatt that the control panel 101 is coupled to a LAN located in the user's home. (Ex. 1002, ¶¶ 77-80.)

### ii.   "coupling a gateway to … a security server in a second location"

Wimsatt and Johnson disclose this portion of claim element 1[a]. Wimsatt does not explicitly disclose a remotely located security server coupled to its control panel 101 but Johnson provides this disclosure. For example, Johnson discloses a control unit 30 that is similar to the control panel 101 in Wimsatt and that is located within a user's home. (Ex. 1005, 4:15-39.) The control unit 30 in Johnson is coupled to a remotely located data center 20 via a global computer network 12.

10

Petition for *Inter Partes* Review of
Patent No. 8,478,844

(*Id*.) Johnson explains that its data center 20 comprises "**one** or more server computers" that are "capable of receiving, storing and transmitting various types of data related to the homeowner's home," including security data. (Ex. 1005, 4:40-53 (emphasis added); *see also, id.*, 4:16-39.) This data center 20 server is the claimed "security server." The data center 20 server in Johnson is located remotely from the user's home and is thus "in a second location." (*See*, Ex. 1005, FIG. 5.)

  ***Motivation to Combine Johnson with Wimsatt:*** It would be obvious to a POSITA to combine Johnson with Wimsatt so that the control panel 101 in Wimsatt is coupled to the data center 20 server in Johnson. (Ex. 1002, ¶¶ 81-82.) As a result of this coupling, the control panel 101 in Wimsatt can be remotely accessed and controlled through the data center 20 server as described in Johnson. (*Id*.) Johnson specifically improves upon the control panel 101 in Wimsatt and explains that "[o]ur society has become extremely mobile with the reduced expense and ease of travel leaving many homes unattended while the homeowner is traveling or at work." (Ex. 1005, 1:14-16.) Therefore, according to Johnson, "there is a need for a home monitoring system that allows a homeowner to monitor their home from a distant location." (Ex. 1005, 1:14-25.) Coupling the control panel 101 in Wimsatt to a remotely located data center 20 server would allow for such remote monitoring and control.

11

Petition for *Inter Partes* Review of
Patent No. 8,478,844

A POSITA would be further motivated to combine Johnson with Wimsatt because the control unit 30 in Johnson is the same as the control panel 101 in Wimsatt. (Ex. 1002, ¶ 83.) Namely, both the control unit 30 and control panel 101 are systems that integrate functionality from multiple subsystems (e.g., security systems, lighting systems, entertainment systems, surveillance systems, etc.) into a single unit 30/ panel 101 for user control and convenience. (*See, e.g.,* Ex. 1004, ¶¶ 0022-0023; Ex. 1005, 4:16-39.) Furthermore, the control panel 101 in Wimsatt is already connected to the Internet so it would be a relatively easy task for the panel 101 to connect with the data center 20 server in Johnson. (Ex. 1002, ¶ 83.) The end result would be a system that allows a homeowner to directly control aspects of the control panel 101 (and its subsystems) from remote locations similar to that in Johnson.

> c. **Claim element 1[b]: "wherein the first location includes a security system comprising a plurality of security system components"**

Wimsatt discloses this limitation. Wimsatt discloses that the user's home (i.e., the claimed "first location") includes a security system. (*See, e.g.,* Ex. 1004, ¶ 0005 ("Home automation systems may be integrated with a home security system"), ¶ 0012 (describing a home automation system that controls "security systems"), ¶ 0023 (explaining that the "invention is particularly useful in home automation environments because it builds on top of the vast array of controlled

12

Petition for *Inter Partes* Review of
Patent No. 8,478,844

devices and subsystems that already exist for managing … security systems"), ¶¶ 0029-0031 ("tripping a zone on a burglar alarm … may indicate a household member [is] entering the house"), ¶¶ 0043, 0057-0058, 0062, 0065, 0073-0074.)

The '844 patent discloses that "security system components" can be sensors or any other components "belonging to the security system." (Ex. 1001, 4:40-45.) While Wimsatt does not illustrate a plurality of sensors in its security system, a POSITA would have understood that the security system indeed includes sensors. (Ex. 1002, ¶ 85.) Wimsatt discloses at paragraph [0031] that "tripping a zone on a burglar alarm … causes the control units to display a security screen having controls that allow the alarm to be de-activated." (Ex. 1004, ¶ 0031.) A POSITA would have understood that a "burglar alarm" is a security system and that at least one sensor located within each zone of the house. (Ex. 1002, ¶ 85.) It is this sensor (or sensors) that is "tripped" and sets off an alarm.  Thus, sensors are inherent in Wimsatt.

To the extent Patent Owner disagrees, it would be obvious from Wimsatt that its security system includes sensors. It was well known at the time of the '844 patent that home security systems came equipped with multiple sensors (e.g., motion sensors, door sensors, window sensors, etc.) that could be mounted at various locations throughout a home. (Ex. 1002, ¶ 86.) As Mr. Parker explains in

13

Petition for *Inter Partes* Review of
Patent No. 8,478,844

his declaration, sensors are the "eyes" of a home security system. (*Id.*) Without

sensors, a home security system is blind and cannot function. (*Id.*)

To the extent the Patent Owner further argues that a more specific disclosure

of sensors is required, Johnson has that disclosure. As illustrated in the below

excerpted and annotated Figure 5 of Johnson, the security system 60 includes

"security sensors." (*See also*, Ex. 1004, FIG. 3 (illustrating icons for well-known

components of a home security system, e.g., a door sensor, a window sensor and a

smoke alarm).)



While a POSITA would have understood that Wimsatt already indicates the

Petition for *Inter Partes* Review of
Patent No. 8,478,844

presence of sensors, it would be obvious to modify Wimsatt to include the plurality

of security sensors disclosed in Johnson to make this disclosure more explicit. (Ex.

1002, ¶ 88.)

> **d.** **Claim element 1[c]: "automatically discovering the plurality of security system components at the gateway and establishing a first communication channel between the gateway and the plurality of security system components"**

Wimsatt, Johnson and Severson disclose this limitation in its entirety. For

clarity, this limitation is divided into two parts and discussed separately.

> **i.** **"automatically discovering the plurality of security system components at the gateway"**

Wimsatt discloses that its control panel 101 can implement a "system

discovery process." According to Wimsatt, "[w]hen a control panel 101 is coupled

to a controlled device or subsystem, it interrogates that device or subsystem to

learn details of the control interface of that particular system." (Ex. 1004, ¶ 0045.)

"This interrogation may simply be a matter of determining the controller type in

which case the control panel 101 can look up a command set and signaling

protocol information for that controller type." (*Id.*) Per this disclosure, the control

panel 101 can automatically discover the home security system when the home

security system is coupled to the control panel 101.

Wimsatt also discloses that its control unit 101 implements "Universal Plug-

and-Play (UPnP™) processes." (Ex. 1004, ¶ 0054.) It was well known at the time

15

Petition for *Inter Partes* Review of
Patent No. 8,478,844

of the '844 patent that UPnP™ was used to auto-discover devices connected to a shared network. (Ex. 1002, ¶¶ 89-90 (citing to Ex. 1011, 7).)

Wimsatt does not explicitly disclose that its security system's sensors are automatically discovered using this process – it only explicitly discloses that the "security system" is discovered. A POSITA would have understood that discovering the security system would also include discovering its sensors. (Ex. 1002, ¶ 91.) To the extent Patent Owner disputes this Severson discloses a security system that includes a controller and a plurality of sensors. (Ex. 1006, FIG. 1, 4:3-29.) Severson explains that "without human intervention" "each system controller may be operated to 'self-learn' each of its sensors." (Ex. 1006, 25:3-13.) In describing a system installation process, Severson explains that the sensors and controller are mounted at the home and then "the controller is enabled and self-learns each of its sensors/transducers as they report their status." (Ex. 1006, 25:51-26:7; *see also, id.*, 23:60-25:50.) As a result, "[i]nstallation time is thereby reduced with minimal potential installer error, due to the CPU self-learning its reporting sensors." (*Id.*, 25:51-26:7.) This is similar to the auto-discovery process described in the '844 patent. (*See, e.g.,* Ex. 1001, FIG. 14, 24:66-26:5.)

***Motivation to Combine Severson with Wimsatt and Johnson:*** It would be obvious to a POSITA to combine the auto-discovery disclosure with Wimsatt and Johnson so that the control panel 101 in Wimsatt can auto-discover the security

16

Petition for *Inter Partes* Review of
Patent No. 8,478,844

sensors in addition to the discovering the security system controller. (Ex. 1002, ¶ 92.) This would predictably result in an easier sensor installation process and reduce the likelihood of installer error. (Ex. 1002, ¶ 92; *see also,* Ex. 1006, 26:5-7.)

As previously discussed, Wimsatt already discloses an automatic discovery process for learning the security system so it would be obvious to a POSITA to further discover the sensors that form part of that system. (Ex. 1004, ¶ 0045; Ex. 1002, ¶ 93.) A POSITA would understand that the control panel 101 would want to "discover" all of the devices that it and the data center 20 server in Johnson controls. Severson illustrates the ability and desire for similar controllers to automatically discover devices at the security component level. A POSITA would understand that adding an extra step in the automatic discovery process to include discovery of the sensors would be easy to implement. (Ex. 1002, ¶ 93.)

ii.    **"establishing a first communication channel between the gateway and the plurality of security system components"**

Wimsatt and Johnson disclose this portion of the limitation. For example, as shown below in excerpted and annotated Figure 5 of Johnson, the control unit 30 includes a "wireless alert receiver" (highlighted red) that wirelessly communicates with the security sensors. (Ex. 1005, 5:54-67.) This wireless communication (highlighted purple) is the claimed "first communication channel". Wireless communication between the control unit 30 and the security sensors would be

17

Petition for *Inter Partes* Review of
Patent No. 8,478,844

established during the system setup (installation) stage.  This channel is then used

every time a sensor reports a change of state (alarm/restore) or supervisory signal.

(Ex. 1002, ¶ 94.)



FIG. 5

When Wimsatt is modified by Johnson, the control panel 101 in Wimsatt can

communicate with the security system sensors via a wireless communication

channel. (Ex. 1002, ¶ 95.) This communication can be "direct" (i.e., the sensors

communicate directly with the control panel 101) or "indirect" (i.e., the sensors

Petition for *Inter Partes* Review of
Patent No. 8,478,844

communicate with the security system controller which then communicates with the control panel 101). The wireless communication channel would have been established during the system setup (installation) stage as a result of the automatic discovery processes discussed above. (*See e.g.,* Ex. 1004, ¶ 0045; Ex. 1002, ¶ 95.) And that channel would be used for all future communications between the devices.

Wimsatt already discloses an embodiment where its control panel 101 has wireless capabilities. (Ex. 1004, ¶ 0037 ("wireless control panels 107").) Thus, it would be obvious to a POSITA to extend this wireless capability to communicating with the security system sensors. (Ex. 1002, ¶ 96.)

        e.      **Claim element 1[d]: "automatically discovering network devices at the gateway and establishing a second communication channel between the gateway and the network devices"**

Wimsatt, Johnson and Severson disclose this limitation in its entirety. For clarity, this limitation is divided into two parts and discussed separately.

        i.      **"automatically discovering network devices at the gateway"**

Wimsatt discloses this portion of the limitation. As previously discussed, Wimsatt discloses that its control panel 101 can implement a "system discovery process." According to Wimsatt, "[w]hen a control panel 101 is coupled to a controlled device or subsystem, it interrogates that device or subsystem to learn

19

Petition for *Inter Partes* Review of
Patent No. 8,478,844

details of the control interface of that particular system." (Ex. 1004, ¶ 0045.)

Wimsatt also explains that when the interrogation process does not work correctly,

"the control panel can be **manually or semi-automatically** programmed to

support that controlled device or subsystem." (*Id.* (emphasis added)) This last

passage indicates that the interrogation process is automatic (i.e., the control panel

101 automatically discovers the controlled devices) because manual or semi-

automatic programming is only performed when the automatic interrogation fails.

(*See also,* Ex. 1004, ¶ 0006 (describing the difficulties of manually adding devices

to a network).)

Also, as previously discussed, Wimsatt also discloses that its control unit

101 implements "Universal Plug-and-Play (UPnP™) processes." (Ex. 1004, ¶

0054.) It was well known at the time of the '844 patent that UPnP™ was used to

auto-discover devices connected to a shared network. (Ex. 1002, ¶ 98 (citing to Ex.

1011, 7).)

A controlled device in Wimsatt can include IP cameras 109 and

environmental sensors. (*Id.*, FIG. 1, ¶ 0038; *see also, id.,* ¶¶ 0040, 0072.) These

controlled devices are the claimed "network devices." (*See, e.g.,* Ex. 1001, claims

43, 44, 47 (reciting "wherein the network device is an [IP] device", "a camera" or

"a sensor").) Thus, Wimsatt discloses automatically discovering network devices at

the control panel 101.

20

Petition for *Inter Partes* Review of
Patent No. 8,478,844

> **ii.** **"establishing a second communication channel between the gateway and the network devices"**

A POSITA would have understood that a communication channel is established between the control panel 101 and the controlled devices in Wimsatt; otherwise, the control panel 101 would not be able to interrogate the controlled devices. (Ex. 1002, ¶ 100.) As shown below in excerpted and annotated Figure 1 of Wimsatt, the red-highlighted path between the control panel 101 and the IP camera 109 demonstrates such an established communication channel. This path forms the claimed "second communication channel".



A POSITA would have understood that a similar communication path would have been established between the control panel 101 and the environmental sensors; otherwise, the control panel 101 would not have been able to interrogate those sensors for the auto-discovery process. (Ex. 1002, ¶ 101.)

Thus, for at least these reasons, Wimsatt discloses claim element 1[d].

21

Petition for *Inter Partes* Review of
Patent No. 8,478,844

> **f.** **Claim element 1[e]: "wherein the second communication channel is independent of the first communication channel"**

As previously discussed, the hub 103 in Wimsatt implements an Ethernet connection between the system devices. (Ex. 1004, ¶ 0036; *see also,* **Part IX.C.1.b.i** above.)  As such, the claimed "second communication channel" between the control panel 101 and the IP camera 109 (and/or environmental sensors) is provided via an Ethernet connection. *See*, **Part IX.C.1.e.ii** above.

As previously discussed with respect to **Part IX.C.1.d.ii**, the claimed "first communication channel" between the control panel 101 and the security system sensors is provided via a wireless communication channel. This wireless communication channel is independent from the communication channel provided by the Ethernet connection. Thus, Wimsatt and Johnson disclose this limitation.

> **g.** **Claim element 1[f]: "forming a security network by electronically integrating into the gateway communications and functions of the network devices and the plurality of security system components"**

For clarity, this limitation is divided into three parts, each of which is discussed separately below. Petitioner discusses "forming a security network" last because it is the end result of "electronically integrating" the devices.

> > **i.** **"electronically integrating into the gateway communications and functions of the network devices…"**

Wimsatt discloses this portion of the limitation. Wimsatt disclose a home

22

Petition for *Inter Partes* Review of
Patent No. 8,478,844

automation system. The purpose of a home automation system, in general, is to communicate with and control the functionality of multiple home-based devices such as lighting, heating and air conditioning, media equipment, and security systems. (Ex. 1004, ¶¶ 0005-0006.) In its background section, Wimsatt provides an example of how such systems were known to operate with home security systems: "Home automation systems may be integrated with a home security system so that when a fire alarm is raised, for example, internal and external lights will be turned on." (Ex. 1004, ¶ 0005.) In other words, it was well known at the time of the '844 patent that home automation systems communicated with home-based devices (such as the lights in the above example) and controlled their functionality (i.e., the system commanded the lights to "turn on"). Thus, the general concept of integrating communications and functions of home-based devices into a home automation system was well known long before the earliest priority date of the '844 patent. (Ex. 1002, ¶ 104.)

Looking at Wimsatt's system specifically, the control panel 101 "electronically integrat[es]" communications and functions of its home-based control devices through the system discovery process discussed above. (*See, e.g.,* Ex. 1004, ¶ 0045.) Through this discovery process, the control panel 101 is able to "learn" various details about the controlled device, such as its command set, signaling protocol information, and the functionality available for that device. (Ex.

23

Petition for *Inter Partes* Review of
Patent No. 8,478,844

1004, ¶ 0046.) The control panel 101 is then able to communicate with and control the functions of that device.

In the case of IP cameras 109 (i.e., the claimed "network devices"), Wimsatt explains that the control unit 101 presents a graphical user interface to the user with controls that allow the user to, for example, move or focus the camera 109. (Ex. 1004, ¶¶ 0072, 0076.) A POSITA would have understood that controlling the camera 109 in this manner requires the control unit 101 to send a command to the camera 109 instructing it to move in a certain direction and/or focus its lens to a certain degree. (Ex. 1002, ¶ 106.) It is understood from the disclosures in Wimsatt that the control panel 101 communicates with and controls the functionality of all of the controlled devices listed within Wimsatt to at least some degree. (*See, e.g.,* Ex. 1004, ¶ 0022 (generally explaining that "a control panel … generates commands … to turn on/off a controlled device, adjust settings on a controlled device… and the like"), ¶ 0044.) As previously discussed, the control panel 101 would not have the ability to control or communicate with the devices if it had not discovered the devices and electronically integrated their functionality into itself and the overall system.

Thus, Wimsatt discloses the portion of this limitation reciting "electronically integrating into the gateway communications and functions of the network devices."

24

Petition for *Inter Partes* Review of
Patent No. 8,478,844

> **ii.** **"electronically integrating into the gateway communications and functions of the … plurality of security system components"**

This portion of the limitation is disclosed by Wimsatt and Johnson. As previously discussed, Wimsatt discloses a security system and a POSITA would understand that it has sensors. Johnson is makes that even more explicit.

As just discussed, Wimsatt discloses "electronically integrating" into the control panel 101 communications and functions of its home-based controlled devices. (Ex. 1004, ¶¶ 0045, 0046.) Wimsatt identifies the home's security system as one type of controlled device. (*See, e.g.,* Ex. 1004, ¶¶ 0012, 0029, 0058.) The specification also states that "control application software executes on the control unit to communicate control information such as commands, *sensor messages*, status messages, and the like with … controlled systems (e.g., *security systems* …)." (*Id.* (emphasis added).) It further explains that this software "may enable features of the security system to be enabled/disabled." (Ex. 1004, ¶ 0058.) A POSITA would have understood that controlling features of a security system would include controlling features (i.e., functions) of the security system's sensors via the home's security system. (Ex. 1002, ¶ 108.) Thus, Wimsatt discloses this portion of the limitation.

25

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### iii.    "forming a security network…"

A POSITA would have understood that the claimed "security network" is formed in Wimsatt (as modified by Johnson) as a result of the control panel 101 integrating the functions of the IP cameras and security system sensors. (Ex. 1002, ¶ 109.) Wimsatt actually refers to this network more generically as a "home automation system" because its control panel 101 integrates the functions of many other types of home-based control devices, in addition to security-related devices. (*See, e.g.,* Ex. 1004, ¶¶ 0005, 0012.) But, a POSITA would have understood that this home automation system includes a security network, which is specific to the security-related devices. (Ex. 1002, ¶¶ 109-110.) Referring to the network as a home automation network versus a security network is semantics.

### h.    Claim element 1[g]: "receiving at the gateway security data from the plurality of security system components, device data of the network devices, and remote data from the security server"

Wimsatt and Johnson disclose this limitation. In general, Wimsatt discloses that its control panel 101 receives "status signals" from the controlled devices. (Ex. 1004, ¶ 0044.) The controlled devices include, for example, IP cameras and the home's security system.

With respect to the security system's sensors specifically, Wimsatt discloses several scenarios where a burglar alarm (i.e., one or more sensors) is triggered, causing the control panel 101 to sound an alarm. (Ex. 1004, ¶¶ 0030-0031, 0059.)

26

Petition for *Inter Partes* Review of
Patent No. 8,478,844

A POSITA would have understood that, in these particular scenarios, the status of the security system's sensors is sent to the control panel 101 in some form. (Ex. 1002, ¶ 112; *see also,* Ex. 1004, ¶¶ 0044, 0056, 0059; *compare to* Ex. 1001, 27:5-10.) Thus, it would be obvious to a POSITA that the control panel 101 in Wimsatt receives "security data" from the security system sensors. (Ex. 1002, ¶ 112.)

With respect to the IP cameras (i.e., the claimed "network devices"), as just discussed, the control panel 101 in Wimsatt receives "status signals" from the IP cameras. (Ex. 1004, ¶ 0044; *see also, id.,* ¶ 0038 (explaining that IP cameras "communicate control messages with a network-coupled control panel 101"), ¶ 0056 (describing "control messages" as "including command and status messages").) Wimsatt also discloses that the control panel 101 receives a streaming input from the IP cameras. (Ex. 1004, ¶¶ 0072, 0075, FIG. 6.) It further discloses that the control panel 101 receives details about the IP cameras (e.g., signaling protocol information) as part of the discovery process. (Ex. 1004, ¶ 0045.) Thus, Wimsatt clearly discloses that its control panel 101 receives "device data of the network devices" as recited in this limitation.

With respect to the security server, as previously discussed, it would have been obvious to a POSITA to modify Wimsatt so that the control panel 101 is coupled to the data center 20 server in Johnson (i.e., the claimed "security server"). *See* **Part IX.C.1.b.ii** above. Johnson discloses that its control unit 30 "may []

27

Petition for *Inter Partes* Review of
Patent No. 8,478,844

download any data from the data center 20 such as commands from the homeowner." (Ex. 1005, 5:13-18; *see also, id.*, 6:65-7:2, 7:67-8:4.) This data is the claimed "remote data." It would have been obvious to modify the control panel 101 in Wimsatt so that it receives data from the remotely-located data center 20 server in the same manner described for the control unit 30 in Johnson. (Ex. 1002, ¶ 114.) As such, a homeowner in Wimsatt would be able to remotely control the control panel 101 and the networked controlled devices through the data center 20 server as described in Johnson. (*Id.*) The motivations to combine Wimsatt and Johnson discussed above in **Part IX.C.1.b.ii** apply here. Thus, Wimsatt (as modified by Johnson) discloses that its control panel 101 receives "remote data from the security server" as recited in this limitation.

> **i.  Claim element 1[h]: "generating processed data by processing at the gateway the security data, the device data, and the remote data"**

Wimsatt and Johnson disclose this limitation. The control panel 101 in Wimsatt includes a processor 201 that "implements data processing functionality for accessing and manipulating data from various subsystems and memory." (Ex. 1004, ¶ 0047.) Thus, it would be obvious for this processor 201 to generate "processed data" by processing the "security data" from the security system sensors, the "device data" from the IP cameras, and the "remote data" from the data center 20 server in Johnson. (Ex. 1002, ¶ 115.)

28

Petition for *Inter Partes* Review of
Patent No. 8,478,844

With respect to the "security data", as previously discussed, when one or more security system sensors are activated (e.g., a burglar alarm is triggered), the sensors transmit a "status signal" that is received at the control unit 101. (*See, e.g.,* Ex. 1004, ¶¶ 0030-0031, 0059.) According to Wimsatt, the control panel's processor 201 includes a message broker process that receives this status signal, interprets it, and then passes it to the security plug-in for further processing. (Ex. 1004, ¶¶ 0044, 0056, 0058-0059.) If the security plug-in determines that the received "security data" indicates an intrusion, it activates the necessary audio plug-in to sound an alarm on the control panel 101. (Ex. 1004, ¶ 0059.) Thus, the "security data" is "processed" by the control panel's processor 201.

With respect to the "device data", a POSITA would understand that any status signal from the IP camera 109 would be processed by the processor 201 in a manner similar to that described above for the "security data". (Ex. 1002, ¶ 117.) Any streamed input received at the control panel 101 from the IP camera 109 would also necessarily require processing. (*Id.*) Furthermore, when the "device data" is, for example, the signaling protocol information received by the control panel 101 as part of the IP camera discovery process, a POSITA would have understood that this information is processed by the processor 201 because the processor 201 uses this information to generate messages that can be

29

Petition for *Inter Partes* Review of
Patent No. 8,478,844

communicated to the IP camera via that protocol. (*Id.*; *see also,* Ex. 1004, ¶¶ 0038, 0045, 0054.)

Finally, with respect to the "remote data", as previously discussed, when the control panel 101 in Wimsatt is modified by Johnson, the control panel 101 is capable of receiving data from a remotely-located data center 20 server. *See* **Part IX.C.1.h** above. The data can be, for example, commands entered by a homeowner instructing the control panel 101 to change one or more settings on a controlled device (e.g., the home security system). (*See, e.g.,* Ex. 1005, 4:15-53.) A POSITA would understand that data received at the control unit 101 from data center 20 server would be processed by the control unit's processor 201 so that the data can be interpreted and the appropriate actions taken by the control unit 101 to modify the settings of the particular controlled device. (Ex. 1002, ¶ 118.) The same motivations to combine Wimsatt and Johnson discussed in **Part IX.C.1.b.ii** apply here.

Thus, Wimsatt and Johnson disclose this limitation.

> **j.** **Claim element 1[i]: "determining a state change of the security system using the processed data; and"**

Wimsatt and Johnson also disclose this limitation. Wimsatt discloses that the control panel 101 can be used to arm and disarm the home's security system. (Ex. 1004, ¶¶ 0065-0066, 0070-0071, 0074.) When Wimsatt is modified by Johnson, a homeowner can control this functionality remotely through the data center 20

30

Petition for *Inter Partes* Review of
Patent No. 8,478,844

server. For example, if the status (or "state") of the security system (and its sensors) is "unarmed", then the homeowner can send a command signal though the data center 20 server to the control panel 101 instructing the control panel 101 to change the status (or "state") of the security system (and its sensors) to "armed". (Ex. 1002, ¶¶ 119-120.) A POSITA would have understood that the control panel 101 in Wimsatt must process this "remote data" from the data center 20 server to determine what command needs to be implemented. (*Id.*) Here, upon processing, the control panel 101 would have determined that the status (or "state") of the home security system needs to be changed from "unarmed" to "armed." (*Id.*)

### k. Claim element 1[j]: "maintaining at the security server with use of the processed data objects corresponding to the plurality of security system components and the network devices"

The '844 patent explains that the remote security server "provide[s] access to, and management of, the objects associated with an integrated security system." (Ex. 1001, 8:29-41.) It further explains that "every **object** monitored by the gateway 102 is called a **device**." (*Id.* (emphasis added)) "Devices include the sensors, cameras, home security panels and automation devices." (*Id.*)

Wimsatt and Johnson disclose claim element 1[j] consistent with this disclosure in the '844 patent. As shown below in Figure 3 of Johnson, the homeowner accesses a web page "displayed by the data center 20" and can

31

Petition for *Inter Partes* Review of
Patent No. 8,478,844

"monitor[] and control[]" aspects of the security system and cameras using that

web page. (Ex. 1005, 4:30-36, 5:29-39, 6:35-59.)



Johnson explains that a homeowner can "modify any preprogrammed

settings within the home" by "simply select[ing] the desired feature on the control

page 76 of the desired home as shown in FIGS. 3 and 7." (Ex. 1005, 6:61-65.)

"The homeowner may then enter the desired data into the computer 16 which is

32

Petition for *Inter Partes* Review of
Patent No. 8,478,844

transmitted to the data center 20 which forwards the information directly to the control unit 30 which transmits the data accordingly modifying any previous settings." (Ex. 1005, 6:65-7:4.) When Wimsatt is modified by Johnson, the homeowner is able to remotely control the control panel 101 and the controlled devices in the same manner. (Ex. 1002, ¶¶ 121-123.)

A POSITA would have understood that the icons illustrated on the above web page represent particular controlled devices located within the home in Wimsatt. (Ex. 1002, ¶ 124.) These icons are the claimed "objects" maintained at the data center 20 servers. For example, the icon labeled "camera" is an object maintained at the server corresponding to the IP camera 109. Similarly, the icons labeled "door" and "window" are objects maintained at the server corresponding to a door sensor and a window sensor, respectively.

A POSITA would have also understood that the data center 20 server maintains the status of each of these objects (corresponding to the camera, window and door sensors) using the processed data discussed in **Part IX.C.1.i** above. (Ex. 1002, ¶ 125.) As Mr. Parker explains in his declaration, it would be difficult to change a device's settings without knowing the current status of that device. (*Id.*; *see also,* Ex. 1005, 7:6-8.) Thus, it would be obvious to a POSITA to conclude that the control panel 101 in Wimsatt transmits the processed security data and device

33

Petition for *Inter Partes* Review of
Patent No. 8,478,844

data to the data center 20 server so that the web page displayed for the homeowner

has the most up-to-date information about the objects. (Ex. 1002, ¶ 125.)

For at least these reasons, Wimsatt in view of Johnson and Severson disclose

claim 1.

### 2.    Dependent claim 25 – Ground 1[3]

| 25 | The method of claim 1, wherein the security server creates, modifies and terminates users corresponding to the security system. |
|----|---|

Claim 25 is rendered obvious under Ground 1. Alexander describes an

integrated information system similar to Wimsatt and Johnson. It includes a

premise server 202 (similar to the control panel 101 / unit 30) that controls

monitoring devices 206 installed throughout a home. (Ex. 1008, FIG. 2, 7:1-14.)

The monitoring devices can include security sensors. (*Id.*) The premise server 202

is connected to a remote central server 210 (similar to the data center 20 server in

Johnson), which provides a user interface allowing users to access data related to

the monitoring devices. (*Id.*, 3:24-28, 10:57-11:17.) Alexander discloses that,

through this interface, a user can "create or modify a number of users to the

---

[3] Throughout the petition when referring to applying a Ground against a given

dependent claim it is intended that the entire combination of references is being

applied against that claim in its totality even if only a subset of the references are

discussed with respect to the specific limitations added by that dependent claim.

Petition for *Inter Partes* Review of
Patent No. 8,478,844

integrated information system." (Ex. 1008, 12:13-13:10, FIGs. 5A-7.) It would be obvious to a POSITA that "modifying" a user could include terminating a user. (Ex. 1002, ¶ 178.)

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson so that the data center 20 server in Johnson is able to create, modify and terminate users corresponding to the security system. (Ex. 1002, ¶ 179.) Johnson already discloses that its server provides users with control pages 76 where they can view and control their home security system. (Ex. 1005, 6:35-59.) Allowing a user to add and modify other users via the control page 76 and data center 20 server in the same manner disclosed in Alexander would enhance the functionality of the data center 20 server as well as allow the user to further customize his home security system. (Ex. 1002, ¶ 179.)

Alexander, Wimsatt, Johnson and Severson disclose similar integrated home monitoring systems and control panels. Thus, a POSITA would be motivated to combine the references to enhance their respective functionalities. (Ex. 1002, ¶ 180.)

35

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 3. Dependent claims 26-29 – Ground 1

| 26 | The method of claim 1, wherein the security server creates, modifies and terminates couplings between the gateway and the security system components. |
|---|---|
| 27 | The method of claim 1, wherein the security server creates, modifies and terminates couplings between the gateway and the plurality of premise network devices. |
| 28 | The method of claim 1, wherein the security server performs creation, modification, deletion and configuration of the security system components. |
| 29 | The method of claim 1, wherein the security server performs creation, modification, deletion and configuration of the network devices. |

Claims 26-29 are rendered obvious under Ground 1. As discussed for claim 25, Alexander describes an integrated home system having monitoring devices (e.g., sensors and cameras) similar to Wimsatt and Johnson and which also has a remote central server 210 similar to the data center 20 server in Johnson. (Ex. 1008, FIG. 2, 7:1-14, 3:24-28, 10:57-11:17.) The remote central server 210 in Alexander provides the user interface shown below in FIG. 18, which allows users to input data to create (or install) a new monitoring device (*id.*, FIG. 15B, 18:65-19:22) and modify an existing monitoring device (*id.*, 17:54-18:12) to the integrated home system. (*See also, id.*, FIG. 5B (item 518 ("create or modify devices and rules")), FIGs. 13, 14A-18, 16:25-17:9, 11:13-17.) Although it does not describe deleting a monitoring device from the system, it would be obvious to a POSITA that "modifying" a device could include deleting it. (Ex. 1002, ¶ 181.)

36

Petition for *Inter Partes* Review of
Patent No. 8,478,844



Alexander further discloses that the central server 210 "configures each monitoring device" 206 using the information input by the user. (Ex. 1008, 19:49-20:2 (cl. 1), 19:23-37.)

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson so that the data center 20 server in Johnson is capable of performing the same functions described in Alexander through its control page 76, thereby predictably resulting in enhanced functionality of the data center 20 server and a simplification of device installation. (Ex. 1002, ¶¶ 182-183.) The rationale and motivations to combine these prior art references discussed for claim 25 also apply here.

37

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 4.    Dependent claims 30 and 31 – Ground 1

| | |
|---|---|
| 30 | The method of claim 1, wherein the security server creates automations, schedules and notification rules associated with the security system components. |
| 31 | The method of claim 1, wherein the security server creates automations, schedules and notification rules associated with the network devices. |

Claims 30 and 31 are rendered obvious under Ground 1. Alexander describes a similar process for allowing a user to create rules for its monitoring devices, which include sensors and camera. (Ex. 1008, 7:1-14, FIG. 13A, FIG. 16, FIG. 19, 18:13-64.) Figure 19 (shown below) illustrates an exemplary user interface provided by the central server 210 in Alexander that allows the user to specifically create notification rules for monitoring devices. (*Id.*, 18:55-61.)



Alexander does not describe creating automation and scheduling rules specifically (except in the context of sending notifications) but it generally refers to the rule as a "device rule" (*id.*, 18:25) and a "monitoring device processing rule"

38

Petition for *Inter Partes* Review of
Patent No. 8,478,844

(*id.*, 18:37). (*See also, id.*, 18:51-55.) As automation and scheduling rules are associated with the device and device processing, it would have been obvious to a POSITA that a user would have been able to create automations and scheduling rules using the same process described in Alexander. (Ex. 1002, ¶ 185.)

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson so that the data center 20 server in Johnson is capable of performing the same functions described in Alexander through its control page 76, thereby predictably resulting in enhanced functionality of the data center 20 server and a simplification of device installation. (Ex. 1002, ¶ 186.) The rationale and motivations to combine these prior art references discussed for claim 25 also apply here.

### 5. Dependent claims 32 and 33 – Ground 1

| 32 | The method of claim 1, wherein the security server manages access to current and logged state data for the security system components. |
|----|----|
| 33 | The method of claim 1, wherein the security server manages access to current and logged state data for the network devices |

As previously discussed, Wimsatt in view of Johnson provides a control page 76 that allows users to access the current state of their home (and the devices therein). (Ex. 1005, FIG. 3, 6:35-59, 4:15-39, 7:47-5.) This control panel 76 is managed by the data center 20 server. (*Id.*) Johnson does not describe keeping a "log" of previous state data for its controlled devices but this is disclosed in Alexander. (*See,* Ex. 1005, 4:47-53 (listing data that the server stores).) The central

39

Petition for *Inter Partes* Review of
Patent No. 8,478,844

server 210 in Alexander, which is similar to the server in Johnson, includes an "event logs database 214". (Ex. 1008, 7:59-65.) "Event data" is described in Alexander as data "obtained from a monitoring device corresponding to an on/off state." (*Id.*, 11:33-36, 7:1-14.)

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson so that the data center 20 server logs the state data for the controlled devices in Wimsatt. (Ex. 1002, ¶¶ 187-188.) This is a simple process of storing data at the server in Johnson once it has been received and keeping it for a period of time. (*Id.*) This would allow a user to access older data using the control page 76, if needed. (*Id.*) Other rationales and motivations to combine these references are discussed in connection with claim 25 and apply here.

### 6.    Dependent claims 34 – Ground 1

| 34 | The method of claim 1, wherein the security server manages access to current and logged state data for couplings among the gateway, the security system components and the network devices. |
|----|---|

As discussed above with respect to claims 32 and 33, Wimsatt in view of Johnson provides a control page 76 that allows users to access the current state of their home (and the devices therein). (Ex. 1005, FIG. 3, 6:35-59, 4:15-39, 7:47-5.) This control panel 76 is managed by the data center 20 server. (*Id.*) Johnson does not describe keeping a "log" of previous state data for its controlled devices but this is disclosed in Alexander. (*See,* Ex. 1005, 4:47-53 (listing data that the server

40

Petition for *Inter Partes* Review of
Patent No. 8,478,844

stores).) The central server 210 in Alexander, which is similar to the server in Johnson, includes an "event logs database 214". (Ex. 1008, 7:59-65.) "Event data" is described in Alexander as data "obtained from a monitoring device corresponding to an on/off state." (*Id.*, 11:33-36, 7:1-14.)

It would have been obvious to a POSITA that couplings amongst the gateway, security system components and network devices are also logged. By logging such couplings a user would be able to better track the various components of the security system. (Ex. 1002, ¶¶ 189-190.)

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson for the same reasons as for claims 32 and 33. Other rationales and motivations to combine these references are discussed in connection with claim 25 and apply here.

### 7.    Dependent claims 35 and 36 – Ground 1

| 35 | The method of claim 1, wherein the security server manages communications with the security system components. |
| 36 | The method of claim 1, wherein the security server manages communications with the network devices. |

Johnson discloses that the data center 20 server sends a "connect" command to the control unit 30 when it wants to communicate with the unit 30. (Ex. 1005, 7:17-28, 7:47-8:5.) If the unit 30 is online, then it establishes a direct secure connection with the server and can communicate data from its controlled devices with the server. (*Id.* 7:17-28, 7:47-8:5, 5:40-52.) For example, if a homeowner, via

41

Petition for *Inter Partes* Review of
Patent No. 8,478,844

the server, requests a live video feed from one of its IP cameras, then the server

would connect with the control unit 30 and request that video feed. In turn, the

control unit 30 would connect to the IP camera to get the video feed. Because the

server in Johnson manages communications between itself and the control unit 30

and the control unit 30 communicates with its controlled devices, the server

therefore manages communications with the security system sensors and cameras

via the control unit 30. When Johnson is combined with Wimsatt, the data center

20 server in Johnson connects with the control panel 101 in Wimsatt to perform the

same functions and manage connections in the same way. Thus, claims 35 and 36

are rendered obvious.

### 8.    Dependent claim 37 – Ground 1

| 37 | The method of claim 1, wherein the security server generates and transfers notifications to remote client devices, the notifications comprising event data. |
|----|----|

Wimsatt and Johnson disclose claim 37. Johnson explains: "when a

condition within the home reaches a warning level (i.e., **an 'event'**) … the control

unit 30 sends an alert to the data center 20 through the global computer network

12." (Ex. 1005, 7:32-36 (emphasis added); *see also, id.*, FIG. 6, 5:63-67.) In

response to this alert, "the control unit 30 may notify the data center 20 which can

then **notify the homeowner of the condition** via e-mail, pager, web page, by

direct telephone call or other communication means." (*Id.*, 6:2-6 (emphasis added);

Petition for *Inter Partes* Review of
Patent No. 8,478,844

*see also, id.*, 7:42-46.) The cell phone, pager and/or computer receiving the notification via email or web page 74 in Johnson are "remote client devices." (*Id.*, FIG. 5 (illustrating that these remote devices are connected to the home via global computer network 12.)

