1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF DELAWARE

3

4    ALARM.COM, INC., a Delaware      )
     corporation, and ICN             )
5    ACQUISITION, LLC, a Delaware     )
     corporation,                     )
6                                     )
                     Plaintiffs,      )
7                                     ) C.A. No. 15-807(RGA)
     v.                               )
8                                     ) JURY TRIAL DEMANDED
     SECURENET TECHNOLOGIES LLC, a    )
9    Delaware limited liability       )
     company,                         )
10                                    )
                     Defendant.       )
11

12                                        J. Caleb Boggs Courthouse
                                          844 North King Street
13                                        Wilmington, Delaware

14                                        Tuesday, February 5, 2019
                                          9:00 a.m.
15                                        Trial Volume II

16

17   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

18   APPEARANCES:

19              MORRIS JAMES, LLP
                BY:  KENNETH L. DORSNEY, ESQUIRE
20
                        -and-
21
                WILSON SONSINI GOODRICH & ROSATI
22              BY:  JAMES C. YOON, ESQUIRE
                BY:  RYAN R. SMITH, ESQUIRE
23              BY:  MARY A. PROCACCIO-FLOWERS, ESQUIRE
                BY:  IAN R. LISTON, ESQUIRE
24
                                          For the Plaintiffs
25

```
1    APPEARANCES CONTINUED:

2                   MORRIS NICHOLS ARSHT & TUNNELL LLP
                    BY:  JACK B. BLUMENFELD, ESQUIRE
3                   BY:  STEPHEN J. KRAFTSCHIK, ESQUIRE

4                          -and-

5                   COOLEY LLP
                    BY:  ERIK B. MILCH, ESQUIRE
6                   BY:  CHRISTOPHER CAMPBELL, ESQUIRE
                    BY:  NAINA SONI, ESQUIRE
7                   BY:  ROSE S. WHELAN, ESQUIRE
                    BY:  FRANK PIETRANTONIO, ESQUIRE
8                   BY:  LISA SCHWIER, ESQUIRE

9                                 For the Defendant

10
                    ***  PROCEEDINGS  ***
11

12            THE COURT:  All right.  Please be seated.

13   Everyone good morning.  So just for what it's worth, I did

14   see the letter from the plaintiff on prosecution history

15   estoppel.  What I plan to do about that is at this point is

16   nothing.  I will postpone it until after trial.  It seems

17   more complex than something I can decide on the fly and I

18   think -- and so one of the things that I'm going to ask

19   which relates to something else we're going to have to do

20   pretty soon is in terms of a verdict form, I have a question

21   that if your a literal infringement of that element or if

22   there is infringement of the claims, where that element is,

23   we'll have a question about whether if the jury found

24   literally infringed and then we'll have a question about

25   whether they found infringed by the Doctrine of Equivalents,
```

```
 1    maybe they will find it's literally infringed and we'll

 2    never have to deal with it.  Maybe they'll find it not

 3    infringed at all, and we'll never have to deal with it.

 4              And in terms of that question, I would just

 5    suggest the trial that I just had, we had that series of

 6    questions in the verdict form.  And I mention that because I

 7    guess the other thing is at some point given changes in the

 8    certain claims and changes in defenses, I'm expecting you're

 9    going to submit revised proposed jury instructions and a

10    verdict form.  Do you all have a plan for when you may be

11    doing that?

12              MR. MILCH:  Not quite yet, Your Honor.

13    Tomorrow, I believe.

14              MR. YOON:  I'm sure that we can have it to up by

15    tomorrow, Your Honor.

16              THE COURT:  All right.  So that's what I have.

17    What do you have.

18              MR. BLUMENFELD:  Good morning, Your Honor.

19              THE COURT:  Hi, Mr. Blumenfeld.

20              MR. BLUMENFELD:  We have an issue that Mr. Yoon

21    and I have discussed this morning and a little bit last

22    night.  And it came up as a result of a couple of things

23    that happened at trial yesterday, both in opening and then

24    with Mr. Dawes' testimony there was I think more than a

25    suggestion that iControl approached SecureNet, tried to
```

```
 1    settle this case, tried to settle the earlier case, and
 2    essentially that we blew them off.  And I don't know if you
 3    --
 4              THE COURT:  Well, so what I got out of what I
 5    heard yesterday and, of course, it might be incorrect, and
 6    of course if it is correct, I have more background on this
 7    than the jury does, but I thought the first case what I
 8    gathered is they decided to dismiss it and figure out the
 9    settlement afterwards.  And that's when nothing happened and
10    that's when they filed the second suit.  Did I understand
11    correctly what the testimony was?
12              MR. BLUMENFELD:  That's in part what the
13    testimony was.  The problem with the testimony, and I can
14    read this to you, it's page 220 from Mr. Dawes and hand it
15    up if you would like to see it.
16              THE COURT:  Just read it.
17              MR. BLUMENFELD:
18              "Question:  Did SecureNet ever give iControl a
19    counterproposal for a license?
20              "Answer:  No, they never responded at all.
21              "Question:  Now, sir, you participated in
22    license negotiations before?
23              "Answer:  Yes.  Lots.
24              "Question:  Is it typical of these negotiations
25    to go back and forth?
```

1          "Answer:  Frequently.

2          "Question:  Did that happen with SecureNet?

3          "Answer:  Not at all."

4          THE COURT:  Right, I remember hearing that.

5          MR. BLUMENFELD:  And what happened was after the

6     second lawsuit was filed, there is no dispute about this.

7     After the second lawsuit was filed, there were negotiations

8     back and forth.  In fact, there were efforts with Judge

9     Thynge to try to settle, there were negotiations between

10    outside counsel, there were meetings between the CEO's of

11    the two companies.  And that went on for about three years.

12    And, in fact, one of the reasons that those broke off for a

13    while in 2017 was because of the Alarm.com transaction where

14    nobody had authority at iControl.

15          But our concern is that the jury has the

16    impression that they sued us in 2015, they dropped that

17    lawsuit, and then we never talked to them again.  Because

18    that's kind of the way the testimony reads.

19          I know from talking to Mr. Yoon that's not what

20    he intended and it's not what he intended in his opening.

21    We don't want to spend the rest of this trial

22    cross-examining Mr. Dawes about that and putting on

23    witnesses about the settlement negotiations.  What we did

24    discuss this morning and I hope we can maybe work this out

25    is to stipulate or somehow instruct the jury that the

1    testimony Mr. Dawes gave referred to the period before

2    September 2015, and that the parties had settlement

3    discussions including possible -- possibly saying extensive

4    discussions for the period after September 2015, because I

5    sure want to get that out of the jury's mind.  I know, not

6    that it means a lot, but when I read Law 360 this morning,

7    part of Mr. Yoon's opening that they quoted was the part

8    about we never responded.  And so if that's the takeaway

9    that people got yesterday, we're very concerned about that

10   not being corrected.

11            THE COURT:  All right.  Mr. Yoon, what do you

12   have to say?

13            MR. YOON:  A couple of things, Your Honor.  I

14   would like to hand up just for a moment just for you to

15   refer to, Your Honor, the two copies, but you have the trial

16   transcript of my opening statement as well as Mr. Dawes'

17   testimony and as well as the statement by Mr. Milch.  Your

18   Honor, just to kind of put it all in context, this case, the

19   infringement began as of September 2014 when the first

20   patent lawsuit was filed.  And in our complaint in this case

21   in September 2015, the basis of willfulness is that they

22   knew about the patents and did nothing about it.

23            Mr. Smith, would you put up on the screen what

24   was said in the opening statement at page 144.  And 143.

25            THE COURT:  Before you start doing this, what is

1   the bottom line takeaway that you're trying to persuade me

2   on here?

3              MR. YOON:  First of all, Your Honor, with

4   regards to it, if you want you can look at Mr. Dawes'

5   testimony at 221, we were only talking about the period

6   between --

7              THE COURT:  Are you saying we don't want to do

8   anything about it?  That's what I'm trying to get, where are

9   we headed?

10             MR. YOON:  Understood, Your Honor.  From the

11  standpoint, and I was working with Mr. Blumenfeld, we don't

12  oppose a stipulation that there were -- that the period of

13  time was -- that was talking about with Mr. Dawes was the

14  period of time before September 2015.  I don't oppose that,

15  nor do we oppose clarification there.

16             With regards to the opening statement, as you

17  can see on the screen, what I was saying was what the

18  testimony in this case will show, and I provided counsel for

19  SecureNet the testimony and Your Honor, you have it, here,

20  and if you could, Mr. Smith, call up the testimony of

21  Mr. Rose, it's the item four.  Go to item four, Mr. Smith,

22  the one at page --

23             THE COURT:  This is not testimony from

24  yesterday, this is a deposition or something.

25             MR. YOON:  This is the unobjected to 30(b)(6)

1     testimony that will be played in video, Your Honor.

2             THE COURT:  All right.

3             MR. YOON:  Understood.  This is coming in.  It

4     was:

5             During that time period, did you SecureNet ever

6     attempt to contact iControl?

7             Not that I'm aware.

8             During that time period did you ever have any

9     communication about the patent?

10            Not that I'm aware.

11            So you never sent any communication about why

12    you didn't infringe?  And then you had no intention to meet.

13            That's the period we're talking about and that's

14    the period if you look at Mr. Dawes' testimony he was

15    talking about as well.  And so what we're focusing on is

16    their contact prior to the file --

17            THE COURT:  No, I understand.

18            MR. YOON:  So counsel for SecureNet raised the

19    issue that they believe that Mr. Dawes' testimony asking

20    about that period of time created the suggestion that there

21    was no more.  And that's why I wanted you to look at the

22    testimony.  And can we have that up on the screen,

23    Mr. Smith, this is at 221, line 9, continuing to page 222,

24    line 23.  And you can see, Your Honor, what we are talking

25    about is the very first question is:  And what happened

1    after iControl dismissed the lawsuit?  That's page 221, line

2    9.

3              And then you have here did there come a time

4    when the second lawsuit was filed?  That's the second page,

5    line nine.

6              THE COURT:  It's certainly less than crystal

7    clear what it is -- what time frame he was talking about.

8    You have to like infer quite a bit from what he says.  Is it

9    possible that he could clean this up himself with some

10   leading questions?

11             MR. YOON:  I can clean that up in a question,

12   but right now he's on cross.

13             THE COURT:  I understand.

14             MR. YOON:  And I'm happy to clean it up with

15   that one question and then turn it back over to cross if

16   that helps.  Obviously since the witness is on the stand, I

17   haven't talked to him.

18             THE COURT:  No.  No.  I appreciate that.  Well,

19   so I don't know, you all can --

20             MR. YOON:  Your Honor, one other point is that

21   we're trying to avoid side issues.  These are the -- they

22   had Mr. Rose's testimony before, it as unobjected to.  The

23   opening went in, the testimony went in, and you know, we

24   were busy.

25             THE COURT:  So when is Mr. Rose's testimony

1    going to be played?

2              MR. YOON:  Either today or tomorrow.

3              THE COURT:  Right.  So I think one of the things

4    that they could be legitimately concerned about is the jury

5    sitting there for the next twenty-four hours thinking about

6    what a bunch of jerks the defense are and how they're

7    obviously bad, so I think it's something that's important

8    not to wait around to clean up.

9              MR. YOON:  Understood, Your Honor.

10             THE COURT:  So, Mr. Blumenfeld, do you have

11   anything more?  I guess what I'm wondering is, I sense what

12   your problem is, you're talking about a solution, you

13   haven't really got there yet.  What is it that you would

14   like me to do?

15             MR. BLUMENFELD:  Well, either have you tell the

16   jury that the period he was talking about was before

17   September 2015, and that the parties agree that there were

18   discussions between them after September 2015.  If Your

19   Honor would prefer, I suppose we could have Mr. Yoon put him

20   up for questions.  I don't want to do it on redirect where

21   there is no recross, because I don't know how it's going to

22   come out if he ask --

23             THE COURT:  Were you planning on cross-examining

24   him about this at all?

25             MR. BLUMENFELD:  We were planning on doing

1    probably more much of a cross than we would like to because

2    it really -- because we have all the documents from what

3    happened in 2016 and '17 and '18, and it that just strikes

4    me as being a sideshow.  If we could get rid of this

5    quickly.

6                 THE COURT:  Right.  I don't think it would be a

7    good use of anybody's time and I don't think Mr. Yoon wants

8    to do this, either, to be pointing out all the things that

9    juries typically never hear and shouldn't hear about what

10   happened after this lawsuit was filed, or the 2015 lawsuit

11   was filed.  So my suggestion would be this, and of course it

12   depends somewhat on Mr. Dawes who is not here, I presume,

13   but what I would suggest is if this could work in the time

14   that's left, which is Mr. Yoon be permitted to talk to

15   Mr. Dawes, tell him he's going to ask him leading questions

16   about his testimony, interrupt the cross-examination, I

17   would say beforehand -- well, I could say beforehand that

18   plaintiff has requested permission to clarify some testimony

19   that was given yesterday and let Mr. Yoon do this and then

20   go on to cross.

21                 MR. BLUMENFELD:  Your Honor, that sounds fine.

22   I talked to Mr. Yoon, I would hope that he would ask both

23   questions which are the period you were talking about was

24   before September 2015, and also confirming with him that

25   there were discussions with them after that.  If he doesn't

1    do that, we'll have to do that on cross.  We may have to do

2    that on cross anyway depending on how it comes out.

3              THE COURT:  Was Mr. Dawes the one because of

4    Alarm.com taking iControl, he doesn't work for Alarm.com?

5              MR. YOON:  He's not an employee.

6              THE COURT:  When did he leave?

7              MR. YOON:  IControl, technically he left on

8    March 2017 when the acquisition became official.  He was

9    March of 2017 I guess is his official date of stop being an

10   employee.

11             MR. BLUMENFELD:  But the negotiations and the

12   communications with Judge Thynge happened as early as March

13   2016 and continued through 2017, the parties discussions, so

14   he was there at the time that iControl and SecureNet were

15   having these discussions.

16             MR. YOON:  So Your Honor, this is a problem

17   because I think we have had a meeting of minds.  We don't

18   want to do anything that's unclear, but our objection is

19   that there's a suggestion in the settlement discussion.  You

20   never go into what happens in settlement discussions in the

21   case.

22             And then we don't want it influenced, one way or

23   the other, as to who was the reasonable party or not the

24   reasonable party at a settlement conference.

25             THE COURT:  So why don't we do this because

1    possibly Mr. Dawes, I don't know actually what he knows

2    post-September of 2015.  And I'm uncomfortable suggesting

3    that someone just be told to say something he may or may not

4    know.  But I think if you asked a leading question or two as

5    to before the September 2015 time frame and perhaps suggest

6    to him -- and I don't remember.  Maybe this came out

7    yesterday, I forget that, because the company was taken over

8    or Alarm.com required it.

9              I don't know.  He left the company at some

10   point.  I'm not sure.  I mean, I don't know what he would

11   say.

12             I gather from what he would say he doesn't think

13   that the defendants ever responded in any way.  And of

14   course, once you have a lawsuit, you know, the period of

15   time that is kind of relevant is when both companies were

16   covered in litigation.  And maybe the fact that the best way

17   to do this is -- because I'm not really sure that what

18   happened -- you know, I don't think they should hear Judge

19   Thynge, mediation, even CEOs talking to each other in a

20   settlement context.  I think that's -- I think that's wrong.

21             So I think what maybe you ought to say, if you

22   can get him to agree to some leading questions is, you were

23   talking about that time before September of 2015, and you

24   were only talking about that time.

25             MR. YOON:  That's what I was going to do, Your

1    Honor.  And there's one other thing I just want to point out

2    because of the time period.  If we could have the transcript

3    at Page 180 on the screen, this is Mr. Milch's opening

4    statement.  And if you look, Your Honor, what Mr. Milch said

5    in his opening, and I just want to make sure that the same

6    rules apply, is One other thing that Mr. Yoon -- can you

7    blow that up?

8              It's Line 15 to 19, Mr. Smith.  One other thing

9    that Mr. Yoon didn't say, while there was a license offer,

10   the terms would have put SecureNet out of business.  I

11   certainly hope, Your Honor, that they're not referring to

12   some settlement negotiation that is coming here that would

13   have put them out of business.

14             THE COURT:  Mr. Milch, what are you referring

15   to?

16             MR. MILCH:  Your Honor, essentially the terms of

17   the offer that would require SecureNet to pay more to

18   iControl then they would have gotten from their customer.

19             THE COURT:  Yes, but in other words, something

20   was proposed before 2015.  Is that the proposal you're

21   referring to, or are you referring to something that

22   occurred after that?

23             MR. MILCH:  It's that, Your Honor.

24             MR. YOON:  Then we're okay.  As long as it's the

25   same time period, then we're okay.

```
 1                      THE COURT:  Okay.  So do you want to --
 2                      MR. YOON:  Could I have like five minutes or
 3       less with Mr. Dawes?
 4                      THE COURT:  Yeah.  Why don't you go see if you
 5       can do that.
 6                      MR. YOON:  No objection, counsel?
 7                      MR. BLUMENFELD:  That's fine.
 8                      THE COURT:  Is there anything else?
 9                      MR. MILCH:  Your Honor, there is one evidentiary
10       objection that we're trying to work out.  It's for a witness
11       that may not even go on, so I don't want to waste the
12       Court's time.
13                      THE COURT:  So, otherwise, we'll give him --
14       I'll come back at 9:30.  Or Mr. Smith, do you have
15       something?
16                      MR. SMITH:  The only thing is we met and
17       conferred for slides about Dr. Clark, and I wasn't --
18                      THE COURT:  Remind me, he's your expert?
19                      MR. SMITH:  He's our expert on infringement
20       issues, and it looked like there may be some lingering
21       objections about labeling on some of the slides in terms of
22       whether they had to actually list exhibit numbers.  And I'm
23       just wondering if those objections are still active or if
24       they've been withdrawn.
25                      MS. SCHWIER:  Your Honor, I think Mr. Smith
```

1    missed my email from this morning.  We have resolved it.

2              MR. SMITH:  I did miss your email, so I

3    apologize.

4              THE COURT:  Well, that's all right.  Good to

5    work these things out.

6              Okay.  So that's all you want to talk about this

7    morning?

8              MR. MILCH:  Yes, Your Honor.

9              THE COURT:  Okay.  All right.  Well, then we'll

10   be in recess for five minutes.

11             THE CLERK:  All rise.

12             (Recess was taken.)

13             THE COURT:  Are we good, Mr. Yoon?

14             MR. YOON:  I believe so.  I gave a preview of

15   what the leading questions would be to SecureNet.  I think

16   we're in good shape.  Obviously I believe Mr. Dawes is going

17   to say the answer to that.  Also, Your Honor, just to avoid

18   a problem, we're now going to play the videotape testimony

19   of Mr. Bill Rose immediately after Dawes.

20             THE COURT:  Okay.

21             MR. DORSNEY:  Your Honor, should we bring the

22   witness in now?

23             THE COURT:  Yes, bring the witness in and let's

24   get the jury.

25             MR. DORSNEY:  We didn't know if you were going

1    to come out and fire questions about it.

2                    THE COURT:  Yes.  Just have a seat, Mr. Dawes.

3                    THE WITNESS:  Thank you.

4                    (Jury entering the courtroom at 9:37 a.m.)

5                    THE COURT:  Good morning, members of the jury.

6    Welcome back.  Everyone, you may be seated.

7                    Members of the jury, the plaintiff has asked to

8    clarify a piece of Mr. Dawes' testimony yesterday, so I'm

9    permitting them to ask a few questions on that topic in the

10   middle of the defendant's, defense's cross-examination.  And

11   so when Mr. Yoon is finished asking questions, then we'll

12   resume the cross-examination.

13                    Mr. Yoon.

14                    MR. YOON:  Yes, Your Honor.

15   BY MR. YOON:

16   Q.    Mr. Dawes, yesterday's testimony, you recall we

17   talked about the time period when iControl dismissed the

18   first lawsuit against SecureNet in March 2015?

19   A.    Yes.

20   Q.    And do you recall that iControl, we talked about

21   iControl filing a second lawsuit in September 2015?

22   A.    Yes.

23   Q.    And during the testimony yesterday, you were asked

24   questions as to whether or not SecureNet provided any

25   counterproposal or counter-licensing proposal.  Do you

1    recall that?

2    A.      Yes.

3    Q.      And what was your answer, sir?

4    A.      My answer was they did not.

5    Q.      And what period of time were you referring to when

6    you gave that testimony?

7    A.      During that time period between the first lawsuit and

8    the filing of the second one.

9    Q.      And that's March 2015 to September 2015?

10   A.      I believe that's correct.

11   Q.      And were you referring to any other period of time?

12   A.      No.

13            MR. YOON:  Thank you, Your Honor.

14            THE COURT:  All right.  You may resume

15   cross-examination.

16            MS. SCHWIER:  Thank you, Your Honor.

17   BY MS. SCHWIER:

18   Q.      Good morning, Mr. Dawes.

19   A.      Hello.

20   Q.      You're one of the inventors on the asserted patents;

21   right?

22   A.      Correct.

23   Q.      And we heard you testify yesterday about the things

24   that you and your co-inventors invented?

25   A.      Yes.

1    Q.     So let's talk about some of the things that you did

2    not invent.

3               IControl did not invent the security panel;

4    right?

5    A.     That's correct.

6    Q.     IControl did not invent security cameras; right?

7    A.     That's correct.

8    Q.     IControl did not invent adding additional devices to

9    a security system; correct?

10   A.     I'm not sure I understand what that means.

11   Q.     You testified in a deposition in this case; correct?

12   A.     Yes.

13   Q.     And you were asked at the time when you began working

14   with iControl, prior art that you became aware provided

15   capability by means of a control panel to provide additional

16   capabilities to a security system; correct?

17   A.     I believe so.

18   Q.     IControl did not invent adding additional devices to

19   a security system?

20   A.     Yes.

21   Q.     IControl did not invent integrating home automation

22   devices into a security panel; correct?

23   A.     I'm not sure what integrated means.

24   Q.     You were asked at your deposition that iControl was

25   not the first to develop a security system that implemented

1   security functions; correct?

2   A.      Correct.

3   Q.      IControl did not invent integrated home automation

4   functions into a security panel?

5   A.      Yes.

6   Q.      IControl did not invent the touchscreen; right?

7   A.      No.

8   Q.      No, you did not invent that?

9   A.      No, we did not invent the touchscreen.

10  Q.      IControl did not invent user interfaces on a

11  touchscreen; correct?

12  A.      That's correct.

13  Q.      IControl did not invent using a security system

14  connected to a central server?

15  A.      That's correct.

16  Q.      And the claims of the '619 and the '844 patents refer

17  to a gateway; right?

18  A.      Correct.

19  Q.      IControl did not invent gateways; right?

20  A.      That's correct.

21  Q.      You were the CEO for iControl starting in 2007?

22  A.      Yes.

23  Q.      And one of your responsibilities when you joined

24  iControl was evaluating the competition; right?

25  A.      Yes.

```
 1    Q.      Including Alarm.com?

 2    A.      Yes.

 3    Q.      And in your opinion as of 2013, Alarm.com was not

 4    really competitive in a lot of iControl's core market;

 5    correct?

 6    A.      That's correct.

 7    Q.      And as CEO you were aware of iControl's finances;

 8    right?

 9    A.      Yes.

10    Q.      Please turn in your binder to the document marked DTX

11    295.  Are you there?

12    A.      Yes.

13    Q.      This is a profit and loss statement from iControl

14    Networks Incorporated; correct?

15    A.      Yes.

16    Q.      And the first page is marked with a Bates label

17    iControl 5351; right?

18    A.      I don't see that.

19    Q.      It's by the --

20    A.      5351, sorry, at the bottom.

21    Q.      Thank you.

22            MS. SCHWIER:  Your Honor, I move to admit DTX

23    295.

24            MR. YOON:  No objection, Your Honor.

25            THE COURT:  Admitted without objection.
```

1          MS. SCHWIER:  Your Honor may I show this to the

2   jury?

3          THE COURT:  Sure.

4          (DTX 295 was admitted into evidence.)

5   BY MS. SCHWIER:

6   Q.     Please turn to the page -- so this is the profit and

7   loss statement we're looking at; right?

8   A.     Yes.

9   Q.     Please turn to the page marked 5368 in DTX 295.  Are

10  you there?

11  A.     Yep.

12  Q.     It's a little difficult to read, but do you see that

13  the first column says January to March '07 at the top?

14  A.     Yes.

15  Q.     And the columns beside that represent the following

16  months ending with April to June of '08 in the last column?

17  A.     Yes, I see that.

18  Q.     Do you see at the bottom line of this page where it

19  says net income?

20  A.     Yes.

21  Q.     And for every column from January 2007 to June 2008,

22  that number is negative; right?

23  A.     Correct.

24  Q.     And this is specifically iControl's net income;

25  correct?

1    A.      That's correct.

2    Q.      So this means iControl was not profitable from

3    January 2007 to June 2008; correct?

4    A.      That's right.

5    Q.      In fact, iControl was not profitable in any year

6    prior to 2014; right?

7    A.      I believe that's correct.

8            MS. SCHWIER:  Thank you.

9                    REDIRECT EXAMINATION

10   BY MR. YOON:

11   Q.      Mr. Dawes, just a couple of questions.

12           You were asked some questions about

13   profitability in the 2007-2008 time frame.  Do you recall

14   that?

15   A.      Yes.

16   Q.      How many employees did iControl have in 2007-2008?

17   A.      Probably seven to fifteen people, in that range.

18   Q.      Was iControl a small startup at that time frame?

19   A.      Yes, very small.

20   Q.      Is it unusual for a small startup to not be

21   profitable?

22   A.      Not unusual at all.

23   Q.      And sir, in 2014-2015, was iControl profitable?

24   A.      I believe we got cash flow positive in that time

25   period.

1    Q.       Was the Connect business profitable?

2    A.       Yes.

3    Q.       And when the Connect business was sold to Alarm.com,

4    how many millions of subscribers did it have?

5    A.       We had over 1.6 million subscribers at the time of

6    the sale.

7                    MR. YOON:  No further questions.

8                    THE COURT:  All right.  Mr. Dawes, thank you

9    very much.  You may step down.  Watch your step.

10                   MR. YOON:  Your Honor, for iControl -- for

11   Alarm.com, the next witness, Alarm.com will play the

12   videotaped testimony of Bill Rose, the chief operating

13   officer of SecureNet.

14                   THE COURT:  All right.  And so members of the

15   jury, there may have been something said in the opening

16   instructions about this, or not.  I wrote them but I don't

17   remember if I didn't deliver them.  But basically a

18   deposition is a statement under oath given before the trial

19   by potential witnesses.  Both sides are represented by

20   counsel and can ask questions of the witness, and so when

21   you hear it, it counts just the same as if the witness were

22   appearing here live.

23                   One other thing which is in the interest of

24   time, these depositions are heavily edited to get rid of

25   things that are no longer relevant or were never relevant,

1    so if you see things being skipped, because sometimes there

2    are time counters and things, that is done by agreement of

3    the parties.  And so don't be thinking there is some

4    cheating going on here, because there is not.

5                  Go ahead.

6                  (Videotaped deposition of William Rose:)

7    Q.     So it's fair to say that you have been the chief

8    operating officer at SecureNet Technologies from October

9    2015 to the present?

10   A.     Yes.

11   Q.     When did SecureNet first become aware of the '844,

12   '635, and '619 patents?

13   A.     September 2014.

14   Q.     Is it fair to say that SecureNet first became aware

15   of these three patents when it was sued by iControl in the

16   complaint which has been marked as Exhibit 145?

17   A.     Yes.

18   Q.     When did SecureNet first become aware of the '931

19   patent?

20   A.     September 2015.

21   Q.     Okay.  And it would be fair to say it came -- became

22   aware of it when the complaint was filed by iControl that

23   has been marked as Exhibit 2?

24   A.     Yes.

25   Q.     During that time period, did SecureNet ever attempt

1    to contact iControl regarding a license to the '844, the

2    '635, or the '619 patents?

3    A.    Not that I'm aware of.

4    Q.    During that time period between March 18th, 2015 and

5    September 11th, 2015, did SecureNet send any communication

6    to iControl regarding the '844, '635, or '619 patents?

7    A.    Not that I'm aware.

8    Q.    So it's fair to say that during that time period,

9    SecureNet never sent any communication to iControl

10   describing or explaining the basis for SecureNet's belief

11   that its products did not infringe the '844, the '635, or

12   the '619 patents; correct?

13   A.    Yes.

14   Q.    And between March 18th, 2015 and September 11th,

15   2015, SecureNet did not send any communication to iControl

16   relating to the validity of the '844, the '635, or the '619

17   patents; correct?

18   A.    Correct.

19   Q.    Between March 18th, 2015, and September 11th, 2015,

20   did SecureNet attempt to schedule or arrange any meeting

21   with iControl to discuss intellectual property or patents?

22   A.    No.

23   Q.    Has SecureNet entered into any patent license

24   agreements with respect to its products?

25   A.    No.

1    Q.    And it's fair to say as of today, SecureNet has not

2    signed any patent license?

3    A.    We have not.

4    Q.    And intellectual property is one of the slides in the

5    Private Placement Memorandum; correct?

6    A.    Yes.

7    Q.    Is intellectual property important to SecureNet?

8    A.    Yes.

9    Q.    And is it important to SecureNet that it obtain

10   patents?

11   A.    Yes.

12   Q.    Why is it important to SecureNet that it obtain

13   patents?

14   A.    Because we believe we have some unique processes that

15   we use in the delivery of our service.

16   Q.    And how would patents help you protect your unique

17   processes and services?

18   A.    That it would be documented that they are our

19   inventions.

20   Q.    And so the patents would document what -- the

21   inventions that SecureNet owns, correct?

22   A.    Yes.

23   Q.    And SecureNet would be in the position to protect its

24   -- the technology that it owns; is that fair to say?

25   A.    Yes.

1  Q.     And you understand, in this case, Alarm.com is trying

2  to file a patent case to protect its patented inventions,

3  correct?

4  A.     Yes.

5  Q.     And while you may disagree as to whether or not you

6  infringe, you understand that the assertions of patents is

7  completely proper, correct?

8  A.     Yes.

9  Q.     Does SecureNet have any policies with respect to the

10  licensing of other companies' patents?

11  A.     Not that I'm aware of.

12  Q.     Has SecureNet ever attempted to develop a policy as

13  to how it would license other companies' technology?

14  A.     No.

15  Q.     Has SecureNet attempted to set a policy for how it

16  would license its patented technology?

17  A.     No.

18  Q.     Has SecureNet ever attempted to purchase a patent?

19  A.     No.

20         (Conclusion of videotape deposition excerpt.)

21         THE COURT:  All right.  And so members of the

22  jury, there was some reference in the questioning to

23  something called the '635 patent.  That is not at issue in

24  this case.

25         All right.  Mr. Yoon.

```
 1                    MR. YOON:  Yes.  Alarm.com would like to call

 2      for the next witness the CEO of Alarm.com, Steve Trundle.

 3                    THE CLERK:  Good morning.

 4                    THE WITNESS:  Hi.

 5                    THE CLERK:  Please state and spell your full

 6      name for the record.

 7                    THE WITNESS:  Stephen Scott Trundle.  Last name

 8      is T-R-U-N-D-L-E.

 9                    THE CLERK:  Do you affirm that the testimony you

10      are about to give to the Court and the jury in the case now

11      pending will be the truth, the whole truth, and nothing but

12      the truth, you do so affirm?

13                    THE WITNESS:  Yes.

14                    THE CLERK:  Thank you.  You may be seated.

15                    MR. YOON:  Your Honor, I apologize.  I should

16      have handed this up earlier.  May I bring the binders up?

17                    THE COURT:  Sure, and take away the other

18      binders, please.

19                    MR. YOON:  Sure.  Madam court reporter.

20                    DIRECT EXAMINATION

21      BY MR. YOON:

22      Q.    Good morning, Mr. Trundle.

23      A.    Good morning.

24      Q.    Could you please introduce yourself to the jury?

25      A.    Yes.  I'm Steve Trundle.  I'm the CEO of Alarm.com.
```

1    Q.    And, sir, what are your responsibilities as CEO of

2    Alarm.com?

3    A.    I oversee the company.  The primary thing I do is I'm

4    responsible for building the team and making sure the team

5    is aligned and focused on the right things.  So it's about

6    hopefully recruiting the right people, getting them in the

7    right place, nurturing them, developing them, and then

8    making sure we're organized to make progress.

9    Q.    And, sir, how long have you been with Alarm.com?

10   A.    I've been involved with the company since the year

11   2000, and I've been full time since 2003.

12   Q.    And, sir, let's talk a little bit about your personal

13   background.  Could you briefly describe your education?

14   A.    Sure.  So I graduated from high school in Tampa,

15   Florida and went on and got a undergraduate degree in

16   engineering science and government.

17   Q.    And, sir, are you the named inventor on any patents

18   at Alarm.com?

19   A.    I am.

20   Q.    Approximately how many?

21   A.    More than 20.

22   Q.    And in what fields are you a patented inventor?

23   A.    A couple of fields, but the majority are in the

24   fields of home security and home automation.

25   Q.    And Mr. Trundle, what was your involvement in the

1    founding of Alarm.com?

2    A.    Sure.  Well, I -- I hired the first people that we

3    put on a project that became Alarm.com.  So when it was just

4    an idea, and we were thinking about what we might do, I

5    needed to go find a couple of really sharp folks to

6    hopefully develop the idea.  And I hired, of course, two

7    people who today are called founders.

8    Q.    Yeah.  Are you familiar with the term life safety

9    products, sir?

10   A.    I am.

11   Q.    What is your understanding of that to mean, and how

12   does that relate to the Alarm.com mission?

13   A.    Yeah.  The category that -- of software products that

14   we participate in is called life safety products.  And it's

15   a super important kind of distinction from other types of

16   technology.  The reason is that at the end of the day, the

17   software we create that might be sitting in a home or

18   business, normally sitting on a hub, is actually responsible

19   at that very moment.  You don't know when this is going to

20   occur.  It could occur five years later, ten years later.

21   You don't know when, but at some moment someone's carbon

22   monoxide detector is going to go off, or there's going to be

23   a break in, and the door is going to be open.

24             And at that very moment, your software has to

25   work.  It has to receive the signal from that device in the

1     home, and then transmit that data to a central station where

2     there are first responders, and make sure it's going to the

3     right place.  And because of that, so at that moment, if it

4     doesn't work, a life is literally at risk.  It's one of the

5     things that keeps us awake at night.

6               And so what it does is it really increases the

7     bar or the threshold for quality and for how thorough you

8     attempt to be when you're doing engineering of these types

9     of software products.

10    Q.    Mr. Smith, could I have PDEM-1 onto the screen?  Mr.

11    Trundle, do you recognize the people in this picture?

12    A.    Yeah, I do.

13    Q.    Who are they, sir?

14    A.    So on the left is Alison Slavin, and Allie was one of

15    those two people I mentioned earlier, one of the founders of

16    Alarm.com.  This is a long time ago.

17              And on the right is Jean-Paul Martin.  Jean-Paul

18    was the other person that I mentioned as one of the first

19    two people that I hired on the project.  He's a founder.

20              In the middle is Ian Rose.  And actually

21    Jean-Paul and Allie are both still with the company.

22    Jean-Paul today is our CTO.  And Allie is the vice president

23    of our creation lab, so she's working on creative and

24    innovative types of things.  And Ian went back to graduate

25    school shortly after this photo.

1   Q.      And when that photo was taken, sir, how many

2   employees did Alarm.com have?

3   A.      That's it, three.

4   Q.      Now, how many employees does Alarm.com have today,

5   sir?

6   A.      Approximately 900 today.

7   Q.      And so could you describe how Alarm.com went from a

8   company of three employees to 900?

9   A.      (Witness laughed.)  It would take the rest of the day

10  to really -- to really explain that, but I'll just say this:

11  It was a -- it seems like, wow, you've gone a long way, but

12  it was a very, very slow, slow process.  So when you're --

13  when you're three employees, you know, your goal is to be

14  able to grow enough to get to six.  There's lots of things

15  you want to do.

16          You get to six, you're hoping to maybe find

17  another customer, get to eight or ten.  And that process of

18  simply going from three at this point to getting to -- you

19  know -- my goal early on was to get to 50 employees.  That's

20  what I had hoped to do.  The process of getting to 50 took

21  us about seven or eight years, and -- but that allowed us

22  through that time, seven or eight years, gradually building

23  the company, again focusing on getting the right people, and

24  doing the right things.  That allowed us to build a strong

25  foundation that once our product became more mainstream, we

1   were able to grow off of that and really, for the last

2   decade, have continued to grow and now have the number I

3   just stated.

4   Q.     Yeah.  What were the biggest challenges in the early

5   days of Alarm.com?

6   A.     The big -- the biggest challenges -- well, really

7   there was one big challenge, and the big challenge was, you

8   know, you could imagine three people without any revenue,

9   not knowing if the product you're attempting to build is

10  actually going to work or be desirable.

11         So the biggest challenge is maintaining faith

12  that -- and not just my faith, the faith of all the people

13  that you're asking to work, maintaining faith that what

14  you're working on is going to have meaning and purpose one

15  day.  And you can imagine this team working for three years,

16  and they finally get the software out.

17         We finally get a customer.  That first customer

18  generates $8 a month in revenue.  So they know what's going

19  on.

20         We have one customer that's going to generate

21  $96 in a year, and people are wondering, how are you going

22  to keep paying -- how are we going to keep getting our

23  salary.  So a big part of it and I think this is true of

24  other early companies, but a big part of being successful

25  with an early-stage company is maintaining motivation, and

1   confidence, and trying to stay focused, and just sort of

2   having faith that what you're working on is the right thing

3   and that you're in the right place.

4   Q.      Well, sir, when was the first time you believed you

5   saw information that indicated to you that Alarm.com could

6   be a successful business?

7   A.      For me, the first time was -- was 2008.

8   Q.      And what was that evidence or information you saw,

9   sir?

10  A.      At that time, we -- so we had a number of small

11  customers, but none of those customers, and even all of them

12  together, weren't really big enough to sustain the company.

13  In 2008, we landed a much larger customer.  They were

14  security providers, so they're someone that sells a lot more

15  security systems then all of our other customers put

16  together.

17          You know, they said they were going to be big,

18  and they were going to be a big customer.  You don't really

19  know if they're going to be big.  You sort of hear it, but

20  you don't believe it until you see it.

21          But sure enough, once they adopted our software

22  and began to install it in homes, they were selling a lot

23  more Alarm.com software than any prior security provider had

24  sold for us.  And the next question you have is:  Okay.

25  Now, we're suddenly getting a lot of customers, you know,

1   you wonder, is the product actually working?  Are the things

2   we're delivering working?

3            So we set up a small team of our own employees

4   to do surveys.  We couldn't survey all of their customers.

5   So the security provider is selling to customers, but we

6   surveyed about ten percent of the customers as they were

7   being installed with new systems.  And what we found is

8   people really liked what we had built.

9            So the combination of now having a large

10  security provider that's installing in lots of homes and

11  then having a little bit of confidence that, hey, not only

12  are we starting to sell some stuff, but people actually like

13  it, I was able to plug those numbers into in -- you know,

14  into a spreadsheet at that time and see that if this

15  continued for two, or three, or four years, we would get to

16  the break-even point.

17           And that gave me confidence at that point like

18  all of a sudden like scientific confidence that we could --

19  we could -- we would be successful.

20  Q.    And approximately what year was that, sir?

21  A.    That was 2008.

22  Q.    And about how many years had Alarm.com been in

23  business at that time?

24  A.    At that point, we had been in business since 2000.

25  So approximately eight years.  And that was -- that was when

1    we saw that we could, if we continued, you know, be

2    successful.

3    Q.    And when did Alarm.com actually break even as a

4    business?

5    A.    I believe it was 2010.

6    Q.    And so approximately how long had Alarm.com been in

7    business before it ever broke even?

8    A.    About a decade.

9    Q.    Well, let's talk about today, sir.  What are the

10   major products and services offered by Alarm.com?

11   A.    Sure.  So really a handful of categories.  First, our

12   products are interactive security services.  So this is

13   providing a customer control of their security system and

14   managing all the communication of data from security

15   systems.

16            The second category is home automation.  This is

17   providing the customer the ability to control things like

18   lights, locks, thermostats, those type of what we call home

19   automation devices that are typically in a home.

20            The third category is energy management, and

21   here what we're attempting to do is save the customer money

22   on their energy bill by being intelligent, and smart, and in

23   the way we watch what's happening with their thermostat.  If

24   they've left a window open, they've got their AC set to

25   70 degrees, you know, do something about it.  So that's the

1   energy management category.

2            And then last is wellness which means -- with

3   wellness products what we're attempting to do is allow

4   someone that may be living alone, may need a little help, or

5   may have a disability to live independently by using sensors

6   to keep track of how they're doing.

7   Q.    Now, sir, how does a homeowner purchase an Alarm.com

8   security and home automation system?

9   A.    So they -- they purchase from what we call a security

10  provider.  Sometimes folks will use the term a security

11  dealer.  I like to call them security providers.

12            And you know, so if you happen to be -- and I'm

13  not selling systems today, obviously, but if you were in

14  Wilmington, Delaware and you needed to find a -- you decided

15  you're in a market for security, whether you're a business

16  or a homeowner, more than likely you would look at who are

17  the local -- who are the local businesses that offer

18  security services, and you would pick one of those.  And we

19  would then hope that that security provider had chosen to

20  sell and install the Alarm.com services.

21  Q.    Well, so as a business, why is Alarm.com working

22  through security providers as opposed to selling directly to

23  homeowners?

24  A.    It was a decision we made early on.  First, we

25  thought that for most people and if you're really going to

1    have a life safety system -- life safety system, there's a

2    role for an expert to come into the home or business and

3    help you figure out what you need and how to set it up.

4              Exactly where should I put a smoke detector?

5    Where should the CO detector be?  How high from the ground

6    should it be?  How should a sensor go on the door?  What are

7    the most likely places that someone may attempt to break

8    into the property?

9              So there are a set of licensed, you know,

10   focused people in most markets that are security providers.

11   And we felt that in all likelihood, the customer would get a

12   better system that would be more likely to work properly if

13   a professional was involved in design and installation of

14   that system.  So we decided to sell through security

15   providers.

16   Q.    Well, how does Alarm.com get paid for the products

17   and services?

18   A.    So we bill the security provider.  They may have a

19   hundred customers that are all being used -- are using the

20   Alarm.com software and services.  We bill the security

21   provider, and they pay us.  They're billing the end

22   customer, and the end customer is paying them.

23   Q.    Okay.  Well, who determines the price that the

24   homeowner pays the security provider?

25   A.    That's the security provider, so that's between the

1    customer and the local security provider in terms of how

2    much they pay.

3    Q.    Is Alarm.com involved in that?

4    A.    No.

5    Q.    Now, let's talk about the relationship that Alarm.com

6    has with its service providers?

7    A.    Sure.

8    Q.    Is that an exclusive or non-exclusive relationship?

9    A.    That's a non-exclusive relationship, so they're not

10   required -- none of the local service providers are required

11   to sell Alarm.com software.  We hope they choose to.  And if

12   they do choose to use our software, often times it's better

13   for their business if they're using our software for the

14   majority of their business.  It just is more efficient.

15   It's easier.  You train people in fewer things.  But they're

16   not exclusive relationships.

17   Q.    Well, there's been some discussion about competition.

18   Today, who are the primary direct competitors of Alarm.com?

19   A.    The direct competitors today would be companies like

20   Honeywell, which is now called Resideo.  They changed their

21   name about, I don't know, a couple months ago.  SecureNet

22   and Alula would be another example.

23   Q.    Okay.  Mr. Trundle, if you would turn in your binder

24   to PTX-342.

25                  MR. YOON:  Your Honor, we would like to admit

1    PTX 342, the press release, into evidence.

2                   MR. CAMPBELL:  No objection.

3                   THE COURT:  All right.  Admitted without

4    objection.

5                   (Exhibit PTX-342 was admitted into evidence.)

6    BY MR. YOON:

7    Q.    Mr. Trundle, do you recognize this June 2016 press

8    release?

9    A.    I do.

10   Q.    What is it, sir?

11   A.    This is a press release where we announced that

12   Alarm.com was acquiring two business units from iControl

13   Networks.

14   Q.    And what business units were they, sir?

15   A.    It was the Connect business unit and the Piper

16   business unit.

17   Q.    And what was Connect, sir?

18   A.    Connect was a software platform that also provided

19   interactive security and had a very large customer.  And

20   that customer was ADT.

21   Q.    And who is ADT?

22   A.    ADT is the largest security provider in North

23   America.

24   Q.    And so there's reference there to ADT Pulse.  Do you

25   see that?

1    A.     Yes, I do.

2    Q.     And does that refer to Connect?

3    A.     Yeah.  ADT Pulse is running or is created on the

4    Connect software platform.  Yes.

5    Q.     And how many ADT homeowners used Connect at the time

6    the deal was announced?

7    A.     At the time that the acquisition was announced, it

8    was about 1.6 million homeowners.

9    Q.     Okay.  If we could just go to the fourth paragraph of

10   that press release.

11                Mr. Trundle, were you quoted in this press

12   release?

13   A.     I was.

14   Q.     And what was the main reason Alarm.com acquired the

15   Connect and Piper business units, sir?

16   A.     The main reason was that we were, and even today

17   still are, but we were trying to get to an increased

18   capacity to invest in research and development.  So we

19   wanted to get higher R and D scale, meaning we wanted to

20   have more engineers and be able to afford having more people

21   working on further advancements in the product, further

22   advancements in the technology.  And we saw a great

23   opportunity here to make an acquisition of what I thought

24   was a really good team.

25   Q.     And, sir, it's your understanding that the patents in

1    this case were originally owned by iControl?

2    A.     Yes, sir.

3    Q.     And could you describe how Alarm.com became the owner

4    of the patents?

5    A.     Well, when we acquired the iControl Connect and Piper

6    business units, the patents are important to the Connect

7    software platform, so we obtained through the acquisition of

8    those patents.

9    Q.     Okay.  And Mr. Trundle, if we can now look at your

10   binder at PTX 371, the Asset Purchase Agreement.

11          MR. YOON:  We'd like to move into evidence

12   Exhibit PTX-371.

13          MR. CAMPBELL:  No objection.

14          THE COURT:  Admitted without objection.

15          (Exhibit PTX-371 was admitted into evidence.)

16   BY MR. YOON:

17   Q.     Mr. Trundle, do you recognize Exhibit PTX-371?

18   A.     I do.

19   Q.     What is it, sir?

20   A.     This is the purchase agreement that we used to

21   acquire those two business units of iControl Networks.

22   Q.     And so there have been some reference in the case to

23   ICN Acquisitions.  Who are they?

24   A.     That's -- they're just a part of Alarm.com.  It's

25   just a wholly-owned subsidiary.

1    Q.    And, sir, at the time this agreement, the Asset

2    Purchase Agreement was signed, did the parties to the

3    agreement understand that ICN was a part of Alarm.com?

4    A.    Yes.

5    Q.    If we could go to the signature page of this

6    agreement, Page 10430.  Mr. Trundle, did you sign the Asset

7    Purchase Agreement?

8    A.    Yes, I did.

9    Q.    And, sir, on what two companies did you sign the

10   Asset Purchase Agreement on behalf of?

11   A.    On ICN Acquisition, which was the holding or the

12   subsidiary, and then Alarm.com Holdings.

13   Q.    And it was understood by the parties that ICN

14   Acquisition was part of Alarm.com?

15   A.    Yes.

16          MR. YOON:  Now, if we could now go to PTX 229.

17   And I'd like to move into evidence PTX 229.

18          MR. CAMPBELL:  No objection.

19          THE COURT:  All right.  Admitted without

20   objection.

21          (Exhibit PTX-229 was admitted into evidence.)

22   BY MR. YOON:

23   Q.    Mr. Trundle, what is Exhibit PTX-229?

24   A.    It's a patent assignment agreement whereby the

25   patents that we acquired from iControl were signed over to

1    Alarm.com through the ICN Acquisition entity.

2    Q.    And does that include the three patents in this case?

3    A.    Yes.

4    Q.    Now, you can take that down, Mr. Smith.

5          So let's talk about patent licensing for a

6    moment.  And if we could have PDEM-3 on the screen.

7          Mr. Trundle, has Alarm.com licensed its patents

8    to other companies?

9    A.    Yes, we have.

10   Q.    Can you give me some examples, please?

11   A.    Vivint shown here, and iControl are both examples.

12   Q.    Yeah.  And is there any other examples, sir?

13   A.    We've licensed to Honeywell as well.

14   Q.    Yeah.  And now, if I could have -- in your binder, if

15   you would go to PTX-216, sir.

16         MR. YOON:  And we'd like to move into evidence

17   PTX 216.

18         MR. CAMPBELL:  No objection?

19         THE COURT:  Admitted without objection.

20         (Exhibit PTX-216 was admitted into evidence.)

21   BY MR. YOON:

22   Q.    Mr. Trundle, do you recognize PTX 216?

23   A.    I do.

24   Q.    What is it, sir?

25   A.    This is a -- this is our license agreement to Vivint

1    which is shown -- which was shown in the last slide.  So we

2    licensed patents to Vivint.

3    Q.     And, sir, if we can now look at your binder at

4    PTX-215.

5    A.     215, okay.

6           MR. YOON:  And I'd like to move into evidence

7    PTX-215.

8           MR. CAMPBELL:  No objection.

9           THE COURT:  Admitted without objection.

10          (Exhibit PTX-215 was admitted into evidence.)

11    BY MR. YOON:

12    Q.     Do you recognize PTX-215, sir?

13    A.     I do.

14    Q.     And what is this, sir?

15    A.     This is a license agreement from Alarm.com or between

16    Alarm.com and iControl Networks for some patents.

17    Q.     As part of this license agreement, did Alarm.com

18    license its patents to iControl?

19    A.     Yes.

20    Q.     And as part of this agreement, did iControl license

21    patents to Alarm.com?

22    A.     Yes.

23    Q.     Now, let's talk a little bit more about the

24    competition here.  What does Alarm.com do to keep up with --

25    keep track of its competition?

1    A.     Sure.  So we don't have any sort of absolutely formal

2    process, but we watch what's going on in the press.  We talk

3    mainly to our security service providers.  So these folks

4    that are our customers will normally tell us, Hey, you know

5    you're competing with Company X or Company Y.  They're

6    better in this area, whatever it may be.

7           So I would say we hear pretty frequently from

8    our security partners on what they're seeing in the market.

9    And then I personally hear at times from our -- from our

10   sales team.  They're out there every day talking to people

11   in all the local markets trying to sell our software.  And

12   they -- you know, they'll come back and say, Hey, we're

13   competing here with this entity or that entity.  So that's

14   how I have a sense of what's going on.

15   Q.     Okay.  And, sir, you mentioned that SecureNet was one

16   of the primary direct competitors of Alarm.com.  How did you

17   first become aware of SecureNet?

18   A.     I first became aware of SecureNet when I got a -- I

19   got a phone call from the head of a central station.  So

20   central station is where people -- where they -- operators

21   are.  When an alarm signal is generated, you know, they have

22   to deal with the alarm signal and get it to the first

23   responders.

24          So I got a call from a person who ran one of

25   those central stations, and they -- this particular central

1    station had been a long time, since the very early days,

2    since like 2003, a longtime partner of Alarm.com.  And he

3    was also a friend, so he was a friend of mine that I

4    developed through the years.

5              And he called just to give me a head's up.  He

6    said that there is another company that had technology that

7    seemed a lot like what he was familiar with from Alarm.com,

8    and he wanted me to know they were going to give it, you

9    know, an evaluation and a look.  And that's what I heard

10   when I heard about in.

11   Q.    Did that come as a surprise?

12   A.    Yeah, it did.  I mean, yeah, it came as somewhat of a

13   surprise.  I had not heard of the company previously, and --

14   but more of the surprise was that a partner, you know,

15   someone we had probably done business with at one level or

16   another for six, seven years was considering, you know, or

17   looking at this option.

18   Q.    Okay.  And if we could have PDEM-2 on the screen,

19   please.

20             Mr. Trundle, do you recognize the four companies

21   on the slide here?

22   A.    I do.

23   Q.    And were these companies Alarm.com customers, sir?

24   A.    Yes, they were.

25   Q.    Has SecureNet had any impact on Alarm.com's business

1    with these four companies?

2    A.     Yes.

3    Q.     Well, let's talk about the impact, sir.  The first

4    company, Protect America, what impact has SecureNet had on

5    Alarm.com's business with Protect America?

6    A.     Yeah.  So Protect America had been an Alarm.com

7    customer going -- going pretty far back, and SecureNet was

8    able to come in and -- and win the majority of the business

9    there at Protect America.  And that was a fairly large

10   customer.

11   Q.     Okay.

12   A.     Yeah.

13   Q.     Let's turn to the next customer, Alder.  What impact

14   has SecureNet had on the business with Alder?

15   A.     Similar.  Alder had been an Alarm.com customer for a

16   couple of years, probably one of our ten largest security

17   provider partners.  And SecureNet was able to come in and

18   win that security provider's relationship away from us.

19   Q.     What about Protection 1?

20   A.     In Protection 1's case, SecureNet also has competed

21   and has won some business there.  And we've been able to

22   retain, you know, quite a bit of the business there as well.

23   Q.     Okay.  And, sir, what about Safe Home Security?

24   A.     Safe Home Security is a dealer program, so they have

25   lots of dealers.  And SecureNet has -- has been able to win

1    some of those underlying dealers who were previously

2    Alarm.com customers.

3    Q.      Okay.  Let's go back to the press release which was

4    PTX-342.

5    A.      Mm-hmm.

6    Q.      The one that announced the acquisition of the Connect

7    business.  Do you recall an earlier discussion regarding

8    your quote from the press release regarding enhancing

9    research and development scale?

10   A.      Yes, I do.

11   Q.      There's been a couple years, sir, since the deal was

12   announced.  What impact has the Connect acquisition had on

13   the research and development scale at Alarm.com?

14   A.      It's had a -- it's had a tremendous impact, and I

15   think the reason is that right after the deal was finished,

16   we got out to their offices.  They're out in California, and

17   we did everything we could to retain all the people in the

18   company right down to we invited them all -- I think in

19   their second week with us, we invited them to a company

20   retreat.  And that's a hundred people we flew from

21   California over to the East Coast.  We had a talent show.

22   It turned out they were very, very talented, not just in

23   software, but in a lot of things.  And we all just kind of

24   got to know each other, if you will, and pulled them into

25   our culture and into our team.  And as a result, we've been

1    able to retain almost all of the folks in that -- in that

2    office.

3              And you know, you can think about what can 80 or

4    90 people get done?  They can get a lot done.

5              So we've been able to do -- to significantly

6    expand our R & D capacity as a result of this acquisition.

7    Q.    Yeah.  And, sir, has the Connect business grown since

8    it's been part of the Alarm.com family?

9    A.    It has.

10   Q.    How much, sir?

11   A.    Approximately 50 percent.  So today it's -- on

12   Connect, around 2.4 or 2.5 million subscribers.

13   Q.    Okay.  Now, from the time that Alarm.com was founded

14   until today, have patents been an important part of the

15   company?

16   A.    Yes.

17   Q.    And why?

18   A.    Well, you know, you build technology.  You've got to

19   get that right.  You've got to make the products work and

20   make sure they're products that people want.

21             But if you think about it, the way we sell to

22   the customer is through these service providers.  And we

23   can't just give them technology.  We have -- also have to be

24   able to tell them that they have the right to use that

25   technology.

1           And for them to have the right to use that

2     technology, we have to buy provide they're patented, or in

3     some cases, we have to go get licenses for pieces of the

4     technology.  But one way or another, we want to make sure

5     that our customers don't have just products, good software,

6     good technology, but they actually have the right to use it.

7     So we spent a lot of effort on patents.

8                 MR. YOON:  Thank you, sir.  No more questions.

9                 THE COURT:  All right.  Cross-examination.

10                      CROSS-EXAMINATION

11    BY MR. CAMPBELL:

12    Q.    Good morning, Mr. Trundle.  I'm Chris Campbell.  Nice

13    to meet you.

14    A.    Nice to meet you.

15    Q.    I want to talk about some of your direct testimony.

16    So you said that you are the inventor on 20 patents or so;

17    right?

18    A.    One of the named inventors, yes.

19    Q.    Alarm.com is not accusing SecureNet of infringing any

20    of your patents; isn't that correct, sir?

21    A.    That's correct.

22    Q.    You also testified that Alarm.com broke even in 2010

23    or so; right?

24    A.    On a cash basis, yes.

25    Q.    It's true that Alarm.com has been backed by a

1    publicly-traded company known as Micro Strategy; isn't that

2    right?

3    A.      Early on, yes.

4    Q.      There was also testimony in your direct regarding the

5    Asset Purchase Agreement of iControl.  Do you remember that?

6    A.      Yes.  I remember being asked about that.

7    Q.      And you talked about the company called ICN

8    Acquisition, LLC; right?

9    A.      Yes.

10    Q.      That's a shell company; right?

11    A.      It's a wholly-owned subsidiary.

12    Q.      Shell company; right?

13    A.      That's your words.  I don't know if that's -- I

14    define -- it's defined as a wholly-owned subsidiary.

15    Q.      Set up for the sole purpose of holding the patents;

16    correct?

17    A.      No.

18    Q.      Set up for the sole purpose of holding technology; is

19    that right?

20    A.      No.

21    Q.      And doesn't have any operations, does it?

22    A.      It has no operations.

23    Q.      You're the only employee; right?

24    A.      I'm an employee of Alarm.com.  I'm a member, I

25    believe, of the entity that was set up to complete the

1    acquisition transaction.  So it's just a subsidiary that's

2    set up by attorneys and accountants to complete an

3    acquisition.  And we own the entire -- all of ICN.

4    Q.    It doesn't have any current operations --

5    A.    No.

6    Q.    -- does it, sir?

7    A.    No.

8    Q.    You testified as well, using a demonstrative, PDEM-2,

9    where on that demonstrative some of the business that

10   SecureNet had, according to you, taken, included Protect

11   America, Alder, Safe Home and Protection 1; right?

12   A.    Yes.

13   Q.    It's true that dealers can work with several

14   providers at once; right?

15   A.    Yes.

16   Q.    Let's talk about competition.  As a publicly-traded

17   company, Alarm.com is required to make periodic filings with

18   the Securities Exchange Commission, which is known as the

19   SEC; correct?

20   A.    Yes.

21   Q.    Companies are required to be truthful and accurate in

22   their filings with the SEC; right?

23   A.    Yes.

24   Q.    Just need to tell the truth, correct?

25   A.    Yes.

1    Q.     One of the filings that Alarm.com makes with the SEC

2    is a 10-K annual report; right?

3    A.     That's correct.

4              MR. CAMPBELL:  Your Honor, I'd move into

5    evidence DTX-242.

6              MR. YOON:  No objection, Your Honor.

7              THE COURT:  All right.  Admitted without

8    objection.

9              (Exhibit DTX-242 was admitted into evidence.)

10   BY MR. CAMPBELL:

11   Q.     This is Alarm's 10-K for 2017; isn't that correct,

12   sir?

13   A.     That's correct.

14   Q.     All right.  Let's go to the last page, which is

15   10867.  That's your signature, isn't it; sir?

16   A.     That is.

17   Q.     Okay.  And just to be clear for the members of the

18   jury, /s/ is a way to electronically sign your name when

19   filing documentation; correct?

20   A.     That's correct.

21   Q.     This Alarm.com 10-K from 2017 provides a

22   comprehensive summary of Alarm.com's financial performance

23   for 2017; correct?

24   A.     Yes.

25   Q.     It's an important document; right?

1    A.     Yes.

2    Q.     Okay.  Let's turn now to Page 3, and there's a

3    section entitled, "Acquisition of Connect and Piper business

4    units from iControl Networks."

5              Do you see that?

6    A.     I do.

7    Q.     All right.  This section was reporting on the

8    acquisition of Connect business from iControl; correct?

9    Right?

10   A.     This, yeah.  This -- this deals with that

11   acquisition.

12   Q.     The iControl patents-in-suit were assets acquired

13   from iControl; right?

14   A.     Yes.

15   Q.     Alarm.com did not identify the patents-in-suit in

16   this section of its 2017 10-K; right?

17   A.     I need to review the section.  Do you want me to take

18   a moment?

19   Q.     Please.

20   A.     Sir, this is the only section that mentions iControl

21   that's -- definitely doesn't mention patents in here.

22   Q.     Turn to Page 9, sir.  There's a section entitled

23   "Market Opportunity."

24              Do you see that?

25   A.     I do.

1    Q.    And there, this particular section identifies the

2    addressable market; do you see that?

3    A.    Yes.

4    Q.    Okay.  Part of the addressable market that Alarm.com

5    told the SEC in 2017 included residential single-family

6    homes; correct?

7    A.    Yes.

8    Q.    And another part of the addressable market that

9    Alarm.com told the SEC in 2017 included commercial

10   properties; correct?

11   A.    That's correct.

12   Q.    Accurate statements; right?

13   A.    Yes.

14   Q.    Let's go to Page 11.  There we see a reference to

15   "Our Competition."  Do you see that?

16   A.    Okay.  Yes.

17   Q.    And right up front in the first sentence, Alarm.com

18   reported to the SEC in its annual report that the market is

19   fragmented; right?

20   A.    Yes.

21   Q.    And the market is highly competitive?

22   A.    Yes.

23   Q.    The market is constantly evolving; correct?

24   A.    Yes.

25   Q.    All true statements?

1    A.     Yes.

2    Q.     Correct?  Also, let's take a look at who Alarm.com

3    identified as its competitors in its filing with the SEC.

4    In the same paragraph, the first named competitor is

5    Honeywell; correct?

6    A.     Yes.

7    Q.     Alarm.com also identified Telular, SecureNet, Ring,

8    IPR, United Technologies as competitors; correct?

9    A.     That's correct.

10   Q.     Continuing further in the same paragraph, Alarm also

11   identified Scout and SimpliSafe as competitors; correct?

12   A.     Correct.

13   Q.     Alarm.com further identified Comcast, AT&T, Charter

14   Communications, Google, Amazon, Samsung, Apple, Loews, and

15   Canary as competitors; right?

16   A.     Yes.

17   Q.     All true and accurate statements to the SEC; right?

18   A.     Yes.

19   Q.     Okay.  Let's turn now to an earnings call.  And this

20   is DTX-87.

21             MR. CAMPBELL:  And I move that into evidence,

22   Your Honor.

23             MR. YOON:  No objection, Your Honor.

24             THE COURT:  All right.  Admitted without

25   objection.

```
 1                    (Exhibit DTX-87 was admitted into evidence.)

 2     BY MR. CAMPBELL:

 3     Q.      This is a transcript, Mr. Trundle, of Alarm.com's

 4     2016 third quarter earnings call; right?

 5     A.      Yes.

 6     Q.      And you participated in this call on behalf of

 7     Alarm.com; right?

 8     A.      Yes.

 9     Q.      All right.  And these are quarterly calls that you

10     have to provide a financial overview of the company to

11     investors; right?

12     A.      Correct.

13     Q.      The purpose of the call is to make information such

14     as performance results public; right?

15     A.      Yes.

16     Q.      You take questions from analysts; right?

17     A.      Yes.

18     Q.      It's important to be truthful in the earnings calls;

19     isn't that right?

20     A.      Yes.

21     Q.      Okay.  Let's turn to Page 8 of the transcript from

22     the earnings call.  And there's a portion of it that's

23     blacked out, that's redacted, so we can ignore that portion.

24              But there's a question from Michael Barry

25     Nemeroff.  Do you see that, right at the top?  And he asks
```

302

1    you a question, and you respond just below that.  And in

2    your response you say that, "The market is highly

3    competitive," don't you?

4    A.    I do.

5    Q.    Okay.  And again, you identify the first company as a

6    competitor as Honeywell; right?

7    A.    Yes.

8    Q.    And you also identify Numerex, Telular, and

9    SecureNet; right?

10   A.    Yes.

11   Q.    In addition, you identify Apple, Google and others

12   who participate in the DIY market as competitors; right?

13   A.    That's correct.

14   Q.    By the way, DIY, that stands for do it yourself?

15   A.    Yes.

16   Q.    Okay.  And that's where you install the system

17   yourself; correct?

18   A.    Yes.

19   Q.    Okay.  Your statements on the earnings call are

20   truthful and accurate?

21   A.    To the best of my ability, yes.

22   Q.    Now, let's summarize what we just went over.

23   Competition in the home security market is intense; right?

24   A.    Yes.

25   Q.    And it continues to get more and more intense with

1    new entrants; correct?

2    A.    Yes.

3    Q.    Honeywell is a multi-billion dollar giant in the

4    marketplace; correct?

5    A.    They are very large company, yes.

6    Q.    There is also competition from cable and telecom

7    giants like Comcast, AT&T and others; right?

8    A.    Today or at that time?

9    Q.    At the time of the earnings call.

10   A.    At the time of this earnings call?

11   Q.    Yes.

12   A.    Yes.

13   Q.    There is also a rapidly growing DIY, or

14   do-it-yourself players in the market like Simplisafe,

15   BlankenScout; right?

16   A.    Yes.

17   Q.    And the fourth quarter of 2015, DIY, that's

18   do-it-yourself, accounted for 27 percent of the market,

19   didn't it, sir?

20   A.    That data point would likely be according to some

21   third party, so I would trust the third party.  I can't

22   definitively say the third party got it right, but I don't

23   think that's my data point.

24   Q.    That's something you said, though, isn't that

25   correct, sir?

1    A.    Referring likely to a study or analysis.  If you want

2    to point me to it I can see, but sounds about right.

3    Q.    Google was another direct competitor to Alarm.com;

4    correct?

5    A.    Not a direct competitor, no.

6    Q.    You never said Google was a direct competitor to

7    Alarm.com, Mr. Trundle?

8    A.    I may have at some point.  We think of them as an

9    indirect competitor.  They're competing for the customer,

10   for the end customer.  They're not typically competing for

11   the security provider relationship, they don't sell to

12   security providers.

13   Q.    You don't recall providing a declaration where you

14   identified Google as another direct competitor to Alarm.com?

15   A.    I could have.  At the customer level they compete

16   directly for the customer relationship with our security

17   employer.

18   Q.    So the current home security market has 22 million

19   homes; isn't that right, sir?

20   A.    That's approximately correct.

21           MR. CAMPBELL:  I would like to move into

22   evidence DTX 265.

23           MR. YOON:  No objection, Your Honor.

24           THE COURT:  Admitted without objection.

25           (DTX 265 was admitted into evidence.)

1   BY MR. CAMPBELL:

2   Q.      Of those 22 million homes, 5.5 million have smart

3   home security with Alarm.com; isn't that right?

4   A.      As of May 2018, that sounds about right.

5   Q.      And when you're referring to May 2018, what you're

6   looking at is the front page of DTX 265, which is an

7   investor presentation prepared by Alarm.com; correct?

8   A.      I believe so, yes.

9   Q.      It's important to be truthful and accurate in

10  investor presentations; correct?

11  A.      Yes.

12  Q.      Let's go to slide 13.  This slide contains a pie

13  chart breaking down some statistics about those 22 million

14  homes.  Do you see that?

15  A.      I do.

16  Q.      And it shows the current home security market has 22

17  million homes, and that of that, Alarm.com serves 5.5

18  million; right?

19  A.      Yes.

20  Q.      Slide 13 is truthful and accurate, isn't it, sir?

21  A.      Yes.

22  Q.      Let's talk now about competitive information.

23  Alarm.com can't operate in a competitive market without

24  getting some level of information about competitive pricing;

25  right?

1    A.      We typically will get some sort of anecdote, a

2    customer will tell you you're too expensive.

3    Q.      As part of its business practices, Alarm.com tries to

4    obtain information about competitor pricing; correct?

5    A.      We try to win our sales opportunities and we try to

6    be competitive with our pricing.  We don't accurately rake

7    for someone's pricing, no.

8    Q.      Let's take a look at that.  As CEO, you are

9    ultimately responsible for Alarm.com's corporate strategy,

10   aren't you?

11   A.      Yes.

12              MR. CAMPBELL:  I would like to move into

13   evidence DTX 401.

14              MR. YOON:  No objection, Your Honor.

15              THE COURT:  All right.  Admitted without

16   objection.

17              (DTX 401 was admitted into evidence.)

18   BY MR. CAMPBELL:

19   Q.      This is a slide from an Alarm.com presentation,

20   entitled Strategy dated December 2014.  Do you see that?

21   A.      I see that.

22   Q.      Let's turn to slide seven of this strategy deck.  And

23   at the top, you see it says Pricing Pressure (Direct)?

24   A.      Yes.

25   Q.      And this slide provides a breakdown for offerings

1   from various competitors.  Do you see that?

2   A.      I see that.

3   Q.      And, in fact, what it does, it provides pricing

4   information for iControl, Honeywell and SecureNet; right?

5   A.      It includes an estimate by whoever produced the deck

6   of what we believe their pricing to be.

7   Q.      So if you look at the very top, Alarm.com identifies

8   its own list price in 2014 as 9.95.  Do you see that?

9   A.      Yes.

10  Q.      Beneath that iControl is listed at 6.95.  Do you see

11  that?

12  A.      Yes.

13  Q.      So Alarm's list price is about 1.5 X of that of

14  iControl in 2014; right?

15  A.      Yes.

16  Q.      Then you look down, Honeywell, Alarm.com list, or

17  estimates the list price at $5; right?

18  A.      For a dual path, yes.

19  Q.      That's about half the price listed for Alarm.com in

20  2014; correct?

21  A.      Yes.

22  Q.      And then you look down at SecureNet, the price there

23  is listed or estimated at $3.50 to $4.  Do you see that?

24  A.      Yes.

25  Q.      So Alarm.com is almost three times the cost of

1    SecureNet's pricing in 2014; correct?

2    A.    The list price, yes.

3    Q.    Let's turn to slide eight.  This slide contains

4    additional pricing information from other competitors.  Do

5    you see that?

6    A.    I do.

7    Q.    Among those, I won't put them all in into the record,

8    but you see Wink?

9    A.    Yes.

10   Q.    Revolv?

11   A.    Yes.

12   Q.    Nest at the bottom.  And by the way, Nest is Google;

13   right?

14   A.    Today it is Google.

15   Q.    Then you see Honeywell listed again?

16   A.    Yes.

17   Q.    And then Ecobee; right?

18   A.    Yes.

19   Q.    Is it fair to say that Alarm.com keeps abreast of

20   competitor's pricing, sir?

21   A.    Yes.

22   Q.    Let's turn to slide 10.

23         At the top of the slide, do you see where it

24   says, "Alarm.com has enjoyed a first mover's advantage."?

25   A.    Yes, I see that.

1    Q.      "Because of that advantage, Alarm.com has been able

2    to hold premium pricing."

3                Do you see that?

4    A.      I see the bullet that it's been able to hold premium

5    pricing.

6    Q.      And then it also says that competitive pressures are

7    strengthening; correct?

8    A.      Yes.

9    Q.      The slide notes that vendors are offering the same

10   end user features; correct?

11   A.      As perceived by dealers and end users, yes.

12   Q.      To sum it up, Alarm.com operates in a competitive

13   market; right?

14   A.      Yes.

15   Q.      It faces pricing pressure?

16   A.      Yes.

17   Q.      In order to compete, Alarm.com keeps abreast of its

18   competitors' activities; correct?

19   A.      Yes.

20   Q.      In order to compete, Alarm.com keeps abreast of

21   competitive pricing; correct?

22   A.      Yes.

23   Q.      Let's talk about the acquisition of the

24   patents-in-suit.  The three patents-in-suit were part of an

25   acquisition of assets from iControl; correct?

1     A.      Yes.

2     Q.      I know the jury has heard it.  Just to come back to

3     it, Alarm.com did not invent what is claimed in the asserted

4     patents; correct?

5     A.      That's correct.

6     Q.      Turn to your DTX in your binder.

7                   MR. CAMPBELL:  And I move to admit DTX 73.

8                   MR. YOON:  We have no objection, Your Honor, but

9     this is a duplicate of what was admitted already.  This is

10    the patent assignment agreement, so we don't know if you

11    want to admit the same document twice.

12                  THE COURT:  I prefer to admit it just once.  The

13    jury is going to get a big enough stack of paper.  Can we

14    just say what the exhibit number is it's already been

15    admitted as?

16                  MR. YOON:  It's a PTX 229.

17                  MR. CAMPBELL:  Thank you, Your Honor.

18                  MR. YOON:  PTX 229, Your Honor.

19                  THE COURT:  All right.  There we have it.

20                  MR. CAMPBELL:  Thank you.

21    BY MR. CAMPBELL:

22    Q.      This is the patent assignment agreement from iControl

23    to ICN Acquisition; correct?

24    A.      Yes.

25    Q.      The agreement is dated March 8, 2017; right?

1    A.      That's correct.

2    Q.      And you signed the agreement; correct?

3    A.      Yes.

4    Q.      In the patent assignment, ICN Acquisition acquired 20

5    patents and patent applications.  Isn't that right, sir?

6    A.      Yes.

7    Q.      ICN Acquisition also entered into another agreement

8    that is the asset purchase agreement that you testified

9    about earlier; isn't that right?

10   A.      Yes.

11   Q.      Turn to DTX 72, please.  This is Alarm's 8K filed

12   with the SEC on June 23rd, 2016.

13            MR. CAMPBELL:  And I move that into evidence.

14            MR. YOON:  No objection, Your Honor.

15            THE COURT:  Admitted without objection.

16            (DTX 72 was admitted into evidence.)

17   BY MR. CAMPBELL:

18   Q.      Page five shows your electronic signature; isn't that

19   right, sir?

20   A.      Yes.

21   Q.      Page seven, which is Exhibit 2.1, is the asset

22   purchase agreement I just mentioned; correct?

23   A.      I believe it is, yes.

24   Q.      The agreement is dated June 23rd, 2016; right?

25   A.      Yes.

1    Q.    IControl owned the patents when it filed this lawsuit

2    in 2015; correct?

3    A.    Are you referring to the lawsuit or the patent

4    purchase agreement?

5    Q.    To the lawsuit.  In other words, Alarm.com did not

6    own the patents when the lawsuit was filed in 2015; correct?

7    A.    So back before we did the acquisition there was a

8    lawsuit, and iControl owned the patents at that point, yes.

9    Q.    Turn to page 50, please.  What I want to focus on is

10   particularly small Roman numeral two clause.  And the last

11   portion of that says, "Settle any legal proceedings in

12   connection with the business or with respect to the

13   transferred assets."  Do you see that?

14              MR. YOON:  Your Honor, can we have a side-bar on

15   this one?

16              THE COURT:  All right.

17              (Side-bar discussion:)

18              MR. YOON:  We had an understanding that outside

19   lawsuits would not come in.  The Court has issued MILs in

20   this.  I'm not sure what this settlement is referring to.

21              MR. MILCH:  It's talking about this lawsuit.

22              MR. YOON:  This lawsuit?  I apologize.  That's

23   my fault.  I thought it was referring to anything else.

24              MR. CAMPBELL:  It's this lawsuit.

25              THE COURT:  There is no problem here?

1          MR. YOON:  As long as it's this lawsuit I have

2     no problem.  I apologize.

3               (End of side-bar.)

4          MR. CAMPBELL:  Thank you, Your Honor.

5     BY MR. CAMPBELL:

6     Q.    This particular clause, it reads as follows,

7     Mr. Trundle.  "Settle any legal proceedings in connection

8     with the business or with respect to the transferred

9     assets."

10               Do you see that?

11    A.    I see those words, yes.

12    Q.    And in sum and substance what this clause is saying

13    is that Alarm.com as part of the acquisition of iControl

14    prohibited iControl from settling this lawsuit; correct?

15    A.    I have to take a minute to glance at the context of

16    this, of that particular item.  But that's what that item

17    says.  But I would imagine somewhere it says without the

18    prior approval or the collaboration of the acquired, to the

19    extent we're allowed to collaborate.

20    Q.    Fair to say the plain language of these words say

21    that iControl cannot settle the current lawsuit with my

22    client, SecureNet; right?

23    A.    As I said, likely without us agreeing to it, because

24    we're acquiring the business.

25    Q.    Let's talk about licenses now.  One of the license

1    that you talked about was the Honeywell license, and that's

2    DTX 245 in your binder.

3    A.      DTX 2.5?

4    Q.      245.

5                  MR. YOON:  No objection, Your Honor.

6                  THE COURT:  All right.  Admitted without

7    objection.

8                  (DTX 245 was admitted into evidence.)

9    BY MR. CAMPBELL:

10   Q.      This is a license between Alarm and Honeywell;

11   correct?

12   A.      Yes.

13   Q.      And you signed the agreement on behalf of Alarm.com;

14   right?

15   A.      Yes.

16   Q.      Let's take a look at clause 1.6.  This is entitled

17   Licensed Patents.  And there, it includes the three

18   patents-in-suit, '931, '619, and '844; correct?

19   A.      Yes.

20   Q.      Now, in connection with this license, Honeywell did

21   not pay any money for the license; correct?

22   A.      That's correct.

23   Q.      So in other words, Honeywell -- Alarm.com gave

24   Honeywell a license to the three patents-in-suit without

25   Honeywell actually paying any money; correct?

1    A.      They did not pay money.

2    Q.      Let's talk about the Alarm.com iControl license now.

3    That's DTX 88.

4              MR. CAMPBELL:  Move that into evidence, Your

5    Honor.

6              MR. YOON:  It was actually PTX 215, Your Honor.

7    It was admitted already.

8              THE COURT:  All right.  Let's use PTX 215.

9    BY MR. CAMPBELL:

10   Q.      And this is the license between iControl and

11   Alarm.com; correct?

12   A.      Yes.

13   Q.      You negotiated this license; right?

14   A.      I'm just catching up with you on the date that this

15   is, but yes, I believe I did.

16   Q.      Let's look at the third paragraph under recitals.

17   There, which is beneath the second portion that's been

18   redacted, it identifies the '931, '619 and '844 patents.  Do

19   you see that?

20   A.      Yes.

21   Q.      And this license, again, does not include what's

22   called a running royalty, in other words, Alarm.com did not

23   give iControl any money for this license; correct?

24   A.      That's correct.

25   Q.      So Alarm.com got the three patents that are in issue

```
 1   in this litigation without paying iControl any money; right?
 2   A.    You mean got a license or that we acquired the three
 3   patents?
 4   Q.    This was part of a license agreement?
 5   A.    We were licensed on those patents, yes, before the
 6   acquisition as part of a patent cross license agreement
 7   without the exchange of money.
 8   Q.    Let's now talk about the Comcast license which is DTX
 9   239 in your binder?
10             MR. CAMPBELL:  And I move that into evidence,
11   Your Honor.
12             THE WITNESS:  229?
13             MR. CAMPBELL:  239.
14             MR. YOON:  No objection.
15             THE COURT:  Admitted without objection.
16             (DTX 239 was admitted into evidence.)
17   BY MR. CAMPBELL:
18   Q.    This is another license for the asserted patents;
19   correct?
20   A.    Yes.
21   Q.    Page 49, that's your signature; correct?
22   A.    Yes.
23   Q.    Back to the first page, there is a license to the,
24   among others, the three asserted patents in this litigation;
25   correct?
```

1    A.      Yes.

2    Q.      Let's take a look quickly to clause 3.1.  And

3    specifically 3.1(b), there is a reference, third line down,

4    royalty-free and fully paid-up license.  Do you see that?

5    A.      Yes.

6    Q.      So Comcast received a license to a group of patents

7    that included the three patents-in-suit without paying any

8    money for that license; correct?

9    A.      They did not pay Alarm.com money, no.

10   Q.      Let's look at clause 3.4.  And there in 3.4, it says

11   in part, "No grantee or any of its affiliates shall have the

12   right to grant a sublicense to any restricted patent under

13   the license to any restricted competitor party."  Do you see

14   that?

15   A.      I do.

16   Q.      Let's take a look very quickly at clause 192 that

17   defines restricted competitor parties.  Among those

18   identified is SecureNet; right?

19   A.      I need to take a second to read this.  Yes, I see

20   them in that definition.

21   Q.      So in sum and substance, what this means, that is the

22   grantee could not sublicense restricted parties, Alarm.com

23   expressly prohibited Comcast from granting a license to

24   SecureNet; right?

25   A.      I believe that's what this says.  I would need to

1   take a closer look at the agreement.

2   Q.     Thank you.

3          Let's take a look at the KPM valuation document.

4   That is DTX 238 in the binder.

5          MR. CAMPBELL:  I move that into evidence.

6          MR. YOON:  Which one is that again?

7          MR. CAMPBELL:  238.

8          MR. YOON:  No objection, Your Honor.

9          THE COURT:  Admitted without objection.

10         (DTX 238 was admitted into evidence.)

11  BY MR. CAMPBELL:

12  Q.     Alarm.com hired KPMG to value the assets it was

13  acquiring from iControl; right?

14  A.     We did.

15  Q.     KPMG is a third-party accounting firm; right?

16  A.     Yes.

17  Q.     Respected accounting firm; right?

18  A.     I think so, yes.

19  Q.     If they weren't, you wouldn't have hired them; right?

20  A.     No.

21  Q.     As president and CEO of Alarm.com, you were aware of

22  the KPMG valuation, weren't you, sir?

23  A.     Can you repeat that question?

24  Q.     As president and CEO of Alarm.com, you were aware of

25  the KPM valuation; correct?

1    A.      Only when we came here to trial.

2    Q.      Let's turn to page 23 of that valuation.  This is

3    KPMG's valuation summary.  Do you see that?

4    A.      I do.

5    Q.      So there, what we see are a number of different items

6    under assets and liabilities.  On the left and to the right

7    in the table, it says US in thousands.  Do you see that?

8    A.      I do.

9    Q.      US in thousands, what that means is if we just

10   convert it, we can add three zeros, for example, where it

11   says Developed Technology (Connect) that's $4.4 million.

12   A.      That's correct.

13   Q.      If you look down it says Customer Relationships,

14   92,500, that's $92,500,000; correct?

15   A.      Yes.

16   Q.      In this valuation that was performed by KPMG as part

17   of Alarm.com's acquisition of iControl, KPMG did not provide

18   any separate line item for the iControl patents; right?

19   A.      Correct.

20   Q.      So the three patents that are at issue in this

21   litigation, they're not valued in this KPMG valuation;

22   correct?

23   A.      They're not specifically called out separately.

24   Q.      And what KPMG did, and I have highlighted on the

25   screen, they did provide a value for developed technology of

1    $4.4 million; right?

2    A.    Yes.

3    Q.    And the total purchase price for the iControl assets

4    was in the neighborhood of 150 million; right?

5    A.    That's correct.

6    Q.    And KPMG assigned for the Connect technology, of the

7    $150 million purchase price, 4.4 million for the developed

8    technology that included Connect; right?

9    A.    They established that that would be the replacement

10   cost.

11   Q.    So KPMG valued the Connect technology in their

12   summary for the Connect product line of $4.4 million; right?

13   A.    That's correct.

14   Q.    Let's turn to page 18.  And there is a definition

15   there of developed technology in the overview.  If we could

16   highlight that.  And in the second sentence it says the

17   acquired developed technology includes patents, know-how,

18   process, and designs.  Do you see that?

19   A.    I do.

20   Q.    When it is talking about patents, it's talking about

21   all 18 of the acquired iControl patents, isn't it, sir?

22   A.    It's talking about all the patents in the

23   acquisition.

24   Q.    Let's turn to page 9.  Here we have a table prepared

25   by KPMG that identifies the assets.  Do you see that?

1    A.    Yes.

2    Q.    So customer relationships, that had a particular

3    value assigned to it.  Assembled work force.  That had a

4    value assigned to it.  But I want to direct your attention

5    to the third entry.  Do you see Honeywell License Agreement

6    at the bottom?

7    A.    I do.

8    Q.    Look to the far right.  It says "Not Valued."  Do you

9    see that?

10   A.    Yes.

11   Q.    Honeywell is one of Alarm.com's competitors in the

12   home security space, isn't it?

13   A.    Yes.

14   Q.    The 201710(k) that we talked about earlier in my

15   examination included Honeywell, in fact, that 10(k) listed

16   Honeywell first as a competitor; correct?

17   A.    Yes.

18   Q.    And the earnings call when you responded to a

19   question, the first competitor that you mentioned in

20   response to the question was Honeywell, wasn't it?

21   A.    Yes.

22   Q.    In the table of identified assets, KPMG by contrast

23   did not give the Honeywell license any value at all; right?

24   A.    They assigned not valued to it.

25   Q.    And then in the description, in the next line, it

322

1    says, "When we inquired with management, they noted that

2    their expectations of the iControl business did not change

3    based on the license agreement."  Do you see that?

4    A.    Yes.

5    Q.    So we know that Honeywell is a direct competitor of

6    Alarm.com, that's what you're telling the Securities

7    Exchange Commission; right?

8    A.    Yes.

9    Q.    KPMG inquired of management about the effect of the

10   Honeywell license, did they not?  It says it right there.

11   A.    Yes.

12   Q.    And in response, management said the Honeywell

13   license that we looked at that included the three

14   patents-in-suit, would have no effect on your business;

15   correct?

16   A.    That's correct.

17   Q.    Honeywell is a nearly hundred billion market cap

18   company?

19   A.    Yes.

20   Q.    And Alarm.com is about a $1 billion company?

21   A.    At that time, yes.

22   Q.    So fair to say, if my math is right, Honeywell is

23   about a hundred times the capital of Alarm.com?

24   A.    Yes.

25   Q.    And SecureNet by contrast is a fraction of the size

1    of Alarm.com.  You're aware of that; right?

2    A.    Yes.

3    Q.    And, in fact, SecureNet has less than ten million in

4    revenue.  Are you aware of that?

5    A.    No.

6    Q.    So assume that, and if my math is correct, Alarm has

7    somewhere about 90 to a hundred times the revenue of

8    SecureNet; right?

9    A.    You said 10 million?

10   Q.    In revenue.

11   A.    90 times that would be 900 million.  We're not that

12   big.

13   Q.    You're about 850 million; right?

14   A.    No.  We're less than 500 million.

15   Q.    Let's call it 500 million.  50 times larger?

16   A.    As I said, we're less than that, but I'm happy with

17   something in that range.

18   Q.    So just so I get it very clear for the jury,

19   Alarm.com is about 50 times the revenue of SecureNet; right?

20   A.    If we look at 2018 results, it would be closer to 40

21   times.

22   Q.    And a company, Honeywell, with a hundred billion,

23   that would make them about 200 times the size of Alarm.com;

24   right?

25   A.    Just for clarity, I think market cap is different

324

1   than revenues, so Honeywell's market cap is a hundred

2   billion dollars.   I don't know their revenues.

3   Q.      So notwithstanding, there is a great disparity in

4   size between Alarm.com and Honeywell; correct?

5   A.      That's correct.

6   Q.      Great disparity in size between Alarm.com and

7   SecureNet; right?

8   A.      Yes.

9   Q.      Yet your management told KPMG that Honeywell, one of

10  your largest competitors where there is a great disparity in

11  size on could not use the patents to drive business away

12  from Alarm.com; correct?

13  A.      Could not effect the value of the deal with these

14  patents.

15  Q.      The patents, your management told KPMG that the

16  patents that you gave to Honeywell free of charge could not

17  be used to drive business away from Alarm.com; right?

18  A.      For clarity, we say exactly that our expectations are

19  that the iControl business would not change based on the

20  license agreement.

21  Q.      And that means that you wouldn't lose any customers,

22  revenue sales to Honeywell, that's a fair interpretation,

23  isn't it, sir?

24  A.      I'm sorry?

25  Q.      That's a fair interpretation of that, is it not?

1   A.      I think what it says is what it says.

2   Q.      All right.  So on the one hand you have Honeywell and

3   what management said, it was noted that it was highly

4   speculative to conclude that Honeywell could in any way use

5   the patents to drive business away from Alarm.com, do you

6   see that?

7   A.      Yes.

8   Q.      And, therefore, it goes on, no adjustment was made in

9   our valuation for this license agreement.  Do you see that?

10  A.      I do see that.

11  Q.      So you give a license that included the three

12  patents-in-suit to Honeywell, and that couldn't be used in

13  some way to drive business from Alarm.com.  That's what it

14  says; right?

15  A.      Yes.

16  Q.      And that's what management told Honeywell -- excuse

17  me, that's what management told KPMG; correct?

18  A.      That is what the document states.

19  Q.      Yet SecureNet at a fraction of the size of Alarm.com,

20  50 times smaller, and a tiny fraction of the size of

21  Honeywell, drives business away from Alarm.com, that's your

22  position, sir; right?

23  A.      Yes.

24              MR. CAMPBELL:  Pass the witness.

25              THE COURT:  All right.  Redirect.

```
 1              MR. YOON:  Yes, Your Honor.
 2                   REDIRECT EXAMINATION
 3   BY MR. YOON:
 4   Q.    Mr. Trundle, do you recall that you were asked a
 5   question about the filing that you made with the Securities
 6   Commission, a 10(k) and annual report, do you recall that,
 7   sir?
 8   A.    I do.
 9   Q.    And sir, at the start of your testimony before you
10   were asked on cross-examination, I asked you to identify the
11   primary key competitor of Alarm.com.  Do you recall that?
12   A.    Yes, I do.
13   Q.    Who did you identify?
14   A.    Our direct competitor is Honeywell, SecureNet and
15   Alula.
16   Q.    Alula, did it have another name at one point in time?
17   A.    It used to be called ipDatatel.
18   Q.    And so was Honeywell, SecureNet, ipDatatel, Alula
19   identified in the security files, I believe?
20   A.    I believe they were, yes.
21   Q.    Now, why did you identify Honeywell's SecureNet and
22   Alula as the key competitors?
23   A.    I think, you know, that was just the ones we hear
24   about most frequently from our security providers.
25   Q.    And did counsel for SecureNet ask you to identify who
```

1    the key competitors were?

2    A.     I don't remember exactly what his phrasing of his

3    question was.

4    Q.     Understood, sir.  If we could go to DTX-401.  Do you

5    see -- can we have that on the screen?  That's the strategy

6    December 2014 document.  And if we could turn to page 355.

7              Do you recall being asked about pricing

8    questions, sir?

9    A.     I do.

10   Q.     And this is a December 2014 document.  Do you recall

11   that?

12   A.     I do.

13   Q.     As of today, the Connect business is part of

14   Alarm.com; correct?

15   A.     That's correct.

16   Q.     And so who did you identify as your direct

17   competitors in 2014, except for iControl?

18   A.     At that time, Telular, Honeywell, SecureNet.

19   Q.     And you understood that Telular was using the

20   iControl system; correct?

21   A.     That's correct.

22   Q.     Okay.  So in 2014, you were saying the direct

23   competitors were Honeywell and SecureNet; do you see that?

24   A.     I do.

25   Q.     And do you see that SecureNet's estimated price was

1       $3.50?

2       A.      I do.

3       Q.      That's more than 50 percent less than Alarm.com?

4       A.      I see that.

5       Q.      Yeah.  And has SecureNet's pricing hurt Alarm.com?

6       A.      Yes, it has.

7       Q.      Okay.  And if we could have PDEM-2 on the screen,

8       again, the four companies.

9               Now, sir, has SecureNet's pricing and pricing

10      practices hurt Alarm.com's business with the four companies

11      that we discussed?

12      A.      We believe it has been a meaningful contributor to

13      the losses that we have encountered at these four entities.

14      Yes.

15      Q.      How has SecureNet's pricing hurt Alarm.com?

16      A.      Very simply, their message is usually -- at least

17      what we understand to be the message from talking to our

18      service providers is, Hey, we do some of the same things as

19      Alarm.com, a lot of the things, and we're going to charge

20      you half of whatever they charge you.

21      Q.      In fact, more than half, 60 percent on the document

22      that we saw; correct?

23      A.      That's correct.

24      Q.      Now, sir, you heard a lot of discussion about

25      Honeywell being a hundred-billion-dollar company.  Do you

1    recall that?

2    A.     I do.

3    Q.     Did Honeywell -- were they meaningful competition for

4    any of these four companies?

5    A.     It's interesting.  They had been earlier, but we got

6    -- in the case of Protection 1, I think there was no -- our

7    relationship at the security provider basically told us that

8    they had evaluated Alarm.com, SecureNet, and Honeywell, and

9    that Honeywell's Total Connect 2.0 was not a contender.  It

10   just wasn't a contender.

11            The race was going to be between Alarm.com and

12   SecureNet, and that they appeared to be very familiar with

13   architecture of what we were doing and were competing

14   across.

15   Q.     The Honeywell 2.0 product is the product that

16   directly competes with Alarm.com; correct?

17   A.     That's the software product from Honeywell.  It's

18   called Total Connect that competes with Alarm.com.

19   Q.     And what did Protection 1 tell you about that

20   Honeywell Total Connect product?

21            MR. CAMPBELL:  Objection, Your Honor.

22            THE COURT:  I'm going to sustain it.

23   BY MR. YOON:

24   Q.     Well, with regard to the Protection 1, sir, who were

25   the two primary companies competing for that business?

1    A.       Alarm.com and SecureNet.

2    Q.       Was Honeywell one?

3    A.       No.

4    Q.       Now, sir, going back to Exhibit 361.  371, the Asset

5    Purchase Agreement.

6    A.       DTX-371?

7    Q.       We can use PTX-371.  Do you recall being asked a

8    question about PTX-371?  Do you recall that, sir?

9    A.       I do.  Yes.

10   Q.       Do you -- if we could turn to page 50 of that

11   document.

12   A.       Fifty?

13   Q.       Right.  And do you recall you were asked a question

14   about little (i)2, about whether or not iControl could enter

15   into a license agreement with SecureNet?

16   A.       I do.

17   Q.       And the date of this document was June 23rd, 2016?

18   A.       That's correct.

19   Q.       And what was the date of the press release we looked

20   at, PTX 342?  If you could have that on the screen.

21            What's the date of that press release, sir?

22   A.       June 23rd, 2016.

23   Q.       And you understand -- sir, what do you understand a

24   license agreement to be?

25   A.       A license agreement?

1   Q.      A patent license agreement between two companies.

2   A.      Well, it normally gives one company the right to use

3   the patents of another company.  So you're giving someone or

4   you're charging someone to use your patents.

5   Q.      Why, in June 23rd, 2016, would Alarm.com want to have

6   input or voice in what iControl did with its patents?

7   A.      Sure.  We had just spent six months plus negotiating

8   the acquisition of iControl.  And when you negotiate for

9   something, you want to know what you're buying.  And from

10  the time -- once you make a deal, it then takes five, six,

11  seven months for the lawyers to work everything out and to

12  actually finish the deal where you wire the money.

13          So we didn't want the value of the company to

14  change from the time we announced the deal to the time that

15  we actually completed the acquisition.  And if they're out

16  doing licensing deals and giving away their patents, that

17  would change the value of the company.

18  Q.      And so was it your understanding that the purpose of

19  this provision was to maintain the value of the company at

20  the time you announced the deal?

21  A.      Until we closed the deal, yes.

22  Q.      So let's now go to PTX-215, please, the license

23  agreement between iControl and Alarm.com.  Do you recall

24  that counsel for SecureNet asked whether any money was

25  exchanged for the iControl patents?  Do you recall that?

1    A.      I do.

2    Q.      And, sir, if you would turn to the second page of

3    that agreement, Section 1.4.  And if we could have that on

4    the screen?

5    A.      Right.

6    Q.      Did iControl obtain something valuable in exchange

7    for providing a license of the patents to Alarm.com?

8    A.      Yes, immensely valuable.

9    Q.      And what did iControl get in exchange for licensing

10   its patents to Alarm.com?

11   A.      So in exchange, they got a license to almost every

12   patent that Alarm.com had created since the beginning of

13   time.  So our entire arsenal, our entire body of

14   intellectual property, we licensed to iControl in exchange

15   for the license to these patents.

16   Q.      And, sir, during your direct testimony, you talked

17   about the importance of patents to Alarm.com?

18   A.      Yes.

19   Q.      How did the license agreement where iControl and

20   Alarm.com exchanged the rights to each company's portfolios

21   with each other go with the Alarm.com business?

22   A.      Sorry.  Can you repeat the question?

23   Q.      Yes.  What was the reason why Alarm.com would

24   exchange its patent portfolio for iControl for the purpose

25   of your business?

1   A.     Well, at that time, we were -- we were in litigation,

2   and we thought that the patents --

3   Q.     That's okay, sir.  I'm going to move on.

4          Sir, looking at now DTX-2388.  Do you recall

5   that you were asked a question about the KPMG presentation?

6   A.     I do.

7   Q.     And if we could go to Page 5627, sir, the Valuation

8   Summary.  Do you recall that counsel for SecureNet asked you

9   a number of questions about this valuation summary?

10  A.     I do.

11  Q.     And if we could go to the prior page that goes and

12  describes what this is about, if we could go to the previous

13  page.  And see that, the reference there to Valuation

14  Approach?  Could we have that blown up?

15         Sir, I believe that you were trying to describe

16  in your cross-examination testimony what approach that was

17  used in the valuation.  Do you recall that?

18  A.     I do.

19  Q.     And what was the KPMG valuation approach?

20  A.     They describe it as the cost replacement method.

21  Q.     And what does this cost replacement method state if

22  you look at the sentence that says, "Using this method,"

23  what does it say?

24  A.     They basically say if you had a fully trained and

25  effective team, you know, how much would it cost you to

1    rebuild the software.

2    Q.    Was KPMG ever asked to calculate the harm caused by

3    SecureNet's infringement of the patents?

4    A.    Not to the best of my knowledge.

5    Q.    Was KPMG ever asked to calculate the proper

6    reasonable royalty rate for the patents?

7    A.    No.

8    Q.    Was KPMG ever asked to calculate the financial harm

9    and lost profits that Alarm.com experienced as a result of

10   SecureNet's infringement?

11   A.    No.

12   Q.    Was KPMG asked to do any type of damage analysis with

13   respect to the patents?

14   A.    No.

15            MR. YOON:  No further questions.

16            THE COURT:  All right.  Mr. Trundle, thank you,

17   you may step down.  Watch your step.  Actually, Mr. Trundle,

18   why don't you just sit there for a minute.

19            Members of the jury, we're going to take our

20   15-minute morning break.  So we'll start again at 11:30.

21            Could we take the jury out, please?

22            (Jury leaving the courtroom at 11:16 a.m.)

23            THE COURT:  All right.  So we'll be in recess

24   for 15 minutes.

25            (Recess was taken.)

335

 1                 THE CLERK:  All rise.

 2                 THE COURT:  All right.  Are you ready to go?

 3                 MR. DORSNEY:  One minute, Your Honor.  He went

 4      to the restroom.

 5                 Your Honor, do you like to take your lunch from

 6      12:30 to 1:30, just so we know for our witnesses.

 7                 THE COURT:  More like 1:00.  Mr. Dorsney, who's

 8      your next witness?

 9                 MR. DORSNEY:  Mr. Kerzner.  Mr. Daniel Kerzner.

10                 THE COURT:  So why don't you come up and sit

11      here, and why don't you distribute the reports.

12                 MS. PROCACCIO-FLOWERS:  Binders, thank you, Your

13      Honor.

14                 THE COURT:  All right.  Let's get the jury.

15                 MR. YOON:  I apologize, Your Honor.

16                 THE COURT:  It's all right.  I don't think I

17      took the full 15 minutes.

18                 (Jury entering the courtroom at 11:31 a.m.)

19                 THE COURT:  All right.  Members of the jury,

20      welcome back.  Everyone, you may be seated.

21                 Counsel, you may proceed.

22                 MS. PROCACCIO-FLOWERS:  Thank you, Your Honor.

23      Alarm.com calls to the stand Mr. Daniel Kerzner.

24      BY MS. PROCACCIO-FLOWER:

25      Q.    Good morning, Mr. Kerzner.  Can you please introduce

1    yourself to the jury?

2                THE COURT:  Wait.  I don't think we swore him.

3                THE CLERK:  Please state and spell your full

4    name for the record.

5                THE WITNESS:  Daniel Kerner, D-A-N-I-E-L

6    K-E-R-Z-N-E-R.

7                THE CLERK:  Do you affirm that the testimony you

8    are about to give the Court and the jury in the case now

9    pending will be the truth, the whole truth, and nothing but

10   truth, you do so affirm?

11               THE WITNESS:  I do.

12               THE CLERK:  Thank you.

13               MS. PROCACCIO-FLOWERS:  My name is Mary

14   Procaccio-Flowers.  I represent Alarm.com and ICN

15   acquisition.

16   BY MS. PROCACCIO-FLOWER:

17   Q.    Good morning, Mr. Kerzner.  Can you please introduce

18   yourself to the jury?

19   A.    Sure.  Hi.  Good afternoon.  Good morning.  I'm Dan

20   Kerzner.  I'm the chief product officer for Alarm.com.

21   Q.    What are your responsibilities at Alarm.com?

22   A.    Sure.  I'm responsible for managing our product team

23   that includes the product managers who set the direction for

24   the product, the quality engineers that make sure the

25   product functions as it's expected to.  We have a 24-by-7

1    network operations team that manages the software, product

2    marketing team that figures out how to communicate what our

3    software does.  And then I also manage the Connect team

4    which we've been discussing the last couple days.

5    Q.    And Mr. Kerzner, what did you study after high

6    school?

7    A.    After high school, I got a degree in computer

8    engineering.  And then later, I got an MBA.

9    Q.    Mr. Kerzner, what is the security panel?

10   A.    Sure.  So a security panel, sometimes called an

11   intrusion panel, is generally used to secure either a home

12   or a business.  And what it does is it puts out a group of

13   sensors, typically a door sensor or a window sensor, maybe a

14   motion detector, and then it will monitor to see the state

15   of the home and whether or not someone is entering or

16   exiting the home, or whether there is a smoke or a CO2 event

17   that's unexpected.

18            And then it will send a signal to what is called

19   a central station that something has happened.  So the

20   security panel also allows you to basically put your home

21   into an alarm state, so it's protected.  And then if

22   something happens, it lets you know.

23   Q.    And Mr. Kerzner, as chief product officer at

24   Alarm.com, are you generally familiar with the types of

25   security panels that are available?

1    A.    Yes.

2    Q.    Okay.  Are you familiar with the Simon XT panel?

3    A.    Yes.  The Simon is one of the kind of long-standing

4    panels that have been in the industry for quite a while.

5    Originally developed by a company called Interlogix, later

6    it became GE.  And it allows you to have the basic functions

7    of a security system.

8    Q.    Is it possible to buy a Simon XT panel without a

9    gateway?

10   A.    Yes.

11   Q.    How does a Simon XT panel without a gateway operate?

12   A.    Sure.  So the Simon XT really predates, you know,

13   much of the technology that we've been discussing because

14   it's been around for a long time.  Built into the Simon is a

15   phone line connection, a traditional phone jack.  And so

16   historically the way you would install the Simon, you can

17   still do this today, is you put it on the wall.  You hook it

18   up to a phone line, and then it would communicate out of the

19   house.

20   Q.    Can someone add a gateway to a Simon XT panel?

21   A.    Yes.

22   Q.    What companies have gateways that can be added to a

23   Simon XT panel?

24   A.    Alarm.com has one.  I believe SecureNet has one.  And

25   there are probably a handful of others.

1    Q.    And, sir, earlier you testified that you managed the

2    Connect team.  Do you remember that?

3    A.    Yes.

4    Q.    What did you mean when you referred to the Connect

5    team?

6    A.    Sure.  So after the acquisition of iControl

7    concluded, then we acquired the team of engineers and

8    quality engineers who work on that product.  I spend a lot

9    time flying out to California to meet with them.  We kept

10   the organizational structure largely intact because we

11   wanted them to be able to continue the work that they were

12   doing to the work on the Connect platform.

13            And so when I refer to Connect team, it's that

14   group of people that I'm talking about.

15   Q.    Sir, why do you fly out to California to meet with

16   the Connect software team?

17   A.    Sure.  So I live in Virginia where Alarm.com is

18   headquartered, but I manage that team.  And it's very

19   important when you're working with a team, particularly a

20   team that you care about and is new, to actually go there

21   and meet with them in person.  And so I try to get out

22   there, you know, every four to six weeks and try to make

23   sure that they have the resources that they need, and

24   they're getting the support from the company, and that they

25   really feel fully integrated in the team, because we have a

1    very talented group of people that we're lucky to add to our

2    overall Alarm.com engineering team.  But that only really

3    works if you kind of make the effort to bring them in and be

4    reasonably successful at doing that.

5    Q.    Mr. Kerzner, can you describe your history and

6    involvement with the Connect software?

7    A.    Sure.  So I -- I had sort of peripheral knowledge of

8    the Connect software prior to the acquisition, but really

9    had not been deeply involved in it.  And then since the

10   acquisition, I've spent a lot of time understanding it, and

11   particularly understanding the way that Connect is used by

12   ADT, which is the principal and largest customer of Connect

13   that Mr. Dawes talked about, and the way that software

14   functions and is used to support the ADT customers, among

15   others.

16   Q.    How many people are on the Connect software platform

17   team at Alarm.com?

18   A.    Today, I think it's about 115.

19   Q.    What has Alarm.com done to grow and improve the

20   Connect software platform?

21   A.    Sure.  So you know, there's a very large group of

22   consumers that rely on the Connect platform every day, and

23   so we take that responsibility seriously.  And so what we've

24   done is continued to have that team largely focused on

25   improving and evolving that platform.

1          And so there's a kind of ongoing research and

2     development roadmap that we execute against to try to make

3     sure that the platform gets better every day.

4     Q.    And how did Alarm.com integrate the Connect software

5     team at the company?

6     A.    Sure.  So as Mr. Trundle described, the timing was

7     good.  We had all company events that just happened to be

8     scheduled very close to when the deal finally closed, and so

9     we brought them in.  We had them kind of participate in that

10    event.

11         We've done a lot of other things.  We have

12    something that we call the So Co or Social Committee.  We

13    make sure that they have that.  There's lots of kind of

14    human things that you can do to help the team integrate and

15    be productive.

16         And then I think more substantive, and I think

17    something the economic team really cares about is we engage

18    them both in terms of their kind of core activity of

19    supporting the Connect platform.  But also on a cross team

20    basis, there's a lot of very talented engineers there.  And

21    from a seniority perspective, some of them have kind of

22    levels of expertise to even go beyond some of the folks that

23    we have on the core Alarm.com team.

24         So, for example, the lead quality engineer at

25    Connect acts as a mentor and someone who works with quality

1    engineers across the entire Alarm.com company and that goes

2    a long way to kind of pull people together.

3    Q.      Sir, earlier you mentioned EDM.  Who is ADT?

4    A.      ADT is the largest residential security company in

5    the United States.

6    Q.      And how does the Connect team work with ADT?

7    A.      So, Connect is what we internally call the software.

8    ADT brings that to market through a platform they call

9    Pulse, so you may have seen commercials over time that talk

10   about ADT Pulse, that's a pre-brand for ADT.  There is a

11   whole group of people over at ADT who are responsible for

12   the Pulse offering and what its needs are and where it's

13   going, so there is a pretty ongoing collaboration between

14   ADT and us to evolve that platform.  I would say we have

15   people meeting with ADT a couple of times a week if not

16   every day.  And just as an example, we just had a group of

17   folks fly to ADT's headquarters, we probably had eight or

18   nine people from our side, from their side engaged in a

19   two-day meeting all over what is going to be the 2019

20   roadmap for the Connect offering.  As you can imagine, the

21   ADT offering is a critical offering, so we care about what

22   they say and what they do.

23   Q.      How much has Alarm.com's Connect software business

24   grown since you became involved?

25   A.      It's grown quite a bit.  I think when I first started

1    working with them, it was probably -- it's probably gone up

2    thirty, forty percent since I got involved.  And as

3    Mr. Trundle said, probably fifty percent since the

4    acquisition was announced.  That's coming off a very large

5    customer base in the first place from a culture perspective,

6    we still look back to the days when Alarm.com was very

7    small, so growing thirty to forty percent of a million is a

8    big deal.  That's a lot of homes.  That's a lot of people to

9    protect.

10   Q.    How much is Connect growing per month currently?

11   A.    Tens of thousands of accounts.

12   Q.    Mr. Kerzner, as part of your responsibilities at

13   Alarm.com, do you review the subscriber numbers for the

14   Connect software platform?

15   A.    Yes.

16   Q.    Do you ever see reports of the number of subscribers?

17   A.    I do.

18   Q.    Who typically prepares those reports?

19   A.    We have a reporting team, a business intelligence

20   team that puts them together and they'll share them both

21   with us and with ADT.

22   Q.    And Mr. Kerzner, if you could please turn in your

23   binder to PTX 384?

24            MS. PROCACCIO-FLOWERS:  Your Honor, we would

25   offer PTX 384 into evidence at this time.

1           MR. BLUMENFELD:  No objection.

2           THE COURT:  Admitted without objection.

3           (PTX 384 was admitted into evidence.)

4   BY MS. PROCACCIO-FLOWERS:

5   Q.    Mr. Kerzner, I understand the text on this document

6   is small.  Mr. Smith, if you could blow up a portion of this

7   PTX 384.

8           Mr. Kerzner, what is PTX 384?

9   A.    It is a document that outlines the user accounts or

10  subscribers currently on ADT's implementation of Connect on

11  Pulse.

12  Q.    And how is the information in the left-hand column

13  organized?

14  A.    Sure.  So it's broken up into what they call Tier 1

15  and Tier 2 and 3.  Tier 1 you can think of as kind of basic

16  control.  This would be the ability to arm and disarm your

17  security system from say a mobile phone.  And then Tier 2

18  and 3 add things like automation, lights, locks, thermostats

19  and video.

20  Q.    Mr. Smith, if you could please blow up the right-hand

21  side of PTX 384.  Thank you, sir.

22          Mr. Kerzner, how many total subscribers did

23  Connect have in March of 2018?

24  A.    Roughly 2.3 million.

25  Q.    Mr. Kerzner, where does Connect go from here?

1    A.     You know, I think we expect to keep investing in

2    Connect kind of in a couple of different ways.  One in terms

3    of the overall robustness and quality of the platform.  The

4    best you can do for your existing subscribers is to have the

5    offering work really well and be available all the time and

6    continue to make feature investments so the consumers can

7    get more value out of the platform over time.

8                 MS. PROCACCIO-FLOWERS:  Thank you.  I pass the

9    witness.

10                THE COURT:  All right.  Any cross-examination?

11                MR. BLUMENFELD:  A little bit, Your Honor.

12   Thank you.

13                    CROSS-EXAMINATION

14   BY MR. BLUMENFELD:

15   Q.     Good morning, still, Mr. Kerzner.  My name is Jack

16   Blumenfeld.  I'm one of the attorneys for SecureNet.  It's

17   nice to meet you, sir.

18   A.     Nice to meet you.

19   Q.     I just have a few questions for you.  You understand

20   that this case is a patent case by Alarm.com against

21   SecureNet; right?

22   A.     Yes.

23   Q.     And you didn't mention SecureNet at all in your

24   direct testimony; correct?

25   A.     I think I mentioned them once in response to the

1     question about the gateways.

2     Q.     And you didn't mention any patents either; right?

3     A.     I don't think so.

4     Q.     Now, during the time that you've been -- I'm not sure

5     if you said group leader, manager, whatever, of Connect, you

6     put up numbers showing the growth of subscribers.  SecureNet

7     hasn't taken any Connect customers away from Alarm.com, has

8     it?

9     A.     If you just -- the number we looked at together,

10    those were ADT customers, so no, I don't believe SecureNet

11    has taken any of those.

12    Q.     It hasn't taken ADT away; correct?

13    A.     Correct.

14    Q.     That's your biggest customer?

15    A.     That's right.

16    Q.     As far as you know, it hasn't taken any other

17    customers away, either?

18    A.     I don't think so.

19    Q.     You started off by talking about security panels.  Do

20    you remember that?

21    A.     Yes.

22    Q.     And Alarm.com sells security panels; right?

23    A.     No.

24    Q.     They don't sell security panels?

25    A.     No.

1    Q.      And SecureNet as far as you know, it doesn't sell

2    security panels, either, does it?

3    A.      I'm not sure what SecureNet sells.

4    Q.      As far as you know, you never heard that they sell

5    security panels, have you?

6    A.      I would just be speculating.

7    Q.      And as far as you know, SecureNet doesn't sell

8    gateways either; correct?

9    A.      I also don't know that one way or the other.

10   Q.      You just don't know one way or the other?

11   A.      That's right.

12            MR. BLUMENFELD:  Your Honor, I don't have any

13   further questions.  Thank you.

14            THE COURT:  Any redirect?

15            MS. PROCACCIO-FLOWERS:  No, Your Honor.

16            THE COURT:  All right.  Mr. Kerzner, you may

17   step down.  Watch your step.

18            THE WITNESS:  Great.  Thank you.

19            THE COURT:  All right.  Next witness.

20            MS. PROCACCIO-FLOWERS:  Your Honor, at this time

21   we will now show portions of the deposition of Barrie Webb,

22   SecureNet's vice-president of global sales.  And Your Honor,

23   there is a small break between two videos.  And the exhibits

24   referenced in the video will be shown on the screen.

25   Defendant has not objected to these exhibits and we will

1    move them into evidence after the video.

2              THE COURT:  All right.  Thank you.

3              (Video deposition of Barrie Webb:)

4    Q.    I will now mark as Exhibit 9 from the SecureNet

5    website a document called "IGM SecureNet."  So there's no

6    hidden surprise.  You can see where I get some of the

7    terminology from.

8              And, sir, do you see that looking at the first

9    page of this document and one of eight in the upper left

10   corner you can see IGM SecureNet and then you can the

11   website link SecureNetTech.com/hardware/IGM.  It's in the

12   upper left corner.

13   A.    Yeah.

14   Q.    I just want to show you that this was actually

15   printed out from the SecureNet website.

16   A.    Okay.

17   Q.    I would like to now mark as Exhibit 20, the exciting

18   part of any deposition, the Excell spreadsheet.  And we're

19   looking at an Excell spreadsheet where the title of the

20   spreadsheet is Competitive Analysis Dealer Channel

21   Distribution.  And the custodian is listed as Barrie Webb

22   and the author is listed as Barrie Webb.  The creation date

23   is May 14th, 2016.

24             Turning to the page Alarm-SecureNet 0314068, do

25   you see that there is a spreadsheet there entitled

1    Competitive Analysis Dealer Channel Distribution?

2    A.    Uh-huh.  I do.

3    Q.    Now, looking at the top ten customers by revenue, the

4    top ten customers in the United States by revenue as of

5    November 30th, 2017, would be Protect America, Alder, Safe

6    Home Security, and Slomin's; correct?

7    A.    Correct.

8    Q.    And by subscriber count, the top ten customers would

9    be Protect America, Slomin's, Safe Home Security, and Alder.

10   Is that fair to say?

11   A.    It is.

12   Q.    So it's fair to say that the top ten customers for

13   SecureNet represent over 90 percent of the company's total

14   revenue?

15   A.    That's fair to say.

16   Q.    I understand, sir.  But it's fair to say that one of

17   the companies that SecureNet monitors for pricing is

18   Alarm.com; correct?

19   A.    They're one.

20   Q.    And you wrote, on October 25th, 2017, to John Pirrie,

21   VP product at SecureNet, quote, "As such, we believe our

22   main competitor is Alarm.com."

23         Do you see that?

24   A.    I do.

25   Q.    And you believed that was a true statement when you

1   made it; correct?

2   A.      Correct.

3   Q.      So in the October 2016 time frame, you had informed

4   Alarm Capital that, quote:  "There really is only ADT and

5   SecureNet as options for an independent interactive platform

6   provider."  Correct?

7   A.      Correct.  I was using that in context of being able

8   to offer connectivity to those hardware solutions.

9   Q.      What training programs does SecureNet offer?

10  A.      Our training.  Our training is developed to -- as

11  with any service, is developed to enable a dealer to use our

12  service.

13  Q.      Now, sir, what type of customer support activities

14  does SecureNet offer its customers?

15  A.      Not dissimilar to any other software as a service

16  provider, we provide technical support.

17  Q.      And what are the typical forms of technical support

18  that SecureNet provides?

19  A.      Telephony support and online material.

20  Q.      I'd like to now mark as Exhibit 38 a document

21  entitled, "SecureNet Privilege Placement Memorandum" bearing

22  Bates numbers Alarm-SecureNet 529897 to 959.

23          Mr. Webb, you've seen this SecureNet Private

24  Placement Memorandum before; correct?

25  A.      Correct.

1               (End of videotape.)

2               MS. PROCACCIO-FLOWERS:  Your Honor, based on the

3      deposition video, we would offer the following exhibits into

4      evidence:  PTX 009, PTX 020, and PTX 038.

5               MR. MILCH:  No objection, Your Honor.

6               THE COURT:  Admitted without objection.

7               (PTX 009, 020 and 038 were admitted into

8      evidence.)

9               MS. PROCACCIO-FLOWERS:  We will now show

10     portions of the deposition of Andrew Wilson, SecureNet's

11     chief executive officer.

12              THE COURT:  All right.

13              (Videotape deposition of Andrew Wilson:)

14     Q.      And Mr. Wilson, you are currently CEO at SecureNet

15     Technologies?

16     A.      That is correct.

17     Q.      And then if you turn the page, have you seen the

18     patent number 8,473,619 before?

19     A.      Nope.

20     Q.      And looking at the paragraph five, have you seen the

21     patent number 8,478,844 before?

22     A.      Nope.

23     Q.      And looking at paragraph six, have you seen the

24     patent number 8,073,931 before?

25     A.      No.

1    Q.    And then -- so sir, is it fair to say you have not

2    seen the '619 patent, the '844 patent, or the '931 patent?

3    A.    That's correct.  I've been dealing with my attorneys.

4    Q.    So just to be clear, my question is you have not seen

5    the patents before?  I'm sorry, and to be clear -- to make

6    sure the record is clear?

7    A.    I'm aware of the patents; I have not read the

8    patents.

9    Q.    So Mr. Wilson, separate and apart from any legal

10   advice you may have received -- I want to segment that out

11   -- you have not formed an opinion on the patents reflected

12   in exhibits 3, 4, 5, and 6?  And again, that's the '844, the

13   '931, and '635, and '619 patents?

14   A.    Please just give me a sec to look at that.

15   Q.    Uh-hmm.

16   A.    I haven't formed an opinion on any of them.  The only

17   thing we're involved with was -- is the IPR on the '635

18   patent which was involved with my attorneys so I would refer

19   to attorney privilege on that.

20   Q.    And Mr. Wilson, what are your responsibilities with

21   respect to the design of the SecureNet products?

22   A.    The -- as far as the design of the -- its customer

23   features, functionality and customer requests I'm involved

24   in.

25   Q.    Those are the particular areas?

1   A.      Correct.

2   Q.      Has that changed over time?

3   A.      No.

4   Q.      Okay.  Was Amazon a competitor in 2016?

5   A.      No, they were not.

6   Q.      Was Google a competitor in 2016?

7   A.      No, they were not.

8   Q.      Was Alarm.com a competitor of SecureNet's in 2016?

9   A.      Correct.

10  Q.      Okay.  How -- how so would that have been different?

11  A.      How would it have been different in 2009?  Because we

12  didn't provide them those services then.  As I stated

13  earlier, we only provided video service at that stage to

14  them.  They were looking at introducing our services at a

15  later stage.  They were doing it stage by stage.

16  Q.      And so when did SecureNet provide home automation

17  services to Protect America?

18  A.      To my best recollection, probably around 2010, maybe

19  2011, somewhere in that service -- vicinity.  But that's --

20  that's a speculation.  I would have to refer to a contract.

21  Q.      And then, do you see at the bottom there it says

22  software pricing and then there is prices listed there?

23  A.      Correct.

24  Q.      And so there is a standard direct complete

25  interactive row?

1    A.      Yes.

2    Q.      And for SecureNet it list 4.99?

3    A.      Yes.

4    Q.      And for Alarm.com it list 9.99?

5    A.      It does.

6    Q.      For Total Connect, it list 5.99?

7    A.      This is published general information, it's public

8    information and that's to our management's best estimates.

9    Q.      As of the date this document was created?

10   A.      Correct.

11   Q.      Is it accurate to say that SecureNet's offering

12   except for ongoing iterative improvements in the design and

13   operation of the offering has not changed since January 1st,

14   2011?

15   A.      Not significantly.

16   Q.      And do you see it says the new versions have been

17   merely upgrades on the same basic product, do you see that?

18   A.      I do.

19   Q.      Is that an accurate statement, sir?

20   A.      To my best knowledge.  It's always enhancing and

21   adding new functionality and feature to it, but the general

22   architecture of the system is the same.

23   Q.      And has been the same since January 1st, 2011?

24   A.      Correct.

25   Q.      Do you know if Alder -- let me back up.  So we

1    previously discussed Alder is a current customer of

2    SecureNet's; correct?

3    A.      Correct.

4    Q.      Alder became a customer of -- customer of SecureNet's

5    sometime in the past two or three years; correct?

6    A.      Correct.  But they're also a customer of Alarm.com.

7    Q.      Are they still a customer of Alarm.com?

8    A.      That's correct.  We gave our customers choices so

9    they can -- it's a very large customer base of Alarm.com,

10   and they have customers with us.

11   Q.      And the same is true of Protect America, correct?

12   A.      Correct.  Protect America has customers of Alarm.com,

13   as well and so do we.  We offer -- we gave our customers

14   choices.

15   Q.      And you conducted a negotiation with Alder, correct?

16   A.      Correct.

17   Q.      And when you negotiated with Alder as a potential

18   SecureNet customer, you were aware that Alder was an

19   Alarm.com customer?

20   A.      Was I aware they were an existing Alarm.com customer?

21   It's general market information.  Sure.

22   Q.      And in 2009, was Protect America a customer of

23   Alarm.com?

24   A.      Yes, they were.

25   Q.      And you were aware in negotiations with Protect

1    America in 2009 that Protect America was a customer of

2    Alarm.com's?

3    A.      Correct.

4    Q.      Did you personally have negotiations with Safe

5    Home --

6    A.      Yes, I did.

7    Q.      -- Security?  And at the time that you negotiated

8    with Safe Home Security, did you know that Safe Home

9    Security was an Alarm.com customer?

10   A.     I would be aware that they're a customer of many

11   service providers, and -- and Alarm.com I'm sure would be

12   one of them.  I'd be naive to think not.

13                   (Conclusion of videotape excerpt.)

14                   MS. PROCACCIO-FLOWERS:  Your Honor, we will now

15   show portions of the deposition of David Wilson, SecureNet's

16   chief technical officer.

17                   THE COURT:  All right.

18                   (Beginning of videotape deposition excerpt.)

19   Q.     Welcome back, Mr. Wilson.  I'm giving you Exhibit 173

20   that I just marked.  And generally, what is Exhibit 173?

21   A.     Hang on one second.

22                   Generally, it looks like a promotional, maybe an

23   internal sales document -- not internal, but a confidential

24   document that we would use with other customers.

25   Q.     To your understanding, all the IGMs include a Z-wave

1    chip?

2    A.    I believe so.  All the IGMs, yeah, to my knowledge,

3    yes.

4    Q.    And Resolution Products provides the IGM; is that

5    right?

6    A.    Yes.

7    Q.    Okay.  And then after the panel has communicated its

8    unique hardware identifier and panel information to the

9    SecureNet server, how would the server respond to that?

10   A.    There's just a handshake that goes back and forth.

11   There's -- you either belong to the server or you don't.  It

12   completes it.  It establishes an encryption and creates a --

13   provides a session or a conduit to exchange information.

14   Q.    So you would -- so SecureNet would have to do some

15   amount of work to basically get the -- the SecureNet

16   software to work on the customer's servers?

17   A.    A lot of work.

18   Q.    Okay.  So, for example, if there was an update to the

19   server code, would you then -- would SecureNet go and

20   actually install the updates and get it -- get it, make sure

21   it's all working?

22   A.    Yeah.  Yeah.  We do everything from the OS up.

23   Q.    Mr. Wilson, if you could take a look at this document

24   and, for the record, just let me know what it is.

25   A.    It's a -- a presentation that our sales staff would

358

1    use in meetings with prospective clients.

2    Q.    Okay.  I'm going to show you the next exhibit, which

3    I'll mark as 176.

4          And what would be the purpose of a document like

5    this?

6    A.    To instruct -- to instruct someone.

7    Q.    Okay.  Now, generally, this shows the process by

8    which someone could upgrade a Simon XT or XTi panel to

9    include a interactive gateway module, right?

10   A.    Yes.

11   Q.    Now, let me show you what I've marked as Exhibit 180.

12         Mr. Wilson, if you could take a look -- look at

13   this document and let me know what it is.

14   A.    So this is a cheat sheet for bringing a GoControl

15   panel online with SecureNet.

16   Q.    And did SecureNet prepare this document?

17   A.    I think we did.

18   Q.    What would -- the purpose of this cheat sheet that

19   SecureNet prepared regarding the 2GIG GoControl panel?

20   A.    Yeah.  The purpose is just as it's stated there,

21   installation guide to help somebody that's not familiar with

22   it.

23   Q.    So Mr. Wilson, if you could take a look at what I've

24   marked as Exhibit 183.  And first of all, just let me know

25   what that document is, if you know.

1    A.      It's a document explaining our APIs.

2    Q.      And Mr. Wilson, did you participate in the

3    preparation of the document we've marked as 183?

4    A.      I -- I think I -- I think I have been involved in

5    this, yes.

6    Q.      Okay.  And --

7    A.      I may be the original author.

8    Q.      What's the purpose of Exhibit 183?

9    A.      Instructions how to use our API.

10   Q.      So earlier we talked about how the SecureNet server

11   would store in the database information about the security

12   panel associated with a subscribers account, right?

13   A.      Yeah, we did talk about that.

14   Q.      Okay.  And this would allow, for example, a large

15   customer to obtain information about a security panel that

16   had been stored in the database?

17   A.      Yeah.  Purely database.

18   Q.      Okay.  So -- and if we look here, there is a -- it

19   says "JSON Response Example."  Do you see that?

20   A.      I see that.

21   Q.      And so would this be a listing of all the information

22   provided by the SecureNet server in response to this API

23   call?

24   A.      Yes.  It's coming in from SecureNet.

25   Q.      Okay.  So all these fields would be things that were

1    stored in the database associated with a given security

2    panel?

3    A.    Yes.

4    Q.    Is it correct that Protect America is an enterprise

5    customer in that Protect America is running the SecureNet

6    servers?

7    A.    Yes.

8    Q.    And did SecureNet do the installation process of its

9    software into Protect America?

10   A.    Yeah.  We -- we always do the installation of the

11   software.

12   Q.    For all the enterprise customers, SecureNet installed

13   its server software, right?

14   A.    Yes.

15   Q.    And then all the other customers listed on this list

16   that are not enterprise customers would be customers where

17   SecureNet is hosting the server for the customer?

18   A.    Yes.

19   Q.    Yeah.  How -- how would SecureNet deliver the

20   software to, for example, Protect America?

21   A.    So it's -- we get remote access to a server, and we

22   install the software.

23   Q.    Is there a particular person at SecureNet who does

24   the installs?

25   A.    Me.

1    Q.      Which office of SecureNet have you been working out

2    of over the last five years?

3    A.      Primarily here in Utah.

4    Q.      Okay.  What is Exhibit 195?

5    A.      It is our protocol between alarm panels and other

6    devices and our SecureNet cloud.

7    Q.      Did SecureNet create this document?

8    A.      This -- the original author on this one is Resolution

9    Products.  We have created a variant of this, as we've

10   modified it, customized it for other -- other vendors.  So

11   we worked with resolution.  They were the author of it.  We

12   fit a lot of our ideas together and construed this protocol

13   around the early days of 2008 with Protect America.

14   Q.      If you could please take a look at this.  And what's

15   Exhibit 197?

16   A.      An addendum or expansion or addition to the

17   Resolution Products communication process protocol

18   specifically pertaining to Z-wave communication.

19   Q.      Okay.  Have you seen this document before today?

20   A.      Yes.

21   Q.      And how, if at all, has SecureNet used this document?

22   A.      How we've used it?  We've used it to talk Z-wave over

23   the -- to the IGMs and Helix to talk to the Z-wave devices.

24   Q.      So Exhibit 197 provides the API for the SecureNet

25   server to communicate with the Z-wave aspects of the

1    interactive gateway module and the Helix panels?

2    A.    So it allows us to speak to the Z-wave devices

3    through the IGM and Helix from our SecureNet server.

4    Q.    So for example, you could use the API that's set

5    forth in this document to enroll Z-wave devices from the

6    server?  Is that right?

7    A.    It's a -- we discussed the Z-wave enrollment before.

8    So this API would be part of that, putting the gateway into

9    learn mode, and then the customer -- end user would have to

10   press the bind button.  So this is a part of that process of

11   learning and enrolling devices.

12              (Conclusion of videotape deposition excerpt.)

13              MS. PROCACCIO-FLOWERS:  Your Honor, based on the

14   deposition video of Mr. David Wilson, we would offer the

15   following exhibits into evidence PTX-173, PTX-175, PTX-176,

16   PTX-180, PTX-183, PTX-195, and PTX-197.

17              MR. MILCH:  No objection.

18              THE COURT:  Admitted without objection.

19              (Exhibits PTX-173, PTX-175, PTX-176, PTX-180,

20   PTX-183, PTX-195 and PTX-197 were admitted into evidence.)

21              MS. PROCACCIO-FLOWERS:  Thank you, Your Honor.

22   And our understanding is with respect to the deposition

23   video of Mr. Andrew Wilson, the exhibits shown have already

24   been admitted.

25              THE COURT:  Okay.

```
 1                    MR. SMITH:  And Your Honor, Alarm.com's next
 2       witness is Dr. Paul Clark.
 3                    THE COURT:  All right.
 4                    MR. SMITH:  And Your Honor, one question.  We
 5       had some physical exhibits in a box, and I am just
 6       wondering:  Do you want us to mark each item in the box, or
 7       can we just do the boxes?  What would you like me to do?
 8                    THE COURT:  I take it you're going to be
 9       admitting these physical exhibits?
10                    MR. SMITH:  Physical exhibits in a box as part
11       of the exhibits.
12                    THE COURT:  How many of them are there?
13                    MR. SMITH:  There's several components inside
14       there.  They're fairly small, but --
15                    THE COURT:  I don't know.  As far as I'm
16       concerned, one box is fine.
17                    MR. SMITH:  Okay.  Thank you, Your Honor.
18                    THE CLERK:  Please state and spell your full
19       name for the record.
20                    THE WITNESS:  Paul Clark, P-A-U-L C-L-A-R-K.
21                    THE CLERK:  Do you affirm that the testimony you
22       are about to give to the Court and the jury in the case now
23       pinning will be the truth, the whole truth, and nothing but
24       the truth, you do so affirm?
25                    THE WITNESS:  I do.
```

1          THE CLERK:  Thank you.  You may be seated.

2                     DIRECT EXAMINATION

3    BY MR. SMITH:

4    Q.      Good afternoon, Dr. Clark.  I'm Ryan Smith, one of

5    the attorneys for Alarm.com in this case.

6               And Dr. Clark, first of all, could you just

7    briefly introduce yourself to the jury?

8    A.      My name is Paul Clark.  I'm from Baltimore, Maryland.

9    Q.      And generally speaking, what is your role on this

10   case?

11   A.      I was asked to perform an infringement analysis of

12   the SecureNet products as they pertain to the three

13   patents-in-suit.

14   Q.      And for the work that you're doing on this case, are

15   you being paid an hourly fee?

16   A.      I am.

17   Q.      And is your compensation in any way contingent on how

18   this case turns out?

19   A.      Of course not.

20   Q.      And did you help to prepare any demonstratives for

21   purposes of your testimony today?

22   A.      I did.

23   Q.      Okay.  And if we could pull up Slide Number 1 from

24   the 3-PDEM demonstrative.

25               Now, Dr. Clark, could you briefly summarize your

1   post-high school education?

2   A.    Yeah.  I have degrees in computer science, electrical

3   engineering, and computer science.  And I have a doctorate

4   in computer and network security.

5   Q.    And when you obtained your doctorate, what was the

6   general focus of that?

7   A.    It dealt with securing network communications and

8   platforms, in addition to their communications.

9   Q.    And then what did you do professionally after

10  obtaining a doctorate?

11  A.    I actually did that while I was working in the field,

12  so I continued on in the technical field.  That persists to

13  this day.

14  Q.    And generally, what's that technical field that you

15  were doing work in?

16  A.    I deal with largely secure systems to include complex

17  network processing systems.

18  Q.    And does your work involve premises security like a

19  physical location?

20  A.    It -- it does.  I mean, the -- as those systems

21  become digital, the lines have become blurred between

22  network, and computer security, and premise security.

23  Q.    And have you taught any classes on what you're

24  describing as the digital security and physical security?

25  A.    Absolutely.

1    Q.      Okay.  And, also, have you done any work for any

2    governmental body or agency involving security?

3    A.      I've been involved in civilian and DOD government

4    agencies doing security-type work, systems deployment, as

5    well as commercial customers.

6    Q.      And when you said the "DOD," what's that?

7    A.      Department of Defense Pentagon-related agencies.

8    Q.      What about -- and on the screen, are there other

9    agencies that you've done some -- some consulting work for?

10   A.      Yeah.  Some of the intelligence agencies, for

11   instance, who were concerned about securing things like

12   SCIFS, those are classified facilities that they want to

13   control access to.

14   Q.      Okay.  And have you -- for some of that work you were

15   doing with the government, did you receive any awards or

16   accolades?

17   A.      We got a few Al Gore Hammer Awards for one of the

18   network processing systems that we deployed.

19   Q.      And now you're testifying here today.  Have you

20   testified in some other forum besides a courtroom about

21   security issues?

22   A.      I was asked to testify before Congress on physical

23   and digital countermeasures for border security several

24   years ago.

25   Q.      And are you an inventor on any patents?

1    A.      I have four patents.

2    Q.      And generally, what's the overall subject matter of

3    those patents?

4    A.      They're largely -- they deal largely with advanced

5    security measures for communicating between what we call

6    security events.

7    Q.      And there were some aspects of the software patents

8    that you invented or some aspects of the patents that you

9    related to software?

10   A.      Yeah.  They're implemented using a combination of

11   hardware and software.  That's how most systems are

12   deployed.

13   Q.      Based on your education and experience, do you

14   consider yourself to be an expert in network-based security

15   systems?

16   A.      Yes.

17           MR. SMITH:  And at this time, Your Honor,

18   plaintiffs would offer Dr. Clark as an expert witness in the

19   field of network-based security systems.

20           MR. MILCH:  No objection, Your Honor.

21           THE COURT:  Admitted without objection.

22   BY MR. SMITH:

23   Q.      If we could turn to Slide 2, Dr. Clark.  What's shown

24   on Slide 2 generally?

25   A.      These are the patents-in-suit that were filed

1   approximately a decade ago.  The '931, the '619, and '844

2   share common Figure 1, and they -- the claims of these

3   patents are considered for various aspects of that system.

4            The '931 deals with touchscreen.  The '619 deals

5   with what are called security devices and integrating those

6   into the system.

7            And the '844 deals with integrating network

8   devices at the gateway.

9   Q.    And do you see at the bottom of slide two there is,

10  for the '931 there is claims 1 and 9, and then claims 1 and

11  55 for the '619 patent, and claim 48 for the '844 patent, do

12  you see that?

13  A.    Those are the five claims that we're going to present

14  today.

15  Q.    Okay.  And in addition to looking at the patents

16  themselves, did you attempt to analyze any information about

17  the back and forth between the Patent Office and the

18  inventors before the patents issued?

19  A.    Well, as part of the process of issuing a patent,

20  there is a file history that's created.  So you have to look

21  at that to make sure you know anything that's disclaimed and

22  what the patentee is telling the Patent Office as part of

23  getting the patent issued.

24  Q.    Did you look at that written record in this case for

25  these three patents?

1    A.      Extensively.

2    Q.      And now, did you analyze or look at any testimony

3    from any of the inventors of the three patents?

4    A.      Yes.  I relied on inventor testimony, including

5    Mr. Dawes as well as SecureNet witnesses.

6    Q.      Now, I'm going to go and take a little more detail

7    look into the patent.

8            MR. SMITH:  Your Honor, if it's okay, can I

9    approach the witness with a laser pointer?

10           THE COURT:  Sure.  Yes.

11   Q.      And I'm going to try to set it up, Dr. Clark, so you

12   can see this board right in front of this table.  Dr. Clark,

13   can you see -- this is figure 1, do you want to put it where

14   you can see it?

15           THE COURT:  If you're going to put it like that,

16   Mr. Milch, you can come stand someplace where you can see

17   the board while he's pointing at it.  Do we not have an

18   easel?

19           MR. SMITH:  We can do an easel if that's easier.

20           THE COURT:  I'm not entirely sure the witness

21   will be able to see it.

22           MR. SMITH:  Can you see that, Dr. Clark?

23           THE WITNESS:  Not well.

24           THE COURT:  Don't those things have extended

25   legs where you can raise it up a little bit?

1    BY MR. SMITH:

2    Q.    Now, Dr. Clark, can you see that?

3    A.    Yes.

4    Q.    I'm sorry for that delay, Dr. Clark.

5          What's on the board that we just put up, what's

6    that?

7    A.    This is the figure 1 from the patents and you can see

8    at the bottom of each of the front pages of the bottom.

9    Q.    What -- you may want to use the laser pointer,

10   although I trust you not to hit me in the eye with it.

11         What's showing here on the lower left-hand

12   portion of this figure?

13   A.    So the lower one here is the customer premise, what

14   you think of as the claims we'll refer to it as a first

15   location.

16   Q.    If you look inside this, what is this box here?  It

17   says iControl iHub technology.

18   A.    That's the gateway that's been mentioned.  That's the

19   interface to all the various networks within the customer

20   premise.

21   Q.    What's this below that?  You see this box that says

22   home security system, what's that referring to?

23   A.    That's the old style security panel and things like

24   sensors and other things that would be connected to it.

25   Q.    What's the thing next to it, says touchscreen keypad,

1   can you explain what that is?

2   A.      That's the touchscreen that's at issue in the '931

3   patent.

4   Q.      And then there is a box, a self-monitoring device.

5   Can you just briefly explain what that is?

6   A.      Those are smarter devices that are connected to the

7   system.

8   Q.      Okay.  And then I guess if you look at the upper

9   left-hand corner, what is that?  It says iControl supported

10  client types.  What's that referring to?

11  A.      Those are user devices, roughly, so you would think

12  of those in the context of this case, things like iPhones or

13  Android devices.

14  Q.      And then if you look at over on the right-hand

15  portion, the upper portion, it says operator data center and

16  there is some stuff inside.  What is that referring to?

17  A.      Those are the remote servers with the patent claims,

18  we'll refer to it as being a second location.  And those are

19  the servers that monitor and control events from the

20  customer premise.

21  Q.      And when you say a second location, is there a first

22  location?

23  A.      The first location is the customer premise.

24  Q.      Why don't we go to slide number 7 for the

25  presentation.  And Dr. Clark, do you see that there is a

1    table here on slide 7 with the title Claim Constructions?

2    A.    Yes.  Generally speaking, the terms in the patent are

3    given the meaning as they would have been understood by like

4    a network engineer with about three years experience at the

5    time the patents were filed.  And then there are disputed

6    terms that the Court gives us the definition for.  And we

7    have to apply those when we're doing the claim analysis to

8    make sure we're using the Court's definition.

9              So the first one is automatically, which the

10   Court tells us means without user input.

11             The gateway that you've heard mentioned is a

12   device at that first location for interconnecting a local

13   area network and a separate security panel at a first

14   location to the server at a second location.  So it's

15   basically the gateway is going to interface the internet to

16   the local area network to the security panel.

17   Q.    What is the next one, connection management

18   component?

19   A.    This one is different than the rest of them because

20   it has both the function and the structure.  And the

21   connection management component is roughly going to be the

22   servers at the second location.  And it has the function of

23   automatically establishing a wireless coupling with a

24   separate security system and forming a security network that

25   is an overall security network by automatically serving the

1   security system components of the security system and

2   integrating communications and functions of the security

3   system, so it's the component that's going to be on the

4   server and it's going to integrate the remote function of

5   the security sensors and other network devices.

6          It will also have a structure, the Court has

7   told us that will be software executing an algorithm that's

8   shown in figures 12 and 14 of the patent.  And when we get

9   to it, we'll go through those steps.

10  Q.    You see below that, there is a term security system?

11  A.    Yes.  The security system as we've been saying is

12  simply the security panel and one or more components coupled

13  to that security panel.  Doors and window sensors, things

14  like that.

15  Q.    And then below that we have the security system

16  components.  Do you see that?

17  A.    Yep.  Those are the components I just mentioned,

18  basically the sensors.

19  Q.    And then beneath that we have touchscreen?

20  A.    Yes.

21  Q.    Was that a claim that was also construed by the

22  Court?

23  A.    It's construed, but it's construed to be just what

24  you think which is a display screen that you can touch and

25  select things.

1   Q.      Finally what about the term objects, was that one

2   that was construed, too?

3   A.      Yeah.  The objects are actually going to be data,

4   which is data stored in the remote servers that represent

5   information about the components or devices at the first

6   location.  So think of database records.

7   Q.      Now, when you did your -- I think you mentioned you

8   did an infringement analysis.  When you did that, were you

9   applying the definitions that we just went through on the

10  screen to that analysis?

11  A.      Yes.  You're required to do so.

12  Q.      What about, there is more words in the patent than

13  just the ones we have seen on the screen here.  How did you

14  deal with those other words?

15  A.      Those, as I said, would be a security network

16  engineer with a few years experience, a decade ago, you

17  would look at it through his or her eyes.

18  Q.      Now, if you could turn to PTX 173, and display it on

19  the screen.

20          Now, as part of your work on this case, did you

21  look at technical documents that came from SecureNet?

22  A.      Yes, they produced a lot of documents.

23  Q.      Did you review those documents?

24  A.      I did.

25  Q.      And is exhibit PTX 173 an example of one of the

1    documents that you reviewed?

2    A.    It is.

3    Q.    And why don't we go to the page ending in 183.  Put

4    that on the screen.  And if we could blow up.  Do you see

5    there is a heading that says Supported Panels and Gateways?

6    Do you see that?

7    A.    Yeah.  Those are examples of panels and gateways that

8    are supported by the SecureNet systems.

9    Q.    Do you see one of them says 2 GiG control, do you see

10   that?

11   A.    Yes, that's the Go!Control.

12   Q.    As part of your analysis and work on this case, did

13   you physically look at one of those?

14   A.    That's one of the ones that I plugged in and took

15   apart.

16   Q.    Why don't we go to the next page ending in 184.  Do

17   you see, Dr. Clark, it says Supported Panels (Retrofit), do

18   you see that?

19   A.    I do.

20   Q.    And then if you look kind of towards the left-hand

21   portion of the screen, interactive gateway module at IGM, do

22   you see that?

23   A.    I do.  That's the gateway that we have been talking

24   about.

25   Q.    There is six other devices to the right of that.

1    What are those?

2    A.    Those are examples of devices that are supported by

3    SecureNet that you can add a gateway to to add the functions

4    like network connectivity and other functions.  So when I

5    was doing my analysis, I installed a system with the Simon

6    XTi, and it had one of these gateways in it.  And I was able

7    to operate it for some number of months.

8    Q.    When you say these devices, in terms of these six

9    boxes, what's the general type of device that we're looking

10   at here?

11   A.    They're all security panels which you can add a

12   gateway which is retrofitted.

13   Q.    What do you mean by adding a gateway?

14   A.    You can take one of these gateway modules, the IGM,

15   and plug it into the box, you connect it as we saw you take

16   the enclosure apart and you put the module in the box and

17   then it provides these different kinds of connectivity to,

18   for instance, networks that will do home automation or door

19   locks or things like that.

20   Q.    What I'm going to do, Dr. Clark, is I'm going to hand

21   you a box that we'll mark as PTX 743.

22           MR. SMITH:  And, Your Honor, may I approach the

23   witness with this?

24           THE COURT:  Yes.

25   BY MR. SMITH:

1    Q.      Now, Dr. Clark, do you have before you a box that

2    we've marked as PTX 743?

3    A.      Yeah.  This is the box that I ordered from Protect

4    America and installed in my office.

5    Q.      And when you say you ordered, how did you order it?

6    A.      I went online and basically ordered it and they

7    called me and I gave them my credit card and they shipped

8    this.

9    Q.      And since you have now opened the box, can you locate

10   any security panel in the box.

11   A.      So this is the Simon XTi that we have been

12   discussing.

13   Q.      And is that the panel that you received from Protect

14   America?

15   A.      It's the one in the picture up there.

16   Q.      And are there any other devices in the box?

17   A.      Yes.  The panel comes with these sensors that are

18   numbered, so these are -- you stick these on your windows

19   and doors and they detect when they're open or not.  There

20   is a well-used camera that came.  And also a door lock that

21   I ordered separately that they delivered.

22   Q.      And so after you ordered this equipment from Protect

23   America, what did you do after you received it?

24   A.      I received notifications from them to call them so

25   that we could go through the enrollment process.  And so I

1    installed the panel and installed the window sensors, the

2    door sensors and the camera.  And then when I spoke to them,

3    they asked me to stand at the panel and they put it in

4    enroll mode and it went out and found the three door and

5    window sensors that I installed out of the 16 that came in

6    the box.

7                 MR. SMITH:  Your Honor, plaintiffs would like to

8    move PTX 743 into evidence.

9                 MR. MILCH:  No objection.

10                THE COURT:  Admitted without objection.

11                (PTX 743 was admitted into evidence.)

12   BY MR. SMITH:

13   Q.    Did you actually speak with anyone from Protect

14   America or was it just all online?

15   A.    No, I was speaking with them when they put the panel

16   in enroll mode.

17   Q.    And let's go back to PTX 173 that we looked at

18   previously.  And if you could put up the page ending in 204.

19   Can we expand that?  Do you see this document or this page

20   that has a heading SecureNet architecture?

21   A.    That's the architecture that's defined by SecureNet.

22   Q.    And generally, and you can use the laser pointer if

23   you want, but at a general level, what is this architecture

24   that's shown here?

25   A.    So that's showing the contents of the customer

1   premise here, the first location.  You have a wireless

2   connection through cell, or a wired connection both

3   connected to the internet and to the data center which is

4   the SecureNet data center here, that includes servers and

5   storage for objects and events that are in the home or the

6   customer premise.

7   Q.    And I think earlier we were talking about figure 1

8   where you said there was a first location and a second

9   location.  Did you find that same first location and second

10  location in the architecture documents?

11  A.    Sure.

12              THE COURT:  There is going to be an objection

13  and I'm going to sustain it.

14              MR. SMITH:  Okay.  I'll move on.

15              THE COURT:  And also to strike the last answer.

16  BY MR. SMITH:

17  Q.    Now, did you review any sort of I guess code for

18  servers that you just mentioned were in the SecureNet system

19  as part of your analysis?

20  A.    I did.  I reviewed the source code for the SecureNet

21  servers as well as for the SecureNet app that runs on the

22  defined list.

23  Q.    Maybe we can move to another document to show that

24  client device.  Why don't we put PTX 009, please, page six

25  of eight.  If you could blow that up at the top.  We're

1    looking at PTX 009 and then on the screen there is this

2    diagram.  What's generally being depicted here?

3    A.    This shows how the custom premise that fits into that

4    overall architecture.  So you've got the security system,

5    the panel that can be connected like to sensors.

6         You have a gateway that will provide z-speed

7    wave conductivity.  It will talk to home-automation-type

8    devices as well as security devices like door locks,

9    cameras, things like that.  And those are all connected and

10   accessible from user devices over the Internet.

11   Q.    Okay.  When you said you reviewed source code for a

12   mobile app, where would that mobile app fit into this

13   picture, if anywhere?

14   A.    On the phone.

15   Q.    Now, is this diagram, the one we just looked at

16   before this, are those ones that you put together yourself,

17   or are those ones that came from the SecureNet

18   documentation?

19   A.    No.  Those were SecureNet's.

20   Q.    And when we were talking about those devices, I think

21   you mentioned there's home control by Z-wave, Wi-Fi on those

22   devices.  Did you get any of those sort of devices from the

23   Protect America order that you did?

24   A.    Yes.  I ordered my Simon XTi with the Z-wave gateway

25   module in it.

1    Q.    Okay.  Why don't we go to Slide 12.  And Dr. Clark,

2    what's shown here in -- I'm sorry.  Actually, this is Slide

3    9.

4              So Dr. Clark, what's shown?  What's being

5    depicted here?

6    A.    So what we've done is we've taken the pictures, and

7    we're showing what's actually in the home here and how it

8    communicates with the SecureNet servers there.

9    Q.    And so the home is that the little house that's on

10   the upper left-hand portion of that, the lower document?

11   A.    That's right.

12   Q.    And was looking at these two documents together from

13   SecureNet helpful in your analysis?

14   A.    Yes.  I think we can use that to identify and point

15   out where the claim elements are when we do the analysis.

16   Q.    Okay.  Why don't we go to the next slide, please.

17   Number 10.

18              And now, was it your understanding that to

19   infringe a patent claim, the accused product had to have

20   each of the elements of each claim?

21   A.    Every one has to be present.

22   Q.    And did you do an analysis to figure out if the

23   SecureNet system had each of the elements of the asserted

24   claims of the three patents?

25   A.    I did.

1  Q.     Okay.  And which is the first patent that you're

2  going to talk about?

3  A.     We're going to talk about the '931 which talks about

4  how the touchscreens fit into the architecture of the

5  patents.

6  Q.     So this may take a little while and be a little

7  tedious, so I apologize Dr. Clark, but I think we're now

8  going to try to walk you through the different claim

9  elements step by step.

10         And so let's start with claim 1 of the '93 --

11  '931 patent.  So just generally if we take a look at this

12  slide we have on the screen --

13  A.     Yes.

14  Q.     -- 11, what's being shown here on the left-hand

15  portion?

16  A.     So that's a claim which may have a preamble and then

17  some number of claim elements.  Each of which we must find

18  and demonstrate that we found.

19  Q.     And then on the right-hand portion, what's being

20  shown on the right-hand portion of the slide generally?

21  A.     Generally, that's going to show where on that

22  architecture these elements fall, and then we're going to go

23  to documents for further evidence.

24  Q.     Okay.  So based on your analysis, does the SecureNet

25  system have a device comprising a touchscreen at a first

1   location wherein the touchscreen includes a processor

2   coupled to a local area network (LAN) and a security system

3   at the first location?

4   A.    It does.

5   Q.    Okay.  And with respect to this particular

6   demonstrative, can you explain your opinion?

7   A.    Sure.  So the panels here have touchscreen.  Some of

8   them have touchscreen capability.  And then the phones when

9   they're in the home, as they often are, would also have a

10  touchscreen that would meet this limitation.

11  Q.    Okay.  And then there's that blue box that you have

12  on the right.  What's being -- why did you annotate that?

13  A.    Because you have to couple to the local area network

14  which is going to be either Z-wave or Wi-Fi, as it says

15  here.

16  Q.    And then the green annotation, what's that showing?

17  A.    That's the security system that we've been talking

18  about that has the security panel and some -- and some

19  number of these sensors and resides at the first location

20  which is the custom premise.

21  Q.    Okay.  Now, did you consider whether or not a mobile

22  phone or Smartphone running the SecureNet app could be a

23  touchscreen?

24  A.    Yes.

25  Q.    Okay.  What did you conclude?

1    A.     Absolutely, it can.

2    Q.     Why don't we go to the next slide, Number 12, and

3    what's being shown here in this Slide Number 12?

4    A.     So this is showing that the supported Apple and

5    Android devices have a touchscreen, according to the Court's

6    construction.  They respond to touch and include a processor

7    that's depicted next to it.

8    Q.     Okay.  And then the language says, "a touchscreen at

9    a first location."  Did you consider whether these

10   Smartphones could be at a first location?

11   A.     Yes.  I mean, they don't have to be there all the

12   time, but they certainly function at the first location.

13   Q.     Why don't you turn in your binder to PTX-422, please.

14          MR. SMITH:  And I'd move to admit PTX-422 into

15   evidence.

16          MR. MILCH:  No objection.

17          THE COURT:  Admitted without objection.

18          (Exhibit PTX-422 was admitted into evidence.)

19   BY MR. SMITH:

20   Q.     And why don't we go to the page ending in 624 from

21   PTX-422.  Okay.

22          Just, first of all, what is -- at a general

23   level, what is PTX-422?

24   A.     It's talking about the Smartlink that is how you

25   would use your phone to interact with the security system.

1   Q.    When you say Smartlink, what do you mean by

2   Smartlink?

3   A.    That's the -- essentially the app that's running on

4   the phone used to control the phone system.

5   Q.    And did you -- who provides the app, the Smartlink

6   app?

7   A.    That comes from SecureNet.

8   Q.    Okay.  So now, let's go to the page which is on the

9   screen ending in 624.

10        Do you see where it says "Controlling Your

11   Security System"?  Do you see that?

12   A.    Yes.

13   Q.    And now, did you actually use -- based on your work

14   in this case, did you actually use that app, the SecureNet

15   app?

16   A.    Yes.  It's on the phone in my pocket, in fact.

17   Q.    And did you use it to control the Protect America

18   security system?

19   A.    Yes.  I was able to arm and disarm with the phone.  I

20   was able to look at cameras and stuff.

21   Q.    And are there different ways of arming the security

22   system?

23   A.    Yes.  I mean, you can arm it at the panel.  There's a

24   key fob in the box that will let you do it.  And then you

25   also can do it through the app.

1   Q.      And when you do it through the app, if you look at

2   the screen, you see it says Away Mode?

3   A.      Yes.

4   Q.      What is Away Mode for, if you know?

5   A.      That means you're out of the house, and so it's going

6   to arm everything.

7   Q.      Okay.  And what's the next one down?  It says Stay

8   Mode.

9           Do you see that, Stay?

10  A.      Yeah.

11  Q.      What's Stay?

12  A.      That means that you're in the house, but you want to

13  be notified if somebody opens the door or a window.

14  Q.      Okay.  What's below that where it says Night, what's

15  that?

16  A.      Night mode sets up the sensors, any motion sensors in

17  rooms where you normally wouldn't be at night, in addition

18  to the away mode.

19  Q.      Now, were you here for the opening statements in this

20  case?

21  A.      I was.

22  Q.      And did you hear SecureNet's counsel mention that,

23  Well, the touchscreen wouldn't be used at the first location

24  or wasn't intended to be used?  Did you hear something like

25  that?

1    A.      Yeah.  I would -- I disagree with that.

2    Q.      Why would you disagree?

3    A.      Well, I mean, for instance, it would be imminently

4    reasonable to set to night mode from your bedroom.

5    Q.      What would be the advantage of being able to set it

6    on your phone, set night mode when you're sitting in bed?

7    A.      Well, you don't have to go downstairs and do it, and

8    then go back up.

9    Q.      Okay.  And when a user is in their home with the

10   phone, when you were using it, were you on the Wi-Fi

11   network?

12   A.      Yes.  I used it both ways when I was testing it.  It

13   could connect to the local Wi-Fi network or it could connect

14   through cellular.

15   Q.      Okay.  Let's take a look at the next slide, please.

16   So this is Number 14.  Do you see a demonstrative on the

17   screen that says "Example Security Panels With Touchscreen"?

18   A.      Yes.  I guess I don't have the GoControl here, but --

19   Q.      Okay.

20   A.      -- the XTi certainly.

21   Q.      And my question is:  Did you look at whether or

22   consider whether a security panel could have a touchscreen

23   associated with it?

24   A.      Yes.

25   Q.      Okay.  And are these examples of security panels with

1   touchscreens on them?

2   A.      They not only have touchscreens, but they also have

3   LAN interfaces, too.

4   Q.      Okay.  And so when you looked at the '931, would a

5   user need to have both, a mobile app bearing a touchscreen

6   and a security panel with a touchscreen for there to be

7   infringement, or would it just be one or the other?

8   A.      Either one would qualify as the touchscreen of the

9   claim, but I mean we could -- we can go through it.

10  Q.      Let's go to the next slide, please.  Okay.

11          And going back to the comparison between the

12  claim and the SecureNet system, looking at this language,

13  does -- based on your review, does the SecureNet system have

14  a plurality of interfaces presented by at least one

15  application executing on the processor of touchscreen and

16  presented to user via a touchscreen?

17  A.      Absolutely.  I mean, both of these devices have that

18  capability.

19  Q.      And if we could click to the next portion of this

20  demonstrative.  If we could go to the next section of the

21  demonstrative, please.

22          And then do you see the language that says,

23  "wherein the plurality of interfaces include a security

24  interface and a network interface wherein the security

25  interface provides the user with control of functions of the

1    security system and access to data collected by the security

2    system"?  Do you see that?

3    A.    Yes.  So --

4    Q.    And with reference to this demonstrative, were you

5    able to find a security interface?

6    A.    Sure.  So you have a security interface here with the

7    locks, with the cameras, and then you also have Z-wave

8    interface down here, and also, the ability to control

9    lights.

10   Q.    And when you say the Z-wave interface and controlling

11   lights, is that in reference to the network interface that

12   allows a user to transfer content to and from the wide area

13   network of the LAN?

14   A.    Yes.

15   Q.    And you found that element also on the SecureNet

16   system?

17   A.    Well, the SecureNet systems are able to monitor that.

18   Q.    Now, let's take a look at a document we've already

19   looked at, PTX 422, but if you could go back to that.  And

20   in particular, the page ending in 626.

21              And I think earlier in your testimony, you did

22   mention the word Z-wave.

23   A.    Yes.

24   Q.    Can you just briefly explain what that is?

25   A.    Z-wave is a network protocol like Wi-Fi that you have

1    in your home that allows Z-wave and it enables devices like

2    thermostats, lights, door locks, cameras, all types of

3    devices to communicate with the common protocol.  So you

4    have to have the equivalent of a network hub that

5    communicates using Z-wave in order to control those devices.

6    Q.    Can you provide an example of something you could do

7    if you had a Z-wave light in your house?  What could you do

8    if you had that?

9    A.    Well, you can program events, for instance, where a

10   door opens, and the light goes on.  You could have a motion

11   sensor outside that turns on a flood light.  There are

12   various applications.

13   Q.    So if you open your door, maybe the light turns on,

14   for example?

15   A.    Yeah, your defined events.

16   Q.    And then if we take a look at what's shown here from

17   PTX 422, when it's talking about -- when it's referencing --

18   when it says controlling lights and appliances --

19   A.    It's talking about the app, and it's the ability to

20   control Z-wave devices.  And so here on your phone, you can

21   see we can tell the status of those lights and turn them on

22   and off.

23   Q.    Okay.  And why don't we go to, I think, the page

24   before this.  Yeah, 625.

25              Do you see at the top of the page it says

1   "Viewing Live Video and Recordings"?

2   A.      Yes.

3   Q.      Okay.  And I believe you had mentioned that you had

4   utilized the video camera that you got in that box?

5   A.      Right.  I installed that outside the back door of my

6   office.

7   Q.      Okay.  And could you use the video camera with the

8   mobile application?

9   A.      I did.  I was able to pull up realtime video and also

10  take recordings.

11  Q.      And what's being depicted generally in this portion

12  of the SecureNet document, what are they talking about?

13  A.      They're showing the app interface into the camera.

14  Q.      And I want to direct you to there is an icon that

15  looks like a microphone and it says microphone will launch

16  the push-to-talk functionality.  Do you see that?

17  A.      I do.

18  Q.      What is that referring to?

19  A.      That allows you to issue commands to a camera in the

20  event that it has a microphone.

21  Q.      So in the situation with the microphone, could you

22  then talk into your phone and somebody who is in front of

23  the camera would be able to hear you, something like that?

24  A.      Right.  Exactly.  I mean, if I turn on the camera and

25  my son is not doing his homework, for instance, I could tell

1    him to do it.

2    Q.    And is the audio that's going from your phone to the

3    SecureNet server, is that an example of content being

4    transferred?

5    A.    Sure.  I mean, it's audio content that you would be

6    sending.

7    Q.    And then what about when you view the video on your

8    phone, is that an example of content you view?

9    A.    That would be video content delivered to the app.

10   Q.    Now, I want to go to the next demonstrative in the

11   presentation.  Can we take a look at this demonstrative.

12   You see it says example security panels with touchscreen.

13   Do you see that?

14   A.    This is the Go!Control.

15   Q.    Were you able to find any example of network

16   interfaces and security interfaces in the Go!Control camera?

17   A.    Sure, you see check networks, it has door locks sort

18   of like what we saw in the phone, it has thermostats and

19   other things, like rules to define some of those events that

20   we were talking about.

21   Q.    Would that be part of a network interface in your

22   view?

23   A.    Yeah, the check network would be one.  We have an

24   example over here where it's getting the current weather off

25   the internet.

1    Q.     And from this touchscreen that you're talking about

2    on the Go!Control panel, could you do things like arming and

3    disarming the panel from the touchscreen?

4    A.     Yes.  It provides that capability.

5    Q.     Is there a space on the screen to be able to do any

6    sort of arming and disarming?

7    A.     Yes, this is just an example of the interface.

8    Q.     What's being shown on this next demonstrative,

9    another slide entitled Example Security Panels with

10   Touchscreen?

11   A.     This is the Simon XTi, and it has again the ability

12   to control lights or door locks.

13   Q.     And were you able to find both a network interface

14   and a security interface in the Simon XTi panel?

15   A.     Yes, as the interface to the locks, and also it will

16   have an interface on it as well as the ability to control

17   non-security devices.

18   Q.     Why don't we go to the next demonstrative.  This is

19   going back to the '931 patent and we're at the last element

20   of claim 1.  Do you see the first portion reads, "A remote

21   server at a second location, wherein the remote server is

22   coupled to the touchscreen, the remote server managing at

23   least one of the touchscreen and the security system."  Do

24   you see that?

25   A.     That's the SecureNet servers at the second location

1    have to have the ability to communicate with the first

2    location, and in particular the security system, the panel.

3    Q.    And then did you find that portion of the claim

4    element that I just read in the SecureNet system?

5    A.    Yeah.  I think we just showed a device with a

6    touchscreen that communicates with the remote servers.

7    Q.    And then the remaining portions the claim reads,

8    "objects are maintained on the remote server that correspond

9    to at least one of at least one security system component of

10   the security system and at least one network device of the

11   LAN."

12             Do you see that language?

13   A.    I do.  What that says is there has to be an object or

14   data that represents say panel status and/or device status

15   on the LAN, maybe the door locks or the lights.

16   Q.    And did you find that last portion of the claim

17   language in the SecureNet system?

18   A.    Yes.  There is an API that shows it and also the

19   database scheme in itself shows that that data has been

20   maintained at the SecureNet servers.

21   Q.    Why don't we go to PTX 183, please, the first page.

22   I think you said something about an API in your testimony

23   just now?

24   A.    Right, that's the programmer interface, this is

25   basically the computer calls that can be made to interact

1   with data that's stored on the SecureNet servers.

2   Q.    And so is it -- when you say API, is that talking

3   about a server talking to some other computer?

4   A.    Well, the server is the computer, it's software

5   running on a computer.  So you have various applications

6   that need to make low level data calls, and so this will

7   tell you what types of data when we're down at that level

8   are actually being stored.

9   Q.    Why don't we go to the page ending in 1802 in this

10  document.  And do you see here there is a heading that says

11  Get Account Gateway List with Zwave Devices.  Do you see

12  that?

13  A.    Yes, that's an example of an API call.

14  Q.    When you say an API call, what would you get in

15  response if you tried to make that call?

16  A.    That's below the JSON response example is going to

17  return things like a gateway ID, device ID, location, it

18  said basic type, generic type, a product ID, a product type,

19  these are all information about the device and its state.

20  Q.    So are you saying that the server is basically

21  telling another computer that it's communicating with that

22  this is the information that I have and get a database?

23  A.    Yes.  What happened as we heard from an earlier

24  testimony is they go out and they poll through the gateway,

25  they poll the panel, and they find the device status for all

1    these devices on a periodic basis, and that status is stored

2    in the database at the SecureNet servers.

3    Q.     And you said earlier testimony.  Do you recall which

4    witness you were referring to?

5    A.     Mr. Wilson.

6    Q.     And which, was it Mr. David Wilson or Andrew Wilson?

7    A.     Yes, their CTO.

8    Q.     You were referring to his testimony about SecureNet

9    having the database?

10   A.     Yes.

11   Q.     Now, why don't we go to the page ending in 1806,

12   please.  And if we pull up the heading that says Get Zone

13   List.  Do you see that?

14   A.     Yes.

15   Q.     And generally what is being described here?

16   A.     Usually within the customer premise there are zones,

17   and lots of times those are individual rooms, but they could

18   also be a first floor, a second floor, and an outdoors, for

19   instance.  And so the user in the panel can define these

20   zones and group the various devices into a zone so maybe you

21   have a TV and lights in your living room and window sensors

22   in the living room or something like that.

23          And this call allows the panel again as we saw

24   from the earlier testimony, to poll and get zone information

25   that is stored in the SecureNet database.

1   Q.      Why don't we go to PTX 195, the cover of that.  And I

2   believe you said you were here for the testimony, the

3   videotape testimony of David Wilson; is that right?

4   A.      Yes, I have been here both days.

5   Q.      And is this one of the documents that Mr. Wilson was

6   talking about in his testimony?

7   A.      Yes.

8   Q.      And did you review PTX 195 as part of your work in

9   the case?

10  A.      I did.

11  Q.      Generally what is PTX 195?

12  A.      It talks about the protocol for talking with

13  Resolution Products, that is the communication language

14  that's spoken over the internet from the SecureNet servers

15  to the customer premise.

16  Q.      And would this be -- so you're talking about the

17  server on one hand is communicating to a gateway, you

18  mentioned earlier, on the other end?

19  A.      That's correct.

20  Q.      Why don't we go to the page of this document ending

21  in 291, the bottom, and extending over to the following page

22  where it begins with -- and if we look at the very -- it's a

23  section -- strike that.  Heading three, it's an overview.

24  Do you see that?

25  A.      Yes.

1    Q.      And do you see the language it says the gateway

2    communicates with the panel via a serial bus.  Do you see

3    that?

4    A.      Yes.  They talk over a serial connection.

5    Q.      What do you mean, what's a serial bus?

6    A.      It's a connection between the two modules, you have

7    the gateway module and you have got the module for the

8    panel, and they communicate what are called serial

9    communications.

10   Q.      Is that a standardized type of communication?

11   A.      Yes, there are various types of serial

12   communications, but they're standardized protocols.

13   Q.      The next sentence says the gateway continuous polls

14   the panel for any changes in status.  Do you see that?

15   A.      Right.  So the gateway on a periodic basis queries

16   the panel for its status, and then sends that off one

17   request to the SecureNet server.

18   Q.      When data from the gateway is going to the server, is

19   it stored somewhere?

20   A.      Yeah, in the database using, for example, the API

21   that we looked at.

22   Q.      Why don't we go to the next, another page of this

23   document, ending in 308.  And then do you see the section

24   7.11, Send Gateway Status?

25   A.      Yes.  That's a packet that's sent from the gateway to

1    the SecureNet servers.

2    Q.    And when you say a packet, what sort of information

3    would be generally included in the packet going from the

4    gateway to the SecureNet server?

5    A.    Well, whether or not it says here -- it says here

6    whether or not it's actually connected to the panel, various

7    zwave status and other things like that.

8    Q.    Okay.  If we could go ahead a couple of slides to the

9    claim 9.

10              THE COURT:  All right.  Actually, Mr. Smith,

11   let's break for lunch now.

12              All right.  Members of the jury, we'll break for

13   lunch.  We'll start again at two o'clock.

14              All right.  Can you take the jury out, please.

15              (Jury leaving the courtroom at 1:05 p.m.)

16              THE COURT:  All right.  We'll be in recess for

17   lunch.

18              (A luncheon recess was taken.)

19              THE COURT:  All right.  Let's get the jury in

20   and continue.

21              MR. MILCH:  Your Honor, Mr. Trundle is in still

22   the courtroom.  We haven't released him.

23              THE COURT:  You want to ask questions of him?

24              MR. YOON:  Your Honor, this is the first we have

25   even heard of this.  Obviously he's going to be here, but

1    I'm a little confused as to what they intend to do.  They

2    had him here on cross.  They had not indicated anything,

3    Your Honor.

4              THE COURT:  I guess we didn't talk about the

5    general policy of what to do with all the witnesses while

6    they're on the stand I guess; right?

7              MR. YOON:  I didn't hear a discussion.  At the

8    same time, Your Honor, we didn't preclude when they were

9    asking Mr.  Trundle they brought all --

10             THE COURT:  I understand they didn't try, but

11   sometimes people try when we have haven't talked about it.

12             MR. MILCH:  Right, Your Honor, as plaintiff's

13   counsel knows, our witnesses were on video today were

14   played, Mr. Rose and Mr. Wilson will be witnesses and they

15   played their testimony.

16             THE COURT:  Mr. Wilson, they're not sitting in

17   the courtroom, are they?

18             MR. MILCH:  Not right now, sir.

19             MR. CAMPBELL:  Your Honor, I did the

20   cross-examination of Mr. Trundle.  I limited very closely my

21   cross.

22             THE COURT:  We're not talking about that.  Based

23   on the representation that they may call him, I'm going to

24   exclude Mr. Trundle from the courtroom until they say they

25   change their mind.

1          MR. YOON:  Your Honor, we would request -- we'll

2     do that, but the jury is waiting, but Mr. Trundle is the

3     CEO, now he's going to have to wait and hear just when

4     they're going to call him.

5          THE COURT:  I'm guessing he's going to have to

6     wait.  Maybe he can pull rank, but in any event, right now I

7     need to get him out of the courtroom.

8          All right.  Let's get the jury.

9          (Jury entering the courtroom at 2:04 p.m.)

10         THE COURT:  All right.  Welcome back, everyone.

11         All right.  Mr. Smith, you may continue.

12         MR. SMITH:  Thank you, Your Honor.

13    BY MR. SMITH:

14    Q.    Welcome back from lunch, Dr. Clark.  And do you

15    recall before we broke for lunch we were just finishing off

16    the claim 1 of the '931 patent?

17    A.    Yes.

18    Q.    And just to wrap that up, in your opinion, based on

19    everything you looked at in the case, does the SecureNet

20    system have all the elements of claim 1 of the '931 patent?

21    A.    I think I have shown that we did, yes.

22    Q.    Why don't we move on to claim 9 of the '931 patent.

23    And are you familiar with what's called a dependent claim?

24    A.    Yes.  The dependent claim has to have all the

25    elements that we just went through.  And in this case claim

1    9 has two additional elements that we have to go through.

2    Q.     And are those additional elements labeled as claim 7

3    and claim 9 there?

4    A.     Yes.

5    Q.     Okay.  And so based on your analysis, did you find

6    that the touchscreen plays live video from a camera wherein

7    a camera uses internet protocol IP camera and is managed by

8    the remote server?

9    A.     Yes.  The camera that came in the box here that I

10   showed as an IP camera and I was able to play it on my

11   phone.  And it was accessing over the cellular network to

12   the SecureNet servers in order to get to my location.  So it

13   was managed by the remote server.

14   Q.     If we go take a look at the demonstrative we have on

15   the screen, number 23, do you see the right-hand portion,

16   does that show visually where the camera is in that overall

17   architecture?

18   A.     Sure.  The camera is down here at the first location,

19   this is zwave, in this case WiFi camera, and with my device,

20   I was able to communicate with the servers to connect back

21   to my office and bring up that camera.

22   Q.     Now, so before we move on from the '931 patent, is it

23   your opinion -- do you have an opinion as to whether or not

24   SecureNet, SecureNet's system practices each limitation of

25   claims 1, 7 and 9?

1    A.    Yes.  It infringes claims 1 and 9 for sure.

2    Q.    Why don't we move on to the next demonstrative,

3    number 24, I believe.  And I want to talk about number 25 --

4    I just want to talk about the '619 patent.  And just to

5    recap your prior testimony, is the '619 patent one of the

6    patents that you analyzed to see if there is infringement?

7    A.    Yes.  This is the one that deals with discovery of

8    security sensors from the remote management component that

9    we talked about.

10   Q.    Which claims did you specifically analyze for

11   SecureNet?

12   A.    Claims 1 and 55.

13   Q.    Why don't we go to the next slide, please.  And if we

14   take a look at just generally what's being depicted on the

15   left-hand portion of slide 26 which is labeled '619,

16   infringement analysis.

17   A.    These are the claim elements of claim 1 of the '619.

18   Q.    And then just to recap again, what's the right-hand

19   portion?

20   A.    These are the figures from SecureNet's architecture

21   documents that we're going to reference the components and

22   then we'll show further evidence that they perform the

23   functions.

24   Q.    And based on your review of the evidence, does the

25   SecureNet system have a gateway located in a first location?

1   A.      Yeah.  It's called the interactive gateway module,

2   it's depicted right there.

3   Q.      When we say, when we make a reference to the slide,

4   what is the gate -- interactive gateway module shown to be

5   attached to?

6   A.      Security panel.  And it also communicates with the

7   zwave WiFi device.

8   Q.      Can it communicate with anything else on the one

9   hand, a security panel, and on the other hand a zwave and

10  WiFi device?

11  A.      Yes, also the internet and the area network.

12  Q.      Why don't we take a look at PTX 175, please.  And in

13  particular, page ending in 1277.  And Dr. Clark, did you

14  take a look at PTX 175 during your work on this case?

15  A.      I did.  And I further disassembled panels and found a

16  board like that in them.

17  Q.      And you see at the top it says interactive gateway

18  for Vista, Power Series and Concord, do you see that?

19  A.      Yes, it's the gateway that interacts with at least

20  those three panels.

21  Q.      And is there a different type of gateways, one for

22  each of the Vista, Power Series and Concord, or is there

23  just one gateway for all of them?

24  A.      No, it connects to all three.

25  Q.      And if we go down further, I think the third bullet

1   point under key features, do you see where it says instant

2   upgrade to existing installed base?

3   A.      Right.  So we'll provide the additional

4   communications capability once you put it in the panel.

5   Q.      What's meant by -- what's upgrade in this context, if

6   you know?

7   A.      It means that you have installed operating system, a

8   system that works, and you want to add capabilities.

9   Q.      What kind of system are you talking about in terms of

10  what would the system be before you add this in?

11  A.      This would be a standard security system.

12  Q.      And in your view, could the security panel function

13  independently from the gateway?

14  A.      Well, it was working before we put the gateway in

15  there, so I would assume so.

16  Q.      Why don't we go to the next -- actually, PTX 246,

17  please.

18          MR. SMITH:  And I'll move to admit PTX 246 into

19  evidence.

20          THE COURT:  I guess without objection.

21          MR. MILCH:  I'm sorry.  No objection.

22          MR. SMITH:  Thank you.

23          (PTX 246 was admitted into evidence.)

24  BY MR. SMITH:

25  Q.      Now, Dr. Clark are you familiar with PTX 246?

1    A.    Yes.

2    Q.    And what is it, generally?

3    A.    It's the press release of sorts about the ability to

4    upgrade these panels.

5    Q.    Why don't we go -- can you go to the first paragraph

6    of this press release, begins with Lake Mary, Florida,

7    December 3, 2013.  Now, were you here for the testimony

8    earlier about from Mr. Dawes about the timing of the patent

9    dispute between iControl and SecureNet and how that all

10   originated?

11   A.    Yes.  I don't remember the exact dates, but, I was

12   here.

13   Q.    Do you know if it was after December of 2013, is that

14   consistent with what your --

15   A.    Yes.

16   Q.    And if we go down where it begins with the next

17   paragraph, SecureNet GSM gateway.  If we look, the second

18   sentence reads, "The process of upgrading an existing panel

19   with a SecureNet gateway is simple, and services can be

20   fully activated in less than one minute."

21         Do you see that?

22   A.    Yes.

23   Q.    And what is the -- what's your interpretation of that

24   statement by SecureNet in the document?

25   A.    Well, they're claiming that it's pretty easy to put

1    in this module into the existing enclosure.  I think it took

2    me more than a minute.

3    Q.     And was SecureNet claiming before the lawsuit was

4    filed that they actually had the SecureNet gateway?

5    A.     They were saying that they have a SecureNet gateway

6    here, that's the announcement.

7    Q.     Now, did you hear -- were you here for the testimony

8    of Dan Kerzner?

9    A.     Yes.

10   Q.     Did you hear any testimony about -- him talking about

11   well, there was a Simon XTi panel and the panel could have

12   Alarm.com, gateway or SecureNet gateway?

13   A.     That's consistent with my understanding.

14   Q.     And I'm going to show you a -- from afar, an exhibit

15   that I marked, 744.  And Dr. Clark, standing over here, can

16   you tell if this is one of the SecureNet gateways or

17   Alarm.com?

18   A.     No.

19   Q.     Now, why are you having a hard time doing that?

20   A.     Well, I mean, they're the same size and they fit into

21   the same place on the panels.

22             MR. SMITH:  Your Honor, may I approach the

23   witness?

24             THE COURT:  Sure.

25   BY MR. SMITH:

1    Q.    Dr. Clark, do you recognize what we have marked as

2    Exhibit 744?

3    A.    I mean, it's a gateway module.  It says Resolution

4    Products on it.

5    Q.    And having taken now a very close look at it, can you

6    tell whether or not it's the Alarm.com one or the SecureNet

7    one?

8    A.    No.  I'm still looking.  I don't see any

9    distinguishing labeling on it.

10   Q.    Now, I think also, and I encourage you to, if we

11   could go to the other physical exhibit that we marked

12   previously, the box from Protect America, 7.3.  Dr. Clark,

13   if you could pull out the security panel.

14         Now, Dr. Clark, were you here for the opening

15   statement when SecureNet's counsel mentioned that if you

16   take out the gateway, the security panel can't communicate

17   with anything?

18   A.    Yeah, we discussed that earlier.

19   Q.    With respect to the statement that it can't

20   communicate with anything except unless it has the gateway,

21   what did you find, if anything, about other communication

22   methods?

23   A.    It has a phone line, an ether net port right here.

24   Q.    So what could you do with that?

25   A.    Plug it into a phone line or into a network.

1    Q.      And if it's plugged into a network, would you be able

2    to do any communication?

3    A.      It would be able to communicate.  The legacy panel

4    would be able to communicate with the call center using dial

5    up.

6    Q.      And based on your analysis, are those gateways, are

7    they made by the same company that makes the security panel

8    itself?

9    A.      No, they're an add on that goes into multiple

10   different types of panels.

11   Q.      And in your view, as a technical matter, do you view

12   the security panel and the gateway to be separate

13   components?

14   A.      Yes.

15   Q.      And why don't we move to the next slide.  And

16   Dr. Clark, do you see we're now moving on to element B of

17   claim 1 of the '619 patent.  And were you able to find in

18   the SecureNet system a connection management component

19   coupled to the gateway and automatically establishing a

20   wireless coupling with a security system installed first

21   location, the security system including security system

22   components?

23   A.      Yeah, that would be the SecureNet server here that

24   had the ability to make a communication link with the

25   gateway and with the security panel there.

1    Q.      And when you say the security net server, is that

2    that purple-type box in there?

3    A.      Yeah.

4    Q.      Okay.  And then -- and when you say a wireless

5    coupling, what are you talking about?  What kind of wireless

6    coupling is it?

7    A.      It's cellular.  There's the communication link from

8    the gateway that's cellular.  It communicates over the

9    Internet.

10   Q.      And then what were you referencing with respect to

11   the security system and security components?

12   A.      The panel-attached components that we've discussed.

13   Q.      And in your view, does the security net system

14   automatically -- actually, let's move on to the next

15   element.

16           Actually, let's move on to PTX-195.  Let's go

17   back there just briefly.

18           And in particular, I'm looking at page ending in

19   291.  And if you look at that language, it says, On power up

20   the gateway connects to the server.

21           Do you see that?

22   A.      Right.  So when the gateway turns on, it attempts to

23   connect to the server, and then a session is established.

24   And it says kept in place indefinitely.  And that's from the

25   server to the gateway.

1    Q.      And do you have a view on whether or not this session

2    that's established would be over a wireless connection?

3    A.      Yeah, insofar as they're using the cellular

4    connection, that's wireless.

5    Q.      Okay.  Let's move on to the next slide, please.  And

6    now we're still on the second -- we've marked as B, element

7    B in the '619 patent here on the screen, but now I want to

8    focus you on the language, wherein the connection management

9    component forms a security network by automatically

10   discovering the security system components and integrating

11   communications and functions of the security system

12   components into the security network.

13              Do you see that language?

14   A.      I do.

15   Q.      And were you able to find that portion of the claim

16   in the SecureNet system?

17   A.      Yeah.  When I installed the security panel and then

18   called Protect America, they placed it in an enrollment.  It

19   automatically went out and pulled my system to see what

20   sensors were online, and then it configured them.  And the

21   SecureNet server, the management component, was aware of the

22   sensors and what their status was.

23   Q.      And did you see any technical documents that talk

24   about that enroll mode you just mentioned?

25   A.      Yes.

1    Q.      Why don't we go back to PTX-195, and I'd like to

2    direct your attention to the page ending in 329.  And in

3    particular, the heading 7.44.

4            And Dr.  Clark, what's that where it says set

5    enroll mode?

6    A.      Yes.  This is the command that comes from the

7    SecureNet servers that goes to the gateway and tells the

8    panel to go into enroll mode, so it will go out and figure

9    out which sensors it could find.

10   Q.      Okay.  And as part of that enroll mode, was there any

11   user input on your part that you needed to do to the gateway

12   or any part of the system?

13   A.      No, certainly not.  As part of the discovery process,

14   I mean I had to call Protect America, but the -- when they

15   put it in enroll mode, it went out and found the security

16   system component without me doing anything.

17   Q.      And when you say "security system component," what

18   are some examples of what you were using?

19   A.      The -- the panel, and as I said, I had door and

20   window sensors installed to my office.

21   Q.      And did those door and window sensors, were there

22   buttons on them that you had to put in for the bind mode

23   they're talking about?

24   A.      No.  No.  You -- they had tape on them.  And you

25   pulled the tape off, and you stuck them on either side of

1    the door.  So that when it was closed, they lined up.  And

2    when it was open, the connection was broken.

3    Q.    Now, why don't we go to the same document with a page

4    ending 302.  And, also, if you could put up on the screen, I

5    guess, Section 7.6.  And then if we could go to the

6    preceding page and pull up Section 7.5.

7              And now I'm showing you what we put on the

8    screen here from PTX 195, something called "Request Panel

9    Data" which is 7.5 and "Send Panel Data."

10             Do you see that, Dr. Clark?

11   A.    Yeah.  This is when the server, the management

12   component says to the gateway, Tell me about the panel.  And

13   then it polls the panel and sends the data back, so that

14   they know what to put in their database.

15   Q.    And in your view, is this sequence of the server

16   requesting panel data and the gateway sending panel data, in

17   your view, is that another instance of automatic discovery

18   or something else?

19   A.    I didn't -- they knew what panel I was using without

20   me having to put anything in.

21   Q.    So based on that, did you come to a conclusion of

22   whether this request panel data and send panel data was an

23   instance of automatic discovery?

24   A.    It was another example of automatically discovering

25   security system component.

1    Q.     Okay.  Why don't we go to the next slide, please.

2           Actually, if we go to -- why don't we take a

3    look at PTX-197, please.  Actually, before we go to this,

4    and in particular, the page 0043 to 0044, those portions.

5           First of all, Dr. Clark, the document that we

6    put up, 197, which is entitled "Resolution Products'

7    Communication Protocol Local Z-wave API."

8           Is that a document that you looked at in this

9    case?

10   A.     Yes.

11   Q.     And just generally, what would be the subject matter

12   of this protocol document?

13   A.     It will talk about the commands that can be issued

14   from the server to the gateway.

15   Q.     Okay.  And what's the reference to Z-wave about?

16   A.     That's -- the gateway is communicating with the

17   Z-wave devices, among others, at the first location.

18   Q.     Okay.  Now, why don't we go to that page ending in

19   043.

20          Okay.  And then, so on the screen, we have a

21   portion of 043 and 044 on the screen here.

22          And Dr. Clark, when you were looking, evaluating

23   this issue of automatic discovery, what was the document

24   telling you about that issue?

25   A.     Okay.  The document certainly thinks it's automatic.

1    Q.    And did you find references to automatically in this

2    SecureNet document that they were using?

3    A.    Yeah, they're highlighted.

4    Q.    Okay.  Now, and do you see where it says six, "Device

5    Initialization/Enrollment Process"?

6          Do you see that?

7    A.    Yes.

8    Q.    And is SecureNet describing that as an automatic

9    process, on one hand, or a manual process?

10   A.    No.  It says the Z-wave code will automatically

11   complete the enrollment process.

12   Q.    Now, in your view, is this automatic discovery

13   process literally practiced by the SecureNet connection

14   management component on the server?

15   A.    Yes, the user has to install devices.  I mean,

16   there's -- they can't install themselves.  They have to be

17   powered up.  I mean, and they have to be on the network in

18   order to be discovered.  But the discovery process is done

19   without user input.

20   Q.    But isn't it true -- or strike that.  With respect to

21   installing sensors, are there some steps that you'd have to

22   do for actually installing sensors that involve human input?

23   A.    If you have a Z-wave door lock, you have to put it on

24   the door.

25   Q.    What about -- and I think earlier you mentioned for

1   the sensors, as part of the installation process, you said

2   you would be sticking them on the door?

3   A.      Yeah.  You have to stick them on the door and remove

4   the tape so they become active.

5   Q.      And if the concept of automatic discovery included

6   even that, those installations processes, would you still --

7   would you believe that, in your view, based on your analysis

8   that what SecureNet is doing is equivalent to complete

9   automatic discovery?

10  A.      I think so, yes, because it's performing the function

11  of automatic discovery which is what is required.

12  Q.      And even if you include those manual install steps,

13  would the way that SecureNet is doing it be substantially

14  the same as that?

15  A.      I think so.  You're going to install and then

16  discover.

17  Q.      And would the result in both cases be substantially

18  the same?

19  A.      Would be discovery and the objects stored back at

20  SecureNet servers.

21  Q.      Now, why don't we go to, I believe, the slide we were

22  at just previously.  Okay.

23          So let's take a look at what's identified here

24  as Slide 34.  And Dr. Clark, could you describe what's being

25  shown on this particular slide?

1  A.     This is the Court construction for which we had a

2  structure that had steps and an algorithm that had to be

3  done by a processor and perform the function of

4  automatically establishing a wireless coupling with a

5  separate security system, the panel, and forming a security

6  network which would include the remote servers, the

7  Internet, and the home premise.  And then this automatically

8  discovering the system components, as we've been describing,

9  of the security system at the first location, and then

10  integrating communications and functions of the security

11  system.  That is the ability to remotely control the devices

12  that have been discovered.

13  Q.     And Dr. Clark, I believe we've talked about the

14  function, but now I want to focus you on what's identified

15  here as a structure.

16  A.     Yeah.

17  Q.     And you see software executing on a processor using

18  the algorithm shown in Figures 12 and 14.  Do you see that?

19  A.     Yes, that's what the Court has told us the structure

20  needs to be.

21  Q.     And first of all, were you able to identify software

22  executing on a processor on the SecureNet server?

23  A.     Yes.  I looked at the source code and verified that

24  it met the requirements of these algorithms as it performed

25  substantially all the steps.

1    Q.      And why did looking at the source code help you to

2    figure out that there was software on a processor?

3    A.      Well, the source code is built into the software that

4    is then run on the SecureNet servers which are computers.

5    Q.      And do computers have processors?

6    A.      Processors, memory, operating systems.

7    Q.      Okay.  Now, let's talk about these algorithms.  So if

8    you look at the left-hand portion, can you tell us:  Where

9    is this Figure 12 coming from?

10   A.      This comes from the patent.  All the patents have

11   Figure 12 and Figure 14.

12   Q.      Okay.  And now, I just want to walk you through some

13   of these.  At least, let's start with Figure 12.

14               This Item 1210, System Powerup.  Do you see

15   that?

16   A.      Yeah.  The system is assumed to be powered up.  And

17   you can't perform any of the other steps unless the system

18   is on.  And the system, in this case, includes the SecureNet

19   servers as well as the gateway and intervening device.

20   Q.      And what about -- did you find anything like

21   Item 1210 in SecureNet?

22   A.      Yes.  We just went through the process of the gateway

23   discovery that went and looked at the patent.

24   Q.      And what about Item 1230 where it says Learn System

25   into WSP?

1   A.      So the system -- the sensors are enrolled in the

2   wireless security panel and then communicated back to the

3   SecureNet server.  So that performs that step.

4   Q.      And when you say the "wireless security panel," have

5   we looked at or seen any examples of those earlier in your

6   testimony?

7   A.      Yes.

8   Q.      And what's the next step, 1240, talking about?

9   A.      You have to put multiple devices into the system

10  which, in my case, would have been the multiple sensors,

11  plus the panel ID.

12  Q.      Okay.  And then it says Manage and Control WSP and

13  Associated Devices.  Do you see that?

14  A.      Yes.  So they're -- they're tracking the status and

15  have the capability to do things like turn flood lights on

16  and off and any other number of functions.

17  Q.      And what's the next step, 1260, where it says

18  Interface WSP and Devices with Non-WSP Devices?  What's

19  that?

20  A.      So the wireless security panel wants to include

21  things like these sensors.  And -- and non-security devices

22  might be interior light or thermostats.

23  Q.      And what's this last step about where it says

24  Item 1270, Provide Consumer Interface for Control and

25  Management?

1    A.      So we've seen that the app on the phone allows us to

2    perform these functions, and that's a consumer interface

3    that allows me to control these devices.

4    Q.      Okay.  Let's take a look at Figure 14, and Figure 14

5    is also coming from the '619 patent?

6    A.      All three patents, yes.

7    Q.      Okay.  And why don't we -- can you describe how this

8    figure, this algorithm is being generally performed?

9    A.      So it's looking at the steps that we just went

10   through essentially from the perspective of the gateway.

11   And when it's communicating with the management component

12   with the component it's doing

13   Q.      And you said these were from the perspective of the

14   gateway, but are you saying they're just on the server?

15   A.      Right.  Those steps have to be performed on the

16   server.

17   Q.      Skipping ahead, and you see it says use wireless

18   transceiver to identify WSP, item 1420, and then 1430 is set

19   WSP mode to learn mode?

20   A.      That's the get panel ID.

21   Q.      And then item 1440, you see where is says use WSP

22   protocols to add gateway as a virtual keypad.  Do you see

23   that?

24   A.      It needs to be able to communicate with the panel and

25   enter a code to arm or disarm remotely, and I think we have

1    a slide.

2    Q.    Why don't we go to PTX 195 and in particular the

3    bottom of the page ending in 323, and I think spilling over

4    to the beginning of the next page.  Do you see now where

5    section 7.36 of the Resolution Products communication

6    protocol that we looked at earlier?

7    A.    Yes.  It has the command to enable or disable the

8    virtual keypad.

9    Q.    Let's go back to compare it to 12 and 14 again.  We

10   have gone through the virtual, where it says item 1440

11   virtual keypad.  Can you explain the rest of what, of the

12   algorithm shown in 14?

13   A.    I want says exit learn mode, so it's done getting

14   devices.  And then 1460, 70, and -- yeah, those two talk

15   about mimicking a state change.  So what that would be used

16   for would be to test the ability to control the sensor and I

17   didn't find that ability to test.  But I did find and we saw

18   earlier the ability to associate sensors with the zone and

19   then learn that zone.

20   Q.    And then it says down here in 1470, you talk about

21   adding sensors to databases.  Did you find that?

22   A.    I did, yes, the objects are in the database.

23   Q.    And then 1480 it says associate sensor with WSP

24   broadcasted zone name or token.  Do you see that?

25   A.    Yes, we saw that from Mr. Wilson's testimony.

1    Q.      And then finally 1490 says operate system.  Do you

2    see that?

3    A.      That means the system is ready to go.

4    Q.      Was it your understanding based on your analysis of

5    this connection management component claim construction, did

6    you understand that you had to find something that was

7    substantially the same as on the one hand the algorithm of

8    14 and 12 in totality in comparison with the SecureNet

9    server?

10   A.      I was advised that the law is they have to be

11   substantially the same, not the exactly the same.

12   Q.      In your opinion, did you find an overall structural

13   equivalent between on the one hand the algorithms described

14   in figures 12 and 14 of the '619 patent and on the other

15   hand the SecureNet server?

16   A.      We found all the steps required in figure 12 and all

17   but essentially one of the steps which is the mimicking of

18   the sensor in figure 14.

19   Q.      And is not having the mimicking step, is that a

20   substantial difference in your view?

21   A.      No, because the system is able to be operated without

22   having it.

23   Q.      Why don't we take and head to the next slide.  And

24   here do you see the first part of this next element which

25   reads a security server at a second location different from

1    the first location wherein the security server is coupled to

2    the gateway.  Do you see that?

3    A.    Yes.

4    Q.    And did you define the security server?

5    A.    Yes, the security server is over here.  And it's

6    going to be coupled to the gateway here.

7    Q.    And in your -- and you're referencing the portions of

8    the PTX 009 and 173 on the screen?

9    A.    Yes.

10   Q.    And then the next part of the claim reads, "Wherein

11   the gateway receives security data from the security system

12   components, device data of a plurality of network devices

13   coupled to a local network of the first location that is

14   independent of the security network, and remote data from

15   the security server wherein the gateway generates processed

16   data by processing at the gateway the security data, the

17   device data, and the remote data, wherein the gateway

18   determines a state change of the security system using the

19   processed data and maintains objects at the security server

20   using the processed data."

21   A.    So let's break that up a little bit if that's okay.

22   Q.    Sure.

23   A.    The security data from the security system components

24   includes data from the panel that we saw as being returned

25   from the gateway receives that from the panel.  And then

1    there is a plurality of network devices, network devices

2    being zwave network devices coupled to the local zwave

3    network, for example, for the WiFi network.  And that's

4    independent, that network is independent of the overall

5    security network that includes the panel, the gateway, and

6    going back to the SecureNet servers.

7              Then the second part in yellow that you were

8    asking about is the gateway generates processed data by

9    processing at the gateway the security data, so, for

10   instance, getting a panel ID, packaging it up, and

11   determining a state change in the panel, and then transmits

12   that back to the security server where it's stored and it's

13   stored in objects in the database.

14   Q.    Did you find any examples in the technical SecureNet

15   documents of this, of this use of security data, network

16   data, remote data to generate process data?

17   A.    We already seen multiple examples, but we can show a

18   couple more.

19   Q.    Why don't we turn to PTX 195 with the page ending in

20   307 and extending to 308.  And then Dr. Clark, do you see

21   here we have the heading is 7.10, request gateway status,

22   and then below that is 7.11, send gateway status?

23   A.    That's the ability of the server to query the

24   gateway.

25   Q.    Is that an example of a scenario where processed

1    data, security data, and network device data is used to make

2    processed data?

3    A.     Yes.  The gateway is generating and packaging the

4    data to send it back.

5    Q.     Now, one other question.  When you -- were you here

6    for the videotape testimony of David Wilson?

7    A.     Yes.

8    Q.     And did you hear Mr. Wilson say that the SecureNet

9    server, the architecture had been developed by the time they

10   got to around 2011?

11   A.     Yes, I heard that.

12   Q.     And turning to the '619 patent, when did the '619

13   patent issue?

14   A.     I believe it was 2008.

15   Q.     I guess I didn't mean filed, I meant, is it your

16   understanding that the '619 patent issued in 2013?

17   A.     It issued in 2013, it was filed in 2008.

18   Q.     Now, why don't we go -- before we move on to the next

19   -- there is one other question on the end of the '619

20   patent.  There is the limitation wherein the objects

21   correspond to the security system components and the

22   plurality of network devices.  Have we seen that before?

23   A.     Yeah, we looked at the API that showed the data that

24   was associated with each device.  And those meet the Court's

25   construction for an object.

1    Q.    Now, before we move on from claim 1, is it your

2    opinion that SecureNet server includes -- strike that.

3          Before we move on from the claim 1 of the '619

4    patent, is it your opinion that the SecureNet system

5    includes all the elements of claim 1 either literally or

6    under the Doctrine of Equivalents?

7    A.    Yeah, I think they're there literally.

8    Q.    And also, we talked about your alternative, you

9    believe that they were also infringed under the Doctrine of

10   Equivalents; is that right?

11   A.    Well, that would be true, also, but they're literally

12   infringed.

13   Q.    Why don't we go to slide 4, claim 55 of the '619

14   patent.  And now, is this an independent claim or dependent

15   claim, if you know?

16   A.    This is a dependent claim because it says the system

17   of claim 1, all the elements that we just painfully went

18   through.

19   Q.    Sorry for the torture.  I'm almost done.

20   A.    Wherein the security server generates and transfers

21   notifications to the remote client devices, and those

22   notifications are event data.  So what this requires is that

23   the security server somehow taking these events and pushing

24   them out to a client device.

25   Q.    And did you actually receive any -- did you

1    personally receive any notifications in connection with your

2    security system from Protect America?

3    A.    I received several e-mails from having unplugged this

4    panel telling me that the battery is low and various other

5    things.

6    Q.    Why don't we go to the next slide, please.  And if

7    you take a look at slide 41, does this slide provide your

8    overall opinions or summation for the '931 and '619 patents?

9    A.    For the first two patents, yes.

10   Q.    And based on your analysis, does SecureNet make a

11   system of -- strike that.

12         Based on your analysis, does SecureNet make a

13   system that embodies claims 1 and 9 of the '931 patent and

14   claims 1 and 55 of the '619 patent?

15   A.    My understanding of the law is that you make the

16   system when you put it into service, and we have heard

17   testimony that they wrote the code for the app after the

18   servers and that they, SecureNet, actually does the

19   installation of those servers, so I would say that's putting

20   the system into service.

21   Q.    And what about upgrades to the software?

22   A.    Sure, they write software upgrades and install those.

23   Q.    And did you have a view based on your analysis as to

24   whether SecureNet has used the system of the '931 and '619

25   patent?

1    A.     Well, you can't develop such a system without having

2    tested it, so you have to have at least as part of the

3    development process tested all these elements.

4    Q.     And would customers based on your analysis and

5    experience with Protect America, would the customers of

6    SecureNet also be using the system?

7    A.     Yeah.  The customers being the resellers of those

8    like Protect America would actually be performing these

9    functions as well.

10   Q.     And with respect to the claims you looked at for the

11   '931 and '619 patents, were you able to identify any

12   substantial non-infringing uses for the SecureNet software

13   server?

14   A.     It's designed and developed with that architecture in

15   mind.

16   Q.     Were you able to -- were you able to identify any

17   substantial non-infringing uses for the SecureNet mobile

18   app?

19   A.     No.  The app is intended to talk to the SecureNet

20   server.

21   Q.     And with respect to the '931 and '619 patents, were

22   you able to identify any non-infringing alternatives or

23   substitutes for those?

24   A.     I'm not aware of any.

25   Q.     But you didn't identify -- you didn't find any when

1    you were doing your analysis?

2    A.    No.

3    Q.    Let's tear into the last patent here, the '844

4    patent.  And now I'm going to walk through this claim as

5    well, but fortunately we'll see some of the elements are the

6    same, so we're not going to talk about it that painfully.

7    As you go to the next slide 43, what's being shown here on

8    the left-hand portion?

9    A.    This is a method claim in this case, so someone has

10   to actually perform the steps of the method.  And we're

11   going to go through the ones that are different than the

12   elements from the claim 1 of the '619.

13   Q.    In your view would a security dealer like Protect

14   America or others perform this step of performing a security

15   network by coupling a gateway to a security server wherein

16   the gateway is located at a first location and coupled to a

17   security system that includes security system components

18   located at the first location, wherein the security server

19   is located at a second location different from the first

20   location?

21   A.    Yes, I mean, they sent me the box sitting to my left

22   that had the components that I needed to install that set up

23   the security network.  And it was able to establish

24   communications with the SecureNet servers at Protect

25   America, and the gateway was at my office, the first

1    location, and the security system was elsewhere, a second

2    location.  And that was certainly different than where my

3    office was.

4    Q.    Why don't we go to the next slide which shows the

5    second element or step of claim 48 of the '844 patent.  Do

6    you see that?  Do you see where it says automatically

7    discovering network devices at the gateway and establishing

8    a coupling between the gateway and the network devices

9    located at the first location, wherein the gateway

10   electronically integrates communications and functions of

11   the network devices and the security system components into

12   the gateway and the security network.  Do you see that?

13   A.    I do.  So this is different than the last one, the

14   '619, because this time we're automatically discovering

15   network devices, not security devices at the gateway, not at

16   the management component.  And this is happening at the

17   first location, at the premise.

18        And then the gateway needs to electronically

19   integrate communications and functions of the network

20   devices into the gateway which is communicating with the

21   server to create the security network.

22   Q.    And if you referenced this slide here which is

23   showing portions of PTX-009 and PTX-173, can you see what --

24   can you identify what the network devices would be that

25   you're talking about?

1    A.      Sure.  So you have the gateway here, and these are

2    network devices on either Z-wave or a Wi-Fi network.  And

3    the gateway needs to automatically discover these and

4    integrate them into the overall system.

5    Q.      Now, when you did your -- now, with respect to some

6    of the Z-wave devices, is there -- for some Z-wave devices

7    that you looked at, is there user input involved in the

8    installation process?

9    A.      Well, not -- not input, but there are some that

10   require you to push a bind button.

11   Q.      Okay.  And now, with respect to the gateway, for

12   example, the green card, is there any button on that that

13   you have to push to --

14   A.      No.  The gateway remains inside the enclosure, so

15   there's nothing that you need to do.

16   Q.      Okay.  Now, why don't we take a look at the next

17   demonstrative.  Now, what's being shown in this slide?

18   A.      This is the -- an example of one of the panels that I

19   tested, and it's the GoControl.  And it has the ability to,

20   through a Z-wave interface here, you can manage those

21   devices.  And you can tell it to install, and it will go out

22   and try to discover Z-wave devices there.

23   Q.      And in order to go into that, you see what it says at

24   the top, it says add Z-wave devices, discovering devices.

25   Do you see that?

1    A.     Yes.

2    Q.     And to get into that mode, would you have to press

3    any buttons on the touchscreen?

4    A.     Yes.  I'd -- I'd have to get out of the main menu and

5    get into this menu, and then tell it to go out and look for

6    Z-wave devices essentially.  I would be putting it in enroll

7    mode at that point.

8    Q.     During that process, would you be touching the

9    security panel or the gateway?

10   A.     The security panel.

11   Q.     And now, when you were trying to add and going

12   through the process of adding Z-wave devices, did you have

13   to use the mobile app when you were doing it through the

14   touchscreen on the security panel?

15   A.     No.  No.  This is a different process.

16   Q.     And do you remember during SecureNet's opening

17   statement, they mentioned -- they showed a demonstrative

18   where there was a screen shot, and then there was a button

19   that somebody was pushing on the Z-wave device?

20   A.     Yeah, that was on the phone.  This is not.

21   Q.     Oh.  So on the Z-wave devices or other network

22   devices that you looked at, did you have any that didn't

23   have buttons on them?

24   A.     Yeah.  They're -- I mean, they're examples.

25   Q.     And do you have any of those?  Did you see those in

1   the Protect America box?

2   A.      This is a Z-wave dead bolt lock, so it fits on the

3   inside of your door.  And when activated, it will turn your

4   dead bolt.  And there's no bind button on this device.

5   Q.      Okay.  And is that a device that you actually use

6   yourself?

7   A.      Yeah, it's one that I ordered from Protect America.

8   Q.      Okay.  And also, why don't we go to PTX-197, pages 43

9   to 44, and I think we already saw this.  But with respect to

10  the '844, when you looked at the SecureNet technical

11  documents, did you see reference to the discovery being

12  automatic process or manual process?

13  A.      Well, I mean, again, they portray it as automatic.

14  It seemed automatic to me.

15  Q.      And now, I think earlier when we talked about the

16  '619 patent, we talked about the fact that although you

17  believed it was literally infringed, you also believe that

18  there was -- there could be infringement of the Doctrine of

19  Equivalents; do you recall that?

20  A.      Yes.

21  Q.      And if we were to encompass all the installation

22  steps and pushing bind buttons on certain Z-wave devices

23  into what's automatic discovery, if that's what we were

24  saying is automatic discovery, would you still say there was

25  an infringement under the Doctrine of Equivalents?

1   A.      Well, yeah.  I mean, with the exception where you'd

2   have to look to the Doctrine of Equivalents would be whether

3   or not that bind button constitutes user input at the

4   gateway.  And, again, it's arguable, but I think that the

5   process is equivalent.  And you've installed the device,

6   you've hit the bind button, and you go out, and you discover

7   the devices.  That seems automatic to me.

8   Q.      And is your opinion on that equivalents based in the

9   same function-way-result test --

10  A.      Yes.

11  Q.      -- that we talked about earlier?

12  A.      Yes.

13  Q.      Okay.  Why don't we turn to the next slide.  And this

14  may be the slide everyone really likes because do you see

15  any correlation between elements of the Claim 48 of the '844

16  patent and claim 1 of the '619 patent which we already went

17  through?

18  A.      That is substantially the same, and they're color

19  coded.  So I don't think we need to go through these.

20  Q.      So for the remaining elements which start with the

21  receiving step, the generating step, determining, and

22  maintaining, based on your analysis, does that have the same

23  claim language as the corresponding portion of the '619

24  patent, claim 1?

25  A.      I -- yes, and I would use the same demonstratives to

1    prove it.

2    Q.    So before moving on from Claim 48 of the '844 patent,

3    is it your opinion that the method steps would be performed

4    by security dealers, either literally or under the Doctrine

5    of Equivalents?

6    A.    Yes.  These would be the steps performed by somebody

7    at Protect America.

8    Q.    And why don't we go to the next slide.  And Dr.

9    Clark, does this slide just summarize your overall opinion

10   on the '844 patent?

11   A.    Yeah.  With regard to claim 48, I think we've shown

12   that.

13   Q.    Okay.  And in your view, based on your analysis,

14   would the method steps of Claim 48 necessarily be performed

15   when someone's installing a system like you had from Protect

16   America with Z-wave or alternatively video devices?

17   A.    Yeah.  I had to perform those steps.

18   Q.    And did you see any way that they wouldn't have been

19   performed through that process?

20   A.    No.

21   Q.    And based on your review of the evidence, did

22   SecureNet encourage customers to use the server and mobile

23   app portions of the product?

24   A.    They did in my case.

25   Q.    And were you able to identify any non-infringing

1    alternatives or substitutes for claim 48 of the '844 patent?

2    A.    No.  I mean, it's intended to be a security system

3    operated over the network in the way they used it.

4              MR. SMITH:  Okay.  Thank you, Dr. Clark.  Let me

5    pass the witness.

6              CROSS-EXAMINATION

7    BY MR. MILCH:

8    Q.    Good afternoon, Dr.  Clark.  You've offered opinions

9    today regarding the '619, the '844, and the '931 patents;

10   correct?

11   A.    Yes.

12   Q.    Just they're not infringed; right?

13   A.    I'm sorry?

14   Q.    Just that they're not infringed; right?  I'm sorry,

15   that they're infringed?

16   A.    Yes.

17   Q.    My apologies.  I wasn't trying to trick you there, I

18   just misspoke.

19              You offer no opinions on invalidity or validity?

20   A.    That's correct.

21   Q.    And you understand that patent claims are infringed

22   only if an accused product performs every single limitation

23   of that claim; right?  We just heard you say that?

24   A.    That is right.

25   Q.    Can't infringe a claim without meeting all the

1    limitations; right?

2    A.      Except under the Doctrine of Equivalents, but yes.

3    Q.      So you have to meet that limitation, either literally

4    or, in your words, by the Doctrine of Equivalents; right?

5    A.      That's correct.

6    Q.      And you'd agree, sir, that even if a single

7    limitation is not met, one word, then there's no

8    infringement; right?

9    A.      That's correct.

10   Q.      And you provided your complete opinion, your complete

11   analysis for the jury as how SecureNet satisfies every

12   limitation of the asserted claims in your mind; correct?

13   A.      Yeah, I believe so.

14   Q.      You purchased a security system from Protect America,

15   and we saw it earlier; correct?

16   A.      Yes.

17   Q.      And it came with the Simon XTi panel?

18   A.      Yes.

19   Q.      And when that panel showed up that, IGM was already

20   installed in the panel; correct?

21   A.      Yes.

22   Q.      And you don't know who installed it?

23   A.      That's correct.

24   Q.      It was already there when you got it?

25   A.      Yes.

1   Q.      And you removed that IGM at some point; correct?

2   A.      I disassembled the panel and examined it.  Yes.

3   Q.      And you put it back in?

4   A.      That's correct.

5   Q.      And to remove that IGM, you had to go through a

6   process where you took the face of the panel off; correct?

7   A.      Yes.

8   Q.      And you had to unscrew it?

9   A.      Not sure.

10  Q.      Unscrew the IGM, to be clear?

11  A.      I'm not sure there were screws in it actually.

12  Q.      Okay.  But you had to unsnap the casing?

13  A.      Yes.

14  Q.      And you had to disconnect the pin connectors;

15  correct?

16  A.      Yeah.  I had to disconnect the wire and the --

17  whatever clip was holding it.

18  Q.      There was a wire in the Simon XTi panel you received?

19  A.      Yes.

20  Q.      And you were here for the opening; right?

21  A.      Yes.

22  Q.      And you saw the demonstration that I did removing an

23  IGM from a Simon XTi panel?

24  A.      I did.

25  Q.      And that one didn't have a wire, did it?

1    A.      Not that I saw.

2    Q.      Okay.  And if you didn't put that panel -- I'm sorry.

3    If you didn't put that IGM back in the panel that you

4    received from Protect America, it would have no way of

5    communicating with the outside world; correct?

6    A.      Incorrect.

7    Q.      That panel without you adding something to it?

8    A.      Oh, it has connectors, including phone and Ethernet.

9    The adaptors.

10   Q.      And did you connect the phone line to the panel?

11   A.      I didn't test the phone line.

12   Q.      Okay.  You didn't add an Ethernet line to the panel?

13   A.      No, it has ports that --

14   Q.      So without adding one of those, either phone line or

15   Ethernet cable, it wouldn't be able to connect with the

16   outside world; is that right?

17   A.      It has a -- I would have to look at it.  It also had

18   the cellular card in it, but I think that connected to the

19   other card.

20   Q.      And by "the other card," you mean the IGM?

21   A.      Yes.

22   Q.      And certainly, without the IGM, the end user would

23   have no way to remotely control or interact with their

24   panel; right?  Correct?

25   A.      Again, I'm not sure that's true.  The Ethernet

1    capability would give it the ability to connect to the

2    Internet.

3    Q.    And you haven't brought any evidence that a user

4    using SecureNet's app would be able to interact with that

5    panel without the IGM in place; correct?

6    A.    I agree.

7    Q.    And so isn't it true that the only way for a panel to

8    communicate with the SecureNet server is through the IGM?

9    A.    I'm not sure that's true.

10   Q.    You haven't provided any evidence that there's any

11   way for a panel to communicate with the SecureNet server

12   other than through an IGM; correct?

13   A.    I've shown you the Ethernet port on the device.

14   Q.    But you haven't shown any evidence that an end user

15   using the SecureNet app could somehow communicate or control

16   the -- communicate with or control their panel without that

17   IGM in place; correct?

18   A.    I agree.

19   Q.    And without the IGM in place, without the IGM in

20   place in the panel, the server could not get any information

21   about the sensors discovered by the security panel; correct?

22   A.    Again, I'm not sure that's true.

23   Q.    You haven't provided any evidence that without the

24   IGM in place, the SecureNet server could get any information

25   about sensors connected to the panel; correct?

1    A.      I have not tested that, I agree.

2    Q.      After you receive the Protect America panel, I think

3    you said earlier you installed it in your office; correct?

4    A.      Yes, sir.

5    Q.      And the system that you received, I think you showed

6    it earlier, it had a panel, it had some security sensors as

7    well as a video camera; correct?

8    A.      Yes.

9    Q.      And you only saw I think you said three of the

10   sensors?

11   A.      Three or four.

12   Q.      A door sensor, a window sensor, a back door sensor, I

13   can't remember exactly.

14   A.      That's correct.

15   Q.      And before you received the panel, these sensors had

16   already been learned into the panel by Protect America;

17   correct?

18   A.      The firmware was set up to look for sixteen sensors

19   that were shipped.  But it didn't know which ones were in

20   there, so they weren't learned in until we went into enroll

21   mode.

22   Q.      And have you shown that through any code that that's

23   the way the Protect America panel was configured?

24   A.      I thought I had screen shots in my report.

25   Q.      But sitting here today, you don't know how those

1    sensors were programmed in the panel, do you?

2    A.    I know that it was expecting sixteen sensors and when

3    we discussed it, that that would have been done in the

4    firmware before it shipped.  And it then would detect the

5    actual sensors out of the sixteen that were online.

6    Q.    So that's not my question, Doctor.

7              So when you got the panel, you weren't aware how

8    those sensors were actually learned into the panel; correct?

9    A.    No, I had to test it to figure out how it worked.

10   Q.    But you didn't ask Protect America about their

11   process for sending you the pre-configured panel; correct?

12   A.    I had to tell them which version I wanted with how

13   many sensors, and then I installed a subset of those to test

14   them.

15   Q.    That's not my question.  You never asked Protect

16   America how those sensors get learned into the panel, did

17   you?

18   A.    The first time on the phone, no, I didn't ask them

19   that question.

20   Q.    You didn't ask anybody at Protect America, did you?

21   A.    The only person I spoke to was on the phone.

22   Q.    During the installation of the Protect American

23   system, you said earlier that you saw the sensors

24   automatically discovered?

25   A.    Yes, I observed that process.

1    Q.    And is it your understanding that it was the Simon

2    XTi panel that polled for the sensors?

3    A.    It was placed into enroll mode and the panel went

4    looking for the sensors, yes.

5    Q.    So the panel itself did that?

6    A.    Yes, when instructed from Protect America.

7    Q.    But the panel performed the process of finding those

8    sensors; correct?

9    A.    Yes.

10   Q.    And you understand that if the panel did not have an

11   IGM, it would still find the sensors; correct?

12   A.    I didn't test that, but no, if it didn't have the

13   IGM, I don't think it would have been able to be placed in

14   enroll mode, so I'm not sure that's right.

15   Q.    So if it didn't have the IGM, the panel would have no

16   ability to find the security sensors that it came with?

17   A.    No, I think you could do it through the interface on

18   the panel, probably.

19   Q.    But you didn't test that?

20   A.    No, sir.

21   Q.    And you're not sure if that's the case?

22   A.    I did not memorize the user interface.

23   Q.    But to be clear, you haven't brought any evidence

24   that shows that the panel couldn't enroll sensors without

25   the IGM?

1    A.    I agree.

2    Q.    Other than the Simon XTi panel that you got from

3    Protect America, you didn't integrate any other panels and

4    bring them up with the security system, did you?

5    A.    I powered up the Go!Control and tested its functions,

6    but I did not deploy it, no.

7    Q.    So you didn't witness any automatic discovery of any

8    sensors through the Go!Control panel?

9    A.    No.  I brought it up and looked at the capability.

10   Q.    For the 2 GiG Go!Control panel, did you ever open the

11   2 GiG Go!Control panel?

12   A.    Yes.

13   Q.    Did you identify the 2 GiG radio?

14   A.    Yes.

15   Q.    Was the 2GiG radio under the panel?

16   A.    It's in the same enclosure.

17   Q.    And Nortek makes that 2 GiG panel; right?

18   A.    I'll accept your representation.

19   Q.    Okay.  Thank you.  I appreciate it.  Nortek also

20   makes the 2 GiG radio; correct?

21   A.    I will accept your representation.

22   Q.    And you have no evidence that SecureNet ever told

23   Nortek how to make the 2 GiG radio; correct?

24   A.    I agree.

25   Q.    And you haven't shown any evidence that SecureNet

1    provided any source code to Nortek; correct?

2    A.    I'm not aware of any, no.

3    Q.    You haven't provided any evidence; right?

4    A.    That's correct.

5    Q.    We haven't seen a thing.

6          So let's talk about SecureNet's mobile app.  The

7    app is designed to be used by end users on their mobile

8    phones; correct?

9    A.    Yes.

10   Q.    And it provides end users with the ability to

11   remotely arm and disarm their system; correct?

12   A.    To arm and disarm their systems in general, but

13   remotely, too.

14   Q.    Remotely is one way they could arm and disarm their

15   system if the smart app was on the phone?

16   A.    I agree.

17   Q.    And the smart app for remote control over home

18   automation devices?

19   A.    Yes.

20   Q.    And video?

21   A.    Yes.

22   Q.    And when you use the word remote, you understand that

23   to mean a different location; correct?

24   A.    Yes.

25   Q.    So let's talk about the system that you have accused

1    of infringement.  You accused a system that has several

2    components; correct?

3    A.      Yes.

4    Q.      And we talked about some of them, but it includes the

5    SecureNet server; right?

6    A.      Yes.

7    Q.      And it includes the SecureNet app on a mobile phone?

8    A.      Yes.

9    Q.      And there are other, a bunch of other elements as

10   well, for example, the security system; right?

11   A.      Yes.

12   Q.      And those are in end user's homes?

13   A.      Yes.

14   Q.      And the security system includes the panel?

15   A.      Yes.

16   Q.      And it includes the sensors?

17   A.      Yes.

18   Q.      You also pointed to the accused gateways; right?

19   A.      Yes.

20   Q.      And in some cases you pointed to video cameras;

21   right?

22   A.      Yes.

23   Q.      Let's talk about each of these elements.  There is no

24   dispute that SecureNet provides the software; right?

25   A.      None that I have heard.

1   Q.      And the software for the server; correct?

2   A.      And the app.

3   Q.      And the app.  Correct.  Thank you.

4           And, in fact, you're not aware of SecureNet

5   manufacturing anything other than the software for the

6   server and for the app; correct?

7   A.      I have seen a box with I think a camera in it, but in

8   general, no.

9   Q.      But you're not aware of SecureNet manufacturing the

10  camera, are you?

11  A.      No, I have seen it with a SecureNet label on it.

12  Q.      Have you shown that today?

13  A.      No.

14  Q.      So that's not anything you have shown the jury today;

15  right?

16  A.      No.

17  Q.      So SecureNet doesn't provide end users to mobile

18  phones; right, Dr. Clark?

19  A.      Absolutely not.

20  Q.      Let's look at figure 1 of the patent and let's see

21  what SecureNet does and doesn't do.  We said SecureNet

22  doesn't provide mobile phones; right?  I think you said

23  Samsung and Apple; right?

24  A.      Android devices.

25  Q.      Thank you.

448

1              And self-monitoring devices in figure 1, is that

2      the zwave devices that you mentioned?

3      A.      That would include those, yes.

4      Q.      And what about the touchscreen keypad, does SecureNet

5      make a touchscreen keypad?

6      A.      Not that I'm aware of.

7      Q.      I'll do this.  Are you comfortable with saying

8      SecureNet doesn't make UI widgets for touchscreen keypad?

9      A.      No, because they write the app that has user

10     interface widgets.

11     Q.      We'll put this on the touchscreen keypad for now.

12             What about the broadband modem and the router,

13     does SecureNet make a broadband modem or a router?

14     A.      No, sir.

15     Q.      And here we have the iControl iHub technology, it's

16     in the iControl box.  Is that some piece of hardware, the

17     iControl box?

18     A.      It's a module that can be in a box.

19     Q.      Is it separate from the security panel?

20     A.      Yes.

21     Q.      And SecureNet doesn't make that, do they?

22     A.      Not that I'm aware of.

23     Q.      A company called Resolution Products makes one?

24     A.      That's one of them.

25     Q.      And Nortek makes a 2 GiG radio, for example, that was

1     my representation to you and you accepted it?

2     A.      I'll agree.

3     Q.      We don't need that.  What about the home security

4     system, SecureNet doesn't make a home security system, do

5     they?

6     A.      Not that I'm aware of.

7     Q.      I think the ones we looked at was the 2 GiG

8     Go!Control and the Simon XTi?

9     A.      Those were two examples.

10    Q.      And we don't make a browser -- SecureNet doesn't make

11    a browser or UC widget, do they?

12    A.      I don't think so, no.

13    Q.      So SecureNet, they don't make the home security

14    central monitoring station that they operate there?

15    A.      They provide the software that runs on the servers.

16    Q.      That's what I meant when I said they operate there.

17    Sorry?

18    A.      Yes.

19    Q.      And so the back end of the server, the SecureNet I

20    think we said they make a server or software for a server?

21    A.      Yes.

22    Q.      Anything that I missed?  I'm not going to cover the

23    internet or cellular network.

24            Thank you, Doctor.  So at SecureNet just to be

25    clear, they're not involved in developing any of the

1    software for the home security panel; right?

2    A.     I don't know what relationships they have.

3    Q.     Okay.  They don't install any security system in any

4    user's homes, do they?

5    A.     I'm not aware of any if they do.

6    Q.     And you said they didn't manufacture any of those

7    components.  They don't sell those components at all, do

8    they, other than the IP camera which I left open given your

9    representation you seen SecureNet on a box somewhere?

10   A.     I don't know.

11   Q.     Okay.  So in the box that you have in front of you,

12   the Protect America box, I'm struggling to find the exhibit

13   number, I think it was labels as Exhibit PTX 743.  In that

14   box is there anything that says SecureNet?

15   A.     I could look, but do you want it?

16   Q.     Please turn to JTX 003, that's the '619 patent.  And

17   if you could look at claim 1, please.  Are you there?

18   A.     My binder came apart, but I'm at the patent.

19   Q.     Thank you.

20          Can you look at claim 1 of the '619 patent,

21   please.  And let's take a look at the second limitation that

22   starts a connection management component coupled to the

23   gateway.  Do you see that?

24   A.     Yep.

25   Q.     Let's look at the Court's claim construction, if we

1   use your exhibit which was PDM 7, I believe.  So the

2   connection management component has to perform two

3   functions; right?  I think you talked about this earlier,

4   for sure?

5   A.    Yes.

6   Q.    And it has to automatically establish a wireless

7   coupling with a separate security system; right?

8   A.    Yes.

9   Q.    It has to form a security system network by

10  automatically -- I'm sorry, using software executing on a

11  processor using the algorithms of 12 and 14; right?

12  A.    Yes.

13  Q.    And it's your opinion that SecureNet provided the

14  structure and function to meet the connection management

15  component limitation; right?

16          And so claim 1 provides a connection management

17  component automatically establishing a wireless coupling,

18  and the limitation continues, the security system including

19  security system components; right?

20  A.    Yes.

21  Q.    So let's talk about security system components for a

22  second.  The parties agree to the construction of that term;

23  right?

24  A.    Yep.

25  Q.    And that's a security panel and one or more

 1    components operatively coupled to the security panel?

 2    A.    Yes.

 3    Q.    And you have identified several different types of

 4    security system components in your analysis today; correct?

 5    A.    Yes.

 6    Q.    And one option is security system sensors; right?

 7    A.    Yes.

 8    Q.    Door sensors, window sensors, those kinds of things?

 9    A.    Yes.

10    Q.    And these are RF sensors like the one that you

11    installed in your office; right?

12    A.    They can be, yes.

13    Q.    But you know the only sensors that you actually

14    installed are the ones that you installed with the Protect

15    America system; right?

16    A.    For this case or the only ones that I have knowledge

17    of?

18    Q.    The only evidence that you provided of actually

19    installing security system sensors are the ones that you

20    installed through the Protect America system; correct?

21    A.    That's right.

22    Q.    And you haven't shown any source codes showing how

23    the sensors connect to a security panel, have you?

24    A.    No.   I just connected them.

25    Q.    And you didn't look at the source codes for the panel

1  at all, did you?

2  A.    I think I looked at some source code for Resolution

3  Products at some point, but it doesn't matter.

4  Q.    Is Resolution Products the security panel?

5  A.    No, that has the gateway.

6  Q.    And so did you look at any source code for the Simon

7  XTi panel?

8  A.    No, sir.

9  Q.    What about the 2GIG GoControl panel?

10  A.    No.

11  Q.    Now, at one point earlier, you said that the security

12  camera would be a security system component.  Do you recall

13  that testimony?

14  A.    It could be a component of the security panel.  Yeah.

15  Q.    So looking at the Court's definition -- I'm sorry,

16  the agreed-upon definition of the parties, the security

17  system is a security panel of one of more components

18  operatively coupled to the security panel; right?

19  A.    Yes.

20  Q.    And a security system component is a component that's

21  operatively coupled to a security panel of a security

22  system; right?

23  A.    Yes.

24  Q.    And you understand that the security camera that

25  SecureNet sells do not connect -- I'm sorry -- do not

1    communicate with the security panel; right?

2    A.    The Wi-Fi ones don't, but I believe the Z-wave ones

3    are --

4    Q.    Are you aware of SecureNet providing a Z-wave camera?

5    A.    I believe so.

6    Q.    Have you shown any evidence of SecureNet producing a

7    Z-wave camera?

8    A.    I have not specifically shown any.

9    Q.    So are you absolutely certain that SecureNet makes a

10   Z-wave camera?

11   A.    SecureNet, I'm certain, does not make a Z-wave

12   camera.

13   Q.    Does SecureNet sell a Z-wave camera?

14   A.    SecureNet probably doesn't sell a Z-wave camera, but

15   the panels will talk to a Z-wave camera.

16   Q.    Have you shown any evidence that SecureNet has a

17   Z-wave camera that's compatible with their back-end server

18   or their app software in any way?

19   A.    Yes.

20   Q.    You've shown a Z-wave camera that's compatible with

21   the SecureNet server?

22   A.    I've shown Z-wave devices that are learned in by

23   device type and device ID, and that would include a Z-wave

24   camera.

25   Q.    But you haven't seen a Z-wave camera?

1    A.      I did not.  I showed Z-wave devices in general.

2    Q.      Not a Z-wave camera?

3    A.      Not specifically.

4    Q.      So absent the Z-wave camera that you haven't shown,

5    any other -- the Wi-Fi security cameras, they're unable to

6    communicate with the security panel; correct?

7    A.      That's right.

8    Q.      And so there's no way that a SecureNet -- let me

9    rephrase.

10            There's no way a security panel operating with

11   the SecureNet server software can operate a security camera;

12   correct?

13   A.      I don't believe that to be true.

14   Q.      You haven't shown that, have you?  You haven't?

15   A.      I have not specifically shown it for a Z-wave camera.

16   I showed it for Z-wave devices in general.

17   Q.      You said you haven't shown it for a Z-wave camera?

18   A.      Not specifically, no.

19   Q.      Okay.  So you haven't shown there's any way that the

20   SecureNet system can work with a panel such as that panel

21   can control a Z-wave camera?

22   A.      I have shown that the panels, in particular the 2GIG

23   have an interface for Z-wave devices.  And since they're

24   speaking the Z-wave protocol, I would think that would

25   include Z-wave cameras.  But I have not tested or provided

1    specific evidence of that.

2    Q.    But you haven't seen that evidence, either, have you?

3    A.    I have not gone out and purchased the Z-wave camera

4    to do it.

5    Q.    But, certainly, if you were trying to make an

6    infringement argument that SecureNet was performing those

7    functions or had that system, certainly you would have gone

8    out and found it; right?

9    A.    If I needed the specific example of a Z-wave camera,

10   I would have.

11   Q.    And with the Wi-Fi cameras that operate the security

12   system, you can't see any video from the security panel;

13   right?

14   A.    No, that requires the app.

15   Q.    But not through the security panel; right?

16   A.    That's right.

17   Q.    And you can't interact with the video camera at all

18   through the security panel; right?

19   A.    Again, I'm not sure that's true, but it's not

20   necessary.

21   Q.    Let's pull up your slide.  Let's go to Slide 42, as

22   they were originally numbered.  It's PDM-42.

23           Do you recall this slide?

24   A.    Yes.

25   Q.    And you said that the SecureNet software performs the

1 step of the algorithms shown in Figures 12 and 14; right?

2 A. Twelve, and most of the steps in 14.

3 Q. Okay.  And you provided your entire opinion regarding

4 how the algorithms of Figures 12 and 14 are met; correct?

5 A. Well, I explained it.  Yes.

6 Q. And that was your entire opinion about how the

7 algorithms of Figures of 12 and 14 are met; right?

8 A. Well, I'm sure I could have spoken longer, but I

9 explained it.

10 Q. But that was your entire opinion, Doctor?

11 A. Yes, that was my explanation as I sit here.

12 Q. Thank you, Doctor.  And so you relied on Z-wave

13 devices as network devices; correct?

14 A. Yes.

15 Q. And you also relied on Z-wave devices as security

16 system components; correct?

17 A. They can be, either.

18 Q. I want to turn to PTX-197, please.  And if we could

19 go to page TPDX-43, please.  Do you recall seeing this

20 document, Dr. Clark?

21 A. Yes.

22 Q. And Mr. Smith had a slide that he put up that

23 highlighted the words automatically several times, and even

24 numbered them for us.  If we could just look at a couple of

25 those.

1          If you look at the second bullet under Number

2   5 -- if you take that slide off.  The second bullet under

3   Number 5 where it says, After enrollment of a device, do you

4   see that?

5   A.     Yes.

6   Q.     So after enrollment of a device, if the device

7   supports -- and then there's a command -- the device will

8   automatically be associated with the controller, so that

9   value changes and events will be automatically reported.

10  That's after the enrollment of the device; correct?

11  A.     But, yeah, the device has to be enrolled.

12  Q.     Right.  So after it's enrolled, then there's some

13  automatic process; right?

14  A.     That's what it says.

15  Q.     So the automatically they're highlighting there that

16  Mr. Smith put up and highlighted for us and numbered, that's

17  not talking about automatic discovery; right?

18  A.     I see your argument, but it's -- it says after the

19  enrollment of the device, then it would be automatically

20  associated with the controller.  So I don't really see the

21  distinction.

22  Q.     Because it's after the enrollment, right, and

23  enrollment happens after discovery; correct?

24  A.     No, usually you would put the panel into enroll mode,

25  as I showed, to discover the Z-wave devices which presumably

1    they could be enrolled.  And if they supported the command

2    class association, then they would be automatically

3    associated, and then change events will be automatically

4    reported.

5    Q.    After enrollment; right, Doctor?

6    A.    Yes, sir.

7    Q.    Thank you.  Let's switch gears.  Let's talk about

8    claim 1 of the '931 patent which is JTX 2.

9             Can you go to that, please?  And you rely on two

10   different security panels as possible touchscreens in the

11   accused system; right?

12   A.    Yes.

13   Q.    The 2GIG GoControl panel?

14   A.    And the Simon -- there's actually three that have

15   touchscreens.

16   Q.    Well, today you relied on the 2GIG GoControl and the

17   Simon XTi correct?

18   A.    That's correct.

19   Q.    So let's look at claim 1 of the '931 patent, and

20   we're there.  And let's take a look at -- the parties

21   stipulated to the definitions of several terms in this

22   patent; correct?

23   A.    That's my understanding.

24   Q.    Can you go back quickly to the claim construction,

25   switch back, and touchscreen was defined as a component with

460

1   a display screen that can receive input via touch; right?

2   A.    Yes.

3   Q.    And security system was defined -- we talked about

4   this earlier.  A security panel is one or more components

5   operatively coupled to the security panel; right?

6   A.    Yes.

7   Q.    So a touchscreen is something different than a

8   security panel; right?

9   A.    Well, it's separately defined to be, sure.

10  Q.    They're two separate components; right?

11  A.    Yeah.  I guess you could say that there's a

12  touchscreen component as part of the security system

13  component.

14  Q.    The Simon XTi touchscreen is part of the panel

15  itself; right?

16  A.    I mean, it's part of the enclosure, but it's

17  definitely a separate component.

18  Q.    But it's part of the panel; right?

19  A.    It comes from the panel.

20  Q.    Okay.  And the GoControl touchscreen is part of the

21  panel itself as well; right?

22  A.    It comes in the same enclosure.

23  Q.    Let's talk about the network interface of the '931

24  patent.  If you go back to claim 1 of the '931 patent, which

25  is, again, JTX 2.  The third limitation recites a plurality

1    of interfaces.

2              Do you see that?

3    A.    Yes.

4    Q.    And they include a security interface, and I want to

5    talk about the network interface.  Do you see that in the

6    claim?

7    A.    Yes.

8    Q.    And it says the network interface allows the user to

9    transfer content to and from a wide area network when

10   coupled to the LAN, right, at the bottom of that?

11   A.    Yes.

12   Q.    So to meet this limitation, we say that the SecureNet

13   app can be directed to the display live video or recorded

14   video; right?

15   A.    That's one way to do it.  The other way to do it is

16   through Z-wave devices.

17   Q.    Okay.  We'll talk about the Z-wave devices, but with

18   respect to the camera, you said that to meet this limitation

19   that the SecureNet app can display live video and recorded

20   video; right?

21   A.    It can, yes.

22   Q.    And you also talk about the push to talk feature;

23   right?

24   A.    Yes.

25   Q.    And we discussed this can only happen on the

1    touchscreen mobile phone; right?

2    A.     The ability to view feeds, I'm not aware of being in

3    any of the security panels that I saw.

4    Q.     Okay.  And as we discussed earlier, the cameras don't

5    communicate over Wi-Fi with the security panels; correct?

6    A.     Right.

7    Q.     And the camera that you got from Protect America,

8    that was an outdoor camera?

9    A.     Yes.

10   Q.     And I think you said it was a well-used outdoor

11   camera, if I remember correctly?

12   A.     It was kind of dirty.

13   Q.     So that was sent to you by Protect America; right?

14   A.     Yes.

15   Q.     And did that have the push to talk functionality on

16   it?

17   A.     No.

18   Q.     Did you ever use the push to talk functionality?

19   A.     No.

20   Q.     Okay.  Did it have any pan tilt or zoom

21   functionality?

22   A.     That particular camera did not.

23   Q.     Okay.  Was that a smart iCamera, do you know?

24   A.     I don't.

25   Q.     And you don't know what kind of -- what brand of

1    camera that was?

2    A.    I didn't memorize all the brands, sir.

3    Q.    Let's go to PDM Slide 17.  Actually, if we can jump

4    from there, take a look at PTX 425, if you would, please.

5          Bear with me one second, Doctor.  Let's instead

6    go to PTX 422.  Have you seen this document?

7    A.    Yes.

8    Q.    And what is this document?

9    A.    This is the user guide for the phone app.

10   Q.    Thank you, Doctor.

11         If we could go to page 625 -- I'm sorry.  Page

12   625, please.  And you recall seeing this image earlier?

13   A.    Yes.

14   Q.    And so just so we're clear, the -- you talked about

15   the functionality of how this would connect to a phone;

16   right?

17   A.    I did.

18   Q.    But you didn't show this jury what you relied on, did

19   you?

20   A.    I relied on my own views, I think I mentioned.

21   Q.    So you didn't point to any other camera than the one

22   that's in here shown in these images or that's talked about

23   in this document that has this functionality; right?

24   A.    No, I did not specifically identify a camera.

25   Q.    And you never looked at the code for this particular

464

1   camera, did you?

2   A.     I mean, I looked at the code for the server dealing

3   with cameras, but not for this particular one.

4   Q.     And you looked at code for the SmartLink app as well;

5   right?

6   A.     Yes.

7   Q.     And you never identified any code that addresses how

8   voice or video is sent to and from the Smart iCamera using

9   the SmartLink app; right?

10  A.     I did not cite to source code.

11  Q.     And you say that you relied on your own experience

12  using the system in terms of the demonstration of how the

13  system works; correct?

14  A.     Yes.

15  Q.     But the Protect America camera that you got didn't

16  have push to talk; correct?

17  A.     That's right.

18  Q.     And it didn't have the pan tilt functionality; right?

19  A.     That's right.

20  Q.     Why don't we take that box of materials out that you

21  have got from Protect America.  Do you have that still?

22  A.     I have it right here.  What would you like to see?

23  Q.     If you can you can take out the components, we'll

24  start with the camera.  That's the outdoor camera that you

25  used, just hold that up?

1                And that says Protect America on the side?

2    A.     Yes.

3    Q.     And so that doesn't come from SecureNet, does it?

4    A.     I don't know.  It says Protect America.

5    Q.     You got it from Protect America?

6    A.     Yes, sir.

7    Q.     What about if you could take the panel out.  Sorry

8    it's so cumbersome.

9                That's a Simon XTi panel?

10   A.     It is.

11   Q.     And you got that from Protect America; right?

12   A.     I did.

13   Q.     SecureNet doesn't make it?

14   A.     Not that I'm aware.

15   Q.     And Protect America sent you that panel; right?

16   A.     Yes.

17   Q.     Same thing for the sensors, before you had a contact

18   sensor that you held up.  You don't have to take it out.

19   A.     Labeled ITI.

20   Q.     So that's not a SecureNet product; right?

21   A.     Not that I'm aware.

22   Q.     And then you had the black box in there, that's the

23   door lock you showed before?

24   A.     Yes, that's this.

25   Q.     That's not a SecureNet product, is it?

1    A.      Not that I'm aware.

2    Q.      And you got that from Protect America I think you

3    said?

4    A.      Yes.

5               MR. MILCH:  I pass the witness.

6               THE COURT:  All right.  Redirect.

7               MR. SMITH:  None, Your Honor, except I may have

8    forget to admit one of the physical exhibits.

9               THE COURT:  All right.

10              MR. SMITH:  Let me just check.  We move to admit

11   PTX 744.

12              MR. MILCH:  No objection, Your Honor.

13              THE COURT:  All right.  Admitted without

14   objection.

15              (PTX 744 was admitted into evidence.)

16              MR. YOON:  I think we're going on to the next

17   witness.

18              THE COURT:  No, I think we can take a break

19   here.  So we'll take a break until about ten minutes to

20   4:00.  If we could take the jury out.  Dr. Clark, if you

21   would just stay there for a second.

22              (Jury leaving the courtroom at 3:36 p.m.)

23              THE COURT:  All right.  So we'll take a break.

24              MR. YOON:  Maybe we can deal with it afterwards.

25              THE COURT:  What?

```
 1              MR. YOON:  I just wanted to note one thing, Your

 2   Honor, just because it was an issue in the opening, given

 3   that counsel for SecureNet had put X's all over figure 1 as

 4   their basis for non-infringement, I should be able to put

 5   figure 1 in the SecureNet --

 6              THE COURT:  I don't think that's their basis for

 7   non-infringement, so you're allowed to use figure 1.  All

 8   right.  We'll be in recess.

 9              (A brief recess was taken.)

10              THE COURT:  All right.  I am trying to get the

11   temperature lowered in here.  Let's get the jurors.

12              MR. YOON:  Your Honor, the binder is already up

13   here for the witness.  The court reporter has the binder.

14   Here is the binder for the witness.

15              THE COURT:  Thank you.

16              Who is the witness after Mr. Natale?

17              MR. YOON:  It will be the damages expert.

18              THE COURT:  Is that your last witness?

19              MR. YOON:  It is, Your Honor.  We are right on

20   pace.

21              THE COURT:  Okay.

22              MR. YOON:  May Mr. Natale go up there?

23              THE COURT:  Yes.

24              (Jury entering the courtroom at 3:52 p.m.)

25              THE COURT:  All right.  Members of the jury,
```

1    welcome back.  I had started the process of trying to get

2    the temperature lowered in here.  It's, you know, if you

3    watch the movie Titanic, when the iceberg is there, it takes

4    like forty-five minutes.  If you don't have forty-five

5    minutes notice, you hit the iceberg.  It's kind of like that

6    with the temperature controls in here.  But in any event,

7    probably by the time you leave today, it will be cold.

8                   MR. YOON:  Just for the record, Your Honor, for

9    Alarm.com's next witness we call Nate Natale.

10                  THE COURT:  All right.

11                  THE CLERK:  Please state and spell your full

12   name for the record.

13                  THE WITNESS:  It's a Donald Natale.

14   D-O-N-A-L-D.  N-A-T-A-L-E.

15                        DIRECT EXAMINATION

16   BY MR. YOON:

17   Q.    Good afternoon, Mr. Natale.

18   A.    Good afternoon.

19   Q.    And, sir, would you please introduce yourself to the

20   jury?

21   A.    I am Nate Natale.  I'm senior vice-president of North

22   American sales.

23   Q.    Sir, what are your responsibilities as vice-president

24   of North American sales at Alarm.com?

25   A.    I oversee our sales leaders that work in the various

1    sales positions.

2    Q.    And sir, who are Alarm.com's primary customers in the

3    United States?

4    A.    They are our dealers.

5    Q.    And sometime are they referred to as security dealers

6    or security providers?

7    A.    Yes.

8    Q.    And sir, in your position as vice-president of sales,

9    how often do you communicate directly with your security

10   dealers for potential business?

11   A.    Daily basis.

12   Q.    And Mr. Natale, as part of the compensation that

13   Alarm.com receives for its services, who directly pays

14   Alarm.com?

15   A.    Our partners, our security dealers.

16            MR. YOON:  I would like to now move into

17   evidence exhibit PTX 253, please.

18            MS. WHELAN:  No objection.

19            THE COURT:  It's admitted without objection.

20            MR. YOON:  Can we have this on the screen,

21   please.

22            (PTX 253 was admitted into evidence.)

23   BY MR. YOON:

24   Q.    Mr. Natale, what is Exhibit 253?

25   A.    That is a pricing schedule that we provide our

1    dealers.

2    Q.      And what is the purpose of a pricing schedule?

3    A.      To establish the price that we charge for services.

4    Q.      And what is the date of this particular price list,

5    sir?

6    A.      Would you find this in here?

7    Q.      If you look at the bottom, there is a copy right

8    there.

9    A.      2014.

10   Q.      And would there be a price list for 2015, '16, and

11   '17 that's similar?

12   A.      Yes.

13   Q.      And sir, do you see there is a reference there to a

14   section called Residential Interactive Service Plan, or

15   interactive plan?

16   A.      Yes.

17   Q.      What do they refer to sir?

18   A.      They refer to various levels of interactive services

19   that we provided our dealers.

20   Q.      If we could just focus on one of them, Interactive

21   Gold.  Sir, would you briefly describe the Interactive Gold

22   plan?

23   A.      It is a plan that encompasses most of our features,

24   everything from interactive services to automation to also

25   things like image sensors and severe weather notifications,

1    those sorts of things.

2    Q.    And how much would a dealer under this price list pay

3    Alarm.com a month for that service?

4    A.    $9.95.

5    Q.    And, sir, you indicated earlier that you communicated

6    regularly with the security dealers and providers?

7    A.    Yes.

8    Q.    And does SecureNet ever come up in those

9    conversations, sir?

10   A.    Yes.

11   Q.    And on what basis do you hear that SecureNet competes

12   with Alarm.com?

13              MS. WHELAN:  Objection; hearsay.

14              THE COURT:  I'm going to overrule it.

15              THE WITNESS:  Primarily on a price basis.

16   BY MR. YOON:

17   Q.    And how does price competition with SecureNet affect

18   your relationship with your service providers?

19   A.    Well, it negatively impacts our relationship and

20   introduces new variables.

21   Q.    And can you think of an example of a customer that

22   Alarm.com has lost to SecureNet because of price?

23   A.    Well, of course, the first one was Protect America.

24   Q.    And, sir, approximately how many new subscribers per

25   month does Alarm.com have?

1    A.    In the core business, approximately 70,000 new

2    subscribers a month.

3    Q.    And if SecureNet did not take the Protect America

4    business, did Alarm.com have the capacity to service it?

5    A.    Oh, certainly.

6            MR. YOON:  Now, sir, we'd like to now admit

7    Exhibit PTX-264.

8            MS. WHELAN:  No objection.

9            THE COURT:  All right.  Admitted without

10   objection.

11           (Exhibit PTX-264 was admitted into evidence.)

12   BY MR. YOON:

13   Q.    If we could blow up the top email, sir.  Mr. Natale,

14   who is Kevin Bradley?

15   A.    He's our vice president of financial planning.

16   Q.    And do you communicate with Mr. Bradley regarding the

17   pricing of Alarm.com products?

18   A.    I do.

19   Q.    And do you do that in your position as VP of sales?

20   A.    Yes.

21   Q.    Do you communicate with Mr. Bradley when you're

22   competing for new business?

23   A.    Yes.

24   Q.    Do you see the first sentence there in the email,

25   "We're definitely not going to compete with SecureNet head

1    on regarding price"?

2    A.    Yes, sir.

3    Q.    As VP of sales, what do you understand Alarm.com's

4    view is in terms of competing with SecureNet on price?

5    A.    Well, in Mr. Bradley's opinion, that we could not

6    maintain our level of service to our dealers if we were to

7    go as low as SecureNet, so he was not willing to go that low

8    in terms of pricing.

9    Q.    And what is Mr. Bradley's position at Alarm.com?

10   A.    He's vice president of financial planning.

11             MR. YOON:  No further questions.

12                  CROSS-EXAMINATION

13   BY MS. WHELAN:

14   Q.    Good afternoon, Mr. Natale.

15   A.    Hi.

16   Q.    We haven't met before.  My name is Rose Whelan.  I'm

17   one of the lawyers for SecureNet.  Let's talk about the

18   services that Alarm.com provides.  Alarm.com generally

19   provides different tiers of services; correct?

20   A.    That's correct.

21   Q.    Please turn to DTX-302 in your binder.

22             MS. WHELAN:  And Your Honor, I'd move to admit

23   DTX-302.

24             MR. YOON:  No objection, Your Honor.

25             THE COURT:  All right.  Admitted without

1   objection.

2                    (Exhibit DTX-302 was admitted into evidence.)

3   BY MS. WHELAN:

4   Q.    This is Alarm.com's service and pricing list for

5   2016; correct?

6   A.    Yes.

7   Q.    Let's look at the residential services.  Let's first

8   look at the wireless signal forwarding.

9                    And this wireless signal forwarding, this does

10  not give you any notifications or remote access to your

11  system; correct?

12  A.    It doesn't give the consumer remote access.  No.  You

13  can actually look at that plan remotely, see the status of

14  your system, but you can't control it.

15  Q.    The only thing it really does is provides a

16  transmittal of alarm signals to a central station; correct?

17  A.    No.  Well, no, not exactly.  It also allows the

18  dealer to remotely control, remotely program the system.  So

19  there's more than just that.

20  Q.    But as far as an end user, that's really the only

21  service that they would see?

22  A.    Yeah.  Yes.

23  Q.    So you'd agree with me that that service doesn't

24  include Z-wave; correct?

25  A.    Well, it could -- it could include Z-wave at the

1    residential -- at the home level, but not remote

2    connectivity.

3    Q.     Right.  So the Alarm.com app wouldn't provide Z-wave

4    functionality with that service level?

5    A.     Right.

6    Q.     Let's move to the next tier.  The next tier is called

7    interactive; correct?

8    A.     Correct.

9    Q.     And it allows you to monitor the status of sensors in

10   your home?

11   A.     It does.

12   Q.     And to arm and disarm your system?

13   A.     Yes.

14   Q.     And you'd agree with me as well that this doesn't

15   include Z-wave, either; correct?

16   A.     It doesn't -- it doesn't include remote connect or

17   remote management of Z-wave.  That's correct.

18   Q.     And the next level is called interactive with

19   automation?

20   A.     Right.

21   Q.     And that allows you to do things like control

22   different features in your house, for example, lights,

23   thermostats, door locks?

24   A.     Yes, that level includes the complete Z-wave

25   integration.

1    Q.    So you'd agree with me that Z-wave is what provides

2    that functionality?

3    A.    Well, it provides the lights, and locks, and

4    thermostats.  There's other Wi-Fi features that are included

5    in that as well.

6    Q.    So that service plan includes Z-wave, you'd agree?

7    A.    Yes.  It includes Z-wave.

8    Q.    Let's look at the prices for these different service

9    plans.  Now, would you agree with me that the interactive

10   with automation is only one more than interactive?

11   A.    One dollar more?

12   Q.    Excuse me.  One dollar more?

13   A.    Yes.

14   Q.    Yes.  So if an end customer were to add Z-wave to the

15   Alarm.com app to their home security system, Alarm.com would

16   only receive one additional dollar for that; correct?

17   A.    We would, from the dealer, that is correct.

18   Q.    Let's turn to PTX-253.  I believe that was already

19   admitted into evidence.

20   A.    That would be in the other binder?

21   Q.    Yes, sir.  It's in the other binder.

22   A.    Yes.

23   Q.    And this is the pricing list that you discussed in

24   your direct testimony; correct?

25   A.    Correct.

1    Q.      It's from 2014?

2    A.      Yes.

3    Q.      And in 2014, the service plans were a little

4    different; right?

5    A.      They were, yes.

6    Q.      And at that time, advanced interactive didn't include

7    Z-wave, did it?

8    A.      No.

9    Q.      It was just in the interactive gold package?

10   A.      I'm trying to remember at that point.  Yes, that's

11   true.

12   Q.      And if you look at the difference between the prices

13   of the interactive gold and the interactive advanced

14   packages, you'd agree with me that that's only 70 percent --

15   excuse me, 70 cents more?

16   A.      Correct.

17   Q.      So if an end user were to add Z-wave to their home

18   security package with Alarm.com dealers in the 2014 time

19   period, they'd only pay 70 -- excuse me, Alarm.com would

20   only receive 70 additional cents from the dealer; correct?

21   A.      If they moved up in packages, they're -- it would

22   make most sense to do that, but you could add automation to

23   the advanced package.  But we -- what we were trying to do

24   with the interactive gold was package more features together

25   and sell it in a more -- at a more competitive price.

1    Q.      So -- but the difference to Alarm.com between a

2    customer who was signed up with interactive gold or advanced

3    interactive, that would only be 70 cents; right?

4    A.      Between those two packages, yes.

5    Q.      Let's talk about Alarm.com's pricing strategy.

6    Alarm.com changes its pricing plans based on market

7    conditions; correct?

8    A.      Well, I mean, we change pricing mostly based on

9    dealer commitment and volume, but --

10   Q.      That would include market conditions, you would agree

11   with me?

12   A.      I guess it could.

13   Q.      And one factor that you consider in pricing would be

14   pricing offered by competitors; right?

15   A.      I think it would be probably be a consideration.

16   Q.      And you're aware of what SecureNet's pricing is,

17   that's something you have received intel on; correct?

18   A.      Generally, I know we've received some intel on it.

19   I'm not exactly sure what their pricing is.

20   Q.      If you could flip to PTX -- excuse me one moment.  If

21   you could flip to DTX-61 in your binder.

22   A.      Yes.

23              MS. WHELAN:  Your Honor, I'd move to admit

24   DTX-61 into evidence.

25              MR. YOON:  No objection, Your Honor.

```
 1                 THE COURT:  All right.  Admitted without
 2   objection.
 3   BY MS. WHELAN:
 4   Q.     This is an email you forwarded to others at
 5   Alarm.com; correct?
 6   A.     Yes, it looks like it.
 7   Q.     And there's an attachment to this email, correct, if
 8   you flip to the second page?
 9   A.     I -- I think so.  Yes.
10   Q.     And if you look down at the -- go back to the first
11   page and look at the bottom email.  Mr. Gregory refers to
12   that attachment as intel; is that correct?
13   A.     Yes.  Yes.
14   Q.     And that intel, if you flip back to the second page,
15   that's SecureNet's price list for AIN; correct?
16   A.     Yes.
17   Q.     So it's useful to know what your competition does;
18   correct?
19   A.     I'm not sure if it's useful.  I mean, it was -- it
20   was interesting information.
21   Q.     Well, you'd agree with me that there's certainly
22   nothing untoward about monitoring competitors' prices;
23   right?
24   A.     I think that we were given some pricing here.  I
25   mean, it was interesting to see what that was.
```

1    Q.      And that's something that you'd expect companies to

2    do in the industry if they had access to competitors'

3    pricing, that would be something they'd be interested in;

4    right?

5    A.      I would think that you would look at it.

6    Q.      You looked at it?

7    A.      I did look at it.

8    Q.      Mr. Natale, would you agree that a competitor's price

9    isn't the only thing that Alarm.com takes into account to

10   determine pricing?

11   A.      I'm sorry.  Could you repeat the question?

12   Q.      I said would you agree that a competitor's price

13   isn't the only thing that Alarm.com takes into account when

14   determining pricing?

15   A.      Yes, definitely.

16   Q.      I would like to briefly discuss dealer relationships.

17   You would agree that there would be costs to dealers

18   associated with switching end customers from one software

19   provider to another; right?

20   A.      You mean back end provider?

21   Q.      Correct, like an Alarm.com?

22   A.      There would be costs associated with it, yes.

23   Q.      And you would agree with me that Alarm.com and

24   Protect America discussed the potential of Protect America

25   switching end customers and subscribers from SecureNet to

1    Alarm.com in 2015; right?

2    A.      I don't remember that specifically.

3    Q.      Let's flip to PTX 264, which is in your other binder.

4    It was the exhibit you were discussing with Mr. Yoon.

5    A.      Okay.

6    Q.      If you could take a look at the back of that, I

7    believe it's the page, the Bates number that ends in 37887.

8    And there is an e-mail from Mr. Spencer Wheelwright of

9    Protect America; right?

10   A.      I see an e-mail from him.

11   Q.      If you go down to the middle, you see Alarm.com

12   provides three scenarios with different numbers of active

13   accounts at the end of 2016; correct?

14   A.      Yes.

15   Q.      And if you look at the top of the e-mail you can see

16   the conversation was taking place in May of 2015?

17   A.      Yes.

18   Q.      And if I can have you flip a little further in the

19   chain to the Bates page ending in 37885.

20   A.      Okay.

21   Q.      And this is an e-mail from Kevin Bradley?

22   A.      Okay.

23   Q.      And Mr. Bradley was the gentleman you were discussing

24   in your direct examination?

25   A.      Correct.  Yes.

1    Q.      And, if you look down to four lines down I see

2    Mr. Bradley says, "Scenario 3 may be the conversion of all

3    their SecureNet accounts."  Do you see that?

4    A.      Yes.

5    Q.      And would you agree with me that Mr. Bradley is

6    referring back to the scenario 3 in the e-mail for

7    Mr. Wheelwright at Protect America?

8    A.      Yes, I believe so.

9    Q.      So Mr. Bradley almost was contemplating that one of

10   the three scenarios at Protect America would involve

11   switching all of the SecureNet accounts to Alarm.com;

12   correct?

13   A.      My understanding is all the accounts going forward,

14   so moving to the Alarm.com platform I think is what he's

15   saying here.

16   Q.      So conversion?

17   A.      Well, conversion to me would mean taking over old

18   accounts or existing accounts and moving them on to our

19   platform.  But I think he's talking about moving forward and

20   using us as the platform.

21   Q.      Right.  And Mr. Bradley uses the term conversion

22   here; right?

23   A.      He may have.  I don't know.

24   Q.      He says scenario 3 may be the conversion of all of

25   their SecureNet accounts.  And you said conversion would

1   mean transferring old accounts and new accounts; correct?

2   A.    I don't think he meant that.  I think he means in

3   terms of conversion, converting the business to Alarm.com as

4   we move forward.  I don't think he -- I don't think they

5   would have been able to convert the old accounts very

6   easily.

7   Q.    Well, Alarm.com was so interested in getting Protect

8   America business, doing this conversion as Mr. Bradley said

9   that Protect America offered -- excuse me, Alarm.com offered

10  Protect America a discount; correct?

11  A.    I believe we did, yes.

12  Q.    In fact, Alarm.com offered Protect America twelve

13  months of free service for competitive takeovers; right?

14  A.    That might be true, if it's in the document.

15  Q.    It is.  If I can direct your attention to the page

16  ending the 37883.

17  A.    Okay.

18  Q.    And in the middle of the page, middle e-mail,

19  Mr. Martin Herbert wrote -- just for the jury, who is

20  Mr. Herbert?

21  A.    Marty Herbert is one of the account leaders at the

22  time.  He was heading our corporate account.

23  Q.    And he wrote, "We showed him a $99 direct price for

24  new Verizon radios and twelve months of free service for

25  competitive takeovers."

1  A.     Yes.

2  Q.     So it's fair to say that in discussions with Protect

3  America, Alarm.com offered them twelve months of free

4  service for competitive takeovers?

5  A.     I think what the offer was is that we would provide

6  free service for some period of time, I don't know what that

7  was, as a conversion incentive to move over.

8  Q.     And the e-mail says twelve months of free service;

9  correct?  Do you see that?

10  A.     Oh, yes.

11  Q.     But even though Alarm.com offered Protect America

12  twelve months of free service, Protect America did not

13  switch from SecureNet to Alarm.com; correct?

14  A.     That's true.

15  Q.     Mr. Natale, dealers will partner with multiple

16  companies at once?

17  A.     They can.

18  Q.     So, for example, a dealer will work with Honeywell or

19  SecureNet, but also work with Alarm.com; correct?

20  A.     Yes.

21  Q.     Slomin's is a dealer; correct?

22  A.     They are a dealer.

23  Q.     And Slomin's is not an Alarm.com customer; correct?

24  A.     No.

25  Q.     And at some point Alarm.com and SecureNet were both

1    competing for Slomin's business?

2    A.    Well, we were competing for their business.  I'm not

3    sure when SecureNet got involved with that account.

4    Q.    But ultimately Slomin's chose to go with SecureNet;

5    correct?

6    A.    They did.

7    Q.    Mr. Natale, Alarm.com has lost customers to

8    Honeywell; correct?

9    A.    We probably have.

10   Q.    For example, you lost with ADS?

11   A.    Yes.

12   Q.    ADS is a dealer in Nashville?

13   A.    That's correct.

14   Q.    And they were using Alarm.com?

15   A.    Yes.

16   Q.    With hundreds of accounts on a monthly basis;

17   correct?

18   A.    Well, they were a Honeywell dealer and they started

19   using some Alarm.com, and then decided to move all over to

20   Honeywell to consolidate the business.  But it was a

21   Honeywell account that we won partially and then they moved

22   back to Honeywell.

23   Q.    They switched back to Honeywell?

24   A.    They did.

25   Q.    Is if SecureNet loses this case and goes out of

1   business as a result of this litigation --

2               MR. YOON:  Objection, Your Honor.  Side-bar.

3               THE COURT:  Yes.

4           (Side-bar discussion:)

5               MR. YOON:  The law is very clear, they can't

6   argue that we're going to drive them out of business because

7   of this lawsuit.  He mentioned in their opening how they

8   would go out of business in the question, that's an improper

9   question.

10              THE COURT:  What do you have to say?

11              MS. WHELAN:  I was simply asking if they

12  didn't --

13              THE COURT:  What was the question?

14              MS. WHELAN:  I was going to ask if there would

15  still be competitors, other competitors in the market.

16              THE COURT:  I'm going to sustain the objection

17  to that question.  I mean, I don't get what the relevance of

18  it is.

19          (End of side-bar.)

20  BY MS. WHELAN:

21  Q.    There are many competitors in the market other than

22  SecureNet; correct?

23  A.    I guess it depends on how you define many.  There are

24  a handful that we compete against for our type of services.

25  Q.    Like Honeywell?

1    A.      Like Honeywell, yes.

2    Q.      And like Telular?

3    A.      Right.

4    Q.      And like Rein?

5    A.      I wouldn't say we compete with Rein.

6    Q.      They're competitor in the market, though?

7    A.      Well, they don't compete for what we sell to.  We

8    sell to dealers.  So they are not currently in that market.

9    They could be a competitor at some point, but I don't think

10   they are currently.

11   Q.      But you would agree that other than SecureNet, there

12   are other competitors?

13   A.      Yes.

14              MS. WHELAN:  No further questions.

15              THE COURT:  Any redirect?

16              MR. YOON:  Just real short, Your Honor.

17                   REDIRECT EXAMINATION

18   BY MR. YOON:

19   Q.      If I could have DTX 302 on the screen.  And this was

20   in the cross-examination binder, sir.

21   A.      I have it.

22   Q.      And sir, if you could expand the residential

23   interactive plan.

24              Sir, there was a discussion about the pricing of

25   the difference between the interactive and the interactive

1    with automation.  There is a reference to $7.15 and $8.15.

2    Do you see that?

3    A.    I do.

4    Q.    Do you recall there was a discussion of a dollar

5    difference, do you recall that?

6    A.    Yes.

7    Q.    But it's $8.15 per month; correct, sir?

8    A.    That's correct.

9    Q.    And $7.15 per month; correct?

10   A.    Yes, sir.

11   Q.    And what's the average length of a subscriber

12   contract, sir?

13   A.    I think the industry average is about eight years.

14   Q.    So if you multiply eight times twelve, you get

15   ninety-six; correct?

16   A.    Yes.

17               MR. YOON:  Thank you.

18               THE COURT:  All right.  Mr. Natale, you may step

19   down.  Watch your step.  And careful.

20               THE WITNESS:  Thank you.

21               I leave this here.

22               THE COURT:  Leave it.  Other people will take

23   care of it.

24               MR. YOON:  Thank you, Mr. Natale.

25               Your Honor, we're going to call our next witness

1    for direct examination, our damages expert, Brett Reed.

2                    THE COURT:  Okay.

3                    THE CLERK:  Please state and spell your full

4    name for the record.

5                    THE WITNESS:  Brett Reed.

6                    MR. YOON:  This is only for reference, Your

7    Honor.  We're not going to be using these many documents.

8    I'm not going to make your clerk open them up.  These are

9    just foundational purposes.

10                        DIRECT EXAMINATION.

11                    MR. YOON:  Has Mr. Reed been sworn in?

12                    THE COURT:  Yes.

13                    MR. YOON:  Thank you.

14   BY MR. YOON:

15   Q.    Mr. Reed, could you please introduce yourself to the

16   jury, please?

17   A.    Yes, good afternoon.  My name is Brett Reed.  I'm

18   from Pasadena, California.  I'm an economist.  I work with a

19   company call Competition Economics.

20   Q.    What are you here to address today?

21   A.    I'm here to address damages.  And in a patent case

22   like this, damages experts such as I address adequate

23   compensation for the alleged infringer to pay the patent

24   owner, that's what I'm analyzing for damages.

25   Q.    Mr. Reed, what's your area of expertise?

1    A.    I'm an economist and my experience over the last

2    thirty-four years has been working on various matters

3    relating to intellectual property valuation and other

4    damages issues.  Occasionally it leads to my work on large

5    patent infringement cases and sometimes I testify in United

6    States District Court like this addressing my opinions about

7    patent damages.

8    Q.    And sir, approximately how many years have been doing

9    patent damages analysis?

10   A.    When I started work as an economic consultant right

11   out of college, I started working on patent infringement

12   matters.  It's been almost thirty-five years.

13   Q.    How are you being compensated in this case, sir?

14   A.    My firm is compensated for the time that's put into

15   the project by myself and people at my firm that help assist

16   me.

17   Q.    What rate are you charging, sir?

18   A.    My rate is $575 per hour.

19   Q.    And is that your customary rate?

20   A.    That is my customary rate.

21   Q.    Is what you're being paid dependent in any way on the

22   outcome of this case?

23   A.    No, it's not.

24   Q.    Can you tell me a little bit about your educational

25   background?

1    A.    Yes.  I received a bachelors degree in economics and

2    geography from the University of California.  I went into

3    the Ph.D. program at UCLA, Ph.D. program in economics and

4    there I received a masters degree in economics.  I was a

5    teaching associates for two years.

6                MR. YOON:  At this time we would like to offer

7    Mr. Brett Reed as a qualified expert in the field of

8    economics and damages for the purposes of offering testimony

9    regarding the patent reasonable royalty and lost profit

10   damages in this case.

11               MR. CAMPBELL:  No objection.

12               THE COURT:  All right.  You may proceed.

13   BY MR. YOON:

14   Q.    Mr. Reed, could you briefly describe for the jury

15   what you did to form your opinions in this case?

16   A.    Yes.  I did a substantial amount of analysis and

17   review of documents and data, including depositions that

18   were available in this case, financial records from both

19   Alarm.com, from iControl, from SecureNet.  I reviewed

20   marketing materials, proposals and forecasts that were

21   provided by these companies.  And a substantial amount of

22   research of the underlying market conditions, including

23   review of a lot of SalesForce.com documents of Alarm.com

24   where it's addressing the interaction with the dealers about

25   the competitive environment.

1   Q.     And sir, did you do anything to have an

2   understanding, basic understanding of the technical issues

3   in this case?

4   A.     Well, in that regard, I'm an economist, so I rely on

5   the technical experts.  In this case I had a meeting with

6   Dr. Clark who you heard testify, and he provided me his

7   opinions about the issues of the technical side, his

8   opinions about infringement.  I also reviewed depositions of

9   some of the company personnel and I had conversations with

10  Mr. Bradley who you just heard about and Mr. Natale who you

11  just heard testimony from.

12  Q.     And did you have discussions with anyone else in

13  forming your opinions?

14  A.     Yes.  I also had discussions with Mr. Dawes who was

15  the iControl CEO who you all heard testify yesterday.

16  Q.     Now, as part of your review and analysis, Mr. Reed,

17  did you review a substantial number of documents?

18  A.     I did.  A large number of subscriber data, pricing

19  data, large number of different types of documents going to

20  the issues of financials and market issues.

21         MR. YOON:  At this time, Your Honor, we would

22  like to move into evidence PTX 47, 48, 64 to 123, 206, 386,

23  397, 434, 473, 871, and 800 to 826 into evidence.

24         And 781 into evidence.

25         MR. CAMPBELL:  No objection.

```
 1                    THE COURT:  Well, are these these boxes here?

 2                    MR. YOON:   Yes, Your Honor.

 3                    THE COURT:  So what is the point?  Presumably

 4       you have some summaries.  Nobody is ever going to look at

 5       these boxes.  Why are you moving these into evidence?

 6                    MR. YOON:  And I understand, Your Honor.  I must

 7       apologize if I'm anally retentive.  I assume that we do have

 8       summaries.  We're going to be going over the summaries.  And

 9       I don't think it's disputed that Mr. Reed looked at them.

10       We just were establishing a record.  That was the only

11       reason.

12                    THE COURT:  Okay.  Well, I'm going to hold off

13       on admitting them because if I admit them at some point,

14       then I'm going to be giving them to the jury.  And I just

15       think that's not a good idea.

16                    So if you need them when you're finished, you

17       can bring it back.  But I don't think you're going to need

18       them, and I don't think, if the defendant is planning to do

19       the same thing, they're going to need it, either.

20                    MR. YOON:  Understood, Your Honor.  We don't

21       plan on making anyone go through all the boxes.

22       BY MR. YOON:

23       Q.    Mr. Reed, just to make clear on the record, when you

24       formed your opinions in this case, what were the types of

25       documents you relied on with respect to your reasonable
```

1  royalty and lost profit analysis?

2  A.    Well, in addition to review of documents that would

3  go to determination of a royalty rate for my royalty

4  opinion, which I'll be addressing in a little bit, I

5  reviewed a substantial amount of information about the plans

6  that were being offered.  You heard a little bit about that

7  with Mr. Natale's testimony.

8         I looked at the data from SecureNet that showed

9  the number of subscribers every month for the different

10  accounts.  And that was part of the information I analyzed

11  for purposes of assessing the reasonable royalty and the

12  lost profit damages that I will be addressing.

13  Q.    Well, let's go to the summary information, instead of

14  the documents, Mr. Reed.  Can we have Slide 1 on the screen,

15  please?

16         Mr. Reed, what types of damages are included in

17  your analysis with regards to damages in this case?

18  A.    My analysis includes two types which are typical on

19  assessing a patent infringement damages case.  One is

20  reasonable royalty, and the other is lost profits.

21         And this shows the summary of my analysis.  The

22  lost profit damages are $14.54 million.  And the reasonable

23  royalty damages are 5.54 million.

24         I should make a note that under the patent

25  statute, a patent owner's entitled to no less than a

1    reasonable royalty.  So I -- I analyzed the lost profit

2    damages, and I'm going to address certain damages.

3              The lost profits don't apply to all the

4    infringing activity.  Then with the remaining portion,

5    reasonable royalty applies.

6    Q.    And Mr. Reed, for what period of time did you do a

7    lost profit analysis?

8    A.    The lost profit damage period is limited to the

9    period beginning March 8th, 2017.  That's the date which

10   Alarm.com obtained ownership of the patents-in-suit, and

11   that's when the accounting for lost profits begins.

12   Q.    And what time period is covered by your reasonable

13   royalty analysis?

14   A.    This particular calculation which totals $20.1

15   million, the reasonable royalty starts in September of 2014.

16   That's the date in which the original lawsuit was filed that

17   you heard Mr. Dawes address, and when the -- two of the

18   patents, the '844 and '619 patents were identified to

19   SecureNet.

20   Q.    And, sir, in your analysis, what assumptions, if any,

21   were you required to make?

22   A.    There's important assumptions that every damage

23   analyst is required to assess in a patent infringement case,

24   and that is if the patents are viewed valid and that the

25   patents are viewed infringed.  There's not questions about

1    that.

2              In the real world, parties will often debate

3    those issues, and it has an important implication on value.

4    In the patent damages analysis, we assume the patents are

5    valid.  We assume the patents are infringed.

6    Q.    And if we could go to the next slide.  Now, how did

7    you determine -- so what methodology did you use to

8    determine the calculation of a reasonable royalty?

9    A.    This is common methodology used.  We're talking about

10   150 matters as an expert in patent infringement matters.

11             Every single one analyzes this form of damages,

12   Georgia-Pacific factors.  It comes from a famous case law

13   called the Georgia-Pacific case.

14             Fifteen economic, licensing and financial

15   factors to evaluate.  And it shows some of these different

16   factors grouped by type because it's often convenient to

17   look at them in these -- in this group of five.  And they're

18   often analyzed in the context of the 15th factor, which I'll

19   discuss in a matter, which is called a hypothetical

20   negotiation.

21   Q.    Now, you analyzed all 15 factors, sir?

22   A.    I analyzed all 15 as part of my analysis.

23   Q.    And which factors did you consider to be most

24   significant for the calculation of a reasonable royalty?

25   A.    Well, there were three in particular.  The commercial

1    relationship, the competitive relationship here between the

2    parties, the licensing issues, and then the -- what I'm

3    calling this blue slice of pie, popularity of patented

4    invention.  The alternative set would be available from the

5    prior art, sometimes called non-infringing alternatives and

6    the profitability associated with it.

7    Q.    If we could go to the next slide, Mr. Reed, you

8    mentioned.  What is the hypothetical negotiation?

9    A.    So it's this hypothetical context that, for purposes

10   of assessing reasonable royalty damages, we assume that the

11   patent owner and the party that's going to introduce a

12   product that's going to be viewed infringing, that they sit

13   together at a table like I'm showing you on this exhibit and

14   negotiate about whether reasonable royalty would be -- would

15   be taken into account, the considerations of both parties.

16         So here another aspect is this takes place just

17   before the date of the first infringement, which would be,

18   in this case, just before the patents issued.  So we have

19   iControl which was the owner of the patents at the time, and

20   SecureNet which is getting ready to face the situation where

21   its product is going to be infringing these new patents that

22   are being issued.

23         They have to sit down and agree to what a

24   reasonable royalty would be.  So iControl provides patent

25   technology to SecureNet in the form of a license.  SecureNet

1   pays a royalty payment to iControl.

2   Q.    If we can have the next slide, Slide 4, please.  Now,

3   Mr. Reed, you were present during the opening statement in

4   this case?

5   A.    I was, yes.

6   Q.    And do you recall that SecureNet put up this slide?

7   And you also heard testimony about this KPMG report; do you

8   recall that?

9   A.    Yes.  To be clear, they put up the slide that's the

10  small portion on the left-hand side, and I've added notes in

11  my slide.  But, yes, this was a slide that was put up by

12  SecureNet.

13  Q.    Now, in your analysis, did you become aware of the

14  KPMG report?

15  A.    I did become aware of it as a deposition exhibit.

16  Yes.

17  Q.    And so what relevance do you believe that the KPMG

18  report has to your reasonable royalty analysis in this case?

19  A.    I don't think it has any relevance to any reasonable

20  royalty analysis.  It provides certain information about the

21  acquisition, but it doesn't address the right questions.

22  Q.    And so why do you believe that it's not relevant to

23  the reasonable royalty analysis with respect to the

24  Georgia-Pacific factors, for example?

25  A.    Well, for example, it doesn't address the

1   Georgia-Pacific factors.  There's no assessment of the

2   impact of SecureNet's infringement on either iControl or

3   Alarm.com.  And in fact, the KPMG study didn't even address

4   this, the SecureNet lawsuit.

5   Q.     Now, does the KPMG study at any point assess what a

6   reasonable royalty would be for SecureNet?

7   A.     No.  It did not address the specific facts of this

8   case.

9   Q.     Does the KPMG analysis assume the validity and

10  infringement of the patent?

11  A.     No, it doesn't.  Again, that's a very important

12  element of a patent infringement damages matter.

13  Q.     And we'll come back to it with respect to lost

14  profits, but just because it's on the slide right now:  Does

15  the KPMG analysis include any type of lost profit

16  calculation?

17  A.     No, it doesn't.  It doesn't address the Panduit

18  factors which I'll address later in my opinion.

19  Q.     Let's go to Slide 5, please.  Now, Mr. Reed, in your

20  opinion, what were the most important factors that would

21  have driven the hypothetical negotiation between iControl

22  and SecureNet at the date of the first infringement?

23  A.     Yes.  I suggested a little bit of thia answer in the

24  previous question and answer, but the number one item is the

25  competitor relationship between SecureNet and iControl.

1    IControl had established relationships with ADT.  And then

2    in 2012-2013, it was establishing a relationship with

3    Telular.  We heard some about this testimony with respect to

4    testimony from Mr. Dawes.

5              These were very important relationships for

6    iControl, and these would have been foremost in iControl's

7    mind when they would be negotiating with another company

8    that would be attempting to compete with iControl and its

9    critical customers.

10             The second element is that I have information in

11   this case available about industry royalty rates for

12   important licenses between an important license between

13   Alarm.com and a company called Vivint, which is another very

14   large security provider that uses Alarm.com technology and

15   that provides information about royalty rates.  That's very

16   informative.

17             And then the third is that SecureNet has a lack

18   of ability of non-infringing alternative.  This was

19   addressed by Dr. Clark in his testimony.

20             So what that means is that there's not some way

21   that SecureNet could modify its product and offer something

22   that would be acceptable to its dealers and to the end

23   customers.  Thus, there's not going to be an easy

24   alternative for them to be able to use that in negotiating

25   with iControl to try to lower the royalty rate.

1    Q.      Now, sir, you mentioned there that Alarm.com-Vivint

2    patent license.  Do you see that?

3    A.      I do.

4    Q.      Did that license involve the patents that we're

5    talking about today?

6    A.      No.  It involved the Alarm.com patents that was also

7    a cross license with respect to certain Vivint patents and

8    patent applications.  But I believe it's still relevant to

9    my analysis.

10   Q.      And that's what I wanted to ask you:  Even though it

11   didn't involve the patents in this case, as a damages

12   economic expert, why would you look at a license agreement

13   like the Vivint license?

14   A.      Well, more generally because it relates to important

15   information about the industry.  But in this case, it goes

16   further than that.  You've heard about testimony about a

17   license agreement that came about in settlement between

18   Alarm.com and iControl.  And what you heard is that iControl

19   licensed its patents to Alarm.com.  And in exchange for

20   that, Alarm.com licensed its patents back to iControl.

21           That establishes economic comparability under my

22   analysis.  And, thus, when we analyze the value of the

23   iControl patents, you would look at Alarm.com patents as

24   they were licensed to Vivint.

25   Q.      Now, sir, you had a reference up there to $1.50 per

1   subscriber per month.  What are you referring to there?

2   A.     What I am referring to there is part of my opinion on

3   the reasonable royalty.  Often a reasonable royalty can be

4   viewed as a payment that would be made, a frequently on a

5   monthly basis or on an annual basis where you apply a

6   royalty rate times the base of something.  So it could be

7   $1.50 per subscriber a month applied to all the infringing

8   subscribers.  It could be a percentage rate that is applied

9   to revenue.  But the idea is that you would have a monthly

10  or annual payment occurring year after year.

11  Q.     And the basis of your analysis would be the form of

12  royalty paid by SecureNet?

13  A.     In my analysis, the form of the royalty would be very

14  similar to many of the other agreements that I've seen and

15  that I'll be addressing, a royalty that is a per month per

16  subscriber royalty.  And specifically, in this case, $1.50

17  per subscriber a month.

18  Q.     Now, going to the first factor, the competitive

19  relationship between the parties, how does that impact your

20  analysis, sir?

21  A.     Well, it gets to the specifics of what iControl was

22  doing in the marketplace during this time, this relevant

23  time period.

24         And what iControl had done, you heard the

25  testimony, is that it entered into a relationship with ADT,

1    which was really critical to the success of iControl.  And

2    there are very specific aspects of that agreement that are

3    important.

4    Q.    And if we can go to the next slide.  Can you tell the

5    jury about the iControl agreement with ADT and how it

6    affected your analysis?

7    A.    Yes.  So the agreement between iControl and ADT, it's

8    more than a patent license.  It covers software, services,

9    and other things.  But it was a critical agreement for

10   iControl, so it has a very large consideration in the

11   assessment of a royalty that might apply between iControl

12   and a competitor, SecureNet.  The iControl-ADT Master

13   Services Agreement included terms such as most favored

14   customer pricing.

15        So if iControl did something with another

16   company, another competitor, for example, ADT would have the

17   right to say, I demand better terms than that.  This would

18   be important for the considerations of iControl if it would

19   be dealing with any other company.

20        It also included excluded customers.  In other

21   words, ADT said, I'm going to give you a lot of business,

22   iControl, but I don't want you working with certain

23   companies that I would view as competitors.  Those companies

24   included Protect America, Slomin, Protection 1, and Mony

25   which became -- now it's known as Brinks.  So this is a very

1    important consideration.  IControl would have to be very

2    careful when it deals with anybody else.

3    Q.      And, sir, did you come across information in your

4    analysis with regards to iControl's success with ADT?

5    A.      Absolutely.  And you heard the testimony from

6    Mr. Dawes, but I have a chart that demonstrates this.

7    Q.      And could we have Slide 7?  What does this slide

8    show, sir?

9    A.      So this shows two things.  The red line shows the

10   quarterly revenue that iControl earned from services it was

11   providing to ADT.  And you can see that starting back in

12   2010, it was a relatively small amount.  ADT kept adding

13   more and more subscribers with the Pulse product.  And the

14   revenues started increasing by -- by 2000.

15           The blue bars showing another aspect, which is

16   what portion of the Pulse services are interactive, advanced

17   interactive capabilities like Z-wave and video, and then

18   other aspects like video.

19           And so that shows -- and that's a percentage

20   going from zero percent up to about 45, 46 percent.  So that

21   meant over this time period, more and more ADT customers

22   were using advanced interactive capabilities and video.

23   That was helping the success of this product and the growth

24   of the revenues that iControl was earning.  And it shows the

25   very significant importance of the ADT account to iControl.

1    Q.    So looking at the first quarter of 2010, roughly,

2    what percentage of ADT customers were using the interactive

3    and video services?

4    A.    It would be pretty much zero until around 2013 time

5    period.  And around that time period, there was a dramatic

6    -- started to be a dramatic increase in the number of

7    advanced interactive and video users.

8    Q.    And, sir, you saw that the deal with iControl, the

9    Connect business being acquired by Alarm.com, you saw that

10   that was announced in the June 2016 time frame?

11   A.    That's right.  It was announced in about June 2016

12   and completed in March of 2017.

13   Q.    So, roughly, at the time that the deal was announced,

14   what percentage of the ADT customers had moved to the

15   interactive and video services?

16   A.    It was about 45 percent.

17   Q.    And that's from zero in 2010?

18   A.    Yes, that's correct.

19   Q.    Now, let's go to the next slide.  Now, you mentioned

20   another company called Telular.  Why was Telular relevant to

21   your analysis?

22   A.    Telular is another situation where iControl was

23   working with the company providing the software, but also

24   protected by the patents.  And Telular was the hope for

25   iControl to compete in the dealer channel.

1           The dealer channel is where Alarm.com has had

2     success.  It's where SecureNet has had success.  And Telular

3     was a company that had been in the industry, had some

4     success.

5           And then they turned to iControl to be able to

6     do the advanced interactive and video capabilities.

7     Q.    Now, in the hypothetical negotiation that we've been

8     talking about, are you familiar with the terms willing

9     licensor, willing licensee?

10    A.    Yes, I am.

11    Q.    What do you understand that to mean in the context of

12    the hypothetical negotiation of the two people sitting at

13    the table?

14    A.    Well, what it -- it's part of this Georgia-Pacific

15    assessment.  It was -- and this factor 15, this hypothetical

16    negotiation and the idea is that the parties would have to

17    be willing to enter into an agreement before the

18    infringement would begin and that both parties would have to

19    consider the important significance of what would happen if

20    a license was granted and the implications of that.

21    Q.    Can you go to the next slide, Mr. Smith.  Now in this

22    hypothetical negotiation, you had to have a willing licensor

23    and a willing licensee; is that correct?

24    A.    That's what the Georgia-Pacific framework specifies,

25    yes.

1    Q.     So as a result of this negotiation, the parties would

2    have to come up with an agreement?

3    A.     That's correct.

4    Q.     But what would iControl's interest be at the time of

5    the hypothetical negotiation with respect to licensing a

6    competitor?

7    A.     Well, iControl's considerations are first and

8    foremost this relationship with ADT, also reflected into its

9    agreement with Telular.  For example, in the Telular

10   agreement, iControl said you cannot deal with Protect

11   America.  That is an exclusive party with respect to ADT, so

12   Telular, you also cannot deal with Protect America, and

13   others as well, like Protection One.

14             So that's a reflection of the consideration of

15   this ADT agreement to what iControl is thinking about when

16   it enters into this agreement.  And iControl generally did

17   not want to license its patent technology to competitors.

18   It wanted its patented technology to protect its

19   relationship with companies like ADT and Telular.

20   Q.     What impact would that have had on the type of

21   royalty that iControl would have been willing to enter into?

22   A.     IControl would be looking for a royalty rate that

23   would be consistent with its ADT deals and the Telular

24   deals.  So even though those are not what might be called a

25   bare patent license agreement because ADT also got services,

1    ADT also got software, the consideration of those most

2    favored pricing terms, the excluded customer terms would

3    have been very important consideration for iControl.

4    Q.     If we could go to the next slide.

5           Now, sir, we have been talking about all the

6    factors.  How did you weigh these factors together?

7    A.     Well, these factors and others are weighed, but this

8    one is reflecting the licensing issues, iControl's policies,

9    iControl's other licensing programs and the commercial

10   relationship.  And so, for example, I considered the blue

11   boxes here which are some of the negatives to iControl if

12   it's going to willingly grant a license to a competitor.

13          And, for example, the bottom blue box risks

14   goals in the dealer channel by licensing a competitor.  This

15   would impact its relationship with Telular.  The one right

16   above that, risks the $2 million prepayment that Telular

17   made to iControl which is very important revenue in that

18   early period when the revenues were relatively low for

19   iControl.  Risk that future success with ADT that is tens of

20   millions of dollars to iControl, these are critical issues

21   to iControl.  Those points need to be taken into account.

22          The offset would be if I'm going to grant this

23   license to SecureNet, what can I get back from SecureNet.

24   And SecureNet wouldn't have had cash for an upfront payment,

25   couldn't pay $2 million upfront like Telular did.  So the

1    primary posit would be whatever royalties that would be paid

2    over time by SecureNet to iControl.

3    Q.     At the time of the hypothetical negotiation, who was

4    the primary customer for the Connect business?

5    A.     The primary customer was ADT.

6    Q.     And over the entire period of time that the Connect

7    business has been in operation, who has been the primary

8    customer?

9    A.     ADT was the driving force.  That's consistent, you

10   heard the testimony from several witnesses addressing that

11   ADT is the largest security provider in North America.

12   Q.     How would the reasonable royalty have to balance the

13   business risk to iControl?

14   A.     To balance those risks, iControl would have to seek a

15   reasonable royalty of the subscriber fee, per subscriber per

16   month that ADT would not object to, that ADT wouldn't come

17   back and say wait a minute, you offered a patent license for

18   this fee, I want that, those terms, and I'm going to find my

19   own ways to service my customers.  That would be disastrous

20   for iControl.  It's a primary consideration for the

21   reasonable royalty.

22   Q.     If we go to the next slide.

23          Well, did you consider SecureNet's licensing

24   history in your analysis?

25   A.     I did.  But SecureNet does not enter into any license

1    agreements.  You heard the testimony on video from Mr. Rose

2    who is one of the executives at SecureNet.  So there were no

3    license agreements that SecureNet had entered into.

4    Q.    At the time of the hypothetical negotiation, did

5    SecureNet have any policies with respect to licensing

6    patents?

7    A.    Mr. Rose said no, there were no policies either for

8    its patents or for licensing in patents.

9    Q.    Well, sir, what impact did the Alarm.com/Vivint

10   license have as you talked about with ADT already?

11   A.    The Alarm.com patents have the economic comparable to

12   the iControl patents.  So I was able to analyze the

13   agreement.  It was a patent license between Alarm.com and

14   Vivint and I lay it down in this chart some of the important

15   factors there.

16         First of all, it was a cross license.  So in

17   addition to providing rights to Alarm.com patents to Vivint,

18   Alarm.com also got certain rights back from Vivint.  That's

19   an important distinction.

20         Vivint agreed to pay $1 per customer per month

21   for a patent license for each Vivint customer, so Vivint is

22   a dealer and for their particular customers they would agree

23   to pay $1 per month per subscriber, but if Vivint wants to

24   supply other dealers, what's called here a non-Vivint

25   account, then the royalty would be as high as $2.50 per

1    patent per month for the subscriber license.  There was also

2    a consideration, if Vivint had to get another license,

3    Alarm.com gave consideration, we'll lower our royalty rate

4    to $2.07, this provides a range of royalty rates per

5    subscriber per month per technology.

6    Q.    Let's go to the next slide.

7          Did the Vivint/Alarm.com license play any type

8    of benchmarking role to confirm your reasonable royalty

9    analysis?

10   A.    Another part of the Georgia-Pacific factors, what is

11   shown in the midpoint, for example, in this $1 and $2.07

12   rates was $1.50.  I also compared other similarities and

13   differences between this agreement and a hypothetical

14   agreement between iControl and SecureNet.  And it suggested

15   at least $1.50 as a reasonable royalty for this case.

16   Q.    Could we have the next slide, please.

17         Sir, let's talk a little bit more about

18   SecureNet.  What role did SecureNet's participation with

19   security dealers and security providers play in your

20   analysis?

21   A.    Well, that's several different aspects.  Part of the

22   aspects go to the way it marketed its products.  The way it

23   marketed its pricing.  The impact it had on Alarm.com with

24   respect to Alarm.com accounts.  Here I'm focusing on

25   iControl, and what it really goes to is the success of

1    SecureNet winning dealer accounts by offering these advanced

2    interactive video capabilities as part of its platform.

3    Q.     If we could go to PTX 38, the replacement memorandum

4    that's already been admitted into evidence.  And if we go to

5    page 095244.  If you could blow up that.

6               What is this summary from the SecureNet

7    financial document show?

8    A.     This is showing the growth and then the projected

9    growth in revenue and revenue per head and EBITDA which is a

10    measure of profitability.  It shows that SecureNet was

11    showing revenue growth and also future profitability as it

12    gained scale of more and more customers, upgraded to more

13    advanced capabilities, more video capabilities, so that the

14    revenue per subscriber went up.

15    Q.     Did you see the services revenue?

16    A.     Yes.  At the very top.  So it shows revenue in 2016

17    of 4.5 million with a projection that would increase

18    substantially by 2020, 2021.

19    Q.     And do you understand that services revenue relates

20    to the accused products in this case?

21    A.     Well, it relates to the platform that's being offered

22    by SecureNet and that includes the complete interactive, one

23    of the accused aspects and interactive with video.

24    Q.     Sir, there has been some discussion about

25    profitability, but what has been consistently SecureNet's

1  gross margin profits with respect to that profit line?

2  A.    Its gross margin has been consistently about 64, 66

3  percent, which is a particularly large margin, especially

4  given that they are using a low price strategy, a strategy

5  that they're trying to undercut Alarm.com pricing.

6  Q.    If we could now go to page 952, please.  This is the

7  SecureNet private placement memorandum.  What do these

8  subscriber projections show for SecureNet?

9  A.    It's showing two things, the growth in the number of

10  subscribers, which we see on the left side.  And then on the

11  right side it's showing an increase in revenue per

12  subscriber.  Again, as it's more and more successful getting

13  subscribers to use vast interactive what they call complete

14  interactive and interactive video, then the revenue per

15  subscriber will go up as you see here.

16  Q.    You heard some discussion during this case about

17  these relative size of SecureNet and the relative size of

18  Alarm.com?

19  A.    Yes.

20  Q.    What do SecureNet's projections show as to their

21  size?

22  A.    Well, SecureNet is showing here that it's number of

23  subscribers is increasing from -- their projection for 2018

24  was about .35 million, and increasing to over 1.1 million in

25  2021.  That's what their projection is showing.

1    Q.    So in a three-year period they're projecting a

2    tripling?

3    A.    That's about correct, yes.

4    Q.    Let's go back to slide 14 now.  Now, did you prepare

5    this chart on the slide, sir?

6    A.    I did, based on the information that we saw in the

7    previous document.  So it shows the projection of

8    profitability increasing as projected by SecureNet in their

9    private placement memorandum.

10    Q.    And how does this slide relate to the reasonable

11    royalty analysis that you have done in this case?

12    A.    Well, it relates to the Georgia-Pacific factors that

13    go to issues such as the profitability, the success of the

14    products, and it shows that while SecureNet hasn't

15    necessarily earned profitability yet, it's projecting that

16    it's going to have substantial success in the next several

17    years and it's going to achieve profitability.

18    And we heard the testimony from Mr. Trundle and

19    Mr. Dawes about how many years it takes for new companies in

20    this industry to earn profitability.

21    Q.    If we go to the next slide.

22    Sir, what are the key items now to kind of sum

23    up that you relied on to get your reasonable royalty rate of

24    $1.50 per subscriber per month?

25    A.    The first item I already addressed, the iControl

1    agreement with ADT, they had the most favored pricing terms.

2    It had royalty rates of $1.65 up to 2.50 per subscriber.

3    That's per subscriber per month.  That's more than a patent

4    license, but it's critical to iControl and it would be

5    foremost in iControl's mind.

6            The second group relates to the agreement

7    between Vivint and Alarm.com.  And so Vivint is a customer

8    of Alarm.com in addition to a company that took a patent

9    license.  Vivint paid Alarm.com $1.57 per subscriber per

10   month for advanced interactive services, so that's patent

11   and software and support.  But also Vivint for another

12   portion of Vivint's business where it wanted to introduce

13   its own back end system agreed to pay $1 for a patent

14   royalty only.  So that $1 for a royalty compared to $1.57 is

15   about 64 percent, we consider that industry apportionment.

16           Generally I already addressed the Vivint, $2.07

17   to 2.50 per subscriber month for a patent license when there

18   is more competitive pressure on Alarm.com.  Again, SecureNet

19   and iControl would be viewing this competitive pressure.

20           And the last item is Telular, Telular was

21   iControl's hope for the dealer channel.  They were

22   guaranteed at least $2 per subscriber for any subscriber.

23   It was more than a patent license.  But we can use the 64

24   percent apportionment and that points to a royalty

25   equivalent for a patent license of about $1.28.

1          So all of this information supports a royalty

2     rate for SecureNet to pay for the alleged infringement here

3     of $1.50 per subscriber month.

4          MR. YOON:  Your Honor, I'm about to turn to the

5     lost profit analysis and it's five o'clock.

6          THE COURT:  All right.  So members of the jury,

7     we're finished for the day.  So we'll start again tomorrow

8     morning at 9:30.  And make sure you're here before then

9     because hopefully we'll be ready to go at 9:30.

10          I want to remind you not to discuss the case

11     with anyone, not to discuss the case with each other.  Don't

12     go online to discuss the case.  Don't let anyone talk to you

13     about the case.  Make sure that you keep an open mind, and

14     that you're not hearing anything about the case other than

15     what you hear here in court.

16          In addition, or related to that, don't do any

17     research on the case.  Don't Google anything.  Don't be

18     looking things up.  It is important that all the information

19     you get on the case be what you -- what happens here in

20     court.

21          All right.  So we'll see you tomorrow morning.

22     Have a nice evening.

23          (Jury leaving the courtroom at 5:00 p.m.)

24          THE COURT:  All right.  Everyone can be seated.

25     Mr. Reed, you can step down.

1            THE WITNESS:  Thank you, Your Honor.

2            THE COURT:  The only thing that I -- I don't

3    want to talk about that now.

4            Is there anything you want to talk about?

5            MR. YOON:  No, Your Honor.  I want to update

6    you.  After Mr. Reed is completed, we have three minutes of

7    video we're playing and then we rest our case.  I estimate

8    that Mr. Reed will be about a half an hour, in case the

9    Court might want an update on that.

10            Additionally the issue with Mr. Trundle may be

11    resolved.  Counsel for SecureNet indicated they would let me

12    know by tomorrow morning if they were going to call him.

13            MR. MILCH:  That's right.

14            THE COURT:  That's good.  Thank you.

15            All right.  And so just in terms of tomorrow, if

16    the defendant wants to make any motions after plaintiff

17    rest, I don't want to take time while the jury is here, so

18    we'll consider them made and you can either submit something

19    in writing or like the next break or at lunch make them

20    orally, or some combination of both.  But whatever it is, I

21    will consider them as long as I'm properly notified about

22    them afterwards to have been made at the proper time.  Okay?

23            MR. MILCH:  Absolutely, Your Honor.

24            THE COURT:  All right.  Anything else that you

25    want to bring up, Mr. Milch?

518

1              MR. MILCH:  Nothing.

2              MR. YOON:  Nothing, Your Honor.

3              THE COURT:  All right.  See you tomorrow then.

4              (Court recessed at 4:58 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## $

**$1.28** [1] - 515:25
**$1.50** [7] - 501:25, 502:7, 502:16, 511:12, 511:15, 514:24, 516:3
**$1.57** [2] - 515:9, 515:14
**$1.65** [1] - 515:2
**$14.54** [1] - 494:22
**$150** [1] - 320:7
**$2.07** [3] - 511:4, 511:11, 515:16
**$2.50** [1] - 510:25
**$3.50** [2] - 307:23, 328:1
**$4** [1] - 307:23
**$575** [1] - 490:18
**$7.15** [2] - 488:1, 488:9
**$8.15** [2] - 488:1, 488:7
**$9.95** [1] - 471:4
**$92,500,000** [1] - 319:14
**$96** [1] - 276:21
**$99** [1] - 483:23

## '

**'07** [1] - 264:13
**'08** [1] - 264:16
**'16** [1] - 470:10
**'17** [2] - 253:3, 470:11
**'18** [1] - 253:3
**'619** [41] - 262:16, 267:12, 268:2, 268:6, 268:12, 268:16, 314:18, 315:18, 352:2, 352:13, 368:1, 368:4, 368:11, 403:4, 403:5, 403:15, 403:17, 409:17, 411:7, 420:5, 422:14, 425:12, 425:16, 425:19, 426:3, 426:13, 427:8, 427:14, 427:24, 428:11, 428:21, 429:12, 430:14, 433:16, 434:16, 434:23, 436:9, 450:16, 450:20, 495:18
**'635** [8] - 267:12, 268:2, 268:6, 268:11, 268:16,

270:23, 352:13, 352:17
**'844** [22] - 262:16, 267:11, 268:1, 268:6, 268:11, 268:16, 314:18, 315:18, 352:2, 352:12, 368:1, 368:7, 368:11, 429:3, 430:5, 433:10, 434:15, 435:2, 435:10, 436:1, 436:9, 495:18
**'93** [1] - 382:10
**'931** [27] - 267:18, 314:18, 315:18, 352:2, 352:13, 368:1, 368:4, 368:10, 371:2, 382:3, 382:11, 388:4, 393:19, 401:16, 401:20, 401:22, 402:22, 427:8, 427:13, 427:24, 428:11, 428:21, 436:9, 459:8, 459:19, 460:23, 460:24

## /

**/s** [1] - 297:18

## 0

**003** [1] - 450:16
**0043** [1] - 414:4
**0044** [1] - 414:4
**009** [5] - 351:4, 351:7, 379:24, 380:1, 423:8
**020** [2] - 351:4, 351:7
**0314068** [1] - 348:24
**038** [2] - 351:4, 351:7
**043** [2] - 414:19, 414:21
**044** [1] - 414:21
**095244** [1] - 512:5

## 1

**1** [51] - 291:19, 296:11, 322:20, 329:6, 329:19, 329:24, 344:14, 344:15, 364:23, 368:2, 368:10, 369:13, 370:7, 379:7, 382:10, 393:20, 401:16, 401:20, 402:25, 403:1,

403:12, 403:17, 409:17, 426:1, 426:3, 426:5, 426:17, 427:13, 427:14, 429:12, 434:16, 434:24, 447:20, 448:1, 450:17, 450:20, 451:16, 459:8, 459:19, 460:24, 467:3, 467:5, 467:7, 494:14, 503:24, 510:20, 510:23, 511:11, 515:13, 515:14
**1's** [1] - 291:20
**1.1** [1] - 513:24
**1.4** [1] - 332:3
**1.5** [1] - 307:13
**1.6** [3] - 266:5, 284:8, 314:16
**10** [3] - 308:22, 323:9, 381:17
**10(k** [2] - 321:15, 326:6
**10-K** [4] - 297:2, 297:11, 297:21, 298:16
**10430** [1] - 286:6
**10867** [1] - 297:15
**11** [2] - 299:14, 382:14
**115** [1] - 340:18
**11:16** [1] - 334:22
**11:30** [1] - 334:20
**11:31** [1] - 335:18
**11th** [3] - 268:5, 268:14, 268:19
**12** [16] - 373:8, 381:1, 384:2, 384:3, 417:18, 418:9, 418:11, 418:13, 421:9, 422:8, 422:14, 422:16, 451:11, 457:1, 457:4, 457:7
**1210** [2] - 418:14, 418:21
**123** [1] - 492:22
**1230** [1] - 418:24
**1240** [1] - 419:8
**1260** [1] - 419:17
**1270** [1] - 419:24
**1277** [1] - 404:13
**12:30** [1] - 335:6
**13** [2] - 305:12, 305:20
**14** [17] - 373:8, 387:16, 417:18, 418:11, 420:4, 421:9, 421:12, 422:8, 422:14, 422:18,

451:11, 457:1, 457:2, 457:4, 457:7, 514:4
**1420** [1] - 420:18
**143** [1] - 248:24
**1430** [1] - 420:18
**144** [1] - 248:24
**1440** [2] - 420:21, 421:10
**145** [1] - 267:16
**1460** [1] - 421:14
**1470** [1] - 421:20
**1480** [1] - 421:23
**1490** [1] - 422:1
**14th** [1] - 348:23
**15** [6] - 256:8, 334:24, 335:17, 496:21, 496:22, 506:15
**15-807(RGA** [1] - 243:7
**15-minute** [1] - 334:20
**150** [2] - 320:4, 496:10
**15th** [1] - 496:18
**16** [1] - 378:5
**17** [1] - 463:3
**173** [6] - 356:19, 356:20, 374:18, 374:25, 378:17, 423:8
**175** [2] - 404:12, 404:14
**176** [1] - 358:3
**18** [2] - 320:14, 320:21
**180** [2] - 256:3, 358:11
**1802** [1] - 395:9
**1806** [1] - 396:11
**183** [5] - 358:24, 359:3, 359:8, 375:3, 394:21
**184** [1] - 375:16
**18th** [3] - 268:4, 268:14, 268:19
**19** [1] - 256:8
**192** [1] - 317:16
**195** [7] - 361:4, 397:1, 397:8, 397:11, 413:8, 421:2, 424:19
**197** [3] - 361:15, 361:24, 414:6
**1:00** [1] - 335:7
**1:05** [1] - 399:15
**1:30** [1] - 335:6
**1st** [2] - 354:13, 354:23

## 2

**2** [19] - 267:23, 344:15, 344:17, 367:23, 367:24, 375:9,

444:10, 444:11, 444:13, 444:17, 444:20, 444:23, 448:25, 449:7, 459:8, 460:25, 508:16, 508:25, 515:22
**2.0** [2] - 329:9, 329:15
**2.1** [1] - 311:21
**2.3** [1] - 344:24
**2.4** [1] - 293:12
**2.5** [2] - 293:12, 314:3
**2.50** [2] - 515:2, 515:17
**20** [4] - 272:21, 294:16, 311:4, 348:17
**20.1** [1] - 495:14
**200** [1] - 323:23
**2000** [3] - 272:11, 278:24, 504:14
**2003** [2] - 272:11, 290:2
**2007** [3] - 262:21, 264:21, 265:3
**2007-2008** [2] - 265:13, 265:16
**2008** [8] - 264:21, 265:3, 277:7, 277:13, 278:21, 361:13, 425:14, 425:17
**2009** [3] - 353:11, 355:22, 356:1
**2010** [6] - 279:5, 294:22, 353:18, 504:12, 505:1, 505:17
**2011** [4] - 353:19, 354:14, 354:23, 425:10
**2012-2013** [1] - 500:2
**2013** [6] - 263:3, 406:7, 406:13, 425:16, 425:17, 505:4
**2014** [17] - 248:19, 265:6, 267:13, 306:20, 307:8, 307:14, 307:20, 308:1, 327:6, 327:10, 327:17, 327:22, 470:9, 477:1, 477:3, 477:18, 495:15
**2014-2015** [1] - 265:23
**2015** [31] - 247:16, 248:2, 248:4, 248:21, 249:14, 252:17, 252:18,

253:10, 253:24, 255:2, 255:5, 255:23, 256:20, 259:18, 259:21, 260:9, 267:9, 267:20, 268:4, 268:5, 268:14, 268:15, 268:19, 303:17, 312:2, 312:6, 470:10, 481:1, 481:16
**2016** [19] - 253:3, 254:13, 283:7, 301:4, 311:12, 311:24, 330:17, 330:22, 331:5, 348:23, 350:3, 353:4, 353:6, 353:8, 474:5, 481:13, 505:10, 505:11, 512:16
**2017** [15] - 247:13, 254:8, 254:9, 254:13, 297:11, 297:21, 297:23, 298:16, 299:5, 299:9, 310:25, 349:5, 349:20, 495:9, 505:12
**201710(k** [1] - 321:14
**2018** [5] - 305:4, 305:5, 323:20, 344:23, 513:23
**2019** [2] - 243:14, 342:19
**2020** [1] - 512:18
**2021** [2] - 512:18, 513:25
**204** [1] - 378:18
**206** [1] - 492:22
**215** [3] - 288:5, 315:6, 315:8
**216** [2] - 287:17, 287:22
**22** [4] - 304:18, 305:2, 305:13, 305:16
**220** [1] - 246:14
**221** [3] - 249:5, 250:23, 251:1
**222** [1] - 250:23
**229** [5] - 286:16, 286:17, 310:16, 310:18, 316:12
**23** [3] - 250:24, 319:2, 402:15
**238** [3] - 318:4, 318:7, 318:10
**239** [3] - 316:9, 316:13, 316:16
**23rd** [4] - 311:24,

330:17, 330:22, 331:5
**24** [1] - 403:3
**24-by-7** [1] - 336:25
**245** [3] - 314:2, 314:4, 314:8
**246** [4] - 405:16, 405:18, 405:23, 405:25
**25** [1] - 403:3
**253** [3] - 469:17, 469:22, 469:24
**25th** [1] - 349:20
**26** [1] - 403:15
**264** [1] - 481:3
**265** [3] - 304:22, 304:25, 305:6
**27** [1] - 303:18
**291** [2] - 397:21, 410:19
**295** [4] - 263:11, 263:23, 264:4, 264:9
**2:04** [1] - 401:9
**2GIG** [5] - 358:19, 453:9, 455:22, 459:13, 459:16
**2GiG** [1] - 444:15

**3**

**3** [8] - 298:2, 344:15, 344:18, 352:12, 406:7, 482:2, 482:6, 482:24
**3-PDEM** [1] - 364:24
**3.1** [1] - 317:2
**3.1(b** [1] - 317:3
**3.4** [2] - 317:10
**30(b)(6** [1] - 249:25
**302** [2] - 413:4, 487:19
**307** [1] - 424:20
**308** [2] - 398:23, 424:20
**30th** [1] - 349:5
**323** [1] - 421:3
**329** [1] - 412:2
**34** [1] - 416:24
**342** [2] - 283:1, 330:20
**35** [1] - 513:24
**355** [1] - 327:6
**360** [1] - 248:6
**361** [1] - 330:4
**371** [2] - 285:10, 330:4
**37883** [1] - 483:16
**37885** [1] - 481:19
**37887** [1] - 481:7
**38** [2] - 350:20, 512:3
**384** [6] - 343:23, 343:25, 344:3, 344:7, 344:8, 344:21

**386** [1] - 492:22
**397** [1] - 492:23
**3:36** [1] - 466:22
**3:52** [1] - 467:24
**3rd** [1] - 311:12

**4**

**4** [3] - 352:12, 426:13, 498:2
**4.4** [4] - 319:11, 320:1, 320:7, 320:12
**4.5** [1] - 512:17
**4.99** [1] - 354:2
**40** [1] - 323:20
**401** [2] - 306:13, 306:17
**41** [1] - 427:7
**42** [1] - 456:21
**422** [3] - 389:19, 390:17, 463:6
**425** [1] - 463:4
**43** [2] - 429:7, 433:8
**434** [1] - 492:23
**44** [1] - 433:9
**45** [2] - 504:20, 505:16
**46** [1] - 504:20
**47** [1] - 492:22
**473** [1] - 492:23
**48** [8] - 368:11, 430:5, 434:15, 435:2, 435:11, 435:14, 436:1, 492:22
**49** [1] - 316:21
**4:00** [1] - 466:20
**4:58** [1] - 518:4

**5**

**5** [6] - 243:14, 307:17, 352:12, 458:2, 458:3, 499:19
**5.5** [2] - 305:2, 305:17
**5.54** [1] - 494:23
**5.99** [1] - 354:6
**50** [9] - 275:19, 275:20, 293:11, 312:9, 323:15, 323:19, 325:20, 328:3, 330:10
**500** [2] - 323:14, 323:15
**529897** [1] - 350:22
**5351** [2] - 263:17, 263:20
**5368** [1] - 264:9
**55** [4] - 368:11, 403:12, 426:13, 427:14
**5627** [1] - 333:7

**5:00** [1] - 516:23

**6**

**6** [1] - 352:12
**6.95** [1] - 307:10
**60** [1] - 328:21
**624** [2] - 384:20, 385:9
**625** [3] - 390:24, 463:11, 463:12
**626** [1] - 389:20
**64** [4] - 492:22, 513:2, 515:15, 515:23
**66** [1] - 513:2

**7**

**7** [6] - 371:24, 372:1, 402:2, 402:25, 451:1, 504:7
**7.10** [1] - 424:21
**7.11** [2] - 398:24, 424:22
**7.3** [1] - 408:12
**7.36** [1] - 421:5
**7.44** [1] - 412:3
**7.5** [2] - 413:6, 413:9
**7.6** [1] - 413:5
**70** [7] - 279:25, 421:14, 477:14, 477:15, 477:19, 477:20, 478:3
**70,000** [1] - 472:1
**72** [2] - 311:11, 311:16
**73** [1] - 310:7
**743** [5] - 376:21, 377:2, 378:8, 378:11, 450:13
**744** [4] - 407:15, 408:2, 466:11, 466:15
**781** [1] - 492:24

**8**

**8** [3] - 276:18, 301:21, 310:25
**8,073,931** [1] - 351:24
**8,473,619** [1] - 351:18
**8,478,844** [1] - 351:21
**80** [1] - 293:3
**800** [1] - 492:23
**826** [1] - 492:23
**844** [1] - 243:12
**850** [1] - 323:13
**871** [1] - 492:23
**88** [1] - 315:3
**8th** [1] - 495:9

**9**

**9** [14] - 250:23, 251:2, 298:22, 320:24, 348:4, 368:10, 381:3, 399:9, 401:22, 402:1, 402:3, 402:25, 403:1, 427:13
**9.95** [1] - 307:8
**9.99** [1] - 354:4
**90** [4] - 293:4, 323:7, 323:11, 349:13
**900** [3] - 275:6, 275:8, 323:11
**92,500** [1] - 319:14
**952** [1] - 513:6
**959** [1] - 350:22
**9:00** [1] - 243:14
**9:30** [3] - 257:14, 516:8, 516:9
**9:37** [1] - 259:4

**A**

**a.m** [4] - 243:14, 259:4, 334:22, 335:18
**ability** [21] - 279:17, 302:21, 344:16, 389:8, 390:19, 393:11, 393:16, 394:1, 406:3, 409:24, 417:11, 421:16, 421:17, 421:18, 424:23, 431:19, 440:1, 443:16, 445:10, 462:2, 500:18
**able** [51] - 275:14, 276:1, 278:13, 284:20, 291:8, 291:17, 291:21, 291:25, 293:1, 293:5, 293:24, 309:1, 309:4, 339:11, 350:7, 369:21, 376:6, 385:19, 385:20, 387:5, 389:5, 389:17, 391:9, 391:23, 392:15, 393:5, 393:13, 402:10, 402:20, 409:1, 409:3, 409:4, 409:17, 411:15, 417:21, 420:24, 422:21, 428:11, 428:16, 428:22, 429:23, 435:25,

439:15, 440:4, 443:13, 467:4, 483:5, 500:24, 506:5, 510:12

**abreast** [3] - 308:19, 309:17, 309:20

**absent** [1] - 455:4

**absolutely** [8] - 289:1, 365:25, 384:1, 388:17, 447:19, 454:9, 504:5, 517:23

**AC** [1] - 279:24

**accept** [2] - 444:13, 444:21

**acceptable** [1] - 500:22

**accepted** [1] - 449:1

**access** [6] - 360:21, 366:13, 389:1, 474:10, 474:12, 480:2

**accessible** [1] - 380:9

**accessing** [1] - 402:11

**accolades** [1] - 366:16

**according** [3] - 296:10, 303:20, 384:5

**account** [11] - 359:12, 480:9, 480:13, 483:21, 483:22, 485:3, 485:21, 497:15, 504:25, 508:21, 510:25

**Account** [1] - 395:11

**accountants** [1] - 296:2

**accounted** [1] - 303:18

**accounting** [3] - 318:15, 318:17, 495:11

**accounts** [16] - 343:11, 344:9, 481:13, 482:3, 482:11, 482:13, 482:18, 482:25, 483:1, 483:5, 485:16, 494:10, 511:24, 512:1

**accurate** [8] - 296:21, 299:12, 300:17, 302:20, 305:9, 305:20, 354:11, 354:19

**accurately** [1] - 306:6

**accused** [8] - 381:19, 436:22, 445:25, 446:1, 446:18, 459:11, 512:20, 512:23

**accusing** [1] - 294:19

**achieve** [1] - 514:17

**acquire** [1] - 285:21

**acquired** [11] - 284:14, 285:5, 286:25, 298:12, 311:4, 313:18, 316:2, 320:17, 320:21, 339:7, 505:9

**acquiring** [3] - 283:12, 313:24, 318:13

**acquisition** [26] - 254:8, 284:7, 284:23, 285:7, 292:6, 292:12, 293:6, 296:1, 296:3, 298:8, 298:11, 309:23, 309:25, 312:7, 313:13, 316:6, 319:17, 320:23, 331:8, 331:15, 336:15, 339:6, 340:8, 340:10, 343:4, 498:21

**ACQUISITION** [1] - 243:5

**Acquisition** [8] - 286:11, 286:14, 287:1, 295:8, 298:3, 310:23, 311:4, 311:7

**Acquisitions** [1] - 285:23

**activated** [2] - 406:20, 433:3

**active** [3] - 257:23, 416:4, 481:12

**activities** [2] - 309:18, 350:13

**activity** [2] - 341:18, 495:4

**acts** [1] - 341:25

**actual** [1] - 442:5

**adaptors** [1] - 439:9

**add** [17] - 319:10, 338:20, 340:1, 344:18, 376:3, 376:11, 405:8, 405:10, 409:9, 420:22, 431:24, 432:11, 439:12, 476:14, 477:17, 477:22

**added** [2] - 338:22, 498:10

**addendum** [1] - 361:16

**adding** [9] - 261:8, 261:18, 354:21, 376:13, 421:21,

432:12, 439:7, 439:14, 504:12

**addition** [9] - 302:11, 361:16, 365:8, 368:15, 386:17, 494:2, 510:17, 515:8, 516:16

**additional** [9] - 261:8, 261:15, 261:18, 308:4, 402:1, 402:2, 405:3, 476:16, 477:20

**additionally** [1] - 517:10

**address** [11] - 489:20, 489:21, 489:22, 495:2, 495:17, 498:21, 498:25, 499:3, 499:7, 499:17, 499:18

**addressable** [1] - 299:2, 299:4, 299:8

**addressed** [3] - 500:19, 514:25, 515:16

**addresses** [1] - 464:7

**addressing** [6] - 490:6, 491:24, 494:4, 494:12, 502:15, 509:10

**adequate** [1] - 489:22

**adjustment** [1] - 325:8

**admit** [13] - 263:22, 282:25, 310:7, 310:11, 310:12, 384:14, 405:18, 466:8, 466:10, 472:6, 473:22, 478:23, 493:13

**admitted** [55] - 263:25, 264:4, 283:3, 283:5, 285:14, 285:15, 286:19, 286:21, 287:19, 287:20, 288:9, 288:10, 297:7, 297:9, 300:24, 301:1, 304:24, 304:25, 306:15, 306:17, 310:9, 310:15, 311:15, 311:16, 314:6, 314:8, 315:7, 316:15, 316:16, 318:9, 318:10, 344:2, 344:3, 351:6, 351:7, 362:18, 362:20, 362:24, 367:21, 378:10, 378:11, 384:17, 384:18, 405:23,

466:13, 466:15, 469:19, 469:22, 472:9, 472:11, 473:25, 474:2, 476:19, 479:1, 512:4

**admitting** [2] - 363:9, 493:13

**adopted** [1] - 277:21

**ADS** [2] - 485:10, 485:12

**ADT** [51] - 283:20, 283:21, 283:22, 283:24, 284:3, 284:5, 340:12, 340:14, 342:3, 342:4, 342:6, 342:8, 342:10, 342:11, 342:14, 342:15, 342:21, 343:21, 346:10, 346:12, 350:4, 500:1, 502:25, 503:5, 503:7, 503:12, 503:16, 503:21, 504:4, 504:11, 504:12, 504:21, 504:25, 505:2, 505:14, 507:8, 507:11, 507:15, 507:19, 507:23, 507:25, 508:1, 508:19, 509:5, 509:9, 509:11, 509:16, 510:10, 515:1

**ADT's** [2] - 342:17, 344:10

**advanced** [12] - 367:4, 477:6, 477:13, 477:23, 478:2, 504:16, 504:22, 505:7, 506:6, 512:1, 512:13, 515:10

**advancements** [2] - 284:21, 284:22

**advantage** [3] - 308:24, 309:1, 387:5

**advice** [1] - 352:10

**advised** [1] - 422:10

**afar** [1] - 407:14

**affect** [1] - 471:17

**affected** [1] - 503:6

**affiliates** [1] - 317:11

**affirm** [6] - 271:9, 271:12, 336:7, 336:10, 363:21, 363:24

**afford** [1] - 284:20

**afternoon** [7] - 336:19, 364:4,

436:8, 468:17, 468:18, 473:14, 489:17

**afterwards** [3] - 246:9, 466:24, 517:22

**agencies** [4] - 366:4, 366:7, 366:9, 366:10

**agency** [1] - 366:2

**ago** [5] - 274:16, 282:21, 366:24, 368:1, 374:16

**agree** [27] - 252:17, 255:22, 437:6, 440:6, 440:18, 441:1, 444:1, 444:24, 445:16, 449:2, 451:22, 474:23, 475:14, 476:1, 476:6, 476:9, 477:14, 478:10, 479:21, 480:8, 480:12, 480:17, 480:23, 482:5, 487:11, 497:23, 510:22

**agreed** [3] - 453:16, 510:20, 515:13

**agreed-upon** [1] - 453:16

**agreeing** [1] - 313:23

**agreement** [51] - 267:2, 285:20, 286:1, 286:3, 286:6, 286:24, 287:25, 288:15, 288:17, 288:20, 310:10, 310:22, 310:25, 311:2, 311:7, 311:8, 311:22, 311:24, 312:4, 314:13, 316:4, 316:6, 318:1, 322:3, 324:20, 325:9, 330:15, 330:24, 330:25, 331:1, 331:23, 332:3, 332:19, 501:12, 501:17, 503:2, 503:5, 503:7, 503:9, 506:17, 507:2, 507:9, 507:10, 507:15, 507:16, 507:25, 510:13, 511:13, 511:14, 515:1, 515:6

**Agreement** [8] - 285:10, 286:2, 286:7, 286:10, 295:5, 321:5, 330:5, 503:13

**agreements** [4] -

268:24, 502:14, 510:1, 510:3
**ahead** [3] - 267:5, 399:8, 420:17
**AIN** [1] - 479:15
**AK** [1] - 311:11
**Al** [1] - 366:17
**Alarm** [6] - 300:10, 314:10, 323:6, 348:24, 350:4, 350:22
**alarm** [5] - 289:21, 289:22, 337:21, 361:5, 474:16
**Alarm's** [3] - 297:11, 307:13, 311:11
**Alarm-SecureNet** [2] - 348:24, 350:22
**Alarm.com** [249] - 247:13, 254:4, 255:8, 263:1, 263:3, 266:3, 266:11, 270:1, 271:1, 271:2, 271:25, 272:2, 272:9, 272:18, 273:1, 273:3, 273:12, 274:16, 275:2, 275:4, 275:7, 276:5, 277:5, 277:23, 278:22, 279:3, 279:6, 279:10, 280:7, 280:20, 280:21, 281:16, 281:20, 282:3, 282:5, 282:11, 282:18, 283:12, 284:14, 285:3, 285:24, 286:3, 286:12, 286:14, 287:1, 287:7, 288:15, 288:16, 288:17, 288:21, 288:24, 289:16, 290:2, 290:7, 290:23, 291:6, 291:15, 292:2, 292:13, 293:8, 293:13, 294:19, 294:22, 294:25, 295:24, 296:17, 297:1, 297:21, 298:15, 299:4, 299:9, 299:17, 300:2, 300:7, 300:13, 301:7, 304:3, 304:7, 304:14, 305:3, 305:7, 305:17, 305:23, 306:3, 306:19, 307:7,

307:16, 307:19, 307:25, 308:19, 308:24, 309:1, 309:12, 309:17, 309:20, 310:3, 312:5, 313:13, 314:13, 314:23, 315:2, 315:11, 315:22, 315:25, 317:9, 317:22, 318:12, 318:21, 318:24, 322:6, 322:20, 322:23, 323:1, 323:19, 323:23, 324:4, 324:6, 324:12, 324:17, 325:5, 325:13, 325:19, 325:21, 326:11, 327:14, 328:3, 328:5, 328:15, 328:19, 329:8, 329:11, 329:16, 329:18, 330:1, 331:5, 331:23, 332:7, 332:10, 332:12, 332:17, 332:20, 332:21, 332:23, 334:9, 335:23, 336:14, 336:20, 336:21, 337:24, 338:24, 339:17, 340:2, 340:17, 340:19, 341:4, 341:23, 342:1, 343:6, 343:13, 345:20, 346:7, 346:22, 349:18, 349:22, 353:8, 354:4, 355:6, 355:7, 355:9, 355:12, 355:19, 355:20, 355:23, 356:9, 356:11, 364:5, 407:12, 407:17, 408:6, 468:24, 469:13, 469:14, 471:3, 471:12, 471:22, 471:25, 472:4, 472:17, 473:9, 473:18, 475:3, 476:15, 477:18, 477:19, 478:1, 478:6, 479:5, 480:9, 480:13, 480:21, 480:23, 481:1, 481:11, 482:11, 482:14, 483:3, 483:7, 483:9, 483:12, 484:3,

484:11, 484:13, 484:19, 484:23, 484:25, 485:7, 485:14, 485:19, 491:19, 491:23, 495:10, 499:3, 500:13, 500:14, 501:1, 501:6, 501:18, 501:19, 501:20, 501:23, 505:9, 506:1, 510:11, 510:13, 510:17, 510:18, 511:3, 511:23, 511:24, 513:5, 513:18, 515:7, 515:8, 515:9, 515:18
**ALARM.COM** [1] - 243:4
**Alarm.com's** [16] - 290:25, 291:5, 297:22, 301:3, 306:9, 319:17, 321:11, 328:10, 342:23, 356:2, 363:1, 468:9, 469:2, 473:3, 474:4, 478:5
**Alarm.com-Vivint** [1] - 501:1
**Alarm.com/Vivint** [1] - 510:9
**Alder** [12] - 291:13, 291:14, 291:15, 296:11, 349:5, 349:9, 354:25, 355:1, 355:4, 355:15, 355:17, 355:18
**algorithm** [6] - 373:7, 417:2, 417:18, 420:8, 421:12, 422:7
**algorithms** [7] - 417:24, 418:7, 422:13, 451:11, 457:1, 457:4, 457:7
**aligned** [1] - 272:5
**Alison** [1] - 274:14
**alleged** [2] - 489:23, 516:2
**Allie** [3] - 274:14, 274:21, 274:22
**allow** [2] - 280:3, 359:14
**allowed** [4] - 275:21, 275:24, 313:19, 467:7
**allows** [13] - 337:20, 338:6, 362:2, 389:12, 390:1, 391:19, 396:23,

420:1, 420:3, 461:8, 474:17, 475:9, 475:21
**almost** [6] - 293:1, 307:25, 332:11, 426:19, 482:9, 490:12
**alone** [1] - 280:4
**alternative** [4] - 426:8, 497:4, 500:18, 500:24
**alternatively** [1] - 435:16
**alternatives** [3] - 428:22, 436:1, 497:5
**Alula** [5] - 282:22, 326:15, 326:16, 326:18, 326:22
**Amazon** [2] - 300:14, 353:4
**America** [78] - 283:23, 291:4, 291:5, 291:6, 291:9, 296:11, 349:5, 349:9, 353:17, 355:11, 355:12, 355:22, 356:1, 360:4, 360:5, 360:9, 360:20, 361:13, 377:4, 377:14, 377:23, 378:14, 380:23, 385:17, 408:12, 411:18, 412:14, 427:2, 428:5, 428:8, 429:14, 429:25, 433:1, 433:7, 435:7, 435:16, 437:14, 439:4, 441:2, 441:16, 441:23, 442:10, 442:16, 442:20, 443:6, 444:3, 450:12, 452:15, 452:20, 462:7, 462:13, 464:15, 464:21, 465:1, 465:4, 465:5, 465:11, 465:15, 466:2, 471:23, 472:3, 480:24, 481:9, 482:7, 482:10, 483:8, 483:9, 483:10, 483:12, 484:3, 484:11, 484:12, 503:24, 507:11, 507:12, 509:11
**American** [2] - 442:22, 468:22, 468:24
**amount** [5] - 357:15, 491:16, 491:21,

494:5, 504:12
**anally** [1] - 493:7
**Analysis** [2] - 348:20, 349:1
**analysis** [58] - 304:1, 334:12, 364:11, 372:7, 374:8, 374:10, 375:12, 376:5, 379:19, 381:13, 381:15, 381:22, 382:24, 402:5, 403:16, 409:6, 416:7, 422:4, 427:10, 427:12, 427:23, 428:4, 429:1, 434:22, 435:13, 437:11, 452:4, 490:9, 491:16, 492:16, 494:1, 494:17, 494:18, 494:21, 495:7, 495:13, 495:20, 496:4, 496:22, 498:13, 498:18, 498:20, 498:23, 499:9, 499:15, 501:9, 501:22, 502:11, 502:13, 502:20, 503:6, 504:4, 505:21, 509:24, 511:9, 511:20, 514:11, 516:5
**analyst** [1] - 495:23
**analysts** [1] - 301:16
**analyze** [5] - 368:16, 369:2, 403:10, 501:22, 510:12
**analyzed** [6] - 403:6, 494:10, 495:1, 496:18, 496:21, 496:22
**analyzes** [1] - 496:11
**analyzing** [1] - 489:24
**Andrew** [4] - 351:10, 351:13, 362:23, 396:6
**ANDREWS** [1] - 243:16
**Android** [3] - 371:13, 384:5, 447:24
**annotate** [1] - 383:12
**annotation** [1] - 383:16
**announced** [11] - 283:11, 284:6, 284:7, 292:6, 292:12, 331:14, 331:20, 343:4, 505:10, 505:11,

505:13
**announcement** [1] - 407:6
**annual** [5] - 297:2, 299:18, 326:6, 502:5, 502:10
**answer** [6] - 258:17, 260:3, 260:4, 379:15, 499:23, 499:24
**Answer** [4] - 246:20, 246:23, 247:1, 247:3
**antidote** [1] - 306:1
**anyway** [1] - 254:2
**apart** [4] - 352:9, 375:15, 376:16, 450:18
**API** [13] - 359:9, 359:22, 361:24, 362:4, 362:8, 394:18, 394:22, 395:2, 395:13, 395:14, 398:20, 414:7, 425:23
**APIs** [1] - 359:1
**apologies** [1] - 436:17
**apologize** [7] - 258:3, 271:15, 312:22, 313:2, 335:15, 382:7, 493:7
**app** [41] - 379:21, 380:12, 383:22, 385:3, 385:5, 385:6, 385:14, 385:15, 388:5, 390:19, 391:13, 392:9, 420:1, 427:17, 428:18, 428:19, 432:13, 435:23, 440:4, 440:15, 445:6, 445:7, 445:15, 445:17, 446:7, 447:2, 447:3, 447:6, 448:9, 454:18, 456:14, 461:13, 461:19, 463:9, 464:4, 464:9, 475:3, 476:15
**APPEARANCES** [2] - 243:18, 244:1
**appeared** [1] - 329:12
**appearing** [1] - 266:22
**Apple** [4] - 300:14, 302:11, 384:4, 447:23
**appliances** [1] - 390:18
**application** [2] - 388:15, 391:8

**applications** [4] - 311:5, 390:12, 395:5, 501:8
**applied** [2] - 502:7, 502:8
**applies** [1] - 495:5
**apply** [5] - 256:6, 372:7, 495:3, 502:5, 503:11
**applying** [1] - 374:9
**apportionment** [2] - 515:15, 515:24
**appreciate** [2] - 251:18, 444:19
**Approach** [1] - 333:14
**approach** [5] - 333:16, 333:19, 369:9, 376:22, 407:22
**approached** [1] - 245:25
**approval** [1] - 313:18
**April** [1] - 264:16
**architecture** [13] - 329:13, 354:22, 378:20, 378:21, 378:23, 379:10, 380:4, 382:4, 382:22, 402:17, 403:20, 425:9, 428:14
**area** [9] - 289:6, 372:13, 372:16, 383:2, 383:13, 389:12, 404:11, 461:9, 489:25
**areas** [1] - 352:25
**arguable** [1] - 434:4
**argue** [1] - 486:6
**argument** [2] - 456:6, 458:18
**arm** [9] - 344:16, 385:19, 385:23, 386:6, 420:25, 445:11, 445:12, 445:14, 475:12
**arming** [3] - 385:21, 393:2, 393:6
**arrange** [1] - 268:20
**arsenal** [1] - 332:13
**ARSHT** [1] - 244:2
**art** [2] - 261:14, 497:5
**aspect** [2] - 497:16, 504:15
**aspects** [9] - 361:25, 367:7, 367:8, 368:3, 503:2, 504:18, 511:21, 511:22, 512:23
**assembled** [1] - 321:3
**asserted** [6] - 260:20,

310:3, 316:18, 316:24, 381:23, 437:12
**assertions** [1] - 270:6
**assess** [2] - 495:23, 499:5
**assessing** [3] - 494:11, 494:19, 497:10
**assessment** [3] - 499:1, 503:11, 506:15
**asset** [2] - 311:8, 311:21
**Asset** [6] - 285:10, 286:1, 286:6, 286:10, 295:5, 330:4
**assets** [9] - 298:12, 309:25, 312:13, 313:9, 318:12, 319:6, 320:3, 320:25, 321:22
**assigned** [2] - 320:6, 321:3, 321:4, 321:24
**assignment** [4] - 286:24, 310:10, 310:22, 311:4
**assist** [1] - 490:15
**associate** [2] - 421:18, 421:23
**associated** [10] - 359:12, 360:1, 387:23, 425:24, 458:8, 458:20, 459:3, 480:18, 480:22, 497:6
**Associated** [1] - 419:13
**associates** [1] - 491:5
**association** [1] - 459:2
**assume** [7] - 323:6, 405:15, 493:7, 496:4, 496:5, 497:10, 499:9
**assumed** [1] - 418:16
**assumptions** [2] - 495:20, 495:22
**AT&T** [2] - 300:13, 303:7
**attached** [2] - 404:5, 410:12
**attachment** [2] - 479:7, 479:12
**attempt** [6] - 250:6, 267:25, 268:20, 274:8, 281:7, 368:16
**attempted** [3] - 270:12, 270:15, 270:18

**attempting** [4] - 276:9, 279:21, 280:3, 500:8
**attempts** [1] - 410:22
**attention** [3] - 321:4, 412:2, 483:15
**attorney** [1] - 352:19
**attorneys** [5] - 296:2, 345:16, 352:3, 352:18, 364:5
**audio** [2] - 392:2, 392:5
**author** [4] - 348:22, 359:7, 361:8, 361:11
**authority** [1] - 247:14
**automatic** [18] - 413:17, 413:23, 414:23, 414:25, 415:8, 415:12, 416:5, 416:9, 416:11, 433:12, 433:13, 433:14, 433:23, 433:24, 434:7, 444:7, 458:13, 458:17
**automatically** [26] - 372:9, 372:23, 372:25, 409:19, 410:14, 411:9, 411:19, 413:24, 415:1, 415:10, 417:4, 417:7, 430:6, 430:14, 431:3, 442:24, 451:6, 451:10, 451:17, 457:23, 458:8, 458:9, 458:15, 458:19, 459:2, 459:3
**automation** [16] - 261:21, 262:3, 272:24, 279:16, 279:19, 280:8, 344:18, 353:16, 376:18, 380:7, 445:18, 470:24, 475:19, 476:10, 477:22, 488:1
**available** [5] - 337:25, 345:5, 491:18, 497:4, 500:11
**average** [2] - 488:11, 488:13
**avoid** [2] - 251:21, 258:17
**awake** [1] - 274:5
**awards** [1] - 366:15
**Awards** [1] - 366:17
**aware** [40] - 250:7, 250:10, 261:14, 263:7, 267:11, 267:14, 267:18,

267:22, 268:3, 268:7, 270:11, 289:17, 289:18, 318:21, 318:24, 323:1, 323:4, 352:7, 355:18, 355:20, 355:25, 356:10, 411:21, 428:24, 442:7, 445:2, 447:4, 447:9, 448:6, 448:22, 449:6, 450:5, 454:4, 462:2, 465:14, 465:21, 466:1, 478:16, 498:13, 498:15

### B

**bachelors** [1] - 491:1
**back-end** [1] - 454:17
**backed** [1] - 294:25
**background** [3] - 246:6, 272:13, 490:25
**bad** [1] - 252:7
**balance** [2] - 509:12, 509:14
**Baltimore** [1] - 364:8
**bar** [7] - 274:7, 312:14, 312:17, 313:3, 486:2, 486:4, 486:19
**bare** [1] - 507:25
**Barrie** [4] - 347:21, 348:3, 348:21, 348:22
**Barry** [1] - 301:24
**bars** [1] - 504:15
**base** [4] - 343:5, 355:9, 405:2, 502:6
**based** [29] - 322:3, 324:19, 351:2, 362:13, 367:13, 367:14, 367:19, 382:24, 385:13, 388:13, 400:22, 401:18, 402:5, 403:24, 409:6, 413:21, 416:7, 422:4, 427:10, 427:12, 427:23, 428:4, 434:8, 434:22, 435:13, 435:21, 478:6, 478:8, 514:6
**bases** [1] - 398:15
**basic** [5] - 338:6, 344:15, 354:17, 395:18, 492:2
**basis** [14] - 248:21,

268:10, 294:24, 341:20, 396:1, 467:4, 467:6, 469:11, 471:11, 471:15, 485:16, 502:5, 502:11
**Bates** [4] - 263:16, 350:22, 481:7, 481:19
**battery** [1] - 427:4
**bear** [1] - 463:5
**bearing** [2] - 350:21, 388:5
**became** [12] - 254:8, 261:14, 267:14, 267:21, 273:3, 275:25, 285:3, 289:18, 338:6, 342:24, 355:4, 503:25
**become** [8] - 267:11, 267:18, 289:17, 365:21, 416:4, 498:13, 498:15
**bed** [1] - 387:6
**bedroom** [1] - 387:4
**BEFORE** [1] - 243:16
**beforehand** [2] - 253:17
**began** [3] - 248:19, 261:13, 277:22
**begin** [1] - 506:18
**beginning** [4] - 332:12, 356:18, 421:4, 495:9
**begins** [4] - 397:22, 406:6, 406:16, 495:11
**behalf** [3] - 286:10, 301:6, 314:13
**belief** [1] - 268:10
**belong** [1] - 357:11
**below** [7] - 302:1, 370:21, 373:10, 373:15, 386:14, 395:16, 424:22
**benchmarking** [1] - 511:8
**beneath** [3] - 307:10, 315:17, 373:19
**beside** [1] - 264:15
**best** [7] - 255:16, 302:21, 334:4, 345:4, 353:18, 354:8, 354:20
**better** [5] - 281:12, 282:12, 289:6, 341:3, 503:17
**between** [46] - 247:9, 247:10, 249:6,

252:18, 260:7, 268:4, 268:14, 268:19, 281:25, 288:15, 314:10, 315:10, 324:4, 324:6, 329:11, 331:1, 331:23, 342:13, 347:23, 361:5, 365:21, 367:5, 368:17, 388:11, 398:6, 406:9, 422:13, 430:8, 434:15, 477:12, 478:1, 478:4, 487:25, 497:1, 499:21, 499:25, 500:12, 501:17, 502:19, 503:7, 503:11, 510:13, 511:13, 511:14, 515:7
**beyond** [1] - 341:22
**big** [12] - 276:6, 276:7, 276:23, 276:24, 277:12, 277:17, 277:18, 277:19, 310:13, 323:12, 343:8
**biggest** [4] - 276:4, 276:6, 276:11, 346:14
**bill** [4] - 258:19, 279:22, 281:18, 281:20
**Bill** [1] - 266:12
**billing** [1] - 281:21
**billion** [6] - 303:3, 322:17, 322:20, 323:22, 324:2, 328:25
**bind** [7] - 362:10, 412:22, 431:10, 433:4, 433:22, 434:3, 434:6
**binder** [21] - 263:10, 282:23, 285:10, 287:14, 288:3, 310:6, 314:2, 316:9, 318:4, 343:23, 384:13, 450:18, 467:12, 467:13, 467:14, 473:21, 476:20, 476:21, 478:21, 481:3, 487:20
**binders** [3] - 271:16, 271:18, 335:12
**bit** [15] - 245:21, 251:8, 272:12, 278:11, 288:23,

291:22, 342:25, 345:11, 369:25, 423:21, 490:24, 494:4, 494:6, 499:23, 511:17
**black** [1] - 445:22
**blacked** [1] - 301:23
**BlankenScout** [1] - 303:15
**blew** [1] - 246:2
**blow** [7] - 256:7, 344:6, 344:20, 375:4, 379:25, 472:13, 512:5
**blown** [1] - 333:14
**blue** [5] - 383:11, 497:3, 504:15, 508:10, 508:13
**BLUMENFELD** [15] - 244:2, 245:18, 245:20, 246:12, 246:17, 247:5, 252:15, 252:25, 253:21, 254:11, 257:7, 344:1, 345:11, 345:14, 347:12
**Blumenfeld** [4] - 245:19, 249:11, 252:10, 345:16
**blurred** [1] - 365:21
**board** [4] - 369:12, 369:17, 370:5, 404:16
**body** [2] - 332:13, 366:2
**Boggs** [1] - 243:12
**bolt** [2] - 433:2, 433:4
**border** [1] - 366:23
**bottom** [15] - 249:1, 263:20, 264:18, 308:12, 321:6, 353:21, 368:9, 370:8, 397:21, 421:3, 461:10, 470:7, 479:11, 508:13
**box** [35] - 363:5, 363:6, 363:10, 363:16, 370:16, 370:21, 371:4, 376:15, 376:16, 376:21, 377:1, 377:3, 377:9, 377:10, 377:16, 378:6, 383:11, 385:24, 391:4, 402:9, 408:12, 410:2, 429:21, 433:1, 447:7,

448:16, 448:17, 448:18, 450:9, 450:11, 450:12, 450:14, 464:20, 465:22, 508:13
**boxes** [6] - 363:7, 376:9, 493:1, 493:5, 493:21, 508:11
**Bradley** [11] - 472:14, 472:16, 472:21, 481:21, 481:23, 482:2, 482:5, 482:9, 482:21, 483:8, 492:10
**Bradley's** [2] - 473:5, 473:9
**brand** [2] - 342:10, 462:25
**brands** [1] - 463:2
**break** [13] - 273:23, 278:16, 279:3, 281:7, 334:20, 347:23, 399:11, 399:12, 423:21, 466:18, 466:19, 466:23, 517:19
**break-even** [1] - 278:16
**breakdown** [1] - 306:25
**breaking** [1] - 305:13
**Brett** [4] - 489:1, 489:5, 489:17, 491:7
**brief** [1] - 467:9
**briefly** [9] - 272:13, 364:7, 364:25, 371:5, 389:24, 410:17, 470:21, 480:16, 491:14
**bring** [8] - 258:21, 258:23, 271:16, 340:3, 402:21, 444:4, 493:17, 517:25
**bringing** [1] - 358:14
**brings** [1] - 342:8
**Brinks** [1] - 503:25
**broadband** [2] - 448:12, 448:13
**broadcasted** [1] - 421:24
**broke** [4] - 247:12, 279:7, 294:22, 401:15
**broken** [2] - 344:14, 413:2
**brought** [5] - 341:9, 400:9, 440:3, 443:23, 444:9
**browser** [2] - 449:10,

449:11
**build** [3] - 275:24, 276:9, 293:18
**building** [2] - 272:4, 275:22
**built** [3] - 278:8, 338:14, 418:3
**bullet** [4] - 309:4, 404:25, 458:1, 458:2
**bunch** [2] - 252:6, 446:9
**bus** [2] - 398:2, 398:5
**business** [72] - 256:10, 256:13, 266:1, 266:3, 273:18, 277:6, 278:23, 278:24, 279:4, 279:7, 280:15, 280:21, 281:2, 282:13, 282:14, 283:12, 283:14, 283:15, 283:16, 284:15, 285:6, 285:21, 290:15, 290:25, 291:5, 291:8, 291:14, 291:21, 291:22, 292:7, 293:7, 296:9, 298:3, 298:8, 306:3, 312:12, 313:8, 313:24, 322:2, 322:14, 324:11, 324:17, 324:19, 325:5, 325:13, 325:21, 327:13, 328:10, 329:25, 332:21, 332:25, 337:12, 342:23, 343:19, 469:10, 472:1, 472:4, 472:22, 483:3, 483:8, 485:1, 485:2, 485:20, 486:1, 486:6, 486:8, 503:21, 505:9, 509:4, 509:7, 509:13, 515:12
**businesses** [1] - 280:17
**busy** [1] - 251:24
**button** [7] - 362:10, 431:10, 431:12, 432:18, 433:4, 434:3, 434:6
**buttons** [4] - 412:22, 432:3, 432:23, 433:22
**buy** [2] - 294:2, 338:8
**buying** [1] - 331:9

**BY** [64] - 243:19, 243:22, 243:22, 243:23, 243:23, 244:2, 244:3, 244:5, 244:6, 244:6, 244:7, 244:7, 244:8, 259:15, 260:17, 264:5, 265:10, 271:21, 283:6, 285:16, 286:22, 287:21, 288:11, 294:11, 297:10, 301:2, 305:1, 306:18, 310:21, 311:17, 313:5, 314:9, 315:9, 316:17, 318:11, 326:3, 329:23, 335:24, 336:16, 344:4, 345:14, 364:3, 367:22, 370:1, 376:25, 378:12, 379:16, 384:19, 401:13, 405:24, 407:25, 436:7, 468:16, 469:23, 471:16, 472:12, 473:13, 474:3, 479:3, 486:20, 487:18, 489:14, 491:13, 493:22

**C**

**C-L-A-R-K** [1] - 363:20
**C.A** [1] - 243:7
**cable** [2] - 303:6, 439:15
**calculate** [3] - 334:2, 334:5, 334:8
**calculation** [4] - 495:14, 496:8, 496:24, 499:16
**Caleb** [1] - 243:12
**California** [6] - 292:16, 292:21, 339:9, 339:15, 489:18, 491:2
**camera** [56] - 377:20, 378:2, 391:4, 391:7, 391:13, 391:19, 391:23, 391:24, 392:16, 402:6, 402:7, 402:9, 402:10, 402:16, 402:18, 402:19, 402:21, 441:7, 447:7, 447:10, 450:8, 453:12,

453:24, 454:4, 454:7, 454:10, 454:12, 454:13, 454:14, 454:15, 454:17, 454:20, 454:24, 454:25, 455:2, 455:4, 455:11, 455:15, 455:17, 455:21, 456:3, 456:9, 456:17, 461:18, 462:7, 462:8, 462:11, 462:22, 463:1, 463:21, 463:24, 464:1, 464:15, 464:24
**cameras** [11] - 261:6, 380:8, 385:20, 389:7, 390:2, 446:20, 455:5, 455:25, 456:11, 462:4, 464:3
**Campbell** [1] - 294:12
**CAMPBELL** [38] - 244:6, 283:2, 285:13, 286:18, 287:18, 288:8, 294:11, 297:4, 297:10, 300:21, 301:2, 304:21, 305:1, 306:12, 306:18, 310:7, 310:17, 310:20, 310:21, 311:13, 311:17, 312:24, 313:4, 313:5, 314:9, 315:4, 315:9, 316:10, 316:13, 316:17, 318:5, 318:7, 318:11, 325:24, 329:21, 400:19, 491:11, 492:25
**Canary** [1] - 300:15
**cannot** [3] - 313:21, 507:10, 507:12
**cap** [3] - 322:17, 323:25, 324:1
**capabilities** [8] - 261:16, 405:8, 504:17, 504:22, 506:6, 512:2, 512:13
**capability** [8] - 261:15, 383:8, 388:18, 393:4, 405:4, 419:15, 440:1, 444:9
**capacity** [3] - 284:18, 293:6, 472:4
**Capital** [1] - 350:4
**capital** [1] - 322:23

**carbon** [1] - 273:21
**card** [5] - 377:7, 431:12, 439:18, 439:19, 439:20
**care** [3] - 339:20, 342:21, 488:23
**careful** [2] - 488:19, 504:2
**cares** [1] - 341:17
**case** [79] - 246:1, 246:7, 248:18, 248:20, 249:18, 254:21, 261:11, 270:1, 270:2, 270:24, 271:10, 285:1, 285:22, 287:2, 291:20, 329:6, 336:8, 345:20, 363:22, 364:5, 364:10, 364:14, 364:18, 368:24, 371:12, 374:20, 375:12, 385:14, 386:20, 397:9, 401:19, 401:25, 402:19, 404:14, 414:9, 418:18, 419:10, 429:9, 435:24, 443:21, 452:16, 485:25, 489:21, 490:13, 490:22, 491:10, 491:15, 491:18, 492:3, 492:5, 493:24, 494:17, 494:19, 495:23, 496:12, 496:13, 497:18, 498:4, 498:18, 499:8, 500:11, 501:11, 501:15, 502:16, 511:15, 512:20, 513:16, 514:11, 516:10, 516:11, 516:12, 516:13, 516:14, 516:17, 516:19, 517:7, 517:8
**cases** [4] - 294:3, 416:17, 446:20, 490:5
**cash** [3] - 265:24, 294:24, 508:24
**casing** [1] - 438:12
**catching** [1] - 315:14
**categories** [1] - 279:11
**category** [4] - 273:13, 279:16, 279:20, 280:1

**caused** [1] - 334:2
**cell** [1] - 379:2
**cellular** [7] - 387:14, 402:11, 410:7, 410:8, 411:3, 439:18, 449:23
**center** [4] - 371:15, 379:3, 379:4, 409:4
**central** [9] - 262:14, 274:1, 289:19, 289:20, 289:25, 337:19, 449:14, 474:16
**cents** [3] - 477:15, 477:20, 478:3
**CEO** [11] - 262:21, 263:7, 271:2, 271:25, 272:1, 306:8, 318:21, 318:24, 351:14, 401:3, 492:15
**CEO's** [1] - 247:10
**CEOs** [1] - 255:19
**certain** [9] - 245:8, 433:22, 454:9, 454:11, 495:2, 498:20, 501:7, 503:22, 510:18
**certainly** [12] - 251:6, 256:11, 384:12, 387:20, 412:13, 414:25, 430:2, 439:22, 456:5, 456:7, 472:5, 479:21
**chain** [1] - 481:19
**challenge** [3] - 276:7, 276:11
**challenges** [2] - 276:4, 276:6
**change** [10] - 322:2, 324:19, 331:14, 331:17, 400:25, 421:15, 423:18, 424:11, 459:3, 478:8
**changed** [3] - 282:20, 353:2, 354:13
**changes** [5] - 245:7, 245:8, 398:14, 458:9, 478:6
**channel** - 505:25, 506:1, 508:14, 515:21
**Channel** [2] - 348:20, 349:1
**charge** [4] - 324:16, 328:19, 328:20, 470:3
**charging** [2] - 331:4, 490:17
**chart** [4] - 305:13,

504:6, 510:14, 514:5
**Charter** [1] - 300:13
**cheat** [2] - 358:14, 358:18
**cheating** [1] - 267:4
**check** [3] - 392:17, 392:23, 466:10
**chief** [6] - 266:12, 267:7, 336:20, 337:23, 351:11, 356:16
**chip** [1] - 357:1
**choices** [2] - 355:8, 355:14
**choose** [2] - 282:11, 282:12
**chose** [1] - 485:4
**chosen** [1] - 280:19
**Chris** [1] - 294:12
**CHRISTOPHER** [1] - 244:6
**cite** [1] - 464:10
**civilian** [1] - 366:3
**claim** [59] - 368:11, 372:7, 373:21, 381:15, 381:19, 381:20, 382:8, 382:10, 382:16, 382:17, 388:9, 388:12, 393:20, 394:3, 394:7, 394:16, 399:9, 401:16, 401:20, 401:22, 401:23, 401:24, 401:25, 402:2, 402:3, 403:17, 409:17, 411:15, 422:5, 423:10, 426:1, 426:3, 426:5, 426:13, 426:14, 426:15, 426:16, 426:17, 429:4, 429:9, 429:12, 430:5, 434:16, 434:23, 434:24, 435:11, 436:1, 436:23, 436:25, 450:17, 450:20, 450:25, 451:16, 459:8, 459:19, 459:24, 460:24, 461:6
**Claim** [4] - 372:1, 434:15, 435:2, 435:14
**claimed** [1] - 310:3
**claiming** [2] - 406:25, 407:3
**claims** [19] - 244:22,

245:8, 262:16, 368:2, 368:10, 368:13, 370:14, 371:17, 381:24, 402:25, 403:1, 403:10, 403:12, 427:13, 427:14, 428:10, 436:21, 437:12
**clarification** [1] - 249:15
**clarify** [2] - 253:18, 259:8
**clarity** [3] - 323:25, 324:18
**Clark** [44] - 257:17, 363:2, 363:20, 364:4, 364:6, 364:8, 364:25, 367:18, 367:23, 369:11, 369:12, 369:22, 370:2, 370:4, 371:25, 375:17, 376:20, 377:1, 381:1, 381:4, 382:7, 401:14, 404:13, 405:25, 407:15, 408:1, 408:12, 408:14, 409:16, 412:4, 413:10, 414:5, 414:22, 416:24, 417:13, 424:20, 435:9, 436:4, 436:8, 447:18, 457:20, 466:20, 492:6, 500:19
**class** [1] - 459:2
**classes** [1] - 365:23
**classified** [1] - 366:12
**clause** [7] - 312:10, 313:6, 313:12, 314:16, 317:2, 317:10, 317:16
**clean** [4] - 251:9, 251:11, 251:14, 252:8
**clear** [13] - 251:7, 297:17, 323:18, 352:4, 352:5, 352:6, 438:10, 443:23, 449:25, 463:14, 486:5, 493:23, 498:9
**CLERK** [14] - 258:11, 271:3, 271:5, 271:9, 271:14, 335:1, 336:3, 336:7, 336:12, 363:18, 363:21, 364:1, 468:11, 489:3

**clerk** [1] - 489:8
**click** [1] - 388:19
**client** [5] - 313:22, 371:10, 379:24, 426:21, 426:24
**clients** [1] - 358:1
**clip** [1] - 438:17
**close** [2] - 341:8, 408:5
**closed** [3] - 331:21, 341:8, 413:1
**closely** [1] - 400:20
**closer** [2] - 318:1, 323:20
**cloud** [1] - 361:6
**Co** [1] - 341:12
**co** [1] - 260:24
**CO** [1] - 281:5
**co-inventors** [1] - 260:24
**CO2** [1] - 337:16
**Coast** [1] - 292:21
**code** [19] - 357:19, 379:17, 379:20, 380:11, 415:10, 417:23, 418:1, 418:3, 420:25, 427:17, 441:22, 445:1, 453:2, 453:6, 463:25, 464:2, 464:4, 464:7, 464:10
**coded** [1] - 434:19
**codes** [2] - 452:22, 452:25
**cold** [1] - 468:7
**collaborate** [1] - 313:19
**collaboration** [2] - 313:18, 342:13
**collected** [1] - 389:1
**college** [1] - 490:11
**color** [1] - 434:18
**column** [4] - 264:13, 264:16, 264:21, 344:12
**columns** [1] - 264:15
**combination** [3] - 278:9, 367:10, 517:20
**Comcast** [5] - 300:13, 303:7, 316:8, 317:6, 317:23
**comfortable** [1] - 448:7
**coming** [6] - 250:3, 256:12, 343:4, 359:24, 418:9, 420:5
**command** [4] - 412:6, 421:7, 458:7, 459:1
**commands** [2] -

391:19, 414:13
**commercial** [4] - 299:9, 366:5, 496:25, 508:9
**commercials** [1] - 342:9
**Commission** [3] - 296:18, 322:7, 326:6
**commitment** [1] - 478:9
**Committee** [1] - 341:12
**common** [3] - 368:2, 390:3, 496:9
**communicate** [23] - 337:2, 338:18, 361:25, 390:3, 394:1, 398:8, 402:20, 404:8, 408:16, 408:20, 409:3, 409:4, 420:24, 440:8, 440:11, 440:15, 440:16, 454:1, 455:6, 462:5, 469:9, 472:16, 472:21
**communicated** [3] - 357:7, 419:2, 471:5
**communicates** [6] - 381:8, 390:5, 394:6, 398:2, 404:6, 410:8
**communicating** [7] - 367:5, 395:21, 397:17, 414:16, 420:11, 430:20, 439:5
**Communication** [1] - 414:7
**communication** [15] - 250:9, 250:11, 268:5, 268:9, 268:15, 279:14, 361:17, 361:18, 397:13, 398:10, 408:21, 409:2, 409:24, 410:7, 421:5
**communications** [12] - 254:12, 365:7, 365:8, 373:2, 398:9, 398:12, 405:4, 411:11, 417:10, 429:24, 430:10, 430:19
**Communications** [1] - 300:14
**companies** [24] - 247:11, 255:15, 276:24, 282:19, 286:9, 287:8, 290:20, 290:23,

291:1, 296:21, 328:8, 328:10, 329:4, 329:25, 331:1, 338:22, 349:17, 480:1, 484:16, 491:21, 503:23, 507:19, 514:19
**companies'** [2] - 270:10, 270:13
**Company** [2] - 289:5
**company** [51] - 243:9, 255:7, 255:9, 272:3, 272:10, 274:21, 275:8, 275:23, 276:25, 277:12, 290:6, 290:13, 291:4, 292:18, 292:19, 293:15, 295:1, 295:7, 295:10, 295:12, 296:17, 301:10, 302:5, 303:5, 322:18, 322:20, 323:22, 328:25, 331:2, 331:3, 331:13, 331:17, 331:19, 338:5, 339:24, 341:5, 341:7, 342:1, 342:4, 409:7, 448:23, 489:19, 492:9, 500:7, 500:13, 503:16, 503:19, 505:20, 505:23, 506:3, 515:8
**company's** [2] - 332:20, 349:13
**comparability** [1] - 501:21
**comparable** [1] - 510:11
**compare** [1] - 421:9
**compared** [2] - 511:12, 515:14
**comparison** [2] - 388:11, 422:8
**compatible** [2] - 454:17, 454:20
**compensated** [2] - 490:13, 490:14
**compensation** [3] - 364:17, 469:12, 489:23
**compete** [9] - 304:15, 309:17, 309:20, 472:25, 486:24, 487:5, 487:7, 500:8, 505:25
**competed** [1] - 291:20

**competes** [3] - 329:16, 329:18, 471:11
**competing** [10] - 289:5, 289:13, 304:9, 304:10, 329:13, 329:25, 472:22, 473:4, 485:1, 485:2
**competition** [10] - 262:24, 282:17, 288:24, 288:25, 296:16, 302:23, 303:6, 329:3, 471:17, 479:17
**Competition** [2] - 299:15, 489:19
**Competitive** [2] - 348:20, 349:1
**competitive** [19] - 263:4, 299:21, 302:3, 305:22, 305:23, 305:24, 306:6, 309:6, 309:12, 309:21, 477:25, 483:13, 483:25, 484:4, 491:25, 497:1, 502:18, 515:18, 515:19
**competitor** [27] - 300:4, 302:6, 304:3, 304:5, 304:6, 304:9, 304:14, 306:4, 317:13, 317:17, 321:16, 321:19, 322:5, 326:11, 326:14, 349:22, 353:4, 353:6, 353:8, 487:6, 487:9, 499:25, 503:12, 503:16, 507:6, 508:12, 508:14
**competitor's** [3] - 308:20, 480:8, 480:12
**competitors** [23] - 282:18, 282:19, 289:16, 300:3, 300:8, 300:11, 300:15, 302:12, 307:1, 308:4, 321:11, 324:10, 326:22, 327:1, 327:17, 327:23, 478:14, 486:15, 486:21, 487:12, 503:23, 507:17
**competitors'** [3] - 309:18, 479:22,

480:2
**complaint** [3] - 248:20, 267:16, 267:22
**complete** [10] - 295:25, 296:2, 353:24, 415:11, 416:8, 437:10, 475:24, 512:22, 513:13
**completed** [3] - 331:15, 505:12, 517:6
**completely** [1] - 270:7
**completes** [1] - 357:12
**complex** [2] - 244:17, 365:16
**component** [29] - 372:18, 372:21, 373:3, 394:9, 403:8, 409:18, 411:9, 411:21, 412:16, 412:17, 413:12, 413:25, 415:14, 420:11, 420:12, 422:5, 430:16, 450:22, 451:2, 451:15, 451:17, 453:12, 453:14, 453:20, 459:25, 460:12, 460:13, 460:17
**components** [32] - 363:13, 373:1, 373:12, 373:16, 373:17, 374:5, 403:21, 409:13, 409:22, 410:11, 410:12, 411:10, 411:12, 417:8, 423:12, 423:23, 425:21, 429:17, 429:22, 430:11, 446:2, 450:7, 451:19, 451:21, 452:1, 452:4, 453:17, 457:16, 460:4, 460:10, 464:23
**comprehensive** [1] - 297:22
**comprising** [1] - 382:25
**computer** [10] - 337:7, 365:2, 365:3, 365:4, 365:22, 394:25, 395:3, 395:4, 395:5, 395:21
**computers** [2] - 418:4,

418:5
**concept** [1] - 416:5
**concern** [1] - 247:15
**concerned** [4] - 248:9, 252:4, 363:16, 366:11
**conclude** [2] - 325:4, 383:25
**concluded** [1] - 339:7
**conclusion** [3] - 270:20, 362:12, 413:21
**Conclusion** [1] - 356:13
**Concord** [2] - 404:18, 404:22
**conditions** [3] - 478:7, 478:10, 491:22
**conducted** [1] - 355:15
**conductivity** [1] - 380:7
**conduit** [1] - 357:13
**conference** [1] - 254:24
**conferred** [1] - 257:17
**confidence** [4] - 277:1, 278:11, 278:17, 278:18
**confidential** [1] - 356:23
**configured** [3] - 411:20, 441:23, 442:11
**confirm** [1] - 511:8
**confirming** [1] - 253:24
**confused** [1] - 400:1
**Congress** [1] - 366:22
**Connect** [57] - 266:1, 266:3, 283:15, 283:17, 284:2, 284:4, 284:5, 284:15, 285:5, 285:6, 292:6, 292:12, 293:7, 293:12, 298:3, 298:8, 319:11, 320:6, 320:8, 320:11, 320:12, 327:13, 329:9, 329:18, 329:20, 337:3, 339:2, 339:4, 339:12, 339:13, 339:16, 340:6, 340:8, 340:11, 340:12, 340:16, 340:20, 340:22, 341:4, 341:19, 341:25, 342:6,

342:7, 342:20, 342:23, 343:10, 343:14, 344:10, 344:23, 344:25, 345:2, 346:5, 346:7, 354:6, 505:9, 509:4, 509:6
**connect** [13] - 283:18, 376:15, 387:13, 402:20, 410:23, 439:10, 439:15, 440:1, 452:23, 453:25, 463:15, 475:16
**connected** [10] - 262:14, 370:24, 371:6, 379:3, 380:5, 380:9, 399:6, 439:18, 440:25, 452:24
**connection** [22] - 312:12, 313:7, 314:20, 338:15, 372:17, 372:21, 379:2, 398:4, 398:6, 409:18, 411:2, 411:4, 411:8, 413:2, 415:13, 422:5, 427:1, 450:22, 451:2, 451:14, 451:16
**connectivity** [4] - 350:8, 376:4, 376:17, 475:2
**connectors** [2] - 438:14, 439:8
**connects** [2] - 404:24, 410:20
**consider** [11] - 367:14, 383:21, 384:9, 387:22, 478:13, 496:23, 506:19, 509:23, 515:15, 517:18, 517:21
**consideration** [9] - 478:15, 503:10, 504:1, 507:14, 508:1, 508:3, 509:20, 511:2, 511:3
**considerations** [3] - 497:15, 503:18, 507:7
**considered** [2] - 368:3, 508:10
**considering** [1] - 290:16
**consistent** [4] - 406:14, 407:13, 507:23, 509:9
**consistently** [2] -

512:25, 513:2
**consolidate** [1] - 485:20
**constantly** [1] - 299:23
**constitutes** [1] - 434:3
**construction** [7] - 384:6, 417:1, 422:5, 425:25, 450:25, 451:22, 459:24
**Constructions** [1] - 372:1
**construed** [5] - 361:12, 373:21, 373:23, 374:2
**consultant** [1] - 490:10
**consulting** [1] - 366:9
**Consumer** [1] - 419:24
**consumer** [2] - 420:2, 474:12
**consumers** [2] - 340:22, 345:6
**contact** [4] - 250:6, 250:16, 268:1, 465:17
**contains** [2] - 305:12, 308:3
**contemplating** [1] - 482:9
**contender** [2] - 329:9, 329:10
**content** [6] - 389:12, 392:3, 392:5, 392:8, 392:9, 461:9
**contents** [1] - 378:25
**context** [9] - 248:18, 255:20, 313:15, 350:7, 371:12, 405:5, 496:18, 497:9, 506:11
**contingent** [1] - 364:17
**continue** [4] - 339:11, 345:6, 399:20, 401:11
**CONTINUED** [1] - 244:1
**continued** [6] - 254:13, 276:2, 278:15, 279:1, 340:24, 365:12
**continues** [2] - 302:25, 451:18
**continuing** [1] - 250:23, 300:10
**continuous** [1] - 398:13
**contract** [2] - 353:20,

488:12
**contrast** [2] - 321:22, 322:25
**contributor** [1] - 328:12
**Control** [2] - 419:12, 419:24
**control** [27] - 261:15, 279:13, 279:17, 344:16, 366:13, 371:19, 375:9, 380:21, 385:4, 385:17, 388:25, 389:8, 390:5, 390:20, 393:12, 393:16, 417:11, 420:3, 421:16, 439:23, 440:15, 440:16, 445:17, 455:21, 474:14, 474:18, 475:21
**controller** [2] - 458:8, 458:20
**Controlling** [1] - 385:10
**controlling** [2] - 389:10, 390:18
**controls** [1] - 468:6
**convenient** [1] - 496:16
**conversation** [1] - 481:16
**conversations** [2] - 471:9, 492:9
**conversion** [9] - 482:2, 482:16, 482:17, 482:21, 482:24, 482:25, 483:3, 483:8, 484:7
**convert** [2] - 319:10, 483:5
**converting** [1] - 483:3
**COOLEY** [1] - 244:5
**copies** [1] - 248:15
**copy** [1] - 470:7
**core** [4] - 263:4, 341:18, 341:23, 472:1
**corner** [3] - 348:10, 348:12, 371:9
**corporate** [2] - 306:9, 483:22
**corporation** [2] - 243:4, 243:5
**Correct** [1] - 264:23
**correct** [246] - 246:6, 260:10, 260:22, 261:5, 261:7, 261:9, 261:11, 261:16, 261:22, 262:1,

262:2, 262:11, 262:12, 262:15, 262:18, 262:20, 263:5, 263:6, 263:14, 264:25, 265:1, 265:3, 265:7, 268:12, 268:17, 268:18, 269:5, 269:21, 270:3, 270:7, 294:20, 294:21, 295:16, 296:19, 296:24, 297:3, 297:11, 297:13, 297:19, 297:20, 297:23, 298:8, 299:6, 299:10, 299:11, 299:23, 300:2, 300:5, 300:8, 300:9, 300:11, 300:12, 301:12, 302:13, 302:17, 303:1, 303:4, 303:25, 304:4, 304:20, 305:7, 305:10, 306:4, 307:20, 308:1, 309:7, 309:10, 309:18, 309:21, 309:25, 310:4, 310:5, 310:23, 311:1, 311:2, 311:22, 312:2, 312:6, 313:14, 314:11, 314:18, 314:21, 314:22, 314:25, 315:11, 315:23, 315:24, 316:19, 316:21, 316:25, 317:8, 318:25, 319:12, 319:14, 319:19, 319:22, 320:5, 320:13, 321:16, 322:15, 322:16, 323:6, 324:4, 324:5, 324:12, 325:17, 327:14, 327:15, 327:20, 327:21, 328:22, 328:23, 329:16, 330:18, 345:24, 346:12, 346:13, 347:8, 349:6, 349:7, 349:18, 350:1, 350:2, 350:6, 350:7, 350:24, 350:25, 351:16, 352:3, 353:1, 353:9, 353:23, 354:10, 354:24, 355:2,

355:3, 355:5, 355:6, 355:8, 355:11, 355:12, 355:15, 355:16, 356:3, 360:4, 397:19, 436:10, 436:20, 437:5, 437:9, 437:12, 437:15, 437:20, 437:23, 438:1, 438:4, 438:6, 438:15, 439:5, 439:24, 440:5, 440:12, 440:17, 440:21, 440:25, 441:3, 441:7, 441:14, 441:17, 442:8, 442:11, 443:8, 443:11, 444:20, 444:23, 445:1, 445:4, 445:8, 445:11, 445:23, 446:2, 447:1, 447:3, 447:6, 452:4, 452:20, 455:6, 455:12, 457:4, 457:13, 457:16, 458:10, 458:23, 459:17, 459:18, 459:22, 462:5, 464:13, 464:16, 473:19, 473:20, 474:5, 474:11, 474:16, 474:24, 475:7, 475:8, 475:15, 475:17, 476:16, 476:17, 476:24, 476:25, 477:16, 477:20, 478:7, 478:17, 479:5, 479:7, 479:12, 479:15, 479:18, 480:21, 481:13, 481:25, 482:12, 483:1, 483:10, 484:9, 484:13, 484:19, 484:21, 484:23, 485:5, 485:8, 485:13, 485:17, 486:22, 488:7, 488:8, 488:9, 488:15, 505:18, 506:23, 507:3, 514:3
**corrected** [1] - 248:10
**correctly** [2] - 246:11, 462:11
**correlation** [1] - 434:15
**correspond** [2] - 394:8, 425:21

**corresponding** [1] - 434:23
**cost** [5] - 307:25, 320:10, 333:20, 333:21, 333:25
**costs** [2] - 480:17, 480:22
**counsel** [14] - 247:10, 249:18, 250:18, 257:6, 266:20, 326:25, 331:24, 333:8, 335:21, 386:22, 400:13, 408:15, 467:3, 517:11
**count** [1] - 349:8
**counter** [1] - 259:25
**counter-licensing** [1] - 259:25
**countermeasures** [1] - 366:23
**counterproposal** [2] - 246:19, 259:25
**counters** [1] - 267:2
**counts** [1] - 266:21
**couple** [15] - 245:22, 248:13, 265:11, 272:23, 273:5, 282:21, 291:16, 292:11, 337:4, 342:15, 345:2, 383:13, 399:8, 424:18, 457:24
**coupled** [15] - 373:12, 383:2, 393:22, 409:19, 423:1, 423:6, 423:13, 424:2, 429:16, 450:22, 452:1, 453:18, 453:21, 460:5, 461:10
**coupling** [9] - 372:23, 409:20, 410:5, 410:6, 417:4, 429:15, 430:8, 451:7, 451:17
**course** [7] - 246:5, 246:6, 253:11, 255:14, 273:6, 364:19, 471:23
**COURT** [150] - 243:1, 244:12, 245:16, 245:19, 246:4, 246:16, 247:4, 248:11, 248:25, 249:7, 249:23, 250:2, 250:17, 251:6, 251:13, 251:18, 251:25, 252:3, 252:10,

252:23, 253:6, 254:3, 254:6, 254:25, 256:14, 256:19, 257:1, 257:4, 257:8, 257:13, 257:18, 258:4, 258:9, 258:13, 258:20, 258:23, 259:2, 259:5, 260:14, 263:25, 264:3, 266:8, 266:14, 270:21, 271:17, 283:3, 285:14, 286:19, 287:19, 288:9, 294:9, 297:7, 300:24, 304:24, 306:15, 310:12, 310:19, 311:15, 312:16, 312:25, 314:6, 315:8, 316:15, 318:9, 325:25, 329:22, 334:16, 334:23, 335:2, 335:7, 335:10, 335:14, 335:16, 335:19, 336:2, 344:2, 345:10, 347:14, 347:16, 347:19, 348:2, 351:6, 351:12, 356:17, 362:18, 362:25, 363:3, 363:8, 363:12, 363:15, 367:21, 369:10, 369:15, 369:20, 369:24, 376:24, 378:10, 379:12, 379:15, 384:17, 399:10, 399:16, 399:19, 399:23, 400:4, 400:10, 400:16, 400:22, 401:5, 401:10, 405:20, 407:24, 466:6, 466:9, 466:13, 466:18, 466:23, 466:25, 467:6, 467:10, 467:15, 467:18, 467:21, 467:23, 467:25, 468:10, 469:19, 471:14, 472:9, 473:25, 479:1, 486:3, 486:10, 486:13, 486:16, 487:15, 488:18, 488:22, 489:2, 489:12, 491:12, 493:1,

493:3, 493:12, 516:6, 516:24, 517:2, 517:14, 517:24, 518:3
**Court** [13] - 271:10, 312:19, 336:8, 363:22, 372:6, 372:10, 373:6, 373:22, 417:1, 417:19, 490:6, 517:9, 518:4
**court** [4] - 271:19, 467:13, 516:15, 516:20
**Court's** [6] - 257:12, 372:8, 384:5, 425:24, 450:25, 453:15
**Courthouse** [1] - 243:12
**courtroom** [13] - 259:4, 334:22, 335:18, 366:20, 399:15, 399:22, 400:17, 400:24, 401:7, 401:9, 466:22, 467:24, 516:23
**cover** [2] - 397:1, 449:22
**covered** [2] - 255:16, 495:12
**covers** [1] - 503:8
**create** [3] - 273:17, 361:7, 430:21
**created** [6] - 250:20, 284:3, 332:12, 354:9, 361:9, 368:20
**creates** [1] - 357:12
**creation** [2] - 274:23, 348:22
**creative** [1] - 274:23
**credit** [1] - 377:7
**critical** [6] - 342:21, 500:9, 503:1, 503:9, 508:20, 515:4
**CROSS** [4] - 294:10, 345:13, 436:6, 473:12
**cross** [24] - 247:22, 251:12, 251:15, 252:23, 253:1, 253:16, 253:20, 254:1, 254:2, 259:10, 259:12, 260:15, 294:9, 316:6, 326:10, 333:16, 341:19, 345:10, 400:2, 400:20, 400:21,

487:20, 501:7, 510:16

**CROSS-EXAMINATION** [4] - 294:10, 345:13, 436:6, 473:12

**cross-examination** [10] - 253:16, 259:10, 259:12, 260:15, 294:9, 326:10, 333:16, 345:10, 400:20, 487:20

**cross-examining** [2] - 247:22, 252:23

**crystal** [1] - 251:6

**CTO** [2] - 274:22, 396:7

**culture** [2] - 292:25, 343:5

**cumbersome** [1] - 465:8

**current** [6] - 296:4, 304:18, 305:16, 313:21, 355:1, 392:24

**custodian** [1] - 348:21

**custom** [2] - 380:3, 383:20

**customary** [2] - 490:19, 490:20

**customer** [70] - 256:18, 275:17, 276:17, 276:20, 277:13, 277:18, 279:13, 279:17, 279:21, 281:11, 281:22, 282:1, 283:19, 283:20, 291:7, 291:10, 291:13, 291:15, 293:22, 304:9, 304:10, 304:15, 304:16, 306:2, 321:2, 340:12, 343:5, 346:14, 350:13, 352:22, 352:23, 355:1, 355:4, 355:6, 355:7, 355:9, 355:18, 355:19, 355:20, 355:22, 356:1, 356:9, 356:10, 359:15, 360:5, 360:17, 362:9, 370:13, 370:19, 371:20, 371:23, 378:25, 379:6, 396:16, 397:15, 471:21, 476:14, 478:2, 484:23,

503:14, 508:2, 509:4, 509:5, 509:8, 510:20, 510:21, 515:7

**Customer** [1] - 319:13

**customer's** [1] - 357:16

**customers** [49] - 277:11, 277:15, 277:25, 278:4, 278:5, 278:6, 281:19, 289:4, 290:23, 292:2, 294:5, 324:21, 340:14, 346:7, 346:10, 346:17, 349:3, 349:4, 349:8, 349:12, 350:14, 355:8, 355:10, 355:12, 355:13, 356:24, 360:12, 360:15, 360:16, 366:5, 428:4, 428:5, 428:7, 435:22, 469:2, 480:18, 480:25, 485:7, 500:9, 500:23, 503:20, 504:21, 505:2, 505:14, 509:19, 510:22, 512:12

**customized** [1] - 361:10

# D

**D-O-N-A-L-D** [1] - 468:14

**daily** [1] - 469:11

**damage** [3] - 334:12, 495:8, 495:22

**damages** [23] - 467:17, 489:11, 489:21, 489:22, 489:24, 490:4, 490:7, 490:9, 491:8, 491:10, 494:12, 494:16, 494:17, 494:19, 494:22, 494:23, 495:2, 496:4, 496:11, 497:10, 499:12, 501:11

**Dan** [2] - 336:19, 407:8

**Daniel** [3] - 335:9, 335:23, 336:5

**DANIEL** [1] - 336:5

**Data** [2] - 413:9

**data** [49] - 274:1,

279:14, 303:20, 303:23, 371:15, 374:3, 374:4, 379:3, 379:4, 389:1, 394:14, 394:19, 395:1, 395:6, 395:7, 398:18, 413:13, 413:16, 413:22, 423:11, 423:12, 423:14, 423:16, 423:17, 423:19, 423:20, 423:23, 423:24, 424:8, 424:9, 424:15, 424:16, 425:1, 425:2, 425:4, 425:23, 426:22, 491:17, 492:18, 492:19, 494:8

**database** [14] - 359:11, 359:16, 359:17, 360:1, 374:6, 394:19, 395:22, 396:2, 396:9, 396:25, 398:20, 413:14, 421:22, 424:13

**databases** [1] - 421:21

**date** [12] - 254:9, 315:14, 330:17, 330:19, 330:21, 348:22, 354:9, 470:4, 495:9, 495:16, 497:17, 499:22

**dated** [3] - 306:20, 310:25, 311:24

**dates** [1] - 406:11

**David** [5] - 356:15, 362:14, 396:6, 397:3, 425:6

**Dawes** [24] - 246:14, 247:22, 248:1, 249:13, 253:12, 253:15, 254:3, 255:1, 257:3, 258:16, 258:19, 259:2, 259:16, 260:18, 265:11, 266:8, 340:13, 369:5, 406:8, 492:14, 495:17, 500:4, 504:6, 514:19

**Dawes'** [6] - 245:24, 248:16, 249:4, 250:14, 250:19, 259:8

**days** [6] - 276:5, 290:1, 337:4, 343:6, 361:13, 397:4

**dead** [2] - 433:2, 433:4

**deal** [22] - 245:2, 245:3, 284:6, 289:22, 292:11, 292:15, 324:13, 331:10, 331:12, 331:14, 331:20, 331:21, 341:8, 343:8, 365:16, 367:4, 374:14, 466:24, 505:8, 505:13, 507:10, 507:12

**Dealer** [2] - 348:20, 349:1

**dealer** [21] - 280:11, 291:24, 350:11, 429:13, 471:2, 474:18, 476:17, 477:20, 478:9, 480:16, 484:18, 484:21, 484:22, 485:12, 485:18, 505:25, 506:1, 508:14, 510:22, 512:1, 515:21

**dealers** [21] - 291:25, 292:1, 296:13, 309:11, 435:4, 469:4, 469:5, 469:10, 469:15, 470:1, 470:19, 471:6, 473:6, 477:18, 480:17, 484:15, 487:8, 491:24, 500:22, 510:24, 511:19

**dealing** [3] - 352:3, 464:2, 503:19

**deals** [9] - 298:10, 331:16, 368:4, 368:7, 403:7, 504:2, 507:23, 507:24

**dealt** [1] - 365:7

**debate** [1] - 496:2

**decade** [4] - 276:2, 279:8, 368:1, 374:16

**December** [5] - 306:20, 327:6, 327:10, 406:7, 406:13

**decide** [1] - 244:17

**decided** [4] - 246:8, 280:14, 281:14, 485:19

**decision** [1] - 280:24

**deck** [2] - 306:22, 307:5

**declaration** [1] - 304:13

**dead** [2] - 433:2, 433:4

**deeply** [1] - 340:9

**defendant** [3] - 347:25, 493:18, 517:16

**Defendant** [2] - 243:10, 244:9

**defendant's** [1] - 259:10

**defendants** [1] - 255:13

**Defense** [1] - 366:7

**defense** [1] - 252:6

**defense's** [1] - 259:10

**defenses** [1] - 245:8

**define** [5] - 295:14, 392:19, 396:19, 423:4, 486:23

**defined** [7] - 295:14, 378:21, 379:22, 390:15, 459:25, 460:3, 460:9

**defines** [1] - 317:17

**definitely** [4] - 298:21, 460:17, 472:25, 480:15

**definition** [6] - 317:20, 320:14, 372:6, 372:8, 453:15, 453:16

**definitions** [2] - 374:9, 459:21

**definitively** [1] - 303:22

**degree** [4] - 272:15, 337:7, 491:1, 491:4

**degrees** [2] - 279:25, 365:2

**DELAWARE** [1] - 243:2

**Delaware** [5] - 243:4, 243:5, 243:9, 243:13, 280:14

**delay** [1] - 370:4

**deliver** [2] - 266:17, 360:19

**delivered** [2] - 377:21, 392:9

**delivering** [1] - 278:2

**delivery** [1] - 269:15

**demand** [1] - 503:17

**DEMANDED** [1] - 243:8

**demonstrate** [1] - 382:18

**demonstrates** [1] - 504:6

**demonstration** [2] - 438:22, 464:12

**demonstrative** [16] - 296:8, 296:9,

364:24, 383:6, 387:16, 388:20, 388:21, 389:4, 392:10, 392:11, 393:8, 393:18, 402:14, 403:2, 431:17, 432:17
**demonstratives** [2] - 364:20, 434:25
**Department** [1] - 366:7
**dependent** [5] - 401:23, 401:24, 426:14, 426:16, 490:21
**depicted** [6] - 380:2, 381:5, 384:7, 391:11, 403:14, 404:2
**deploy** [1] - 444:6
**deployed** [2] - 366:18, 367:12
**deployment** [1] - 366:4
**deposition** [18] - 249:24, 261:11, 261:24, 266:18, 267:6, 270:20, 347:21, 348:3, 348:18, 351:3, 351:10, 351:13, 356:15, 356:18, 362:12, 362:14, 362:22, 498:15
**depositions** [3] - 266:24, 491:17, 492:8
**describe** [10] - 272:13, 275:7, 285:3, 333:15, 333:20, 340:5, 416:24, 420:7, 470:21, 491:14
**described** [3] - 341:6, 396:15, 422:13
**describes** [1] - 333:12
**describing** [4] - 268:10, 365:24, 415:8, 417:8
**description** [1] - 321:25
**design** [4] - 281:13, 352:21, 352:22, 354:12
**designed** [2] - 428:14, 445:7
**designs** [1] - 320:18
**desirable** [1] - 276:10
**detail** [1] - 369:6
**detect** [2] - 377:19,

442:4
**detector** [4] - 273:22, 281:4, 281:5, 337:14
**determination** [1] - 494:3
**determine** [3] - 480:10, 496:7, 496:8
**determines** [2] - 281:23, 423:18
**determining** [3] - 424:11, 424:21, 480:14
**develop** [4] - 261:25, 270:12, 273:6, 428:1
**Developed** [1] - 319:11
**developed** [10] - 290:4, 319:25, 320:7, 320:15, 320:17, 338:5, 350:10, 350:11, 425:9, 428:14
**developing** [2] - 272:7, 449:25
**development** [5] - 284:18, 292:9, 292:13, 341:2, 428:3
**device** [35] - 273:25, 371:4, 372:12, 376:9, 379:24, 382:25, 394:5, 394:10, 394:14, 395:17, 395:19, 395:25, 402:19, 404:7, 404:10, 418:19, 423:12, 423:17, 425:1, 425:24, 426:24, 432:19, 433:4, 433:5, 434:5, 440:13, 454:23, 458:3, 458:6, 458:7, 458:10, 458:11, 458:19
**Device** [1] - 415:4
**Devices** [4] - 395:11, 419:13, 419:18
**devices** [83] - 261:8, 261:18, 261:22, 279:19, 361:6, 361:23, 362:2, 362:5, 362:11, 368:5, 368:8, 371:6, 371:11, 371:13, 373:5, 374:5, 375:25, 376:2, 376:8, 377:16, 380:7, 380:8, 380:10, 380:20, 380:22, 384:5,

388:17, 390:1, 390:3, 390:5, 390:20, 393:17, 396:1, 396:20, 414:17, 415:15, 417:11, 419:9, 419:21, 420:3, 421:14, 423:12, 424:1, 424:2, 425:22, 426:21, 430:7, 430:8, 430:11, 430:15, 430:20, 430:24, 431:2, 431:6, 431:21, 431:22, 431:24, 432:6, 432:12, 432:21, 432:22, 433:22, 434:7, 435:16, 445:18, 447:24, 448:1, 448:2, 454:22, 455:1, 455:16, 455:23, 457:13, 457:15, 458:25, 461:16, 461:17
**diagram** [2] - 380:2, 380:15
**dial** [1] - 409:4
**difference** [5] - 422:20, 477:12, 478:1, 487:25, 488:5
**differences** [1] - 511:13
**different** [30] - 319:5, 323:25, 345:2, 353:10, 353:11, 372:19, 376:17, 382:8, 385:21, 404:21, 409:10, 422:25, 429:11, 429:19, 430:2, 430:13, 432:15, 445:23, 452:3, 459:10, 460:7, 473:19, 475:22, 476:8, 477:4, 481:12, 492:19, 494:9, 496:15, 511:21
**difficult** [1] - 264:12
**digital** [3] - 365:21, 365:24, 366:23
**Direct** [1] - 306:23
**DIRECT** [4] - 271:20, 364:2, 468:15, 489:10
**direct** [24] - 282:18, 282:19, 289:16, 294:15, 295:4,

304:3, 304:5, 304:6, 304:14, 321:4, 322:5, 326:14, 327:16, 327:22, 332:16, 345:24, 353:24, 391:14, 412:2, 476:24, 481:24, 483:15, 483:23, 489:1
**directed** [1] - 461:13
**direction** [1] - 336:23
**directly** [5] - 280:22, 304:16, 329:16, 469:9, 469:13
**dirty** [1] - 462:12
**disability** [1] - 280:5
**disable** [1] - 421:7
**disagree** [3] - 270:5, 387:1, 387:2
**disarm** [7] - 344:16, 385:19, 420:25, 445:11, 445:12, 445:14, 475:12
**disarming** [2] - 393:3, 393:6
**disassembled** [2] - 404:15, 438:2
**disastrous** [1] - 509:19
**disclaimed** [1] - 368:21
**disconnect** [2] - 438:14, 438:16
**discount** [1] - 483:10
**discover** [5] - 416:16, 431:3, 431:22, 434:6, 458:25
**discovered** [4] - 415:18, 417:12, 440:21, 442:24
**discovering** [6] - 411:10, 413:24, 417:8, 430:7, 430:14, 431:24
**discovery** [10] - 403:7, 412:13, 413:17, 413:23, 414:23, 415:12, 415:18, 416:5, 416:9, 416:11, 416:19, 418:23, 433:11, 433:23, 433:24, 444:7, 458:17, 458:23
**discuss** [7] - 247:24, 268:21, 480:16, 496:19, 516:10, 516:11, 516:12
**discussed** [11] - 245:21, 328:11,

355:1, 362:7, 408:18, 410:12, 442:3, 461:25, 462:4, 476:23, 480:24
**discussing** [5] - 337:4, 338:13, 377:12, 481:4, 481:23
**discussion** [11] - 254:19, 282:17, 292:7, 312:17, 328:24, 400:7, 486:4, 487:24, 488:4, 512:24, 513:16
**discussions** [10] - 248:3, 248:4, 252:18, 253:25, 254:13, 254:15, 254:20, 484:2, 492:12, 492:14
**dismiss** [1] - 246:8
**dismissed** [2] - 251:1, 259:17
**disparity** [3] - 324:3, 324:6, 324:10
**display** [5] - 373:24, 374:18, 460:1, 461:13, 461:19
**dispute** [3] - 247:6, 406:9, 446:24
**disputed** [2] - 372:5, 493:9
**dissimilar** [1] - 350:15
**distinction** [3] - 273:15, 458:21, 510:19
**distinguishing** [1] - 408:9
**distribute** [1] - 335:11
**Distribution** [2] - 348:21, 349:1
**District** [1] - 490:6
**DISTRICT** [2] - 243:1, 243:2
**DIY** [4] - 302:12, 302:14, 303:13, 303:17
**do-it-yourself** [2] - 303:14, 303:18
**Doctor** [7] - 442:6, 449:24, 457:10, 457:12, 459:5, 463:5, 463:10
**doctorate** [3] - 365:3, 365:5, 365:10
**Doctrine** [9] - 244:25, 426:6, 426:9, 433:18, 433:25,

434:2, 435:4, 437:2, 437:4
**document** [53] - 263:10, 269:20, 297:25, 310:11, 318:3, 325:18, 327:6, 327:10, 328:21, 330:11, 330:17, 344:5, 344:9, 348:5, 348:9, 350:20, 354:9, 356:23, 356:24, 357:23, 358:4, 358:13, 358:16, 358:25, 359:1, 359:3, 361:7, 361:19, 361:21, 362:5, 378:19, 379:23, 381:10, 389:18, 391:12, 395:10, 397:20, 398:23, 406:24, 413:3, 414:5, 414:8, 414:12, 414:23, 414:25, 415:2, 457:20, 463:6, 463:8, 463:23, 483:14, 512:7, 514:7
**documentation** [2] - 297:19, 380:18
**documented** [1] - 269:18
**documents** [21] - 253:2, 374:21, 374:22, 374:23, 375:1, 379:10, 381:12, 382:23, 397:5, 403:21, 411:23, 424:15, 433:11, 489:7, 491:17, 491:23, 492:17, 492:19, 493:25, 494:2, 494:14
**DOD** [2] - 366:3, 366:6
**dollar** [6] - 303:3, 328:25, 476:11, 476:12, 476:16, 488:4
**dollars** [2] - 324:2, 508:20
**Donald** [1] - 468:13
**done** [17] - 267:2, 290:15, 293:4, 340:19, 340:24, 341:11, 366:1, 366:9, 381:6, 415:18, 417:3, 421:13, 426:19, 442:3, 502:24,

514:11
**door** [29] - 273:23, 281:6, 337:13, 376:18, 377:20, 378:2, 378:4, 380:8, 386:13, 390:2, 390:10, 390:13, 391:5, 392:17, 393:12, 394:15, 412:19, 412:21, 413:1, 415:23, 415:24, 416:2, 416:3, 433:3, 441:12, 452:8, 465:23, 475:23
**doors** [2] - 373:13, 377:19
**DORSNEY** [5] - 243:19, 258:21, 258:25, 335:3, 335:9
**Dorsney** [1] - 335:7
**down** [25] - 266:9, 287:4, 292:18, 305:13, 307:16, 307:22, 317:3, 319:13, 334:17, 347:17, 386:7, 389:8, 395:7, 402:18, 404:25, 406:16, 421:20, 479:10, 481:11, 482:1, 488:19, 497:23, 510:14, 516:25
**downstairs** [1] - 387:7
**Dr** [42] - 257:17, 363:2, 364:4, 364:6, 364:25, 367:18, 367:23, 369:11, 369:12, 369:22, 370:2, 370:4, 371:25, 375:17, 376:20, 377:1, 381:1, 381:4, 382:7, 401:14, 404:13, 405:25, 407:15, 408:1, 408:12, 408:14, 409:16, 412:4, 413:10, 414:5, 414:22, 416:24, 417:13, 424:20, 435:8, 436:4, 436:8, 447:18, 457:20, 466:20, 492:6, 500:19
**dramatic** [2] - 505:5, 505:6
**drive** [5] - 324:11, 324:17, 325:5,

325:13, 486:6
**driven** [1] - 499:21
**drives** [1] - 325:21
**driving** [1] - 509:9
**dropped** [1] - 247:16
**DTX** [22] - 263:10, 263:22, 264:4, 264:9, 304:22, 304:25, 305:6, 306:13, 306:17, 310:6, 310:7, 311:11, 311:16, 314:2, 314:3, 314:8, 315:3, 316:8, 316:16, 318:4, 318:10, 487:19
**DTX-2388** [1] - 333:4
**DTX-242** [2] - 297:5, 297:9
**DTX-302** [3] - 473:21, 473:23, 474:2
**DTX-371** [1] - 330:6
**DTX-401** [1] - 327:4
**DTX-61** [2] - 478:21, 478:24
**DTX-87** [2] - 300:20, 301:1
**dual** [1] - 307:18
**duplicate** [1] - 310:9
**during** [16] - 250:5, 250:8, 259:23, 260:7, 267:25, 268:4, 268:8, 332:16, 346:4, 404:14, 432:8, 432:16, 442:22, 498:3, 502:22, 513:16

## E

**e-mail** [7] - 481:8, 481:10, 481:15, 481:21, 482:6, 483:18, 484:8
**e-mails** [1] - 427:3
**early** [10] - 254:12, 275:19, 276:4, 276:24, 276:25, 280:24, 290:1, 295:3, 361:13, 508:18
**early-stage** [1] - 276:25
**earn** [1] - 514:20
**earned** [2] - 504:10, 514:15
**earning** [1] - 504:24
**earnings** [8] - 300:19, 301:4, 301:18,

301:22, 302:19, 303:9, 303:10, 321:18
**easel** [2] - 369:18, 369:19
**easier** [2] - 282:15, 369:19
**easily** [1] - 483:6
**East** [1] - 292:21
**easy** [2] - 406:25, 500:23
**EBITDA** [1] - 512:9
**Ecobee** [1] - 308:17
**economic** [6] - 341:17, 490:10, 496:14, 501:12, 501:21, 510:11
**Economics** [1] - 489:19
**economics** [4] - 491:1, 491:3, 491:4, 491:8
**economist** [3] - 489:18, 490:1, 492:4
**edited** [1] - 266:24
**EDM** [1] - 342:3
**education** [3] - 272:13, 365:1, 367:13
**educational** [1] - 490:24
**effect** [3] - 322:9, 322:14, 324:13
**effective** [1] - 333:25
**efficient** [1] - 282:14
**effort** [2] - 294:7, 340:3
**efforts** [1] - 247:8
**eight** [10] - 275:17, 275:21, 275:22, 278:25, 308:3, 342:17, 348:9, 379:25, 488:13, 488:14
**either** [24] - 252:2, 252:15, 253:8, 337:11, 346:2, 346:17, 347:2, 347:8, 357:11, 383:14, 388:8, 412:25, 426:5, 431:2, 435:4, 437:3, 439:14, 456:2, 457:17, 475:15, 493:19, 499:2, 510:7, 517:18
**electrical** [1] - 365:2
**electronic** [1] - 311:18
**electronically** [3] - 297:18, 430:10,

430:18
**element** [12] - 244:21, 244:22, 389:15, 393:19, 394:4, 409:16, 410:15, 411:6, 422:24, 430:5, 499:12, 500:10
**elements** [20] - 381:15, 381:20, 381:23, 382:9, 382:17, 382:22, 401:20, 401:25, 402:1, 402:2, 403:17, 426:5, 426:17, 428:3, 429:5, 429:12, 434:15, 434:20, 446:9, 446:23
**elsewhere** [1] - 430:1
**email** [7] - 258:1, 258:2, 472:13, 472:24, 479:4, 479:7, 479:11
**embodies** [1] - 427:13
**employee** [4] - 254:5, 254:10, 295:23, 295:24
**employees** [7] - 265:16, 275:2, 275:4, 275:8, 275:13, 275:19, 278:3
**employer** [1] - 304:17
**enable** [2] - 350:11, 421:7
**enables** [1] - 390:1
**enclosure** [6] - 376:16, 407:1, 431:14, 444:16, 460:16, 460:22
**encompass** [1] - 433:21
**encompasses** [1] - 470:23
**encountered** [1] - 328:13
**encourage** [2] - 408:10, 435:22
**encryption** [1] - 357:12
**End** [1] - 486:19
**end** [28] - 273:16, 281:21, 281:22, 304:10, 309:10, 309:11, 313:3, 351:1, 362:9, 397:18, 425:19, 439:22, 440:14, 445:7, 445:10,

446:12, 447:17, 449:19, 454:17, 474:20, 476:14, 477:17, 480:18, 480:20, 480:25, 481:13, 500:22, 515:13
**ending** [20] - 264:16, 375:3, 375:16, 378:18, 384:20, 385:9, 389:20, 395:9, 396:11, 397:20, 398:23, 404:13, 410:18, 412:2, 413:4, 414:18, 421:3, 424:19, 481:19, 483:16
**ends** [1] - 481:7
**energy** [3] - 279:20, 279:22, 280:1
**engage** [1] - 341:17
**engaged** [1] - 342:18
**engineer** [3] - 341:24, 372:4, 374:16
**engineering** [5] - 272:16, 274:8, 337:8, 340:2, 365:3
**engineers** [6] - 284:20, 336:24, 339:7, 339:8, 341:20, 342:1
**enhancing** [2] - 292:8, 354:20
**enjoyed** [1] - 308:24
**enroll** [14] - 362:5, 378:4, 378:16, 411:24, 412:5, 412:8, 412:10, 412:15, 432:6, 441:20, 443:3, 443:14, 443:24, 458:24
**enrolled** [4] - 419:1, 458:11, 458:12, 459:1
**enrolling** [1] - 362:11
**enrollment** [11] - 362:7, 377:25, 411:18, 415:11, 458:3, 458:6, 458:10, 458:19, 458:22, 458:23, 459:5
**enter** [5] - 330:14, 420:25, 506:17, 507:21, 509:25
**entered** [4] - 268:23, 311:7, 502:25, 510:3
**entering** [5] - 259:4,

335:18, 337:15, 401:9, 467:24
**enterprise** [3] - 360:4, 360:12, 360:16
**enters** [1] - 507:16
**entire** [8] - 296:3, 332:13, 342:1, 457:3, 457:6, 457:10, 509:6
**entirely** [1] - 369:20
**entities** [1] - 328:13
**entitled** [9] - 298:3, 298:22, 306:20, 314:16, 348:25, 350:21, 393:9, 414:6, 494:25
**entity** [4] - 287:1, 289:13, 295:25
**entrants** [1] - 303:1
**entry** [1] - 321:5
**environment** [1] - 491:25
**equipment** [1] - 377:22
**equivalent** [5] - 390:4, 416:8, 422:13, 434:5, 515:25
**Equivalents** [9] - 244:25, 426:6, 426:10, 433:19, 433:25, 434:2, 435:5, 437:2, 437:4
**equivalents** [1] - 434:8
**ERIK** [1] - 244:5
**especially** [1] - 513:3
**ESQUIRE** [13] - 243:19, 243:22, 243:22, 243:23, 243:23, 244:2, 244:3, 244:5, 244:6, 244:6, 244:7, 244:7, 244:8
**essentially** [6] - 246:2, 256:16, 385:3, 420:10, 422:17, 432:6
**establish** [3] - 429:23, 451:6, 470:3
**established** [4] - 320:9, 410:23, 411:2, 500:1
**establishes** [2] - 357:12, 501:21
**establishing** [7] - 372:23, 409:19, 417:4, 430:7, 451:17, 493:10, 500:2
**estimate** [2] - 307:5,

517:7
**estimated** [2] - 307:23, 327:25
**estimates** [2] - 307:17, 354:8
**estoppel** [1] - 244:15
**ether** [1] - 408:23
**Ethernet** [5] - 439:8, 439:12, 439:15, 439:25, 440:13
**evaluate** [1] - 496:15
**evaluated** [1] - 329:8
**evaluating** [1] - 262:24, 414:22
**evaluation** [1] - 290:9
**evening** [1] - 516:22
**event** [6] - 337:16, 341:10, 391:20, 401:6, 426:22, 468:6
**events** [10] - 341:7, 367:6, 371:19, 379:5, 390:9, 390:15, 392:19, 426:23, 458:9, 459:3
**evidence** [70] - 264:4, 277:8, 283:1, 283:5, 285:11, 285:15, 286:17, 286:21, 287:16, 287:20, 288:6, 288:10, 297:5, 297:9, 300:21, 301:1, 304:22, 304:25, 306:13, 306:17, 311:13, 311:16, 314:8, 315:4, 316:10, 316:16, 318:5, 318:10, 343:25, 344:3, 348:1, 351:4, 351:8, 362:15, 362:20, 378:8, 378:11, 382:23, 384:15, 384:18, 403:22, 403:24, 405:19, 405:23, 435:21, 440:3, 440:10, 440:14, 440:23, 443:23, 444:22, 444:25, 445:3, 452:18, 454:6, 454:16, 456:1, 456:2, 466:15, 469:17, 469:22, 472:11, 474:2, 476:19, 478:24, 492:22, 492:23, 492:24, 493:5, 512:4
**evidentiary** [1] - 257:9
**evolve** [1] - 342:14

**evolving** [2] - 299:23, 340:25
**exact** [1] - 406:11
**exactly** [8] - 281:4, 324:18, 327:2, 391:24, 422:11, 441:13, 474:17, 478:19
**EXAMINATION** [11] - 265:9, 271:20, 294:10, 326:2, 345:13, 364:2, 436:6, 468:15, 473:12, 487:17, 489:10
**examination** [13] - 253:16, 259:10, 259:12, 260:15, 294:9, 321:15, 326:10, 333:16, 345:10, 400:20, 481:24, 487:20, 489:1
**examined** [1] - 438:2
**examining** [2] - 247:22, 252:23
**Example** [3] - 359:19, 387:17, 393:9
**example** [39] - 282:22, 319:10, 341:24, 342:16, 357:18, 359:14, 360:20, 362:4, 374:25, 390:6, 390:14, 392:3, 392:8, 392:12, 392:15, 392:24, 393:7, 395:13, 395:16, 398:20, 413:24, 424:3, 424:25, 431:12, 431:18, 446:10, 448:25, 456:9, 471:21, 475:22, 484:18, 485:10, 498:24, 498:25, 503:16, 507:9, 508:10, 508:13, 511:11
**examples** [12] - 287:10, 287:11, 287:12, 375:7, 376:2, 387:25, 412:18, 419:5, 424:14, 424:17, 432:24, 449:9
**Excell** [2] - 348:18, 348:19
**except** [5] - 327:17, 354:12, 408:20, 437:2, 466:7

**exception** [1] - 434:1
**excerpt** [4] - 270:20, 356:13, 356:18, 362:12
**exchange** [8] - 316:7, 332:6, 332:9, 332:11, 332:14, 332:24, 357:13, 501:19
**Exchange** [2] - 296:18, 322:7
**exchanged** [2] - 331:25, 332:20
**exciting** [1] - 348:17
**exclude** [1] - 400:24
**excluded** [2] - 503:20, 508:2
**exclusive** [5] - 282:8, 282:9, 282:16, 507:11
**excuse** [6] - 325:16, 476:12, 477:15, 477:19, 478:20, 483:9
**execute** [1] - 341:2
**executing** [5] - 373:7, 388:15, 417:17, 417:22, 451:10
**executive** [1] - 351:11
**executives** [1] - 510:2
**exhibit** [12] - 257:22, 310:14, 358:2, 374:25, 407:14, 408:11, 450:12, 451:1, 469:17, 481:4, 497:13, 498:15
**Exhibit** [32] - 267:16, 267:23, 283:5, 285:12, 285:15, 285:17, 286:21, 286:23, 287:20, 288:10, 297:9, 301:1, 311:21, 330:4, 348:4, 348:17, 350:20, 356:19, 356:20, 358:11, 358:24, 359:8, 361:4, 361:15, 361:24, 384:18, 408:2, 450:13, 469:24, 472:7, 472:11, 474:2
**exhibits** [12] - 347:23, 347:25, 351:3, 352:12, 362:15, 362:19, 362:23, 363:5, 363:9, 363:10, 363:11, 466:8

**existing** [6] - 345:4, 355:20, 405:2, 406:18, 407:1, 482:18
**exit** [1] - 421:13
**exiting** [1] - 337:16
**expand** [3] - 293:6, 378:19, 487:22
**expansion** [1] - 361:16
**expect** [2] - 345:1, 480:1
**expectations** [2] - 322:2, 324:18
**expected** [1] - 336:25
**expecting** [2] - 245:8, 442:2
**expensive** [1] - 306:2
**experience** [6] - 367:13, 372:4, 374:16, 428:5, 464:11, 490:1
**experienced** [1] - 334:9
**expert** [10] - 257:18, 257:19, 281:2, 367:14, 367:18, 467:17, 489:1, 491:7, 496:10, 501:12
**expertise** [2] - 341:22, 489:25
**experts** [2] - 489:22, 492:5
**explain** [6] - 275:10, 371:1, 371:5, 383:6, 389:24, 421:11
**explained** [2] - 457:5, 457:9
**explaining** [2] - 268:10, 359:1
**explanation** [1] - 457:11
**expressly** [1] - 317:23
**extended** [1] - 369:24
**extending** [2] - 397:21, 424:20
**extensive** [1] - 248:3
**extensively** [1] - 369:1
**extent** [1] - 313:19
**eye** [1] - 370:10
**eyes** [1] - 374:17

**F**

**face** [2] - 438:6, 497:20
**faces** [1] - 309:15
**facilities** [1] - 366:12
**fact** [13] - 247:8,

247:12, 255:16, 265:5, 307:3, 321:15, 323:3, 328:21, 385:16, 433:16, 447:4, 483:12, 499:3
**factor** [4] - 478:13, 496:18, 502:18, 506:15
**factors** [15] - 496:12, 496:15, 496:16, 496:21, 496:23, 498:24, 499:1, 499:18, 499:20, 508:6, 508:7, 510:15, 511:10, 514:12
**facts** [1] - 499:7
**fair** [17] - 267:7, 267:14, 267:21, 268:8, 269:1, 269:24, 308:19, 313:20, 322:22, 324:22, 324:25, 349:10, 349:12, 349:15, 349:16, 352:1, 484:2
**fairly** [2] - 291:9, 363:14
**faith** [5] - 276:11, 276:12, 276:13, 277:2
**fall** [1] - 382:22
**familiar** [9] - 273:8, 290:7, 329:12, 337:24, 338:2, 358:21, 401:23, 405:25, 506:8
**family** [2] - 293:8, 299:5
**famous** [1] - 496:12
**far** [9] - 291:7, 321:8, 346:16, 347:1, 347:4, 347:7, 352:22, 363:15, 474:20
**fault** [1] - 312:23
**favored** [3] - 503:13, 508:2, 515:1
**feature** [3] - 345:6, 354:21, 461:22
**features** [7] - 309:10, 352:23, 405:1, 470:23, 475:22, 476:4, 477:24
**February** [1] - 243:14
**fee** [3] - 364:15, 509:15, 509:18
**feeds** [1] - 462:2
**felt** [1] - 281:11

**few** [4] - 259:9, 345:19, 366:17, 374:16
**fewer** [1] - 282:15
**Fi** [11] - 380:21, 383:14, 387:10, 387:13, 389:25, 431:2, 454:2, 455:5, 456:11, 462:5, 476:4
**field** [5] - 365:11, 365:12, 365:14, 367:19, 491:7
**fields** [4] - 272:22, 272:23, 272:24, 359:25
**fifteen** [2] - 265:17, 496:14
**fifty** [2] - 330:12, 343:3
**figure** [18] - 246:8, 281:3, 369:13, 370:7, 370:12, 379:7, 381:22, 412:8, 418:2, 420:8, 422:16, 422:18, 442:9, 447:20, 448:1, 467:3, 467:5, 467:7
**Figure** [7] - 368:2, 418:9, 418:11, 418:13, 420:4
**Figures** [4] - 417:18, 457:1, 457:4, 457:7
**figures** [4] - 337:2, 373:8, 403:20, 422:14
**file** [4] - 250:16, 270:2, 311:11, 368:20
**filed** [16] - 246:10, 247:6, 247:7, 248:20, 251:4, 253:10, 253:11, 267:22, 312:1, 312:6, 367:25, 372:5, 407:4, 425:15, 425:17, 495:16
**files** [1] - 326:19
**filing** [5] - 259:21, 260:8, 297:19, 300:3, 326:5
**filings** [3] - 296:17, 296:22, 297:1
**finally** [5] - 276:16, 276:17, 341:8, 374:1, 422:1
**finances** [1] - 263:7
**financial** [8] - 297:22, 301:10, 334:8, 472:15, 473:10, 491:18, 496:14,

512:7
**financials** [1] - 492:20
**fine** [3] - 253:21, 257:7, 363:16
**finish** [1] - 331:12
**finished** [4] - 259:11, 292:15, 493:16, 516:7
**finishing** [1] - 401:15
**fire** [1] - 259:1
**firm** [4] - 318:15, 318:17, 490:14, 490:15
**firmware** [2] - 441:18, 442:4
**first** [90] - 246:7, 248:19, 249:3, 250:25, 259:18, 260:7, 261:25, 263:16, 264:13, 267:11, 267:14, 267:18, 273:2, 274:2, 274:18, 276:17, 277:4, 277:7, 279:11, 280:24, 289:17, 289:18, 289:22, 291:3, 299:17, 300:4, 302:5, 308:24, 316:23, 321:16, 321:19, 342:25, 343:5, 348:8, 358:24, 364:6, 370:14, 371:21, 371:23, 372:9, 372:12, 372:13, 374:5, 379:1, 379:8, 379:9, 382:1, 382:25, 383:3, 383:19, 384:9, 384:10, 384:12, 384:22, 386:23, 393:20, 394:1, 394:21, 396:18, 399:24, 402:18, 403:25, 406:5, 409:20, 414:5, 414:17, 417:9, 417:21, 422:24, 423:1, 423:13, 427:9, 429:16, 429:18, 429:19, 429:25, 430:9, 430:17, 442:18, 471:23, 472:24, 474:7, 479:10, 497:17, 499:22, 502:18, 505:1, 507:7, 510:16, 514:25

**fit** [4] - 361:12, 380:12, 382:4, 407:20
**fits** [2] - 380:3, 433:2
**five** [13] - 257:2, 258:10, 273:20, 311:18, 331:10, 351:20, 361:2, 368:13, 468:4, 490:12, 496:17, 516:5
**flew** [1] - 292:20
**flip** [6] - 478:20, 478:21, 479:8, 479:14, 481:3, 481:18
**flood** [2] - 390:11, 419:15
**floor** [2] - 396:18
**Florida** [2] - 272:15, 406:6
**flow** [1] - 265:24
**FLOWER** [2] - 335:24, 336:16
**FLOWERS** [14] - 243:23, 335:12, 335:22, 336:13, 343:24, 344:4, 345:8, 347:15, 347:20, 351:2, 351:9, 356:14, 362:13, 362:21
**Flowers** [1] - 336:14
**fly** [3] - 244:17, 339:15, 342:17
**flying** [1] - 339:9
**fob** [1] - 385:24
**focus** [5] - 312:9, 365:6, 411:8, 417:14, 470:20
**focused** [4] - 272:5, 277:1, 281:10, 340:24
**focusing** [3] - 250:15, 275:23, 511:24
**folks** [6] - 273:5, 280:10, 289:3, 293:1, 341:22, 342:17
**following** [4] - 264:15, 351:3, 362:15, 397:21
**follows** [1] - 313:6
**FOR** [1] - 243:2
**force** [2] - 321:3, 509:9
**forecasts** [1] - 491:20
**foremost** [3] - 500:6, 507:8, 515:5
**forget** [2] - 255:7, 466:8

**form** [9] - 244:20, 245:6, 245:10, 451:9, 491:15, 496:11, 497:25, 502:11, 502:13
**formal** [1] - 289:1
**formed** [3] - 352:11, 352:16, 493:24
**forming** [3] - 372:24, 417:5, 492:13
**forms** [2] - 350:17, 411:9
**forth** [5] - 246:25, 247:8, 357:10, 362:5, 368:17
**fortunately** [1] - 429:5
**forty** [4] - 343:2, 343:7, 468:4
**forty-five** [2] - 468:4
**forum** [1] - 366:20
**forward** [3] - 482:13, 482:19, 483:4
**forwarded** [1] - 479:4
**forwarding** [2] - 474:8, 474:9
**foundation** [1] - 275:25
**foundational** [1] - 489:9
**founded** [1] - 293:13
**founder** [1] - 274:19
**founders** [2] - 273:7, 274:15
**founding** [1] - 273:1
**four** [15] - 249:21, 252:5, 278:15, 290:20, 291:1, 328:8, 328:10, 328:13, 329:4, 339:22, 367:1, 441:11, 482:1, 490:2
**fourth** [2] - 284:9, 303:17
**fraction** [3] - 322:25, 325:19, 325:20
**fragmented** [1] - 299:19
**frame** [6] - 251:7, 255:5, 265:13, 265:18, 350:3, 505:10
**framework** [1] - 506:24
**FRANK** [1] - 244:7
**free** [8] - 317:4, 324:16, 483:13, 483:24, 484:3, 484:6, 484:8, 484:12
**frequently** [4] - 247:1, 289:7, 326:24, 502:4

**friend** [2] - 290:3
**front** [6] - 299:17, 305:6, 369:12, 370:8, 391:22, 450:11
**full** [7] - 271:5, 272:11, 335:17, 336:3, 363:18, 468:11, 489:3
**fully** [4] - 317:4, 333:24, 339:25, 406:20
**function** [10] - 372:20, 372:22, 373:4, 384:12, 405:12, 416:10, 417:3, 417:14, 434:9, 451:14
**function-way-result** [1] - 434:9
**functionality** [11] - 352:23, 354:21, 391:16, 462:15, 462:18, 462:21, 463:15, 463:23, 464:18, 475:4, 476:2
**functions** [20] - 262:1, 262:4, 336:25, 338:6, 340:14, 373:2, 376:3, 376:4, 388:25, 403:23, 411:11, 417:10, 419:16, 420:2, 428:9, 430:10, 430:19, 444:5, 451:3, 456:7
**future** [2] - 508:19, 512:11

**G**

**gained** [1] - 512:12
**gate** [1] - 404:4
**gateway** [96] - 262:17, 338:9, 338:11, 338:20, 358:9, 362:1, 362:8, 368:8, 370:18, 372:11, 372:15, 375:21, 375:23, 376:3, 376:12, 376:13, 376:14, 380:6, 380:24, 395:17, 395:24, 397:17, 398:1, 398:7, 398:13, 398:15, 398:18, 398:25, 399:4, 403:25, 404:1, 404:4, 404:17, 404:19,

404:23, 405:13, 405:14, 406:17, 406:19, 407:4, 407:5, 407:12, 408:3, 408:16, 408:20, 409:12, 409:19, 409:25, 410:8, 410:20, 410:22, 410:25, 412:7, 412:11, 413:12, 413:16, 414:14, 414:16, 418:19, 418:22, 420:10, 420:14, 420:22, 423:2, 423:6, 423:11, 423:15, 423:16, 423:17, 423:25, 424:5, 424:8, 424:9, 424:21, 424:22, 424:24, 425:3, 429:15, 429:16, 429:25, 430:7, 430:8, 430:9, 430:12, 430:15, 430:18, 430:20, 431:1, 431:3, 431:11, 431:14, 432:9, 434:4, 450:23, 453:5
**Gateway** [2] - 395:11, 398:24
**Gateways** [1] - 375:5
**gateways** [10] - 262:19, 338:22, 346:1, 347:8, 375:7, 376:6, 404:21, 407:16, 409:6, 446:18
**gather** [1] - 255:12
**gathered** [1] - 246:8
**GE** [1] - 338:6
**gears** [1] - 459:7
**general** [12] - 354:7, 354:21, 355:21, 365:6, 376:9, 378:23, 384:22, 400:5, 445:12, 447:8, 455:1, 455:16
**generally** [28] - 337:11, 337:24, 356:20, 356:22, 358:7, 364:9, 365:14, 367:2, 367:24, 372:2, 378:22, 380:2, 382:11, 382:20, 382:21, 391:11, 396:15, 397:11, 399:3, 403:14,

406:2, 414:11, 420:8, 473:18, 478:18, 501:14, 507:16, 515:16
**generate** [2] - 276:20, 424:16
**generated** [1] - 289:21
**generates** [4] - 276:18, 423:15, 424:8, 426:20
**generating** [2] - 425:3, 434:21
**generic** [1] - 395:18
**gentleman** [1] - 481:23
**geography** [1] - 491:2
**Georgia** [8] - 496:12, 496:13, 498:24, 499:1, 506:14, 506:24, 511:10, 514:12
**Georgia-Pacific** [8] - 496:12, 496:13, 498:24, 499:1, 506:14, 506:24, 511:10, 514:12
**giant** [1] - 303:3
**giants** [1] - 303:7
**GiG** [9] - 375:9, 444:10, 444:11, 444:13, 444:17, 444:20, 444:23, 448:25, 449:7
**given** [9] - 245:7, 253:19, 266:18, 360:1, 372:3, 450:8, 467:2, 479:24, 513:4
**glance** [1] - 313:15
**global** [1] - 347:22
**Go!Control** [9] - 375:11, 392:14, 392:16, 393:2, 444:5, 444:8, 444:10, 444:11, 449:8
**goal** [2] - 275:13, 275:19
**goals** [1] - 508:14
**GoControl** [8] - 358:14, 358:19, 387:18, 431:19, 453:9, 459:13, 459:16, 460:20
**Gold** [2] - 470:21
**gold** [4] - 477:9, 477:13, 477:24, 478:2
**GOODRICH** [1] - 243:21
**Google** [9] - 300:14,

302:11, 304:3, 304:6, 304:14, 308:12, 308:14, 353:6, 516:17
**Gore** [1] - 366:17
**government** [3] - 272:16, 366:3, 366:15
**governmental** [1] - 366:2
**gradually** [1] - 275:22
**graduate** [1] - 274:24
**graduated** [1] - 272:14
**grant** [3] - 317:12, 508:12, 508:22
**granted** [1] - 506:20
**grantee** [2] - 317:11, 317:22
**granting** [1] - 317:23
**great** [5] - 284:22, 324:3, 324:6, 324:10, 347:18
**green** [2] - 383:16, 431:12
**Gregory** [1] - 479:11
**gross** [2] - 513:1, 513:2
**ground** [1] - 281:5
**group** [11] - 317:6, 337:12, 339:14, 340:1, 340:21, 342:11, 342:16, 346:5, 396:20, 496:17, 515:6
**grouped** [1] - 496:16
**grow** [4] - 275:14, 276:1, 276:2, 340:19
**growing** [3] - 303:13, 343:7, 343:10
**grown** [3] - 293:7, 342:24, 342:25
**growth** [6] - 346:6, 504:23, 512:8, 512:9, 512:11, 513:9
**GSM** [1] - 406:17
**guaranteed** [1] - 515:22
**guess** [14] - 245:7, 252:11, 254:9, 371:8, 379:17, 387:18, 400:4, 400:6, 405:20, 413:5, 425:15, 460:11, 478:12, 486:23
**guessing** [1] - 401:5
**guide** [2] - 358:21, 463:9

# H

**half** [4] - 307:19, 328:20, 328:21, 517:8
**Hammer** [1] - 366:17
**hand** [27] - 246:14, 248:14, 325:2, 344:12, 344:20, 370:11, 371:9, 371:14, 375:20, 376:20, 381:10, 382:14, 382:19, 382:20, 397:17, 402:15, 403:15, 403:18, 404:9, 415:9, 418:8, 422:7, 422:13, 422:15, 429:8, 498:10
**handed** [1] - 271:16
**handful** [3] - 279:11, 338:25, 486:24
**handshake** [1] - 357:10
**hang** [1] - 356:21
**happy** [2] - 251:14, 323:16
**hard** [1] - 407:19
**hardware** [4] - 350:8, 357:8, 367:11, 448:16
**harm** [2] - 334:2, 334:8
**head** [4] - 289:19, 422:23, 472:25, 512:9
**head's** [1] - 290:5
**headed** [1] - 249:9
**heading** [8] - 375:5, 378:20, 395:10, 396:12, 397:23, 412:3, 424:21, 483:22
**headquartered** [1] - 339:18
**headquarters** [1] - 342:17
**hear** [18] - 253:9, 255:18, 266:21, 277:19, 289:7, 289:9, 326:23, 386:22, 386:24, 391:23, 400:7, 401:3, 407:7, 407:10, 425:8, 471:11, 516:15
**heard** [31] - 246:5, 260:23, 290:9, 290:10, 290:13, 310:2, 328:24,

347:4, 372:11, 395:23, 399:25, 425:11, 427:16, 436:23, 446:25, 492:6, 492:10, 492:11, 492:15, 494:6, 495:17, 498:7, 500:3, 501:16, 501:18, 502:24, 504:5, 509:10, 510:1, 513:16, 514:18
**hearing** [2] - 247:4, 516:14
**hearsay** [1] - 471:13
**heavily** [1] - 266:24
**held** [1] - 465:18
**Helix** [3] - 361:23, 362:1, 362:3
**hello** [1] - 260:19
**help** [8] - 269:16, 280:4, 281:3, 341:14, 358:21, 364:20, 418:1, 490:15
**helpful** [1] - 381:13
**helping** [1] - 504:23
**helps** [1] - 251:16
**Herbert** [3] - 483:19, 483:20, 483:21
**hi** [4] - 245:19, 271:4, 336:19, 473:15
**hidden** [1] - 348:6
**high** [6] - 272:14, 281:5, 337:5, 337:7, 365:1, 510:25
**higher** [1] - 284:19
**highlight** [1] - 320:16
**highlighted** [4] - 319:24, 415:3, 457:23, 458:16
**highlighting** [1] - 458:15
**highly** [3] - 299:21, 302:2, 325:3
**himself** [1] - 251:9
**hired** [5] - 273:2, 273:6, 274:19, 318:12, 318:19
**historically** [1] - 338:16
**history** [4] - 244:14, 340:5, 368:20, 509:24
**hit** [3] - 370:10, 434:6, 468:5
**hmm** [2] - 292:5, 352:15
**hold** [4] - 309:2, 309:4, 464:25,

493:12
**holding** [4] - 286:11, 295:15, 295:18, 438:17
**Holdings** [1] - 286:12
**home** [41] - 261:21, 262:3, 272:24, 273:17, 274:1, 279:16, 279:18, 279:19, 280:8, 281:2, 302:23, 304:18, 305:3, 305:16, 321:12, 337:11, 337:15, 337:16, 337:20, 353:16, 370:22, 376:18, 379:5, 380:7, 380:21, 381:7, 381:9, 383:9, 387:9, 390:1, 417:7, 445:17, 449:3, 449:4, 449:13, 450:1, 475:1, 475:10, 476:15, 477:17
**Home** [8] - 291:23, 291:24, 296:11, 349:6, 349:9, 356:5, 356:8
**home-automation-type** [1] - 380:7
**homeowner** [3] - 280:7, 280:16, 281:24
**homeowners** [3] - 280:23, 284:5, 284:8
**homes** [10] - 277:22, 278:10, 299:6, 304:19, 305:2, 305:14, 305:17, 343:8, 446:12, 450:4
**homework** [1] - 391:25
**Honeywell** [55] - 282:20, 287:13, 300:5, 302:6, 303:3, 307:4, 307:16, 308:15, 314:1, 314:10, 314:20, 314:23, 314:24, 314:25, 321:5, 321:11, 321:15, 321:16, 321:20, 321:23, 322:5, 322:10, 322:12, 322:17, 322:22, 323:22, 324:4, 324:9, 324:16, 324:22, 325:2, 325:4, 325:12,

325:16, 325:21, 326:14, 326:18, 327:18, 327:23, 328:25, 329:3, 329:8, 329:15, 329:17, 329:20, 330:2, 484:18, 485:8, 485:18, 485:20, 485:21, 485:22, 485:23, 486:25, 487:1
**Honeywell's** [3] - 324:1, 326:21, 329:9
**Honor** [110] - 245:12, 245:15, 245:18, 248:13, 248:15, 248:18, 249:3, 249:10, 249:19, 250:1, 250:24, 251:20, 252:9, 252:19, 253:21, 254:16, 256:1, 256:4, 256:11, 256:16, 256:23, 257:9, 257:25, 258:8, 258:17, 258:21, 259:14, 260:13, 260:16, 263:22, 263:24, 264:1, 266:10, 271:15, 282:25, 297:4, 297:6, 300:22, 300:23, 304:23, 306:14, 310:8, 310:17, 310:18, 311:14, 312:14, 313:4, 314:5, 315:5, 315:6, 316:11, 318:8, 326:1, 329:21, 335:3, 335:5, 335:13, 335:15, 335:22, 343:24, 345:11, 347:12, 347:15, 347:20, 347:22, 351:2, 351:5, 356:14, 362:13, 362:21, 363:1, 363:4, 363:17, 367:17, 367:20, 369:8, 376:22, 378:7, 399:21, 399:24, 400:3, 400:8, 400:12, 400:19, 401:1, 401:12, 407:22, 466:7, 466:12, 467:2, 467:12, 467:19, 468:8, 473:22, 473:24, 478:23,

478:25, 486:2, 487:16, 488:25, 489:7, 492:21, 493:2, 493:6, 493:20, 516:4, 517:1, 517:5, 517:23, 518:2
**HONORABLE** [1] - 243:16
**hook** [1] - 338:17
**hope** [7] - 247:24, 253:22, 256:11, 280:19, 282:11, 505:24, 515:21
**hoped** [1] - 275:20
**hopefully** [2] - 272:6, 273:6, 516:9
**hoping** [1] - 275:16
**hosting** [1] - 360:17
**hour** [2] - 490:18, 517:8
**hourly** [1] - 364:15
**hours** [1] - 252:5
**house** [6] - 338:19, 381:9, 386:5, 386:12, 390:7, 475:22
**hub** [2] - 273:18, 390:4
**human** [2] - 341:14, 415:22
**hundred** [8] - 281:19, 292:20, 322:17, 322:23, 323:7, 323:22, 324:1, 328:25
**hundred-billion-dollar** [1] - 328:25
**hundreds** [1] - 485:16
**hurt** [3] - 328:5, 328:10, 328:15
**hypothetical** [12] - 496:19, 497:8, 497:9, 499:21, 506:7, 506:12, 506:15, 506:22, 507:5, 509:3, 510:4, 511:13

# I

**i)2** [1] - 330:14
**IAN** [1] - 243:23
**Ian** [2] - 274:20, 274:24
**iCamera** [2] - 462:23, 464:8
**iceberg** [2] - 468:3, 468:5
**ICN** [12] - 243:4,

285:23, 286:3, 286:11, 286:13, 287:1, 295:7, 296:3, 310:23, 311:4, 311:7, 336:14

**icon** [1] - 391:14

**iControl** [152] - 245:25, 246:18, 247:14, 250:6, 251:1, 254:4, 254:7, 254:14, 256:18, 259:17, 259:20, 259:21, 261:3, 261:6, 261:8, 261:14, 261:18, 261:21, 261:24, 262:3, 262:6, 262:10, 262:13, 262:19, 262:21, 262:24, 263:13, 263:17, 265:2, 265:5, 265:16, 265:18, 265:23, 266:10, 267:15, 267:22, 268:1, 268:6, 268:9, 268:15, 268:21, 283:12, 285:1, 285:5, 285:21, 286:25, 287:11, 288:16, 288:18, 288:20, 295:5, 298:4, 298:8, 298:12, 298:13, 298:20, 307:4, 307:10, 307:14, 309:25, 310:22, 312:1, 312:8, 313:13, 313:14, 313:21, 315:2, 315:10, 315:23, 316:1, 318:13, 319:17, 319:18, 320:3, 320:21, 322:2, 324:19, 327:17, 327:20, 330:14, 331:6, 331:8, 331:23, 331:25, 332:6, 332:9, 332:14, 332:19, 332:24, 339:6, 370:17, 371:9, 406:9, 448:15, 448:16, 448:17, 491:19, 492:15, 497:19, 497:24, 498:1, 499:2, 499:21, 499:25, 500:1, 500:6, 500:8, 500:25, 501:18,

501:20, 501:23, 502:21, 502:24, 503:1, 503:5, 503:7, 503:10, 503:11, 503:12, 503:15, 503:18, 503:22, 504:1, 504:10, 504:24, 504:25, 505:8, 505:22, 505:25, 506:5, 507:10, 507:15, 507:16, 507:21, 507:22, 508:3, 508:11, 508:17, 508:19, 508:20, 508:21, 509:2, 509:13, 509:14, 509:20, 510:12, 511:14, 511:25, 514:25, 515:4, 515:19

**iControl's** [11] - 263:4, 263:7, 264:24, 500:6, 504:4, 507:4, 507:7, 508:8, 508:9, 515:5, 515:21

**iControl-ADT** [1] - 503:12

**ID** [7] - 395:17, 395:18, 419:11, 420:20, 424:10, 454:23

**idea** [5] - 273:4, 273:6, 493:15, 502:9, 506:16

**ideas** [1] - 361:12

**identified** [13] - 300:3, 300:7, 300:11, 300:13, 304:14, 317:18, 321:22, 326:19, 416:23, 417:14, 452:3, 464:7, 495:18

**identifier** [1] - 357:8

**identifies** [4] - 299:1, 307:7, 315:18, 320:25

**identify** [20] - 298:15, 302:5, 302:8, 302:11, 326:10, 326:13, 326:21, 326:25, 327:16, 381:14, 417:21, 420:18, 428:11, 428:16, 428:22, 428:25, 430:24, 435:25, 444:13, 463:24

**IGM** [25] - 348:5, 348:10, 357:4,

362:3, 375:21, 376:14, 437:19, 438:1, 438:5, 438:10, 438:23, 439:3, 439:20, 439:22, 440:5, 440:8, 440:12, 440:17, 440:19, 440:24, 443:11, 443:13, 443:15, 443:25

**IGMs** [3] - 356:25, 357:2, 361:23

**ignore** [1] - 301:23

**iHub** [2] - 370:17, 448:15

**II** [1] - 243:15

**image** [2] - 463:12, 470:25

**images** [1] - 463:22

**imagine** [4] - 276:8, 276:15, 313:17, 342:20

**immediately** [1] - 258:19

**immensely** [1] - 332:8

**imminently** [1] - 387:3

**impact** [12] - 290:25, 291:3, 291:4, 291:13, 292:12, 292:14, 499:2, 502:19, 507:20, 508:15, 510:9, 511:23

**impacts** [1] - 471:19

**implementation** [1] - 344:10

**implemented** [2] - 261:25, 367:10

**implication** [1] - 496:3

**implications** [1] - 506:20

**importance** [2] - 332:17, 504:25

**important** [28] - 252:7, 269:7, 269:9, 269:12, 273:15, 285:6, 293:14, 297:25, 301:18, 305:9, 339:19, 495:22, 496:3, 499:11, 499:20, 500:5, 500:12, 501:14, 503:3, 503:18, 504:1, 506:19, 508:3, 508:17, 510:14, 510:19, 516:18

**impression** [1] - 247:16

**improper** [1] - 486:8

**improve** [1] - 340:19

**improvements** [1] - 354:12

**improving** [1] - 340:25

**IN** [1] - 243:1

**INC** [1] - 243:4

**incentive** [1] - 484:7

**include** [21] - 287:2, 315:21, 356:25, 358:9, 365:16, 384:6, 388:23, 416:12, 417:6, 419:20, 448:3, 454:23, 455:25, 461:4, 474:24, 474:25, 475:15, 475:16, 477:6, 478:10, 499:15

**included** [15] - 296:10, 299:5, 299:9, 317:7, 320:8, 321:15, 322:13, 325:11, 399:3, 416:5, 476:4, 494:16, 503:13, 503:20, 503:24

**includes** [21] - 307:5, 314:17, 320:17, 336:23, 379:4, 383:1, 418:18, 423:24, 424:5, 426:2, 426:5, 429:17, 446:4, 446:7, 446:14, 446:16, 475:24, 476:6, 476:7, 494:18, 512:22

**including** [8] - 248:3, 263:1, 369:4, 409:21, 439:8, 451:18, 491:17, 491:22

**income** [2] - 264:19, 264:24

**Incorporated** [1] - 263:14

**incorrect** [2] - 246:5, 439:6

**increase** [3] - 505:6, 512:17, 513:11

**increased** [1] - 284:17

**increases** [1] - 274:6

**increasing** [4] - 504:14, 513:23, 513:24, 514:8

**indefinitely** [1] - 410:24

**independent** [5] - 350:5, 423:14, 424:4, 426:14

**independently** [2] - 280:5, 405:13

**indicated** [4] - 277:5, 400:2, 471:5, 517:11

**indirect** [1] - 304:9

**individual** [1] - 396:17

**industry** [8] - 338:4, 480:2, 488:13, 500:11, 501:15, 506:3, 514:20, 515:15

**infer** [1] - 251:8

**influenced** [1] - 254:22

**information** [37] - 277:5, 277:8, 301:13, 305:22, 305:24, 306:4, 307:4, 308:4, 344:12, 354:7, 354:8, 355:21, 357:8, 357:13, 359:11, 359:15, 359:21, 368:16, 374:5, 395:19, 395:22, 396:24, 399:2, 440:20, 440:24, 479:20, 494:5, 494:10, 494:13, 498:20, 500:10, 500:15, 501:15, 504:3, 514:6, 516:1, 516:18

**informative** [1] - 500:16

**informed** [1] - 350:3

**infringe** [5] - 250:12, 268:11, 270:6, 381:19, 436:25

**infringed** [13] - 244:24, 244:25, 245:1, 245:3, 426:9, 426:12, 433:17, 436:12, 436:14, 436:15, 436:21, 495:25, 496:5

**infringement** [31] - 244:21, 244:22, 248:19, 257:19, 334:3, 334:10, 364:11, 374:8, 388:7, 403:6, 403:16, 433:18, 433:25, 437:8, 446:1, 456:6, 467:4, 467:7, 490:5, 490:11, 492:8, 494:19, 495:23, 496:10, 497:17, 499:2, 499:10,

**499**:12, **499**:22, **506**:18, **516**:2
**infringer** [1] - **489**:23
**infringes** [1] - **403**:1
**infringing** [11] - **294**:19, **428**:12, **428**:17, **428**:22, **435**:25, **495**:4, **497**:5, **497**:12, **497**:21, **500**:18, **502**:7
**Initialization/ Enrollment** [1] - **415**:5
**innovative** [1] - **274**:24
**input** [9] - **331**:6, **372**:10, **412**:11, **415**:19, **415**:22, **431**:7, **431**:9, **434**:3, **460**:1
**inquired** [2] - **322**:1, **322**:9
**inside** [5] - **363**:13, **370**:16, **371**:16, **431**:14, **433**:3
**insofar** [1] - **411**:3
**install** [14] - **277**:22, **280**:20, **302**:16, **338**:16, **357**:20, **360**:22, **415**:15, **415**:16, **416**:12, **416**:15, **427**:22, **429**:22, **431**:21, **450**:3
**installation** [9] - **281**:13, **358**:21, **360**:8, **360**:10, **416**:1, **427**:19, **431**:8, **433**:21, **442**:22
**installations** [1] - **416**:6
**installed** [22] - **278**:7, **360**:12, **376**:5, **377**:4, **378**:1, **378**:5, **391**:5, **405**:2, **405**:7, **409**:20, **411**:17, **412**:20, **434**:5, **437**:20, **437**:22, **441**:3, **442**:13, **452**:11, **452**:14, **452**:20
**installing** [5] - **278**:10, **415**:21, **415**:22, **435**:15, **452**:19
**installs** [1] - **360**:24
**instance** [9] - **366**:11, **376**:18, **387**:3, **390**:9, **391**:25,

**396**:19, **413**:17, **413**:23, **424**:10
**instant** [1] - **405**:1
**instead** [2] - **463**:5, **494**:13
**instruct** [2] - **247**:25, **358**:6
**instructed** [1] - **443**:6
**instructions** [3] - **245**:9, **266**:16, **359**:9
**intact** [1] - **339**:10
**integrate** [6] - **341**:4, **341**:14, **373**:4, **430**:19, **431**:4, **444**:3
**integrated** [3] - **261**:23, **262**:3, **339**:25
**integrates** [1] - **430**:10
**integrating** [6] - **261**:21, **368**:5, **368**:7, **373**:2, **411**:10, **417**:10
**integration** [1] - **475**:25
**intel** [4] - **478**:17, **478**:18, **479**:12, **479**:14
**intellectual** [5] - **268**:21, **269**:4, **269**:7, **332**:14, **490**:3
**intelligence** [2] - **343**:19, **366**:10
**intelligent** [1] - **279**:22
**intend** [1] - **400**:1
**intended** [5] - **247**:20, **386**:24, **428**:19, **436**:2
**intense** [2] - **302**:23, **302**:25
**intention** [1] - **250**:12
**interact** [5] - **384**:25, **394**:25, **439**:23, **440**:4, **456**:17
**interaction** [1] - **491**:24
**Interactive** [3] - **470**:14, **470**:20, **470**:21
**interactive** [41] - **279**:12, **283**:19, **350**:5, **353**:25, **358**:9, **362**:1, **375**:21, **404**:1, **404**:4, **404**:17, **470**:15, **470**:18, **470**:24, **475**:7, **475**:18, **476**:9, **476**:10, **477**:6, **477**:9, **477**:13, **477**:24, **478**:2,

**478**:3, **487**:23, **487**:25, **504**:16, **504**:17, **504**:22, **505**:2, **505**:7, **505**:15, **506**:6, **512**:2, **512**:22, **512**:23, **513**:13, **513**:14, **515**:10
**interacts** [1] - **404**:19
**interconnecting** [1] - **372**:12
**interest** [2] - **266**:23, **507**:4
**interested** [2] - **480**:3, **483**:7
**interesting** [3] - **329**:5, **479**:20, **479**:25
**interface** [28] - **370**:19, **372**:15, **388**:24, **388**:25, **389**:6, **389**:8, **389**:10, **389**:11, **391**:13, **392**:21, **393**:7, **393**:13, **393**:14, **393**:15, **393**:16, **394**:24, **420**:2, **431**:20, **443**:17, **443**:22, **448**:10, **455**:23, **460**:23, **461**:4, **461**:5, **461**:8
**Interface** [2] - **419**:18, **419**:24
**interfaces** [7] - **262**:10, **388**:3, **388**:14, **388**:23, **392**:16, **461**:1
**interior** [1] - **419**:22
**Interlogix** [1] - **338**:5
**internal** [2] - **356**:23
**internally** [1] - **342**:7
**Internet** [4] - **380**:10, **410**:9, **417**:7, **440**:2
**internet** [7] - **372**:15, **379**:3, **392**:25, **397**:14, **402**:7, **404**:11, **449**:23
**interpretation** [3] - **324**:22, **324**:25, **406**:23
**interrupt** [1] - **253**:16
**intervening** [1] - **418**:19
**introduce** [8] - **271**:24, **335**:25, **336**:17, **364**:7, **468**:19, **489**:15, **497**:11, **515**:12
**introduces** [1] - **471**:20

**introducing** [1] - **353**:14
**intrusion** [1] - **337**:11
**invalidity** [1] - **436**:19
**invent** [14] - **261**:2, **261**:3, **261**:6, **261**:8, **261**:18, **261**:21, **262**:3, **262**:6, **262**:8, **262**:9, **262**:10, **262**:13, **262**:19, **310**:3
**invented** [2] - **260**:24, **367**:8
**invention** [1] - **497**:4
**inventions** [3] - **269**:19, **269**:21, **270**:2
**inventor** [5] - **272**:17, **272**:22, **294**:16, **366**:25, **369**:4
**inventors** [5] - **260**:20, **260**:24, **294**:18, **368**:18, **369**:3
**invest** [1] - **284**:18
**investing** [1] - **345**:1
**investments** [1] - **345**:6
**investor** [2] - **305**:7, **305**:10
**investors** [1] - **301**:11
**invited** [2] - **292**:18, **292**:19
**involve** [5] - **365**:18, **415**:22, **482**:10, **501**:4, **501**:11
**involved** [15] - **272**:10, **281**:13, **282**:3, **340**:9, **342**:24, **343**:2, **352**:17, **352**:18, **352**:23, **359**:4, **366**:3, **431**:7, **449**:25, **485**:3, **501**:6
**involvement** [2] - **272**:25, **340**:6
**involving** [1] - **366**:2
**IP** [3] - **402**:7, **402**:10, **450**:8
**ipDatael** [2] - **326**:17, **326**:18
**iPhones** [1] - **371**:12
**IPR** [1] - **300**:8
**IRP** [1] - **352**:17
**issue** [12] - **245**:20, **250**:19, **270**:23, **315**:25, **319**:20, **371**:2, **391**:19, **414**:23, **414**:24, **425**:13, **467**:2, **517**:10
**issued** [8] - **312**:19,

**368**:18, **368**:23, **414**:13, **425**:16, **425**:17, **497**:18, **497**:22
**issues** [13] - **251**:21, **257**:20, **366**:21, **490**:4, **492**:2, **492**:7, **492**:20, **496**:3, **497**:2, **508**:8, **508**:20, **514**:13
**issuing** [1] - **368**:19
**Item** [4] - **418**:14, **418**:21, **418**:24, **419**:24
**item** [12] - **249**:21, **313**:16, **319**:18, **363**:6, **420**:18, **420**:21, **421**:10, **499**:24, **514**:25, **515**:20
**items** [2] - **319**:5, **514**:22
**iterative** [1] - **354**:12
**ITI** [1] - **465**:19
**itself** [5] - **394**:19, **409**:8, **443**:5, **460**:15, **460**:21

**J**

**jack** [1] - **338**:15
**JACK** [1] - **244**:2
**Jack** [1] - **345**:15
**JAMES** [2] - **243**:19, **243**:22
**January** [5] - **264**:13, **264**:21, **265**:3, **354**:13, **354**:23
**Jean** [4] - **274**:17, **274**:21, **274**:22
**Jean-Paul** [4] - **274**:17, **274**:21, **274**:22
**jerks** [1] - **252**:6
**John** [1] - **349**:20
**joined** [1] - **262**:23
**JSON** [2] - **359**:19, **395**:16
**JTX** [3] - **450**:16, **459**:8, **460**:25
**Judge** [3] - **247**:8, **254**:12, **255**:18
**jump** [1] - **463**:3
**June** [11] - **264**:16, **264**:21, **265**:3, **283**:7, **311**:12, **311**:24, **330**:17, **330**:22, **331**:5, **505**:10, **505**:11
**juries** [1] - **253**:9

jurors [1] - 467:11
**JURY** [1] - 243:8
**jury** [54] - 244:23, 245:9, 246:7, 247:15, 247:25, 252:4, 252:16, 258:24, 259:4, 259:5, 259:7, 264:2, 266:15, 270:22, 271:10, 271:24, 297:18, 310:2, 310:13, 323:18, 334:19, 334:21, 334:22, 335:14, 335:18, 335:19, 336:1, 336:8, 336:18, 363:22, 364:7, 399:12, 399:14, 399:15, 399:19, 401:2, 401:8, 401:9, 437:11, 447:14, 463:18, 466:20, 466:22, 467:24, 467:25, 468:20, 483:19, 489:16, 491:14, 493:14, 503:5, 516:6, 516:23, 517:17
**jury's** [1] - 248:5

## K

**K-E-R-Z-N-E-R** [1] - 336:6
**keep** [7] - 276:22, 280:6, 288:24, 288:25, 345:1, 516:13
**keeps** [4] - 274:5, 308:19, 309:17, 309:20
**KENNETH** [1] - 243:19
**kept** [3] - 339:9, 410:24, 504:12
**Kerner** [1] - 336:5
**Kerzner** [19] - 335:9, 335:23, 335:25, 336:17, 336:20, 337:5, 337:9, 337:23, 340:5, 343:12, 343:22, 344:5, 344:8, 344:22, 344:25, 345:15, 347:16, 407:8
**Kevin** [2] - 472:14, 481:21
**key** [6] - 326:11, 326:22, 327:1,

385:24, 405:1, 514:22
**keypad** [8] - 370:25, 420:22, 421:8, 421:11, 448:4, 448:5, 448:8, 448:11
**kind** [22] - 247:18, 248:18, 255:15, 273:15, 292:23, 338:3, 340:3, 341:1, 341:9, 341:13, 341:18, 341:21, 342:2, 344:15, 345:2, 375:20, 405:9, 410:5, 462:12, 462:25, 468:5, 514:22
**kinds** [2] - 376:17, 452:8
**King** [1] - 243:12
know-how [1] - 320:17
**knowing** [1] - 276:9
**knowledge** [5] - 334:4, 340:7, 354:20, 357:2, 452:16
**known** [3] - 295:1, 296:18, 503:25
**knows** [2] - 255:1, 400:13
**KPM** [2] - 318:3, 318:25
**KPMG** [28] - 318:12, 318:15, 318:22, 319:16, 319:17, 319:21, 319:24, 320:6, 320:11, 320:25, 321:22, 322:9, 324:9, 324:15, 325:17, 333:5, 333:19, 334:2, 334:5, 334:8, 334:12, 498:7, 498:14, 498:17, 499:3, 499:5, 499:9, 499:15
**KPMG's** [1] - 319:3
**KRAFTSCHIK** [1] - 244:3

## L

**lab** [1] - 274:23
**label** [2] - 263:16, 447:11
**labeled** [3] - 402:2, 403:15, 465:19
**labeling** [2] - 257:21, 408:9

**labels** [1] - 450:13
**lack** [1] - 500:17
**Lake** [1] - 406:6
**LAN** [6] - 383:2, 388:3, 389:13, 394:11, 394:15, 461:10
**landed** [1] - 277:13
**language** [12] - 313:20, 384:8, 388:12, 388:22, 394:12, 394:17, 397:13, 398:1, 410:19, 411:8, 411:13, 434:23
**large** [14] - 278:9, 283:19, 291:9, 303:5, 340:21, 343:4, 355:9, 359:14, 490:4, 492:18, 492:19, 500:14, 503:10, 513:3
**largely** [5] - 339:10, 340:24, 365:16, 367:4
**larger** [2] - 277:13, 323:15
**largest** [6] - 283:22, 291:16, 324:10, 340:12, 342:4, 509:11
**laser** [3] - 369:9, 379:9, 378:22
**last** [19] - 245:21, 264:16, 271:7, 276:1, 280:2, 288:1, 297:14, 312:10, 337:4, 361:2, 379:15, 393:19, 394:16, 419:23, 429:3, 430:13, 467:18, 490:1, 515:20
**laughed** [1] - 275:9
**launch** [1] - 391:15
**law** [4] - 422:10, 427:15, 486:5, 496:12
**Law** [1] - 248:6
**lawsuit** [27] - 247:6, 247:7, 247:17, 248:20, 251:1, 251:4, 253:10, 255:14, 259:18, 259:21, 260:7, 312:1, 312:3, 312:5, 312:6, 312:8, 312:21, 312:22, 312:24, 313:1, 313:14, 313:21,

407:3, 486:7, 495:16, 499:4
**lawsuits** [1] - 312:19
**lawyers** [2] - 331:11, 473:17
**lay** [1] - 510:14
**lead** [1] - 341:24
**leader** [1] - 346:5
**leaders** [2] - 468:25, 483:21
**leading** [5] - 251:10, 253:15, 255:4, 255:22, 258:15
**leads** [1] - 490:4
**Learn** [1] - 418:24
**learn** [4] - 362:9, 420:19, 421:13, 421:19
**learned** [5] - 441:16, 441:20, 442:8, 442:16, 454:22
**learning** [1] - 362:11
**least** [11] - 328:16, 388:14, 393:23, 394:9, 394:10, 404:19, 418:13, 428:2, 511:15, 515:22
**leave** [4] - 254:6, 468:7, 488:21, 488:22
**leaving** [4] - 334:22, 399:15, 466:22, 516:23
**left** [21] - 253:14, 254:7, 255:9, 274:14, 279:24, 319:6, 344:12, 348:9, 348:12, 370:11, 371:9, 375:20, 381:10, 382:14, 403:15, 418:8, 429:8, 429:21, 450:8, 498:10, 513:10
left-hand [10] - 344:12, 370:11, 371:9, 375:20, 381:10, 382:14, 403:15, 418:8, 429:8, 498:10
**legacy** [1] - 409:3
**legal** [3] - 312:11, 313:7, 352:9
legitimately [1] - 252:4
**legs** [1] - 369:25
**length** [1] - 488:11
**less** [8] - 251:6, 257:3, 323:3, 323:14,

323:16, 328:3, 406:20, 494:25
**letter** [1] - 244:14
**level** [12] - 290:15, 304:15, 305:24, 378:23, 384:23, 395:6, 395:7, 473:6, 475:1, 475:4, 475:18, 475:24
**levels** [2] - 341:22, 470:18
**liabilities** [1] - 319:6
**liability** [1] - 243:9
**license** [80] - 246:19, 246:22, 256:9, 268:1, 268:23, 269:2, 270:13, 270:16, 287:25, 288:15, 288:17, 288:18, 288:20, 313:25, 314:1, 314:10, 314:20, 314:21, 314:24, 315:2, 315:10, 315:13, 315:21, 315:23, 316:2, 316:4, 316:6, 316:8, 316:18, 316:23, 317:4, 317:6, 317:8, 317:13, 317:23, 321:23, 322:3, 322:10, 322:13, 324:20, 325:9, 325:11, 330:15, 330:24, 330:25, 331:1, 331:22, 332:7, 332:11, 332:15, 332:19, 497:25, 500:12, 501:2, 501:4, 501:7, 501:12, 501:13, 501:17, 503:8, 506:20, 507:17, 507:25, 508:12, 508:23, 509:17, 509:25, 510:3, 510:10, 510:13, 510:16, 510:21, 511:1, 511:2, 511:7, 515:4, 515:9, 515:17, 515:23, 515:25
**License** [1] - 321:5
**licensed** [9] - 281:9, 287:7, 287:13, 288:2, 316:5, 332:14, 501:19, 501:20, 501:24
**Licensed** [1] - 314:17
**licensee** [2] - 506:9,

506:23
**licenses** [3] - 294:3, 313:25, 500:12
**licensing** [14] - 259:25, 270:10, 287:5, 331:16, 332:9, 496:14, 497:2, 507:5, 508:8, 508:9, 508:14, 509:23, 510:5, 510:8
**licensor** [2] - 506:9, 506:22
**life** [5] - 273:8, 273:14, 274:4, 281:1
**light** [5] - 390:7, 390:10, 390:11, 390:13, 419:22
**lights** [13] - 279:18, 344:18, 389:9, 389:11, 390:2, 390:18, 390:21, 393:12, 394:15, 396:21, 419:15, 475:22, 476:3
**likelihood** [1] - 281:11
**likely** [6] - 280:16, 281:7, 281:12, 303:20, 304:1, 313:23
**limitation** [13] - 383:10, 402:24, 425:20, 436:22, 437:3, 437:7, 437:12, 450:21, 451:15, 451:18, 460:25, 461:12, 461:18
**limitations** [1] - 437:1
**limited** [3] - 243:9, 400:20, 495:8
**Line** [1] - 256:8
**line** [20] - 249:1, 250:23, 250:24, 251:1, 251:5, 264:18, 317:3, 319:18, 320:12, 321:25, 338:15, 338:18, 408:23, 408:25, 439:10, 439:11, 439:12, 439:14, 504:9, 513:1
**lined** [1] - 413:1
**lines** [2] - 365:21, 482:1
**lingering** [1] - 257:20
**link** [3] - 348:11, 409:24, 410:7
**LISA** [1] - 244:8
**list** [17] - 257:22, 307:8, 307:13,

307:16, 307:17, 308:2, 354:2, 354:4, 354:6, 360:15, 379:22, 470:4, 470:10, 471:2, 474:4, 476:23, 479:15
**List** [2] - 395:11, 396:13
**listed** [9] - 307:10, 307:19, 307:23, 308:15, 321:15, 348:21, 348:22, 353:22, 360:15
**listing** [1] - 359:21
**LISTON** [1] - 243:23
**literal** [1] - 244:21
**literally** [10] - 244:24, 245:1, 274:4, 415:13, 426:5, 426:7, 426:11, 433:17, 435:4, 437:3
**litigation** [6] - 255:16, 316:1, 316:24, 319:21, 333:1, 486:1
**live** [6] - 266:22, 280:5, 339:17, 402:6, 461:13, 461:19
**Live** [1] - 391:1
**living** [3] - 280:4, 396:21, 396:22
**LLC** [3] - 243:5, 243:8, 295:8
**LLP** [3] - 243:19, 244:2, 244:5
**local** [12] - 280:17, 282:1, 282:10, 289:11, 372:12, 372:16, 383:2, 383:13, 387:13, 423:13, 424:2
**Local** [1] - 414:7
**locate** [1] - 377:9
**located** [5] - 403:25, 429:16, 429:18, 429:19, 430:9
**location** [45] - 365:19, 370:15, 371:18, 371:21, 371:22, 371:23, 372:12, 372:14, 372:22, 374:6, 379:1, 379:8, 379:9, 379:10, 383:1, 383:3, 383:19, 384:9, 384:10, 384:12, 386:23, 393:21, 393:25, 394:2, 395:17, 402:12,

402:18, 403:25, 409:21, 414:17, 417:9, 422:25, 423:1, 423:13, 429:16, 429:18, 429:19, 429:20, 430:1, 430:2, 430:9, 430:17, 445:23
**lock** [4] - 377:20, 415:23, 433:2, 465:23
**locks** [12] - 279:18, 344:18, 376:19, 380:8, 389:7, 390:2, 392:17, 393:12, 393:15, 394:15, 475:23, 476:3
**Loews** [1] - 300:14
**long-standing** [1] - 338:3
**longtime** [1] - 290:2
**look** [99] - 249:4, 250:14, 250:21, 256:4, 280:16, 285:9, 288:3, 290:9, 300:2, 306:8, 307:7, 307:16, 307:22, 314:16, 315:16, 317:2, 317:10, 317:16, 318:1, 318:3, 319:13, 321:8, 323:20, 333:22, 343:6, 352:14, 357:23, 358:12, 358:23, 359:18, 361:14, 368:20, 368:24, 369:2, 369:7, 370:16, 371:8, 371:14, 374:17, 374:21, 375:13, 375:20, 382:11, 385:20, 386:1, 387:15, 387:21, 389:18, 390:16, 392:11, 397:22, 402:14, 403:14, 404:12, 404:14, 406:17, 408:5, 410:19, 414:3, 416:23, 418:8, 420:4, 427:7, 431:16, 432:5, 434:2, 439:17, 441:18, 447:20, 450:15, 450:17, 450:20, 450:21, 450:25, 452:25, 453:6, 457:24, 458:1, 459:19,

459:20, 463:4, 470:7, 474:7, 474:8, 474:13, 476:8, 477:12, 479:10, 479:11, 480:5, 480:7, 481:6, 481:15, 482:1, 493:4, 496:17, 501:12, 501:23
**looked** [29] - 257:20, 322:13, 330:19, 346:9, 378:17, 380:15, 388:4, 389:19, 398:21, 401:19, 414:8, 417:23, 418:23, 419:5, 421:6, 425:23, 428:10, 431:7, 432:22, 433:10, 444:9, 449:7, 453:2, 463:25, 464:2, 464:4, 480:6, 493:9, 494:8
**looking** [25] - 264:7, 290:17, 305:6, 333:4, 348:8, 348:19, 349:3, 351:20, 351:23, 353:14, 368:15, 376:9, 380:1, 381:12, 388:12, 408:8, 410:18, 414:22, 418:1, 420:9, 443:4, 453:15, 505:1, 507:22, 516:18
**looks** [3] - 356:22, 391:15, 479:6
**lose** [1] - 324:21
**loses** [1] - 485:25
**loss** [2] - 263:13, 264:7
**losses** [1] - 328:13
**lost** [17] - 334:9, 471:22, 485:7, 485:10, 491:9, 494:1, 494:12, 494:20, 494:22, 495:1, 495:3, 495:7, 495:8, 495:11, 499:13, 499:15, 516:5
**low** [6] - 395:6, 427:4, 473:7, 508:18, 513:4
**lower** [5] - 370:11, 370:13, 381:10, 500:25, 511:3
**lowered** [2] - 467:11, 468:2

**lucky** [1] - 340:1
**lunch** [7] - 335:5, 399:11, 399:13, 399:17, 401:14, 401:15, 517:19
**luncheon** [1] - 399:18

**M**

**Madam** [1] - 271:19
**mail** [7] - 481:8, 481:10, 481:15, 481:21, 482:6, 483:18, 484:8
**mails** [1] - 427:3
**main** [4] - 284:14, 284:16, 349:22, 432:4
**mainstream** [1] - 275:25
**maintain** [2] - 331:19, 473:6
**maintained** [2] - 394:8, 394:20
**maintaining** [4] - 276:11, 276:13, 276:25, 434:22
**maintains** [1] - 423:19
**major** [1] - 279:10
**majority** [3] - 272:23, 282:14, 291:8
**Manage** [1] - 419:12
**manage** [3] - 337:3, 339:18, 431:20
**managed** [3] - 339:1, 402:7, 402:13
**management** [26] - 279:20, 280:11, 322:1, 322:9, 322:12, 324:9, 324:15, 325:3, 325:16, 325:17, 372:17, 372:21, 403:8, 409:18, 411:8, 411:21, 413:11, 415:14, 420:11, 422:5, 430:16, 450:22, 451:2, 451:14, 451:16, 475:17
**Management** [1] - 419:25
**management's** [1] - 354:8
**manager** [1] - 346:5
**managers** [1] - 336:23
**manages** [1] - 337:1
**managing** [3] - 279:14, 336:22, 393:22

**manual** [3] - 415:9, 416:12, 433:12
**manufacture** [1] - 450:6
**manufacturing** [2] - 447:5, 447:9
**March** [13] - 254:8, 254:9, 254:12, 259:18, 260:9, 264:13, 268:4, 268:14, 268:19, 310:25, 344:23, 495:9, 505:12
**margin** [3] - 513:1, 513:2, 513:3
**mark** [6] - 348:4, 348:17, 350:20, 358:3, 363:6, 376:21
**marked** [14] - 263:10, 263:16, 264:9, 267:16, 267:23, 356:20, 358:11, 358:24, 359:3, 377:2, 407:15, 408:1, 408:11, 411:6
**Market** [1] - 298:23
**market** [31] - 263:4, 280:15, 289:8, 299:2, 299:4, 299:8, 299:18, 299:21, 299:23, 302:2, 302:12, 302:23, 303:14, 303:18, 304:18, 305:16, 305:23, 309:13, 322:17, 323:25, 324:1, 342:8, 355:21, 478:6, 478:10, 486:15, 486:21, 487:6, 487:8, 491:22, 492:20
**marketed** [2] - 511:22, 511:23
**marketing** [2] - 337:2, 491:20
**marketplace** [2] - 303:4, 502:22
**markets** [2] - 281:10, 289:11
**Martin** [2] - 274:17, 483:19
**Marty** [1] - 483:21
**MARY** [1] - 243:23
**Mary** [2] - 336:13, 406:6
**Maryland** [1] - 364:8
**Master** [1] - 503:12
**masters** [1] - 491:4
**material** [1] - 350:19

492:5
**meetings** [2] - 247:10, 358:1
**member** [1] - 295:24
**members** [10] - 259:5, 259:7, 266:14, 270:21, 297:17, 334:19, 335:19, 399:12, 467:25, 516:6
**Memorandum** [3] - 269:5, 350:21, 350:24
**memorandum** [3] - 512:3, 513:7, 514:9
**memorize** [2] - 443:22, 463:2
**memory** [1] - 418:6
**mention** [6] - 245:6, 298:21, 345:23, 346:2, 386:22, 389:22
**mentioned** [25] - 274:15, 274:18, 289:15, 311:22, 321:19, 342:3, 345:25, 370:18, 372:11, 373:17, 374:7, 379:18, 380:21, 391:3, 397:18, 408:15, 411:24, 415:25, 432:17, 448:2, 463:20, 486:7, 497:8, 501:1, 505:19
**mentions** [1] - 298:20
**mentor** [1] - 341:25
**menu** [2] - 432:4, 432:5
**merely** [1] - 354:17
**message** [2] - 328:16, 328:17
**met** [6] - 257:16, 417:24, 437:7, 457:4, 457:7, 473:16
**method** [7] - 333:20, 333:21, 333:22, 429:9, 429:10, 435:3, 435:14
**methodology** [2] - 496:7, 496:9
**methods** [1] - 408:22
**Michael** [1] - 301:24
**Micro** [1] - 295:1
**microphone** [4] - 391:15, 391:20, 391:21
**middle** [5] - 259:10, 274:20, 481:11, 483:18

**materials** [2] - 464:20, 491:20
**math** [2] - 322:22, 323:6
**matter** [6] - 367:2, 409:11, 414:11, 453:3, 496:19, 499:12
**matters** [4] - 490:2, 490:12, 496:10
**MBA** [1] - 337:8
**mean** [39] - 255:10, 273:11, 290:12, 316:2, 339:4, 365:20, 376:13, 384:11, 385:1, 385:23, 387:3, 388:9, 388:17, 391:24, 392:5, 398:5, 407:20, 408:3, 412:14, 415:15, 415:17, 425:15, 429:21, 432:24, 433:13, 434:1, 436:2, 439:20, 445:23, 460:16, 464:2, 478:8, 479:19, 479:25, 480:20, 482:17, 483:1, 486:17, 506:11
**meaning** [3] - 276:14, 284:19, 372:3
**meaningful** [2] - 328:12, 329:3
**means** [16] - 248:6, 261:10, 261:15, 261:23, 265:2, 280:2, 317:21, 319:9, 324:21, 372:10, 386:5, 386:12, 405:7, 422:3, 483:2, 500:20
**meant** [5] - 405:5, 425:15, 449:16, 483:2, 504:21
**measure** [1] - 512:10
**measures** [1] - 367:5
**mediation** [1] - 255:19
**meet** [14] - 250:12, 294:13, 294:14, 339:9, 339:15, 339:21, 345:17, 345:18, 383:10, 425:24, 437:3, 451:14, 461:12, 461:18
**meeting** [6] - 254:17, 268:20, 342:15, 342:19, 436:25,

**midpoint** [1] - 511:11
**might** [8] - 246:5, 273:4, 273:17, 419:22, 483:14, 503:11, 507:24, 517:9
**Milch** [5] - 248:17, 256:4, 256:14, 369:16, 517:25
**MILCH** [22] - 244:5, 245:12, 256:16, 256:23, 257:9, 258:8, 312:21, 351:5, 362:17, 367:20, 378:9, 384:16, 399:21, 400:12, 400:18, 405:21, 436:7, 466:5, 466:12, 517:13, 517:23, 518:1
**Milch's** [1] - 256:3
**million** [31] - 266:5, 284:8, 293:12, 304:18, 305:2, 305:13, 305:17, 305:18, 319:11, 320:1, 320:4, 320:7, 320:12, 323:3, 323:9, 323:11, 323:13, 323:14, 323:15, 343:7, 344:24, 494:22, 494:23, 495:15, 508:16, 508:25, 512:17, 513:24
**millions** [2] - 266:4, 508:20
**MILs** [1] - 312:19
**mimicking** [3] - 421:15, 422:17, 422:19
**mind** [7] - 248:5, 400:25, 428:15, 437:12, 500:7, 515:5, 516:13
**minds** [1] - 254:17
**mine** [1] - 290:3
**minute** [6] - 313:15, 334:18, 335:3, 406:20, 407:2, 509:17
**minutes** [8] - 257:2, 258:10, 334:24, 335:17, 466:19, 468:4, 468:5, 517:6
**miss** [1] - 258:2
**missed** [2] - 258:1, 449:22
**mission** [1] - 273:12

**misspoke** [1] - 436:18
**mobile** [15] - 344:17, 380:12, 383:21, 388:5, 391:8, 428:17, 432:13, 435:22, 445:6, 445:7, 446:7, 447:17, 447:22, 462:1
**mode** [22] - 362:9, 378:4, 378:16, 386:16, 386:18, 387:4, 387:6, 411:24, 412:5, 412:8, 412:10, 412:15, 412:22, 420:19, 421:13, 432:2, 432:7, 441:21, 443:3, 443:14, 458:24
**Mode** [3] - 386:2, 386:4, 386:8
**modem** [2] - 448:12, 448:13
**modified** [1] - 361:10
**modify** [1] - 500:21
**module** [12] - 358:9, 362:1, 375:21, 376:16, 380:25, 398:7, 404:1, 404:4, 407:1, 408:3, 448:18
**modules** [2] - 376:14, 398:6
**moment** [8] - 248:14, 273:19, 273:21, 273:24, 274:3, 287:6, 298:18, 478:20
**money** [11] - 279:21, 314:21, 314:25, 315:1, 315:23, 316:1, 316:7, 317:8, 317:9, 331:12, 331:24
**monitor** [4] - 337:14, 371:19, 389:17, 475:9
**monitoring** [4] - 371:4, 448:1, 449:14, 479:22
**monitors** [1] - 349:17
**monoxide** [1] - 273:22
**month** [22] - 276:18, 343:10, 471:3, 471:25, 472:2, 488:7, 488:9, 494:9, 502:1, 502:7, 502:15, 502:17, 509:16, 510:20, 510:23, 511:1,

511:5, 514:24, 515:3, 515:10, 515:17, 516:3
**monthly** [3] - 485:16, 502:5, 502:9
**months** [10] - 264:16, 282:21, 331:7, 331:11, 376:7, 483:13, 483:24, 484:3, 484:8, 484:12
**Mony** [1] - 503:24
**morning** [21] - 244:13, 245:18, 245:21, 247:24, 248:6, 258:1, 258:7, 259:5, 260:18, 271:3, 271:22, 271:23, 294:12, 334:20, 335:25, 336:17, 336:19, 345:15, 516:8, 516:21, 517:12
**MORRIS** [2] - 243:19, 244:2
**most** [13] - 280:25, 281:7, 281:10, 326:24, 367:11, 457:2, 470:23, 477:22, 496:23, 499:20, 503:13, 508:1, 515:1
**mostly** [1] - 478:8
**motion** [3] - 337:14, 386:16, 390:10
**motions** [1] - 517:16
**motivation** [1] - 276:25
**move** [40] - 263:22, 285:11, 286:17, 287:16, 288:6, 297:4, 300:21, 304:21, 306:12, 310:7, 311:13, 315:4, 316:10, 318:5, 333:3, 348:1, 378:8, 379:14, 379:23, 384:14, 401:22, 402:22, 403:2, 405:18, 409:15, 410:14, 410:16, 411:5, 425:18, 426:1, 426:3, 466:10, 469:16, 473:22, 475:6, 478:23, 483:4, 484:7, 485:19, 492:22
**moved** [3] - 477:21, 485:21, 505:14
**mover's** [1] - 308:24

**movie** [1] - 468:3
**moving** [6] - 409:16, 435:2, 482:14, 482:18, 482:19, 493:5
**MR** [214] - 245:12, 245:14, 245:18, 245:20, 246:12, 246:17, 247:5, 248:13, 249:3, 249:10, 249:25, 250:3, 250:18, 251:11, 251:14, 251:20, 252:2, 252:9, 252:15, 252:25, 253:21, 254:5, 254:7, 254:11, 254:16, 255:25, 256:16, 256:23, 256:24, 257:2, 257:6, 257:7, 257:9, 257:16, 257:19, 258:2, 258:8, 258:14, 258:21, 258:25, 259:14, 259:15, 260:13, 263:24, 265:10, 266:7, 266:10, 271:1, 271:15, 271:19, 271:21, 282:25, 283:2, 283:6, 285:11, 285:13, 285:16, 286:16, 286:18, 286:22, 287:16, 287:18, 287:21, 288:6, 288:8, 288:11, 294:8, 294:11, 297:4, 297:6, 297:10, 300:21, 300:23, 301:2, 304:21, 304:23, 305:1, 306:12, 306:14, 306:18, 310:7, 310:8, 310:16, 310:17, 310:18, 310:20, 310:21, 311:13, 311:14, 311:17, 312:14, 312:18, 312:21, 312:22, 312:24, 313:1, 313:4, 313:5, 314:5, 314:9, 315:4, 315:6, 315:9, 316:10, 316:13, 316:14, 316:17, 318:5, 318:6, 318:7, 318:8, 318:11, 325:24, 326:1, 326:3,

329:21, 329:23, 334:15, 335:3, 335:9, 335:15, 344:1, 345:11, 345:14, 347:12, 351:5, 362:17, 363:1, 363:4, 363:10, 363:13, 363:17, 364:3, 367:17, 367:20, 367:22, 369:8, 369:19, 369:22, 370:1, 376:22, 376:25, 378:7, 378:9, 378:12, 379:14, 379:16, 384:14, 384:16, 384:19, 399:21, 399:24, 400:7, 400:12, 400:18, 400:19, 401:1, 401:12, 401:13, 405:18, 405:21, 405:22, 405:24, 407:22, 407:25, 436:4, 436:7, 466:5, 466:7, 466:10, 466:12, 466:16, 466:24, 467:1, 467:12, 467:17, 467:19, 467:22, 468:8, 468:16, 469:16, 469:20, 469:23, 471:16, 472:6, 472:12, 473:11, 473:24, 478:25, 486:2, 486:5, 487:16, 487:18, 488:17, 488:24, 489:6, 489:11, 489:13, 489:14, 491:6, 491:11, 491:13, 492:21, 492:25, 493:2, 493:6, 493:20, 493:22, 516:4, 517:5, 517:13, 517:23, 518:1, 518:2
**MS** [34] - 257:25, 260:16, 260:17, 263:22, 264:1, 264:5, 265:8, 335:12, 335:22, 335:24, 336:13, 336:16, 343:24, 344:4, 345:8, 347:15, 347:20, 351:2, 351:9, 356:14, 362:13, 362:21, 469:18,

471:13, 472:8, 473:13, 473:22, 474:3, 478:23, 479:3, 486:11, 486:14, 486:20, 487:14
**multi** [1] - 303:3
**multi-billion** [1] - 303:3
**multiple** [5] - 409:9, 419:9, 419:10, 424:17, 484:15
**multiply** [1] - 488:14
**must** [2] - 382:17, 493:6

# N

**N-A-T-A-L-E** [1] - 468:14
**NAINA** [1] - 244:6
**naive** [1] - 356:12
**name** [15] - 271:6, 271:7, 282:21, 297:18, 326:16, 336:4, 336:13, 345:15, 363:19, 364:8, 421:24, 468:12, 473:16, 489:4, 489:17
**named** [3] - 272:17, 294:18, 300:4
**Nashville** [1] - 485:12
**Natale** [16] - 467:16, 467:22, 468:9, 468:13, 468:17, 468:21, 469:12, 469:24, 472:13, 473:14, 480:8, 484:15, 485:7, 488:18, 488:24, 492:10
**Natale's** [1] - 494:7
**Nate** [2] - 468:9, 468:21
**nearly** [1] - 322:17
**necessarily** [2] - 435:14, 514:15
**necessary** [1] - 456:20
**need** [17] - 280:4, 281:3, 296:24, 298:17, 317:19, 317:25, 339:23, 388:5, 395:6, 401:7, 431:15, 434:19, 449:3, 493:16, 493:17, 493:19, 508:21
**needed** [5] - 273:5, 280:14, 412:11,

429:22, 456:9
**needs** [5] - 342:12, 417:20, 420:24, 430:18, 431:3
**negative** [1] - 264:22
**negatively** [1] - 471:19
**negatives** [1] - 508:11
**negotiate** [2] - 331:8, 497:14
**negotiated** [3] - 315:13, 355:17, 356:7
**negotiating** [3] - 331:7, 500:7, 500:24
**negotiation** [13] - 256:12, 355:15, 496:20, 497:8, 499:21, 506:7, 506:12, 506:16, 506:22, 507:1, 507:5, 509:3, 510:4
**negotiations** [8] - 246:22, 246:24, 247:7, 247:9, 247:23, 254:11, 355:25, 356:4
**neighborhood** [1] - 320:4
**Nemeroff** [1] - 301:25
**nest** [1] - 308:12
**Nest** [1] - 308:12
**net** [5] - 264:19, 264:24, 408:23, 410:1, 410:13
**network** [73] - 337:1, 365:4, 365:7, 365:17, 365:22, 366:18, 367:14, 367:19, 368:7, 372:4, 372:13, 372:16, 372:24, 372:25, 373:5, 374:15, 376:4, 383:2, 383:13, 387:11, 387:13, 388:24, 389:11, 389:13, 389:25, 390:4, 392:15, 392:21, 392:23, 393:13, 394:10, 402:11, 404:11, 408:25, 409:1, 411:9, 411:12, 415:17, 417:6, 423:12, 423:13, 423:14, 424:1, 424:2, 424:3, 424:4, 424:5, 424:15, 425:1, 425:22, 429:15, 429:23,

430:7, 430:8,
430:11, 430:12,
430:15, 430:19,
430:21, 430:24,
431:2, 432:21,
436:3, 449:23,
451:9, 457:13,
460:23, 461:5,
461:8, 461:9
**network-based** [2] -
367:14, 367:19
**networks** [3] - 370:19,
376:18, 392:17
**Networks** [5] - 263:14,
283:13, 285:21,
288:16, 298:4
**never** [15] - 245:2,
245:3, 246:20,
247:17, 248:8,
250:11, 253:9,
254:20, 266:25,
268:9, 304:6, 347:4,
442:15, 463:25,
464:7
**new** [13] - 278:7,
303:1, 339:20,
354:16, 354:21,
471:20, 471:24,
472:1, 472:22,
483:1, 483:24,
497:21, 514:19
**next** [66] - 252:5,
266:11, 271:2,
277:24, 291:13,
321:25, 335:8,
347:19, 358:2,
363:1, 370:25,
372:17, 375:16,
381:16, 384:2,
384:7, 386:7,
387:15, 388:10,
388:19, 388:20,
392:10, 393:8,
393:18, 398:13,
398:22, 403:2,
403:13, 405:16,
406:16, 409:15,
410:14, 411:5,
414:1, 419:8,
419:17, 421:4,
422:23, 422:24,
423:10, 425:18,
427:6, 429:7, 430:4,
431:16, 434:13,
435:8, 466:16,
468:9, 475:6,
475:18, 488:25,
496:6, 497:7, 498:2,
503:4, 505:19,
506:21, 508:4,

509:22, 511:6,
511:16, 514:16,
514:21, 517:19
**nice** [5] - 294:12,
294:14, 345:17,
345:18, 516:22
**NICHOLS** [1] - 244:2
**night** [6] - 245:22,
274:5, 386:16,
386:17, 387:4, 387:6
**Night** [1] - 386:14
**nine** [2] - 251:5,
342:18
**ninety** [1] - 488:15
**ninety-six** [1] - 488:15
**nobody** [2] - 247:14,
493:4
**Non** [1] - 419:18
**non** [13] - 282:8,
282:9, 393:17,
419:21, 428:12,
428:17, 428:22,
435:25, 467:4,
467:7, 497:5,
500:18, 510:24
**non-exclusive** [2] -
282:8, 282:9
**non-infringement** [2]
- 467:4, 467:7
**non-infringing** [6] -
428:12, 428:17,
428:22, 435:25,
497:5, 500:18
**non-security** [2] -
393:17, 419:21
**non-Vivint** [1] -
510:24
**Non-WSP** [1] - 419:18
**none** [4] - 277:11,
282:10, 446:25,
466:7
**normally** [4] - 273:18,
289:4, 331:2, 386:17
**Nortek** [5] - 444:17,
444:19, 444:23,
445:1, 448:25
**North** [5] - 243:12,
283:22, 468:21,
468:24, 509:11
**note** [2] - 467:1,
494:24
**noted** [2] - 322:1,
325:3
**notes** [2] - 309:9,
498:10
**nothing** [10] - 244:16,
246:9, 248:22,
271:11, 336:9,
363:23, 431:15,
479:22, 518:1, 518:2

**notice** [1] - 468:5
**notifications** [6] -
377:24, 426:21,
426:22, 427:1,
470:25, 474:10
**notified** [2] - 386:13,
517:21
**notwithstanding** [1] -
324:3
**November** [1] - 349:5
**Number** [6] - 364:23,
384:2, 384:3,
387:16, 458:1, 458:3
**number** [30] - 264:22,
276:2, 277:10,
310:14, 319:5,
333:9, 343:16,
346:9, 351:18,
351:21, 351:24,
371:24, 376:7,
381:17, 382:17,
383:19, 402:15,
403:3, 419:16,
450:13, 481:7,
492:17, 492:18,
492:19, 494:9,
499:24, 505:6,
513:9, 513:22
**numbered** [4] -
377:18, 456:22,
457:24, 458:16
**numbers** [6] - 257:22,
278:13, 343:13,
346:6, 350:22,
481:12
**numeral** [1] - 312:10
**Numerex** [1] - 302:8
**nurturing** [1] - 272:7

# O

**o'clock** [2] - 399:13,
516:5
**oath** [1] - 266:18
**object** [3] - 394:13,
425:25, 509:16
**objected** [1] - 347:25
**objection** [63] -
254:18, 257:6,
257:10, 263:24,
263:25, 283:2,
283:4, 285:13,
285:14, 286:18,
286:20, 287:18,
287:19, 288:8,
288:9, 297:6, 297:8,
300:23, 300:25,
304:23, 304:24,
306:14, 306:16,
310:8, 311:14,

311:15, 314:5,
314:7, 316:14,
316:15, 318:8,
318:9, 329:21,
344:1, 344:2, 351:5,
351:6, 362:17,
362:18, 367:20,
367:21, 378:9,
378:10, 379:12,
384:16, 384:17,
405:20, 405:21,
466:12, 466:14,
469:18, 469:19,
471:13, 472:8,
472:10, 473:24,
474:1, 478:25,
479:2, 486:2,
486:16, 491:11,
492:25
**objections** [2] -
257:21, 257:23
**objects** [9] - 374:1,
374:3, 379:5, 394:8,
416:19, 421:22,
423:19, 424:13,
425:20
**observed** [1] - 442:25
**obtain** [5] - 269:9,
269:12, 306:4,
332:6, 359:15
**obtained** [3] - 285:7,
365:5, 495:10
**obtaining** [1] - 365:10
**obviously** [5] -
251:16, 252:7,
258:16, 280:13,
399:25
**occasionally** [1] -
490:4
**occur** [2] - 273:20
**occurred** [1] - 256:22
**occurring** [1] - 502:10
**October** [3] - 267:8,
349:20, 350:3
**OF** [1] - 243:2
**offer** [15] - 256:9,
256:17, 280:17,
343:25, 350:8,
350:9, 350:14,
351:3, 355:13,
362:14, 367:18,
436:19, 484:5,
491:6, 500:21
**offered** [11] - 279:10,
436:8, 478:14,
483:9, 483:12,
484:3, 484:11,
494:6, 509:17,
512:21
**offering** [10] - 309:9,

342:12, 342:20,
342:21, 345:5,
354:11, 354:13,
491:8, 512:1
**offerings** [1] - 306:25
**office** [10] - 293:2,
361:1, 377:4, 391:6,
402:21, 412:20,
429:25, 430:3,
441:3, 452:11
**Office** [2] - 368:17,
368:22
**officer** [6] - 266:13,
267:8, 336:20,
337:23, 351:11,
356:16
**offices** [1] - 292:16
**official** [2] - 254:8,
254:9
**offset** [1] - 508:22
**often** [7] - 282:12,
383:9, 469:9, 496:2,
496:16, 496:18,
502:3
**old** [4] - 370:23,
482:17, 483:1, 483:5
**once** [9] - 255:14,
275:25, 277:21,
296:14, 310:12,
331:10, 345:25,
405:4, 484:16
**one** [141] - 244:18,
247:12, 249:22,
251:15, 251:20,
252:3, 254:3,
254:22, 256:1,
256:8, 257:9, 260:8,
260:20, 262:23,
266:23, 269:4,
274:4, 274:14,
274:15, 274:18,
276:7, 276:14,
276:20, 280:18,
289:15, 289:24,
290:15, 291:16,
292:6, 294:4,
294:18, 297:1,
312:15, 313:25,
318:6, 321:11,
324:9, 325:2,
326:16, 330:2,
331:2, 335:3, 338:3,
338:24, 345:2,
345:16, 347:9,
347:10, 348:9,
349:16, 349:19,
356:12, 356:21,
361:8, 363:4,
363:16, 364:4,
366:17, 370:13,

372:9, 372:17, 372:19, 373:12, 374:1, 374:25, 375:9, 375:13, 375:14, 376:6, 376:14, 377:15, 380:15, 381:21, 386:7, 388:7, 388:8, 388:14, 392:23, 393:23, 394:9, 394:10, 397:5, 397:17, 398:16, 403:5, 403:7, 404:8, 404:21, 404:23, 406:20, 407:16, 408:6, 408:7, 415:9, 422:7, 422:13, 422:17, 425:5, 425:19, 430:13, 431:18, 433:7, 437:7, 438:25, 439:14, 445:14, 448:23, 448:24, 451:25, 452:6, 452:10, 453:11, 453:17, 460:4, 461:15, 463:5, 463:21, 464:3, 466:8, 467:1, 470:20, 471:23, 473:17, 476:10, 476:11, 476:12, 476:16, 478:13, 478:20, 480:18, 482:9, 483:21, 494:19, 496:11, 499:24, 508:8, 508:15, 510:2, 512:22

**One** [2] - 256:6, 507:13

**ones** [13] - 326:23, 374:13, 375:14, 380:16, 380:17, 429:11, 441:19, 449:7, 452:14, 452:16, 452:19, 454:2

**ongoing** [3] - 341:1, 342:13, 354:12

**online** [7] - 350:19, 358:15, 377:6, 378:14, 411:20, 442:5, 516:12

**open** [9] - 273:23, 279:24, 377:19, 390:13, 413:2, 444:10, 450:8, 489:8, 516:13

**opened** [1] - 377:9

**opening** [17] - 245:23, 247:20, 248:7, 248:16, 248:24, 249:16, 251:23, 256:3, 256:5, 266:15, 386:19, 408:14, 432:16, 438:20, 467:2, 486:7, 498:3

**opens** [2] - 386:13, 390:10

**operate** [8] - 305:23, 338:11, 376:7, 422:1, 449:14, 449:16, 455:11, 456:11

**operated** [2] - 422:21, 436:3

**operates** [1] - 309:12

**operating** [5] - 266:12, 267:8, 405:7, 418:6, 455:10

**operation** [2] - 354:13, 509:7

**operations** [4] - 295:21, 295:22, 296:4, 337:1

**operatively** [4] - 452:1, 453:18, 453:21, 460:5

**operator** [1] - 371:15

**operators** [1] - 289:20

**opinion** [23] - 263:3, 352:11, 352:16, 383:6, 401:18, 402:23, 422:12, 426:2, 426:4, 434:8, 435:3, 435:9, 437:10, 451:13, 457:3, 457:6, 457:10, 473:5, 494:4, 499:18, 499:20, 502:2

**opinions** [9] - 427:8, 436:8, 436:19, 490:6, 491:15, 492:7, 492:8, 492:13, 493:24

**opportunities** [1] - 306:5

**opportunity** [1] - 284:23

**Opportunity** [1] - 298:23

**oppose** [3] - 249:12, 249:14, 249:15

**opposed** [1] - 280:22

**option** [2] - 290:17, 452:6

**options** [1] - 350:5

**orally** [1] - 517:20

**order** [8] - 309:17, 309:20, 377:5, 380:23, 390:5, 402:12, 415:18, 431:23

**ordered** [7] - 377:3, 377:5, 377:6, 377:21, 377:22, 380:24, 433:7

**organizational** [1] - 339:10

**organized** [2] - 272:8, 344:13

**original** [3] - 359:7, 361:8, 495:16

**originally** [3] - 285:1, 338:5, 456:22

**originated** [1] - 406:10

**OS** [1] - 357:22

**otherwise** [1] - 257:13

**ought** [1] - 255:21

**outcome** [1] - 490:22

**outdoor** [3] - 462:8, 462:10, 464:24

**outdoors** [1] - 386:18

**outlines** [1] - 344:9

**outside** [6] - 247:10, 312:18, 390:11, 391:5, 439:5, 439:16

**overall** [11] - 340:2, 345:3, 367:2, 372:25, 380:4, 402:16, 422:12, 424:4, 427:8, 431:4, 435:9

**overrule** [1] - 471:14

**oversee** [2] - 272:3, 468:25

**overview** [3] - 301:10, 320:15, 397:23

**own** [8] - 278:3, 296:3, 307:8, 312:6, 463:20, 464:11, 509:19, 515:13

**owned** [6] - 285:1, 285:25, 295:11, 295:14, 312:1, 312:8

**owner** [4] - 285:3, 489:24, 497:11, 497:19

**owner's** [1] - 494:25

**ownership** [1] - 495:10

**owns** [2] - 269:21, 269:24

---

# P

**p.m** [6] - 399:15,

401:9, 466:22, 467:24, 516:23, 518:4

**pace** [1] - 467:20

**Pacific** [8] - 496:12, 496:13, 498:24, 499:1, 506:14, 506:24, 511:10, 514:12

**package** [4] - 477:9, 477:18, 477:23, 477:24

**packages** [3] - 477:14, 477:21, 478:4

**packaging** [2] - 424:10, 425:3

**packet** [3] - 398:25, 399:2, 399:3

**page** [67] - 246:14, 248:24, 249:22, 250:23, 251:1, 251:4, 263:16, 264:6, 264:9, 264:18, 286:5, 297:14, 305:6, 311:18, 311:21, 312:9, 316:21, 316:23, 319:2, 320:14, 320:24, 327:6, 330:10, 332:2, 333:11, 333:13, 348:9, 348:24, 351:17, 375:3, 375:16, 378:18, 378:19, 379:24, 384:20, 385:8, 389:20, 390:23, 390:25, 394:21, 395:9, 396:11, 397:20, 397:21, 398:22, 404:13, 410:18, 412:2, 413:3, 413:6, 414:4, 414:18, 421:3, 421:4, 424:19, 457:19, 463:11, 479:8, 479:11, 479:14, 481:7, 481:19, 483:15, 483:18, 512:5, 513:6

**Page** [7] - 256:3, 286:6, 298:2, 298:22, 299:14, 301:21, 333:7

**pages** [2] - 370:8, 433:8

**paid** [7] - 281:16, 317:4, 364:15, 490:21, 502:12,

509:1, 515:9

**paid-up** [1] - 317:4

**painfully** [2] - 426:17, 429:6

**pan** [2] - 462:20, 464:18

**Panduit** [1] - 499:17

**panel** [166] - 261:3, 261:15, 261:22, 262:4, 337:9, 337:10, 337:11, 337:20, 338:2, 338:8, 338:11, 338:20, 338:23, 357:7, 357:8, 358:8, 358:15, 358:19, 359:12, 359:15, 360:2, 370:23, 372:13, 372:16, 373:12, 373:13, 377:10, 377:13, 377:17, 378:1, 378:3, 378:15, 380:5, 383:18, 385:23, 387:22, 388:6, 393:2, 393:3, 393:14, 394:2, 394:14, 395:25, 396:19, 396:23, 398:2, 398:8, 398:14, 398:16, 399:6, 404:6, 404:9, 405:4, 405:12, 406:18, 407:11, 408:13, 408:16, 409:3, 409:7, 409:12, 409:25, 410:12, 411:17, 412:8, 412:19, 413:12, 413:13, 413:16, 413:19, 413:22, 417:5, 419:2, 419:4, 419:11, 419:20, 420:20, 420:24, 423:24, 423:25, 424:5, 424:10, 424:11, 427:4, 432:9, 432:10, 432:14, 437:17, 437:19, 437:20, 438:2, 438:6, 438:18, 438:23, 439:2, 439:3, 439:7, 439:10, 439:12, 439:24, 440:5, 440:7, 440:11, 440:16, 440:20, 440:21, 440:25, 441:2, 441:6,

441:15, 441:16, 441:23, 442:1, 442:7, 442:8, 442:11, 442:16, 443:2, 443:3, 443:5, 443:7, 443:10, 443:15, 443:18, 443:24, 444:2, 444:8, 444:10, 444:11, 444:15, 444:17, 446:14, 448:19, 450:1, 451:25, 452:1, 452:23, 452:25, 453:4, 453:14, 453:17, 453:18, 453:21, 454:1, 455:6, 455:10, 455:20, 456:12, 456:15, 456:18, 458:24, 459:13, 460:4, 460:5, 460:8, 460:14, 460:18, 460:19, 460:21, 465:7, 465:9, 465:15

**Panel** [2] - 413:8, 413:9

**panel-attached** [1] - 410:12

**panels** [26] - 337:25, 338:4, 346:19, 346:22, 346:24, 347:2, 347:5, 361:5, 362:1, 375:7, 376:11, 383:7, 387:25, 392:12, 404:15, 404:20, 406:4, 407:21, 409:10, 431:18, 444:3, 454:15, 455:22, 459:10, 462:3, 462:5

**Panels** [4] - 375:5, 375:17, 387:17, 393:9

**paper** [1] - 310:13

**paragraph** [8] - 284:9, 300:4, 300:10, 315:16, 351:20, 351:23, 406:5, 406:17

**part** [57] - 246:12, 248:7, 276:23, 276:24, 285:24, 286:3, 286:14, 288:17, 288:20, 293:8, 293:14, 299:4, 299:8, 306:3, 309:24, 313:13, 316:4, 316:6,

317:11, 319:16, 327:13, 343:12, 348:18, 362:8, 362:10, 363:10, 368:19, 368:22, 374:20, 375:12, 379:19, 392:21, 397:8, 412:10, 412:11, 412:12, 412:13, 416:1, 422:24, 423:10, 424:7, 428:2, 460:12, 460:14, 460:16, 460:18, 460:20, 469:12, 492:16, 494:10, 496:22, 502:2, 506:14, 511:10, 511:21, 512:2

**partially** [1] - 485:21

**participate** [4] - 273:14, 302:12, 341:9, 359:2

**participated** [2] - 246:21, 301:6

**participation** [1] - 511:18

**particular** [24] - 289:25, 299:1, 313:6, 313:16, 321:2, 352:25, 360:23, 383:5, 389:20, 394:2, 404:13, 410:18, 412:3, 414:4, 416:25, 421:2, 455:22, 462:22, 463:25, 464:3, 470:4, 495:14, 496:25, 510:22

**particularly** [4] - 312:10, 339:19, 340:11, 513:3

**parties** [18] - 248:2, 252:17, 254:13, 267:3, 286:2, 286:13, 317:17, 317:22, 451:22, 453:16, 459:20, 496:2, 497:2, 497:15, 502:19, 506:16, 506:18, 507:1

**partner** [3] - 290:2, 290:14, 484:15

**partners** [3] - 289:8, 291:17, 469:15

**party** [9] - 254:23, 254:24, 303:21, 303:22, 317:13,

318:15, 497:11, 507:11

**Pasadena** [1] - 489:18

**pass** [4] - 325:24, 345:8, 436:5, 466:5

**past** [1] - 355:5

**Patent** [2] - 368:17, 368:22

**patent** [119] - 248:20, 250:9, 267:19, 268:23, 269:2, 270:2, 270:18, 270:23, 286:24, 287:5, 310:10, 310:22, 311:4, 311:5, 312:3, 316:6, 317:12, 331:1, 332:12, 332:24, 345:20, 351:18, 351:21, 351:24, 352:2, 352:18, 368:11, 368:19, 368:23, 369:7, 371:3, 371:17, 372:2, 373:8, 374:12, 381:19, 382:1, 382:11, 393:19, 401:16, 401:20, 401:22, 402:22, 403:4, 403:5, 406:8, 409:17, 411:7, 418:10, 418:23, 420:5, 422:14, 425:12, 425:13, 425:16, 425:20, 426:4, 426:14, 427:3, 427:14, 427:25, 429:3, 429:4, 430:5, 433:16, 434:16, 434:24, 435:2, 435:10, 436:1, 436:21, 447:20, 450:16, 450:18, 450:20, 453:7, 453:9, 459:8, 459:19, 459:22, 460:24, 489:21, 489:23, 490:5, 490:7, 490:9, 490:11, 491:9, 494:19, 494:24, 494:25, 495:23, 496:4, 496:10, 497:11, 497:24, 499:10, 499:12, 501:2, 501:8, 503:8, 507:17, 507:25, 509:17, 510:13,

510:21, 511:1, 515:3, 515:8, 515:10, 515:13, 515:17, 515:23, 515:25

**patented** [6] - 270:2, 270:16, 272:22, 294:2, 497:3, 507:18

**patentee** [1] - 368:22

**patents** [134] - 248:22, 260:20, 262:16, 267:12, 267:15, 268:2, 268:6, 268:12, 268:17, 268:21, 269:10, 269:13, 269:16, 269:20, 270:6, 270:10, 272:17, 284:25, 285:4, 285:6, 285:8, 286:25, 287:2, 287:7, 288:2, 288:16, 288:18, 288:21, 293:14, 294:7, 294:16, 294:20, 295:15, 298:12, 298:15, 298:21, 309:24, 310:4, 311:5, 312:1, 312:6, 312:8, 314:18, 314:24, 315:18, 315:25, 316:3, 316:5, 316:18, 316:24, 317:6, 317:7, 319:18, 319:20, 320:17, 320:20, 320:21, 320:22, 322:14, 324:11, 324:14, 324:15, 324:16, 325:5, 325:12, 331:3, 331:4, 331:6, 331:16, 331:25, 332:7, 332:10, 332:15, 332:17, 333:2, 334:3, 334:6, 334:13, 346:2, 352:5, 352:7, 352:8, 352:11, 352:13, 364:13, 366:25, 367:1, 367:3, 367:7, 367:8, 367:25, 368:3, 368:15, 368:18, 368:25, 369:3, 370:7, 372:5, 381:24, 382:5, 403:6, 418:10, 420:6, 427:8, 427:9, 428:11, 428:21, 436:9, 495:10,

495:18, 495:24, 495:25, 496:4, 496:5, 497:18, 497:19, 497:21, 501:4, 501:6, 501:7, 501:11, 501:19, 501:20, 501:23, 505:24, 510:6, 510:8, 510:11, 510:12, 510:17

**Patents** [1] - 314:17

**patents-in-suit** [12] - 298:12, 298:15, 309:24, 314:18, 314:24, 317:7, 322:14, 325:12, 364:13, 367:25, 495:10

**path** [1] - 307:18

**PAUL** [1] - 363:20

**Paul** [7] - 274:17, 274:21, 274:22, 363:2, 363:20, 364:8

**pay** [14] - 256:17, 281:21, 282:2, 314:21, 315:1, 317:9, 471:2, 477:19, 489:23, 508:25, 510:20, 510:23, 515:13, 516:2

**paying** [5] - 276:22, 281:22, 314:25, 316:1, 317:7

**payment** [4] - 498:1, 502:4, 502:10, 508:24

**pays** [3] - 281:24, 469:13, 498:1

**PDEM-1** [1] - 274:10

**PDEM-2** [3] - 290:18, 296:8, 328:7

**PDEM-3** [1] - 287:6

**PDM** [2] - 451:1, 463:3

**PDM-42** [1] - 456:22

**pending** [2] - 271:11, 336:9

**Pentagon** [1] - 366:7

**Pentagon-related** [1] - 366:7

**people** [36] - 248:9, 265:17, 272:6, 273:2, 273:7, 274:11, 274:15, 274:19, 275:23, 276:8, 276:12, 276:21, 278:8, 278:12, 280:25, 281:10, 282:15, 284:20, 289:10,

289:20, 292:17, 292:20, 293:4, 293:20, 339:14, 340:1, 340:16, 342:2, 342:11, 342:15, 342:18, 343:8, 400:11, 488:22, 490:15, 506:12

**per** [36] - 343:10, 471:24, 488:7, 488:9, 490:18, 501:25, 502:1, 502:7, 502:15, 502:17, 509:15, 510:20, 510:23, 510:25, 511:1, 511:4, 511:5, 512:9, 512:14, 513:11, 513:14, 514:24, 515:2, 515:3, 515:9, 515:17, 515:22, 516:3

**perceived** [1] - 309:11

**percent** [16] - 278:6, 293:11, 303:18, 328:3, 328:21, 343:2, 343:3, 343:7, 349:13, 477:14, 504:20, 505:16, 513:3, 515:15, 515:24

**percentage** [4] - 502:8, 504:19, 505:2, 505:14

**perform** [9] - 364:11, 403:22, 417:3, 418:17, 420:2, 429:10, 429:14, 435:17, 451:2

**performance** [2] - 297:22, 301:14

**performed** [9] - 319:16, 417:24, 420:8, 420:15, 435:3, 435:6, 435:14, 435:19, 443:7

**performing** [4] - 416:10, 428:8, 429:14, 456:6

**performs** [3] - 419:3, 436:22, 456:25

**perhaps** [1] - 255:5

**period** [36] - 248:1, 248:4, 249:5, 249:12, 249:14, 250:5, 250:8, 250:13, 250:14, 250:20, 252:16,

466:8

**physically** [1] - 375:13

**pick** [1] - 280:18

**picture** [3] - 274:11, 377:15, 380:13

**pictures** [1] - 381:6

**pie** [2] - 305:12, 497:3

**piece** [2] - 259:8, 448:16

**pieces** [1] - 294:3

**PIETRANTONIO** [1] - 244:7

**pin** [1] - 438:14

**pinning** [1] - 363:23

**Piper** [4] - 283:15, 284:15, 285:5, 298:3

**Pirrie** [1] - 349:20

**place** [13] - 272:7, 274:3, 277:3, 343:5, 407:21, 410:24, 440:5, 440:17, 440:19, 440:20, 440:24, 481:16, 497:16

**placed** [3] - 411:18, 443:3, 443:13

**placement** [2] - 513:7, 514:9

**Placement** [3] - 269:5, 350:21, 350:24

**places** [1] - 281:7

**plain** [1] - 313:20

**plaintiff** [4] - 244:14, 253:18, 259:7, 517:16

**plaintiff's** [1] - 400:12

**plaintiffs** [2] - 367:18, 378:7

**Plaintiffs** [1] - 243:6, 243:24

**Plan** [1] - 470:14

**plan** [9] - 244:15, 245:10, 470:15, 470:22, 470:23, 474:13, 476:6, 487:23, 493:21

**planning** [5] - 252:23, 252:25, 472:15, 473:10, 493:18

**plans** [4] - 476:9, 477:3, 478:6, 494:5

**platform** [21] - 283:18, 284:4, 285:7, 339:12, 340:16, 340:20, 340:22, 340:25, 341:3, 341:19, 342:8, 342:14, 343:14, 345:3, 345:7, 350:5, 482:14, 482:19,

482:20, 512:2, 512:21

**platforms** [1] - 365:8

**play** [5] - 258:18, 266:11, 402:10, 511:7, 511:19

**played** [4] - 250:1, 252:1, 400:14, 400:15

**players** [1] - 303:14

**playing** [1] - 517:7

**plays** [1] - 402:6

**plug** [3] - 278:13, 376:15, 408:25

**plugged** [2] - 375:14, 409:1

**plurality** [6] - 388:14, 388:23, 423:12, 424:1, 425:22, 460:25

**plus** [2] - 331:7, 419:11

**pocket** [1] - 385:16

**point** [28] - 244:15, 245:7, 251:20, 255:10, 256:1, 275:18, 278:16, 278:17, 278:24, 303:20, 303:23, 304:2, 304:8, 312:8, 326:16, 381:14, 405:1, 432:7, 438:1, 453:3, 453:11, 463:21, 477:10, 484:25, 487:9, 493:3, 493:13, 499:5

**pointed** [2] - 446:18, 446:20

**pointer** [3] - 369:9, 370:9, 378:22

**pointing** [2] - 253:8, 369:17

**points** [2] - 508:21, 515:24

**policies** [4] - 270:9, 508:8, 510:5, 510:7

**policy** [3] - 270:12, 270:15, 400:5

**poll** [3] - 395:24, 395:25, 396:24

**polled** [1] - 443:2

**polls** [1] - 398:13

**popularity** [1] - 497:3

**port** [2] - 408:23, 440:13

**portfolio** [1] - 332:24

**portfolios** [1] - 332:20

**portion** [30] - 301:22, 301:23, 312:11, 315:17, 344:6,

370:12, 371:15, 375:21, 381:10, 382:15, 382:19, 382:20, 388:19, 391:11, 393:20, 394:3, 394:16, 402:15, 403:15, 403:19, 411:15, 414:21, 418:8, 429:8, 434:23, 495:4, 498:10, 504:16, 515:12

**portions** [8] - 347:21, 351:10, 356:15, 394:7, 414:4, 423:7, 430:23, 435:23

**portray** [1] - 433:13

**ports** [1] - 439:13

**posit** [1] - 509:1

**position** [5] - 269:23, 325:22, 469:8, 472:19, 473:9

**positions** [1] - 469:1

**positive** [1] - 265:24

**possible** [4] - 248:3, 251:9, 338:8, 459:10

**possibly** [2] - 248:3, 255:1

**post** [2] - 255:2, 365:1

**post-high** [1] - 365:1

**post-September** [1] - 255:2

**postpone** [1] - 244:16

**potential** [4] - 266:19, 355:17, 469:10, 480:24

**power** [1] - 410:19

**Power** [2] - 404:18, 404:22

**powered** [3] - 415:17, 418:16, 444:5

**Powerup** [1] - 418:14

**practiced** [1] - 415:13

**practices** [3] - 306:3, 328:10, 402:24

**pre** [2] - 342:10, 442:11

**pre-brand** [1] - 342:10

**pre-configured** [1] - 442:11

**preamble** [1] - 382:16

**preceding** [1] - 413:6

**preclude** [1] - 400:8

**predates** [1] - 338:12

**prefer** [2] - 252:19, 310:12

**premise** [13] - 365:22, 370:13, 370:20, 371:20, 371:23, 379:1, 379:6, 380:3,

383:20, 396:16, 397:15, 417:7, 430:17
**premises** [1] - 365:18
**premium** [2] - 309:2, 309:4
**preparation** [1] - 359:3
**prepare** [3] - 358:16, 364:20, 514:4
**prepared** [3] - 305:7, 320:24, 358:19
**prepares** [1] - 343:18
**prepayment** [1] - 508:16
**present** [4] - 267:9, 368:13, 381:21, 498:3
**presentation** [6] - 305:7, 306:19, 333:5, 357:25, 371:25, 392:11
**presentations** [1] - 305:10
**presented** [2] - 388:14, 388:16
**president** [9] - 274:22, 318:21, 318:24, 347:22, 468:21, 468:23, 469:8, 472:15, 473:10
**press** [14] - 283:1, 283:7, 283:11, 284:10, 284:11, 289:2, 292:3, 292:8, 330:19, 330:21, 362:10, 406:3, 406:6, 432:2
**pressure** [3] - 309:15, 515:18, 515:19
**Pressure** [1] - 306:23
**pressures** [1] - 309:6
**presumably** [2] - 458:25, 493:3
**presume** [1] - 253:12
**pretty** [6] - 244:20, 289:7, 291:7, 342:13, 406:25, 505:4
**preview** [1] - 258:14
**previous** [3] - 333:12, 499:24, 514:7
**previously** [6] - 290:13, 292:1, 355:1, 378:18, 408:12, 416:22
**price** [25] - 281:23, 307:8, 307:13, 307:17, 307:19, 307:22, 308:2,

320:3, 320:7, 327:25, 470:3, 470:4, 470:10, 471:2, 471:15, 471:17, 471:22, 473:1, 473:4, 477:25, 479:15, 480:8, 480:12, 483:23, 513:4
**prices** [4] - 353:22, 476:8, 477:12, 479:22
**pricing** [44] - 305:24, 306:4, 306:6, 306:7, 307:3, 307:6, 308:1, 308:4, 308:20, 309:2, 309:5, 309:15, 309:21, 327:7, 328:5, 328:9, 328:15, 349:17, 353:22, 469:25, 470:2, 472:17, 473:8, 474:4, 476:23, 478:5, 478:6, 478:8, 478:13, 478:14, 478:16, 478:19, 479:24, 480:3, 480:10, 480:14, 487:24, 492:18, 503:14, 508:2, 511:23, 513:5, 515:1
**Pricing** [1] - 306:23
**primarily** [2] - 361:3, 471:15
**primary** [11] - 272:3, 282:18, 289:16, 326:11, 329:25, 469:2, 509:1, 509:4, 509:5, 509:7, 509:20
**principal** [1] - 340:12
**printed** [1] - 348:14
**private** [2] - 513:7, 514:9
**Private** [2] - 269:5, 350:23
**Privilege** [1] - 350:21
**privilege** [1] - 352:19
**problem** [6] - 246:13, 252:12, 254:16, 258:18, 312:25, 313:2
**Procaccio** [1] - 336:14
**PROCACCIO** [16] - 243:23, 335:12, 335:22, 335:24, 336:13, 336:16, 343:24, 344:4, 345:8, 347:15, 347:20, 351:2,

351:9, 356:14, 362:13, 362:21
**PROCACCIO-FLOWER** [2] - 335:24, 336:16
**PROCACCIO-FLOWERS** [14] - 243:23, 335:12, 335:22, 336:13, 343:24, 344:4, 345:8, 347:15, 347:20, 351:2, 351:9, 356:14, 362:13, 362:21
**Procaccio-Flowers** [1] - 336:14
**proceed** [2] - 335:21, 491:12
**proceedings** [2] - 312:11, 313:7
**PROCEEDINGS** [1] - 244:10
**Process** [1] - 415:5
**process** [36] - 275:12, 275:17, 275:20, 289:2, 320:18, 358:7, 360:8, 361:17, 362:10, 368:19, 377:25, 406:18, 412:13, 415:9, 415:11, 415:13, 415:18, 416:1, 418:22, 424:16, 428:3, 431:8, 432:8, 432:12, 432:15, 433:12, 434:5, 435:19, 438:6, 442:11, 442:25, 443:7, 458:13, 468:1
**processed** [6] - 423:15, 423:19, 423:20, 424:8, 424:25, 425:2
**processes** [3] - 269:14, 269:17, 416:6
**processing** [4] - 365:17, 366:18, 423:16, 424:9
**processor** [8] - 383:1, 384:6, 388:15, 417:3, 417:17, 417:22, 418:2, 451:11
**processors** [2] - 418:5, 418:6
**produced** [2] - 307:5, 374:22
**producing** [1] - 454:6

**product** [31] - 275:25, 276:9, 278:1, 284:21, 320:12, 329:15, 329:17, 329:20, 336:20, 336:22, 336:23, 336:24, 336:25, 337:1, 337:23, 339:8, 349:21, 354:17, 381:19, 395:18, 435:23, 436:22, 465:20, 465:25, 497:12, 497:21, 500:21, 504:13, 504:23
**productive** [1] - 341:15
**Products** [9] - 357:4, 361:9, 361:17, 397:13, 408:4, 421:5, 448:23, 453:3, 453:4
**products** [19] - 268:11, 268:24, 273:9, 273:13, 273:14, 274:9, 279:10, 279:12, 280:3, 281:16, 293:19, 293:20, 294:5, 352:21, 364:12, 472:17, 511:22, 512:20, 514:14
**Products'** [1] - 414:6
**professional** [1] - 281:13
**professionally** [1] - 365:9
**profit** [12] - 263:13, 264:6, 491:9, 494:1, 494:12, 494:22, 495:1, 495:7, 495:8, 499:15, 513:1, 516:5
**profitability** [10] - 265:13, 497:6, 512:10, 512:11, 512:25, 514:8, 514:13, 514:15, 514:17, 514:20
**profitable** [5] - 265:2, 265:5, 265:21, 265:23, 266:1
**profits** [6] - 334:9, 494:20, 495:3, 495:11, 499:14, 513:1
**program** [5] - 291:24, 390:9, 474:18, 491:3
**programmed** [1] - 442:1

**programmer** [1] - 394:24
**programs** [2] - 350:9, 508:9
**progress** [1] - 272:8
**prohibited** [2] - 313:14, 317:23
**project** [3] - 273:3, 274:19, 490:15
**projected** [2] - 512:8, 514:8
**projecting** [2] - 514:1, 514:15
**projection** [4] - 512:17, 513:23, 513:25, 514:7
**projections** [2] - 513:8, 513:20
**promotional** [1] - 356:22
**proper** [3] - 270:7, 334:5, 517:22
**properly** [2] - 281:12, 517:21
**properties** [1] - 299:10
**property** [6] - 268:21, 269:4, 269:7, 281:8, 332:14, 490:3
**proposal** [2] - 256:20, 259:25
**proposals** [1] - 491:20
**proposed** [2] - 245:9, 256:20
**prosecution** [1] - 244:14
**prospective** [1] - 358:1
**protect** [5] - 269:16, 269:23, 270:2, 343:9, 507:18
**Protect** [77] - 291:4, 291:5, 291:6, 291:9, 296:10, 349:5, 349:9, 353:17, 355:11, 355:12, 355:22, 355:25, 356:1, 360:4, 360:5, 360:9, 360:20, 361:13, 377:3, 377:13, 377:22, 378:13, 380:23, 385:17, 408:12, 411:18, 412:14, 427:2, 428:5, 428:8, 429:13, 429:24, 433:1, 433:7, 435:7, 435:15, 437:14, 439:4, 441:2, 441:16, 441:23, 442:10, 442:15,

442:20, 442:22, 443:6, 444:3, 450:12, 452:14, 452:20, 462:7, 462:13, 464:15, 464:21, 465:1, 465:4, 465:5, 465:11, 465:15, 466:2, 471:23, 472:3, 480:24, 481:9, 482:7, 482:10, 483:7, 483:9, 483:10, 483:12, 484:2, 484:11, 484:12, 503:24, 507:10, 507:12
**protected** [2] - 337:21, 505:24
**Protection** [8] - 291:19, 291:20, 296:11, 329:6, 329:19, 329:24, 503:24, 507:13
**protocol** [10] - 361:5, 361:12, 361:17, 389:25, 390:3, 397:12, 402:7, 414:12, 421:6, 455:24
**Protocol** [1] - 414:7
**protocols** [2] - 398:12, 420:22
**prove** [1] - 435:1
**provide** [18] - 261:15, 294:2, 301:10, 319:17, 319:25, 350:16, 353:12, 353:16, 380:6, 390:6, 405:3, 427:7, 447:17, 447:22, 449:15, 469:25, 475:3, 484:5
**Provide** [1] - 419:24
**provided** [18] - 249:18, 259:24, 261:14, 283:18, 353:13, 359:22, 437:10, 440:10, 440:23, 445:1, 445:3, 451:13, 452:18, 455:25, 457:3, 470:19, 491:21, 492:6
**provider** [20] - 277:23, 278:5, 278:10, 280:10, 280:19, 281:18, 281:21, 281:24, 281:25, 282:1, 283:22,

291:17, 304:11, 329:7, 350:6, 350:16, 480:19, 480:20, 500:14, 509:11
**provider's** [1] - 291:18
**providers** [18] - 277:14, 280:11, 280:22, 281:10, 281:15, 282:6, 282:10, 289:3, 293:22, 296:14, 304:12, 326:24, 328:18, 356:11, 469:6, 471:6, 471:18, 511:19
**provides** [24] - 297:21, 306:25, 307:3, 350:18, 357:4, 357:13, 361:24, 376:17, 385:5, 388:25, 393:4, 445:10, 446:24, 451:16, 473:18, 473:19, 474:15, 476:1, 476:3, 481:12, 497:24, 498:20, 500:15, 511:4
**providing** [8] - 279:13, 279:17, 304:13, 332:7, 454:4, 504:11, 505:23, 510:17
**provision** [1] - 331:19
**PTX** [57] - 283:1, 285:10, 286:16, 286:17, 287:17, 287:22, 310:16, 310:18, 315:6, 315:8, 330:20, 343:23, 343:25, 344:3, 344:7, 344:8, 344:21, 351:4, 351:7, 374:18, 374:25, 376:21, 377:2, 378:8, 378:11, 378:17, 379:24, 380:1, 389:19, 390:17, 394:21, 397:1, 397:8, 397:11, 404:12, 404:14, 405:16, 405:18, 405:23, 405:25, 413:8, 421:2, 423:8, 424:19, 450:13, 463:4, 463:6, 466:11, 466:15, 469:17, 469:22,

478:20, 481:3, 492:22, 512:3
**PTX-009** [1] - 430:23
**PTX-173** [3] - 362:15, 362:19, 430:23
**PTX-175** [2] - 362:15, 362:19
**PTX-176** [2] - 362:15, 362:19
**PTX-180** [2] - 362:16, 362:19
**PTX-183** [2] - 362:16, 362:20
**PTX-195** [4] - 362:16, 362:20, 410:16, 412:1
**PTX-197** [5] - 362:16, 362:20, 414:3, 433:8, 457:18
**PTX-215** [5] - 288:4, 288:7, 288:10, 288:12, 331:22
**PTX-216** [2] - 287:15, 287:20
**PTX-229** [2] - 286:21, 286:23
**PTX-253** [1] - 476:18
**PTX-264** [2] - 472:7, 472:11
**PTX-342** [3] - 282:24, 283:5, 292:4
**PTX-371** [4] - 285:12, 285:15, 285:17, 330:7, 330:8
**PTX-422** [5] - 384:13, 384:14, 384:18, 384:21, 384:23
**public** [2] - 301:14, 354:7
**publicly** [2] - 295:1, 296:16
**publicly-traded** [2] - 295:1, 296:16
**published** [1] - 354:7
**pull** [8] - 342:2, 364:23, 391:9, 396:12, 401:6, 408:13, 413:6, 456:21
**pulled** [3] - 292:24, 411:19, 412:25
**pulls** [1] - 413:13
**Pulse** [8] - 283:24, 284:3, 342:9, 342:10, 342:12, 344:11, 504:13, 504:16
**Purchase** [6] - 285:10, 286:2, 286:7, 286:10, 295:5, 330:5

**purchase** [9] - 270:18, 280:7, 280:9, 285:20, 311:8, 311:22, 312:4, 320:3, 320:7
**purchased** [2] - 437:14, 456:3
**purely** [1] - 359:17
**purple** [1] - 410:2
**purple-type** [1] - 410:2
**purpose** [3] - 276:14, 295:15, 295:18, 301:13, 331:18, 332:24, 358:4, 358:18, 358:20, 359:8, 470:2
**purposes** [5] - 364:21, 489:9, 491:8, 494:11, 497:9
**push** [7] - 391:16, 431:10, 431:13, 461:22, 462:15, 462:18, 464:16
**push-to-talk** [1] - 391:16
**pushing** [3] - 426:23, 432:19, 433:22
**put** [48] - 248:18, 248:23, 252:19, 256:10, 256:13, 273:3, 277:15, 281:4, 308:7, 337:20, 338:17, 346:6, 369:13, 369:15, 370:5, 375:3, 376:16, 378:3, 378:15, 378:18, 379:24, 380:16, 405:4, 405:14, 406:25, 412:15, 412:22, 413:4, 413:7, 413:14, 413:20, 414:6, 415:23, 419:9, 427:16, 438:3, 439:2, 439:3, 448:11, 457:22, 458:16, 458:24, 467:3, 467:4, 490:14, 498:6, 498:9, 498:11
**puts** [2] - 337:12, 343:20
**putting** [4] - 247:22, 362:8, 427:19, 432:6

**Q**

**qualified** [1] - 491:7
**qualify** [1] - 388:8

**quality** [6] - 274:7, 336:24, 339:8, 341:24, 341:25, 345:3
**quarter** [3] - 301:4, 303:17, 505:1
**quarterly** [2] - 301:9, 504:10
**queries** [1] - 398:15
**query** [1] - 424:23
**questioning** [1] - 270:22
**questions** [27] - 245:6, 251:10, 252:20, 253:15, 253:23, 255:22, 258:15, 259:1, 259:9, 259:11, 259:24, 265:11, 265:12, 266:7, 266:20, 294:8, 301:16, 327:8, 333:9, 334:15, 345:19, 347:13, 399:23, 473:11, 487:14, 495:25, 498:21
**quickly** [4] - 253:5, 317:2, 317:16, 459:24
**quite** [5] - 245:12, 251:8, 291:22, 338:4, 342:25
**quote** [3] - 292:8, 349:21, 350:4
**quoted** [2] - 248:7, 284:11

**R**

**race** [1] - 329:11
**radio** [5] - 444:13, 444:15, 444:20, 444:23, 448:25
**radios** [1] - 483:24
**raise** [1] - 369:25
**raised** [1] - 250:18
**rake** [1] - 306:6
**ran** [1] - 289:24
**range** [3] - 265:17, 323:17, 511:4
**rank** [1] - 401:6
**rapidly** [1] - 303:13
**rate** [13] - 334:6, 490:17, 490:18, 490:19, 490:20, 494:3, 500:25, 502:6, 502:8, 507:22, 511:3, 514:23, 516:2
**rates** [5] - 500:11,

500:15, 511:4, 511:12, 515:2
**read** [7] - 246:14, 246:16, 248:6, 264:12, 317:19, 352:7, 394:4
**reads** [7] - 247:18, 313:6, 393:20, 394:7, 406:18, 422:25, 423:10
**ready** [4] - 335:2, 422:3, 497:20, 516:9
**real** [2] - 487:16, 496:2
**really** [29] - 252:13, 253:2, 255:17, 263:4, 273:5, 274:6, 275:10, 276:1, 276:6, 277:12, 277:18, 278:8, 279:11, 280:25, 284:24, 338:12, 339:25, 340:2, 340:8, 341:17, 345:5, 350:4, 434:14, 458:20, 474:15, 474:20, 503:1, 511:25
**realtime** [1] - 391:9
**reason** [6] - 273:16, 284:14, 284:16, 292:15, 332:23, 493:11
**reasonable** [31] - 254:23, 254:24, 334:6, 387:4, 491:9, 493:25, 494:11, 494:20, 494:22, 495:1, 495:5, 495:12, 495:15, 496:8, 496:24, 497:10, 497:14, 497:24, 498:18, 498:19, 498:23, 499:6, 502:3, 509:12, 509:15, 509:21, 511:8, 511:15, 514:10, 514:23
**reasonably** [1] - 340:4
**reasons** [1] - 247:12
**rebuild** [1] - 334:1
**recap** [2] - 403:5, 403:18
**receive** [8] - 273:25, 366:15, 426:25, 427:1, 441:2, 460:1, 476:16, 477:20
**received** [14] - 317:6, 352:10, 377:13, 377:23, 377:24,

427:3, 438:18, 439:4, 441:5, 441:15, 478:17, 478:18, 491:1, 491:4
**receives** [3] - 423:11, 423:25, 469:13
**receiving** [1] - 434:21
**recess** [8] - 258:10, 258:12, 334:23, 334:25, 399:16, 399:18, 467:8, 467:9
**recessed** [1] - 518:4
**recitals** [1] - 315:16
**recites** [1] - 460:25
**recognize** [7] - 274:11, 283:7, 285:17, 287:22, 288:12, 290:20, 408:1
**recollection** [1] - 353:18
**record** [12] - 271:6, 308:7, 336:4, 352:6, 357:24, 363:19, 368:24, 468:8, 468:12, 489:4, 493:10, 493:23
**recorded** [2] - 461:13, 461:19
**Recordings** [1] - 391:1
**recordings** [1] - 391:10
**records** [2] - 374:6, 491:18
**recross** [1] - 252:21
**recruiting** [1] - 272:6
**red** [1] - 504:9
**redacted** [2] - 301:23, 315:18
**redirect** [5] - 252:20, 325:25, 347:14, 466:6, 487:15
**REDIRECT** [3] - 265:9, 326:2, 487:17
**Reed** [20] - 489:1, 489:5, 489:11, 489:15, 489:17, 489:25, 491:7, 491:14, 492:16, 493:9, 493:23, 494:14, 494:16, 495:6, 497:7, 498:3, 499:19, 516:25, 517:6, 517:8
**refer** [10] - 248:15, 262:16, 284:2, 339:13, 352:18, 353:20, 370:14, 371:18, 470:17,

470:18
**reference** [16] - 270:22, 283:24, 285:22, 299:14, 317:3, 333:13, 389:4, 389:11, 403:21, 404:3, 414:15, 433:11, 470:13, 488:1, 489:6, 501:25
**referenced** [2] - 347:24, 430:22
**references** [1] - 415:1
**referencing** [3] - 390:17, 410:10, 423:7
**referred** [3] - 248:1, 339:4, 469:5
**referring** [20] - 256:11, 256:14, 256:21, 260:5, 260:11, 304:1, 305:5, 312:3, 312:20, 312:23, 370:22, 371:10, 371:16, 391:18, 396:4, 396:8, 482:6, 502:1, 502:2
**refers** [1] - 479:11
**reflected** [2] - 352:11, 507:8
**reflecting** [1] - 508:8
**reflection** [1] - 507:14
**regard** [3] - 329:24, 435:11, 492:4
**regarding** [11] - 268:1, 268:6, 292:7, 292:8, 295:4, 358:19, 436:9, 457:3, 472:16, 473:1, 491:9
**regards** [4] - 249:4, 249:16, 494:17, 504:4
**regularly** [1] - 471:6
**Rein** [2] - 487:4, 487:5
**relate** [2] - 273:12, 514:10
**related** [3] - 366:7, 367:9, 516:16
**relates** [6] - 244:19, 501:14, 512:19, 512:21, 514:12, 515:6
**relating** [2] - 268:16, 490:3
**relationship** [19] - 282:5, 282:8, 282:9, 291:18, 304:11, 304:16, 329:7, 471:18, 471:19, 497:1, 499:25,

500:2, 502:19, 502:25, 507:8, 507:19, 508:10, 508:15
**Relationships** [1] - 319:13
**relationships** [6] - 282:16, 321:2, 450:2, 480:16, 500:1, 500:5
**relative** [2] - 513:17
**relatively** [2] - 504:12, 508:18
**release** [11] - 283:1, 283:8, 283:11, 284:10, 284:12, 292:3, 292:8, 330:19, 330:21, 406:3, 406:6
**released** [1] - 399:22
**relevance** [3] - 486:17, 498:17, 498:19
**relevant** [7] - 255:15, 266:25, 498:22, 501:8, 502:22, 505:20
**relied** [9] - 369:4, 457:12, 457:15, 459:16, 463:18, 463:20, 464:11, 493:25, 514:23
**rely** [3] - 340:22, 459:9, 492:4
**remaining** [3] - 394:7, 434:20, 495:4
**remains** [1] - 431:14
**remember** [14] - 247:4, 255:6, 266:17, 295:5, 295:6, 327:2, 339:2, 346:20, 406:11, 432:16, 441:13, 462:11, 477:10, 481:2
**remind** [2] - 257:18, 516:10
**remote** [24] - 360:21, 371:17, 373:4, 374:4, 393:20, 393:21, 393:22, 394:6, 394:8, 402:8, 402:13, 403:8, 417:6, 423:14, 423:17, 424:16, 426:21, 445:17, 445:22, 474:10, 474:12, 475:1, 475:16, 475:17
**remotely** [8] - 417:11, 420:25, 445:11,

445:13, 445:14, 474:13, 474:18
**remove** [4] - 416:3, 438:5, 439:23
**removed** [1] - 438:1
**removing** [1] - 438:22
**repeat** [3] - 318:23, 332:22, 480:11
**rephrase** [1] - 455:9
**replacement** [4] - 320:9, 333:20, 333:21, 512:3
**report** [7] - 297:2, 299:18, 326:6, 441:24, 498:7, 498:14, 498:18
**reported** [3] - 299:18, 458:9, 459:4
**reporter** [2] - 271:19, 467:13
**reporting** [2] - 298:7, 343:19
**reports** [3] - 335:11, 343:16, 343:18
**represent** [4] - 264:15, 336:14, 349:13, 374:4
**representation** [5] - 400:23, 444:18, 444:21, 449:1, 450:9
**represented** [1] - 266:19
**represents** [1] - 394:14
**Request** [1] - 413:8
**request** [4] - 398:17, 401:1, 413:22, 424:21
**requested** [1] - 253:18
**requesting** [1] - 413:16
**requests** [1] - 352:23
**require** [2] - 256:17, 431:10
**required** [10] - 255:8, 282:10, 296:17, 296:21, 374:11, 416:11, 422:16, 495:21, 495:23
**requirements** [1] - 417:24
**requires** [2] - 426:22, 456:14
**research** [6] - 284:18, 292:9, 292:13, 341:1, 491:22, 516:17
**resellers** [1] - 428:7
**Residential** [1] - 470:14

**residential** [5] - 299:5, 342:4, 474:7, 475:1, 487:22
**Resideo** [1] - 282:20
**resides** [1] - 383:19
**resolution** [1] - 361:11
**Resolution** [10] - 357:4, 361:8, 361:17, 397:13, 408:3, 414:6, 421:5, 448:23, 453:2, 453:4
**resolved** [2] - 258:1, 517:11
**resources** [1] - 339:23
**respect** [27] - 268:24, 270:9, 312:12, 313:8, 334:13, 352:21, 362:22, 383:5, 408:19, 410:10, 415:20, 428:10, 428:21, 431:5, 431:11, 433:9, 461:18, 493:25, 498:23, 499:13, 500:3, 501:7, 507:5, 507:11, 510:5, 511:24, 513:1
**respected** [1] - 318:17
**respond** [3] - 302:1, 357:9, 384:6
**responded** [4] - 246:20, 248:8, 255:13, 321:18
**responders** [2] - 274:2, 289:23
**Response** [1] - 359:19
**response** [7] - 302:2, 321:20, 322:12, 345:25, 359:22, 395:15, 395:16
**responsibilities** [6] - 262:23, 272:1, 336:21, 343:12, 352:20, 468:23
**responsibility** [1] - 340:23
**responsible** [5] - 272:4, 273:18, 306:9, 336:22, 342:11
**rest** [6] - 247:21, 275:9, 372:19, 421:11, 517:7, 517:17
**restricted** [4] - 317:12, 317:13, 317:17, 317:22
**restroom** [1] - 335:4
**result** [8] - 245:22,

292:25, 293:6, 334:9, 416:17, 434:9, 486:1, 507:1
**results** [2] - 301:14, 323:20
**resume** [2] - 259:12, 260:14
**retain** [3] - 291:22, 292:17, 293:1
**retentive** [1] - 493:7
**retreat** [1] - 292:20
**Retrofit** [1] - 375:17
**retrofitted** [1] - 376:12
**return** [1] - 395:17
**returned** [1] - 423:24
**revenue** [22] - 276:8, 276:18, 323:4, 323:7, 323:10, 323:19, 324:22, 349:3, 349:4, 349:14, 502:9, 504:10, 508:17, 512:9, 512:11, 512:14, 512:15, 512:16, 512:19, 513:11, 513:14
**revenues** [5] - 324:1, 324:2, 504:14, 504:24, 508:18
**review** [13] - 298:17, 343:13, 374:23, 379:17, 388:13, 397:8, 403:24, 435:21, 491:17, 491:23, 492:16, 492:17, 494:2
**reviewed** [6] - 375:1, 379:20, 380:11, 491:19, 492:8, 494:5
**revised** [1] - 245:9
**Revolv** [1] - 308:10
**RF** [1] - 452:10
**RICHARD** [1] - 243:16
**rid** [2] - 253:4, 266:24
**right-hand** [6] - 344:20, 371:14, 382:19, 382:20, 402:15, 403:18
**rights** [3] - 332:20, 510:17, 510:18
**Ring** [1] - 300:7
**rise** [2] - 258:11, 335:1
**risk** [2] - 274:4, 508:19, 509:13
**risks** [3] - 508:13, 508:16, 509:14
**roadmap** [2] - 341:2, 342:20
**robustness** [1] - 345:3
**role** [4] - 281:2, 364:9,

511:8, 511:18
**Roman** [1] - 312:10
**room** [2] - 396:21, 396:22
**rooms** [2] - 386:17, 396:17
**ROSATI** [1] - 243:21
**ROSE** [1] - 244:7
**rose** [1] - 510:7
**Rose** [8] - 249:21, 258:19, 266:12, 267:6, 274:20, 400:14, 473:16, 510:1
**Rose's** [2] - 251:22, 251:25
**roughly** [5] - 344:24, 371:11, 372:21, 505:1, 505:13
**router** [2] - 448:12, 448:13
**row** [1] - 353:25
**royalties** [1] - 509:1
**royalty** [52] - 315:22, 317:4, 334:6, 491:9, 494:1, 494:3, 494:11, 494:20, 494:23, 495:1, 495:5, 495:13, 495:15, 496:8, 496:24, 497:10, 497:14, 497:24, 498:1, 498:18, 498:20, 498:23, 499:6, 500:11, 500:15, 500:25, 502:3, 502:6, 502:12, 502:13, 502:15, 502:16, 503:11, 507:21, 507:22, 509:12, 509:15, 509:21, 510:25, 511:3, 511:4, 511:8, 511:15, 514:11, 514:23, 515:2, 515:14, 515:24, 516:1
**royalty-free** [1] - 317:4
**rules** [2] - 256:6, 392:19
**run** [1] - 418:4
**running** [6] - 284:3, 315:22, 360:5, 383:22, 385:3, 395:5
**runs** [2] - 379:21, 449:15
**RYAN** [1] - 243:22
**Ryan** [1] - 364:4

**S**

**Safe** [7] - 291:23, 296:11, 349:5, 349:9, 356:4, 356:8
**safe** [1] - 291:24
**safety** [4] - 273:8, 273:14, 281:1
**salary** [1] - 276:23
**sale** [1] - 266:6
**sales** [13] - 289:10, 306:5, 324:22, 347:22, 356:23, 357:25, 468:22, 468:24, 468:25, 469:1, 469:8, 472:19, 473:3
**SalesForce.com** [1] - 491:23
**Samsung** [2] - 300:14, 447:23
**satisfies** [1] - 437:11
**save** [1] - 279:21
**saw** [21] - 277:5, 277:8, 279:1, 284:22, 328:22, 376:15, 392:18, 396:23, 421:17, 421:25, 423:24, 433:9, 437:15, 438:22, 439:1, 441:9, 442:23, 462:3, 505:8, 505:9, 514:6
**scale** [4] - 284:19, 292:9, 292:13, 512:12
**scenario** [3] - 424:25, 482:6, 482:24
**Scenario** [1] - 482:2
**scenarios** [2] - 481:12, 482:10
**schedule** [3] - 268:20, 469:25, 470:2
**scheduled** [1] - 341:8
**scheme** [1] - 394:19
**school** [5] - 272:14, 274:25, 337:6, 337:7, 365:1
**SCHWIER** [8] - 244:8, 257:25, 260:16, 260:17, 263:22, 264:1, 264:5, 265:8
**science** [3] - 272:16, 365:2, 365:3
**scientific** [1] - 278:18
**SCIFS** [1] - 366:12
**Scott** [1] - 271:7
**Scout** [1] - 300:11
**screen** [39] - 248:23,

249:17, 250:22, 256:3, 274:10, 287:6, 290:18, 319:25, 327:5, 328:7, 330:20, 332:4, 347:24, 366:8, 373:24, 374:10, 374:13, 374:19, 375:4, 375:21, 380:1, 382:12, 385:9, 386:2, 387:17, 393:5, 402:15, 411:7, 413:4, 413:8, 414:20, 414:21, 423:8, 432:18, 441:24, 460:1, 469:20, 487:19, 494:14
**screws** [1] - 438:11
**seat** [1] - 259:2
**seated** [6] - 244:12, 259:6, 271:14, 335:20, 364:1, 516:24
**SEC** [9] - 296:19, 296:22, 297:1, 299:5, 299:9, 299:18, 300:3, 300:17, 311:12
**sec** [1] - 352:14
**second** [40] - 246:10, 247:6, 247:7, 251:4, 259:21, 260:8, 279:16, 292:19, 315:17, 317:19, 320:16, 332:2, 356:21, 371:18, 371:21, 372:14, 372:22, 379:8, 379:9, 393:21, 393:25, 396:18, 406:17, 411:6, 422:25, 424:7, 429:19, 430:1, 430:5, 450:21, 451:22, 458:1, 458:2, 463:5, 466:21, 479:8, 479:14, 500:10, 515:6
**Section** [3] - 332:3, 413:5, 413:6
**section** [12] - 298:3, 298:7, 298:16, 298:17, 298:20, 298:22, 299:1, 388:20, 397:23, 398:23, 421:5, 470:14

secure [2] - 337:11, 365:16

SecureNet [319] - 245:25, 246:18, 247:2, 249:19, 250:5, 250:18, 254:14, 256:10, 256:17, 258:15, 259:18, 259:24, 266:13, 267:8, 267:11, 267:14, 267:18, 267:25, 268:5, 268:9, 268:15, 268:20, 268:23, 269:1, 269:7, 269:9, 269:12, 269:21, 269:23, 270:9, 270:12, 270:15, 270:18, 282:21, 289:15, 289:17, 289:18, 290:25, 291:4, 291:7, 291:14, 291:17, 291:20, 291:25, 294:19, 296:10, 300:7, 302:9, 307:4, 307:22, 313:22, 317:18, 317:24, 322:25, 323:3, 323:8, 323:19, 324:7, 325:19, 326:14, 326:18, 326:21, 326:25, 327:18, 327:23, 329:8, 329:12, 330:1, 330:15, 331:24, 333:8, 338:24, 345:16, 345:21, 345:23, 346:6, 346:10, 347:1, 347:3, 347:7, 348:4, 348:5, 348:10, 348:15, 348:24, 349:13, 349:17, 349:21, 350:5, 350:9, 350:14, 350:18, 350:21, 350:22, 350:23, 351:14, 352:21, 353:16, 354:2, 355:18, 357:9, 357:14, 357:15, 357:19, 358:15, 358:16, 358:19, 359:10, 359:22, 359:24, 360:5, 360:8, 360:12, 360:17, 360:19, 360:23, 361:1, 361:6, 361:7,

361:21, 361:24, 362:3, 364:12, 369:5, 374:21, 375:8, 376:3, 378:20, 378:21, 379:4, 379:18, 379:20, 379:21, 380:17, 381:8, 381:13, 381:23, 382:24, 383:22, 385:7, 385:14, 388:12, 388:13, 389:15, 389:17, 391:12, 392:3, 393:25, 394:4, 394:17, 394:20, 395:1, 396:2, 396:8, 396:25, 397:14, 398:17, 399:1, 399:4, 401:19, 402:12, 402:24, 403:11, 403:25, 406:9, 406:17, 406:19, 406:24, 407:3, 407:4, 407:5, 407:12, 407:16, 408:6, 409:18, 409:23, 411:16, 411:21, 412:7, 415:2, 415:8, 415:13, 416:8, 416:13, 416:20, 417:22, 418:4, 418:18, 418:21, 419:3, 422:8, 422:15, 424:6, 424:14, 425:8, 426:2, 426:4, 427:10, 427:12, 427:18, 427:24, 428:6, 428:12, 428:17, 428:19, 429:24, 433:10, 435:22, 437:11, 440:8, 440:11, 440:15, 440:24, 444:22, 444:25, 446:5, 446:7, 446:24, 447:4, 447:9, 447:11, 447:17, 447:21, 448:4, 448:8, 448:13, 448:21, 449:4, 449:10, 449:13, 449:19, 449:24, 450:9, 450:14, 451:13, 453:25, 454:4, 454:6, 454:9, 454:11, 454:13, 454:14, 454:16,

454:21, 455:8, 455:11, 455:20, 456:6, 456:25, 461:12, 461:19, 465:3, 465:13, 465:20, 465:25, 467:3, 467:5, 471:8, 471:11, 471:17, 471:22, 472:3, 472:25, 473:4, 473:7, 473:17, 480:25, 482:3, 482:11, 482:25, 484:13, 484:19, 484:25, 485:3, 485:4, 485:25, 486:22, 487:11, 491:19, 494:8, 495:19, 497:20, 497:25, 498:6, 498:12, 499:4, 499:6, 499:22, 499:25, 500:17, 500:21, 502:12, 503:12, 506:2, 508:23, 508:24, 509:2, 509:25, 510:2, 510:3, 510:5, 511:14, 511:18, 512:1, 512:6, 512:10, 512:22, 513:7, 513:8, 513:17, 513:22, 514:8, 514:14, 515:18, 516:2, 517:11

SECURENET [1] - 243:8

SecureNet's [30] - 268:10, 308:1, 327:25, 328:5, 328:9, 328:15, 334:3, 334:10, 347:22, 351:10, 353:8, 354:11, 355:2, 355:4, 356:15, 380:19, 386:22, 402:24, 403:20, 408:15, 432:16, 440:4, 445:6, 478:16, 479:15, 499:2, 509:23, 511:18, 512:25, 513:20

SecureNetTech.com/ hardware/IGM [1] - 348:11

securing [2] - 365:7, 366:11

Securities [3] -

296:18, 322:6, 326:5

security [262] - 261:3, 261:6, 261:9, 261:16, 261:19, 261:22, 261:25, 262:1, 262:4, 262:13, 272:24, 277:14, 277:15, 277:23, 278:5, 278:10, 279:12, 279:13, 279:14, 280:8, 280:9, 280:10, 280:11, 280:15, 280:18, 280:19, 280:22, 281:10, 281:14, 281:18, 281:20, 281:24, 281:25, 282:1, 283:19, 283:22, 289:3, 289:8, 291:16, 291:18, 302:23, 304:11, 304:12, 304:16, 304:18, 305:3, 305:16, 321:12, 326:19, 326:24, 329:7, 337:9, 337:10, 337:20, 337:25, 338:7, 342:4, 344:17, 346:19, 346:22, 346:24, 347:2, 347:5, 359:11, 359:15, 360:1, 365:4, 365:18, 365:22, 365:24, 366:2, 366:4, 366:21, 366:23, 367:5, 367:6, 367:14, 367:19, 368:5, 370:22, 370:23, 372:13, 372:16, 372:24, 372:25, 373:1, 373:2, 373:5, 373:10, 373:11, 373:12, 373:13, 373:15, 374:15, 376:11, 377:10, 380:4, 380:8, 383:2, 383:17, 383:18, 384:25, 385:18, 385:21, 387:22, 387:25, 388:6, 388:23, 388:24, 389:1, 389:5, 389:6, 392:12, 392:16, 393:14, 393:17, 393:23, 394:2, 394:9, 394:10, 403:8, 404:6, 404:9,

405:11, 405:12, 408:13, 408:16, 409:7, 409:12, 409:20, 409:21, 409:25, 410:1, 410:11, 410:13, 411:9, 411:10, 411:11, 411:12, 411:17, 412:15, 412:17, 413:25, 417:5, 417:9, 417:10, 419:2, 419:4, 419:20, 419:21, 422:25, 423:1, 423:4, 423:5, 423:11, 423:14, 423:15, 423:16, 423:18, 423:19, 423:23, 424:5, 424:9, 424:12, 424:15, 425:1, 425:21, 426:20, 426:23, 427:2, 429:13, 429:14, 429:15, 429:17, 429:18, 429:23, 430:1, 430:11, 430:12, 430:15, 430:21, 432:9, 432:10, 432:14, 435:4, 436:2, 437:14, 440:21, 441:6, 443:16, 444:4, 446:10, 446:14, 448:19, 449:3, 449:4, 449:13, 450:1, 450:3, 451:7, 451:9, 451:18, 451:19, 451:21, 451:25, 452:1, 452:4, 452:6, 452:19, 452:23, 453:4, 453:11, 453:12, 453:14, 453:16, 453:17, 453:18, 453:20, 453:21, 453:24, 454:1, 455:5, 455:6, 455:10, 455:11, 456:11, 456:12, 456:15, 456:18, 457:15, 459:10, 460:3, 460:4, 460:5, 460:8, 460:12, 461:4, 462:3, 462:5, 469:5, 469:6, 469:9, 469:15, 471:6, 476:15, 477:18, 500:14, 509:11, 511:19

Security [10] - 291:23,

291:24, 349:6,
349:9, 356:7, 356:8,
356:9, 385:11,
387:17, 393:9
**security-type** [1] -
366:4
**see** [184] - 244:14,
246:15, 249:17,
250:24, 257:4,
263:18, 264:12,
264:17, 264:18,
267:1, 277:20,
278:14, 283:25,
298:5, 298:24,
299:2, 299:14,
299:15, 301:25,
304:2, 305:14,
306:20, 306:21,
306:23, 307:1,
307:2, 307:8,
307:10, 307:23,
308:5, 308:8,
308:15, 308:23,
308:25, 309:3,
309:4, 312:13,
313:10, 313:11,
315:19, 317:4,
317:13, 317:19,
319:3, 319:5, 319:7,
320:18, 320:25,
321:5, 321:9, 322:3,
325:6, 325:9,
325:10, 327:5,
327:23, 327:25,
328:4, 333:13,
337:14, 343:16,
348:6, 348:8,
348:10, 348:25,
349:23, 353:21,
354:16, 354:17,
359:19, 359:20,
368:9, 368:12,
369:12, 369:13,
369:14, 369:16,
369:21, 369:22,
370:2, 370:7,
370:21, 371:25,
373:10, 373:16,
375:4, 375:6, 375:9,
375:17, 375:18,
375:22, 378:19,
385:10, 385:11,
386:2, 386:9,
387:16, 388:22,
389:2, 390:21,
390:25, 391:16,
392:12, 392:13,
392:17, 393:20,
393:24, 394:12,
395:10, 395:11,
396:13, 397:24,

398:1, 398:2,
398:14, 398:23,
402:15, 403:6,
404:17, 404:18,
405:1, 406:21,
408:8, 409:16,
410:21, 411:13,
411:19, 411:23,
413:10, 415:4,
415:6, 417:17,
417:18, 418:14,
419:13, 420:17,
420:21, 420:22,
421:4, 421:24,
422:2, 422:24,
423:2, 424:20,
429:5, 430:6,
430:12, 430:23,
431:23, 431:25,
432:25, 433:11,
434:14, 435:18,
447:20, 450:23,
456:12, 458:4,
458:18, 458:20,
461:2, 461:5,
464:22, 470:13,
472:24, 474:13,
474:21, 479:25,
481:10, 481:11,
481:15, 482:1,
482:3, 484:9, 488:2,
501:2, 504:11,
512:15, 513:10,
513:15, 516:21,
518:3
**seeing** [3] - 289:8,
457:19, 463:12
**seek** [1] - 509:14
**segment** [1] - 352:10
**select** [1] - 373:25
**self** [2] - 371:4, 448:1
**self-monitoring** [2] -
371:4, 448:1
**sell** [17] - 278:12,
280:20, 281:14,
282:11, 289:11,
293:21, 304:11,
346:24, 347:1,
347:4, 347:7, 450:7,
454:13, 454:14,
477:25, 487:7, 487:8
**selling** [4] - 277:22,
278:5, 280:13,
280:22
**sells** [4] - 277:14,
346:22, 347:3,
453:25
**send** [6] - 268:5,
268:15, 337:18,
413:22, 424:22,

425:4
**Send** [2] - 398:24,
413:9
**sending** [3] - 392:6,
413:16, 442:11
**sends** [2] - 398:16,
413:13
**senior** [1] - 468:21
**seniority** [1] - 341:21
**sense** [3] - 252:11,
289:14, 477:22
**sensor** [11] - 281:6,
337:13, 390:11,
421:16, 421:23,
422:18, 441:12,
465:18
**sensors** [60] - 280:5,
337:13, 370:24,
373:5, 373:13,
373:18, 377:17,
378:1, 378:2, 378:5,
380:5, 383:19,
386:16, 396:21,
403:8, 411:20,
411:22, 412:9,
412:20, 412:21,
415:21, 415:22,
416:1, 419:1,
419:10, 419:21,
421:18, 421:21,
440:21, 440:25,
441:6, 441:10,
441:15, 441:18,
442:1, 442:2, 442:5,
442:8, 442:13,
442:16, 442:23,
443:2, 443:4, 443:8,
443:11, 443:16,
443:24, 444:8,
446:16, 452:6,
452:8, 452:10,
452:13, 452:19,
452:23, 465:17,
470:25, 475:9
**sent** [7] - 250:11,
268:9, 398:25,
429:21, 462:13,
464:8, 465:15
**sentence** [6] - 299:17,
320:16, 333:22,
398:13, 406:18,
472:24
**separate** [10] - 319:18,
352:9, 372:13,
372:24, 409:12,
417:5, 448:19,
451:7, 460:10,
460:17
**separately** [3] -
319:23, 377:21,

460:9
**September** [19] -
248:2, 248:4,
248:19, 248:21,
249:14, 252:17,
252:18, 253:24,
255:2, 255:5,
255:23, 259:21,
260:9, 267:13,
267:20, 268:5,
268:14, 268:19,
495:15
**sequence** [1] - 413:15
**serial** [5] - 398:2,
398:4, 398:5, 398:8,
398:11
**series** [1] - 245:5
**Series** [2] - 404:18,
404:22
**seriously** [1] - 340:23
**server** [77] - 262:14,
357:9, 357:11,
357:19, 359:10,
359:22, 360:13,
360:17, 360:21,
361:25, 362:3,
362:6, 372:14,
373:4, 392:3,
393:21, 393:22,
394:8, 395:3, 395:4,
395:20, 397:17,
398:17, 398:18,
399:4, 402:8,
402:13, 409:23,
410:1, 410:20,
410:23, 410:25,
411:21, 413:11,
413:15, 414:14,
415:14, 417:22,
419:3, 420:14,
420:16, 422:9,
422:15, 422:25,
423:1, 423:4, 423:5,
423:15, 423:19,
424:12, 424:23,
425:9, 426:2,
426:20, 426:23,
428:13, 428:20,
429:15, 429:18,
430:21, 435:22,
440:8, 440:11,
440:20, 440:24,
446:5, 447:1, 447:6,
449:19, 449:20,
454:17, 454:21,
455:11, 464:2
**servers** [29] - 357:16,
360:6, 371:17,
371:19, 372:22,
374:4, 379:4,

379:18, 379:21,
381:8, 393:25,
394:6, 394:20,
395:1, 396:2,
397:14, 399:1,
402:12, 402:20,
412:7, 416:20,
417:6, 418:4,
418:19, 424:6,
427:18, 427:19,
429:24, 449:15
**serves** [1] - 305:17
**service** [32] - 269:15,
282:6, 282:10,
289:3, 293:22,
328:18, 350:11,
350:12, 350:15,
353:13, 353:19,
356:11, 427:16,
427:20, 471:3,
471:18, 472:4,
473:6, 474:4,
474:21, 474:23,
475:4, 476:6, 476:8,
477:3, 483:13,
483:24, 484:4,
484:6, 484:8,
484:12, 509:19
**Service** [1] - 470:14
**Services** [1] - 503:13
**services** [28] - 269:17,
279:10, 279:12,
280:18, 280:20,
281:17, 281:20,
353:12, 353:14,
353:17, 406:19,
469:13, 470:3,
470:18, 470:24,
473:18, 473:19,
474:7, 486:24,
503:8, 504:10,
504:16, 505:3,
505:15, 507:25,
512:15, 512:19,
515:10
**serving** [1] - 372:25
**session** [3] - 357:13,
410:23, 411:1
**set** [20] - 270:15,
278:3, 279:24,
281:3, 281:9,
295:15, 295:18,
295:25, 296:2,
336:23, 362:4,
369:11, 387:4,
387:5, 387:6, 412:4,
420:18, 429:22,
441:18, 497:4
**sets** [1] - 386:16
**Settle** [1] - 312:11

**settle** [5] - 246:1, 247:9, 313:7, 313:21
**settlement** [10] - 246:9, 247:23, 248:2, 254:19, 254:20, 254:24, 255:20, 256:12, 312:20, 501:17
**settling** [1] - 313:14
**seven** [7] - 265:17, 275:21, 275:22, 290:16, 306:22, 311:21, 331:11
**several** [11] - 296:13, 363:13, 366:23, 427:3, 446:1, 452:3, 457:23, 459:21, 509:10, 511:21, 514:16
**severe** [1] - 470:25
**shall** [1] - 317:11
**shape** [1] - 258:16
**share** [2] - 343:20, 368:2
**sharp** [1] - 273:5
**sheet** [2] - 358:14, 358:18
**shell** [2] - 295:10, 295:12
**shipped** [3] - 377:7, 441:19, 442:4
**short** [1] - 487:16
**shortly** [1] - 274:25
**shot** [1] - 432:18
**shots** [1] - 441:24
**show** [19] - 249:18, 264:1, 292:21, 347:21, 351:9, 356:15, 358:2, 358:11, 379:23, 382:21, 402:16, 403:22, 407:14, 424:17, 463:18, 504:8, 512:7, 513:8, 513:20
**showed** [12] - 394:5, 402:10, 425:23, 432:17, 437:19, 441:5, 455:1, 455:16, 458:25, 465:23, 483:23, 494:8
**showing** [18] - 346:6, 370:11, 378:25, 381:7, 383:16, 384:4, 391:13, 413:7, 430:23, 452:22, 497:13, 504:15, 512:8, 512:11, 513:9,

513:11, 513:22, 513:25
**shown** [44] - 287:11, 288:1, 347:24, 362:23, 367:23, 373:8, 378:24, 381:2, 381:4, 382:14, 382:20, 384:3, 390:16, 393:8, 401:21, 404:4, 416:25, 417:18, 421:12, 429:7, 431:17, 435:11, 440:13, 440:14, 441:22, 444:25, 447:12, 447:14, 452:22, 454:6, 454:8, 454:16, 454:20, 454:22, 455:4, 455:14, 455:15, 455:17, 455:19, 455:22, 457:1, 463:22, 511:11
**shows** [18] - 305:16, 311:18, 358:7, 380:3, 394:18, 394:19, 430:4, 443:24, 494:21, 496:15, 504:9, 504:19, 504:24, 512:10, 512:16, 514:7, 514:14
**side** [15] - 251:21, 312:14, 312:17, 313:3, 342:18, 344:21, 412:25, 465:1, 486:2, 486:19, 492:7, 498:10, 513:10, 513:11
**Side** [1] - 486:4
**side-bar** [5] - 312:14, 312:17, 313:3, 486:2, 486:19
**Side-bar** [1] - 486:4
**sides** [1] - 266:19
**sideshow** [1] - 253:4
**sign** [3] - 286:6, 286:9, 297:18
**signal** [6] - 273:25, 289:21, 289:22, 337:18, 474:8, 474:9
**signals** [1] - 474:16
**signature** [1] - 286:5, 297:15, 311:18, 316:21
**signed** [6] - 269:2, 286:2, 286:25, 311:2, 314:13, 478:2

**significance** [1] - 506:19
**significant** [2] - 496:24, 504:25
**significantly** [2] - 293:5, 354:15
**similar** [3] - 291:15, 470:11, 502:14
**similarities** [1] - 511:12
**Simon** [27] - 338:2, 338:3, 338:8, 338:11, 338:12, 338:14, 338:16, 338:20, 338:23, 358:8, 376:5, 377:11, 380:24, 393:11, 393:14, 407:11, 437:17, 438:18, 438:23, 443:1, 444:2, 449:8, 453:6, 459:14, 459:17, 460:14, 465:9
**simple** [1] - 406:19
**Simplisafe** [2] - 300:11, 303:14
**simply** [4] - 275:18, 328:16, 373:12, 486:11
**single** [4] - 299:5, 436:22, 437:6, 496:11
**single-family** [1] - 299:5
**sit** [5] - 334:18, 335:10, 457:11, 497:12, 497:23
**sitting** [8] - 252:5, 273:17, 273:18, 387:6, 400:16, 429:21, 441:25, 506:12
**situation** [3] - 391:21, 497:20, 505:22
**six** [12] - 275:14, 275:16, 290:16, 331:7, 331:10, 339:22, 351:23, 375:25, 376:8, 379:24, 415:4, 488:15
**sixteen** [3] - 441:18, 442:2, 442:5
**size** [11] - 322:25, 323:23, 324:4, 324:6, 324:11, 325:19, 325:20, 407:20, 513:17, 513:21

**skipped** [1] - 267:1
**skipping** [1] - 420:17
**Slavin** [1] - 274:14
**slice** [1] - 497:3
**slide** [69] - 288:1, 290:21, 305:12, 305:20, 306:19, 306:22, 306:25, 308:3, 308:22, 308:23, 309:9, 368:9, 371:24, 372:1, 381:16, 382:12, 382:20, 384:2, 387:15, 388:10, 393:9, 403:13, 403:15, 404:3, 409:15, 411:5, 414:1, 416:21, 416:25, 421:1, 422:23, 426:13, 427:6, 427:7, 429:7, 430:4, 430:22, 431:17, 434:13, 434:14, 435:8, 435:9, 456:21, 456:23, 457:22, 458:2, 496:6, 497:7, 498:2, 498:6, 498:9, 498:11, 499:14, 503:4, 504:7, 505:19, 506:21, 508:4, 509:22, 511:6, 511:16, 514:4, 514:5, 514:10, 514:21
**Slide** [13] - 364:23, 367:23, 367:24, 381:1, 381:2, 384:3, 416:24, 456:21, 463:3, 494:14, 498:2, 499:19, 504:7
**slides** [4] - 257:17, 257:21, 269:4, 399:8
**Slomin** [1] - 503:24
**Slomin's** [6] - 349:6, 349:9, 484:21, 484:23, 485:1, 485:4
**slow** [2] - 275:12
**small** [12] - 265:18, 265:19, 265:20, 277:10, 278:3, 312:10, 343:7, 344:6, 347:23, 363:14, 498:10, 504:12
**smaller** [1] - 325:20
**Smart** [1] - 464:8
**smart** [5] - 279:22, 305:2, 445:15,

445:17, 462:23
**smarter** [1] - 371:6
**Smartlink** [6] - 384:24, 385:1, 385:2, 385:5, 464:4, 464:9
**Smartphone** [1] - 383:22
**Smartphones** [1] - 384:10
**SMITH** [34] - 243:22, 257:16, 257:19, 258:2, 363:1, 363:4, 363:10, 363:13, 363:17, 364:3, 367:17, 367:22, 369:8, 369:19, 369:22, 370:1, 376:22, 376:25, 378:7, 378:12, 379:14, 379:16, 384:14, 384:19, 401:12, 401:13, 405:18, 405:22, 405:24, 407:22, 407:25, 436:4, 466:7, 466:10
**Smith** [17] - 248:23, 249:20, 249:21, 250:23, 256:8, 257:14, 257:25, 274:10, 287:4, 344:6, 344:20, 364:4, 399:10, 401:11, 457:22, 458:16, 506:21
**smoke** [2] - 281:4, 337:16
**Social** [1] - 341:12
**software** [66] - 273:13, 273:17, 273:24, 274:9, 276:16, 277:21, 277:23, 281:20, 282:11, 282:12, 282:13, 283:18, 284:4, 285:7, 289:11, 292:23, 294:5, 329:17, 334:1, 337:1, 337:3, 339:16, 340:6, 340:8, 340:13, 340:16, 340:20, 341:4, 342:7, 342:23, 343:14, 350:15, 353:22, 357:16, 360:9, 360:11, 360:13, 360:20, 360:22, 367:7, 367:9, 367:11, 373:7,

395:4, 417:17, 417:21, 418:2, 418:3, 427:21, 427:22, 428:12, 446:24, 447:1, 447:5, 449:15, 449:20, 450:1, 451:10, 454:18, 455:11, 456:25, 480:18, 503:8, 505:23, 508:1, 515:11

**sold** [2] - 266:3, 277:24

**sole** [2] - 295:15, 295:18

**solution** [1] - 252:12

**solutions** [1] - 350:8

**someone** [13] - 255:3, 277:14, 280:4, 281:7, 290:15, 331:3, 331:4, 337:15, 338:20, 341:25, 358:6, 358:8, 429:9

**someplace** [1] - 369:16

**sometime** [2] - 355:5, 469:5

**sometimes** [6] - 267:1, 280:10, 337:10, 400:11, 490:5, 497:5

**somewhat** [2] - 253:12, 290:12

**somewhere** [5] - 313:17, 323:7, 353:19, 398:19, 450:9

**son** [1] - 391:25

**SONI** [1] - 244:6

**SONSINI** [1] - 243:21

**soon** [1] - 244:20

**sorry** [18] - 263:20, 324:24, 332:22, 352:5, 370:4, 381:2, 405:21, 426:19, 436:13, 436:14, 439:2, 449:17, 451:10, 453:15, 453:25, 463:11, 465:7, 480:11

**sort** [10] - 277:1, 277:19, 289:1, 306:1, 340:7, 379:17, 380:22, 392:17, 393:6, 399:2

**sorts** [2] - 406:3, 471:1

**sounds** [3] - 253:21,

304:2, 305:4

**source** [11] - 379:20, 380:11, 417:23, 418:1, 418:3, 445:1, 452:22, 452:25, 453:2, 453:6, 464:10

**sow** [1] - 348:14

**space** [2] - 321:12, 393:5

**speaking** [4] - 364:9, 372:2, 378:15, 455:24

**specific** [4] - 456:1, 456:9, 499:7, 503:2

**specifically** [12] - 264:24, 317:3, 319:23, 361:18, 403:10, 454:8, 455:3, 455:15, 455:18, 463:24, 481:2, 502:16

**specifics** [1] - 502:21

**specifies** [1] - 506:24

**speculating** [1] - 347:6

**speculation** [1] - 353:20

**speculative** [1] - 325:4

**speed** [1] - 380:6

**spell** [5] - 271:5, 336:3, 363:18, 468:11, 489:3

**Spencer** [1] - 481:8

**spend** [2] - 247:21, 339:8

**spent** [3] - 294:7, 331:7, 340:10

**spilling** [1] - 421:3

**spoken** [2] - 397:14, 457:8

**spreadsheet** [5] - 278:14, 348:18, 348:19, 348:20, 348:25

**stack** [1] - 310:13

**staff** [1] - 357:25

**stage** [5] - 276:25, 353:13, 353:15

**stand** [5] - 251:16, 335:23, 369:16, 378:3, 400:6

**standard** [2] - 353:24, 405:11

**standardized** [2] - 398:10, 398:12

**standing** [2] - 338:3, 407:15

**standpoint** [1] - 249:11

**stands** [1] - 302:14

**start** [9] - 248:25, 326:9, 334:20, 382:10, 399:13, 418:13, 434:20, 464:24, 516:7

**started** [8] - 342:25, 346:19, 468:1, 485:18, 490:10, 490:11, 504:14, 505:6

**starting** [3] - 262:21, 278:12, 504:11

**starts** [2] - 450:22, 495:15

**startup** [2] - 265:18, 265:20

**state** [12] - 271:5, 333:21, 336:3, 337:14, 337:21, 363:18, 395:19, 421:15, 423:18, 424:11, 468:11, 489:3

**statement** [15] - 248:16, 248:17, 248:24, 249:16, 256:4, 263:13, 264:7, 266:18, 349:25, 354:19, 406:24, 408:15, 408:19, 432:17, 498:3

**statements** [5] - 299:12, 299:25, 300:17, 302:19, 386:19

**states** [1] - 325:18

**States** [4] - 342:5, 349:4, 469:3, 490:6

**STATES** [1] - 243:1

**station** [7] - 274:1, 289:19, 289:20, 290:1, 337:19, 449:14, 474:16

**stations** [1] - 289:25

**statistics** [1] - 305:13

**Status** [1] - 398:24

**status** [14] - 390:21, 394:14, 395:25, 396:1, 398:14, 398:16, 399:7, 411:22, 419:14, 424:21, 424:22, 474:13, 475:9

**statute** [1] - 494:25

**Stay** [3] - 386:7, 386:9, 386:11

**stay** [2] - 277:1, 466:21

**step** [21] - 266:9,

334:17, 347:17, 382:9, 419:3, 419:8, 419:17, 419:23, 422:19, 429:14, 430:5, 434:21, 457:1, 488:18, 488:19, 516:25

**STEPHEN** [1] - 244:3

**Stephen** [1] - 271:7

**steps** [17] - 373:9, 415:21, 416:12, 417:2, 417:25, 418:17, 420:9, 420:15, 422:16, 422:17, 429:10, 433:22, 435:3, 435:6, 435:14, 435:17, 457:2

**Steve** [2] - 271:2, 271:25

**stick** [2] - 377:18, 416:3

**sticking** [1] - 416:2

**still** [16] - 257:23, 274:21, 284:17, 338:17, 343:6, 345:15, 355:7, 399:21, 408:8, 411:6, 416:6, 433:24, 443:11, 464:21, 486:15, 501:8

**stipulate** [1] - 247:25

**stipulated** [1] - 459:21

**stipulation** [1] - 249:12

**stop** [1] - 254:9

**storage** [1] - 379:5

**store** [1] - 359:11

**stored** [11] - 359:16, 360:1, 374:4, 395:1, 395:8, 396:1, 396:25, 398:19, 416:19, 424:12, 424:13

**strategy** [6] - 306:9, 306:22, 327:5, 478:5, 513:4

**Strategy** [2] - 295:1, 306:20

**Street** [1] - 243:12

**strengthening** [1] - 309:7

**strike** [5] - 379:15, 397:23, 415:20, 426:2, 427:11

**strikes** [1] - 253:3

**strong** [1] - 275:24

**structural** [1] - 422:12

**structure** [7] - 339:10,

372:20, 373:6, 417:2, 417:15, 417:19, 451:14

**struggling** [1] - 450:12

**stuck** [1] - 412:25

**study** [4] - 304:1, 337:5, 499:3, 499:5

**stuff** [3] - 278:12, 371:16, 385:20

**style** [1] - 370:23

**subject** [2] - 367:2, 414:11

**sublicense** [2] - 317:12, 317:22

**submit** [2] - 245:9, 517:18

**subscriber** [25] - 343:13, 349:8, 488:11, 492:18, 502:1, 502:7, 502:16, 502:17, 509:15, 510:23, 511:1, 511:5, 512:14, 513:8, 513:12, 513:15, 514:24, 515:2, 515:3, 515:9, 515:17, 515:22, 516:3

**subscribers** [18] - 266:4, 266:5, 293:12, 343:16, 344:10, 344:22, 345:4, 346:6, 359:12, 471:24, 472:2, 480:25, 494:9, 502:8, 504:13, 513:10, 513:13, 513:23

**subset** [1] - 442:13

**subsidiary** [5] - 285:25, 286:12, 295:11, 295:14, 296:1

**substance** [2] - 313:12, 317:21

**substantial** [8] - 422:20, 428:12, 428:17, 491:16, 491:21, 492:17, 494:5, 514:16

**substantially** [7] - 416:13, 416:17, 417:25, 422:7, 422:11, 434:18, 512:18

**substantive** [1] - 341:16

**substitutes** [2] -

428:23, 436:1
**success** [10] - 503:1, 504:4, 504:23, 506:2, 506:4, 508:19, 511:25, 514:13, 514:16
**successful** [6] - 276:24, 277:6, 278:19, 279:2, 340:4, 513:12
**sudden** [1] - 278:18
**suddenly** [1] - 277:25
**sued** [2] - 247:16, 267:15
**suggest** [3] - 245:5, 253:13, 255:5
**suggested** [2] - 499:23, 511:14
**suggesting** [1] - 255:2
**suggestion** [4] - 245:25, 250:20, 253:11, 254:19
**suit** [13] - 246:10, 298:12, 298:15, 309:24, 314:18, 314:24, 317:7, 322:14, 325:12, 364:13, 367:25, 495:10
**sum** [4] - 309:12, 313:12, 317:21, 514:22
**summaries** [3] - 493:4, 493:8
**summarize** [3] - 302:22, 364:25, 435:9
**Summary** [1] - 333:8
**summary** [7] - 297:22, 319:3, 320:12, 333:9, 494:13, 494:21, 512:6
**summation** [1] - 427:8
**super** [1] - 273:15
**supply** [1] - 510:24
**support** [7] - 339:24, 340:14, 350:13, 350:16, 350:17, 350:19, 515:11
**supported** [5] - 371:9, 375:8, 376:2, 384:4, 459:1
**Supported** [2] - 375:5, 375:17
**supporting** [1] - 341:19
**supports** [2] - 458:7, 516:1
**suppose** [1] - 252:19
**surprise** [4] - 290:11,

290:13, 290:14, 348:6
**survey** [1] - 278:4
**surveyed** [1] - 278:6
**surveys** [1] - 278:4
**sustain** [4] - 277:12, 329:22, 379:13, 486:16
**switch** [3] - 459:7, 459:25, 484:13
**switched** [1] - 485:23
**switching** [3] - 480:18, 480:25, 482:11
**swore** [1] - 336:2
**sworn** [1] - 489:11
**System** [3] - 385:11, 418:14, 418:24
**system** [146] - 261:9, 261:16, 261:19, 261:25, 262:13, 279:13, 280:8, 281:1, 281:12, 281:14, 302:16, 327:20, 338:7, 344:17, 354:22, 368:3, 368:6, 370:22, 371:7, 372:24, 373:1, 373:3, 373:10, 373:11, 373:15, 376:5, 379:18, 380:4, 381:23, 382:25, 383:2, 383:17, 384:25, 385:4, 385:18, 385:22, 388:12, 388:13, 389:1, 389:2, 389:16, 393:23, 394:2, 394:4, 394:9, 394:10, 394:17, 401:20, 402:24, 403:25, 405:7, 405:8, 405:9, 405:10, 405:11, 409:18, 409:20, 409:21, 410:11, 410:13, 411:10, 411:11, 411:16, 411:19, 412:12, 412:16, 412:17, 413:25, 417:5, 417:8, 417:9, 417:11, 418:16, 418:17, 418:18, 419:1, 419:9, 422:1, 422:3, 422:21, 423:11, 423:18, 423:23, 425:21,

426:4, 426:16, 427:2, 427:11, 427:13, 427:16, 427:20, 427:24, 428:1, 428:6, 429:17, 430:1, 430:11, 431:4, 435:15, 436:2, 437:14, 441:5, 442:23, 444:4, 445:11, 445:15, 445:25, 446:1, 446:10, 446:14, 449:4, 450:3, 451:7, 451:9, 451:18, 451:19, 451:21, 452:4, 452:6, 452:15, 452:19, 452:20, 453:12, 453:17, 453:20, 453:22, 455:20, 456:7, 456:12, 457:16, 459:11, 460:3, 460:12, 464:12, 464:13, 474:11, 474:14, 474:18, 475:12, 476:15, 515:13
**systems** [16] - 277:15, 278:7, 279:15, 280:13, 365:16, 365:17, 365:20, 366:4, 366:18, 367:11, 367:15, 367:19, 375:8, 389:17, 418:6, 445:12

## T

**T-R-U-N-D-L-E** [1] - 271:8
**table** [7] - 319:7, 320:24, 321:22, 369:12, 372:1, 497:13, 506:13
**takeaway** [2] - 248:8, 249:1
**takeovers** [3] - 483:13, 483:25, 484:4
**talent** [1] - 292:21
**talented** [3] - 292:22, 340:1, 341:20
**talks** [2] - 382:3, 397:12
**Tampa** [1] - 272:14
**tape** [3] - 412:24, 412:25, 416:4
**taught** [1] - 365:23

**teaching** [1] - 491:5
**team** [32] - 272:4, 276:15, 278:3, 284:24, 289:10, 292:25, 333:25, 336:22, 337:1, 337:2, 337:3, 339:2, 339:5, 339:7, 339:13, 339:16, 339:18, 339:19, 339:20, 339:25, 340:2, 340:17, 340:24, 341:5, 341:14, 341:17, 341:19, 341:23, 342:6, 343:19, 343:20
**tear** [1] - 429:3
**technical** [13] - 350:16, 350:17, 356:16, 365:12, 365:14, 374:21, 409:11, 411:23, 424:14, 433:10, 492:2, 492:5, 492:7
**technically** [1] - 254:7
**Technologies** [3] - 267:8, 300:8, 351:15
**TECHNOLOGIES** [1] - 243:8
**technology** [27] - 269:24, 270:13, 270:16, 273:16, 284:22, 290:6, 293:18, 293:23, 293:25, 294:2, 294:4, 294:6, 295:18, 319:25, 320:6, 320:8, 320:11, 320:15, 320:17, 338:13, 370:17, 448:15, 497:25, 500:14, 507:17, 507:18, 511:5
**Technology** [1] - 319:11
**tedious** [1] - 382:7
**telecom** [1] - 303:6
**telephony** [1] - 350:19
**Telular** [21] - 300:7, 302:8, 327:18, 327:19, 487:2, 500:3, 505:20, 505:22, 505:24, 506:2, 507:9, 507:12, 507:19, 507:23, 508:15, 508:16, 508:25, 515:20

**temperature** [3] - 467:11, 468:2, 468:6
**ten** [10] - 273:20, 275:17, 278:6, 291:16, 323:3, 349:3, 349:4, 349:8, 349:12, 466:19
**tens** [2] - 343:11, 508:19
**term** [6] - 273:8, 280:10, 373:10, 374:1, 451:22, 482:21
**terminology** [1] - 348:7
**terms** [25] - 244:20, 245:4, 256:10, 256:16, 257:21, 282:1, 341:18, 345:2, 372:2, 372:6, 376:8, 405:9, 459:21, 464:12, 473:4, 473:8, 483:3, 503:13, 503:17, 506:8, 508:2, 509:18, 515:1, 517:15
**test** [8] - 421:16, 421:17, 434:9, 439:11, 442:9, 442:13, 443:12, 443:19
**tested** [6] - 428:2, 428:3, 431:19, 441:1, 444:5, 455:25
**testified** [6] - 261:11, 294:22, 296:8, 311:8, 319:1, 366:20
**testify** [5] - 260:23, 366:22, 490:5, 492:6, 492:15
**testifying** [1] - 366:19
**testimony** [72] - 245:24, 246:11, 246:13, 247:18, 248:1, 248:17, 249:5, 249:18, 249:19, 249:20, 249:23, 250:1, 250:14, 250:19, 250:22, 251:22, 251:23, 251:25, 253:16, 253:18, 258:18, 259:8, 259:16, 259:23, 260:6, 266:12, 271:9, 294:15, 295:4, 326:9, 332:16, 333:16, 336:7, 345:24,

363:21, 364:21, 369:2, 369:4, 389:21, 394:22, 395:24, 396:3, 396:8, 396:24, 397:2, 397:3, 397:6, 400:15, 403:5, 406:7, 407:7, 407:10, 419:6, 421:25, 425:6, 427:17, 453:13, 476:24, 491:8, 492:11, 494:7, 498:7, 500:3, 500:4, 500:19, 501:16, 502:25, 504:5, 509:10, 510:1, 514:18

**testing** [1] - 387:12

**text** [1] - 344:5

**THE** [182] - 243:1, 243:2, 243:16, 244:12, 245:16, 245:19, 246:4, 246:16, 247:4, 248:11, 248:25, 249:7, 249:23, 250:2, 250:17, 251:6, 251:13, 251:18, 251:25, 252:3, 252:10, 252:23, 253:6, 254:3, 254:6, 254:25, 256:14, 256:19, 257:1, 257:4, 257:8, 257:13, 257:18, 258:4, 258:9, 258:11, 258:13, 258:20, 258:23, 259:2, 259:3, 259:5, 260:14, 263:25, 264:3, 266:8, 266:14, 270:21, 271:3, 271:4, 271:5, 271:7, 271:9, 271:13, 271:14, 271:17, 283:3, 285:14, 286:19, 287:19, 288:9, 294:9, 297:7, 300:24, 304:24, 306:15, 310:12, 310:19, 311:15, 312:16, 312:25, 314:6, 315:8, 316:12, 316:15, 318:9, 325:25, 329:22, 334:16, 334:23, 335:1, 335:2, 335:7,

335:10, 335:14, 335:16, 335:19, 336:2, 336:3, 336:5, 336:7, 336:11, 336:12, 344:2, 345:10, 347:14, 347:16, 347:18, 347:19, 348:2, 351:6, 351:12, 356:17, 362:18, 362:25, 363:3, 363:8, 363:12, 363:15, 363:18, 363:20, 363:21, 363:25, 364:1, 367:21, 369:10, 369:15, 369:20, 369:23, 369:24, 376:24, 378:10, 379:12, 379:15, 384:17, 399:10, 399:16, 399:19, 399:23, 400:4, 400:10, 400:16, 400:22, 401:5, 401:10, 405:20, 407:24, 466:6, 466:9, 466:13, 466:18, 466:23, 466:25, 467:6, 467:10, 467:15, 467:18, 467:21, 467:23, 467:25, 468:10, 468:11, 468:13, 469:19, 471:14, 471:15, 472:9, 473:25, 479:1, 486:3, 486:10, 486:13, 486:16, 487:15, 488:18, 488:20, 488:22, 489:2, 489:3, 489:5, 489:12, 491:12, 493:1, 493:3, 493:12, 516:6, 516:24, 517:1, 517:2, 517:14, 517:24, 518:3

**themselves** [2] - 368:16, 415:16

**therefore** [1] - 325:8

**thermostat** [1] - 279:23

**thermostats** [7] - 279:18, 344:18, 390:2, 392:18, 419:22, 475:23, 476:4

**they've** [3] - 257:24,

279:24

**thia** [1] - 499:23

**thinking** [4] - 252:5, 267:3, 273:4, 507:15

**thinks** [1] - 414:25

**third** [12] - 279:20, 301:4, 303:21, 303:22, 315:16, 317:3, 318:15, 321:5, 404:25, 460:25, 500:17

**third-party** [1] - 318:15

**thirty** [4] - 343:2, 343:7, 490:2, 490:12

**thirty-five** [1] - 490:12

**thirty-four** [1] - 490:2

**thorough** [1] - 274:7

**thousands** [3] - 319:7, 319:9, 343:11

**three** [41] - 247:11, 267:15, 275:3, 275:8, 275:13, 275:18, 276:8, 276:15, 278:15, 287:2, 307:25, 309:24, 314:17, 314:24, 315:25, 316:2, 316:24, 317:7, 319:10, 319:20, 322:13, 325:11, 355:5, 364:12, 368:25, 369:3, 372:4, 378:4, 381:24, 397:23, 404:20, 404:24, 420:6, 441:9, 441:11, 459:14, 481:12, 482:10, 496:25, 514:1, 517:6

**three-year** [1] - 514:1

**threshold** [1] - 274:7

**Thynge** [3] - 247:9, 254:12, 255:19

**tier** [2] - 475:6

**Tier** [4] - 344:14, 344:15, 344:17

**tiers** [1] - 473:19

**tilt** [2] - 462:20, 464:18

**timing** [2] - 341:6, 406:8

**tiny** [1] - 325:20

**Titanic** [1] - 468:3

**title** [2] - 348:19, 372:1

**today** [32] - 252:2, 269:1, 273:7, 274:22, 275:4, 275:6, 279:9, 280:13, 282:18, 282:19, 284:16,

293:11, 293:14, 303:8, 308:14, 327:13, 338:17, 340:18, 361:19, 364:21, 366:19, 368:14, 400:13, 436:9, 441:25, 447:12, 447:14, 452:4, 459:16, 468:7, 489:20, 501:5

**together** [11] - 277:12, 277:16, 342:2, 343:20, 346:9, 361:12, 380:16, 381:12, 477:24, 497:13, 508:6

**token** [1] - 421:24

**tomorrow** [8] - 245:13, 245:15, 252:2, 516:7, 516:21, 517:12, 517:15, 518:3

**took** [6] - 275:20, 335:17, 375:14, 407:1, 438:6, 515:8

**top** [16] - 264:13, 301:25, 306:23, 307:7, 308:23, 349:3, 349:4, 349:8, 349:12, 379:25, 390:25, 404:17, 431:24, 472:13, 481:15, 512:16

**topic** [1] - 259:9

**torture** [1] - 426:19

**Total** [4] - 329:9, 329:18, 329:20, 354:6

**total** [3] - 320:3, 344:22, 349:13

**totality** [1] - 422:8

**totals** [1] - 495:14

**touch** [3] - 373:24, 384:6, 460:1

**touching** [1] - 432:8

**Touchscreen** [2] - 387:17, 393:10

**touchscreen** [41] - 262:6, 262:9, 262:11, 368:4, 370:25, 371:2, 373:19, 382:25, 383:1, 383:7, 383:8, 383:10, 383:23, 384:5, 384:8, 386:23, 387:22, 388:5, 388:6, 388:8, 388:15, 388:16, 392:12, 393:1, 393:3, 393:22,

393:23, 394:6, 402:6, 432:3, 432:14, 448:4, 448:5, 448:8, 448:11, 459:25, 460:7, 460:12, 460:14, 460:20, 462:1

**touchscreens** [5] - 382:4, 388:1, 388:2, 459:10, 459:15

**towards** [1] - 375:20

**TPDX-43** [1] - 457:19

**track** [2] - 280:6, 288:25

**tracking** [1] - 419:14

**traded** [2] - 295:1, 296:16

**traditional** [1] - 338:15

**train** [1] - 282:15

**trained** [1] - 333:24

**training** [3] - 350:9, 350:10

**transaction** [2] - 247:13, 296:1

**transceiver** [1] - 420:18

**transcript** [4] - 248:16, 256:2, 301:3, 301:21

**transfer** [2] - 389:12, 461:9

**transferred** [3] - 312:13, 313:8, 392:4

**transferring** [1] - 483:1

**transfers** [1] - 426:20

**transmit** [1] - 274:1

**transmits** [1] - 424:11

**transmittal** [1] - 474:16

**tremendous** [1] - 292:14

**trial** [7] - 244:16, 245:5, 245:23, 247:21, 248:15, 266:18, 319:1

**TRIAL** [1] - 243:8

**Trial** [1] - 243:15

**trick** [1] - 436:17

**tried** [3] - 245:25, 246:1, 395:15

**tries** [1] - 306:3

**tripling** [1] - 514:2

**true** [18] - 276:23, 294:25, 296:13, 299:25, 300:17, 349:25, 355:11, 415:20, 426:11, 439:25, 440:7, 440:9, 440:22,

455:13, 456:19, 477:11, 483:14, 484:14
**Trundle** [32] - 271:2, 271:7, 271:22, 271:25, 272:25, 274:11, 282:23, 283:7, 284:11, 285:9, 285:17, 286:6, 286:23, 287:7, 287:22, 290:20, 294:12, 301:3, 304:7, 313:7, 326:4, 334:16, 334:17, 341:6, 343:3, 399:21, 400:9, 400:20, 400:24, 401:2, 514:18, 517:10
**trust** [2] - 303:21, 370:10
**truth** [10] - 271:11, 271:12, 296:24, 336:9, 336:10, 363:23, 363:24
**truthful** [5] - 296:21, 301:18, 302:20, 305:9, 305:20
**try** [12] - 247:9, 306:5, 339:21, 339:22, 341:2, 369:11, 382:8, 400:10, 400:11, 431:22, 500:25
**trying** [17] - 249:1, 249:8, 251:21, 257:10, 270:1, 277:1, 284:17, 289:11, 333:15, 432:11, 436:17, 456:5, 467:10, 468:1, 477:10, 477:23, 513:5
**Tuesday** [1] - 243:14
**TUNNELL** [1] - 244:2
**turn** [38] - 251:15, 263:10, 264:6, 264:9, 282:23, 291:13, 298:2, 298:22, 300:19, 301:21, 306:22, 308:3, 308:22, 310:6, 311:11, 312:9, 319:2, 320:14, 320:24, 327:6, 330:10, 332:2, 343:22, 351:17, 367:23, 374:18, 384:13, 390:21, 391:24,

419:15, 424:19, 433:3, 434:13, 450:16, 457:18, 473:21, 476:18, 516:4
**turned** [2] - 292:22, 506:5
**turning** [2] - 348:24, 425:12
**turns** [4] - 364:18, 390:11, 390:13, 410:22
**TV** [1] - 396:21
**twelve** [7] - 457:2, 483:12, 483:24, 484:3, 484:8, 484:12, 488:14
**twenty** [1] - 252:5
**twenty-four** [1] - 252:5
**twice** [1] - 310:11
**two** [34] - 247:11, 248:15, 255:4, 273:6, 274:15, 274:19, 278:15, 283:12, 285:21, 286:9, 312:10, 329:25, 331:1, 342:19, 347:23, 355:5, 368:9, 381:12, 398:6, 399:13, 402:1, 421:14, 427:9, 449:9, 451:2, 459:9, 460:10, 478:4, 491:5, 494:18, 495:17, 504:9, 506:12, 513:9
**two-day** [1] - 342:19
**type** [18] - 279:18, 334:12, 350:13, 366:4, 376:9, 380:7, 395:18, 398:10, 404:21, 410:2, 454:23, 486:24, 496:16, 499:15, 507:20, 511:7
**types** [14] - 273:15, 274:8, 274:24, 337:24, 371:10, 390:2, 395:7, 398:11, 409:10, 452:3, 492:19, 493:24, 494:16, 494:18
**typical** [3] - 246:24, 350:17, 494:18
**typically** [6] - 253:9, 279:19, 304:10, 306:1, 337:13, 343:18

## U

**U.S.D.C.J** [1] - 243:16
**UC** [1] - 449:11
**UCLA** [1] - 491:3
**uh-hmm** [1] - 352:15
**UI** [1] - 448:8
**ultimately** [2] - 306:9, 485:4
**unable** [1] - 455:5
**unclear** [1] - 254:18
**uncomfortable** [1] - 255:2
**under** [16] - 266:18, 315:16, 317:12, 319:6, 405:1, 426:6, 426:9, 433:25, 435:4, 437:2, 444:15, 458:1, 458:2, 471:2, 494:24, 501:21
**undercut** [1] - 513:5
**undergraduate** [1] - 272:15
**underlying** [2] - 292:1, 491:22
**understood** [8] - 249:10, 250:3, 252:9, 286:13, 327:4, 327:19, 372:3, 493:20
**unexpected** [1] - 337:17
**unique** [3] - 269:14, 269:16, 357:8
**unit** [2] - 283:15, 283:16
**UNITED** [1] - 243:1
**United** [5] - 300:8, 342:5, 349:4, 469:3, 490:5
**units** [6] - 283:12, 283:14, 284:15, 285:6, 285:21, 298:4
**University** [1] - 491:2
**unless** [2] - 408:20, 418:17
**unobjected** [2] - 249:25, 251:22
**unplugged** [1] - 427:3
**unscrew** [2] - 438:8, 438:10
**unsnap** [1] - 438:12
**untoward** [1] - 479:22
**unusual** [2] - 265:20, 265:22
**up** [92] - 245:14, 245:22, 246:15, 248:14, 248:23, 249:20, 250:22,

251:9, 251:11, 251:14, 252:8, 252:20, 256:7, 271:16, 278:3, 281:3, 288:24, 290:5, 295:15, 295:18, 295:25, 296:2, 299:17, 309:12, 315:14, 317:4, 333:14, 335:10, 338:18, 343:1, 344:6, 344:14, 344:20, 346:6, 354:25, 357:22, 364:23, 369:11, 369:25, 370:5, 375:4, 377:15, 378:18, 379:25, 386:16, 387:8, 391:9, 396:12, 401:18, 402:21, 409:5, 410:19, 413:1, 413:4, 413:6, 414:6, 415:17, 418:16, 423:21, 424:10, 429:22, 437:19, 441:18, 444:4, 444:5, 444:9, 456:21, 457:22, 458:16, 464:25, 465:18, 467:12, 467:22, 471:8, 472:13, 477:21, 478:2, 489:8, 498:6, 498:9, 498:11, 501:25, 504:20, 507:2, 512:5, 512:14, 513:15, 514:23, 515:2, 516:18, 517:25
**update** [3] - 357:18, 517:5, 517:9
**updates** [1] - 357:20
**upfront** [2] - 508:24, 508:25
**upgrade** [4] - 358:8, 405:2, 405:5, 406:4
**upgraded** [1] - 512:12
**upgrades** [3] - 354:17, 427:21, 427:22
**upgrading** [1] - 406:18
**upper** [5] - 348:9, 348:12, 371:8, 371:15, 381:10
**US** [2] - 319:7, 319:9
**useful** [2] - 479:17, 479:19
**user** [27] - 262:10,

309:10, 344:9, 362:9, 371:11, 372:10, 380:10, 387:9, 388:5, 388:16, 388:25, 389:12, 396:19, 412:11, 415:15, 415:19, 431:7, 434:3, 439:22, 440:3, 440:14, 443:22, 448:9, 461:8, 463:9, 474:20, 477:17
**user's** [2] - 446:12, 450:4
**users** [5] - 309:11, 445:7, 445:10, 447:17, 505:7
**uses** [5] - 402:7, 428:12, 428:17, 482:21, 500:14
**Utah** [1] - 361:3
**utilized** [1] - 391:4

## V

**valid** [2] - 495:24, 496:5
**validity** [3] - 268:16, 436:19, 499:9
**valuable** [2] - 332:6, 332:8
**Valuation** [2] - 333:7, 333:13
**valuation** [12] - 318:3, 318:22, 318:25, 319:2, 319:3, 319:16, 319:21, 325:9, 333:9, 333:17, 333:19, 490:3
**value** [13] - 318:12, 319:25, 321:3, 321:4, 321:23, 324:13, 331:13, 331:17, 331:19, 345:7, 458:9, 496:3, 501:22
**valued** [3] - 319:21, 320:11, 321:24
**Valued** [1] - 321:8
**variables** [1] - 471:20
**variant** [1] - 361:9
**various** [12] - 307:1, 368:3, 370:19, 390:12, 395:5, 396:20, 398:11, 399:6, 427:4, 468:25, 470:18, 490:2

**vast** [1] - 513:13
**vendors** [2] - 309:9, 361:10
**verdict** [3] - 244:20, 245:6, 245:10
**verified** [1] - 417:23
**Verizon** [1] - 483:24
**version** [1] - 442:12
**versions** [1] - 354:16
**via** [3] - 388:16, 398:2, 460:1
**vice** [7] - 274:22, 347:22, 468:21, 468:23, 469:8, 472:15, 473:10
**vice-president** [4] - 347:22, 468:21, 468:23, 469:8
**vicinity** [1] - 353:19
**Video** [2] - 348:3, 391:1
**video** [39] - 250:1, 344:19, 347:24, 348:1, 351:3, 353:13, 362:14, 362:23, 391:4, 391:7, 391:9, 392:7, 392:9, 400:13, 402:6, 435:16, 441:7, 445:20, 446:20, 456:12, 456:17, 461:13, 461:14, 461:19, 461:20, 464:8, 504:17, 504:18, 504:22, 505:3, 505:7, 505:15, 506:6, 510:1, 512:2, 512:13, 512:23, 513:14, 517:7
**videos** [1] - 347:23
**videotape** [9] - 258:18, 270:20, 351:1, 351:13, 356:13, 356:18, 362:12, 397:3, 425:6
**videotaped** [1] - 266:12
**Videotaped** [1] - 267:6
**view** [19] - 392:7, 392:8, 392:22, 405:12, 409:11, 410:13, 411:1, 413:15, 413:17, 415:12, 416:7, 422:20, 427:23, 429:13, 435:13, 462:2, 473:4, 503:23
**viewed** [4] - 495:24, 495:25, 497:12,

502:4
**viewing** [1] - 515:19
**Viewing** [1] - 391:1
**views** [1] - 463:20
**Virginia** [1] - 339:17
**virtual** [4] - 420:22, 421:8, 421:10, 421:11
**Vista** [2] - 404:18, 404:22
**visually** [1] - 402:16
**Vivint** [22] - 287:11, 287:25, 288:2, 500:13, 501:1, 501:7, 501:13, 501:24, 510:14, 510:17, 510:18, 510:20, 510:21, 510:23, 510:24, 511:2, 515:7, 515:9, 515:11, 515:16
**Vivint's** [1] - 515:12
**Vivint/Alarm.com** [1] - 511:7
**voice** [1] - 331:6, 464:8
**Volume** [1] - 243:15
**volume** [1] - 478:9
**VP** [3] - 349:21, 472:19, 473:3

---

## W

**wait** [5] - 252:8, 336:2, 401:3, 401:6, 509:17
**waiting** [1] - 401:2
**walk** [3] - 382:8, 418:12, 429:4
**wall** [1] - 338:17
**wants** [4] - 253:7, 419:20, 510:23, 517:16
**waste** [1] - 257:11
**watch** [7] - 266:9, 279:23, 289:2, 334:17, 347:17, 468:3, 488:19
**wave** [81] - 356:25, 361:18, 361:22, 361:23, 361:25, 362:2, 362:5, 362:7, 380:6, 380:21, 380:24, 383:14, 389:7, 389:10, 389:22, 389:25, 390:1, 390:5, 390:7, 390:20, 414:7, 414:15, 414:17, 415:10, 415:23, 431:2, 431:6,

431:20, 431:22, 431:24, 432:6, 432:12, 432:19, 432:21, 433:2, 433:22, 435:16, 454:2, 454:4, 454:7, 454:10, 454:11, 454:13, 454:14, 454:15, 454:17, 454:20, 454:22, 454:23, 454:25, 455:1, 455:2, 455:4, 455:15, 455:16, 455:17, 455:21, 455:23, 455:24, 455:25, 456:3, 456:9, 457:12, 457:15, 458:25, 461:16, 461:17, 474:24, 474:25, 475:3, 475:15, 475:17, 475:24, 476:1, 476:6, 476:7, 476:14, 477:7, 477:17, 504:17
**ways** [4] - 345:2, 385:21, 387:12, 509:19
**weather** [2] - 392:24, 470:25
**Webb** [5] - 347:21, 348:3, 348:21, 348:22, 350:23
**website** [3] - 348:5, 348:11, 348:15
**week** [2] - 292:19, 342:15
**weeks** [1] - 339:22
**weigh** [1] - 508:6
**weighed** [1] - 508:7
**welcome** [6] - 259:6, 335:20, 356:19, 401:10, 401:14, 468:1
**well-used** [2] - 377:20, 462:10
**wellness** [2] - 280:2, 280:3
**Wheelwright** [2] - 481:8, 482:7
**WHELAN** [13] - 244:7, 469:18, 471:13, 472:8, 473:13, 473:22, 474:3, 478:23, 479:3, 486:11, 486:14, 486:20, 487:14
**Whelan** [1] - 473:16
**whereby** [1] - 286:24
**Wherein** [1] - 423:10

**wherein** [14] - 383:1, 388:23, 388:24, 393:21, 402:6, 411:8, 423:1, 423:15, 423:17, 425:20, 426:20, 429:15, 429:18, 430:9
**whole** [4] - 271:11, 336:9, 342:11, 363:23
**wholly** [3] - 285:25, 295:11, 295:14
**wholly-owned** [3] - 285:25, 295:11, 295:14
**Wi** [11] - 380:21, 383:14, 387:10, 387:13, 389:25, 431:2, 454:2, 455:5, 456:11, 462:5, 476:4
**Wi-Fi** [11] - 380:21, 383:14, 387:10, 387:13, 389:25, 431:2, 454:2, 455:5, 456:11, 462:5, 476:4
**wide** [2] - 389:12, 461:9
**widget** [1] - 449:11
**widgets** [2] - 448:8, 448:10
**WiFi** [4] - 402:19, 404:7, 404:10, 424:3
**willfulness** [1] - 248:21
**William** [1] - 267:6
**willing** [7] - 473:7, 506:8, 506:9, 506:17, 506:22, 506:23, 507:21
**willingly** [1] - 508:12
**Wilmington** [2] - 243:13, 280:14
**Wilson** [22] - 351:10, 351:13, 351:14, 352:9, 352:20, 356:15, 356:19, 357:23, 358:12, 358:23, 359:2, 362:14, 362:23, 396:5, 396:6, 397:3, 397:5, 400:14, 400:16, 425:6, 425:8
**WILSON** [1] - 243:21
**Wilson's** [1] - 421:25
**win** [4] - 291:8, 291:18, 291:25, 306:5
**window** [11] - 279:24, 337:13, 373:13,

378:1, 378:5, 386:13, 396:21, 412:20, 412:21, 441:12, 452:8
**windows** [1] - 377:18
**Wink** [1] - 308:8
**winning** [1] - 512:1
**wire** [4] - 331:12, 438:16, 438:18, 438:25
**wired** [1] - 379:2
**wireless** [16] - 372:23, 379:1, 409:20, 410:4, 410:5, 411:2, 411:4, 417:4, 419:2, 419:4, 419:20, 420:17, 451:6, 451:17, 474:8, 474:9
**withdrawn** [1] - 257:24
**witness** [30] - 251:16, 257:10, 258:22, 258:23, 266:11, 266:20, 266:21, 271:2, 275:9, 325:24, 335:8, 345:9, 347:19, 363:2, 367:18, 369:9, 369:20, 376:23, 396:4, 407:23, 436:5, 444:7, 466:5, 466:17, 467:13, 467:14, 467:16, 467:18, 468:9, 488:25
**WITNESS** [16] - 259:3, 271:4, 271:7, 271:13, 316:12, 336:5, 336:11, 347:18, 363:20, 363:25, 369:23, 468:13, 471:15, 488:20, 489:5, 517:1
**witnesses** [8] - 247:23, 266:19, 335:6, 369:5, 400:5, 400:13, 400:14, 509:10
**won** [2] - 291:21, 485:21
**wonder** [1] - 278:1
**wondering** [4] - 252:11, 257:23, 276:21, 363:6
**word** [3] - 389:22, 437:7, 445:22
**words** [12] - 256:19, 295:13, 312:5, 313:11, 313:20,

314:23, 315:22, 374:12, 374:14, 437:4, 457:23, 503:21
**works** [4] - 340:3, 341:25, 405:8, 464:13
**world** [3] - 439:5, 439:16, 496:2
**worth** [1] - 244:13
**wow** [1] - 275:11
**wrap** [1] - 401:18
**write** [2] - 427:22, 448:9
**writing** [1] - 517:19
**written** [1] - 368:24
**wrote** [5] - 266:16, 349:20, 427:17, 483:19, 483:23
**WSP** [8] - 418:25, 419:12, 419:18, 420:18, 420:19, 420:21, 421:23

### X

**X's** [1] - 467:3
**XT** [7] - 338:2, 338:8, 338:11, 338:12, 338:20, 338:23, 358:8
**XTi** [18] - 358:8, 376:6, 377:11, 380:24, 387:20, 393:11, 393:14, 407:11, 437:17, 438:18, 438:23, 443:2, 444:2, 449:8, 453:7, 459:17, 460:14, 465:9

### Y

**year** [7] - 265:5, 272:10, 276:21, 278:20, 502:10, 514:1
**years** [25] - 247:11, 273:20, 275:21, 275:22, 276:15, 278:15, 278:22, 278:25, 290:4, 290:16, 291:16, 292:11, 355:5, 361:2, 366:24, 372:4, 374:16, 488:13, 490:2, 490:8, 490:12, 491:5, 514:17, 514:19

**yellow** [1] - 424:7
**yesterday** [10] - 245:23, 246:5, 248:9, 249:24, 253:19, 255:7, 259:8, 259:23, 260:23, 492:15
**yesterday's** [1] - 259:16
**Yoon** [15] - 245:20, 247:19, 248:11, 252:19, 253:7, 253:14, 253:19, 253:22, 256:6, 256:9, 258:13, 259:11, 259:13, 270:25, 481:4
**yOON** [1] - 271:21
**YOON** [105] - 243:22, 245:14, 248:13, 249:3, 249:10, 249:25, 250:3, 250:18, 251:11, 251:14, 251:20, 252:2, 252:9, 254:5, 254:7, 254:16, 255:25, 256:24, 257:2, 257:6, 258:14, 259:14, 259:15, 260:13, 263:24, 265:10, 266:7, 266:10, 271:1, 271:15, 271:19, 282:25, 283:6, 285:11, 285:16, 286:16, 286:22, 287:16, 287:21, 288:6, 288:11, 294:8, 297:6, 300:23, 304:23, 306:14, 310:8, 310:16, 310:18, 311:14, 312:14, 312:18, 312:22, 313:1, 314:5, 315:6, 316:14, 318:6, 318:8, 326:1, 326:3, 329:23, 334:15, 335:15, 399:24, 400:7, 401:1, 466:16, 466:24, 467:1, 467:12, 467:17, 467:19, 467:22, 468:8, 468:16, 469:16, 469:20, 469:23, 471:16, 472:6, 472:12, 473:11, 473:24, 478:25,

486:2, 486:5, 487:16, 487:18, 488:17, 488:24, 489:6, 489:11, 489:13, 489:14, 491:6, 491:13, 492:21, 493:2, 493:6, 493:20, 493:22, 516:4, 517:5, 518:2
**Yoon's** [1] - 248:7
**yourself** [13] - 271:24, 302:14, 302:17, 303:14, 303:18, 336:1, 336:18, 364:7, 367:14, 380:16, 433:6, 468:19, 489:15

### Z

**Z-wave** [80] - 356:25, 361:18, 361:22, 361:23, 361:25, 362:2, 362:5, 362:7, 380:21, 380:24, 383:14, 389:7, 389:10, 389:22, 389:25, 390:1, 390:5, 390:7, 390:20, 414:7, 414:15, 414:17, 415:10, 415:23, 431:2, 431:6, 431:20, 431:22, 431:24, 432:6, 432:12, 432:19, 432:21, 433:2, 433:22, 435:16, 454:2, 454:4, 454:7, 454:10, 454:11, 454:13, 454:14, 454:15, 454:17, 454:20, 454:22, 454:23, 454:25, 455:1, 455:2, 455:4, 455:15, 455:16, 455:17, 455:21, 455:23, 455:24, 455:25, 456:3, 456:9, 457:12, 457:15, 458:25, 461:16, 461:17, 474:24, 474:25, 475:3, 475:15, 475:17, 475:24, 476:1, 476:6, 476:7, 476:14, 477:7, 477:17, 504:17
**zero** [3] - 504:20, 505:4, 505:17

**zeros** [1] - 319:10
**Zone** [1] - 396:12
**zone** [5] - 396:20, 396:24, 421:18, 421:19, 421:24
**zones** [2] - 396:16, 396:20
**zoom** [1] - 462:20
**zwave** [7] - 399:7, 402:19, 404:7, 404:9, 424:2, 448:2
**Zwave** [1] - 395:11