When Wimsatt is modified by Johnson, the control panel 101 is connected to the data center 20 server that performs the same functions described above. The same motivations to combine Wimsatt with Johnson and Severson for claim 1 apply here. In addition, a POSITA would understand the benefit of connecting the control panel 101 to the data center 20 server in Johnson because the connection would enhance the functionality of the control panel 101 and provide the homeowner with up-to-date notifications regarding the state of their property. (Ex. 1002, ¶¶ 193-194.) This is especially important when security breaches occur within a home because immediate action might be needed. (*Id.*)

### 9.    Dependent claim 38 – Ground 1

| 38 | The method of claim 37, wherein the notifications include one or more of short message service messages and electronic mail messages. |
|---|---|

As discussed with respect to claim 37, the data center 20 server in Johnson notifies the homeowner via "e-mail" (i.e., electronic mail). Thus, claim 38 is rendered obvious.

43

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 10.  Dependent claim 39 – Ground 1

| | |
|---|---|
| 39 | The method of claim 37, wherein the event data is event data of the security system components. |

When discussing "alerts" (or "events"), Johnson discloses that the alert (or event) can result from a security condition such as a home intrusion. (Ex. 1005, 5:54-67.) An alert of this nature would originate with the security sensors. This is shown below in annotated, excerpted Figure 5 of Johnson, which illustrates the "security sensors" sending an alert signal to the control unit 30. (*See also, id.*, Ex. 1005, 5:54-62.) When Wimsatt is modified by Johnson, a POSITA would understand that the security sensors of the security system in Wimsatt would function similarly to those described in Johnson. (Ex. 1002, ¶ 196.) Thus, claim 39 is rendered obvious.

Petition for *Inter Partes* Review of
Patent No. 8,478,844



### 11.   Dependent claim 40 – Ground 1

| 40 | The method of claim 37, wherein the event data is event data of the network devices. |
|----|---------------------------------------------------------------------------------------|

This is also disclosed in Johnson by Figure 5 (reproduced above). As shown

in that figure, alerts from cameras are transmitted to the control unit 30. (Ex. 1005,

5:54-62.) When Wimsatt is modified by Johnson, a POSITA would understand that

the IP cameras 109 in Wimsatt would function similarly to the cameras in Johnson

and would send an alert (or event data) to the control panel 101 in Wimsatt. (Ex.

1002, ¶ 197.) Thus, claim 40 is rendered obvious.

45

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 12.    Dependent claim 42 – Ground 1

| 42 | The method of claim 1, wherein the security system components include one or more of sensors, cameras, input/output (I/O) devices, and accessory controllers. |
|----|----|

As discussed for claim 1, a POSITA would have understood that the security system in Wimsatt includes a plurality of sensors. *See,* **Part IX.C.1.c** above. Wimsatt also discloses that its security system includes security cameras. (Ex. 1004, FIG. 1 (item 125, labeled "security camera"), ¶¶ 0040, 0075.) Furthermore, as also discussed for claim 1, Johnson discloses "security sensors." (*See,* Ex. 1005, FIG. 5.) Thus, claim 42 is rendered obvious.

### 13.    Dependent claims 43 and 44 – Ground 1

| 43 | The method of claim 1, wherein the network device is an Internet Protocol device. |
|----|----|
| 44 | The method of claim 1, wherein the network device is a camera. |

As discussed for claim 1, Wimsatt discloses the claimed "network device" as an IP camera 109. (Ex. 1004, FIG. 1, ¶¶ 0038, 0040, 0072; *see also,* **Part IX.C.1.e** above.) Thus, claims 43 and 44 are rendered obvious.

### 14.    Dependent claim 45 – Ground 1

| 45 | The method of claim 1, wherein the network device is a touchscreen. |
|----|----|

Wimsatt discloses that the control panel 101 is connected to other panels 101 via hub 103 or wireless communication (panels 107). (Ex. 1004, ¶¶ 0035-0037.) It would be obvious to include one of these other panels 101/107 as a network device. (Ex. 1002, ¶ 203.)

46

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 15. Dependent claim 46 – Ground 1

| 46 | The method of claim 1, wherein the network device is a device controller that controls an attached device. |
|----|--------------------------------------------------------------------------------------------------------------|

Claim 46 is rendered obvious by Wimsatt. The claimed "network device" is satisfied by any device that is included in the home automation network of Wimsatt. Figure 1 of Wimsatt illustrates a number of network devices, including a lighting control subsystem 113. Wimsatt explains that this subsystem 113 interface comprises a "control device", which is the claimed "device controller." (Ex. 1004, ¶ 0039.) As shown in the below, this control device is coupled to the home's lighting devices (e.g., lamps). (*Compare to* Ex. 1001, 15:21-26, 22:47-52, 22:63-23:3.)

Petition for *Inter Partes* Review of
Patent No. 8,478,844



**FIG. 1**

### 16.    Dependent claim 47 – Ground 1

| 47 | The method of claim 1, wherein the network device is a sensor. |

As discussed for claim 1, Wimsatt discloses the claimed "network device" as

an environmental sensor. (Ex. 1004, FIG. 1, ¶ 0038; *see also*, **Part IX.C.1.e**

above.) Thus, claim 47 is rendered obvious.

Petition for *Inter Partes* Review of
Patent No. 8,478,844

### 17.   Independent claim 48 – Ground 2

As will be demonstrated in the following sections, the language of independent claim 48 is substantially identical to the language of independent claim 1.

#### a.   Preamble: "A method comprising"

Wimsatt in view of Johnson discloses a method for the reasons that follow.

#### b.   Claim element 48[a]: "forming a security network by coupling a gateway to a security server, wherein the gateway is located at a first location and coupled to a security system that includes security system components located at the first location, wherein the security server is located at a second location different from the first location"

This claim element is substantively identical to claim elements 1[a] and 1[b] discussed above in **Parts IX.C.1.b** and **IX.C.1.c**. For example, as discussed with respect to claim element 1[a], Wimsatt in view of Johnson discloses coupling the control panel 101 in Wimsatt (i.e., the claimed "gateway") to the data center 20 server in Johnson (i.e., the claimed "security server"). A POSITA would understand that this "coupling" forms a security network. (Ex. 1002, ¶ 207.)  As such, for the same reasons discussed in **Part IX.C.1.b**, Wimsatt in view of Johnson discloses "*forming a security network by coupling a gateway to a security server*."

As discussed with respect to claim elements 1[a] and 1[b], Wimsatt in view

49

Petition for *Inter Partes* Review of
Patent No. 8,478,844

of Johnson discloses that the control panel 101 is located within the user's home

(i.e., the claimed "first location") and is wirelessly coupled to the home's security

system, which includes a plurality of "security sensors" installed throughout the

home. As such, for the same reasons discussed in **Parts IX.C.1.b** and **IX.C.1.c**,

Johnson discloses "*wherein the gateway is located at a first location and coupled*

*to a security system that includes security system components located at the first*

*location*."

Lastly, as discussed with respect to claim element 1[a], the data center 20

server in Johnson is located remotely from the home where the control panel 101

from Wimsatt is located. Thus, for the same reasons discussed in **Part IX.C.1.b**,

Johnson discloses "*wherein the security server is located at a second location*

*different from the first location*."

        c.    **Claim element 48[b]: "automatically discovering network devices at the gateway and establishing a coupling between the gateway and the network devices located at the first location, wherein the gateway electronically integrates communications and functions of the network devices and the security system components into the gateway and the security network"**

As illustrated in the below chart, this claim element is substantively identical

to claim elements 1[d] and 1[f] discussed above in **Parts IX.C.1.e** and **IX.C.1.g**.

50

Petition for *Inter Partes* Review of
Patent No. 8,478,844

| Claim Element 48[b] | Claim Elements 1[d] & 1[f] |
|---|---|
| automatically discovering network devices at the gateway and | **1[d]:** "automatically discovering network devices at the gateway and …" |
| establishing a <u>coupling</u> between the gateway and the network devices located at <u>the first location</u> | **1[d]:** "…establishing a second communication channel between the gateway and the network devices" |
| <u>wherein the gateway</u> electronically integrates communications and functions of the network devices and the security system components into the gateway <u>and the security network</u> | **1[f]:** "forming a security network by electronically integrating into the gateway communications and functions of the network devices and the plurality of security system components" |

The underlined language in the left column highlights language that is slightly different from, but otherwise substantively identical to, the language in the right column. For example, the claim element 48[b] recitation "establishing a coupling" is broader than the claim element 1[d] recitation "establishing a second communication channel" and therefore the arguments presented above for claim element 1[d] satisfy this claim element 48[d] recitation.

Similarly, with respect to the claim element 48[b] recitation "electronically integrates communications and functions … into the gateway and security network," the arguments presented above for claim element 1[f] satisfy this limitation because "forming a security network by electronically integrating into the gateway communications and functions," as recited in claim element 1[f], necessarily includes electronically integrating those communications and functions into the security network because the security network encompasses the gateway.

Finally, as discussed above with respect to claim element 1[f], the control

51

Petition for *Inter Partes* Review of
Patent No. 8,478,844

unit 101 in Wimsatt (i.e., the claimed "gateway") electronically integrates these

communications and functions into itself. It also integrates them into the "security

network" because the control unit 101 is part of the security network and thus

integrating these communications and functions into the control panel 101

necessarily includes integrating them into the security network. (Ex. 1002, ¶¶ 208-

209.)

Thus, for the same reasons discussed above in **Parts IX.C.1.e** and **IX.C.1.g**,

Wimsatt in view of Johnson discloses claim element 48[b].

### d.    Claim elements 48[c]-48[f]

As illustrated in the below chart, claim elements 48[c] to 48[f] are identical

to claim elements 1[g] to 1[j]. Thus, for the same reasons discussed above in **Parts**

**IX.C.1.h** to **IX.C.1.k**, Wimsatt in view of Johnson discloses claim elements 48[c]

to 48[f].

| | Claim 1 | | Claim 48 |
|---|---|---|---|
| 1[g] | receiving at the gateway security data from the plurality of security system components, device data of the network devices, and remote data from the security server; | 48[c] | receiving at the gateway security data from the security system components, device data of the network devices, and remote data from the security server; |
| 1[h] | generating processed data by processing at the gateway the security data, the device data, and the remote data; | 48[d] | generating processed data by processing at the gateway the security data, the device data, and the remote data; |
| 1[i] | determining a state change of the security system using the processed data; and | 48[e] | determining a state change of the security system using the processed data; and |

52

Petition for *Inter Partes* Review of
Patent No. 8,478,844

| 1[j] | maintaining at the security server with use of the processed data objects corresponding to the plurality of security system components and the network devices. | 48[f] | maintaining at the security server with use of the processed data objects corresponding to the plurality of security system components and the network devices. |
| --- | --- | --- | --- |

For at least these reasons, Wimsatt in view of Johnson discloses claim 48.

### 18.   Independent claim 49 – Ground 2

As will be demonstrated in the following sections, the language of independent claim 49 is substantially identical to the language of independent claims 1 and 48.

#### a.   Preamble: "A method comprising"

Wimsatt in view of Johnson discloses a method for the reasons that follow.

#### b.   Claim element 49[a]: "automatically discovering a security system at a gateway"

Wimsatt discloses this limitation. For example, as previously discussed, Wimsatt discloses that its control panel 101 (i.e., the claimed "gateway") can implement a "system discovery process." According to Wimsatt, "[w]hen a control panel 101 is coupled to a controlled device or subsystem, it interrogates that device or subsystem to learn details of the control interface of that particular system." (Ex. 1004, ¶ 0045.) Wimsatt also explains that when the interrogation process does not work correctly, "the control panel can be **manually or semi-automatically** programmed to support that controlled device or subsystem." (*Id.* (emphasis

53

Petition for *Inter Partes* Review of
Patent No. 8,478,844

added)) This last passage indicates that the interrogation process is automatic (i.e.,

the control panel 101 automatically discovers the controlled devices) because

manual or semi-automatic programming is only performed when the automatic

interrogation fails. [4]

A controlled device in Wimsatt can include a security system. (Ex. 1004, ¶¶

0012, 0022.) Thus, Wimsatt discloses automatically discovering the security

system at the control panel 101.

> c.    **Claim element 49[b]: "establishing communications between the gateway and the security system in a facility"**

Wimsatt discloses this limitation as well. For example, Wimsatt discloses

that the control panel 101 and the security system can be located within a building.

(Ex. 1004, ¶¶ 0012, 0024, 0034.) This building is the claimed "facility."

Wimsatt further discloses that its control panel 101 establishes

communications with the security system. For example, during the discovery

process, Wimsatt describes "interrogating" the security system, which requires

---

[4] As previously discussed, Wimsatt also discloses that its control unit 101

implements "Universal Plug-and-Play (UPnP™) processes." (Ex. 1004, ¶ 0054.) It

was well known at the time of the '844 patent that UPnP™ was used to auto-

discover devices connected to a shared network. (Ex. 1002, ¶ 213 (Ex. 1011, 7).)

Petition for *Inter Partes* Review of
Patent No. 8,478,844

establishing communications with the security system. (Ex. 1004, ¶ 0045; *see also, id.*, ¶ 0012 (explaining that the control panel 101 "communicate[s] control information … with other control units as well as controlled systems (e.g., security systems…).").) Thus, Wimsatt discloses establishing communications between the control panel 101 and the security system in a facility.

> **d.    Claim element 49[c]: "wherein the security system includes a plurality of security system components that are proprietary to the security system"**

For the same reasons discussed in **Part IX.C.1.c**, Wimsatt and Johnson disclose that the security system in Wimsatt includes "security sensors", which are the claimed "security system components."

These security sensors are proprietary to the security system in Wimsatt. For example, Wimsatt explains that its system "may be adapted to handle special-purpose and proprietary controlled devices and subsystems." (Ex. 1004, ¶ 0023.) As such, a POSITA would have understood that the entire controlled device – i.e., the entire security system, including the sensors of the security system – could be proprietary. (Ex. 1002, ¶¶ 214-215.) This, Wimsatt and Johnson disclose this limitation.

Petition for *Inter Partes* Review of
Patent No. 8,478,844

      e.      **Claim element 49[d]: "automatically discovering a plurality of network devices at the gateway and establishing communications between the gateway and the plurality of network devices"**

This limitation is substantively identical to claim element 1[d], which recites "automatically discovering network devices at the gateway and establishing a second communication channel between the gateway and the network devices." Thus, for the same reasons discussed above in **Part IX.C.1.e**, Wimsatt discloses this limitation.

      f.      **Claim element 49[e]: "wherein the gateway fauns [sic – "forms"] a security network at the facility and couples the security network to a local area network of the facility"**

The first portion of this limitation is substantively identical to claim element 1[d], which recites in part "forming a security network". As discussed with respect to claim element 1[d], the control panel 101 in Wimsatt forms this security network. *See* **Part IX.C.1.g** (the relevant arguments for which apply here). As discussed with respect to claim element 49[b], the control panel 101, security system, and networked devices are located within a facility. The formed security network is therefore also at the facility.

The second portion of this limitation is substantively identical to claim element 1[a], which recites in part "coupling a gateway to a local area network

56

Petition for *Inter Partes* Review of
Patent No. 8,478,844

located in a first location." *See* **Part IX.C.1.b** (the relevant arguments for which

apply here). Here, the first location is the facility which includes the LAN.

Wimsatt explains that the control panel 101 can be a wireless control panel

107 and thus the security system and other networked components (which form the

"security network") are coupled to the LAN via the control panel 101. (Ex. 1004, ¶

0037, FIG. 1.)

> g.  **Claim element 49[f]: "wherein the gateway forms the security network by electronically integrating into the gateway communications and functions of the plurality of network devices and the plurality of security system components"**

This limitation is substantively identical to claim element 1[f] and portions of

claim element 48[b]. Thus, for the same reasons discussed in **Parts IX.C.1.g** and

**IX.C.17.c**, Wimsatt in view of Johnson discloses this limitation.

> h.  **Claim elements 49[g]-49[j]**

As illustrated in the below chart, claim elements 49[g] to 49[j] are identical

to claim elements 1[g] to 1[j]. Thus, for the same reasons discussed above in **Parts**

**IX.C.1.h** to **IX.C.1.k**, Wimsatt in view of Johnson and Severson discloses claim

elements 49[g] to 49[j].

Petition for *Inter Partes* Review of
Patent No. 8,478,844

|  | **Claim 1** |  |  | **Claim 49** |
|---|---|---|---|---|
| 1[g] | receiving at the gateway security data from the plurality of security system components, device data of the network devices, and remote data from the security server; | | 49[g] | receiving at the gateway security data from the plurality of security system components, device data of the plurality of network devices, and remote data from the remote server; |
| 1[h] | generating processed data by processing at the gateway the security data, the device data, and the remote data; | | 49[h] | generating processed data by processing at the gateway the security data, the device data, and the remote data; |
| 1[i] | determining a state change of the security system using the processed data; and | | 49[i] | determining a state change of the security system using the processed data; and |
| 1[j] | maintaining at the security server with use of the processed data objects corresponding to the plurality of security system components and the network devices. | | 49[j] | maintaining at the remote server with use of the processed data objects corresponding to the plurality of security system components and the plurality of network devices. |

For at least these reasons, Wimsatt in view of Johnson discloses claim 49.

### 19.   Independent claim 50 – Ground 2

As will be demonstrated in the following sections, the language of independent claim 50 is substantially identical to the language of independent claims 1, 48 and 49.

#### a.   Preamble: "A method comprising"

For the reasons discussed in the following sections, Wimsatt in view of Johnson discloses a method.

58

Petition for *Inter Partes* Review of
Patent No. 8,478,844

> **b.    Claim element 50[a]: "forming a security network by automatically discovering a security system at a gateway and establishing communications between the gateway and the security system"**

This limitation is substantively identical to claim elements 49[a] and 49[b], which collectively recite "*automatically discovering a security system at a gateway and establishing communications between the gateway and the security system.*" Thus, for the same reasons discussed above in **Parts IX.C.18.b** and **IX.C.18.c**, Wimsatt discloses this limitation.

A POSITA would have understood that automatically discovering security-related devices on a network and establishing communications with those devices forms a "security network" because it meets the basic definition of a network – i.e., two or more components capable of communicating with each other. (Ex. 1002, ¶ 217.)

Thus, Wimsatt discloses this limitation.

> **c.    Claim element 50[b]: "the security system including security system components installed at a facility"**

This limitation is substantively identical to claim element 1[b], which recites in part "*a security system comprising a plurality of security system components.*" Thus, for the same reasons discussed in **Part IX.C.1.c**, Wimsatt and Johnson disclose this limitation.

59

Petition for *Inter Partes* Review of
Patent No. 8,478,844

Claim element 50[b] further recites that the security system and its components are "installed at a facility." Wimsatt discloses that the security system can be located within a building. (Ex. 1004, ¶¶ 0012, 0024, 0034.) This building is the claimed "facility." A POSITA would have understood that the security system's sensors (i.e., the claimed "security system components") would also be installed at the facility. (Ex. 1002, ¶¶ 214-215, 219.)

> d.    **Claim element 50[c]: "wherein the gateway is located at a first location"**

As just discussed, Wimsatt discloses that its control panel 101 (i.e., the claimed "gateway") is co-located with the security system in a building (i.e., the claimed "facility"). (Ex. 1004, ¶¶ 0012, 0024, 0034.) Nothing in this claim requires that the "facility" be different from the "first location." Thus, the control panel 101 in Wimsatt is located at a first location within the building.

> e.    **Claim element 50[d]: "wherein the gateway is coupled to a security server at a second location different than the first location"**

This limitation is substantively identical to claim element 48[a], which recites in part "*coupling a gateway to a security server, wherein the gateway is located at a first location ... wherein the security server is located at a second location different from the first location.*" Thus, for the same reasons discussed in **Part IX.C.17.b**, Wimsatt and Johnson disclose this limitation.

60

Petition for *Inter Partes* Review of
Patent No. 8,478,844

> **f.      Claim element 50[e]: "automatically discovering a plurality of network devices at the gateway and establishing communications between the security network and the plurality of network devices located at the facility"**

This limitation is substantively identical to claim element 49[d], which recites "*automatically discovering a plurality of network devices at the gateway and establishing communications between the gateway and the plurality of network devices*," except for two minor differences. The first difference between these limitations is that element 50[e] recites that communications are established between the network devices and the security network, as opposed to the gateway. However, the gateway is part of the security network so a POSITA would have understood that establishing communications with the gateway is the same as establishing communications with the security network. (Ex. 1002, ¶¶ 218-219.)

The second difference is that element 50[e] further recites that the network devices are "located at the facility." It is clear from the disclosure in Wimsatt that all of the controlled devices, including the IP cameras 109 (i.e., the claimed "plurality of network devices"), are located on the same premise as the control panel 101 (i.e., the claimed "gateway"). (*See, e.g.,* Ex. 1004, FIG. 1, ¶¶ 0012, 0024, 0034.) Otherwise, Wimsatt discloses this limitation for the same reasons discussed in **Part IX.C.18.e**.

Petition for *Inter Partes* Review of
Patent No. 8,478,844

> g.   Claim element 50[f]: "the gateway electronically integrating communications and functions of the plurality of network devices and the security system components into the gateway and the security network"

This limitation is substantively identical to claim element 48[b], which recites in part "*wherein the gateway electronically integrates communications and functions of the network devices and the security system components into the gateway and the security network.*" Thus, for the same reasons discussed in **Part IX.C.17.c**, Wimsatt in view of Johnson discloses this limitation.

> h.   Claim elements 50[g]-50[j]

As illustrated in the below chart, claim elements 50[g] to 50[j] are identical to claim elements 1[g] to 1[j]. Thus, for the same reasons discussed above in **Parts IX.C.1.h** to **IX.C.1.k**, Wimsatt in view of Johnson discloses claim elements 50[g] to 50[j].

|  | Claim 1 |  |  | Claim 50 |
|---|---|---|---|---|
| 1[g] | receiving at the gateway security data from the plurality of security system components, device data of the network devices, and remote data from the security server; | 50[g] |  | receiving at the gateway security data from the security system components, device data of the plurality of network devices, and remote data from the security server; |
| 1[h] | generating processed data by processing at the gateway the security data, the device data, and the remote data; | 50[h] |  | generating processed data by processing at the gateway the security data, the device data, and the remote data; |
| 1[i] | determining a state change of the security system using the processed data; and | 50[i] |  | determining a state change of the security system using the processed data; |

Petition for *Inter Partes* Review of
Patent No. 8,478,844

| 1[j] | maintaining at the security server with use of the processed data objects corresponding to the plurality of security system components and the network devices. | 50[j] | maintaining at the security server with use of the processed data objects corresponding to the plurality of security system components and the network devices; |
|------|------|------|------|

        **i.**    **Claim element 50[k]: "providing an interface by which a remote client device accesses the security network, the interface enabling communications with and control of the functions of the security system components and the plurality of network devices"**

Wimsatt and Johnson disclose this limitation. For example, Johnson

discloses that a homeowner can access a web page from a computer located outside

the home or building. (*See, e.g.,* Ex. 1005, Abstract ("An Internet based home

communications system for allowing a homeowner to monitor and control various

features of their home from a distant location via a global computer network"),

FIG. 1 (illustrating that the "user's computer" is remote from the home where the

control unit 30 and control devices 40 are located), 4:30-36, 5:29-39, 6:35-59.)

Johnson's web page is the claimed "interface" and the homeowner's computer is

the claimed "remote client device".

The web page in Johnson allows the homeowner to "monitor[] and

control[]" aspects of the security system and cameras using that web page. (Ex.

1005, 4:30-36, 5:29-39, 6:35-59.) These components are all part of the "security

network". Thus, the web page in Johnson "provid[es] an interface by which a

remote client device access the security network," as recited in this limitation.

63

Petition for *Inter Partes* Review of
Patent No. 8,478,844

Figure 3 of Johnson (shown below) is an illustration of the web page. Johnson explains that a homeowner can "modify any preprogrammed settings within the home" by "simply select[ing] the desired feature on the control page 76 of the desired home as shown in FIGS. 3 and 7." (Ex. 1005, 6:61-65.) "The homeowner may then enter the desired data into the computer 16 which is transmitted to the data center 20 which forwards the information directly to the control unit 30 which transmits the data accordingly modifying any previous settings." (Ex. 1005, 6:65-7:4.) When Wimsatt is modified by Johnson, the homeowner (or building administrator) is able to remotely communicate with and control the control panel 101 and the controlled devices in the same manner. (Ex. 1002, ¶ 222.)

Petition for *Inter Partes* Review of
Patent No. 8,478,844



A POSITA would have understood that the icons illustrated on the above

web page represent particular controlled devices located within the home in

Wimsatt. (Ex. 1002, ¶ 223.) For example, the icon labeled "camera" corresponds to

the IP cameras 109, and the icons labeled "door" and "window" correspond to door

sensors and window sensors, respectively. Thus, Wimsatt in view of Johnson

65

Petition for *Inter Partes* Review of
Patent No. 8,478,844

disclose this limitation. A POSITA would be motivated to combine Johnson with

Wimsatt for the reasons already discussed in **Part IX.C.1.b.ii**.

## X.   NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST

Patent Owner has not identified any evidence of secondary indicia of non-

obviousness for the '844 patent. Accordingly, there is no objective evidence of

non-obviousness that might warrant a finding that the Petitioned Claims are

patentable. (Ex. 1002, ¶ 224.)

## XI.   CONCLUSION

Petitioner respectfully requests that the Board institute *inter partes* review of

claims 25-40 and 42-50.


Dated: <u>September 30, 2016</u>

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
Tel: (703) 456-8000
Fax: (202) 842-7899

Respectfully submitted,
**COOLEY LLP**

By:   <u>  /Erik B. Milch/          </u>
Erik B. Milch
Reg. No. 42,887

66

Petition for *Inter Partes* Review of
Patent No. 8,478,844

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Petition complies with the type-volume limits of 37 C.F.R. § 42.24(a)(1)(i) because it contains 12,897 words, according to the word-processing system used to prepare this petition, excluding the parts of this Petition that are exempted by 37 C.F.R. § 42.24(a) (including the table of contents, mandatory notices, a certificate of service or this certificate word count, appendix of exhibits, and claim listings).

Dated: September 30, 2016

By:    /Erik B. Milch/
Erik B. Milch
Reg. No. 42,887

Petition for *Inter Partes* Review of
Patent No. 8,478,844

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.6(e) and 42.105(b), the undersigned certifies

that on September 30, 2016, a complete and entire copy of this **Petition for *Inter***

***Partes* Review of Patent No. 8,478,844**, including Exhibit Nos. 1001-1013 and a

Power of Attorney, was served via FEDERAL EXPRESS, costs prepaid, to the

Patent Owner by serving the correspondence address of record as follows:

> Richard Gregory Jr.
> Barbara Courtney
> IPR Law Group, PC
> 5338 Cornish Street
> Houston, TX 77007

A courtesy copy was also served via FEDERAL EXPRESS on the Patent Owner at

the following address:

> Ryan Smith
> Wilson Sonsini Goodrich & Rosati
> 650 Page Mill Road
> Palo Alto, CA 94304

By:    /Erik B. Milch/
       Erik B. Milch
       Reg. No. 42,887

EXHIBIT 7

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SecureNet Technologies, LLC,
Petitioner

v.

iControl Networks, Inc.,
Patent Owner

U.S. Patent No. 8,473,619
Filing Date: Aug. 11, 2008
Issue Date: June 25, 2013

Title: Forming a Security Network Including Integrated Security System
Components and Network Devices

———————————

*Inter Partes* Review No. _____

**Petition for *Inter Partes* Review of U.S. Patent No. 8,473,619**

i

**Table of Contents**

                                                                    **Page**

I.     INTRODUCTION ..................................................................................1

II.    MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1) .......................1

       A.    Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1) ...........................1

       B.    Related Matters Under 37 C.F.R. § 42.8(b)(2) ....................................1

       C.    Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3) ..................2

       D.    Service Information ..............................................................................2

       E.    Power of Attorney ................................................................................2

III.   PAYMENT OF FEES - 37 C.F.R. § 42.103 .........................................2

IV.    REQUIREMENTS FOR INTER PARTES REVIEW UNDER 37
       C.F.R. §§ 42.104 AND 42.108 ........................................................3

       A.    Grounds for Standing Under 37 C.F.R. § 42.104(a) ...........................3

       B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and
             Statement of Precise Relief Requested ................................................3

       C.    Threshold Requirement for Inter Partes Review 37 C.F.R. §
             42.108(c) ..............................................................................................3

V.     BACKGROUND OF TECHNOLOGY RELATED TO THE '619
       PATENT ...........................................................................................4

VI.    SUMMARY OF THE '619 PATENT ...................................................4

VII.   CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3) ..................4

       A.    Legal Overview .....................................................................................4

       B.    Proposed Claim Constructions .............................................................4

VIII.  PERSON HAVING ORDINARY SKILL IN THE ART & STATE
       OF THE ART .....................................................................................5

IX.    CLAIMS 1-9, 12-16, 19, 23-28, 32, 34, 42-47, 54-57 AND 59-62 OF
       THE '619 PATENT ARE UNPATENTABLE ..........................................5

       A.    Overview Of The Prior Art ...................................................................5

             1.    Overview of Wimsatt ..................................................................5

             2.    Overview of Johnson ..................................................................6

             3.    Overview of Severson ................................................................7

       B.    The Cited References Are Analogous Art .............................................7

i

## Table of Contents
### (continued)

                                                                                    **Page**

C.   Ground 1 – Claims 1-9, 12-16, 19, 23-28, 32, 34, 42-47, 54-57
     and 59-62 Are Obvious over Wimsatt in view of Johnson
     and/or Other Prior Art References Under 35 U.S.C. § 103(a).............7

     1.   Independent claim 1 – Ground 1..................................................7

     2.   Dependent claim 2 – Ground 1 ...............................................29

     3.   Dependent claim 3 – Ground 1 ...............................................31

     4.   Dependent claim 4 – Ground 1 ...............................................32

     5.   Dependent claim 5 – Ground 1 ...............................................32

     6.   Dependent claim 6 – Ground 1 ...............................................34

     7.   Dependent claim 7 – Ground 1 ...............................................36

     8.   Dependent claim 8 – Ground 1 ...............................................36

     9.   Dependent claim 9 – Ground 1 ...............................................37

     10.  Dependent claim 12 – Ground 1 .............................................37

     11.  Dependent claim 13 – Ground 1 .............................................38

     12.  Dependent claim 14 – Ground 1 .............................................38

     13.  Dependent claim 15 – Ground 1 .............................................40

     14.  Dependent claim 16 – Ground 1 .............................................41

     15.  Dependent claim 19 – Ground 1 .............................................43

     16.  Dependent claim 23 – Ground 1 .............................................43

     17.  Dependent claim 24 – Ground 1 .............................................44

     18.  Dependent claim 25 – Ground 1 .............................................45

     19.  Dependent claim 26 – Ground 1 .............................................45

     20.  Dependent claim 27 – Ground 1 .............................................46

     21.  Dependent claim 28 – Ground 1 .............................................46

     22.  Dependent claim 32 – Ground 1 .............................................47

     23.  Dependent claim 34 – Ground 1 .............................................47

     24.  Dependent claim 42 – Ground 1 .............................................48

     25.  Dependent claims 43 and 44 – Ground 1.............................48

## Table of Contents
(continued)

**Page**

26. Dependent claim 45 – Ground 1 ...............................................49

27. Dependent claim 46 – Ground 1 ...............................................49

28. Dependent claim 47 – Ground 1 ...............................................50

29. Dependent claim 54 – Ground 1 ...............................................51

30. Dependent claim 55 – Ground 1 ...............................................51

31. Dependent claim 56 – Ground 1 ...............................................53

32. Dependent claim 57 – Ground 1 ...............................................53

33. Dependent claim 59 – Ground 1 ...............................................54

34. Independent claim 60 – Ground 1 ............................................55

35. Independent claim 61 – Ground 1 ............................................58

36. Dependent claim 62 – Ground 1 ...............................................64

X.   NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST ...............................................................................................64

XI.   CONCLUSION.............................................................................64

**EXHIBITS**

| Exhibit No. | Description of Document |
|---|---|
| 1001 | U.S. Patent No. 8,473,619 ("the '619 patent") |
| 1002 | Declaration of James Parker |
| 1003 | File History for U.S. Patent No. 8,473,619 |
| 1004 | U.S. Patent Publication No. 2004/0260427 to Wimsatt ("Wimsatt") |
| 1005 | U.S. Patent No. 6,580,950 to Johnson et al. ("Johnson") |
| 1006 | U.S. Patent No. 4,951,029 to Severson ("Severson") |
| 1007 | U.S. Publication No. 2003/0062997 to Naidoo et al. ("Naidoo") |
| 1008 | U.S. Patent No. 6,748,343 to Alexander et al. ("Alexander") |
| 1009 | U.S. Publication No. 2003/0137426 to Anthony et al. ("Anthony") |
| 1010 | Installation Instructions for PC5401 Data Interface Module (2004) |
| 1011 | "Understanding Universal Plug and Play," White Paper, Microsoft (2000) |
| 1012 | Waiver of Service, *iControl Networks, Inc. v. SecureNet Techns., LLC*, No. 15-807-GMS,  (D. Del. Sept. 30, 2015), ECF No. 5 |
| 1013 | *Curriculum Vitae* of James Parker |

Petition for *Inter Partes* Review of
Patent No. 8,473,619

## I.   INTRODUCTION

SecureNet Technologies, LLC ("Petitioner" or "SecureNet") petitions for

*inter partes* review ("IPR") under 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42 of

claims 1-9, 12-16, 19, 23-28, 32, 34, 42-47, 54-57 and 59-62 ("the Petitioned

Claims") of U.S. Patent No. 8,473,619 ("the '619 patent") (Ex. 1001).

## II.   MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A.   Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1)

SecureNet Technologies, LLC is the real party-in-interest.

### B.   Related Matters Under 37 C.F.R. § 42.8(b)(2)

The '619 patent is asserted in *iControl Networks, Inc. v. SecureNet

Technologies, LLC*, No. 15-807-GMS (D. Del.), which was filed on September 11,

2015.[1]

Petitioner is also concurrently filing an IPR petition covering claims 1-6, 14-

46, 49-58 and 60-61 of U.S. Patent No. 8,073,931, which is assigned to the Patent

Owner and claims priority to same applications as the '619 patent. Petitioner is

also concurrently filing two IPR petitions covering claims 1-4, 6-50 of U.S. Patent

---

[1] iControl Networks, Inc. ("Patent Owner" or "iControl") filed a Waiver of Service

in that case on September 30, 2015 (Ex. 1012). Based on the PTAB-designated

informative decision docketed as Case No. IPR2013-00010 (Paper 20) (January 30,

2013), this Petition is being timely filed.

1

Petition for *Inter Partes* Review of
Patent No. 8,473,619

No. 8,478,844 ("the '844 patent"), which is assigned to the Patent Owner and is the

child patent to the '619 patent. Petitioner is also concurrently filing an IPR petition

for claims 25-40 and 42-50 of the '844 patent.

Petitioner is not aware of any other judicial or administrative matters that

would affect, or be affected by, a decision in this proceeding.

### C. Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

**Lead Counsel:** Erik B. Milch (Reg. No. 42,887) / emilch@cooley.com
**Back-up Counsel:**
Jennifer Volk (Reg. No. 62,305) / jvolkfortier@cooley.com
Frank Pietrantonio (Reg. No. 32,289) / fpietrantonio@cooley.com
zSecureNetIPR@cooley.com
zpatdcdocketing@cooley.com
Cooley LLP ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700 Washington, DC 20004
Tel: (703) 456-8573 Fax: (703) 456-8100

### D. Service Information

The Petition is being served by FEDERAL EXPRESS to the '619 Patent

Owner's attorneys of record, IPR Law Group, PC and the known outside counsel

to Patent Owner, Wilson Sonsini Goodrich & Rosati. Petitioner consents to service

by e-mail at the addresses provided above.

### E. Power of Attorney

Filed concurrently with this petition per 37 C.F.R. § 42.10(b).

### III. PAYMENT OF FEES - 37 C.F.R. § 42.103

This Petition requests review of claims 1-9, 12-16, 19, 23-28, 32, 34, 42-47,

54-57 and 59-62 (a total of 37 claims) of the '619 patent and is accompanied by a

2

Petition for *Inter Partes* Review of
Patent No. 8,473,619

payment of $35,200.  37 C.F.R. § 42.15. This Petition meets the fee requirements

of 35 U.S.C. § 312(a)(1).

**IV.    REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108**

    **A.    Grounds for Standing Under 37 C.F.R. § 42.104(a)**

Petitioner certifies that the '619 patent is eligible for IPR and further

certifies that Petitioner is not barred or estopped from requesting IPR.

    **B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested**

Petitioner requests that the Board institute *inter partes* review of claims 1-9,

12-16, 19, 23-28, 32, 34, 42-47, 54-57 and 59-62 of the '619 patent and requests

that each claim be found unpatentable as obvious under 35 U.S.C. § 103(a) on the

following ground:

| Ground | '619 Claim(s) | Basis for Challenge |
|--------|---------------|---------------------|
| 1. | 1-9, 12-16, 19, 23-28, 32, 34, 42-47, 54-57, 59-62 | Obvious over Wimsatt in view of Johnson and Severson under 35 U.S.C. § 103(a) |

This petition is accompanied by the Declaration of James Parker (Ex. 1002,

"Mr. Parker"), an expert in the field.

    **C.    Threshold Requirement for *Inter Partes* Review 37 C.F.R. § 42.108(c)**

*Inter partes* review of claims 1-9, 12-16, 19, 23-28, 32, 34, 42-47, 54-57 and

59-62 should be instituted because this Petition establishes a reasonable likelihood

3

Petition for *Inter Partes* Review of
Patent No. 8,473,619

that Petitioner will prevail with respect to each of the claims challenged. 35 U.S.C.

§ 314(a).

## V.    BACKGROUND OF TECHNOLOGY RELATED TO THE '619 PATENT

Mr. Parker provides a technology tutorial in his declaration. (Ex. 1002, ¶¶

30-57.)

## VI.    SUMMARY OF THE '619 PATENT

The '619 patent was filed on August 11, 2008 and claims priority to a

divisional application and a long list of continuation-in-part applications and

provisional applications, the earliest of which has a filing date of March 16, 2005.

(Ex. 1001.) For purposes of this proceeding, we assume that the earliest possible

priority date of the '619 patent is March 16, 2005. We reserve the right to dispute

this priority date at a later time or in another proceeding.

## VII.    CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(b)(3)

### A.    Legal Overview

A claim subject to IPR is given its "broadest reasonable construction in light

of the specification of the patent in which it appears."[2] 37 C.F.R. § 42.100(b).

### B.    Proposed Claim Constructions

---

[2] Petitioners reserve the right to pursue different constructions in litigation. *In re
Zletz,* 893 F.2d 319, 321 (Fed. Cir. 1989).

4

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Petitioner does not propose any claim constructions for this proceeding. All claim terms and clauses should be given their plain and ordinary meaning as understood by a person of ordinary skill in the art ("POSITA"). (*See* Ex. 1002, ¶¶ 59.)

## VIII. PERSON HAVING ORDINARY SKILL IN THE ART & STATE OF THE ART

The '619 patent is directed to integrated security systems that are capable of being remotely accessed and controlled. (Ex. 1002, ¶¶ 17-24.) At the time of the alleged invention, a POSITA as of 2005 would hold a bachelor's degree or the equivalent in electrical engineering (or related academic fields) and at least three years of additional work experience in the area of digital and/or telecommunication system design, as applicable to safety and security systems, or equivalent work experience. (*Id.*, ¶ 19.)

## IX. CLAIMS 1-9, 12-16, 19, 23-28, 32, 34, 42-47, 54-57 AND 59-62 OF THE '619 PATENT ARE UNPATENTABLE

As detailed in the sections below, claims 1-9, 12-16, 19, 23-28, 32, 34, 42-47, 54-57 and 59-62 of the '619 patent are obvious in light of Wimsatt in view of Johnson and/or one or more other prior art references cited below.

### A. Overview Of The Prior Art

#### 1. Overview of Wimsatt

Wimsatt published on December 23, 2004 and therefore qualifies as prior art under 35 U.S.C. § 102(a). The patent issuing from Wimsatt was cited by Patent

5

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Owner in an Information Disclosure Statement (IDS) during prosecution of the

'619 patent but it was never applied against the claims.

Wimsatt describes a home automation system having a control panel 101

that is connected to a number of co-located devices, called "controlled devices",

which manage already-existing systems, such as lighting systems or security

systems. (Ex. 1004, ¶ 0023.) The control panel 101 displays an interactive

graphical user interface (GUI) that allows the user (e.g., homeowner) to control the

controlled devices. (*Id.*, ¶ 0022; Ex. 1002, ¶¶ 61-64.)

### 2.    Overview of Johnson

Johnson issued on June 17, 2003 and therefore qualifies as prior art under 35

U.S.C. § 102(b). Johnson was cited by Patent Owner in an IDS during prosecution

of the '619 patent but it was never applied against the claims.

Johnson discloses an "Internet based home communications system for

allowing a homeowner to monitor and control various features of their home from

a distant location via a global computer network." (Ex. 1005, Abstract.) For

example, Johnson provides a website where homeowners can log in to access,

monitor and control a home's security system, lighting system, exterior cameras

and the like. (*Id.*, 2:8-28, 6:35-59.) The web site is provided through one or more

data center 20 servers that are located remotely from the home. (*Id.*, 4:15-53.)

6

Petition for *Inter Partes* Review of
Patent No. 8,473,619

### 3.    Overview of Severson

Severson issued on August 21, 1990 and therefore qualifies as prior art under 35 U.S.C. § 102(b). Severson discloses a home security system controller that automatically discovers newly-added sensors its security network. (Ex. 1006, 23:60-26:7; Ex. 1002, ¶¶ 70-72.)

### B.    The Cited References Are Analogous Art

As indicated in the section above and as explained in Mr. Parker's declaration, each of the prior art references combined in this Petition is analogous art to the '619 patent and to each other, as each reference is in the same field of endeavor as the '619 patent. (Ex. 1002, ¶ 76.)

### C.    Ground 1 – Claims 1-9, 12-16, 19, 23-28, 32, 34, 42-47, 54-57 and 59-62 Are Obvious over Wimsatt in view of Johnson and/or Other Prior Art References Under 35 U.S.C. § 103(a)

Claims 1-9, 12-16, 19, 23-28, 32, 34, 42-47, 54-57 and 59-62 are rendered obvious under 35 U.S.C. § 103(a) for the reasons that follow.

### 1.    Independent claim 1 – Ground 1

#### a.    Preamble: "A system comprising"

For the reasons discussed in the following sections, Wimsatt in view of Johnson and Severson discloses all the elements of the claimed system.

7

Petition for *Inter Partes* Review of
Patent No. 8,473,619

>        **b.      Claim element 1[a]: "a gateway located at a first location"**

Wimsatt discloses a control panel 101 that is mounted within a user's home at a central location. (Ex. 1004, ¶ 0034.) The control panel 101 is the claimed "gateway" and the user's home is the claimed "first location."

>        **c.      Claim element 1[b]: "a connection management component coupled to the gateway and automatically establishing a wireless coupling with a security system installed at the first location"**

Wimsatt discloses this limitation in its entirety. For clarity, this limitation is divided into two parts and discussed separately.

>              **i.      "a connection management component coupled to the gateway …"**

A POSITA would understand that the "connection management component" (referred to also throughout as "CMC") would be a module implemented by a processor to carry out the claimed operations. (Ex. 1002, ¶ 80.) A POSITA would also have understood that the control panel 101 in Wimsatt must also include a module to perform the discovery and connection processes that it describes and, thus, the control panel 101 in Wimsatt must indeed include the "connection management component" that would be responsible for the claimed couplings of the system. (Ex. 1002, ¶ 80.) Because the CMC is implemented by the control panel 101 (via its processor 201), Wimsatt discloses that the CMC is coupled to the control panel 101.

Petition for *Inter Partes* Review of
Patent No. 8,473,619

> ii. **"a connection management component … automatically establishing a wireless coupling with a security system installed at the first location"**

Wimsatt discloses that the user's home (i.e., the claimed "first location") includes a security system. (*See, e.g.,* Ex. 1004, ¶ 0005 ("Home automation systems may be integrated with a home security system"), ¶ 0012 (describing a home automation system that controls "security systems"), ¶ 0023 (explaining that the "invention is particularly useful in home automation environments because it builds on top of the vast array of controlled devices and subsystems that already exist for managing … security systems"), ¶¶ 0029-0031 ("tripping a zone on a burglar alarm … may indicate a household member [is] entering the house"), ¶¶ 0043, 0057-0058, 0062, 0065, 0073-0074.)

Wimsatt discloses that its control panel 101 can implement a "system discovery process." A POSITA would have understood that the CMC module performs this process. (Ex. 1002, ¶¶ 82-83.) According to Wimsatt, "[w]hen a control panel 101 is coupled to a controlled device or subsystem, it interrogates that device or subsystem to learn details of the control interface of that particular system." (Ex. 1004, ¶ 0045.) "This interrogation may simply be a matter of determining the controller type in which case the control panel 101 can look up a command set and signaling protocol information for that controller type." (*Id.*) Wimsatt also explains that when the interrogation process does not work correctly,

9

Petition for *Inter Partes* Review of
Patent No. 8,473,619

"the control panel can be **manually or semi-automatically** programmed to support that controlled device or subsystem." (*Id.* (emphasis added)) This last passage indicates that the interrogation process is automatic (i.e., the control panel 101 automatically discovers the controlled devices) because manual or semi-automatic programming is only performed when the automatic interrogation fails. (*See also,* Ex. 1004, ¶ 0006 (describing the difficulties of manually adding devices to a network).) Per this disclosure, the control panel 101 can automatically discover the home security system when the home security system is coupled to the control panel 101.

Wimsatt further discloses that its control panel 101 can be wireless (referred to as "control panel 107") and can wirelessly communicate with any of the controlled devices of the security system as a result of the above discovery process (e.g., because it now has the signaling protocol information needed for communication). (Ex. 1004, ¶¶ 0037, 0043.)

<blockquote>d.    <b>Claim element 1[c]: "the security system including security system components"</b></blockquote>

The '619 patent discloses that "security system components" can be sensors or any other components "belonging to the security system." (Ex. 1001, 4:40-45.) While Wimsatt does not illustrate sensors in its security system, a POSITA would have understood that the security system indeed includes sensors. (Ex. 1002, ¶ 85.) Wimsatt discloses at paragraph [0031] that "tripping a zone on a burglar alarm …

10

Petition for *Inter Partes* Review of
Patent No. 8,473,619

causes the control units to display a security screen having controls that allow the alarm to be de-activated." (Ex. 1004, ¶ 0031.) A POSITA would have understood that a "burglar alarm" is a security system and that at least one sensor is located within each zone of the house. (Ex. 1002, ¶ 85.) It is this sensor (or sensors) that is "tripped" and sets off an alarm. Thus, sensors are inherent in Wimsatt.

To the extent Patent Owner disagrees, it would be obvious from Wimsatt that its security system includes sensors. It was well known at the time of the '619 patent that home security systems came equipped with multiple sensors (e.g., motion sensors, door sensors, window sensors, etc.) that could be mounted at various locations throughout a home. (Ex. 1002, ¶ 86.) As Mr. Parker explains in his declaration, sensors are the "eyes" of a home security system. (*Id.*) Without sensors, a home security system is blind and cannot function. (*Id.*)

To the extent the Patent Owner further argues that a more specific disclosure of sensors is required, Johnson has that disclosure. As illustrated in the below excerpted and annotated Figure 5 of Johnson, the security system 60 includes "security sensors." (*See also,* Ex. 1004, FIG. 3 (illustrating icons for well-known components of a home security system, e.g., a door sensor, a window sensor and a smoke alarm).)

11

Petition for *Inter Partes* Review of
Patent No. 8,473,619



FIG. 5

While a POSITA would have understood that Wimsatt already indicates the presence of sensors, it would be obvious to modify Wimsatt to include the plurality of security sensors disclosed in Johnson to make this disclosure more explicit. (Ex. 1002, ¶ 88.)

12

Petition for *Inter Partes* Review of
Patent No. 8,473,619

> **e.    Claim element 1[d]: "wherein the connection management component forms a security network by automatically discovering the security system components and integrating communications and functions of the security system components into the security network"**

For clarity, this limitation is divided into three parts and discussed separately. Petitioner discusses "form[ing] a security network" last because it is the end result of "automatically discovering" and "integrating" the devices.

> **i.    "the connection management component … automatically discovering the security system components"**

Wimsatt discloses that its control panel 101, including the connection management component, can implement a "system discovery process" as described above with respect to how Wimsatt also discloses element 1[b]. According to Wimsatt, "[w]hen a control panel 101 is coupled to a controlled device or subsystem, it interrogates that device or subsystem to learn details of the control interface of that particular system." (Ex. 1004, ¶ 0045.) Wimsatt also explains that when the interrogation process does not work correctly, "the control panel can be **manually or semi-automatically** programmed to support that controlled device or subsystem." (*Id.* (emphasis added)) This last passage indicates that the interrogation process is automatic (i.e., the control panel 101 automatically discovers the controlled devices) because manual or semi-automatic programming is only performed when the automatic interrogation fails. (*See also,* Ex. 1004, ¶

13

Petition for *Inter Partes* Review of
Patent No. 8,473,619

0006 (describing the difficulties of manually adding devices to a network).) Per

this disclosure, the control panel 101 can automatically discover the home security

system when the home security system is coupled to the control panel 101.

Wimsatt also discloses that its control panel 101 implements "Universal

Plug-and-Play (UPnP™) processes." (Ex. 1004, ¶ 0054.) It was well known at the

time of the '844 patent that UPnP™ was used to auto-discover 2-way devices

connected to a shared network. (Ex. 1002, ¶ 91 (citing to Ex. 1011, 7).)

Wimsatt does not explicitly disclose that its security system's sensors are

automatically discovered using this process – it only explicitly discloses that the

"security system" is discovered. A POSITA would have understood that

discovering the security system would also include discovering its sensors. (Ex.

1002, ¶ 92.) To the extent Patent Owner disputes this, Severson discloses a security

system that includes a controller and a plurality of sensors. (Ex. 1006, FIG. 1, 4:3-

29.) Severson explains that "without human intervention" "each system controller

may be operated to 'self-learn' each of its sensors." (Ex. 1006, 25:3-13.) In

describing a system installation process, Severson explains that the sensors and

controller are mounted at the home and then "the controller is enabled and self-

learns each of its sensors/transducers as they report their status." (Ex. 1006, 25:51-

26:7; *see also, id.*, 23:60-25:50.) As a result, "[i]nstallation time is thereby reduced

with minimal potential installer error, due to the CPU self-learning its reporting

14

Petition for *Inter Partes* Review of
Patent No. 8,473,619

sensors." (*Id.*, 25:51-26:7.) This is similar to the auto-discovery process described in the '619 patent. (*See, e.g.,* Ex. 1001, FIG. 14, 24:66-26:5.)

**_Motivation to Combine Severson with Wimsatt and Johnson:_** It would be obvious to a POSITA to combine the auto-discovery disclosure with Wimsatt and Johnson so that the control panel 101 in Wimsatt can auto-discover the security sensors in addition to the discovering the security system controller. (Ex. 1002, ¶ 93.) This would predictably result in an easier sensor installation process and reduce the likelihood of installer error. (Ex. 1002, ¶ 93; *see also,* Ex. 1006, 26:5-7.)

As previously discussed, Wimsatt already discloses an automatic discovery process for learning the security system so it would be obvious to a POSITA to further discover the sensors that form part of that system. (Ex. 1004, ¶ 0045; Ex. 1002, ¶ 94.) A POSITA would understand that the control panel 101 would want to "discover" all of the devices that it and the data center 20 server in Johnson controls. Severson illustrates the ability and desire for similar controllers to automatically discover devices at the security component level. A POSITA would understand that adding an extra step in the automatic discovery process to include discovery of the sensors would be easy to implement. (Ex. 1002, ¶ 94.)

> **ii.    "the connection management component … integrating communications and functions of the security system components into the security network"**

As background, Wimsatt discloses a home automation system. The purpose

15

Petition for *Inter Partes* Review of
Patent No. 8,473,619

of a home automation system, in general, is to communicate with and control the functionality of multiple home-based devices such as lighting, heating and air conditioning, media equipment, and security systems. (Ex. 1004, ¶¶ 0005-0006.) In its background section, Wimsatt provides an example of how such systems were known to operate with home security systems: "Home automation systems may be integrated with a home security system so that when a fire alarm is raised, for example, internal and external lights will be turned on." (Ex. 1004, ¶ 0005.) In other words, it was well known at the time of the '619 patent that home automation systems communicated with home-based devices (such as the lights in the above example) and controlled their functionality (i.e., the system commanded the lights to "turn on"). Thus, the general concept of integrating communications and functions of home-based devices into a home automation system was well known long before the earliest priority date of the '619 patent. (Ex. 1002, ¶ 95.)

Looking at Wimsatt's system specifically, the control panel 101, including the connection management component, "integrat[es]" communications and functions of its home-based control devices through the system discovery process discussed above. (*See, e.g.,* Ex. 1004, ¶ 0045.) Through this discovery process, the control panel 101 is able to "learn" various details about the controlled device, such as its command set, signaling protocol information, and the functionality available for that device. (Ex. 1004, ¶ 0046.) The control panel 101 is then able to

16

Petition for *Inter Partes* Review of
Patent No. 8,473,619

communicate with and control the functions of that device.

Wimsatt identifies the home's security system as one type of controlled device. (*See, e.g.,* Ex. 1004, ¶¶ 0012, 0029, 0058.) The specification also states that "control application software executes on the control unit to communicate control information such as commands, ***sensor messages***, status messages, and the like with … controlled systems (e.g., ***security systems*** …)." (*Id.* (emphasis added).) It further explains that this software "may enable features of the security system to be enabled/disabled." (Ex. 1004, ¶ 0058.) A POSITA would have understood that controlling features of a security system would include controlling features (i.e., functions) of the security system's sensors via the home's security system. (Ex. 1002, ¶ 97.) The control panel 101 would not otherwise have the ability to control or communicate with the devices if it had not discovered the devices and integrated their functionality into itself and the overall system. Thus, this portion of the limitation is satisfied by Wimsatt, Johnson and Severson.

>     iii.    **"the connection management component forms a security network …"**

A POSITA would have understood that the claimed "security network" is formed in Wimsatt (as modified by Johnson and Severson) as a result of the control panel's CMC integrating the functions of the security system sensors. (Ex. 1002, ¶¶ 98-100.) Wimsatt actually refers to its overall network more generically as a "home automation system" because its control panel 101 integrates the

17

Petition for *Inter Partes* Review of
Patent No. 8,473,619

functions of many other types of home-based control devices, in addition to security-related devices. (*See, e.g.,* Ex. 1004, ¶¶ 0005, 0012.) But, a POSITA would have understood that this home automation system includes a security network, which is specific to the security-related devices. (Ex. 1002, ¶¶ 98-100.)

> **f.      Claim element 1[e]: "a security server at a second location different from the first location, wherein the security server is coupled to the gateway"**

This limitation is disclosed by Wimsatt and Johnson. Petitioner relies on Johnson for disclosing a remotely located server coupled to a control panel. (*See also*, Ex. 1002, ¶ 101.) Johnson discloses a control unit 30 that is similar to panel 101 in Wimsatt and that is located within a user's home. (Ex. 1005, 4:15-39.) Control unit 30 in Johnson is coupled to a remotely located data center 20 via a global computer network 12. (*Id.*) Johnson explains that its data center 20 comprises "**one** or more server computers" that are "capable of receiving, storing and transmitting various types of data related to the homeowner's home," including security data. (Ex. 1005, 4:40-53 (emphasis added); *see also, id.*, 4:16-39.) This data center 20 server is the claimed "security server." The data center 20 server in Johnson is located remotely from the user's home and is thus "in a second location different from the first location." (*See*, Ex. 1005, FIG. 5.)

*__Motivation to Combine Johnson with Wimsatt and Severson:__* It would be obvious to a POSITA to combine Johnson with Wimsatt and Severson so that

18

Petition for *Inter Partes* Review of
Patent No. 8,473,619

panel 101 in Wimsatt is coupled to data center 20 server in Johnson. (Ex. 1002, ¶ 102.) As a result of this coupling, the control panel 101 can be remotely accessed and controlled through data center 20 server as described in Johnson. (*Id.*) Johnson specifically improves upon panel 101 in Wimsatt and explains that "[o]ur society has become extremely mobile with the reduced expense and ease of travel leaving many homes unattended while the homeowner is traveling or at work" (Ex. 1005, 1:14-16) and that "there is a need for a home monitoring system that allows a homeowner to monitor their home from a distant location." (*Id.*, 1:14-25.) Coupling panel 101 in Wimsatt to remotely located data center 20 server would allow for such remote monitoring and control. (Ex. 1002, ¶¶ 102-103.)

A POSITA would be further motivated to combine Johnson with Wimsatt because control unit 30 in Johnson is similar to panel 101 in Wimsatt. (Ex. 1002, ¶ 103.) Control unit 30 and panel 101 are systems that integrate functionality from multiple subsystems (e.g., security systems, lighting systems, entertainment systems, surveillance systems, etc.) into a single controller for user control and convenience. (*See, e.g.,* Ex. 1004, ¶¶ 0022-0023; Ex. 1005, 4:16-39.) Furthermore, panel 101 in Wimsatt is already connected to the Internet so it would be an easy task for the panels to connect with data center 20 server in Johnson. (Ex. 1002, ¶ 103.) The end result would be a system that allows a homeowner to directly control aspects of the panels (and their subsystems) from remote locations similar to

19

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Johnson. A POSITA would be motivated to combine Wimsatt and Johnson with

Severson for the reasons discussed above. (Ex. 1002, ¶ 103.)

> **g.    Claim element 1[f]: "wherein the gateway receives security data from the security system components, device data of a plurality of network devices coupled to a local network of the first location that is independent of the security network, and remote data from the security server,"**

Wimsatt and Johnson disclose this limitation. In general, Wimsatt discloses

that its control panel 101 receives "status signals" from the controlled devices. (Ex.

1004, ¶ 0044.) The controlled devices include, for example, IP cameras and the

home's security system.

With respect to the security system's sensors specifically, Wimsatt discloses

several scenarios where a burglar alarm (i.e., one or more sensors) is triggered,

causing the control panel 101 to sound an alarm. (Ex. 1004, ¶¶ 0030-0031, 0059.)

A POSITA would have understood that, in these particular scenarios, the status of

the security system's sensors is sent to the control panel 101 in some form. (Ex.

1002, ¶ 105; *see also,* Ex. 1004, ¶¶ 0044, 0056, 0059; *compare to* Ex. 1001, 27:5-

10.) Thus, it would be obvious to a POSITA that the control panel 101 in Wimsatt

receives "security data" from the security system sensors. (Ex. 1002, ¶ 105.)

With respect to the "network devices", the '619 patent discloses that these

can be IP cameras. (*See, e.g.,* Ex. 1001, 14:20-27, FIG. 5.) Wimsatt discloses IP

cameras 109. (Ex. 1004, ¶¶ 0038, 0072 ("one or more monitor cameras such as IP

20

Petition for *Inter Partes* Review of
Patent No. 8,473,619

camera 109").) As just discussed, the control panel 101 in Wimsatt receives "status signals" from the IP cameras. (Ex. 1004, ¶ 0044; *see also, id.*, ¶ 0038 (explaining that IP cameras "communicate control messages with a network-coupled control panel 101"), ¶ 0056 (describing "control messages" as "including command and status messages").) Wimsatt also discloses that the control panel 101 receives a streaming input from the IP cameras. (Ex. 1004, ¶¶ 0072, 0075, FIG. 6.) It further discloses that the control panel 101 receives details about the IP cameras (e.g., signaling protocol information) as part of the discovery process. (Ex. 1004, ¶ 0045.) Thus, Wimsatt clearly discloses that its control panel 101 receives "device data of the network devices" as recited in this limitation.

Wimsatt further discloses that the IP cameras are coupled to a local area network (LAN) via a hub 103, which is described as implementing an Ethernet connection among the system devices. (Ex. 1004, ¶ 0036, FIG. 1.) It is well known that Ethernet connections form LANs. (Ex. 1002, ¶ 107.). The hub 103 in Wimsatt is located within the home and therefore the LAN is also located at the "first location." (*See, e.g.,* Ex. 1004, ¶¶ 0036, 0038, 0040 (each passage describing physical couplings between the hub 103 and system devices located within the home indicating the hub's physical presence within the home).) Because the IP cameras 109 are coupled to the hub 103 and not the control panel 101 in Wimsatt, the IP cameras can be considered part of a "local network" that is independent

21

Petition for *Inter Partes* Review of
Patent No. 8,473,619

from the "security network" which consists of the security system and the sensors with which it directly communicates. (Ex. 1002, ¶ 107.) Thus, Wimsatt discloses that its IP cameras are coupled to a local network that is independent from the security network.

With respect to the security server and "remote data", as previously discussed, it would have been obvious to a POSITA to modify Wimsatt so that the control panel 101 is coupled to the data center 20 server in Johnson (i.e., the claimed "security server"). *See* **Part IX.C.1.f** above. Johnson discloses that its control unit 30 "may [] download any data from the data center 20 such as commands from the homeowner." (Ex. 1005, 5:13-18; *see also, id.*, 6:65-7:2, 7:67-8:4.) This data is "remote data" as claimed. It would have been obvious to modify the control panel 101 in Wimsatt so that it receives data from the remotely-located data center 20 server in the same manner described for the control unit 30 in Johnson. (Ex. 1002, ¶ 108.) As such, a homeowner in Wimsatt would be able to remotely control the control panel 101 and the networked controlled devices through the data center 20 server as described in Johnson. (*Id.*) The motivations to combine Wimsatt, Johnson and Severson discussed above in **Part IX.C.1.f** apply here. Thus, Wimsatt (as modified by Johnson and Severson) discloses that its control panel 101 receives "remote data from the security server" as recited in this limitation.

22

Petition for *Inter Partes* Review of
Patent No. 8,473,619

> h.    **Claim element 1[g]: "wherein the gateway generates processed data by processing at the gateway the security data, the device data, and the remote data,"**

Wimsatt and Johnson disclose this limitation. The control panel 101 in Wimsatt includes a processor 201 that "implements data processing functionality for accessing and manipulating data from various subsystems and memory." (Ex. 1004, ¶ 0047.) Thus, it would be obvious for this processor 201 to generate "processed data" by processing the "security data" from the security system sensors, the "device data" from the IP cameras, and the "remote data" from the data center 20 server in Johnson. (Ex. 1002, ¶ 109.)

With respect to the "security data", as previously discussed, when one or more security system sensors are activated (e.g., a burglar alarm is triggered), the sensors transmit a "status signal" that is received at the control unit 101. (*See, e.g.,* Ex. 1004, ¶¶ 0030-0031, 0059.) According to Wimsatt, the control panel's processor 201 includes a message broker process that receives this status signal, interprets it, and then passes it to the security plug-in for further processing. (Ex. 1004, ¶¶ 0044, 0056, 0058-0059.)  If the security plug-in (executed by the processor 201) determines that the received "security data" indicates an intrusion, it activates the necessary audio plug-in to sound an alarm on the control panel 101. (Ex. 1004, ¶ 0059.) Thus, the "security data" is "processed" by the control panel's processor 201.

23

Petition for *Inter Partes* Review of
Patent No. 8,473,619

With respect to the "device data", a POSITA would understand that any status signal from the IP cameras 109 would be processed by the processor 201 in a manner similar to that described above for the "security data". (Ex. 1002, ¶ 111.) Any streamed input received at the control panel 101 from the IP cameras 109 would also necessarily require processing. (Ex. 1002, ¶ 111.) Furthermore, when the "device data" is, for example, the signaling protocol information received by the control panel 101 as part of the IP camera discovery process, a POSITA would have understood that this information is processed by the processor 201 because the processor 201 uses this information to generate messages that can be communicated to the IP camera via that protocol. (Ex. 1002, ¶ 111; *see also,* Ex. 1004, ¶¶ 0038, 0045, 0054.)

Finally, with respect to the "remote data", as previously discussed, when the control panel 101 in Wimsatt is modified by Johnson, the control panel 101 is capable of receiving data from a remotely-located data center 20 server. *See* **Part IX.C.1.g** above. The data can be, for example, commands entered by a homeowner instructing the control panel 101 to change one or more settings on a controlled device (e.g., the home security system). (*See, e.g.,* Ex. 1005, 4:15-53.) A POSITA would understand that data received at the control unit 101 from data center 20 server would be processed by the control unit's processor 201 so that the data can be interpreted and the appropriate actions taken by the control unit 101 to modify

24

Petition for *Inter Partes* Review of
Patent No. 8,473,619

the settings of the particular controlled device. (Ex. 1002, ¶ 112.) The same

motivations to combine Wimsatt and Johnson discussed in **Part IX.C.1.f** apply

here.

> i. **Claim element 1[h]: "wherein the gateway determines a state change of the security system using the processed data and maintains objects at the security server using the processed data, wherein the objects correspond to the security system components and the plurality of network devices"**

Wimsatt and Johnson disclose this limitation in its entirety. For clarity, this

limitation is divided into two parts and discussed separately.

> i. **"wherein the gateway determines a state change of the security system using the processed data …"**

Wimsatt and Johnson also disclose this limitation. Wimsatt discloses that the

control panel 101 can be used to arm and disarm the home's security system. (Ex.

1004, ¶¶ 0065-0066, 0070-0071, 0074.) When Wimsatt is modified by Johnson, a

homeowner can control this functionality remotely through the data center 20

server. For example, if the status (or "state") of the security system (and its

sensors) is "unarmed", then the homeowner can send a command signal though the

data center 20 server to the control panel 101 instructing the control panel 101 to

change the status (or "state") of the security system (and its sensors) to "armed".

(Ex. 1002, ¶¶ 114-115.) A POSITA would have understood that the control panel

101 in Wimsatt must process this "remote data" from the data center 20 server to

25

Petition for *Inter Partes* Review of
Patent No. 8,473,619

determine what command needs to be implemented. (*Id.*) Here, upon processing,

the control panel 101 would have determined that the status (or "state") of the

home security system needs to be changed from "unarmed" to "armed." (*Id.*)

> ii.    **"wherein the gateway … maintains objects at the security server using the processed data, wherein the objects correspond to the security system components and the plurality of network devices"**

The '619 patent explains that the remote security server "provide[s] access

to, and management of, the objects associated with an integrated security system."

(Ex. 1001, 8:29-41.) It further explains that "every **object** monitored by the

gateway 102 is called a **device**." (*Id.* (emphasis added)) "Devices include the

sensors, cameras, home security panels and automation devices." (*Id.*)

Wimsatt and Johnson disclose the above limitation consistent with this

disclosure in the '619 patent. As shown below in Figure 3 of Johnson, the

homeowner accesses a web page "displayed by the data center 20" and can

"monitor[] and control[]" aspects of the security system and cameras using that

web page. (Ex. 1005, 4:30-36, 5:29-39, 6:35-59.)

26

Petition for *Inter Partes* Review of
Patent No. 8,473,619



Johnson explains that a homeowner can "modify any preprogrammed settings within the home" by "simply select[ing] the desired feature on the control page 76 of the desired home as shown in FIGS. 3 and 7." (Ex. 1005, 6:61-65.) "The homeowner may then enter the desired data into the computer 16 which is transmitted to the data center 20 which forwards the information directly to the control unit 30 which transmits the data accordingly modifying any previous

27

Petition for *Inter Partes* Review of
Patent No. 8,473,619

settings." (Ex. 1005, 6:65-7:4.) When Wimsatt is modified by Johnson, the homeowner is able to remotely control the control panel 101 and the controlled devices in the same manner. (Ex. 1002, ¶ 118.)

A POSITA would have understood that the icons illustrated on the above web page represent particular controlled devices located within the home in Wimsatt. (Ex. 1002, ¶ 119.) These icons are the claimed "objects" maintained and stored at the data center 20 servers. For example, the icon labeled "camera" is an object at the server corresponding to the IP cameras 109. Similarly, the icons labeled "door" and "window" are objects at the server corresponding to a door sensor and a window sensor, respectively.

A POSITA would have also understood that the data center 20 server maintains the status of each of these objects (corresponding to the camera, window and door sensors) using the processed data it receives from the control panel 101, as discussed in **Part IX.C.1.h** above. (Ex. 1002, ¶ 120.) As Mr. Parker explains in his declaration, it would be difficult to change a device's settings without knowing the current status of that device. (Ex. 1002, ¶ 120; *see also,* Ex. 1005, 7:6-8.) Thus, it would be obvious to a POSITA to conclude that the control panel 101 in Wimsatt transmits the processed security data and device data to the data center 20 server so that the web page displayed for the homeowner has the most up-to-date

28

Petition for *Inter Partes* Review of
Patent No. 8,473,619

information about the objects. (Ex. 1002, ¶ 120.) Thus, the control panel 101 in

Wimsatt "maintains" the "objects at the security server using the processed data."

For at least these reasons, Wimsatt in view of Johnson and Severson disclose

claim 1.

### 2.    Dependent claim 2 – Ground 1

| 2 | The system of claim 1, wherein the gateway is connected to a local area network at the first location, and the local area network is coupled to a wide area network via a router at the first location. |
|---|---|

Wimsatt discloses claim 2. With respect to the first part of the limitation,

which recites "***wherein the gateway is connected to a local area network at the***

***first location***," Wimsatt discloses that its control panel 101 is connected to a hub

103. This is shown below in annotated and excerpted Figure 1. The hub 103 is

described as implementing an Ethernet connection among the system devices. (Ex.

1004, ¶ 0036.) It is well known that Ethernet connections form LANs. (Ex. 1002, ¶

122.) The hub 103 in Wimsatt is located within the home and therefore the LAN is

also located at the "first location." (*See, e.g.,* Ex. 1004, ¶¶ 0036, 0038, 0040 (each

passage describing physical couplings between the hub 103 and system devices

located within the home indicating the hub's physical presence within the home).)

29

Petition for *Inter Partes* Review of
Patent No. 8,473,619



Figure 2 of Wimsatt (annotated and shown below) provides a "hardware-oriented view" of the control panel 101 and shows that the panel 101 includes a "network interface" component. (Ex. 1004, ¶ 0016.) According to Wimsatt, the network interface's "functions are substantially similar to what might be found in a convention[al] personal computer network interface card (NIC)." (*Id.*, ¶ 0050.) A POSITA would have understood that a NIC is designed to couple or connect a computer to a LAN so that it can communicate over the LAN. (Ex. 1002, ¶ 123; *see also,* Ex. 1004, ¶ 0024 (explaining that Wimsatt's system can be used in LAN environments).) Thus, for at least these reasons, a POSITA would have understood from the disclosures in Wimsatt that the control panel 101 is connected to a LAN located in the user's home. (Ex. 1002, ¶ 123.)

30

Petition for *Inter Partes* Review of
Patent No. 8,473,619



With respect to the last part of the limitation, which recites "***the local area***

***network is coupled to a wide area network via a router at the first location***,"

Wimsatt further discloses that the hub 103 can be a router. (Ex. 1004, ¶ 0036.) As

also shown above in Figure 1, the hub 103 is connected to an Internet gateway 127

that provides access to the Internet, which is a "wide area network." (*Id.*, FIG. 1, ¶

0041.)

### 3.    Dependent claim 3 – Ground 1

| 3 | The system of claim 1, wherein the gateway is coupled to a wide area network and is coupled to a local area network at the first location via the connection management component and a router at the first location. |
|---|---|

As discussed above for claim 2, the control panel 101 in Wimsatt, including

31

Petition for *Inter Partes* Review of
Patent No. 8,473,619

the connection management component, is connected to a hub 103, which can be a router and which forms a LAN. (Ex. 1004, ¶ 0036.) Both the hub 103 and the LAN are in the "first location." As also discussed, the hub 103 is coupled to the Internet (i.e., a wide area network) via an Internet gateway 127. (*Id.*, FIG. 1, ¶ 0041.) Thus, the control panel 101 is coupled to the Internet via the hub 103 and intervening devices.

### 4. Dependent claim 4 – Ground 1

| 4 | The system of claim 1, wherein the gateway is coupled to the security server via the internet. |
|---|---|

Claim 4 is disclosed by Wimsatt and Johnson. Johnson explains that its control unit 30 is coupled to the data center 20 server via a global computer network 12, which is described as the Internet. (Ex. 1005, 4:21-23, 4:61-63, FIG. 1.) When Wimsatt is modified by Johnson as discussed in claim 1, the control panel 101 in Wimsatt is coupled to the data center 20 server in the same manner – i.e., through the Internet. (Ex. 1002, ¶ 126.)

### 5. Dependent claim 5 – Ground 1

| 5 | The system of claim 1, comprising an interface coupled to the security network, wherein the interface allows control of the functions of the security network by a user. |
|---|---|

Claim 5 is also disclosed by Wimsatt and Johnson. Johnson discloses that a homeowner can access a web page that allows the homeowner to "monitor[] and control[]" aspects of the security system using that web page. (Ex. 1005, 4:30-36,

32

Petition for *Inter Partes* Review of
Patent No. 8,473,619

5:29-39, 6:35-59.) Johnson's web page is the claimed "interface." The security

system (and its components) is part of the "security network" described in claim 1.

Figure 3 of Johnson (shown below) is an illustration of the web page.

Johnson explains that a homeowner can "modify any preprogrammed settings

within the home" by "simply select[ing] the desired feature on the control page 76

of the desired home as shown in FIGS. 3 and 7." (Ex. 1005, 6:61-65.) "The

homeowner may then enter the desired data into the computer 16 which is

transmitted to the data center 20 which forwards the information directly to the

control unit 30 which transmits the data accordingly modifying any previous

settings." (Ex. 1005, 6:65-7:4.) When Wimsatt is modified by Johnson, the

homeowner is able to remotely communicate with and control the control panel

101 and the security system in the same manner. (Ex. 1002, ¶ 128.) Thus, the web

page 76 is communicatively coupled to the security network and allows the user to

control functions of the security network.

33

Petition for *Inter Partes* Review of
Patent No. 8,473,619



A POSITA would be motivated to combine Johnson with Wimsatt for the reasons already discussed with respect to claim element 1[e].

### 6.    Dependent claim 6 – Ground 1

| 6 | The system of claim 1, comprising a portal coupled to the gateway, wherein the portal provides access to the communications and the functions of the security network via remote client devices. |
|---|---|

34

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Wimsatt and Johnson disclose claim 6. The web page 76 illustrated above in Figure 3 of Johnson is provided by a web browser 14, which is the claimed "portal." As similarly discussed in connection with claim 5, through the web browser 14, the web page allows a homeowner to "monitor[] and control[]" aspects of the security system using that web page. (Ex. 1005, 4:30-36, 5:29-39, 6:35-59.) Because these components are part of the "security network", the web browser 14 provides the user with access (via the web page) to the communications and functions of the security network. The web browser 14 in Johnson is coupled to the home's control unit 30 via the global network 12 and the data center 20 server. (*See, e.g.,* Ex. 1005, FIG. 1, 4:15-39.) And, the homeowner in Johnson is able to access the web page via the browser 14 using a remotely located computer, "wireless PDA", and/or "web-connected phones and pagers." (i.e., the claimed "remote client devices"). (*See, e.g.,* Ex. 1005, FIG. 5, Abstract ("An Internet based home communications system for allowing a homeowner to monitor and control various features of their home from a distant location via a global computer network"), FIG. 1 (illustrating that the "user's computer" is remote from the home where the control unit 30 and control devices 40 are located), 4:30-36, 5:29-39, 6:35-59.)

When Wimsatt is modified by Johnson, the homeowner in Wimsatt would be able to remotely access the control panel 101 in Wimsatt and control the

35

Petition for *Inter Partes* Review of
Patent No. 8,473,619

controlled devices in the "security network" using the web page provided in

Johnson. The motivations to combine Wimsatt, Johnson and Severson for claim 6

are the same as for claim 1.

### 7. Dependent claim 7 – Ground 1

| 7 | The system of claim 6, comprising an interface coupled to the security network, wherein the interface allows control of the functions of the security network from the remote client devices. |
|---|---|

Claim 7 is substantively identical to claim 5 except for its dependency on

claim 6 and it adds that the interface allows control "from the remote client

devices." As discussed in claim 6, users can access the web page 76 (i.e., the

claimed "interface") through the web browser 14 (i.e., the claimed "portal") using

a remotely located computer, "wireless PDA", and/or "web-connected phones and

pagers." (i.e., the claimed "remote client devices"). Thus, Wimsatt and Johnson

disclose claim 7 for the same reasons discussed in claims 5 and 6.

### 8. Dependent claim 8 – Ground 1

| 8 | The system of claim 6, wherein the remote client devices include one or more of personal computers, personal digital assistants, cellular telephones, and mobile computing devices. |
|---|---|

As discussed, Johnson discloses that the homeowner can access the web

page via a computer, which is the claimed "personal computer". (Ex. 1005, 3:24-

27, 3:40-43, 4:30-33, 6:36-38, 7:30-32.)

36

Petition for *Inter Partes* Review of
Patent No. 8,473,619

### 9. Dependent claim 9 – Ground 1

| 9 | The system of claim 1, wherein the gateway including the connection management component automatically discovers the security system components. |
|---|---|

For the same reasons discussed for claim element 1[d], which recites in part "the connection management component … automatically discovering the security system components," claim 9 is rendered obvious by Wimsatt, Johnson and Severson. As also discussed in that section, the CMC is a module within the gateway and thus the gateway necessarily automatically discovers the security system components when the CMC discovers them. (Ex. 1002, ¶ 134.)

### 10. Dependent claim 12 – Ground 1

| 12 | The system of claim 1, wherein the gateway including the connection management component automatically establishes and controls the communications with the security system components. |
|---|---|

For the same reasons discussed for claim element 1[d], which recites in part "the connection management component … automatically discovering the security system components," claim 12 is rendered obvious by Wimsatt, Johnson and Severson. Wimsatt also discloses that, as a result of the discovery process, the control panel 101 is "programmed to support" the discovered devices and receives "full access" to those devices. (Ex. 1004, ¶ 0045.) A POSITA would understand that automatic discovery of the security system components includes establishing and controlling the communications with such components.  (Ex. 1002, ¶ 135.) As discussed, the CMC is a module within the gateway and thus the gateway

37

Petition for *Inter Partes* Review of
Patent No. 8,473,619

necessarily automatically establishes and controls communications with the

security system components when the CMC discovers them. (*Id.*)

### 11.    Dependent claim 13 – Ground 1

| 13 | The system of claim 1, wherein the gateway including the connection management component automatically establishes a coupling with the security system including the security system components. |
|---|---|

For the same reasons discussed for claim elements 1[b] and 1[c], which

recite in part "the connection management component … automatically

establishing a wireless coupling with a security system" (element 1[b]) and "the

security system including security system components" (element 1[c]), claim 13 is

rendered obvious by Wimsatt, Johnson and Severson. As also discussed in that

section, the CMC is a module within the gateway and thus the gateway necessarily

automatically establishes a coupling with the security system when the CMC

couples to it. (Ex. 1002, ¶ 136.)

### 12.    Dependent claim 14 – Ground 1

| 14 | The system of claim 1, wherein the gateway includes a rules component that manages rules of interaction between the gateway and the security system components. |
|---|---|

Claim 14 is disclosed by Wimsatt and Johnson. The claimed "rules

component" is collectively formed by the plug-ins shown below in annotated

Figure 3 of Wimsatt, which are stored at and processed by the control panel 101.

38

Petition for *Inter Partes* Review of
Patent No. 8,473,619



Wimsatt discloses that the security plug-in in particular "may monitor [the] status of a home security system and when an anomaly is detected, activate the audio and home control plug-ins to provide information and/or alerts to users." (Ex. 1004, ¶ 0059; *see also, id.*, ¶¶ 0058, 0061.) The audio and home control plug-ins are described in Wimsatt as controlling the home's audio equipment 123 and the home's lighting system 113, respectively. (*Id.*, FIG. 1, ¶¶ 0056, 0058.)  An alert received at the security plug-in therefore results in that plug-in activating the home's audio equipment 123 and the home's lighting system 113 (e.g., sounding an alarm and/or turning on the lights).[3] Thus, the security plug-in includes the rules

---

[3] The '619 patent appears to suggest that Automation engine 308 is an example of a "rules component" as it is described as "manag[ing] the user-defined rules of

Petition for *Inter Partes* Review of
Patent No. 8,473,619

for determining how the control panel 101 and the other networked devices respond when the security system (and its sensors) alerts the control panel 101 to a particular situation. It would be obvious to a POSITA that each plug-in includes its own set of rules for managing how the control panel 101 interacts and communicates with corresponding devices, and vice versa. (Ex. 1002, ¶¶ 137-140.)

### 13.    Dependent claim 15 – Ground 1

| 15 | The system of claim 1, wherein the gateway includes a device connect component that includes definitions of the security system components. |
|----|----|

The plug-ins in Wimsatt also collectively form the claimed "device connect component". The '619 patent states that "DeviceConnect 310 includes definitions of all supported devices (e.g., cameras, security panels, sensors, etc.) using **standardized plug-in architecture**." (Ex. 1001, 13:9-19 (emphasis added).) This is exactly what Wimsatt discloses for its plug-ins. (Ex. 1004, ¶¶ 0057-0059.)

Although Wimsatt does not explicitly disclose that its plug-ins include definitions for the security system's sensors (i.e., the claimed "security system components"), this would be obvious to implement into the security plug-in in view of Severson. (Ex. 1002, ¶ 142.) Severson discloses that sensor information

interaction between the different devices (e.g., when door opens turn on the light)." (Ex. 1001, 13:3-8.) Wimsatt describes an identical operation for the security plug-in.

40

Petition for *Inter Partes* Review of
Patent No. 8,473,619

(including sensor name, alert level) is learned into the controller. (*See, e.g.,* Ex. 1006, 23:60-67, Tables 4 and 5.) When Wimsatt is modified by Severson, the control panel 101 would include this sensor information. This information (or "definition") would be included in and/or used by the security plug-in in Wimsatt to support interaction between the control panel 101 and the sensors. (Ex. 1002, ¶ 142.) The motivations for combining Severson with Wimsatt and Johnson here are the same as discussed for claim 1. Thus, claim 15 is rendered obvious.

### 14.    Dependent claim 16 – Ground 1

| 16 | The system of claim 1, wherein the security system is coupled to a central monitoring station via a primary communication link, wherein the gateway is coupled to the central monitoring station via a secondary communication link that is different than the primary communication link, wherein the central monitoring station is located at a third location different from the first location and the second location. |
|---|---|

Claim 16 is rendered obvious by Wimsatt and Johnson. Johnson discloses that its control unit 30 can communicate over the Internet with an auxiliary service 80 to report a security breach. (Ex. 1005, 6:6-11, 6:27-29, 4:20-21, FIG. 5 ("security service").) A POSITA would understand from Johnson that the auxiliary service could be a security agency or service that can call the homeowner at, for example, their office to notify them of the breach. (*Id.*, 1:27-32.) This auxiliary service / agency is the claimed "central monitoring station" and is at a third location separate from the first location and second location. The Internet can be implemented by, for example, a "digital subscriber line (DSL)," which is the

41

Petition for *Inter Partes* Review of
Patent No. 8,473,619

claimed "secondary communication link." Thus, Wimsatt in view of Johnson

discloses "*wherein the gateway is coupled to the central monitoring station via a*

*secondary communication link.*"

In its background section, Johnson explains that conventional security

system panels communicate directly with security agencies. (Ex. 1005, 1:27-32.)

Nothing in Wimsatt suggests that its security system panel loses any functionality

when it is connected to the control panel 101 as part of the home automation

system. According to Wimsatt, the control panel 101 is intended to work with

*existing devices* and merely provides a user-friendly interface through which those

devices can be controlled. (Ex. 1004, ¶¶ 0023, 0065.) Wimsatt is silent with respect

to the control panel 101 being capable of communicating with an outside service,

such as a central monitoring station, so a POSITA would have understood that the

security system in Wimsatt maintains the ability to contact the monitoring station

even when it is part of the home automation system. (Ex 1002, ¶¶ 143-144.)

Wimsatt and Johnson do not disclose how the security system communicates

with the monitoring center, but Severson does. Severson discloses that its security

system controller communicates with a central monitoring station 4 via one or

more telephone lines. (Ex. 1006, 3:57-4:2.) When Wimsatt is modified by

Severson and Johnson, the security system in Wimsatt communicates with the

security agency via a telephone line. This telephone line is the claimed "primary

42

Petition for *Inter Partes* Review of
Patent No. 8,473,619

communication link." A telephone line is a different communication channel than a DSL.

It would have been obvious to combine Wimsatt with Johnson and Severson so that both the security system and the control panel 101 in Wimsatt are capable of contacting a security agency (or central monitoring station). (Ex. 1002, ¶¶ 145-146.) A POSITA would have understood the benefit of having two devices capable of contacting a security agency on different communication channels. (*Id.*) For example, once device (e.g., the control panel 101) could act as a back-up in case the first device (e.g., the security system) failed to make contact with the central monitoring station.

### 15.   Dependent claim 19 – Ground 1

| 19 | The system of claim 16, wherein the secondary communication link includes a broadband coupling. |
|----|---|

As discussed for claim 16, the claimed "secondary communication link" is formed by a DSL channel. It is well known that DSL technologies are broadband. Thus, claim 19 is rendered obvious by Wimsatt in view of Johnson and Severson.

### 16.   Dependent claim 23 – Ground 1

| 23 | The system of claim 16, wherein the gateway receives control data for control of the security system components from remote client devices via the secondary communication link. |
|----|---|

As discussed for claims 5 to 7, Wimsatt in view of Johnson discloses that the user can control the security system (and its sensors) via the web page 76. (Ex.

43

Petition for *Inter Partes* Review of
Patent No. 8,473,619

1005, 6:35-7:4.) The user can select an item on the web page 76 and provide a

"command" to change a specific setting. (Ex. 1005, 7:47-8:5.) The data center 20

server then transmits this "command" to the control panel 101 which transmits data

to the security system (and its components) to modify the setting. (Ex. 1005, 7:47-

8:5, 6:61-7:4.) This "command" is the claimed "control data." As explained

throughout, the control panel 101 communicates with the data center 20 server via

the Internet, which is the claimed "secondary communication link." Furthermore,

as discussed for claim 6, the user accesses the web page 76 remotely via a remote

device, such as a computer. (*See, e.g.,* Ex. 1005, FIG. 5, Abstract, FIG. 1, 4:30-36,

5:29-39, 6:35-59.)

### 17.   Dependent claim 24 – Ground 1

| 24 | The system of claim 1, wherein the security network comprises network devices coupled to the gateway via a wireless coupling. |
|----|---|

Wimsatt discloses "security cameras" that are understood to be part of the

security network because they are a security-related device. (Ex. 1004, ¶ 0040,

FIG. 1 (item 125).) Wimsatt also discloses that its control panels 101 can be

wireless (referred to as control panels 107); thus, the control panel 101 can

communicatively couple to the security camera, or any other such devices, via a

"wireless coupling". (*Id.,* ¶¶ 0037, 0044, FIG. 1.)

44

Petition for *Inter Partes* Review of
Patent No. 8,473,619

### 18.  Dependent claim 25 – Ground 1

| 25 | The system of claim 24, wherein the gateway including the connection management component automatically discovers the network devices. |
|----|----|

As discussed in connection with claim element 1[d], Wimsatt discloses that the CMC (which is part of the control panel 101) automatically discovers controlled devices within its network. (Ex. 1004, ¶ 0045.) Because security cameras (i.e., the claimed "network devices) are controlled devices, Wimsatt discloses automatically discovering the security cameras via the control panel's CMC. (Ex. 1004, ¶ 0040.) Thus, claim 25 is rendered obvious under Ground 1.

### 19.  Dependent claim 26 – Ground 1

| 26 | The system of claim 24, wherein the gateway including the connection management component automatically installs the network devices in the security network. |
|----|----|

The discovery process described in Wimsatt includes automatically installing the discovered devices into the control panel 101 and thus into the security network. For example, Wimsatt discloses that, as a result of the discovery process, the control panel 101 is "programmed to support" the discovered devices (e.g., an IP camera 109) and receives "full access" to those devices. (Ex. 1004, ¶ 0045.) The discovered / installed security camera is thus operational on the security network via the control panel 101. As discussed with respect to claim 1, the control panel's CMC performs this discovery process. (Ex. 1002, ¶ 164.) Claim 26 is therefore rendered obvious under Ground 1.

45

Petition for *Inter Partes* Review of
Patent No. 8,473,619

### 20.   Dependent claim 27 – Ground 1

| 27 | The system of claim 24, wherein the gateway including the connection management component automatically configures the network devices for operation in the security network. |
|---|---|

As discussed for claim 26, the discovery process described in Wimsatt includes automatically installing the discovered devices into the control panel 101 and thus into the security network such that the devices operate within the security network. For example, Wimsatt discloses that, as a result of the discovery process, the control panel 101 is "programmed to support" the discovered devices (e.g., an IP camera 109) and receives "full access" to those devices. (Ex. 1004, ¶ 0045.) The discovered / installed security cameras are thus operational on the security network via the control panel 101. As discussed with respect to claim 1, the control panel's CMC performs this discovery, installation and configuration process. (Ex. 1002, ¶ 165.) A POSITA would not install devices without having them configured to operate with the system. (*Id.*) Claim 27 is therefore rendered obvious under Ground 1.

### 21.   Dependent claim 28 – Ground 1

| 28 | The system of claim 24, wherein the gateway controls communications between the network devices, the security system components, and the security server. |
|---|---|

As previously discussed, when Wimsatt is modified by Johnson, the control panel 101 is the "middle man" between the remotely located data center 20 server and the home-based network devices (e.g., security cameras) / security system

46

Petition for *Inter Partes* Review of
Patent No. 8,473,619

components (e.g., sensors). (Ex. 1005, FIG. 1; Ex. 1004, FIG. 1.)  Nowhere does

Johnson disclose that controlled devices communicate directly to the data center 20

server; rather, all communications must come from the control unit 30 (or control

panel 101 in Wimsatt). (Ex. 1005, 7:16-8:5.) Thus, when Wimsatt is modified by

Johnson, the control panel 101 "controls communications" per claim 28.

### 22.    Dependent claim 32 – Ground 1

| 32 | The system of claim 24, wherein the security system is coupled to a central monitoring station via a primary communication link, wherein the gateway is coupled to the central monitoring station via a secondary communication link that is different than the primary communication link. |
|----|---|

Claim 32 is substantively identical to claim 16 except for its dependency on

claim 24, which has no bearing on the claim language. Thus, claim 32 is obvious

for the same reasons discussed with respect to claim 16.

### 23.    Dependent claim 34 – Ground 1

| 34 | The system of claim 32, wherein the secondary communication link includes a broadband coupling. |
|----|---|

As discussed for claims 16 and 32, the claimed "secondary communication

link" is formed by a DSL channel. It is well known that DSL technologies are

broadband. Thus, claim 34 is rendered obvious by Wimsatt in view of Johnson and

Severson.

47

Petition for *Inter Partes* Review of
Patent No. 8,473,619

### 24.   Dependent claim 42 – Ground 1

| 42 | The system of claim 24, wherein the security server manages communications with the network devices. |
|----|------|

Johnson discloses that the data center 20 server sends a "connect" command to the control unit 30 when it wants to communicate with the unit 30. (Ex. 1005, 7:17-28, 7:47-8:5.) If the unit 30 is online, then it establishes a direct secure connection with the server and can communicate data from its controlled devices with the server. (*Id.* 7:17-28, 7:47-8:5, 5:40-52.) For example, if a homeowner, via the server, requests a live video feed from one of its security cameras, then the server would connect with the control unit 30 and request that video feed. In turn, the control unit 30 would connect to the security camera to get the video feed. Because the server in Johnson manages communications between itself and the control unit 30 and the control unit 30 communicates with its controlled devices, the server therefore manages communications with the cameras via the control unit 30. When Johnson is combined with Wimsatt, the data center 20 server in Johnson connects with the control panel 101 in Wimsatt to perform the same functions and manage connections in the same way. Thus, claim 42 is rendered obvious.

### 25.   Dependent claims 43 and 44 – Ground 1

| 43 | The system of claim 24, wherein the network device is an Internet Protocol device. |
|----|------|
| 44 | The system of claim 24, wherein the network device is a camera. |

The security cameras in Wimsatt can be IP cameras 109 different from those

Petition for *Inter Partes* Review of
Patent No. 8,473,619

located in the local network. (Ex. 1004, FIG. 1, ¶¶ 0038, 0040, 0072.) Thus, claims

43 and 44 are rendered obvious.

### 26.   Dependent claim 45 – Ground 1

| 45 | The system of claim 24, wherein the network device is a touchscreen. |
|----|----|

Wimsatt discloses that the control panel 101 is connected to other panels 101

via hub 103 or wireless communication (panels 107). (Ex. 1004, ¶¶ 0035-0037.) It

would be obvious to include one of these other panels 101/107 as a network

device. (Ex. 1002, ¶ 192.)

### 27.   Dependent claim 46 – Ground 1

| 46 | The system of claim 24, wherein the network device is a device controller that controls an attached device. |
|----|----|

Claim 46 is rendered obvious by Wimsatt. The claimed "network device" is

satisfied by any device that is included in the home automation network of

Wimsatt.  Figure 1 of Wimsatt illustrates a number of network devices, including a

lighting control subsystem 113. Wimsatt explains that this subsystem 113 interface

comprises a "control device", which is the claimed "device controller." (Ex. 1004,

¶ 0039.) As shown in the below, this control device is coupled to the home's

lighting devices (e.g., lamps). (*Compare to* Ex. 1001, 15:21-26, 22:47-52, 22:63-

23:3.)

Petition for *Inter Partes* Review of
Patent No. 8,473,619



FIG. 1

### 28.    Dependent claim 47 – Ground 1

| 47 | The system of claim 24, wherein the network device is a sensor. |
|---|---|

As discussed for claim 1, Wimsatt discloses the claimed "network device" as

an environmental sensor. (Ex. 1004, FIG. 1, ¶ 0038.) Thus, claim 47 is rendered

obvious.

50

Petition for *Inter Partes* Review of
Patent No. 8,473,619

### 29.    Dependent claim 54 – Ground 1

| 54 | The system of claim 1, wherein the security server manages communications with the security system components. |
|----|------------------------------------------------------------------------------------|

Johnson discloses that the data center 20 server sends a "connect" command to the control unit 30 when it wants to communicate with the unit 30. (Ex. 1005, 7:17-28, 7:47-8:5.) If the unit 30 is online, then it establishes a direct secure connection with the server and can communicate data from its controlled devices with the server. (*Id.* 7:17-28, 7:47-8:5, 5:40-52.) For example, if a homeowner, via the server, requests a live video feed from one of its IP cameras, then the server would connect with the control unit 30 and request that video feed. In turn, the control unit 30 would connect to the IP camera to get the video feed. A similar process is used to communicate with sensors. Because the server in Johnson manages communications between itself and the control unit 30 and the control unit 30 communicates with its controlled devices, the server therefore manages communications with the security system sensors and cameras via the control unit 30. When Johnson is combined with Wimsatt, the data center 20 server in Johnson connects with the control panel 101 in Wimsatt to perform the same functions and manage connections in the same way. Thus, claim 54 is rendered obvious.

### 30.    Dependent claim 55 – Ground 1

| 55 | The system of claim 1, wherein the security server generates and transfers notifications to remote client devices, the notifications comprising event data. |
|----|------------------------------------------------------------------------------------|

51

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Wimsatt and Johnson disclose claim 55. Johnson explains: "when a condition within the home reaches a warning level (i.e., **an 'event'**) … the control unit 30 sends an alert to the data center 20 through the global computer network 12." (Ex. 1005, 7:32-36 (emphasis added); *see also, id.*, FIG. 6, 5:63-67.) In response to this alert, "the control unit 30 may notify the data center 20 which can then **notify the homeowner of the condition** via e-mail, pager, web page, by direct telephone call or other communication means." (*Id.*, 6:2-6 (emphasis added); *see also, id.*, 7:42-46.) The cell phone, pager and/or computer receiving the notification via email or web page 74 in Johnson are "remote client devices." (*Id.*, FIG. 5 (illustrating that these remote devices are connected to the home via global computer network 12.)

When Wimsatt is modified by Johnson, the control panel 101 is connected to the data center 20 server that performs the same functions described above. The same motivations to combine Wimsatt with Johnson and Severson for claim 1 apply here. In addition, a POSITA would understand the benefit of connecting the control panel 101 to the data center 20 server in Johnson because the connection would enhance the functionality of the control panel 101 and provide the homeowner with up-to-date notifications regarding the state of their property. (Ex. 1002, ¶ 208.) This is especially important when security breaches occur within a home because immediate action might be needed. (*Id.*)

52

Petition for *Inter Partes* Review of
Patent No. 8,473,619

### 31.    Dependent claim 56 – Ground 1

| 56 | The system of claim 55, wherein the notifications include one or more of short message service messages and electronic mail messages. |
|----|-----|

As discussed with respect to claim 55, the data center 20 server in Johnson notifies the homeowner via "e-mail" (i.e., electronic mail). Thus, claim 56 is rendered obvious.

### 32.    Dependent claim 57 – Ground 1

| 57 | The system of claim 55, wherein the event data is event data of the security system components. |
|----|-----|

When discussing "alerts" (or "events"), Johnson discloses that the alert (or event) can result from a security condition such as a home intrusion. (Ex. 1005, 5:54-67.) An alert of this nature would originate with the security sensors. This is shown below in annotated, excerpted Figure 5 of Johnson, which illustrates the "security sensors" sending an alert signal to the control unit 30. (*See also, id.*, Ex. 1005, 5:54-62.) When Wimsatt is modified by Johnson, a POSITA would understand that the security sensors of the security system in Wimsatt would function similarly to those described in Johnson. (Ex. 1002, ¶ 210.) Thus, claim 57 is rendered obvious.

Petition for *Inter Partes* Review of
Patent No. 8,473,619



FIG. 5

### 33. Dependent claim 59 – Ground 1

| 59 | The system of claim 1, wherein the security system components include one or more of sensors, cameras, input/output (I/O) devices, and accessory controllers. |
|---|---|

As discussed for claim 1, a POSITA would have understood that the security system in Wimsatt includes a plurality of sensors. *See,* **Part IX.C.1.d** above. Wimsatt also discloses that its security system includes security cameras. (Ex. 1004, FIG. 1 (item 125, labeled "security camera"), ¶¶ 0040, 0075.) Furthermore, as also discussed for claim 1, Johnson discloses "security sensors." (*See,* Ex. 1005, FIG. 5.) Thus, claim 59 is rendered obvious.

54

Petition for *Inter Partes* Review of
Patent No. 8,473,619

### 34.  Independent claim 60 – Ground 1

As will be demonstrated in the following sections, the language of independent claim 60 is substantially identical to the language of independent claim 1.

### a.  Preamble: "A security network comprising"

Wimsatt in view of Johnson and Severson discloses a security network for the reasons that follow.

### b.  Claim elements 60[a] to 60[d]

As illustrated in the below chart, claim elements 60[a] to 60[d] are substantively identical to claim elements 1[a] to 1[e]. Thus, for the same reasons discussed above in **Parts IX.C.1.b** to **IX.C.1.c**, Wimsatt in view of Johnson and Severson discloses claim elements 60[a] to 60[d].

| | Claim 1 | | | Claim 60 |
|---|---|---|---|---|
| 1[a] | a gateway located at a first location | 60[a] | | a gateway including a connection management component located at a first location and automatically establishing a wireless coupling with a security system installed at the first location |
| 1[b] | a connection management component coupled to the gateway and automatically establishing a wireless coupling with a security system installed at the first location | | | |
| 1[c] | the security system including security system components | 60[b] | | the security system including security system components, |
| 1[d] | wherein the connection management component forms a security network by automatically discovering the security system components and | 60[c] | | wherein the connection management component forms a security network by automatically discovering the security system components and |

55

Petition for *Inter Partes* Review of
Patent No. 8,473,619

|  | integrating communications and functions of the security system components into the security network |  | integrating communications and functions of the security system components into the security network |
|---|---|---|---|
| 1[e] | a security server at a second location different from the first location, wherein the security server is coupled to the gateway | 60[d] | a security server at a second location different from the first location |

      c.      **Claim element 60[e]: "wherein the security server is coupled to the gateway and includes a plurality of security network applications"**

For the same reasons discussed above for claim element 1[e], Wimsatt in view of Johnson and Severson discloses "the security server is coupled to the gateway." With respect to the latter recitation in claim element 60[e], the '619 patent provides details regarding Service Management clients that manage the operation of the overall service, including running applications to handle certain tasks such as provisioning, service monitoring, customer support and reporting. Johnson discloses that the data center 20 handles the same tasks. (Ex. 1005, col. 5, l. 54 – col. 6, l. 11.)

Such applications are also disclosed as the Operating System (OS) in Wimsatt. (Ex. 1004, FIG. 3.) It is well known the function of an OS on any computer is to dynamically provision processes and data. (Ex. 1002, ¶ 219.) Wimsatt discloses that panel 101 includes "variants of a personal computer (PC) architecture to take advantage of price and performance features." (Ex. 1004, ¶

56

Petition for *Inter Partes* Review of
Patent No. 8,473,619

0034.) This passage clearly suggests that the panel's OS can function in the same manner as PC, including the provisioning features. (Ex. 1002, ¶ 219.) Those provisioning features would obviously be applied to the applications and other content stored at panel 101. (*Id*.). Thus, Wimsatt in view of Johnson and Severson teach claim element 60[e].

### d.    Claim elements 60[f]-60[i]

As illustrated in the below chart, claim elements 60[f] to 60[h] are identical to claim elements 1[f] to 1[h]. Thus, for the same reasons discussed above in **Parts IX.C.1.g** to **IX.C.1.i**, Wimsatt in view of Johnson discloses claim elements 60[f] to 60[h].

| | Claim 1 | | Claim 60 |
|---|---|---|---|
| 1[f] | wherein the gateway receives security data from the security system components, device data of a plurality of network devices coupled to a local network of the first location that is independent of the security network, and remote data from the security server | 60[f] | wherein the gateway receives security data from the security system components, device data of a plurality of network devices coupled to a local network of the first location that is independent of the security network, and remote data from the security server |
| 1[g] | wherein the gateway generates processed data by processing at the gateway the security data, the device data, and the remote data | 60[g] | wherein the gateway generates processed data by processing at the gateway the security data, the device data, and the remote data, |
| 1[h] | wherein the gateway determines a state change of the security system using the processed data and maintains objects at the security server using the | 60[h] | wherein the gateway determines a state change of the security system using the processed data and maintains objects at the security server using the |

Petition for *Inter Partes* Review of
Patent No. 8,473,619

| | processed data, wherein the objects correspond to the security system components and the plurality of network devices | | processed data, wherein the objects correspond to the security system components and the plurality of network devices. |
|---|---|---|---|

### 35. Independent claim 61 – Ground 1

As will be demonstrated in the following sections, the language of independent claim 61 is substantially identical to the language of independent claims 1 and 60.

#### a. Preamble: "A security network comprising"

Wimsatt in view of Johnson and Severson discloses a security network for the reasons that follow.

#### b. Claim element 61[a]: "a gateway including a connection management component located at a first location"

Claim element 61[a] is identical to claim element 60[a], which is substantively identical to claim element 1[a]. Thus, for the same reasons discussed for claim elements 60[a] and 1[a], claim element 61[a] is rendered obvious by Wimsatt in view of Johnson and Severson.

#### c. Claim element 61[b]: "a wireless coupling between the gateway and a security system installed at the first location"

This claim element is substantively identical to claim element 1[b], which recites "a connection management component coupled to the gateway and automatically establishing a wireless coupling with a security system installed at

58

Petition for *Inter Partes* Review of
Patent No. 8,473,619

the first location." As discussed in that section, the "connection management component" is a software module within the control panel 101 in Wimsatt and the control panel 101 can be a wireless control panel 107. Thus, for the same reasons discussed for claim element 1[b], Wimsatt in view of Johnson and Severson disclose claim element 61[b].

### d.    Claim elements 61[c]-61[g]

As illustrated in the below chart, claim elements 61[c] to 61[g] are identical to claim elements 1[b]-1[d] and 1[f]-1[h], except for the underlined language which is discussed after the chart. Thus, for the same reasons discussed above for claim elements 1[b]-1[d] and 1[f]-1[h], Wimsatt in view of Johnson discloses claim elements 61[c] to 61[g].

|  | Claim 1 |  |  | Claim 61 |
|---|---|---|---|---|
| 1[c] | the security system including security system components | 61[c] |  | wherein the security system includes security system components that are proprietary to the security system, |
| 1[b] | a connection management component coupled to the gateway and automatically establishing a wireless coupling with a security system installed at the first location | 61[d] |  | the connection management component automatically establishing the wireless coupling with the security system components and forming a security network by automatically discovering the security system components and integrating communications and functions of the security system components into the security network, |
| 1[d] | wherein the connection management component forms a security network by automatically discovering the security system components and integrating communications and functions of the security system |  |  |  |

59

Petition for *Inter Partes* Review of
Patent No. 8,473,619

| | | | |
|---|---|---|---|
| | components into the security network | | |
| 1[f] | wherein the gateway receives security data from the security system components, device data of a plurality of network devices coupled to a local network of the first location that is independent of the security network, and remote data from the security server | 61[e] | the gateway receives security data from the security system components, device data of a plurality of network devices coupled to a local network of the first location that is independent of the security network, and remote data <u>from a remote network at a second location different from the first location,</u> |
| 1[g] | wherein the gateway generates processed data by processing at the gateway the security data, the device data, and the remote data | 61[f] | wherein the gateway generates processed data by processing at the gateway the security data, the device data, and the remote data, |
| 1[h] | wherein the gateway determines a state change of the security system using the processed data and maintains objects at the security server using the processed data, wherein the objects correspond to the security system components and the plurality of network devices | 61[g] | wherein the gateway determines a state change of the security system using the processed data and maintains objects at the remote network using the processed data, wherein the objects correspond to the security system components and the plurality of network devices; and |

With respect to the underlined language in claim element 61[c], which recites "security system components <u>that are proprietary to the security system,</u>" Wimsatt explains that its system "may be adapted to handle special-purpose and proprietary controlled devices and subsystems." (Ex. 1004, ¶ 0023.) As such, a

60

Petition for *Inter Partes* Review of
Patent No. 8,473,619

POSITA would have understood that the entire controlled device – i.e., the entire
security system, including the sensors of the security system – could be
proprietary. (Ex. 1002, ¶ 226.) Thus, Wimsatt and Johnson disclose this limitation.

With respect to the underlined language in claim element 61[e], which
recites "remote data from a remote network at a second location different from the
first location," the remote network corresponds to the network within which the
data center 20 server in Johnson resides. This network is remote from the location
of the home where the control panel 101 and its controlled devices reside. Thus,
claim element 61[e] is substantively identical to claim element 1[f] and is rendered
obvious for the same reasons discussed in claim element 1[f] and related sections
discussing the data center 20 server.

> e.    **Claim element 61[h]: "an interface coupled to the gateway, the interface providing communications with the security network and control of the functions of the security network from a remote client device"**

Wimsatt and Johnson disclose this limitation. For example, Johnson
discloses that a homeowner can access a web page from a computer located outside
the home or building. (*See, e.g.,* Ex. 1005, Abstract ("An Internet based home
communications system for allowing a homeowner to monitor and control various
features of their home from a distant location via a global computer network"),
FIG. 1 (illustrating that the "user's computer" is remote from the home where the
control unit 30 and control devices 40 are located), 4:30-36, 5:29-39, 6:35-59.)

61

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Johnson's web page is the claimed "interface" and the homeowner's computer is the claimed "remote client device".

The web page in Johnson allows the homeowner to "monitor[] and control[]" aspects of the security system and cameras using that web page. (Ex. 1005, 4:30-36, 5:29-39, 6:35-59.) These components are all part of the "security network".

Figure 3 of Johnson (shown below) is an illustration of the web page. Johnson explains that a homeowner can "modify any preprogrammed settings within the home" by "simply select[ing] the desired feature on the control page 76 of the desired home as shown in FIGS. 3 and 7." (Ex. 1005, 6:61-65.) "The homeowner may then enter the desired data into the computer 16 which is transmitted to the data center 20 which forwards the information directly to the control unit 30 which transmits the data accordingly modifying any previous settings." (Ex. 1005, 6:65-7:4.) When Wimsatt is modified by Johnson, the homeowner (or building administrator) is able to remotely communicate with and control the control panel 101 and the controlled devices in the same manner. (Ex. 1002, ¶ 230.) Thus, the web page 76 is communicatively coupled to the control panel 101 via the data center 20 server.

Petition for *Inter Partes* Review of
Patent No. 8,473,619



A POSITA would have understood that the icons illustrated on the above web page represent particular controlled devices located within the home in Wimsatt. (Ex. 1002, ¶ 231.) For example, the icon labeled "camera" corresponds to the IP cameras 109, and the icons labeled "door" and "window" correspond to door sensors and window sensors, respectively. Thus, Wimsatt in view of Johnson disclose this limitation. A POSITA would be motivated to combine Johnson with

63

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Wimsatt for the reasons already discussed with respect to claim 1.

The grounds discussed in claims 5-7 are applicable to this claim element as well.

### 36.  Dependent claim 62 – Ground 1

| 62 | The system of claim 1, wherein a component of the gateway controls dynamic updating and replacing of the operating system of the security system on the gateway. |
|----|---|

As discussed above, Wimsatt discloses an Operating System (OS). (Ex. 1004, FIG. 3.) Wimsatt discloses that panel 101 includes "variants of a personal computer (PC) architecture to take advantage of price and performance features." (Ex. 1004, ¶ 0034.) This passage clearly suggests that the panel's OS can function in the same manner as PC, including updating and replacing the OS.. (Ex. 1002, ¶ 233.) Such capability is well known to a POSITA.

## X.  NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST

Patent Owner has not identified any evidence of secondary indicia of non-obviousness for the '619 patent. Accordingly, there is no objective evidence of non-obviousness that might warrant a finding that the Petitioned Claims are patentable. (Ex. 1002, ¶ 234.)

## XI.  CONCLUSION

Petitioner respectfully requests that the Board institute *inter partes* review of claims 1-9, 12-16, 19, 23-28, 32, 34, 42-47, 54-57 and 59-62.

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Respectfully submitted,

Dated: <u>September 30, 2016</u>

**COOLEY LLP**

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
Tel: (703) 456-8000
Fax: (202) 842-7899

By:      <u>/Erik B. Milch/</u>
Erik B. Milch
Reg. No. 42,887

Petition for *Inter Partes* Review of
Patent No. 8,473,619

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Petition complies with the

type-volume limits of 37 C.F.R. § 42.24(a)(1)(i) because it contains 13,213 words,

according to the word-processing system used to prepare this petition, excluding the

parts of this Petition that are exempted by 37 C.F.R. § 42.24(a) (including the table

of contents, mandatory notices, a certificate of service or this certificate word count,

appendix of exhibits, and claim listings).

Dated: September 30, 2016

By:      /Erik B. Milch/
         Erik B. Milch
         Reg. No. 42,887

Petition for *Inter Partes* Review of
Patent No. 8,473,619

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.6(e) and 42.105(b), the undersigned certifies

that on September 30, 2016, a complete and entire copy of this **Petition for *Inter**

***Partes* Review of Patent No. 8,473,619**, including Exhibit Nos. 1001-1013 and a

Power of Attorney, was served via FEDERAL EXPRESS, costs prepaid, to the

Patent Owner by serving the correspondence address of record as follows:

> Richard Gregory Jr.
> Barbara Courtney
> IPR Law Group, PC
> 5338 Cornish Street
> Houston, TX 77007

A courtesy copy was also served via FEDERAL EXPRESS on the Patent Owner at

the following address:

> Ryan Smith
> Wilson Sonsini Goodrich & Rosati
> 650 Page Mill Road
> Palo Alto, CA 94304

By:    /Erik B. Milch/
Erik B. Milch
Reg. No. 42,887

EXHIBIT 8

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SecureNet Technologies, LLC,
Petitioner

v.

iControl Networks, Inc.,
Patent Owner

U.S. Patent No. 8,473,619
Filing Date: Aug. 11, 2008
Issue Date: June 25, 2013

Title: Forming a Security Network Including Integrated Security System
Components and Network Devices

———————————

*Inter Partes* Review No. _____

**Petition for *Inter Partes* Review of U.S. Patent No. 8,473,619**

i

**Table of Contents**

                                                                          **Page**

I.      INTRODUCTION ...............................................................................1

II.     MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1) .......................1

        A.    Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1) ...........................1

        B.    Related Matters Under 37 C.F.R. § 42.8(b)(2) ....................................1

        C.    Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3) ..................2

        D.    Service Information..............................................................................2

        E.    Power of Attorney ...............................................................................2

III.    PAYMENT OF FEES - 37 C.F.R. § 42.103 .........................................2

IV.     REQUIREMENTS FOR INTER PARTES REVIEW UNDER 37
        C.F.R. §§ 42.104 AND 42.108 ...........................................................3

        A.    Grounds for Standing Under 37 C.F.R. § 42.104(a) ...........................3

        B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and
              Statement of Precise Relief Requested ................................................3

        C.    Threshold Requirement for Inter Partes Review 37 C.F.R. §
              42.108(c)..............................................................................................4

V.      BACKGROUND OF TECHNOLOGY RELATED TO THE '619
        PATENT ............................................................................................4

VI.     SUMMARY OF THE '619 PATENT ....................................................4

VII.    CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3)...................4

        A.    Legal Overview ....................................................................................4

        B.    Proposed Claim Constructions .............................................................5

VIII.   PERSON HAVING ORDINARY SKILL IN THE ART & STATE
        OF THE ART ......................................................................................5

IX.     CLAIMS 17, 18, 20-22, 29-31, 33, 35-41, 48-53 AND 58 OF THE
        '619 PATENT ARE UNPATENTABLE......................................................5

        A.    Overview Of The Prior Art ..................................................................6

              1.    Overview of Wimsatt...................................................................6

              2.    Overview of Johnson ...................................................................6

              3.    Overview of Severson..................................................................7

              4.    Overview of Naidoo.....................................................................7

i

**Table of Contents**
(continued)

| | | | Page |
|---|---|---|---|
| | 5. | Overview of Alexander | 7 |
| | 6. | Overview of Anthony | 8 |
| B. | | The Cited References Are Analogous Art | 8 |
| C. | | Grounds 1-3 – Claims 17, 18, 20-22, 29-31, 33, 35-41, 48-53 and 58 Are Obvious over Wimsatt in view of Johnson and/or Other Prior Art References Under 35 U.S.C. § 103(a) | 8 |
| | 1. | Independent claim 1 | 9 |
| | 2. | Dependent claim 16 | 30 |
| | 3. | Dependent claim 17 – Ground 1 | 32 |
| | 4. | Dependent claim 18 – Ground 1 | 34 |
| | 5. | Dependent claim 20 – Ground 2 | 35 |
| | 6. | Dependent claim 21 – Ground 1 | 36 |
| | 7. | Dependent claim 22 – Ground 1 | 37 |
| | 8. | Dependent claim 24 | 38 |
| | 9. | Dependent claim 29 – Ground 1 | 38 |
| | 10. | Dependent claim 30 – Ground 1 | 40 |
| | 11. | Dependent claim 31 – Ground 1 | 40 |
| | 12. | Dependent claim 32 | 41 |
| | 13. | Dependent claim 33 – Ground 1 | 41 |
| | 14. | Dependent claim 35 – Ground 2 | 42 |
| | 15. | Dependent claim 36 – Ground 1 | 42 |
| | 16. | Dependent claims 37 and 38 – Ground 3 | 42 |
| | 17. | Dependent claim 39 – Ground 3 | 45 |
| | 18. | Dependent claim 40 – Ground 3 | 47 |
| | 19. | Dependent claim 41 – Ground 3 | 48 |
| | 20. | Dependent claim 48 – Ground 3 | 49 |
| | 21. | Dependent claims 49 and 50 – Ground 3 | 50 |
| | 22. | Dependent dcaim 51 – Ground 3 | 52 |

## Table of Contents
(continued)

**Page**

23.   Dependent claim 52 – Ground 3 ................................................54

24.   Dependent claim 53 – Ground 3 ................................................55

25.   Dependent claim 58 – Ground 1 ................................................56

X.   NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST ................................................................................................57

XI.   CONCLUSION................................................................................58

**EXHIBITS**

| Exhibit No. | Description of Document |
|---|---|
| 1001 | U.S. Patent No. 8,473,619 ("the '619 patent") |
| 1002 | Declaration of James Parker |
| 1003 | File History for U.S. Patent No. 8,473,619 |
| 1004 | U.S. Patent Publication No. 2004/0260427 to Wimsatt ("Wimsatt") |
| 1005 | U.S. Patent No. 6,580,950 to Johnson et al. ("Johnson") |
| 1006 | U.S. Patent No. 4,951,029 to Severson ("Severson") |
| 1007 | U.S. Publication No. 2003/0062997 to Naidoo et al. ("Naidoo") |
| 1008 | U.S. Patent No. 6,748,343 to Alexander et al. ("Alexander") |
| 1009 | U.S. Publication No. 2003/0137426 to Anthony et al. ("Anthony") |
| 1010 | Installation Instructions for PC5401 Data Interface Module (2004) |
| 1011 | "Understanding Universal Plug and Play," White Paper, Microsoft (2000) |
| 1012 | Waiver of Service, *iControl Networks, Inc. v. SecureNet Techns., LLC*, No. 15-807-GMS, (D. Del. Sept. 30, 2015), ECF No. 5 |
| 1013 | *Curriculum Vitae* of James Parker |

iv

Petition for *Inter Partes* Review of
Patent No. 8,473,619

## I.     INTRODUCTION

SecureNet Technologies, LLC ("Petitioner" or "SecureNet") petitions for

*inter partes* review ("IPR") under 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42 of

claims 17, 18, 20-22, 29-31, 33, 35-41, 48-53 and 58 ("the Petitioned Claims") of

U.S. Patent No. 8,473,619 ("the '619 patent") (Ex. 1001).

## II.    MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A.     Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1)

SecureNet Technologies, LLC is the real party-in-interest.

### B.     Related Matters Under 37 C.F.R. § 42.8(b)(2)

The '619 patent is asserted in *iControl Networks, Inc. v. SecureNet*

*Technologies, LLC*, No. 15-807-GMS (D. Del.), which was filed on September 11,

2015.[1]

Petitioner is also concurrently filing an IPR petition covering claims 1-6, 14-

46, 49-58 and 60-61 of U.S. Patent No. 8,073,931, which is assigned to the Patent

Owner and claims priority to same applications as the '619 patent. Petitioner is

also concurrently filing two IPR petitions covering claims 1-4, 6-50 of U.S. Patent

---

[1] iControl Networks, Inc. ("Patent Owner" or "iControl") filed a Waiver of Service

in that case on September 30, 2015 (Ex. 1012). Based on the PTAB-designated

informative decision docketed as Case No. IPR2013-00010 (Paper 20) (January 30,

2013), this Petition is being timely filed.

1

Petition for *Inter Partes* Review of
Patent No. 8,473,619

No. 8,478,844 ("the '844 patent"), which is assigned to the Patent Owner and is the child patent to the '619 patent. Petitioner is also concurrently filing an IPR petition for claims 25-40 and 42-50 of the '844 patent.

Petitioner is not aware of any other judicial or administrative matters that would affect, or be affected by, a decision in this proceeding.

### C.    Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

**Lead Counsel:** Erik B. Milch (Reg. No. 42,887) / emilch@cooley.com
**Back-up Counsel:**
Jennifer Volk (Reg. No. 62,305) / jvolkfortier@cooley.com
Frank Pietrantonio (Reg. No. 32,289) / fpietrantonio@cooley.com
zSecureNetIPR@cooley.com
zpatdcdocketing@cooley.com
Cooley LLP ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700 Washington, DC 20004
Tel: (703) 456-8573 Fax: (703) 456-8100

### D.    Service Information

The Petition is being served by FEDERAL EXPRESS to the '619 Patent Owner's attorneys of record, IPR Law Group, PC and the known outside counsel to Patent Owner, Wilson Sonsini Goodrich & Rosati. Petitioner consents to service by e-mail at the addresses provided above.

### E.    Power of Attorney

Filed concurrently with this petition per 37 C.F.R. § 42.10(b).

### III.    PAYMENT OF FEES - 37 C.F.R. § 42.103

This Petition requests review of claims 17, 18, 20-22, 29-31, 33, 35-41, 48-53 and 58 (a total of 23 claims) of the '619 patent and is accompanied by a

2

Petition for *Inter Partes* Review of
Patent No. 8,473,619

payment of $26,800. 37 C.F.R. § 42.15. This Petition meets the fee requirements of

35 U.S.C. § 312(a)(1).

## IV.   REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108

### A.   Grounds for Standing Under 37 C.F.R. § 42.104(a)

Petitioner certifies that the '619 patent is eligible for IPR and further

certifies that Petitioner is not barred or estopped from requesting IPR.

### B.   Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested

Petitioner requests that the Board institute *inter partes* review of claims 17,

18, 20-22, 29-31, 33, 35-41, 48-53 and 58 of the '619 patent and requests that each

claim be found unpatentable as obvious under 35 U.S.C. § 103(a) on the following

grounds:

| Ground | '619 Claim(s) | Basis for Challenge |
|--------|---------------|---------------------|
| 1. | 17, 18, 21-22, 29-31, 33, 36, 58 | Obvious over Wimsatt in view of Johnson, Severson and Naidoo under 35 U.S.C. § 103(a) |
| 2. | 20, 35 | Obvious over Wimsatt in view of Johnson, Severson, Naidoo and Anthony under 35 U.S.C. § 103(a) |
| 3. | 37-41, 48-53 | Obvious over Wimsatt in view of Johnson, Severson and Alexander under 35 U.S.C. § 103(a) |

This petition is accompanied by the Declaration of James Parker (Ex. 1002,

"Mr. Parker"), an expert in the field.

3

Petition for *Inter Partes* Review of
Patent No. 8,473,619

**C.     Threshold Requirement for *Inter Partes* Review 37 C.F.R. § 42.108(c)**

*Inter partes* review of claims 17, 18, 20-22, 29-31, 33, 35-41, 48-53 and 58 should be instituted because this Petition establishes a reasonable likelihood that Petitioner will prevail with respect to each of the claims challenged. 35 U.S.C. § 314(a).

**V.     BACKGROUND OF TECHNOLOGY RELATED TO THE '619 PATENT**

Mr. Parker provides a technology tutorial in his declaration. (Ex. 1002, ¶¶ 30-57.)

**VI.    SUMMARY OF THE '619 PATENT**

The '619 patent was filed on August 11, 2008 and claims priority to a divisional application and a long list of continuation-in-part applications and provisional applications, the earliest of which has a filing date of March 16, 2005. (Ex. 1001.) For purposes of this proceeding, we assume that the earliest possible priority date of the '619 patent is March 16, 2005. We reserve the right to dispute this priority date at a later time or in another proceeding.

**VII.   CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(b)(3)**

**A.     Legal Overview**

A claim subject to IPR is given its "broadest reasonable construction in light

4

Petition for *Inter Partes* Review of
Patent No. 8,473,619

of the specification of the patent in which it appears."[2] 37 C.F.R. § 42.100(b).

### B.      Proposed Claim Constructions

Petitioner does not propose any claim constructions for this proceeding.  All claim terms and clauses should be given their plain and ordinary meaning as understood by a person of ordinary skill in the art ("POSITA"). (*See* Ex. 1002, ¶ 59.)

## VIII.  PERSON HAVING ORDINARY SKILL IN THE ART & STATE OF THE ART

The '619 patent is directed to integrated security systems that are capable of being remotely accessed and controlled. (Ex. 1002, ¶¶ 17-24.) At the time of the alleged invention, a POSITA as of 2005 would hold a bachelor's degree or the equivalent in electrical engineering (or related academic fields) and at least three years of additional work experience in the area of digital and/or telecommunication system design, as applicable to safety and security systems, or equivalent work experience. (*Id.*, ¶ 19.)

## IX.    CLAIMS 17, 18, 20-22, 29-31, 33, 35-41, 48-53 AND 58 OF THE '619 PATENT ARE UNPATENTABLE

As detailed in the sections below, claims 17, 18, 20-22, 29-31, 33, 35-41, 48-53 and 58 of the '619 patent are obvious in light of Wimsatt in view of Johnson

---

[2] Petitioners reserve the right to pursue different constructions in litigation. *In re Zletz,* 893 F.2d 319, 321 (Fed. Cir. 1989).

5

Petition for *Inter Partes* Review of
Patent No. 8,473,619

and/or one or more other prior art references cited below.

### A.    Overview Of The Prior Art

#### 1.    Overview of Wimsatt

Wimsatt published on December 23, 2004 and therefore qualifies as prior art

under 35 U.S.C. § 102(a). The patent issuing from Wimsatt was cited by Patent

Owner in an Information Disclosure Statement (IDS) during prosecution of the

'619 patent but it was never applied against the claims.

Wimsatt describes a home automation system having a control panel 101

that is connected to a number of co-located devices, called "controlled devices",

which manage already-existing systems, such as lighting systems or security

systems. (Ex. 1004, ¶ 0023.) The control panel 101 displays an interactive

graphical user interface (GUI) that allows the user (e.g., homeowner) to control the

controlled devices. (*Id.*, ¶ 0022; Ex. 1002, ¶¶ 61-64.)

#### 2.    Overview of Johnson

Johnson issued on June 17, 2003 and therefore qualifies as prior art under 35

U.S.C. § 102(b). Johnson was cited by Patent Owner in an IDS during prosecution

of the '619 patent but it was never applied against the claims.

Johnson discloses an "Internet based home communications system for

allowing a homeowner to monitor and control various features of their home from

a distant location via a global computer network." (Ex. 1005, Abstract.) For

6

Petition for *Inter Partes* Review of
Patent No. 8,473,619

example, Johnson provides a website where homeowners can log in to access, monitor and control a home's security system, lighting system, exterior cameras and the like. (*Id.*, 2:8-28, 6:35-59.) The web site is provided through one or more data center 20 servers that are located remotely from the home. (*Id.*, 4:15-53.)

### 3. Overview of Severson

Severson issued on August 21, 1990 and therefore qualifies as prior art under 35 U.S.C. § 102(b). Severson discloses a home security system controller that automatically discovers newly-added sensors its security network. (Ex. 1006, 23:60-26:7; Ex. 1002, ¶¶ 70-72.)

### 4. Overview of Naidoo

Naidoo published on April 3, 2003 and therefore qualifies as prior art under 35 U.S.C. § 102(b). Naidoo was used as a primary reference against the claims during prosecution. It is used here as a secondary reference for a few of the dependent claims. Naidoo discloses transmitting alarm and video data from a premise security gateway 115 to a security server 131, a central monitoring station 136, and/or a remote client device 155. (Ex. 1007, FIG. 7, ¶¶ 0069-0070, Ex. 1002, ¶ 73.)

### 5. Overview of Alexander

Alexander issued on June 8, 2004 and is prior art under 35 U.S.C. § 102(a). Alexander discloses an integrated security system connected to a remote server

7

Petition for *Inter Partes* Review of
Patent No. 8,473,619

capable of creating and modifying user accounts, and creating and modifying system devices. (Ex. 1008, Abstract, Ex. 1002, ¶74.)

### 6.    Overview of Anthony

Anthony published on July 24, 2003 and therefore qualifies as prior art under 35 U.S.C. § 102(b). Anthony discloses security cameras for use in various security operations, including home security. (Ex. 1009, ¶¶ 31-33.)   Anthony discloses a security system that allows continuous remote monitoring and analysis. (Ex. 1009, ¶ 38.)   Audiovisual signals and other signals from the system can be transmitted via general packet radio service ("GPRS").   (Ex. 1009, ¶¶ 8, 29, 39, 40, 44, 57, 92, Ex. 1002, ¶ 75.)

### B.    The Cited References Are Analogous Art

As indicated in the section above and as explained in Mr. Parker's declaration, each of the prior art references combined in this Petition is analogous art to the '619 patent and to each other, as each reference is in the same field of endeavor as the '619 patent. (Ex. 1002, ¶ 76.)

### C.    Grounds 1-3 – Claims 17, 18, 20-22, 29-31, 33, 35-41, 48-53 and 58 Are Obvious over Wimsatt in view of Johnson and/or Other Prior Art References Under 35 U.S.C. § 103(a)

Claims 17, 18, 20-22, 29-31, 33, 35-41, 48-53 and 58 are rendered obvious under 35 U.S.C. § 103(a) for the reasons that follow. The elements of claims 1, 16, 24 and 32 are addressed herein despite the fact that claims 1, 16, 24 and 32 are not

8

Petition for *Inter Partes* Review of
Patent No. 8,473,619

the subject of this petition.  The elements of claim 1 and 16 are addressed because

claims 17, 18, 20-22, 29-31, 33, 35, 37-41 and 48-53 depend from claim 1 and/or

16.  The basis of rejection for each of claims 1 and 16 is incorporated into each of

the claims that depend therefrom.

### 1.    Independent claim 1

#### a.    Preamble: "A system comprising"

For the reasons discussed in the following sections, Wimsatt in view of

Johnson and Severson discloses all the elements of the claimed system.

#### b.    Claim element 1[a]: "a gateway located at a first location"

Wimsatt discloses a control panel 101 that is mounted within a user's home

at a central location. (Ex. 1004, ¶ 0034.) The control panel 101 is the claimed

"gateway" and the user's home is the claimed "first location."

#### c.    Claim element 1[b]: "a connection management component coupled to the gateway and automatically establishing a wireless coupling with a security system installed at the first location"

Wimsatt discloses this limitation in its entirety. For clarity, this limitation is

divided into two parts and discussed separately.

##### i.    "a connection management component coupled to the gateway …"

A POSITA would understand that the "connection management component"

(referred to also throughout as "CMC") would be a module implemented by a

9

Petition for *Inter Partes* Review of
Patent No. 8,473,619

processor to carry out the claimed operations. (Ex. 1002, ¶ 80.) A POSITA would also have understood that the control panel 101 in Wimsatt must also include a module to perform the discovery and connection processes that it describes and, thus, the control panel 101 in Wimsatt must indeed include the "connection management component" that would be responsible for the claimed couplings of the system. (*Id.*) Because the CMC is implemented by the control panel 101 (via its processor 201), Wimsatt discloses that the CMC is coupled to the control panel 101.

ii.    **"a connection management component … automatically establishing a wireless coupling with a security system installed at the first location"**

Wimsatt discloses that the user's home (i.e., the claimed "first location") includes a security system. (*See, e.g.,* Ex. 1004, ¶ 0005 ("Home automation systems may be integrated with a home security system"), ¶ 0012 (describing a home automation system that controls "security systems"), ¶ 0023 (explaining that the "invention is particularly useful in home automation environments because it builds on top of the vast array of controlled devices and subsystems that already exist for managing … security systems"), ¶¶ 0029-0031 ("tripping a zone on a burglar alarm … may indicate a household member [is] entering the house"), ¶¶ 0043, 0057-0058, 0062, 0065, 0073-0074.)

10

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Wimsatt discloses that its control panel 101 can implement a "system discovery process." A POSITA would have understood that the CMC module performs this process. (Ex. 1002, ¶¶ 82-83.) According to Wimsatt, "[w]hen a control panel 101 is coupled to a controlled device or subsystem, it interrogates that device or subsystem to learn details of the control interface of that particular system." (Ex. 1004, ¶ 0045.) "This interrogation may simply be a matter of determining the controller type in which case the control panel 101 can look up a command set and signaling protocol information for that controller type." (*Id.*) Wimsatt also explains that when the interrogation process does not work correctly, "the control panel can be **manually or semi-automatically** programmed to support that controlled device or subsystem." (*Id.* (emphasis added)) This last passage indicates that the interrogation process is automatic (i.e., the control panel 101 automatically discovers the controlled devices) because manual or semi-automatic programming is only performed when the automatic interrogation fails. (*See also,* Ex. 1004, ¶ 0006 (describing the difficulties of manually adding devices to a network).) Per this disclosure, the control panel 101 can automatically discover the home security system when the home security system is coupled to the control panel 101.

Wimsatt further discloses that its control panel 101 can be wireless (referred to as "control panel 107") and can wirelessly communicate with any of the

11

Petition for *Inter Partes* Review of
Patent No. 8,473,619

controlled devices of the security system as a result of the above discovery process

(e.g., because it now has the signaling protocol information needed for

communication). (Ex. 1004, ¶¶ 0037, 0043.)

### d.     Claim element 1[c]: "the security system including security system components"

The '619 patent discloses that "security system components" can be sensors

or any other components "belonging to the security system." (Ex. 1001, 4:40-45.)

While Wimsatt does not illustrate sensors in its security system, a POSITA would

have understood that the security system indeed includes sensors. (Ex. 1002, ¶ 85.)

Wimsatt discloses at paragraph [0031] that "tripping a zone on a burglar alarm …

causes the control units to display a security screen having controls that allow the

alarm to be de-activated." (Ex. 1004, ¶ 0031.) A POSITA would have understood

that a "burglar alarm" is a security system and that at least one sensor is located

within each zone of the house. (Ex. 1002, ¶ 85.) It is this sensor (or sensors) that is

"tripped" and sets off an alarm.  Thus, sensors are inherent in Wimsatt.

To the extent Patent Owner disagrees, it would be obvious from Wimsatt

that its security system includes sensors. It was well known at the time of the '619

patent that home security systems came equipped with multiple sensors (e.g.,

motion sensors, door sensors, window sensors, etc.) that could be mounted at

various locations throughout a home. (Ex. 1002, ¶ 86.) As Mr. Parker explains in

12

Petition for *Inter Partes* Review of
Patent No. 8,473,619

his declaration, sensors are the "eyes" of a home security system. (*Id.*) Without

sensors, a home security system is blind and cannot function. (*Id.*)

To the extent the Patent Owner further argues that a more specific disclosure

of sensors is required, Johnson has that disclosure. As illustrated in the below

excerpted and annotated Figure 5 of Johnson, the security system 60 includes

"security sensors." (*See also,* Ex. 1005, FIG. 3 (illustrating icons for well-known

components of a home security system, e.g., a door sensor, a window sensor and a

smoke alarm).)



FIG. 5

While a POSITA would have understood that Wimsatt already indicates the

13

Petition for *Inter Partes* Review of
Patent No. 8,473,619

presence of sensors, it would be obvious to modify Wimsatt to include the plurality

of security sensors disclosed in Johnson to make this disclosure more explicit. (Ex.

1002, ¶ 88.)

> **e.    Claim element 1[d]: "wherein the connection management component forms a security network by automatically discovering the security system components and integrating communications and functions of the security system components into the security network"**

For clarity, this limitation is divided into three parts and discussed

separately. Petitioner discusses "form[ing] a security network" last because it is the

end result of "automatically discovering" and "integrating" the devices.

> **i.    "the connection management component … automatically discovering the security system components"**

Wimsatt discloses that its control panel 101, including the connection

management component, can implement a "system discovery process." According

to Wimsatt, "[w]hen a control panel 101 is coupled to a controlled device or

subsystem, it interrogates that device or subsystem to learn details of the control

interface of that particular system." (Ex. 1004, ¶ 0045.) Wimsatt also explains that

when the interrogation process does not work correctly, "the control panel can be

**manually or semi-automatically** programmed to support that controlled device or

subsystem." (*Id.* (emphasis added)) This last passage indicates that the

interrogation process is automatic (i.e., the control panel 101 automatically

14

Petition for *Inter Partes* Review of
Patent No. 8,473,619

discovers the controlled devices) because manual or semi-automatic programming is only performed when the automatic interrogation fails. (*See also,* Ex. 1004, ¶ 0006 (describing the difficulties of manually adding devices to a network).) Per this disclosure, the control panel 101 can automatically discover the home security system when the home security system is coupled to the control panel 101.

Wimsatt also discloses that its control panel 101 implements "Universal Plug-and-Play (UPnP™) processes." (Ex. 1004, ¶ 0054.) It was well known at the time of the '844 patent that UPnP™ was used to auto-discover 2-way devices connected to a shared network. (Ex. 1002, ¶ 91 (citing to Ex. 1011, 7).)

Wimsatt does not explicitly disclose that its security system's sensors are automatically discovered using this process – it only explicitly discloses that the "security system" is discovered. A POSITA would have understood that discovering the security system would also include discovering its sensors. (Ex. 1002, ¶ 92.) To the extent Patent Owner disputes this, Severson discloses a security system that includes a controller and a plurality of sensors. (Ex. 1006, FIG. 1, 4:3-29.) Severson explains that "without human intervention" "each system controller may be operated to 'self-learn' each of its sensors." (Ex. 1006, 25:3-13.) In describing a system installation process, Severson explains that the sensors and controller are mounted at the home and then "the controller is enabled and self-learns each of its sensors/transducers as they report their status." (Ex. 1006, 25:51-

15

Petition for *Inter Partes* Review of
Patent No. 8,473,619

26:7; *see also, id.*, 23:60-25:50.) As a result, "[i]nstallation time is thereby reduced with minimal potential installer error, due to the CPU self-learning its reporting sensors." (*Id.*, 25:51-26:7.) This is similar to the auto-discovery process described in the '619 patent. (*See, e.g.,* Ex. 1001, FIG. 14, 24:66-26:5.)

***Motivation to Combine Severson with Wimsatt and Johnson:*** It would be obvious to a POSITA to combine the auto-discovery disclosure with Wimsatt and Johnson so that the control panel 101 in Wimsatt can auto-discover the security sensors in addition to the discovering the security system controller. (Ex. 1002, ¶ 93.) This would predictably result in an easier sensor installation process and reduce the likelihood of installer error. (Ex. 1002, ¶ 93; *see also,* Ex. 1006, 26:5-7.)

As previously discussed, Wimsatt already discloses an automatic discovery process for learning the security system so it would be obvious to a POSITA to further discover the sensors that form part of that system. (Ex. 1004, ¶ 0045; Ex. 1002, ¶ 94.) A POSITA would understand that the control panel 101 would want to "discover" all of the devices that it and the data center 20 server in Johnson controls. Severson illustrates the ability and desire for similar controllers to automatically discover devices at the security component level. A POSITA would understand that adding an extra step in the automatic discovery process to include discovery of the sensors would be easy to implement. (Ex. 1002, ¶ 94.)

16

Petition for *Inter Partes* Review of
Patent No. 8,473,619

> ii. **"the connection management component … integrating communications and functions of the security system components into the security network"**

As background, Wimsatt discloses a home automation system. The purpose of a home automation system, in general, is to communicate with and control the functionality of multiple home-based devices such as lighting, heating and air conditioning, media equipment, and security systems. (Ex. 1004, ¶¶ 0005-0006.) In its background section, Wimsatt provides an example of how such systems were known to operate with home security systems: "Home automation systems may be integrated with a home security system so that when a fire alarm is raised, for example, internal and external lights will be turned on." (Ex. 1004, ¶ 0005.) In other words, it was well known at the time of the '619 patent that home automation systems communicated with home-based devices (such as the lights in the above example) and controlled their functionality (i.e., the system commanded the lights to "turn on"). Thus, the general concept of integrating communications and functions of home-based devices into a home automation system was well known long before the earliest priority date of the '619 patent. (Ex. 1002, ¶ 95.)

Looking at Wimsatt's system specifically, the control panel 101, including the connection management component, "integrat[es]" communications and functions of its home-based control devices through the system discovery process discussed above. (*See, e.g.,* Ex. 1004, ¶ 0045.) Through this discovery process, the

17

Petition for *Inter Partes* Review of
Patent No. 8,473,619

control panel 101 is able to "learn" various details about the controlled device, such as its command set, signaling protocol information, and the functionality available for that device. (Ex. 1004, ¶ 0046.) The control panel 101 is then able to communicate with and control the functions of that device. (Ex. 1002, ¶ 96.)

Wimsatt identifies the home's security system as one type of controlled device. (*See, e.g.,* Ex. 1004, ¶¶ 0012, 0029, 0058.) The specification also states that "control application software executes on the control unit to communicate control information such as commands, **sensor messages**, status messages, and the like with … controlled systems (e.g., **security systems** …)." (*Id.* ¶ 0012 (emphasis added).) It further explains that this software "may enable features of the security system to be enabled/disabled." (Ex. 1004, ¶ 0058.) A POSITA would have understood that controlling features of a security system would include controlling features (i.e., functions) of the security system's sensors via the home's security system. (Ex. 1002, ¶ 97.) The control panel 101 would not otherwise have the ability to control or communicate with the devices if it had not discovered the devices and integrated their functionality into itself and the overall system. Thus, this portion of the limitation is satisfied by Wimsatt, Johnson and Severson.

### iii.    "the connection management component forms a security network …"

A POSITA would have understood that the claimed "security network" is formed in Wimsatt (as modified by Johnson and Severson) as a result of the

18

Petition for *Inter Partes* Review of
Patent No. 8,473,619

control panel's CMC integrating the functions of the security system sensors. (Ex. 1002, ¶¶ 98-100.) Wimsatt actually refers to its overall network more generically as a "home automation system" because its control panel 101 integrates the functions of many other types of home-based control devices, in addition to security-related devices. (*See, e.g.,* Ex. 1004, ¶¶ 0005, 0012.) But, a POSITA would have understood that this home automation system includes a security network, which is specific to the security-related devices. (Ex. 1002, ¶¶ 98-100.)

> **f.    Claim element 1[e]: "a security server at a second location different from the first location, wherein the security server is coupled to the gateway"**

This limitation is disclosed by Wimsatt and Johnson. Petitioner relies on Johnson for disclosing a remotely located server coupled to a control panel. (*See also*, Ex. 1002, ¶ 101.) Johnson discloses a control unit 30 that is similar to panel 101 in Wimsatt and that is located within a user's home. (Ex. 1005, 4:15-39.) Control unit 30 in Johnson is coupled to a remotely located data center 20 via a global computer network 12. (*Id.*) Johnson explains that its data center 20 comprises "**one** or more server computers" that are "capable of receiving, storing and transmitting various types of data related to the homeowner's home," including security data. (Ex. 1005, 4:40-53 (emphasis added); *see also, id.*, 4:16-39.) This data center 20 server is the claimed "security server." The data center 20

19

Petition for *Inter Partes* Review of
Patent No. 8,473,619

server in Johnson is located remotely from the user's home and is thus "in a second location different from the first location." (*See*, Ex. 1005, FIG. 5.)

> ***Motivation to Combine Johnson with Wimsatt and Severson:*** It would be obvious to a POSITA to combine Johnson with Wimsatt and Severson so that panel 101 in Wimsatt is coupled to data center 20 server in Johnson. (Ex. 1002, ¶ 102.) As a result of this coupling, the control panel 101 can be remotely accessed and controlled through data center 20 server as described in Johnson. (*Id.*) Johnson specifically improves upon panel 101 in Wimsatt and explains that "[o]ur society has become extremely mobile with the reduced expense and ease of travel leaving many homes unattended while the homeowner is traveling or at work" (Ex. 1005, 1:14-16) and that "there is a need for a home monitoring system that allows a homeowner to monitor their home from a distant location." (*Id.*, 1:14-25.) Coupling panel 101 in Wimsatt to remotely located data center 20 server would allow for such remote monitoring and control. (Ex. 1002, ¶¶ 102-103.)

A POSITA would be further motivated to combine Johnson with Wimsatt because control unit 30 in Johnson is similar to panel 101 in Wimsatt. (Ex. 1002, ¶ 103.) Control unit 30 and panel 101 are systems that integrate functionality from multiple subsystems (e.g., security systems, lighting systems, entertainment systems, surveillance systems, etc.) into a single controller for user control and convenience. (*See, e.g.,* Ex. 1004, ¶¶ 0022-0023; Ex. 1005, 4:16-39.) Furthermore,

20

Petition for *Inter Partes* Review of
Patent No. 8,473,619

panel 101 in Wimsatt is already connected to the Internet so it would be an easy task for the panels to connect with data center 20 server in Johnson. (Ex. 1002, ¶ 103.) The end result would be a system that allows a homeowner to directly control aspects of the panels (and their subsystems) from remote locations similar to Johnson. Severson illustrates the ability and desire for similar controllers to automatically discover devices at the security component level. A POSITA would understand that adding an extra step in the automatic discovery process to include discovery of the sensors would be easy to implement. (Ex. 1002, ¶ 103.)

> **g.** **Claim element 1[f]: "wherein the gateway receives security data from the security system components, device data of a plurality of network devices coupled to a local network of the first location that is independent of the security network, and remote data from the security server,"**

Wimsatt and Johnson disclose this limitation. In general, Wimsatt discloses that its control panel 101 receives "status signals" from the controlled devices. (Ex. 1004, ¶ 0044.) The controlled devices include, for example, IP cameras and the home's security system.

With respect to the security system's sensors specifically, Wimsatt discloses several scenarios where a burglar alarm (i.e., one or more sensors) is triggered, causing the control panel 101 to sound an alarm. (Ex. 1004, ¶¶ 0030-0031, 0059.) A POSITA would have understood that, in these particular scenarios, the status of the security system's sensors is sent to the control panel 101 in some form. (Ex.

21

Petition for *Inter Partes* Review of
Patent No. 8,473,619

1002, ¶ 105; *see also,* Ex. 1004, ¶¶ 0044, 0056, 0059; *compare to* Ex. 1001, 27:5-10.) Thus, it would be obvious to a POSITA that the control panel 101 in Wimsatt receives "security data" from the security system sensors. (Ex. 1002, ¶ 105.)

With respect to the "network devices", the '619 patent discloses that these can be IP cameras. (*See, e.g.,* Ex. 1001, 14:20-27, FIG. 5.) Wimsatt discloses IP cameras 109. (Ex. 1004, ¶¶ 0038, 0072 ("one or more monitor cameras such as IP camera 109").) As just discussed, the control panel 101 in Wimsatt receives "status signals" from the IP cameras. (Ex. 1004, ¶ 0044; *see also, id.*, ¶ 0038 (explaining that IP cameras "communicate control messages with a network-coupled control panel 101"), ¶ 0056 (describing "control messages" as "including command and status messages").) Wimsatt also discloses that the control panel 101 receives a streaming input from the IP cameras. (Ex. 1004, ¶¶ 0072, 0075, FIG. 6.) It further discloses that the control panel 101 receives details about the IP cameras (e.g., signaling protocol information) as part of the discovery process. (Ex. 1004, ¶ 0045.) Thus, Wimsatt clearly discloses that its control panel 101 receives "device data of the network devices" as recited in this limitation.

Wimsatt further discloses that the IP cameras are coupled to a local area network (LAN) via a hub 103, which is described as implementing an Ethernet connection among the system devices. (Ex. 1004, ¶ 0036, FIG. 1.) It is well known that Ethernet connections form LANs. (Ex. 1002, ¶ 107.). The hub 103 in Wimsatt

22

Petition for *Inter Partes* Review of
Patent No. 8,473,619

is located within the home and therefore the LAN is also located at the "first location." (*See, e.g.,* Ex. 1004, ¶¶ 0036, 0038, 0040 (each passage describing physical couplings between the hub 103 and system devices located within the home indicating the hub's physical presence within the home).) Because the IP cameras 109 are coupled to the hub 103 and not the control panel 101 in Wimsatt, the IP cameras can be considered part of a "local network" that is independent from the "security network" which consists of the security system and the sensors with which it directly communicates. (Ex. 1002, ¶ 107.) Thus, Wimsatt discloses that its IP cameras are coupled to a local network that is independent from the security network.

With respect to the security server and "remote data", as previously discussed, it would have been obvious to a POSITA to modify Wimsatt so that the control panel 101 is coupled to the data center 20 server in Johnson (i.e., the claimed "security server"). *See* **Part IX.C.1.f** above. Johnson discloses that its control unit 30 "may [] download any data from the data center 20 such as commands from the homeowner." (Ex. 1005, 5:13-18; *see also, id.*, 6:65-7:2, 7:67-8:4.) This data is the claimed "remote data." It would have been obvious to modify the control panel 101 in Wimsatt so that it receives data from the remotely-located data center 20 server in the same manner described for the control unit 30 in Johnson. (Ex. 1002, ¶ 108.) As such, a homeowner in Wimsatt would be able to

23

Petition for *Inter Partes* Review of
Patent No. 8,473,619

remotely control the control panel 101 and the networked controlled devices

through the data center 20 server as described in Johnson. (*Id.*) The motivations to

combine Wimsatt, Johnson and Severson discussed above in **Part IX.C.1.f** apply

here. Thus, Wimsatt (as modified by Johnson and Severson) discloses that its

control panel 101 receives "remote data from the security server" as recited in this

limitation.

> h.  **Claim element 1[g]: "wherein the gateway generates
> processed data by processing at the gateway the
> security data, the device data, and the remote data,"**

Wimsatt and Johnson disclose this limitation. The control panel 101 in

Wimsatt includes a processor 201 that "implements data processing functionality

for accessing and manipulating data from various subsystems and memory." (Ex.

1004, ¶ 0047.) Thus, it would be obvious for this processor 201 to generate

"processed data" by processing the "security data" from the security system

sensors, the "device data" from the IP cameras, and the "remote data" from the

data center 20 server in Johnson. (Ex. 1002, ¶ 109.)

With respect to the "security data", as previously discussed, when one or

more security system sensors are activated (e.g., a burglar alarm is triggered), the

sensors transmit a "status signal" that is received at the control unit 101. (*See, e.g.,*

Ex. 1004, ¶¶ 0030-0031, 0059.) According to Wimsatt, the control panel's

processor 201 includes a message broker process that receives this status signal,

24

Petition for *Inter Partes* Review of
Patent No. 8,473,619

interprets it, and then passes it to the security plug-in for further processing. (Ex. 1004, ¶¶ 0044, 0056, 0058-0059.)   If the security plug-in (executed by the processor 201) determines that the received "security data" indicates an intrusion, it activates the necessary audio plug-in to sound an alarm on the control panel 101. (Ex. 1004, ¶ 0059.) Thus, the "security data" is "processed" by the control panel's processor 201.

With respect to the "device data", a POSITA would understand that any status signal from the IP cameras 109 would be processed by the processor 201 in a manner similar to that described above for the "security data". (Ex. 1002, ¶ 111.) Any streamed input received at the control panel 101 from the IP cameras 109 would also necessarily require processing. (Ex. 1002, ¶ 111.) Furthermore, when the "device data" is, for example, the signaling protocol information received by the control panel 101 as part of the IP camera discovery process, a POSITA would have understood that this information is processed by the processor 201 because the processor 201 uses this information to generate messages that can be communicated to the IP camera via that protocol. (Ex. 1002, ¶ 111; *see also,* Ex. 1004, ¶¶ 0038, 0045, 0054.)

Finally, with respect to the "remote data", as previously discussed, when the control panel 101 in Wimsatt is modified by Johnson, the control panel 101 is capable of receiving data from a remotely-located data center 20 server. *See* **Part**

25

Petition for *Inter Partes* Review of
Patent No. 8,473,619

**IX.C.1.g** above. The data can be, for example, commands entered by a homeowner instructing the control panel 101 to change one or more settings on a controlled device (e.g., the home security system). (*See, e.g.,* Ex. 1005, 4:15-53.) A POSITA would understand that data received at the control unit 101 from data center 20 server would be processed by the control unit's processor 201 so that the data can be interpreted and the appropriate actions taken by the control unit 101 to modify the settings of the particular controlled device. (Ex. 1002, ¶ 112.) The same motivations to combine Wimsatt and Johnson discussed in **Part IX.C.1.f** apply here.

      i.      **Claim element 1[h]: "wherein the gateway determines a state change of the security system using the processed data and maintains objects at the security server using the processed data, wherein the objects correspond to the security system components and the plurality of network devices"**

Wimsatt and Johnson disclose this limitation in its entirety. For clarity, this limitation is divided into two parts and discussed separately.

      i.      **"wherein the gateway determines a state change of the security system using the processed data …"**

Wimsatt and Johnson also disclose this limitation. Wimsatt discloses that the control panel 101 can be used to arm and disarm the home's security system. (Ex. 1004, ¶¶ 0065-0066, 0070-0071, 0074.) When Wimsatt is modified by Johnson, a homeowner can control this functionality remotely through the data center 20

26

Petition for *Inter Partes* Review of
Patent No. 8,473,619

server. For example, if the status (or "state") of the security system (and its sensors) is "unarmed", then the homeowner can send a command signal though the data center 20 server to the control panel 101 instructing the control panel 101 to change the status (or "state") of the security system (and its sensors) to "armed". (Ex. 1002, ¶¶ 114-115.) A POSITA would have understood that the control panel 101 in Wimsatt must process this "remote data" from the data center 20 server to determine what command needs to be implemented. (*Id.*) Here, upon processing, the control panel 101 would have determined that the status (or "state") of the home security system needs to be changed from "unarmed" to "armed." (*Id.*)

        ii.      **"wherein the gateway … maintains objects at the security server using the processed data, wherein the objects correspond to the security system components and the plurality of network devices"**

The '619 patent explains that the remote security server "provide[s] access to, and management of, the objects associated with an integrated security system." (Ex. 1001, 8:29-41.) It further explains that "every **object** monitored by the gateway 102 is called a **device**." (*Id.* (emphasis added)) "Devices include the sensors, cameras, home security panels and automation devices." (*Id.*)

Wimsatt and Johnson disclose the above limitation consistent with this disclosure in the '619 patent. As shown below in Figure 3 of Johnson, the homeowner accesses a web page "displayed by the data center 20" and can

27

Petition for *Inter Partes* Review of
Patent No. 8,473,619

"monitor[] and control[]" aspects of the security system and cameras using that

web page. (Ex. 1005, 4:30-36, 5:29-39, 6:35-59.)



Johnson explains that a homeowner can "modify any preprogrammed

settings within the home" by "simply select[ing] the desired feature on the control

page 76 of the desired home as shown in FIGS. 3 and 7." (Ex. 1005, 6:61-65.)

"The homeowner may then enter the desired data into the computer 16 which is

28

Petition for *Inter Partes* Review of
Patent No. 8,473,619

transmitted to the data center 20 which forwards the information directly to the control unit 30 which transmits the data accordingly modifying any previous settings." (Ex. 1005, 6:65-7:4.) When Wimsatt is modified by Johnson, the homeowner is able to remotely control the control panel 101 and the controlled devices in the same manner. (Ex. 1002, ¶ 118.)

A POSITA would have understood that the icons illustrated on the above web page represent particular controlled devices located within the home in Wimsatt. (Ex. 1002, ¶ 119.) These icons are the claimed "objects" maintained and stored at the data center 20 servers. For example, the icon labeled "camera" is an object at the server corresponding to the IP cameras 109. Similarly, the icons labeled "door" and "window" are objects at the server corresponding to a door sensor and a window sensor, respectively.

A POSITA would have also understood that the data center 20 server maintains the status of each of these objects (corresponding to the camera, window and door sensors) using the processed data it receives from the control panel 101, as discussed in **Part IX.C.1.h** above. (Ex. 1002, ¶ 120.) As Mr. Parker explains in his declaration, it would be difficult to change a device's settings without knowing the current status of that device. (Ex. 1002, ¶ 120; *see also,* Ex. 1005, 7:6-8.) Thus, it would be obvious to a POSITA to conclude that the control panel 101 in Wimsatt transmits the processed security data and device data to the data center 20 server so

29

Petition for *Inter Partes* Review of
Patent No. 8,473,619

that the web page displayed for the homeowner has the most up-to-date information about the objects. (Ex. 1002, ¶ 120.) Thus, the control panel 101 in Wimsatt "maintains" the "objects at the security server using the processed data."

For at least these reasons, Wimsatt in view of Johnson and Severson disclose claim 1.

### 2.   Dependent claim 16

| 16 | The system of claim 1, wherein the security system is coupled to a central monitoring station via a primary communication link, wherein the gateway is coupled to the central monitoring station via a secondary communication link that is different than the primary communication link, wherein the central monitoring station is located at a third location different from the first location and the second location. |

Claim 16 is rendered obvious by Wimsatt and Johnson. Johnson discloses that its control unit 30 can communicate over the Internet with an auxiliary service 80 to report a security breach. (Ex. 1005, 6:6-11, 6:27-29, 4:20-21, FIG. 5 ("security service").) A POSITA would understand from Johnson that the auxiliary service could be a security agency or service that can call the homeowner at, for example, their office to notify them of the breach. (*Id.*, 1:27-32.) This auxiliary service / agency is the claimed "central monitoring station" and is at a third location separate from the first location and second location. The Internet can be implemented by, for example, a "digital subscriber line (DSL)," which is the claimed "secondary communication link." Thus, Wimsatt in view of Johnson

30

Petition for *Inter Partes* Review of
Patent No. 8,473,619

discloses "*wherein the gateway is coupled to the central monitoring station via a secondary communication link.*"

In its background section, Johnson explains that conventional security system panels communicate directly with security agencies. (Ex. 1005, 1:27-32.) Nothing in Wimsatt suggests that its security system panel loses any functionality when it is connected to the control panel 101 as part of the home automation system. According to Wimsatt, the control panel 101 is intended to work with *existing devices* and merely provides a user-friendly interface through which those devices can be controlled. (Ex. 1004, ¶¶ 0023, 0065.) Wimsatt is silent with respect to the control panel 101 being capable of communicating with an outside service, such as a central monitoring station, so a POSITA would have understood that the security system in Wimsatt maintains the ability to contact the monitoring station even when it is part of the home automation system. (Ex 1002, ¶ 114.)

Wimsatt and Johnson do not disclose how the security system communicates with the monitoring center, but Severson does. Severson discloses that its security system controller communicates with a central monitoring station 4 via one or more telephone lines. (Ex. 1006, 3:57-4:2.) When Wimsatt is modified by Severson and Johnson, the security system in Wimsatt communicates with the security agency via a telephone line. This telephone line is the claimed "primary communication link." A telephone line is a different communication channel than a

31

Petition for *Inter Partes* Review of
Patent No. 8,473,619

DSL.

It would have been obvious to combine Wimsatt with Johnson and Severson so that both the security system and the control panel 101 in Wimsatt are capable of contacting a security agency (or central monitoring station). (Ex. 1002, ¶¶ 145-146.) A POSITA would have understood the benefit of having two devices capable of contacting a security agency on different communication channels. (*Id.*) For example, once device (e.g., the control panel 101) could act as a back-up in case the first device (e.g., the security system) failed to make contact with the central monitoring station.

### 3.    Dependent claim 17 – Ground 1

| 17 | The system of claim 16, wherein the gateway transmits event data of the security system components to the central monitoring station over the secondary communication link. |
|----|----|

Claim 17 is disclosed by Wimsatt in view of Johnson, Severson and Naidoo. An overview of Naidoo's security system is illustrated below. (Ex. 1007, FIG. 7.) As shown, the security gateway 115 in Naidoo (which is located on a homeowner's premises) communicates directly with a data center 132 (similar to Johnson) as well as a central monitoring station 136 (also similar to Johnson). Naidoo discloses that, upon detection of an alarm event, the gateway 115 sends the central monitoring station 136 "notification of the alarm condition and information relating to the alarm condition, which may include alarm video." (Ex. 1007, ¶¶

32

Petition for *Inter Partes* Review of
Patent No. 8,473,619

0070-0071.)



When Wimsatt in view of Johnson is further modified by Naidoo, the control panel 101 in Wimsatt is capable of sending the security sensor alarm data to the central monitoring station 136, as described in Naidoo. Transmission between the control panel 101 and the central monitoring station 136 occurs over the DSL, as discussed in claim 16. (Ex. 1002, ¶ 148.)

It would have been obvious to a POSITA to combine Naidoo with Wimsatt, Johnson and Severson so that the control panel 101 in Wimsatt could communicate certain event data with the central monitoring station. (Ex. 1002, ¶ 149.) As discussed in Naidoo, by providing the sensor event data to the central monitoring

33

Petition for *Inter Partes* Review of
Patent No. 8,473,619

station, an operator, in short order, is able to "verif[y] whether the alarm signal corresponds to an actual alarm condition using the alarm signal information and the segment of real-time video," and then take appropriate action. (Ex. 1007, ¶¶ 0075, 0077, 0008, 0011, 0027.) "Timely response may increase the chance of apprehending an intruder, and in the case of life-threatening circumstances, reduce the likelihood of injury or death." (*Id.*, ¶ 0100.) A POSITA would have understood these benefits and been motivated to combine Naidoo with Wimsatt, Johnson and Severson to enhance their respective security capabilities and first-responder response times.

A POSITA would have also understood that sending sensor data and video data is a relatively easy task, especially since Johnson already provides for the connection between the control panel 101 in Wimsatt and a central monitoring station. (Ex. 1002, ¶ 150.)

### 4.    Dependent claim 18 – Ground 1

| 18 | The system of claim 17, wherein the event data comprises changes in device states of the security system components, data of the security system components, and data received by the security system components. |
|----|---|

As discussed for claim 17, Naidoo discloses that, upon detection of an alarm event, the gateway 115 sends the central monitoring station 136 "notification of the alarm condition and **information relating to the alarm condition**." (Ex. 1007, ¶¶

34

Petition for *Inter Partes* Review of
Patent No. 8,473,619

0070-0071 (emphasis added).) Thus, for the same reasons discussed for claim 17,

claim 18 is rendered obvious under Ground 1.

### 5. Dependent claim 20 – Ground 2

| 20 | The system of claim 16, wherein the secondary communication link includes a General Packet Radio Service (GPRS) coupling. |
|---|---|

It is well known that GPRS communications are a type of mobile

communication. (Ex. 1002, ¶ 153.) Naidoo discloses that gateway 115 can transmit

to a security server 131 (similar to the data center 20 server in Johnson) via a

"mobile communications network." (Ex. 1007, ¶ 0043.) It would be obvious to a

POSITA that the gateway 115 in Naidoo could also communicate with the central

monitoring station 136 via this same mobile communications network as long as

the station 136 is equipped to handle such communication. (Ex. 1002, ¶ 153.)

Anthony discloses a security system that allows continuous remote

monitoring and analysis. (Ex. 1009, ¶ 38.) Audiovisual signals and other signals

from the system can be transmitted via general packet radio service ("GPRS"),

which is a mobile communication mode. (Ex. 1002, ¶ 154.)

It would be obvious to a POSITA to combine Naidoo with Wimsatt, Johnson

and Severson so that the control panel 101 in Wimsatt can communicate with the

central monitoring station via the mobile communications network disclosed in

Naidoo. (Ex. 1002, ¶ 155.) It would further be obvious to a POSITA to combine

Anthony with Naidoo, Wimsatt, Johnson and Severson to utilize available mobile

35

Petition for *Inter Partes* Review of
Patent No. 8,473,619

communication modes, such as GPRS.  (*Id.*)

### 6.    Dependent claim 21 – Ground 1

| 21 | The system of claim 16, wherein the gateway transmits messages comprising event data of the security system components to remote client devices over the secondary communication link. |
|---|---|

Naidoo discloses that its security server 131 can "create a data connection between remote station 155 and security gateway 115 such that communications between remote station 155 and security gateway 115 bypass security system server 131." (Ex. 1007, ¶ 0041.) Through this connection, the gateway 115 can "transmit the alarm signal and alarm video corresponding to the alarm condition automatically to [the] customer … at an email address [or] by any other electronic means." (*Id.*, ¶ 0069.) As discussed for claim 8, Johnson discloses various types of "remote client devices" that can be implemented in Wimsatt.

It would have been obvious to a POSITA to combine the above disclosures from Naidoo with Wimsatt, Johnson and Severson so that the control panel 101 in Wimsatt is capable of directly communicating event data with the remote client devices (such as those described in Johnson). (Ex. 1002, ¶ 157.) This communication would be over the DSL channel as described for claim 16 (the relevant arguments for which apply here) because that is the channel the control panel 101 uses when communicating with external devices / entities. (Ex. 1002, ¶ 157.)

36

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Naidoo explains that bypassing a security server "avoids network bottlenecks" at the server – this is especially important during an alarm condition when server resources should be spent processing alarm data instead of sending messages to customers. (Ex. 1007, ¶ 0041.) In other words, the direct connection can provide a better allocation of resources. (Ex. 1002, ¶ 158.)

Also, a POSITA would have understood that creating this connection between devices would have been a relatively simple task since the control panel 101 and the remote client devices are already connected to the Internet (via DSL). (Ex. 1002, ¶ 159.) Furthermore, when a homeowner is remotely located from the home, receiving a message with this data would have brought "peace of mind" that the situation is being handled and it would quickly alert the homeowner of the alarm condition so they can appropriately. A POSITA would understand the aforementioned benefits and would have been motivated to combine these references. (Ex. 1002, ¶ 159.)

### 7. Dependent claim 22 – Ground 1

| 22 | The system of claim 21, wherein the event data comprises changes in device states of the security system components, data of the security system components, and data received by the security system components. |
|----|---|

As discussed for claim 21, the gateway 115 in Naidoo can "transmit the alarm signal and alarm video corresponding to the alarm condition automatically to [the] customer … at an email address [or] by any other electronic means." (1007, ¶

37

Petition for *Inter Partes* Review of
Patent No. 8,473,619

0069.) Thus, for the same reasons discussed for claim 21, claim 22 is rendered obvious.

### 8. Dependent claim 24

| 24 | The system of claim 1, wherein the security network comprises network devices coupled to the gateway via a wireless coupling. |
|---|---|

Wimsatt discloses "security cameras" that are understood to be part of the security network because they are a security-related device. (Ex. 1004, ¶ 0040, FIG. 1 (item 125).) Wimsatt also discloses that its control panels 101 can be wireless (referred to as control panels 107); thus, the control panel 101 can communicatively couple to the security camera, or any other such devices, via a "wireless coupling". (*Id.*, ¶¶ 0037, 0044, FIG. 1.)

### 9. Dependent claim 29 – Ground 1

| 29 | The system of claim 24, wherein the gateway including the connection management component transmits event data of the network devices to remote client devices over at least one of a plurality of communication links. |
|---|---|

Claim 29 is similar to claim 17 but recites that "event data of the network devices" is transmitted by the gateway to "remote client devices over at least one of a plurality of communication links". As discussed for claim 17, Naidoo discloses that, upon detection of an alarm event, the gateway 115 sends the central monitoring station 136 "notification of the alarm condition and information relating to the alarm condition, **which may include alarm video**." (Ex. 1007, ¶¶ 0070-0071 (emphasis added).)

38

Petition for *Inter Partes* Review of
Patent No. 8,473,619

As discussed for claim 21, Naidoo discloses that its security server 131 can "create a data connection between remote station 155 and security gateway 115 such that communications between remote station 155 and security gateway 115 bypass security system server 131." (Ex. 1007, ¶ 0041.) Through this connection, the gateway 115 can "transmit the alarm signal and **alarm video** corresponding to the alarm condition automatically to [the] customer … at an email address [or] by any other electronic means." (*Id.*, ¶ 0069 (emphasis added).) As discussed for claim 8, Johnson discloses various types of "remote client devices" that can be implemented in Wimsatt.

It would have been obvious to a POSITA to combine the above disclosures from Naidoo with Wimsatt, Johnson and Severson so that the control panel 101 in Wimsatt, including the CMC, is capable of directly communicating event data with the remote client devices (such as those described in Johnson). (Ex. 1002, ¶ 169.) This communication would be over the DSL channel as described for claim 16 (the relevant arguments for which apply here) because that is the channel the control panel 101 uses when communicating with external devices / entities. (Ex. 1002, ¶ 169.) As also discussed for claim 16, the combined system discloses a plurality of different communication links, such as DSL, telephone line, Internet, etc.

It would be obvious to combine Naidoo with Wimsatt, Johnson and Severson for the same reasons discussed for claim 21.

39

Petition for *Inter Partes* Review of
Patent No. 8,473,619

### 10.    Dependent claim 30 – Ground 1

| 30 | The system of claim 29, wherein the gateway receives control data for control of the network devices from remote client devices via at least one of the plurality of communication links. |
|----|-----|

Wimsatt in view of Johnson discloses that the user can control the security system (and its sensors) via the web page 76. (Ex. 1005, 6:35-7:4.) The user can select an item on the web page 76 and provide a "command" to change a specific setting. (Ex. 1005, 7:47-8:5.) The data center 20 server then transmits this "command" to the control panel 101 which transmits data to any of its controlled devices (including network devices, such as cameras) to modify the setting. (Ex. 1005, 7:47-8:5, 6:61-7:4.) This "command" is the claimed "control data." The control panel 101 communicates with the data center 20 server via the Internet, which is one of a plurality of communication links available in the combined system. Furthermore, as discussed for claim 6, the user accesses the web page 76 remotely via a remote device, such as a computer. (*See, e.g.,* Ex. 1005, FIG. 5, Abstract, FIG. 1, 4:30-36, 5:29-39, 6:35-59.)

### 11.    Dependent claim 31 – Ground 1

| 31 | The system of claim 29, wherein the event data comprises changes in device states of the network devices, data of the network devices, and data received by the network devices. |
|----|-----|

As discussed for claim 29, Naidoo discloses that, upon detection of an alarm event, the gateway 115 sends the central monitoring station 136 "notification of the alarm condition and **information relating to the alarm condition, which may**

40

Petition for *Inter Partes* Review of
Patent No. 8,473,619

**include alarm video**.” (Ex. 1007, ¶¶ 0070-0071 (emphasis added).) Thus, for the

same reasons discussed for claim 29, claim 31 is rendered obvious under Ground 1.

### 12. Dependent claim 32

| 32 | The system of claim 24, wherein the security system is coupled to a central monitoring station via a primary communication link, wherein the gateway is coupled to the central monitoring station via a secondary communication link that is different than the primary communication link. |
|----|---|

Claim 32 is substantively identical to claim 16 except for its dependency on

claim 24, which has no bearing on the claim language. Thus, claim 32 is obvious

for the same reasons discussed with respect to claim 16.

### 13. Dependent claim 33 – Ground 1

| 33 | The system of claim 32, wherein the gateway transmits event data of the network devices to the central monitoring station over the secondary communication link. |
|----|---|

Claim 33 recites “event data of the network devices” but is otherwise

identical to claim 17. As discussed for claim 17, Naidoo discloses that, upon

detection of an alarm event, the gateway 115 sends the central monitoring station

136 “notification of the alarm condition and information relating to the alarm

condition, which may include **alarm video**.” (Ex. 1007, ¶¶ 0070-0071 (emphasis

added).) Thus, claim 33 is obvious for the same reasons discussed with respect to

claim 17.

41

Petition for *Inter Partes* Review of
Patent No. 8,473,619

### 14.    Dependent claim 35 – Ground 2

| 35 | The system of claim 32, wherein the secondary communication link includes a General Packet Radio Service (GPRS) coupling. |
|----|---|

Claim 35 is substantively identical to claim 20 except for its dependency on claim 32, which has no bearing on the claim language. Thus, for the same reasons discussed for claim 20, claim 35 is rendered obvious under Ground 2.

### 15.    Dependent claim 36 – Ground 1

| 36 | The system of claim 32, wherein the gateway transmits messages comprising event data of the network devices to remote client devices over the secondary communication link. |
|----|---|

Claim 36 is substantively identical to claim 21 except that it recites "event data of the network devices" instead of event data of the security system components.  As discussed for claim 17, however, Naidoo discloses that, upon detection of an alarm event, the gateway 115 sends the central monitoring station 136 "notification of the alarm condition and information relating to the alarm condition, **which may include alarm video**." (Ex. 1007, ¶¶ 0070-0071 (emphasis added).) This video comes from one of the network devices of Wimsatt. Thus, for the same reasons discussed in claim 21, claim 36 is rendered obvious under Ground 1.

### 16.    Dependent claims 37 and 38 – Ground 3

| 37 | The system of claim 24, wherein the security server creates, modifies and terminates couplings between the gateway and the network devices. |
|----|---|
| 38 | The system of claim 24, wherein the security server performs creation, modification, deletion and configuration of the network devices. |

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Alexander describes an integrated information system similar to Wimsatt and Johnson. It includes a premise server 202 (similar to the control panel 101 / unit 30) that controls monitoring devices 206 installed throughout a home. (Ex. 1008, FIG. 2, 7:1-14.) The monitoring devices can include video cameras. (*Id.*) The premise server 202 is connected to a remote central server 210 (similar to the data center 20 server in Johnson) that provides the user interface shown below in Figure 18, which allows users to input data to create (or install) a new monitoring device (*id.*, FIG. 13B, 18:65-19:22) and modify an existing monitoring device (*id.*, 17:54-18:12) to the integrated home system. (*See also, id.*, FIG. 5B (item 518 ("create or modify devices and rules")), FIGs. 13A-B, 14-18, 16:25-17:9, 11:13-17.) Although it does not describe deleting a monitoring device from the system, it would be obvious to a POSITA that "modifying" a device could include deleting it. (Ex. 1002, ¶ 178.)

43

Petition for *Inter Partes* Review of
Patent No. 8,473,619



Alexander further discloses that the central server 210 "configures each monitoring device" 206 using the information input by the user. (Ex. 1008, 19:49-20:2 (cl. 1), 19:23-37.)

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson so that the data center 20 server in Johnson is capable of performing the same functions described in Alexander through its control page 76, thereby predictably resulting in enhanced functionality of the data center 20 server and a simplification of device installation. (Ex. 1002, ¶ 180.) Allowing a user to add and modify other device connections via the control page 76 and data center 20 server in the same manner disclosed in Alexander would enhance the functionality of the data center 20 server as well as allow the user to further customize his home security system. (Ex. 1002, ¶ 180.) A POSITA would understand that these device

44

Petition for *Inter Partes* Review of
Patent No. 8,473,619

connections are "couplings" between the control panel 101 and the network

devices because adding a device to the system necessarily requires that the device

is coupled to the control panel 101 for operation as part of the system.

Alexander, Wimsatt, Johnson and Severson disclose similar integrated home

monitoring systems and control panels. Thus, a POSITA would be motivated to

combine the references to enhance their respective functionalities. (Ex. 1002, ¶

181.)

### 17.   Dependent claim 39 – Ground 3

| 39 | The system of claim 24, wherein the security server creates automations, schedules and notification rules associated with the network devices. |
|----|-----|

Alexander describes a similar process for allowing a user to create rules for

its monitoring devices, which include cameras. (Ex. 1008, 7:1-14, FIG. 13A, FIG.

16, FIG. 19, 18:13-64.) Figure 19 (shown below) illustrates an exemplary user

interface provided by the central server 210 in Alexander that allows the user to

specifically create notification rules for monitoring devices. (*Id.*, 18:55-61.)

45

Petition for *Inter Partes* Review of
Patent No. 8,473,619



Alexander does not describe creating automation and scheduling rules

specifically (except in the context of sending notifications) but it generally refers to

the rule as a "device rule" (*id.*, 18:25) and a "monitoring device processing rule"

(*id.*, 18:37). (*See also, id.*, 18:51-55.) As automation and scheduling rules are

associated with the device and device processing, it would have been obvious to a

POSITA that a user would have been able to create automations and scheduling

rules using the same process described in Alexander. (Ex. 1002, ¶ 183.)

Moreover, Wimsatt discloses scheduling the HVAC system, lighting, sound

and other controlled devices using the control panel 101. (Ex. 1004, FIG. 4F, ¶¶

0067-0068.)

It would be obvious to combine Alexander with Wimsatt, Johnson and

Severson so that the data center 20 server in Johnson is capable of performing the

same functions described in Alexander through its control page 76, thereby

46

Petition for *Inter Partes* Review of
Patent No. 8,473,619

predictably resulting in enhanced functionality of the data center 20 server and a simplification of device installation. (Ex. 1002, ¶ 185.) The rationale and motivations to combine these prior art references discussed for claims 37 and 38 also apply here.

### 18.    Dependent claim 40 – Ground 3

| 40 | The system of claim 24, wherein the security server manages access to current and logged state data for the network devices. |
|----|--------------------------------------------------------------------------|

As previously discussed, Wimsatt in view of Johnson provides a control page 76 that allows users to access the current state of their home (and the devices therein). (Ex. 1005, FIG. 3, 6:35-59, 4:15-39, 7:47-50.) This control panel 76 is managed by the data center 20 server. (*Id.*) Johnson does not describe keeping a "log" of previous state data for its controlled devices but this is disclosed in Alexander. (*See,* Ex. 1005, 4:47-53 (listing data that the server stores).) The central server 210 in Alexander, which is similar to the server in Johnson, includes an "event logs database 214". (Ex. 1008, 7:59-65.) "Event data" is described in Alexander as data "obtained from a monitoring device corresponding to an on/off state." (*Id.*, 11:33-36, 7:1-14.)

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson so that the data center 20 server logs the state data for the controlled devices in Wimsatt. (Ex. 1002, ¶ 187.) This is a simple process of storing data at the server in Johnson once it has been received and keeping it for a period of time.

47

Petition for *Inter Partes* Review of
Patent No. 8,473,619

(*Id.*) This would allow a user to access older data using the control page 76, if needed. (*Id.*) Other rationales and motivations to combine these references are discussed in connection with claims 37 and 38 apply here.

### 19.    Dependent claim 41 – Ground 3

| 41 | The system of claim 24, wherein the security server manages access to current and logged state data for couplings between the gateway and the network devices. |
|----|----|

As previously discussed, Wimsatt in view of Johnson provides a control page 76 that allows users to access the current state of their home (and the devices therein). (Ex. 1005, FIG. 3, 6:35-59, 4:15-39, 7:47-50.) This control panel 76 is managed by the data center 20 server. (*Id.*) Johnson does not describe keeping a "log" of previous state data for its controlled devices but this is disclosed in Alexander. (*See,* Ex. 1005, 4:47-53 (listing data that the server stores).) The central server 210 in Alexander, which is similar to the server in Johnson, includes an "event logs database 214". (Ex. 1008, 7:59-65.) "Event data" is described in Alexander as data "obtained from a monitoring device corresponding to an on/off state." (*Id.*, 11:33-36, 7:1-14.)

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson so that the data center 20 server logs the state data for the controlled devices in Wimsatt, including couplings between the devices and the control panel 101. (Ex. 1002, ¶ 189.) This is a simple process of storing data at the server in

48

Petition for *Inter Partes* Review of
Patent No. 8,473,619

Johnson once it has been received and keeping it for a period of time. (*Id.*) This would allow a user to access older data using the control page 76, if needed. (*Id.*) Other rationales and motivations to combine these references are discussed in connection with claims 37 and 38 apply here.

### 20. Dependent claim 48 – Ground 3

| 48 | The system of claim 1, wherein the security server creates, modifies and terminates users corresponding to the security system. |
|---|---|

Claim 48 is rendered obvious under Ground 3. Alexander describes an integrated information system similar to Wimsatt and Johnson. It includes a premise server 202 (similar to the control panel 101 / unit 30) that controls monitoring devices 206 installed throughout a home. (Ex. 1008, FIG. 2, 7:1-14.) The monitoring devices can include security sensors. (*Id.*) The premise server 202 is connected to a remote central server 210 (similar to the data center 20 server in Johnson), which provides a user interface allowing users to access data related to the monitoring devices. (*Id.*, 3:24-28, 10:57-11:17.) Alexander discloses that, through this interface, a user can "create or modify a number of users to the integrated information system." (Ex. 1008, 12:13-13:10, FIGs. 5A-7.) It would be obvious to a POSITA that "modifying" a user could include terminating a user. (Ex. 1002, ¶ 195.)

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson so that the data center 20 server in Johnson is able to create, modify and

49

Petition for *Inter Partes* Review of
Patent No. 8,473,619

terminate users corresponding to the security system. (Ex. 1002, ¶ 196.) Johnson

already discloses that its server provides users with control pages 76 where they

can view and control their home security system. (Ex. 1005, 6:35-59.) Allowing a

user to add and modify other users via the control page 76 and data center 20

server in the same manner disclosed in Alexander would enhance the functionality

of the data center 20 server as well as allow the user to further customize his home

security system. (Ex. 1002, ¶ 196.)

Alexander, Wimsatt, Johnson and Severson disclose similar integrated home

monitoring systems and control panels. Thus, a POSITA would be motivated to

combine the references to enhance their respective functionalities by providing this

element in combination with those of claim 1. (Ex. 1002, ¶ 197.)

### 21. Dependent claims 49 and 50 – Ground 3

| 49 | The system of claim 1, wherein the security server creates, modifies and terminates couplings between the gateway and the security system components. |
| 50 | The system of claim 1, wherein the security server performs creation, modification, deletion and configuration of the security system components. |

Claims 49 and 50 are rendered obvious under Ground 3. Alexander

describes an integrated home system having monitoring devices (e.g., sensors and

cameras) similar to Wimsatt and Johnson and which also has a remote central

server 210 similar to the data center 20 server in Johnson. (Ex. 1008, FIG. 2, 7:1-

14, 3:24-28, 10:57-11:17.) The remote central server 210 in Alexander provides

50

Petition for *Inter Partes* Review of
Patent No. 8,473,619

the user interface shown below in FIG. 18, which allows users to input data to

create (or install) a new monitoring device (*id.*, FIG. 13B, 18:65-19:22) and

modify an existing monitoring device (*id.*, 17:54-18:12) to the integrated home

system. (*See also, id.*, FIG. 5B (item 518 ("create or modify devices and rules")),

FIGs. 13A-B, 14-18, 16:25-17:9, 11:13-17.) Although it does not describe deleting

a monitoring device from the system, it would be obvious to a POSITA that

"modifying" a device could include deleting it. (Ex. 1002, ¶ 198.)



Alexander further discloses that the central server 210 "configures each

monitoring device" 206 using the information input by the user. (Ex. 1008, 19:49-

20:2 (cl. 1), 19:23-37.)

It would be obvious to combine Alexander with Wimsatt, Johnson and

Severson so that the data center 20 server in Johnson is capable of performing the

same functions described in Alexander through its control page 76, thereby

51

Petition for *Inter Partes* Review of
Patent No. 8,473,619

predictably resulting in enhanced functionality of the data center 20 server and a

simplification of device installation. (Ex. 1002, ¶ 198.) A POSITA would

understand that these device connections are "couplings" between the control panel

101 and the security system (and its sensors) because adding a device to the system

necessarily requires that the device is coupled to the control panel 101 for

operation as part of the system. The rationale and motivations to combine these

prior art references discussed for claim 48, 37 and 38 also apply here.

### 22.    Dependent claim 51 – Ground 3

| 51 | The system of claim 1, wherein the security server creates automations, schedules and notification rules associated with the security system components. |
|---|---|

Alexander describes a similar process for allowing a user to create rules for

its monitoring devices, which include sensors and camera. (Ex. 1008, 7:1-14, FIG.

13A, FIG. 16, FIG. 19, 18:13-64.) Figure 19 (shown below) illustrates an

exemplary user interface provided by the central server 210 in Alexander that

allows the user to specifically create notification rules for monitoring devices. (*Id.*,

18:55-61.)

Petition for *Inter Partes* Review of
Patent No. 8,473,619



Alexander does not describe creating automation and scheduling rules specifically (except in the context of sending notifications) but it generally refers to the rule as a "device rule" (*id.*, 18:25) and a "monitoring device processing rule" (*id.*, 18:37). (*See also, id.*, 18:51-55.) As automation and scheduling rules are associated with the device and device processing, it would have been obvious to a POSITA that a user would have been able to create automations and scheduling rules using the same process described in Alexander. (Ex. 1002, ¶ 200.)

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson so that the data center 20 server in Johnson is capable of performing the same functions described in Alexander through its control page 76, thereby predictably resulting in enhanced functionality of the data center 20 server and a simplification of device installation. (Ex. 1002, ¶ 200.) The rationale and

53

Petition for *Inter Partes* Review of
Patent No. 8,473,619

motivations to combine these prior art references discussed for claim 48, 37 and 38

also apply here.

### 23.   Dependent claim 52 – Ground 3

| 52 | The system of claim 1, wherein the security server manages access to current and logged state data for the security system components. |
|----|----|

As previously discussed, Wimsatt in view of Johnson provides a control

page 76 that allows users to access the current state of their home (and the devices

therein). (Ex. 1005, FIG. 3, 6:35-59, 4:15-39, 7:47-50.) This control panel 76 is

managed by the data center 20 server. (*Id.*) Johnson does not describe keeping a

"log" of previous state data for its controlled devices but this is disclosed in

Alexander. (*See,* Ex. 1005, 4:47-53 (listing data that the server stores).) The central

server 210 in Alexander, which is similar to the server in Johnson, includes an

"event logs database 214". (Ex. 1008, 7:59-65.) "Event data" is described in

Alexander as data "obtained from a monitoring device corresponding to an on/off

state." (*Id.*, 11:33-36, 7:1-14.)

It would be obvious to combine Alexander with Wimsatt, Johnson and

Severson so that the data center 20 server logs the state data for the controlled

devices in Wimsatt. (Ex. 1002, ¶ 202.) This is a simple process of storing data at

the server in Johnson once it has been received and keeping it for a period of time.

(*Id.*) This would allow a user to access older data using the control page 76, if

54

Petition for *Inter Partes* Review of
Patent No. 8,473,619

needed. (*Id.*) Other rationales and motivations to combine these references are discussed in connection with claim 48, 37 and 38 and apply here.

### 24.    Dependent claim 53 – Ground 3

| 53 | The system of claim 1, wherein the security server manages access to current and logged state data for couplings between the gateway and the security system components. |
|----|---------------------------------------------------------------------------------|

As discussed above with respect to claim 41, Wimsatt in view of Johnson provides a control page 76 that allows users to access the current state of their home (and the devices therein). (Ex. 1005, FIG. 3, 6:35-59, 4:15-39, 7:47-50.) This control panel 76 is managed by the data center 20 server. (*Id.*) Johnson does not describe keeping a "log" of previous state data for its controlled devices but this is disclosed in Alexander. (*See,* Ex. 1005, 4:47-53 (listing data that the server stores).) The central server 210 in Alexander, which is similar to the server in Johnson, includes an "event logs database 214". (Ex. 1008, 7:59-65.) "Event data" is described in Alexander as data "obtained from a monitoring device corresponding to an on/off state." (*Id.*, 11:33-36, 7:1-14.)

It would have been obvious to a POSITA that couplings between the gateway and security system components are also logged.  By logging such couplings a user would be able to better track the various components of the security system.  (Ex. 1002, ¶ 204.)

55

Petition for *Inter Partes* Review of
Patent No. 8,473,619

It would be obvious to combine Alexander with Wimsatt, Johnson and Severson for the same reasons as for claim 41. Other rationales and motivations to combine these references are discussed in connection with claim 48, 37 and 38 and apply here.

### 25.    Dependent claim 58 – Ground 1

| 58 | The system of claim 1, wherein the security server transmits event data of the security system components to a central monitoring station of the security system over the secondary communication link. |
|---|---|

As an initial matter, this claim recites "over **the** secondary communication link" but no such communication link is disclosed in claim 1, to which claim 58 depends. Dependent claim 16 is the first claim to recite this secondary communication link but claim 58 does not depend from claim 16. Thus, the "secondary communication link" is interpreted here to mean any communication link as there is also no first / primary communication link recited in claim 1.

Claim 58 is rendered obvious under Ground 1. Johnson discloses that the data center 20 server communicates security alarm alerts (or event data) to an auxiliary service 80 via the Internet (i.e., the claimed "fourth communication channel") but is silent regarding sending video event data. (Ex. 1005, 6:6-11, 7:30-42.) This is disclosed in Naidoo. Naidoo discloses that, upon detection of an alarm event, the gateway 115 sends the security server 131 "a notification of the alarm condition and information relating to the alarm condition, which may include

56

Petition for *Inter Partes* Review of
Patent No. 8,473,619

alarm video." (Ex. 1007, ¶ 0070.) The security server 131 then relays the notification to the central monitoring station 133. (*Id.*, 0072.)

It would have been obvious to a POSITA to combine Naidoo with Wimsatt, Johnson and Severson so that the control panel 101 in Wimsatt transmits this "event data" to the data center 20 server in Johnson, which then relays that information to the central monitoring station in Naidoo. (Ex. 1002, ¶ 213.) These devices can be coupled together in this manner without any change in their respective functionalities, as they are all capable of communicating via the Internet. (Ex. 1002, ¶ 213.) Also, as discussed in Naidoo, by providing both the sensor event data to the central monitoring station, an operator, in short order, is able to "verif[y] whether the alarm signal corresponds to an actual alarm condition using the alarm signal information and the segment of real-time video," and then take appropriate action.  (Ex. 1007, ¶¶ 0075, 0077, 0008, 0011, 0027.) "Timely response may increase the chance of apprehending an intruder, and in the case of life-threatening circumstances, reduce the likelihood of injury or death." (*Id.*, ¶ 0100.) A POSITA would have understood these benefits and been motivated to combine Naidoo with Wimsatt, Johnson and Severson to enhance their respective security capabilities and first-responder response times.

## X.   NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST

Patent Owner has not identified any evidence of secondary indicia of non-

Petition for *Inter Partes* Review of
Patent No. 8,473,619

obviousness for the '619 patent. Accordingly, there is no objective evidence of

non-obviousness that might warrant a finding that the Petitioned Claims are

patentable. (Ex. 1002, ¶ 234.)

## XI.    CONCLUSION

Petitioner respectfully requests that the Board institute *inter partes* review of

claims 17, 18, 20-22, 29-31, 33, 35-41, 48-53 and 58.


Dated: <u>September 30, 2016</u>

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
Tel: (703) 456-8000
Fax: (202) 842-7899

Respectfully submitted,
COOLEY LLP

By:     <u> /Erik B. Milch/ </u>
Erik B. Milch
Reg. No. 42,887

58

Petition for *Inter Partes* Review of
Patent No. 8,473,619

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Petition complies with the

type-volume limits of 37 C.F.R. § 42.24(a)(1)(i) because it contains 12,191 words,

according to the word-processing system used to prepare this petition, excluding the

parts of this Petition that are exempted by 37 C.F.R. § 42.24(a) (including the table

of contents, mandatory notices, a certificate of service or this certificate word count,

appendix of exhibits, and claim listings).

Dated: September 30, 2016

By:    /Erik B. Milch/
       Erik B. Milch
       Reg. No. 42,887

Petition for *Inter Partes* Review of
Patent No. 8,473,619

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.6(e) and 42.105(b), the undersigned certifies

that on September 30, 2016, a complete and entire copy of this **Petition for *Inter***

***Partes* Review of Patent No. 8,473,619**, including Exhibit Nos. 1001-1013 and a

Power of Attorney, was served via FEDERAL EXPRESS, costs prepaid, to the

Patent Owner by serving the correspondence address of record as follows:

> Richard Gregory Jr.
> Barbara Courtney
> IPR Law Group, PC
> 5338 Cornish Street
> Houston, TX 77007

A courtesy copy was also served via FEDERAL EXPRESS on the Patent Owner at

the following address:

> Ryan Smith
> Wilson Sonsini Goodrich & Rosati
> 650 Page Mill Road
> Palo Alto, CA 94304

By:     /Erik B. Milch/
        Erik B. Milch
        Reg. No. 42,887

# EXHIBIT 9
## FILED UNDER SEAL

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 10

## FILED UNDER SEAL

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 11

Trials@uspto.gov
571-272-7822

Paper 11
Entered: February 8, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SECURENET TECHNOLOGIES, LLC,
Petitioner,

v.

ICONTROL NETWORKS, INC.,[1]
Patent Owner.

———————

Case IPR2016-01909
Patent 8,073,931 B2

———————

Before KEN B. BARRETT, PATRICK M. BOUCHER, and
MINN CHUNG, *Administrative Patent Judges.*

BARRETT, *Administrative Patent Judge.*

DECISION
Denying Petitioner's Request for Rehearing
*37 C.F.R. § 42.71*

———————

[1] Patent Owner filed a Change-Of-Information Notice identifying the real parties-in-interest as ICN Acquisition, LLC and Alarm.com Incorporated, and referring to ICN Acquisition as "Patent Owner." Paper 9.

ALARM.COM-SECURENET-DE 1726716

IPR2016-01909
Patent 8,073,931 B2

## I.    INTRODUCTION

SecureNet Technologies, LLC ("Petitioner") filed a Request for Rehearing (Paper 12, "Request" or "Req. Reh'g") of our Decision (Paper 11, "Dec.") denying *inter partes* review of U.S. Patent No. 8,073,931 B2 (Ex. 1001, "the '931 patent"). Petitioner's Request alleges that "the Board misapprehended or overlooked arguments pertaining to a limitation in claim 1 reciting 'objects.'" Req. Reh'g 1. For the reasons given below, the Request for Rehearing is *denied*.

## II.    ANALYSIS

A party requesting rehearing bears the burden of showing that the decision should be modified. 37 C.F.R. § 42.71(d). The party must identify specifically all matters we misapprehended or overlooked, and the place where each matter was addressed previously in the record. *Id.* When rehearing a decision on a petition, we review the decision for an abuse of discretion. 37 C.F.R. § 42.71(c). With this in mind, we address the arguments presented by Patent Owner in turn.

### A. Whether we should have been persuaded by Petitioner's arguments and evidence that the icons in Johnson are the claimed "objects"

Claim 1 recites: "objects are maintained on the remote server that correspond to at least one of at least one security system component of the security system and at least one network device of the LAN." Ex. 1001, 51:32–35. Petitioner argues that "[t]he Board should have . . . determined that the icons [of the Johnson reference] are synonymous with the claimed 'objects,' and that "[t]he abuse of discretion lies in the Board's finding in its Decision not being supported by substantial evidence." Req. Reh'g 5–6. Although Petitioner does not clearly identify the purported finding that

2

ALARM.COM-SECURENET-DE 1726717

IPR2016-01909
Patent 8,073,931 B2

allegedly constitutes an abuse of discretion, we presume Petitioner is referring to our statement that "[a]fter a review of the portions of Johnson cited by Petitioner, we are unable to discern any sufficient elaboration regarding these icons that persuades us that Petitioner's proposition is correct." Dec. 12–13 (citing Pet. 31–34). We were "not persuaded that the icons in Johnson's figure would be understood by a person of ordinary skill in the art to correspond to recited objects that correspond to the security system components and network devices." *Id.* at 13. The arguments in Petitioner's Request do not show that we should have been persuaded by the assertions in the Petition.

In the Petition, it was argued that:

> A POSITA would have understood that the icons illustrated on the above web page [of Johnson's Figure 3] represent particular controlled devices located within the home in Wimsatt. (Ex. 1002, ¶ 129.) These icons are the claimed "objects" maintained at data center 20 server. For example, the icon labeled "camera" is an object maintained at the server corresponding to the IP camera 109. Similarly, icons labeled "door" and "window" are objects maintained at the server corresponding to a door and window sensor, respectively.

Pet. 29; *see also* Dec. 12 (quoting the same). In the Decision, we noted that "[t]he cited expert testimony appears to be the same assertion with little elaboration and explanation for the bases of the opinion." Dec. 12 (citations omitted). We also noted that, in its Preliminary Response, Patent Owner argued that the expert testimony was "bald opinion," and that Johnson does not describe the nature of the icons. *Id.* (quoting Prelim. Resp. 18). We further stated:

> Patent Owner also argues that there is depicted in Figure 3 only one each of a camera icon, a window icon, and a door icon, and

3

ALARM.COM-SECURENET-DE 1726718

IPR2016-01909
Patent 8,073,931 B2

persuasively argues that one would expect there to be more than one of each of these items in a house and, therefore, it would be illogical for the icons to correspond to a *particular* security system component as alleged.

*Id.* (citing Prelim. Resp. 19–20).

Petitioner asserts in its Request that Patent Owner's argument is illogical, and Petitioner now asserts that "figures are meant to be *exemplary*" and concludes that Johnson's Figure 3 does not show all of the icons available. Req. Reh'g 6–7. Petitioner's resort to the speculative argument that the depiction of, for example, a single window icon in Johnson's Figure 5 is exemplary of multiple, non-depicted window icons highlights the correctness of our determination that the evidence is too unclear for Petitioner to have met its burden.

We similarly are not persuaded by Petitioner's argument that "the fact that only one window icon and one camera icon is displayed on the web page [of Johnson] is still enough to satisfy the claim 1 limitation." Req. Reh'g 7–8. We would only reach this argument if Petitioner first would have persuaded us that the icons are the claimed "objects."

To the extent Petitioner argues that we *sua sponte* should have engaged in a claim construction analysis of "objects," the argument is misplaced. *See* Req. Reh'g 6 ("Notably, the Decision did not address the '931 patent's limited description of objects, nor did it acknowledge that the icon/object disclosure in Johnson parallels that of the object description in the '931 patent."); *id.* at 3 ("These disclosures [in the '931 patent] are therefore of great import and should have been taken into consideration when the Board assessed whether the icons in Johnson were synonymous with the claimed 'objects.'"); *cf.* Pet. 4 (Petitioner not proposing any explicit

4

ALARM.COM-SECURENET-DE 1726719

IPR2016-01909
Patent 8,073,931 B2

constructions, but arguing only that claim terms should be given their plain and ordinary meaning). The dispositive issue—for which Petitioner was unpersuasive—was not whether icons generally could be an "object" but whether the *specific* icons in Johnson's Figure 5 relied upon by Petitioner would have been recognized by a person of ordinary skill in the art as the claimed objects.

### B. Whether the Board overlooked arguments in the Petition regarding Wimsatt's IP camera 109

In the Decision, we stated:

> Additionally, and as Patent Owner notes, Petitioner apparently identifies Wimsatt's IP camera 109 as corresponding to the camera icon in Johnson's system. Prelim. Resp. 19 (citing Pet. 29). This mixing-and-matching of references' elements without adequate explanation is confusing rather than clarifying.

Dec. 13. Petitioner argues that we overlooked Petitioner's earlier description of the proposed combination and description of IP camera 109 being part of Wimsatt's system and of Johnson's camera icon. Req. Reh'g 8. We did not overlook these arguments. The pertinent portion of the Petition is confusing because it is not described clearly as setting forth the proposed combination—and immediately precedes the paragraph asserting that it would be obvious to combine Johnson and Wimsatt. *See* Pet. 29. Rather, the Petition could be read to assert that one of ordinary skill in the art would have understood Johnson's icon to correspond to Wimsatt's camera *before* combining the references. *See, e.g., id.* ("A POSITA would have understood that the icons illustrated on the above web page [of Johnson] represent particular controlled devices located within the home in

5

ALARM.COM-SECURENET-DE 1726720

IPR2016-01909
Patent 8,073,931 B2

Wimsatt. . . . For example, the icon labeled 'camera' [in Johnson] is an object . . . corresponding to the IP camera 109 [of Wimsatt].").

### C. Whether we overlooked or misapprehended arguments that the icons in Johnson are maintained on the remote server

In the Decision, we stated: "Even were Johnson's icons found to be the claimed 'objects,' Petitioner does not persuasively demonstrate that those icons are maintained on the security server." Dec. 13.

Petitioner argues "[t]he Board's abuse of discretion lies in its failure to support its finding with substantial evidence." Req. Reh'g 10. Petitioner again does not clearly identify the purported finding that allegedly constitutes an abuse of discretion. *See id.* at 8–10. We note that we did not make an affirmative finding regarding where Johnson's icons are maintained, but rather determined that Petitioner had not meet its burden on that point.

Petitioner argues that "[t]he Board, however, overlooked and likely misapprehended Petitioner's earlier arguments regarding its position that the icons in Johnson are indeed maintained at the remote server 20." Req. Reh'g 9. This argument is made without a citation to the Petition. Petitioner further argues "[a]s Petitioner previously explained, the server 20 in Johnson provides access to and management of the icons on the web page 74." *Id.* at 9. This argument also is made without citation to the Petition. The only citation to the Petition under the pertinent heading is to page 27, and the associated argument in the Request appears to be a new or previously undeveloped claim construction argument regarding the term "maintained." *Id.* at 8–10; *see id.* at 9 (citing Pet. 27 as support for proposition regarding "[t]he only description relating to 'maintaining' in the '931 patent"). To the

6

ALARM.COM-SECURENET-DE 1726721

IPR2016-01909
Patent 8,073,931 B2

extent Petitioner is referring to the last sentence on page 27[2] of the Petition, we note that that sentence lacks the claim terms "icon" and "maintained" that otherwise (along with a developed claim construction analysis of "maintained") might have provided a clearer tie to Petitioner's theory of the case. We are unpersuaded that any "earlier arguments regarding [Petitioner's] position that the icons in Johnson are indeed maintained at the remote server 20" (Req. Reh'g 9) was set forth with sufficient clarity such that those can be considered to have been misapprehended or overlooked.

Petitioner also argues that we misapprehended its expert's "arguments." *Id.* Petitioner again does not identify where these "arguments" were made in the *Petition. Id.* at 9–10; *cf.* 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document.").

Petitioner's Request does not show that there was an abuse of discretion in our determination that "Petitioner [did] not persuasively demonstrate that those icons are maintained on the security server." Dec. 13; *see* Req' Reh'g 10 (alleging an abuse of discretion).

*D. Whether we erred by not giving Petitioner's expert's testimony weight*

Petitioner argues that "[t]he Board erred by not giving Petitioner's expert's testimony weight." Req. Reh'g 10 (section heading). Petitioner also argues we "erred in giving more credit to Patent Owner's unsupported attorney arguments than it gave to Petitioner's expert." *Id.* We presume this

---

[2] That sentence, including the citation, reads: "As shown in Figure 3 of Johnson, the homeowner accesses a web page 'displayed by data center 20' and can 'monitor and control' aspects of the security system and cameras using that web page. (Ex. 1006, 4:30–36, 5:29–39, 6:35–59.)"

7

ALARM.COM-SECURENET-DE 1726722

IPR2016-01909
Patent 8,073,931 B2

is a reference to our statement that "[t]he cited expert testimony appears to be the same assertion [as Petitioner's argument] with little elaboration and explanation for the bases of the opinion." Dec. 12. Contrary to Petitioner's argument, we gave its expert's opinion the weight due as reflected in our discussion of that same testimony.

Petitioner further argues that:

> The fact that Petitioner's expert did not provide more "elaboration or explanation" on the objects matter is only because the disclosure in Johnson was clear and did not warrant more discussion. (Decision 12.) Many of the arguments were considered common sense to the expert.

Req. Reh'g 11. That, at most, suggests that the expert was persuaded. It does not, however, identify anything we misapprehended or overlooked such that we—rather than the expert—should have been persuaded by the testimony. *See also* 37 CFR § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."). Thus, Petitioner merely disagrees with our analysis and conclusion, and does not persuade us of an abuse of discretion.

### III.  ORDER

For the foregoing reasons, it is

ORDERED that Petitioner's Request for Rehearing is *denied*.

ALARM.COM-SECURENET-DE 1726723

IPR2016-01909
Patent 8,073,931 B2

For PETITIONER:

Erik B. Milch
Jennifer Volk-Fortier
Frank Pietrantonio
COOLEY LLP
emilch@cooley.com
jvolkfortier@cooley.com
fpietrantonio@cooley.com

For PATENT OWNER:

Matthew A. Argenti
Michael T. Rosato
WILSON SONSINI GOODRICH & ROSATI
margenti@wsgr.com
mrosato@wsgr.com

9

ALARM.COM-SECURENET-DE 1726724

# EXHIBIT 12

Trials@uspto.gov
571-272-7822

Paper 9
Entered: March 31, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SECURENET TECHNOLOGIES, LLC,
Petitioner,

v.

ICONTROL NETWORKS, INC.,
Patent Owner.

———————

Case IPR2016-01911 (Patent 8,478,844 B2)
Case IPR2016-01916 (Patent 8,478,844 B2)[1]

———————

Before KEN B. BARRETT, PATRICK M. BOUCHER, and
MINN CHUNG, *Administrative Patent Judges.*

BARRETT, *Administrative Patent Judge.*

DECISION
Denying Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

———————

[1] This Decision will be entered in each case. The parties are not authorized
to use this caption style.

ALARM.COM-SECURENET-DE 1726806

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

## I. INTRODUCTION

### A. Background and Summary

SecureNet Technologies, LLC ("Petitioner") filed, in IPR2016-01911, a Petition requesting *inter partes* review of U.S. Patent No. 8,478,844 B2 ("the '844 patent," Ex. 1001). Paper 1 ("Pet."). The Petition challenges the patentability of claims 1–4, 6–24, and 41 of the '844 patent on the grounds of obviousness under 35 U.S.C. § 103. Icontrol Networks, Inc. (Patent Owner) filed a Preliminary Response to the Petition. Paper 6 (Prelim. Resp.).

Petitioner filed, in IPR2016-01916, a Petition requesting *inter partes* review of the '844 patent and challenging the patentability of claims 25–40 and 42–50 on the grounds of obviousness under 35 U.S.C. § 103. Paper 1 (IPR2016-01916). Patent Owner filed a Preliminary Response to the Petition. Paper 6 (IPR2016-01916).

The dispositive issues in the two *inter partes* review cases are substantively similar. Unless otherwise indicated, citations herein are to the papers filed in IPR2016-01911.

An *inter partes* review may not be instituted "unless . . . the information presented in the petition . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Having considered the arguments and evidence presented by Petitioner and Patent Owner, we determine that Petitioner has not demonstrated a reasonable likelihood that it would prevail in establishing the unpatentability of the challenged claims of the '844 patent.

ALARM.COM-SECURENET-DE 1726807

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

## B. Related Proceedings

One or both parties identify, as matters involving or related to the '844 patent, *Icontrol Networks, Inc. v. SecureNet Technologies, LLC*, No. 15-807-GMS (D. Del.), and Patent Trial and Appeal Board cases IPR2016-01909 (U.S. Patent No. 8,073,931), IPR2016-01919 (U.S. Patent No. 8,473,619), and IPR2016-01920 (U.S. Patent No. 8,473,619). Pet. 1–2; Paper 4.

## C. The '844 Patent

The '844 patent is titled "Forming a Security Network Including Integrated Security System Components and Network Devices." According to the Abstract of the '844 patent:

> An integrated security system is described that integrates broadband and mobile access and control with conventional security systems and premise devices to provide a tri-mode security network (broadband, cellular/GSM, POTS access) that enables users to remotely stay connected to their premises. The integrated security system, while delivering remote premise monitoring and control functionality to conventional monitored premise protection, complements existing premise protection equipment. The integrated security system integrates into the premise network and couples wirelessly with the conventional security panel, enabling broadband access to premise security systems.

The '844 patent further explains "[t]he integrated security system provides a complete system that integrates or layers on top of a conventional host security system available from a security system provider." Ex. 1001, 5:19–21. Figure 1 of the '844 is reproduced below:

3

ALARM.COM-SECURENET-DE 1726808

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2



FIG.1

Figure 1 is a block diagram of an embodiment of the integrated security system. *Id.* at 3:7–8. The integrated security system includes gateway 102 in communication with security servers 104. *Id.* at 6:53–57. At the customer premises, the gateway connects and manages the home security devices. *Id.* at 6:57–59.

The '844 patent also explains that "[t]he server components provide access to, and management of, the objects associated with an integrated security system installation." *Id.* at 8:29–31.

### D. Illustrative Claim

Of the challenged claims of the '844 patent, claims 1 and 48–50 are independent claims. The remaining challenged claims directly or indirectly depend from Claim 1. Claim 1, reproduced below with bracketed annotations[2] inserted for identifying specific limitations, is illustrative:

---

[2] We utilize Petitioner's annotations for claim 1 but have retained the paragraphing from the issued patent.

4

ALARM.COM-SECURENET-DE 1726809

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

1.    A method comprising:
[a] coupling a gateway to a local area network located in a first location and a security server in a second location, [b] wherein the first location includes a security system comprising a plurality of security system components;

[c] automatically discovering the plurality of security system components at the gateway and establishing a first communication channel between the gateway and the plurality of security system components;

[d] automatically discovering network devices at the gateway and establishing a second communication channel between the gateway and the network devices, [e] wherein the second communication channel is independent of the first communication channel;

[f] forming a security network by electronically integrating into the gateway communications and functions of the network devices and the plurality of security system components;

[g] receiving at the gateway security data from the plurality of security system components, device data of the network devices, and remote data from the security server;

[h] generating processed data by processing at the gateway the security data, the device data, and the remote data;

[i] determining a state change of the security system using the processed data; and

[j] maintaining at the security server with use of the processed data objects corresponding to the plurality of security system components and the network devices.

Ex. 1001, 46:28–55.

### E. Applied References

| Reference | | Dates | Exhibit No. |
|---|---|---|---|
| Wimsatt | US 2004/0260427 Al | Filed Apr. 8, 2004; Published Dec. 23, 2004 | Ex. 1004 |
| Johnson | US 6,580,950 Bl | Filed Apr. 28, 2000; Issued June 17, 2003 | Ex. 1005 |

5

ALARM.COM-SECURENET-DE 1726810

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

| Reference | | Dates | Exhibit No. |
|---|---|---|---|
| Severson | US 4,951,029 | Filed Feb. 16, 1988; Issued Aug. 21, 1990 | Ex. 1006 |
| Naidoo | US 2003/0062997 A1 | Filed Oct. 2, 2001; Published Apr. 3, 2003 | Ex. 1007 |
| Alexander | US 6,748,343 B2 | Filed Sept. 28, 2001; Issued June 8, 2004 | Ex. 1008 |
| Anthony | US 2003/0137426 A1 | Filed Jan. 17, 2003; Published July 24, 2003 | Ex. 1009 |

Petitioner also relies on the Declaration of Mr. James Parker, dated Sept. 30, 2016, (Ex. 1002) in support of its arguments.

### F. Asserted Grounds of Unpatentability

Petitioner asserts, in IPR2016-01911, the following grounds of unpatentability:

| Reference[s] | Basis | Claim(s) |
|---|---|---|
| Wimsatt, Johnson, and Severson | § 103(a) | 1–4, 6–17, 21 |
| Wimsatt, Johnson, Severson, and Naidoo | § 103(a) | 18–20, 23, 24, 41 |
| Wimsatt, Johnson, Severson, Naidoo, and Anthony | § 103(a) | 22 |

Petitioner asserts, in IPR2016-01916, the following grounds of unpatentability:

| Reference[s] | Basis | Claim(s) |
|---|---|---|
| Wimsatt, Johnson, Severson, and Alexander | § 103(a) | 25–40, 42–47 |
| Wimsatt and Johnson | § 103(a) | 48–50 |

6

ALARM.COM-SECURENET-DE 1726811

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

## II. ANALYSIS

### A. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *see also Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire patent disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

Petitioner does not propose an explicit claim construction for any term, asserting that every term should be given its plain and ordinary meaning. Pet. 4; *cf.* Prelim Resp. 9–10 (Patent Owner's claim construction discussion). On this record and for purposes of this decision, we determine that no claim terms require express construction.

### B. The Alleged Obviousness of
### Claims 1–4, 6–17, and 21 Over Wimsatt, Johnson, and Severson

Petitioner alleges that claims 1–4, 6–17, and 21 of the '844 patent would have been obvious over Wimsatt, Johnson, and Severson. *See* Pet. 8–34 (addressing claim 1).

#### 1. Wimsatt (Ex. 1004)

Wimsatt discloses "[a] home automation and control architecture having a contextually relevant user interface [where] [t]he user interface is generated on one of a plurality of control units located throughout a controlled environment such as a home or office building." Ex. 1004 ¶ 12. "Automation and/or control application software executes on the control unit

7

ALARM.COM-SECURENET-DE 1726812

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

to communicate control information such as commands, sensor messages, status messages, and the like with other control units as well as controlled systems (e.g., security systems, entertainment systems, HVAC systems, and the like)." *Id.* Wimsatt explains:

> The present invention is particularly useful in home automation environments because it builds on top of the vast array of controlled devices and subsystems that already exist for managing lighting, security systems, heating and air conditioning, window shades or curtains, pool heaters and filtration systems, lawn sprinklers, ornamental fountains, audio/visual equipment, and other appliances. Hence, while it is contemplated that the present invention may be adapted to handle special-purpose and proprietary controlled devices and subsystems, a particular advantage is that the present invention adapts to existing controlled devices and subsystems and leverages their advantages.

*Id.* at ¶ 23. Figure 1 of Wimsatt is reproduced below:



FIG. 1

8

ALARM.COM-SECURENET-DE 1726813

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

Figure 1 depicts a networked control environment in which Wimsatt's invention is implemented. *Id.* at ¶ 15. Figure 1 shows a plurality of control panels 101, wireless access point/router 105, and wireless control panels 107. *Id.* at ¶¶ 34, 37. Controlled devices such as IP camera 109 may be directly connected to the network via hub 103. *Id.* at ¶ 38. Another type of controlled device is coupled to a particular control panel 101 or 107 through a subsystem interface, for example, lighting control subsystem 113 and entertainment control subsystem 115. *Id.* at 39. Alternatively, a subsystem interface may couple with the hub, such as analog subsystem interface 117. *Id.* at ¶ 40.

### 2. Johnson (Ex. 1005)

Johnson discloses an "Internet based home communications system for allowing a homeowner to monitor and control various features of their home from a distant location via a global computer network." Ex. 1005, Abstr. Johnson discloses a system comprising a plurality of control devices, a control unit in communication with the devices and connected to the Internet, and a data center having server computers connected to the internet and the control unit. *Id.* at 2:8–14.

> The homeowner is capable of monitoring and controlling the control device within the home by accessing a web page displayed by the data center through a conventional web browser on a computer. The homeowner can view, monitor and control features of their home through the web page such as viewing interior images of their home or adjusting the thermostat for the interior of their home. In addition, the control unit may notify the appropriate supplier when propane or food becomes low within the home through the global computer network.

*Id.* at 2:19–28. Control devices include "lighting controls, heating controls, moisture controls, freeze controls, pet feeding devices, propane gauge,

9

ALARM.COM-SECURENET-DE 1726814

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

interior cameras, exterior cameras, security system, smoke alarm and various other devices." *Id.* at 2:13–18.

### 3. *Severson (Ex. 1006)*

Severson discloses a programmable security alarm system including a system controller "which is programmably responsive to a plurality of distributed wireless and hardwired alarm sensors/transducers and which communicates with neighboring system controllers and a central station interactively monitoring a number of subscriber systems." Ex. 1006, 1:5–12. Each system controller is programmable with sensor/transducer numbers, options, and features. *Id.* at 23:60–63. Severson explains:

> Even further and without human intervention, once the sensors transducers are initially programmed, each system controller may be operated to "self-learn" each of its sensors. In this mode as the sensors/transducers report to the controller for the first time and after the controller confirms the existence of a proper house code or unit number, they are logged into the controller's RAM memory. Human error is thus minimized even though during hand programming with the wireless key pad 13, the circuitry performs a similar subroutine to log the assigned [sensor/transducer] S/T numbers into RAM.

*Id.* at 25:3–13.

### 4. *The Alleged Obviousness of Claim 1 in View of Wimsatt, Johnson, and Severson*

For reasons discussed below, Petitioner has not shown a reasonable likelihood that it would prevail in establishing unpatentability of independent claim 1 as obvious over Wimsatt, Johnson, and Severson.

#### a) *Limitation 1[c]*

Claim 1 recites: "automatically discovering the plurality of security system components at the gateway and establishing a first communication

10

ALARM.COM-SECURENET-DE 1726815

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

channel between the gateway and the plurality of security system components." Ex. 1001, 46:33–36.

Petitioner asserts that one of ordinary skill would understand Wimsatt's security system to include sensors (although "not illustrate[d]" in Wimsatt) and that those sensors would be the recited "security system components." Pet. 13. Petitioner concedes that "Wimsatt does not explicitly disclose that its security system's sensors are automatically discovered using this [Universal Plug-and-Play (UPnP)] process – it only explicitly discloses that the 'security system' is discovered." *Id.* at 16. Petitioner then argues "[a] POSITA would have understood that discovering the security system would also include discovering its sensors." *Id.* (citing Ex. 1002 ¶ 91). Patent Owner asserts (Prelim. Resp. 21), and we agree, that this argument from Petitioner is too conclusory to satisfy Petitioner's burden. The cited portion of the expert testimony merely repeats, without adequate elaboration or explanation, Petitioner's argument and, therefore, similarly is conclusory. *See* Ex. 1002 ¶ 91.

Petitioner, arguing in the alternative, turns to Severson for the disclosure of a system having a controller that may "self-learn" sensors "without human intervention." Pet. 16 (citing Ex. 1006, 25:3–13). Petitioner asserts:

> In describing a system installation process, Severson explains that the sensors and controller are mounted at the home and then "the controller is enabled and self-learns each of its sensors/transducers as they report their status." (Ex. 1006, 25:51-26:7; *see also, id.*, 23:60-25:50.) As a result, "[i]nstallation time is thereby reduced with minimal potential installer error, due to the CPU self-learning its reporting sensors." (*Id.*, 25:51-26:7.) This is similar to the auto-discovery

11

ALARM.COM-SECURENET-DE 1726816

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

process described in the '844 patent. (*See, e.g.*, Ex. 1001, FIG. 14, 24:66-26:5.)

Pet. 16. Patent Owner disputes this contention, maintaining that Severson's self-learning is not "automatically discovering" within the meaning of the claimed invention. Prelim. Resp. 22–23. Petitioner does not propose a construction for "automatically discovering," but, as quoted above, merely asserts that Severson's process is "similar" to that disclosed in the '844 patent. Pet. 16 (citing Ex. 1001, Fig. 14, 24:66–26:5). The process, however, described in the '844 patent and upon which Petitioner relies, indicates that the first step after gateway power-up, and *before* entering "learn mode," is for the gateway to "identify" accessible wireless security panels and wireless devices. Ex. 1001, 25:1–11, Fig. 14 (software sequences 1420 and 1425). In contrast, as Patent Owner notes, Severson discloses that the sensors and controllers are initially programmed in a manual process. Prelim. Resp. 22–23; *see also* Ex. 1006, 25:3–6 ("Even further and without human intervention, once the sensors transducers are initially programmed, each system controller may be operated to 'self-learn' each of its sensors"). Severson's controller "self-learns" the sensors when those sensors report their status. Ex. 1006, 25:62–65. Thus, Severson suggests that the sensors must first be identified for the controller before Severson's controller "self-learns" those sensors "without human intervention." Even if Severson's process is "similar" to the learning process described in the '844 patent, Petitioner has not persuaded us that Severson discloses the claimed "automatically discovering" feature as recited in claim 1.

Petitioner contends that it would have been obvious to a person of ordinary skill in the art to combine the "auto-discovery disclosure" of

12

ALARM.COM-SECURENET-DE 1726817

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

Severson with Wimsatt and Johnson "so that the control panel 101 in Wimsatt can auto-discover the security sensors in addition to the discovering the security system controller." Pet. 16–17. Citing Severson and the Parker Declaration, Petitioner asserts that "[t]his would predictably result in an easier sensor installation process and reduce the likelihood of installer error." *Id.* (citing Ex. 1002 ¶ 92; Ex. 1006, 26:5–7). Patent Owner argues that Petitioner's contention is at odds with Wimsatt's description that its control panels communicate with a security system, not the underlying security system components, such as the security sensors. Prelim. Resp. 24– 25 (citing Ex. 1004 ¶¶ 5, 23, 30, 31, 58, 62, 65). Patent Owner asserts that, because "Wimsatt's control panels are limited to functionality regarding the status of a security system" and do not communicate with or control individual security system components, Petitioner's proposed modification would unnecessarily complicate installation, not simplify it. *Id.* at 25.

We agree with Patent Owner that Wimsatt's control panels do not communicate directly with the security system components, such as the sensors. Wimsatt is directed to providing control panels with consistent user interfaces to existing home subsystems, such as home automation systems and security systems. Ex. 1004 ¶¶ 3, 22, 23, 77. Hence, Wimsatt's control panels discover the existing subsystems at the premises, such as a security system, and learn the details of the *control interface* of the subsystems, but do not in general discover or communicate with the components internal to the subsystems, such as the security system components or sensors. *Id.* ¶ 45. Indeed, Wimsatt describes that "[i]n most cases it is *not necessary* for every control panel 101/107 to have detailed knowledge of a particular controlled device or subsystem. Instead, it is *sufficient* to be aware of the existence of

13

ALARM.COM-SECURENET-DE 1726818

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

each controlled device and the functionality available from that device." *Id.*
¶ 46 (emphases added). Furthermore, because Wimsatt contemplates adding
or adapting its control panels "on top of" the existing security systems (*id.*
¶ 23), Wimsatt's discovery process would have expected that the sensors
would have already been installed and the sensor installation process
previously completed. Hence, the record indicates that Wimsatt is *not*
concerned with sensor installation processes, such as those described in
Severson. Petitioner does not explain why the combination of Wimsatt and
Severson would nonetheless "predictably result in an easier sensor
installation process and reduce the likelihood of installer error." Pet. 17.
The cited portion of the expert testimony repeats, without adequate
elaboration or explanation, Petitioner's unpersuasive argument and,
therefore, similarly is unpersuasive. *See* Ex. 1002 ¶ 92.

Petitioner's argument that Severson "illustrates the ability and desire
for similar controllers to automatically discover devices at the security
component level" (Pet. 17) is similarly unpersuasive because Wimsatt is not
concerned with discovering security system components.

The rest of Petitioner's arguments regarding the reasons to combine
Wimsatt with Severson and Johnson are too conclusory to satisfy
Petitioner's burden. For example, similar to Petitioner's conclusory
contention discussed above, Petitioner asserts that "Wimsatt already
discloses an automatic discovery process for learning the security system so
it would be obvious to a POSITA to further discover the sensors that form
part of that system." *Id.* (citing Ex. 1002 ¶ 93). Petitioner also contends that
"[a] POSITA would understand that adding an extra step in the automatic
discovery process to include discovery of the sensors would be easy to

14

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

implement." *Id.* (citing Ex. 1002 ¶ 93). The cited portion of the expert testimony again repeats, without adequate elaboration or explanation, Petitioner's conclusory assertions. *See* Ex. 1002 ¶ 93. These conclusory statements are insufficient to provide the requisite "reasoned explanation" to justify combining Wimsatt with Severson and Johnson to teach "automatically discovering the plurality of security system components," as recited in claim 1. *See In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016).

### b) Limitation 1[j]

Claim 1 further recites: "maintaining at the security server with use of the processed data objects corresponding to the plurality of security system components and the network devices." Ex. 1001, 46:53–55.

Patent Owner argues that Petitioner's analysis regarding this limitation is flawed and that Johnson does not disclose the recited "objects" maintained at the server. Prelim. Resp. 30–34.

Petitioner maintains that the combination of Wimsatt and Johnson discloses this limitation. Pet. 31. Petitioner (Pet. 31–32) points to the webpage shown in Johnson's Figure 3, which is reproduced below:

15

ALARM.COM-SECURENET-DE 1726820

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2



Figure 3 depicts "a browser containing the control page displaying some of the features of [Johnson's] invention that allow the homeowner to monitor and control their home through a global computer network such as the Internet." Ex. 1005, 3:30–33.

Petitioner asserts:

> A POSITA would have understood that the icons illustrated on the above web page [of Johnson's Figure 3] represent particular controlled devices located within the home in Wimsatt. (Ex. 1002, ¶ 124.) These icons are the claimed "objects" maintained at the data center 20 servers. For example, the icon labeled "camera" is an object maintained at the server corresponding to the IP camera 109. Similarly, the icons labeled "door" and "window" are objects maintained at the server corresponding to a door sensor and a window sensor, respectively.

16

ALARM.COM-SECURENET-DE 1726821

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

Pet. 33. The cited expert testimony appears to be the same assertion with no elaboration or explanation for the bases of the opinion. *See* Ex. 1002 ¶ 124.

Patent Owner argues that Mr. Parker's "bald opinion" that one of ordinary skill would have understood the icons to represent particular controlled devices should be entitled to no weight. Prelim. Resp. 31. Patent Owner contends that Johnson does not describe the nature of the icons. *Id.* Patent Owner also argues that there is depicted in Figure 3 only one each of a camera icon, a window icon, and a door icon, and persuasively argues that one would expect there to be more than one of each of these items in a house and, therefore, it would be illogical for the icons to correspond to a *particular* security system component as alleged. *Id.* at 31–32. After a review of the portions of Johnson cited by Petitioner, we are unable to discern any sufficient elaboration regarding these icons that persuades us that Petitioner's proposition is correct. *See* Pet. 31–34. Additionally, and as Patent Owner notes, Petitioner apparently identifies Wimsatt's IP camera 109 as corresponding to the camera icon in Johnson's system. Prelim. Resp. 31 (citing Pet. 33). This mixing-and-matching of references' elements without adequate explanation is confusing rather than clarifying.

Accordingly, we are not persuaded that the icons in Johnson's figure would be understood by a person of ordinary skill in the art to correspond to recited objects corresponding to the security system components and network devices.

Even were Johnson's icons found to be the claimed "objects," Petitioner does not persuasively demonstrate that those icons are maintained at the security server. *Cf.* Prelim. Resp. 33–34 (Patent Owner arguing that "[t]here is no explanation [in Johnson] regarding where those icons are

17

ALARM.COM-SECURENET-DE 1726822

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

maintained or what they even represent."). Indeed, Petitioner does not cite any disclosure in Johnson describing the "icons" in Figure 3 as "objects" maintained at the server. Petitioner's conclusory assertion and the corresponding equally conclusory testimony from Mr. Parker that "[t]hese icons [of Johnson] are the claimed 'objects' maintained at the data center 20 servers" are inadequate and not persuasive.

### c) Summary

Petitioner has not demonstrated a reasonable likelihood of prevailing in showing that the subject matter of claim 1 would have been obvious over Wimsatt, Johnson, and Severson.

### 5. The Alleged Obviousness of Claims 2–4, 6–17, and 21 Over Wimsatt, Johnson, and Severson

Claims 2–4, 6–17, and 21 each depends directly or indirectly from claim 1. Petitioner's arguments against these claims refer to and rely on the same contentions discussed above regarding the obviousness of claim 1 based on Wimsatt, Johnson, and Severson. *See* Pet. 34–49, 53. Thus, for the same reasons discussed above, Petitioner has not shown a reasonable likelihood of prevailing in showing that claims 2–4, 6–17, and 21 would have been obvious over Wimsatt, Johnson, and Severson.

### C. The Alleged Obviousness of Claims 18–20, 23, 24, and 41 Over Wimsatt, Johnson, Severson, and Naidoo, and of Claim 22 Over Wimsatt, Johnson, Severson, Naidoo, and Anthony

Claims 18–20, 22, 23, 24, and 41 each depends directly or indirectly from claim 1. Petitioner's arguments against these claims refer to and rely on the same contentions discussed above regarding the obviousness of claim 1 based on Wimsatt, Johnson, and Severson. *See* Pet. 49–58. Petitioner does not rely on Naidoo or Anthony in any manner that cures the

18

ALARM.COM-SECURENET-DE 1726823

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

underlying defect in the articulation of the ground of alleged obviousness of claim 1. Thus, for the same reasons discussed above, Petitioner has not shown a reasonable likelihood of prevailing in showing that claims 18–20, 23, 24, and 41 would have been obvious over Wimsatt, Johnson, Severson, and Naidoo, or that claim 22 would have been obvious over Wimsatt, Johnson, Severson, Naidoo, and Anthony.

### D. The Alleged Obviousness of Claims 25–40 and 42–47 Over Wimsatt, Johnson, Severson, and Alexander

In IPR2016-01916, Petitioner alleges that claims 25–40 and 42–47 of the '844 patent would have been obvious over Wimsatt, Johnson, Severson, and Alexander. Pet. (IPR2016-01916) 8–48. Each of these challenged claims depends directly or indirectly from claim 1. Because of this, Petitioner first discusses independent claim 1. *Id.* at 7. For the two limitations discussed above in the context of IPR2016-01911—limitations 1[c] and 1[j]—Petitioner repeats the same or substantially the same arguments we found unpersuasive. *See id.* at 15–17, 31–34. Petitioner's subsequent analysis of the dependent claims subject to this ground does not cure the defects underlying Petitioner's challenge of independent claim 1. *See id.* at 34–48. Thus, for the same reasons discussed above, Petitioner has not shown a reasonable likelihood of prevailing in showing that claims 25–40 and 42–47 would have been obvious over Wimsatt, Johnson, Severson, and Alexander.

### E. The Alleged Obviousness of Claims 48–50 Over Wimsatt and Johnson

In IPR2016-01916, Petitioner also alleges that independent claims 48–50 of the '844 patent would have been obvious over Wimsatt and Johnson. Pet. (IPR2016-01916), 49–66. Petitioner asserts that limitation 1[j],

19

ALARM.COM-SECURENET-DE 1726824

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2

pertaining to maintaining objects at the security server, is identical to limitations in claims 48–50, specifically those identified as elements 48[f], 49[j], and 50[j]. *Id.* at 52–53, 57–58, 62–63. Petitioner does not provide additional arguments for those limitations of claims 48–50, but relies on its earlier arguments made in the context of claim 1. *Id.*; *see also id.* at 65 (citing 1002 ¶ 223) (Petitioner reiterating, in its discussion of limitation 50[k], some of its arguments for limitation 1[j]). We have found those arguments not to be persuasive. Accordingly, Petitioner has not shown a reasonable likelihood of prevailing in showing that claims 48–50 would have been obvious over Wimsatt and Johnson.

### III. CONCLUSION

Petitioner, in IPR2016-01911, has not demonstrated that there is a reasonable likelihood of establishing the unpatentability of any of claims 1–4, 6–24, and 41 of the '844 patent. Petitioner, in IPR2016-01916, has not demonstrated that there is a reasonable likelihood of establishing the unpatentability of any of claims 25–40 and 42–50 of the '844 patent.

### IV. ORDER

For the foregoing reasons, it is

ORDERED that both Petitions are *denied* as to the challenged claims, and no trial is instituted.

20

ALARM.COM-SECURENET-DE 1726825

IPR2016-01911 and IPR2016-01916
Patent 8,478,844 B2


For PETITIONER:

Erik Milch
Jennifer Volk-Fortier
Frank Pietrantonio
COOLEY LLP
emilch@cooley.com
jvolkfortier@cooley.com
fpietrantonio@cooley.com

For PATENT OWNER:

Matthew Argenti
Michael Rosato
WILSON SONSINI GOODRICH & ROSATI
margenti@wsgr.com
mrosato@wsgr.com

21

ALARM.COM-SECURENET-DE 1726826

# EXHIBIT 13

Trials@uspto.gov
571-272-7822

Paper 9
Entered:  March 30, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SECURENET TECHNOLOGIES, LLC,
Petitioner,

v.

ICONTROL NETWORKS, INC.,
Patent Owner.

_____

Case IPR2016-01919
Case IPR2016-01920
Patent 8,473,619 B2[1]

_____

Before KEN B. BARRETT, PATRICK M. BOUCHER, and
MINN CHUNG, *Administrative Patent Judges.*

CHUNG, *Administrative Patent Judge.*

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314(a) and 37 C.F.R. § 42.108*

_____

[1] This Order will be entered in each case.  The parties are not authorized to use this caption style.

ALARM.COM-SECURENET-DE 1726760

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

## I. INTRODUCTION

SecureNet Technologies, LLC ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–9, 12–16, 19, 23–28, 32, 34, 42–47, 54–57, and 59–62 of U.S. Patent No. 8,473,619 B2 (Ex. 1001, "the '619 patent"). IPR2016-01919, Paper 1 ("Pet."). Petitioner filed another Petition challenging claims 17, 18, 20–22, 29–31, 33, 35–41, 48–53, and 58 of the same patent. IPR2016-01920, Paper 1 ("'1920 Pet.").[2] Icontrol Networks, Inc. ("Patent Owner") filed a Preliminary Response in each case. IPR2016-01919, Paper 6 ("Prelim. Resp."); IPR2016-01920, Paper 6 ("'1920 Prelim. Resp."). We have authority to determine whether to institute an *inter partes* review. 35 U.S.C. § 314(b); 37 C.F.R. § 42.4(a).

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides that an *inter partes* review may not be instituted unless the information presented in the Petition "shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." Upon consideration of the Petitions and the Preliminary Responses, we conclude that the information presented in the Petitions does not establish a reasonable likelihood that Petitioner would prevail in showing the unpatentability of any of the claims challenged in the Petitions on the grounds set forth therein. Accordingly, we deny Petitioner's request to institute an *inter partes* review in each Petition.

---

[2] Because of the substantial overlap in the two proceedings, we will cite only to the Petition, the Preliminary Response, Papers, and Exhibits in IPR2016-01919 unless otherwise noted.

2

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

## II. BACKGROUND

### A. Real Party In Interest

SecureNet Technologies, LLC identifies itself as the real-party-in-interest. Pet. 1.

### B. Related Proceedings

Petitioner asserts that the '619 patent has been asserted in the following patent infringement case: *Icontrol Networks, Inc. v. SecureNet Technologies, LLC*, No. 15-807-GMS (D. Del.). Pet. 1. Petitioner also filed petitions seeking *inter partes* review of certain claims of U.S. Patent No. 8,073,931 in IPR2016-01909 and of U.S. Patent No. 8,478,844 in IPR2016-01911 and IPR2016-01916. Pet. 1–2; Paper 4, 2.

## III. THE '619 PATENT

### A. Described Invention

The '619 patent describes an add-on security system that integrates with the conventional security systems existing at the premises to provide remote monitoring and control functions. Ex. 1001, Abstract, col. 3, ll. 45–62. According to the '619 patent, the remote monitoring and control functions are provided by introducing a combination of two interconnected modules: a gateway and a security server. *Id.* at col. 6, l. 66–col. 7, l. 3.

3

ALARM.COM-SECURENET-DE 1726762

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

Figure 1 of the '619 patent is reproduced below.



FIG.1

Figure 1 shows a block diagram of an integrated system in an exemplary embodiment of the '619 patent. *Id.* at col. 3, ll. 7–8, col. 6, ll. 53–54. As shown in Figure 1, integrated system 100 includes gateway 102 and security servers 104 coupled to conventional home security system 110. *Id.* at col. 6, ll. 54–57; *see also* col. 4, ll. 34–40 (describing the integrated system as comprising a gateway (also referred to as an iHub gateway) and security servers (also referred to as iConnect servers)). At a customer's home or business, the gateway connects and manages home security and monitoring devices. *Id.* at col. 6, ll. 57–59. The gateway also communicates over communication network 108 with the security servers located in the service provider's data center 106. *Id.* at col. 6, ll. 59–64. The combination of the

4

ALARM.COM-SECURENET-DE 1726763

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

gateway and the security servers enables the users to remotely monitor the premises and control the premises' security system by using remote client devices 120, such as PCs and mobile devices. *Id.* at col. 6, l. 66–col. 7, l. 27.

The gateway integrates into a home network and communicates with the home security panel in wired and wireless installations. *Id.* at col. 4, ll. 37–40, col. 11, l. 53–55. The gateway supports various wireless protocols and can interconnect with home security control panels over a wireless communication link. *Id.* at col. 11, 58–60. Figure 13 of the '619 patent is reproduced below.



## FIG.13

Figure 13 shows a block diagram of an integrated security system wirelessly interfacing to a home or business security system. *Id.* at col. 23, ll. 19–20. As shown in Figure 13, gateway 1320 is coupled to security system 1310, which may be any type of home or business security system. *Id.* at col. 23,

ALARM.COM-SECURENET-DE 1726764

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

ll. 21–22, 34–35. Security system 1310 includes RF-capable wireless security panel (WSP) 1311 that acts as the master controller for security system 1310. *Id.* at col. 23, ll. 38–41. Gateway 1320 monitors and controls WSP 1311 and associated wireless devices 1313 and 1314 of security system 1310 over RF link 1370 using wireless transceiver 1325. *Id.* at col. 24, ll. 14–23. As shown in Figure 13, gateway 1320 includes WSP manager 1323, device manager 1324, and wireless protocol manager 1326. *Id.* at col. 24, ll. 4–5, Fig. 13. These components in conjunction implement interface protocols and algorithms to communicate with security system 1310. *Id.* at col. 24, ll. 4–14.

Figure 12 (not reproduced herein) illustrates a method of integrating the gateway with an existing security system in an exemplary embodiment. *Id.* at col. 22, ll. 17–19. Upon power up, the gateway initiates software and RF sequence 1220 to locate an existing security system by finding the wireless security panel of the security system. *Id.* at col. 22, ll. 23–25, Fig. 12. The gateway and installer then initiate sequence 1230 "to 'learn' the gateway into the security system," followed by sequence 1240 "to discover and learn the existence and capabilities" of the devices within the existing security system. *Id.* at col. 22, ll. 25–30. Figure 14 (not reproduced herein) is a flowchart that illustrates "wirelessly 'learning' the [g]ateway into an existing security system and discovering extant sensors." *Id.* at col. 24, l. 66–col. 25, l. 2. Upon power up, the gateway initiates sequences 1420 and 1425 to identify WSPs 1311 and wireless devices 1313, including all sensors in the existing security system. *Id.* at col. 25, ll. 2–6, Fig. 14 (sequence 1420, sequence 1425 ("Use Wireless transceiver to find all

6

ALARM.COM-SECURENET-DE 1726765

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

sensors")). In another embodiment, the gateway is automatically installed with the security system by automatically discovering devices at the premises, such as sensors and cameras, and adding the discovered devices to the network of the integrated system. *Id.* at col. 25, ll. 44–45, 55–58.

After the gateway has completed the discovery and learning of the sensors and other devices and has been integrated into the existing security system, the integrated security system becomes operational. *Id.* at col. 22, ll. 41–44. The gateway has the ability to listen to network traffic and keep track of the status of all devices in the integrated system. *Id.* at col. 26, ll. 44–47, col. 27, ll. 6–8. The gateway utilizes the sensor updates, state changes, and supervisory signals of the network to maintain a current system of the premises being protected by the integrated system. *Id.* at col. 27, ll. 8–10. This data is sent to the security system server and stored in a database for use by server components. *Id.* at col. 27, ll. 11–13.

As discussed above, Figure 1 illustrates a gateway communicating with a security server over a communication network. Figure 2 (not reproduced herein) provides a more detailed illustration of the components of the security server. *Id.* at col. 7, ll. 34–36, Fig. 2. According to the '619 patent, the server components provide access to, and management of, the objects associated with the integrated security system installation. *Id.* at col. 8, ll. 29–31. Objects monitored by the gateway within the network where the gateway is located (i.e., the site or premises) are called "devices," which include sensors, cameras, home security panels, and other automation devices. *Id.* at col. 8, ll. 31–35, 37–41. The server components, identified as iConnect Business Components in Figure 2, store information about the

7

ALARM.COM-SECURENET-DE 1726766

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

objects that are managed by the server. *Id.* at col. 9, ll. 47–49. For example, the iConnect Business Components has an interface, called DeviceConnect 260 (shown in Figure 2), to define the properties of the new devices that have been added to the integrated security system at the premises, including how the devices can be managed. *Id.* at col. 10, ll. 18–23. Common types of supported devices include sensors, home security panels, and IP cameras. *Id.* at col. 10, ll. 23–28.

As shown in Figures 1 and 2, the users or customers use client devices 120, such as a PC, a web browser, or a mobile device, to connect to the security servers to remotely monitor, control, and manage the security system at the premises. *Id.* at col. 6, l. 66–col. 7, l. 27, col. 7, l. 31–col. 8, l. 11, Figs. 1, 2.

### B. Illustrative Claim

Of the challenged claims, claims 1, 60, and 61 are independent. Claim 1 is illustrative of the challenged claims and is reproduced below with the key disputed limitations emphasized in *italics* and added paragraph breaks and indentations for the "wherein" clauses.

1. A system comprising:

    a gateway located at a first location;

    a connection management component coupled to the gateway and automatically establishing a wireless coupling with a security system installed at the first location, the security system including security system components,

        wherein *the connection management component forms a security network by automatically discovering the security system components and integrating communications and functions of the security system components into the*

8

ALARM.COM-SECURENET-DE 1726767

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

> *security network*; and
>
> a security server at a second location different from the first location,
>
>> wherein the security server is coupled to the gateway,
>>
>> wherein the gateway receives security data from the security system components, device data of a plurality of network devices coupled to a local network of the first location that is independent of the security network, and remote data from the security server,
>>
>> wherein the gateway generates processed data by processing at the gateway the security data, the device data, and the remote data,
>>
>> wherein *the gateway* determines a state change of the security system using the processed data and *maintains objects at the security server* using the processed data,
>>
>> wherein *the objects correspond to the security system components and the plurality of network devices.*

Ex. 1001, col. 46, ll. 29–54.

## IV. PETITIONER'S CHALLENGES

### A. Prior Art Cited in Petitioner's Challenges

Petitioner cites the following references in its challenges to patentability:

| Reference and Relevant Dates | Designation | Exhibit No. |
|---|---|---|
| U.S. Patent Application Pub. No. 2004/0260427 Al (filed Apr. 8, 2004; published Dec. 23, 2004) | Wimsatt | Ex. 1004 |
| U.S. Patent No. 6,580,950 B1 (filed Apr. 28, 2000; issued June 17, 2003) | Johnson | Ex. 1005 |

9

ALARM.COM-SECURENET-DE 1726768

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

| Reference and Relevant Dates | Designation | Exhibit No. |
|---|---|---|
| U.S. Patent No. 4,951,029 (filed Feb. 16, 1988; issued Aug. 21, 1990) | Severson | Ex. 1006 |
| U.S. Patent Application Pub. No. 2003/0062997 A1 (filed Oct. 2, 2001; published Apr. 3, 2003) | Naidoo | Ex. 1007 |
| U.S. Patent No. 6,748,343 B2 (filed Sept. 28, 2001; issued June 8, 2004) | Alexander | Ex. 1008 |
| U.S. Patent Application Pub. No. 2003/0137426 A1 (filed Jan. 17, 2003; published July 24, 2003) | Anthony | Ex. 1009 |

*B. Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability in IPR2016-01919 (Pet. 3):

| Claims Challenged | Statutory Basis | References |
|---|---|---|
| 1–9, 12–16, 19, 23–28, 32, 34, 42–47, 54–57, 59–62 | § 103(a) | Wimsatt, Johnson, and Severson |

Petitioner asserts the following grounds of unpatentability in IPR2016-01920 ('1920 Pet. 3):

| Claims Challenged | Statutory Basis | References |
|---|---|---|
| 17, 18, 21, 22, 29–31, 33, 36, 58 | § 103(a) | Wimsatt, Johnson, Severson, and Naidoo |
| 20, 35 | § 103(a) | Wimsatt, Johnson, Severson, Naidoo, and Anthony |

ALARM.COM-SECURENET-DE 1726769

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

| Claims Challenged | Statutory Basis | References |
|---|---|---|
| 37–41, 48–53 | § 103(a) | Wimsatt, Johnson, Severson, Naidoo, and Alexander |

## V. CLAIM CONSTRUCTION

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *see Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144 (2016) (holding that 37 C.F.R. § 42.100(b) "represents a reasonable exercise of the rulemaking authority that Congress delegated to the . . . Office"). Under the broadest reasonable interpretation standard, and absent any special definitions, claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art, in view of the specification. *In re Translogic Tech. Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

Petitioner does not propose any claim constructions in these proceedings. Pet. 4–5. Patent Owner criticizes Petitioner's approach but does not propose its own construction for any claim term. Prelim. Resp. 8–9. For purposes of this decision, we need not construe any claim term explicitly in order to determine whether there is a reasonable likelihood of Petitioner prevailing with respect to the challenged claims. *See* 35 U.S.C. § 314(a); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

11

ALARM.COM-SECURENET-DE 1726770

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

## VI. ANALYSIS OF PETITIONER'S PRIOR ART CHALLENGES

### A. Obviousness over Wimsatt, Johnson, and Severson

Petitioner contends claims 1–9, 12–16, 19, 23–28, 32, 34, 42–47, 54–57, and 59–62 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Wimsatt, Johnson, and Severson. Pet. 7–64. Petitioner submits a Declaration of James Parker (Ex. 1002) in support of its contention. We have reviewed the parties' contentions and supporting evidence. Given the evidence of record, we are not persuaded that Petitioner has established a reasonable likelihood of prevailing on this asserted ground as to any of these claims for the reasons explained below.

### 1. Relevant Principles of Law

A claim is unpatentable under § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, objective indicia of non-obviousness (i.e., secondary considerations). *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

12

ALARM.COM-SECURENET-DE 1726771

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

### 2. *Overview of Wimsatt (Ex. 1004)*

Wimsatt describes a system and method for implementing a contextually sensitive user interface for home automation systems. Ex. 1004, Abstract, ¶¶ 3, 22. Figure 1 of Wimsatt is reproduced below.



FIG. 1

Figure 1 depicts an exemplary environment for implementing the system and method of Wimsatt. *Id.* ¶¶ 15, 34. According to Wimsatt, control panels 101 implement a programmable human interface that may include a touch-screen graphical user interface. *Id.* ¶¶ 34, 35. Wireless control panels 107 may also be used to implement similar functionality as control panels 101 in a wireless networking environment. *Id.* ¶ 37.

13

ALARM.COM-SECURENET-DE 1726772

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

As shown in Figure 1 above, control panels 101 or 107 couple to home automation subsystems, such as lighting control subsystem 113 and entertainment control subsystem 115. *Id.* ¶ 39. The control panels connect to the subsystem interfaces using signaling protocols adopted by the subsystems. *Id.*

Wimsatt contemplates adding or adapting its control panels "on top of" the existing home automation subsystems, such as lighting control systems and security systems. *See id.* ¶ 23 (stating that the disclosed invention is useful because it builds "on top of" the existing home automation subsystems and that "a particular advantage" of the invention is adapting to the existing controlled devices or subsystems). Reflecting this intended use, Wimsatt describes a process implemented in control panels 101 or 107 for discovering the existing subsystems at the premises. *Id.* ¶ 45. When a control panel is coupled to a controlled device or subsystem, it interrogates the device or subsystem to learn the details of the control interface of the device or subsystem. *Id.* In some cases, this interrogation may simply be a matter of determining the controller type of the subsystem. *Id.* If the subsystem or the controlled device returns insufficient information during interrogation, the control panel can be programmed manually to support the controlled device or subsystem. *Id.*

According to Wimsatt, unlike conventional home automation systems, which required a separate, independent control system for each subsystem with a separate, dedicated human interface, Wimsatt's control panels can access and control any of the controlled devices or subsystems that are coupled to the control panels. *Id.* ¶¶ 43–44. By utilizing common interface

14

ALARM.COM-SECURENET-DE 1726773

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

elements, the control panels of Wimsatt present substantially the same set of controls and provide similar graphical user interfaces to various home automation subsystems in a context sensitive manner. *Id.* ¶¶ 63, 77.

### 3. *Overview of Johnson (Ex. 1005)*

Johnson discloses an "Internet based home communications system for allowing a homeowner to monitor and control various features of their home from a distant location via a global computer network." Ex. 1005, Abstract. Johnson discloses a system comprising a plurality of control devices, a control unit in communication with the devices and connected to the Internet, and a data center having server computers connected to the Internet and the control unit. *Id.* at col. 2, ll. 8–14.

> The homeowner is capable of monitoring and controlling the control device within the home by accessing a web page displayed by the data center through a conventional web browser on a computer. The homeowner can view, monitor and control features of their home through the web page such as viewing interior images of their home or adjusting the thermostat for the interior of their home. In addition, the control unit may notify the appropriate supplier when propane or food becomes low within the home through the global computer network.

*Id.* at col. 2, ll. 19–28. Control devices include "lighting controls, heating controls, moisture controls, freeze controls, pet feeding devices, propane gauge, interior cameras, exterior cameras, security system, smoke alarm and various other devices." *Id.* at col. 2, ll. 13–18.

15

ALARM.COM-SECURENET-DE 1726774

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

### 4. Overview of Severson (Ex. 1006)

Severson discloses a programmable security alarm system including a system controller "which is programmably responsive to a plurality of distributed wireless and hardwired alarm sensors/transducers and which communicates with neighboring system controllers and a central station interactively monitoring a number of subscriber systems." Ex. 1006, col. 1, ll. 5–12. Each system controller is programmable with sensor/transducer numbers, options, and features. *Id.* at col. 23, ll. 60–63. Severson explains:

> Even further and without human intervention, once the sensors transducers are initially programmed, each system controller may be operated to "self-learn" each of its sensors. In this mode as the sensors/transducers report to the controller for the first time and after the controller confirms the existence of a proper house code or unit number, they are logged into the controller's RAM memory. Human error is thus minimized even though during hand programming with the wireless key pad 13, the circuitry performs a similar subroutine to log the assigned [sensor/transducer] S/T numbers into RAM.

*Id.* at col. 25, ll. 2–13.

### 5. Discussion

#### a. Claims 1, 60, and 61

Independent claims 1, 60, and 61 all recite "the connection management component" "forms" or "forming" "a security network by automatically discovering the security system components and integrating communications and functions of the security system components into the security network" and "the gateway . . . maintains objects at the security server using the processed data, wherein the objects correspond to the

16

ALARM.COM-SECURENET-DE 1726775

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

security system components and the plurality of network devices."
Ex. 1001, col. 46, ll. 35–39, 49–54; col. 49, l. 52–col. 50, l. 3; col. 50, ll. 12–19, 26–32, 40–45. These two limitations are identified by Petitioner as claim limitations 1[d] and 1[h], respectively, with respect to claim 1. Pet. 13, 25. We discuss each of these limitations below.

### i) Limitation 1[d]

Petitioner contends that the combination of Wimsatt, Johnson, and Severson renders obvious the claim limitation identified by Petitioner as limitation 1[d], i.e., the limitation reciting "the connection management component forms a security network by automatically discovering the security system components and integrating communications and functions of the security system components into the security network" (the "two-part network formation limitation"). Pet. 13–18. The plain language of this claim limitation indicates that "the connection management component forms a security network" by performing two separate operations—that is, by "automatically discovering the security system components" and "integrating communications and functions of the security system components into the security network." We first address the parties' disputes regarding whether Wimsatt or Wimsatt in view of Severson teaches "automatically discovering the security system components."

Petitioner asserts that, although Wimsatt does not illustrate sensors in its security system, a person of ordinary skill in the art would have understood Wimsatt's security system to include sensors and that those sensors would be the "security system components" recited in the claims.

17

ALARM.COM-SECURENET-DE 1726776

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

*Id.* at 10. Petitioner concedes that "Wimsatt does not explicitly disclose that its security system's sensors are automatically discovered using this [Universal Plug-and-Play (UPnP)] process – it only explicitly discloses that the 'security system' is discovered." *Id.* at 14. Petitioner then argues "[a] POSITA would have understood that discovering the security system would also include discovering its sensors." *Id.* (citing Ex. 1002 ¶ 92). Patent Owner asserts (Prelim. Resp. 12), and we agree, that this argument from Petitioner is too conclusory to satisfy Petitioner's burden. The cited portion of the expert testimony merely repeats, without adequate elaboration or explanation, Petitioner's argument and, therefore, similarly is conclusory. *See* Ex. 1002 ¶ 92.

Petitioner, arguing in the alternative, turns to Severson for the disclosure of a system having a controller that may "self-learn" sensors "without human intervention." Pet. 14 (citing Ex. 1006, col. 25, ll. 3–13). Petitioner asserts

> In describing a system installation process, Severson explains that the sensors and controller are mounted at the home and then "the controller is enabled and self-learns each of its sensors/transducers as they report their status." (Ex. 1006, 25:51-26:7; *see also*, *id.*, 23:60-25:50.) As a result, "[i]nstallation time is thereby reduced with minimal potential installer error, due to the CPU self-learning its reporting sensors." (*Id.*, 25:51-26:7.) This is similar to the auto-discovery process described in the '619 patent. (*See, e.g.*, Ex. 1001, FIG. 14, 24:66-26:5.)

*Id.* at 14–15.

Patent Owner disputes this contention and argues that Severson's self-learning is not "automatically discovering" within the meaning of the

18

ALARM.COM-SECURENET-DE 1726777

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

claimed invention. Prelim. Resp. 13–14. Petitioner does not propose a construction for "automatically discovering," but, as quoted above, merely asserts that Severson's process is "similar" to that disclosed in the '619 patent. Pet. 15 (citing Ex. 1001, Fig. 14, col. 24, l. 66–col. 26, l. 5). The process described in the '619 patent and upon which Petitioner relies, however, indicates that the first step after gateway power-up, and *before* entering "learn mode," is for the gateway to "identify" accessible wireless security panels and wireless devices. Ex. 1001, col. 25, ll. 1–11, Fig. 14 (software sequences 1420 and 1425). In contrast, as Patent Owner notes, Severson discloses that the sensors and controllers are initially programmed in a manual process. Prelim. Resp. 13–14 (citing Ex. 1006, col. 25, ll. 3–6 ("Even further and without human intervention, *once the sensors transducers are initially programmed*, each system controller may be operated to 'self-learn' each of its sensors.") (emphasis by Patent Owner), 22–24, 51–61). Indeed, Severson describes that Severson's controller "self-learns" the sensors when those sensors report their status after first being programmed manually. Ex. 1006, col. 25, ll. 51–65. Thus, Severson suggests that the sensors must first be identified for the controller before Severson's controller "self-learns" those sensors "without human intervention." Even if Severson's process is "similar" to the learning process described in the '619 patent, we are not persuaded Petitioner has demonstrated sufficiently that Severson discloses "automatically discovering the security system components," as recited in the claims 1, 60, and 61.

Petitioner contends that it would have been obvious to a person of ordinary skill in the art to combine the "auto-discovery disclosure" of

19

ALARM.COM-SECURENET-DE 1726778

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

Severson with Wimsatt and Johnson "so that the control panel 101 in Wimsatt can auto-discover the security sensors in addition to the discovering the security system controller." Pet. 15. Citing Severson and the Parker Declaration, Petitioner asserts that "[t]his would predictably result in an easier sensor installation process and reduce the likelihood of installer error." *Id.* (citing Ex. 1002 ¶ 93; Ex. 1006, col. 26, ll. 5–7). Patent Owner argues that Petitioner's contention is at odds with Wimsatt's description that its control panels communicate with a security system, not the underlying security system components, such as the security sensors. Prelim. Resp. 15–16 (citing Ex. 1004 ¶¶ 5, 23, 30, 31, 58, 62, 65). Patent Owner asserts that, because "Wimsatt's control panels are limited to functionality regarding the *status* of a security system" and do not communicate with or control individual security system components, Petitioner's proposed modification would unnecessarily complicate installation, not simplify it. *Id.* at 16.

We agree with Patent Owner that Wimsatt's control panels do not communicate directly with the security system components, such as the sensors. As discussed above in our overview of Wimsatt, Wimsatt is directed to providing control panels with consistent user interfaces to existing home subsystems, such as home automation systems and security systems. Ex. 1004 ¶¶ 3, 22, 23, 77. Hence, Wimsatt's control panels discover the existing subsystems at the premises, such as a security system, and learn the details of the *control interface* of the subsystems, but do not in general discover or communicate with the components internal to the subsystems, such as the security system components or sensors. *Id.* ¶ 45. Indeed, Wimsatt describes that "[i]n most cases it is *not necessary* for every

20

ALARM.COM-SECURENET-DE 1726779

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

control panel 101/107 to have detailed knowledge of a particular controlled device or subsystem. Instead, it is *sufficient* to be aware of the existence of each controlled device and the functionality available from that device." *Id.* ¶ 46 (emphases added). Furthermore, because Wimsatt contemplates adding or adapting its control panels "on top of" the existing security systems (*id.* ¶ 23), Wimsatt's discovery process would have expected that the sensors would have already been installed and the sensor installation process previously completed. Hence, the record indicates that Wimsatt is *not* concerned with sensor installation processes, such as those described in Severson. Petitioner does not explain why the combination of Wimsatt and Severson would nonetheless "predictably result in an easier sensor installation process and reduce the likelihood of installer error." Pet. 15. The cited portion of the expert testimony repeats, without adequate elaboration or explanation, Petitioner's unpersuasive argument and, therefore, similarly is unpersuasive. *See* Ex. 1002 ¶ 93.

Petitioner's argument that Severson "illustrates the ability and desire for similar controllers to automatically discover devices at the security component level" (Pet. 15) is similarly unpersuasive because Wimsatt is not concerned with discovering security system components.

The rest of Petitioner's arguments regarding the reasons to combine Wimsatt with Severson and Johnson are too conclusory to satisfy Petitioner's burden. For example, similar to Petitioner's conclusory contention discussed above, Petitioner asserts that "Wimsatt already discloses an automatic discovery process for learning the security system so it would be obvious to a POSITA to further discover the sensors that form

21

ALARM.COM-SECURENET-DE 1726780

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

part of that system." *Id.* (citing Ex. 1002 ¶ 94). Petitioner also contends that "[a] POSITA would understand that adding an extra step in the automatic discovery process to include discovery of the sensors would be easy to implement." *Id.* (citing Ex. 1002 ¶ 94). The cited portion of the expert testimony again repeats, without adequate elaboration or explanation, Petitioner's conclusory assertions. *See* Ex. 1002 ¶ 94. These conclusory statements are insufficient to provide the requisite "reasoned explanation" to justify combining Wimsatt with Severson and Johnson to teach "automatically discovering the security system components," as recited in claims 1, 60, and 61. *See In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016).

In addition, Petitioner does not demonstrate sufficiently that the combination of Wimsatt, Severson, and Johnson renders obvious the entire claim limitation identified by Petitioner as limitation 1[d], i.e., the "two-part network formation limitation," because Petitioner does not adequately address the limitation as a whole. As discussed above, the "two-part network formation limitation" recites that "the connection management component forms a security network" by performing two separate operations—that is, by "automatically discovering the security system components" *and* "integrating communications and functions of the security system components into the security network." Hence, in order to demonstrate the combination of Wimsatt, Johnson, and Severson renders the "two-part network formation limitation" obvious, Petitioner must identify the differences between the claimed subject matter (i.e., forming a security network by performing two operations discussed above) and the prior art

22

ALARM.COM-SECURENET-DE 1726781

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

references, and demonstrate that the differences are such that the subject matter, as a whole, would have been obvious to a person having ordinary skill in the art. *See KSR*, 550 U.S. at 406. Petitioner makes no such showing in the Petition.

Instead, Petitioner focuses largely on the integration of functions only, and asserts that a person of ordinary skill in the art would have understood that "the claimed 'security network' is formed in Wimsatt (as modified by Johnson and Severson) as a result of the control panel integrating the functions of the security system sensors." Pet. 17 (citing Ex. 1002 ¶¶ 98–100). Petitioner's analysis is largely devoid of a discussion regarding how a network may be formed by "automatically discovering the security system components." *See id.* at 17–18. The mere fact that Wimsatt (as modified by Johnson and Severson) teaches an integrated security system with sensors does not necessarily show that the control panel of Wimsatt "forms a security network" by "automatically discovering the security system components," e.g., the sensors, *and* "integrating communications and functions of the security system components into the security network." Hence, Petitioner's analysis is deficient because Petitioner does not demonstrate sufficiently how the combination of the references renders obvious the subject matter of the "two-part network formation limitation" as a whole. The cited portion of the expert testimony does not adequately address the "automatically discovering the security system components" aspect or the subject matter of the "two-part network formation limitation" as a whole, either, and, therefore, does not remedy the deficiency in Petitioner's argument. *See* Ex. 1002 ¶¶ 98–100.

23

ALARM.COM-SECURENET-DE 1726782

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

Therefore, Petitioner does not demonstrate sufficiently that the "two-part network formation limitation" recited in claims 1, 60, and 61 is rendered obvious by the combination of Wimsatt, Johnson, and Severson.

### ii) Limitation 1[h]

As discussed above, Petitioner identifies as claim limitation 1[h] the limitation reciting "the gateway . . . maintains objects at the security server using the processed data, wherein the objects correspond to the security system components and the plurality of network devices." Pet. 25.

Petitioner contends that the combination of Wimsatt and Johnson teaches this limitation. *Id.* at 26. Petitioner (*id.* at 26–27) points to the webpage shown in Johnson's Figure 3, which is reproduced below:



24

ALARM.COM-SECURENET-DE 1726783

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

Figure 3 depicts "a browser containing the control page displaying some of the features of [Johnson's] invention that allow the homeowner to monitor and control their home through a global computer network such as the Internet." Ex. 1005, col. 3, ll. 30–33.

Petitioner asserts

> A POSITA would have understood that the icons illustrated on the above web page [of Johnson's Figure 3] represent particular controlled devices located within the home in Wimsatt. (Ex. 1002, ¶ 119.) These icons are the claimed "objects" maintained at the data center 20 servers. For example, the icon labeled "camera" is an object maintained at the server corresponding to the IP camera 109. Similarly, the icons labeled "door" and "window" are objects maintained at the server corresponding to a door sensor and a window sensor, respectively.

Pet. 28. The cited expert testimony appears to be the same assertion with no elaboration or explanation for the bases of the opinion. *See* Ex. 1002 ¶ 119.

Patent Owner argues that Petitioner's analysis regarding this limitation is flawed and that Johnson does not disclose the recited "objects" maintained at the server. Prelim. Resp. 16–20. Patent Owner argues that Mr. Parker's "bald opinion" that one of ordinary skill would have understood the icons to represent particular controlled devices should be entitled to no weight. *Id.* at 17. Patent Owner contends that Johnson does not describe the nature of the icons. *Id.* Patent Owner also argues that there is depicted in Figure 3 only one each of a camera icon, a window icon, and a door icon, and persuasively argues that one would expect there to be more than one of each of these items in a house and, therefore, it would be illogical for the icons to correspond to a *particular* security system

25

ALARM.COM-SECURENET-DE 1726784

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

component as alleged. *Id.* at 17–18. After a review of the portions of Johnson cited by Petitioner, we are unable to discern any elaboration regarding these icons that persuades us that Petitioner's proposition is correct. *See* Pet. 26–29. Additionally, and as Patent Owner notes, Petitioner apparently identifies Wimsatt's IP camera 109 as corresponding to the camera icon in Johnson's system. Prelim. Resp. 17–18 (citing Pet. 28). This mixing-and-matching of references' elements without adequate explanation is confusing rather than clarifying.

Accordingly, we are not persuaded that the icons in Johnson's Figure 3 would be understood by a person of ordinary skill in the art to correspond to recited objects corresponding to the security system components and network devices.

Even if Johnson's icons were found to be the claimed "objects," Petitioner does not persuasively demonstrate that those icons are maintained at the security server. *Cf.* Prelim. Resp. 19–20 (Patent Owner arguing that "[t]here is no explanation [in Johnson] regarding where those icons are maintained or what they even represent."). Indeed, Petitioner does not cite any disclosure in Johnson describing the "icons" in Figure 3 as "objects" maintained at the server. Petitioner's conclusory assertion and the corresponding equally conclusory testimony from Mr. Parker that "[t]hese icons [of Johnson] are the claimed 'objects' maintained at the data center 20 servers" are insufficient and not persuasive.

26

ALARM.COM-SECURENET-DE 1726785

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

### iii) Summary

Based on the record presented, the information presented in the Petition does not demonstrate a reasonable likelihood of Petitioner prevailing in its challenge to independent claims 1, 60, and 61 under 35 U.S.C. § 103(a) as obvious over the combination of Wimsatt, Johnson, and Severson.

### b. *Claims 2–9, 12–16, 19, 23–28, 32, 34, 42–47, 54–57, 59, and 62*

Claims 2–9, 12–16, 19, 23–28, 32, 34, 42–47, 54–57, 59, and 62 each depend directly or indirectly from claim 1. Petitioner's arguments and evidence presented with respect to these dependent claims do not remedy the deficiencies in Petitioner's analysis of the challenged independent claims discussed above. *See* Pet. 29–54, 64. Therefore, Petitioner does not demonstrate a reasonable likelihood of prevailing in its challenge to dependent claims 2–9, 12–16, 19, 23–28, 32, 34, 42–47, 54–57, 59, and 62 under 35 U.S.C. § 103(a) as obvious over the combination of Wimsatt, Johnson, and Severson.

### B. Obviousness over Wimsatt, Johnson, Severson, and Naidoo

In IPR2016-01920, Petitioner contends claims 17, 18, 21, 22, 29–31, 33, 36, and 58 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Wimsatt, Johnson, Severson, and Naidoo. '1920 Pet. 8–42, 56–57. Each of these challenged claims depends directly or indirectly from claim 1. Because of this, Petitioner first discusses independent claim 1. *Id.* at 9. For the two limitations discussed above in the context of IPR2016-01919—limitations 1[d] and 1[h]—Petitioner repeats the same or

27

ALARM.COM-SECURENET-DE 1726786

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

substantially the same arguments we found unpersuasive. *See id.* at 14–19, 27–30. Petitioner's subsequent analysis of the dependent claims subject to this ground does not cure the deficiencies underlying Petitioner's challenge of independent claim 1. *See id.* at 30–42, 56–57. Thus, for the same reasons discussed above, Petitioner has not shown a reasonable likelihood of prevailing in its challenge to dependent claims 17, 18, 21, 22, 29–31, 33, 36, and 58 under 35 U.S.C. § 103(a) as obvious over the combination of Wimsatt, Johnson, Severson, and Naidoo.

### C. Obviousness over Wimsatt, Johnson, Severson, Naidoo, and Anthony or Alexander

Petitioner adds the teachings of Anthony to the basic combination of Wimsatt, Johnson, Severson, and Naidoo in an asserted ground of obviousness as to dependent claims 20 and 35. '1920 Pet. 35–36, 42. Petitioner also contends that dependent claims 37–41 and 48–53 would have been obvious over the combination of Wimsatt, Johnson, Severson, Naidoo, and Alexander. *Id.* at 42–56. Each of these challenged claims depends directly or indirectly from claim 1, and Petitioner's subsequent analysis of the dependent claims subject to these grounds does not cure the deficiencies underlying Petitioner's challenge of independent claim 1. Thus, for the same reasons discussed above, Petitioner has not shown a reasonable likelihood of prevailing in showing that claims 20 and 35 would have been obvious over the combination of Wimsatt, Johnson, Severson, Naidoo, and Anthony, or in showing that claims 37–41 and 48–53 would have been

28

ALARM.COM-SECURENET-DE 1726787

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2

obvious over the combination of Wimsatt, Johnson, Severson, Naidoo, and Alexander.

## VII. CONCLUSION

Based on the arguments and evidence presented in the Petitions, we conclude Petitioner has not demonstrated a reasonable likelihood that Petitioner would prevail in showing at least one of the challenged claims of the '619 patent is unpatentable based on any asserted ground of unpatentability in IPR2016-01919 or IPR2016-01920. Therefore, we do not institute an *inter partes* review with respect to any of the challenged claims of the '619 patent.

## VIII. ORDER

In consideration of the foregoing, it is ORDERED that both Petitions are denied as to all challenged claims of the '619 patent in each Petition, and no trial is instituted.

29

ALARM.COM-SECURENET-DE 1726788

IPR2016-01919
IPR2016-01920
Patent 8,473,619 B2


PETITIONER:


Erik B. Milch
Jennifer Volk-Fortier
Frank Pietrantonio
COOLEY LLP
emilch@cooley.com
jvolkfortier@cooley.com
fpietrantonio@cooley.com


PATENT OWNER:

Matthew A. Argenti
Michael T. Rosato
WILSON SONSINI GOODRICH & ROSATI
margenti@wsgr.com
mrosato@wsgr.com


30

ALARM.COM-SECURENET-DE 1726789

EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE


INTERDIGITAL                        :    CIVIL ACTION
COMMUNICATIONS, INC., a     :
Delaware corporation,       :
INTERDIGITAL TECHNOLOGY      :
CORPORATION, a Delaware     :
corporation, IPR            :
LICENSING, INC., a          :
Delaware corporation,       :
and INTERDIGITAL            :
HOLDINGS, INC., a           :
Delaware corporation,       :
                            :
        Plaintiff,          :
                            :
                            :
   vs.                      :
                            :
                            :
ZTE CORPORATION, and ZTE    :
(USA) INC.,                 :
                            :
        Defendants          :
        and Counterclaim    :
        Plaintiffs,         :    NO. 13-00009-RGA


                           - - -

                    Wilmington, Delaware
                    Wednesday, October 15, 2014
                    11:30 o'clock, a.m.

                           - - -

BEFORE:   HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

                           - - -

                    Valerie J. Gunning
                    Official Court Reporter

APPEARANCES:


        SMITH KATZENSTEIN & JENKINS
        BY:  NEAL C. BELGAM, ESQ.


                -and-


        LATHAM & WATKINS LLP
        BY:  RON E. SHULMAN, ESQ.
             (Menlo Park, California)


                -and-


        LATHAM & WATKINS LLP
        BY:  MAXIMILIAN A. GRANT, ESQ. and
             BERT C. REISER, ESQ.
             (Washington, D.C.)


             Counsel for Plaintiffs
             InterDigital Communications, Inc.,
             InterDigital Technology Corporation,
             IPR Licensing, Inc., and InterDigital
             Holdings, Inc.




        FARNAN LLP
        BY:  KELLEY E. FARNAN, ESQ.


                -and-

APPEARANCES (Continued):


        BRINKS GILSON & LIONE
        BY:   RALPH J. GABRIC, ESQ. and
              CHARLES M. McMAHON, ESQ.
              (Chicago, Illinois)


                  -and-


        BRINKS GILSON & LIONE
        BY:  JAY H. REIZISS, ESQ.
              (Washington D.C.)



              Counsel for Defendants
              ZTE Corp. and ZTE (USA) Inc.


                  -   -   -

P R O C E E D I N G S

(Proceedings commenced in the courtroom, beginning at 11:30 a.m.)

THE COURT:  All right.  Please be seated.  So this is a pretrial conference in InterDigital versus ZTE, Civil Action No. 13-9.

Mr. Belgam, there you are.  Who have you got with you here?

MR. BELGAM:  I have with me -- good afternoon, your Honor.  I have with me Max Grant, Ron Shulman and Bert Reiser from Latham & Watkins.

MR. GRANT:  Good morning, your Honor.

THE COURT:  Good morning to you all.

And Ms. Farnan?

MS. FARNAN:  Good morning, your Honor.  Here on of behalf of ZTE, and I have my co-counsel from Brinks Gilson, Ralph Gabric, Charles McMahon and Jay Reiziss.

THE COURT:  Okay.  Good morning to

petition that was granted.  So that process is in the midst of occurring.

I think the parties have agreed, consistent with the Court's prior ruling, it's not appropriate to raise anything having to do with that IPR proceeding with the caveat being that if we somehow open the door in our discussion of the '244 patent, that that would permit ZTE to come in and discuss it, and if that occurs or they believe that's going to occur, we will have a sidebar, make sure it is clear.

THE COURT:  I was going to say, subject to something that Mr. Gabric -- getting close?

MR. GABRIC:  You're getting real close.

THE COURT:  Gabric.  Mr. Gabric. At least I got the right letter.  I'm just not pronouncing them right.

Mr. Gabric says, yes, that's what I would say is, I didn't realize there was an IPR on that one, too.  But the same logic that I said before as to why it didn't come in when you

thought it was in your favor, it doesn't come in if it's in their favor.

So if there is something that supposedly opens the door, I would like to hear about it before you walk through the door.  All right?  So a sidebar would be good on that thing.

MR. GRANT:  Other than motions in limine, which I assume from the Court's posture it would not like to hear argument on, that's all we have.

THE COURT:  Well, I have some questions about that, but I don't want to just have a freeform argument because some of them are harder or easier than others of them.

Mr. Gabric, what do you have to say?  So far I've heard nothing but happiness from Mr. Grant.

MR. GABRIC:  I'm happy too, your Honor, so I think things are moving along.

Just a couple of housekeeping issues.  As far as jury notebooks, I read the pretrial order from the Nokia case and I understand that the jury binders will have

copies of the patents and the Court's construction of the relevant terms that they'll have to deal with.

THE COURT:  Right.  I mean, I assume, Mr. Grant, you are onboard with that?

MR. GRANT:  Yes, your Honor.  I assumed that we would deal with that in the same way and then along the way limit it in numbers of exhibits that are admitted into evidence that each side wants.

THE COURT:  Yes.  If there's something that would make things easier, yes. But I think that really having the jury get a notebook with patents at issue and the claim constructions that have been given --

MR. GRANT:  That streamlined version with just the Court's instructions.

THE COURT:  Right.  Just the ones that are pertinent to the disputes.  There's no need -- and if, and I can't remember.  If there's a -- if I gave a plain meaning for one, then actually I prefer that they not be told it's a plain meaning because I'm going to tell

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ALARM.COM, INC. and ICN ACQUISITION, LLC, | ) ) ) | CASE NO.: 1:15-cv-00807 (RGA) |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| | ) | ▮▮▮▮▮▮▮▮▮▮ |
| SECURENET TECHNOLOGIES LLC, | ) ) | |
| Defendant. | ) ) | |
| | ) ) ) ) | |

**EXHIBIT 14C**

**SECURENET'S REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALARM.COM, INC. and                       )
ICN ACQUISITION, LLC,                     )
                                          )
            Plaintiffs,                   )
                                          )
      v.                                  )    C.A. No. 15-807 (RGA)
                                          )
SECURENET TECHNOLOGIES LLC,               )    **JURY TRIAL DEMANDED**
                                          )
            Defendant.                    )


**SECURENET TECHNOLOGIES LLC'S REPLY IN SUPPORT OF
SECURENET'S MOTION *IN LIMINE* NO. 2:
PRECLUDE REFERENCE TO THE PATENT TRIAL AND APPEAL BOARD'S
DENIAL OF INSTITUTION OF INTER PARTES REVIEW PROCEEDINGS
OF THE ASSERTED PATENTS**

Plaintiffs' opposition fails to show that the PTAB's denials of institution of SecureNet's IPR Petitions are highly probative to any issue in this case.  That a different expert, in a previous case, included a few of the secondary references cited in the denied Petitions does not make the Petitions relevant here.  Notably, Mr. Parker did not rely on Wimsatt, the primary reference in all of the IPR petitions.  Similarly, SecureNet's reliance on a subset of references used in the Petitions is no different than any defendant in a similar posture.  Plaintiffs cite no cases that say reliance in both the PTO and the District Court somehow forms a basis for relevance of denied Petitions.

The PTAB's rejection of certain prior art does not justify admission of this evidence.[1] SecureNet does not rely on Wimsatt alone, but combines it with newly cited prior art.  As SecureNet's arguments are not identical to those rejected by the PTAB, those rejections are irrelevant and would confuse the jury regarding Wimsatt's relevance in an invalidity challenge.

Plaintiffs' reliance on *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332 (Fed. Cir. 2018), to argue the denial of IPR Petitions is relevant to willful infringement is misguided.  *Exmark* did not relate to IPR Petitions—instead, pre-*Halo*, the district court found the Defendant's litigation defenses unreasonable and "precluded [Defendant] Briggs from presenting any evidence regarding the validity of claim 1" in its willfulness defense.  *Id.* at 1352.  It is this evidence of invalidity that the Federal Circuit held should have been admitted, not denied IPR Petitions.

The PTAB's denial of IPR Petitions are not a decision on the merits, were reached on a less complete record without the benefit of a full adversarial proceeding, and should be excluded.

---

[1] Although the number of rejections is irrelevant, Plaintiffs statement that the PTAB rejected Wimsatt "eight times" is misleading.  *See* Pls. Opp. at 1 ("prior art . . . rejected *eight times*"), 2 ("The Patent Office considered Wimsatt a total of eight several [*sic*] times").  Plaintiffs fail to clarify that Wimsatt has been relied on in prosecution and IPR Petitions for three separate Asserted Patents, not eight times for a single patent.